# EXHIBIT K

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| GGC INTERNATIONAL LIMITED,<br><br>Plaintiff<br><br>v.<br><br>ROGER VER,<br><br>Defendant. | Index No. 650439/2023<br><br>Motion Seq. No. 001 |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFF / COUNTERCLAIM-DEFENDANT GGC INTERNATIONAL LIMITED'S MOTION TO DISMISS DEFENDANT / COUNTERCLAIM-PLAINTIFF ROGER VER'S COUNTERCLAIMS**

MORRISON COHEN LLP
Jason Gottlieb
Michael Mix
Vani Upadhyaya
909 Third Avenue
New York, New York 10022
(212) 735-8600

*Counsel for Plaintiff / Counterclaim-Defendant GGC International Limited*

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ..... 1

ARGUMENT ..... 3

I. THE BREACH OF CONTRACT COUNTERCLAIMS SHOULD BE DISMISSED ..... 3

A. Ver Failed to Comply with the ISDA Master Agreement's Conditions Precedent to Suit ..... 3

B. The Counterclaims Do Not Contain Sufficient Allegations of Insolvency ..... 8

II. THE FRAUD COUNTERCLAIMS SHOULD BE DISMISSED ..... 10

A. The Fraud Counterclaims Are Duplicative of the Breach of Contract Counterclaims ..... 10

B. Ver Has Failed to Allege Fraud With Particularity ..... 11

C. Ver Cannot State a Counterclaim for Fraudulent Omission ..... 12

D. Ver Cannot State a Counterclaim For Fraudulent Inducement When the Trades at Issue Occurred Before the Allegedly Fraudulent Conduct ..... 12

E. Ver Disclaimed Reliance on Extracontractual Representations ..... 14

CONCLUSION ..... 14

WORD COUNT CERTIFICATION ..... 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashwood Capital, Inc. v. OTG Mgmt., Inc.*,
99 A.D.3d 1 (1st Dep't 2012) ....................5

*Carlyle, LLC v. Quik Park 1633 Garage LLC*,
160 A.D.3d 476 (1st Dep't 2018) ....................9

*Cohn v. Lionel Corp.*,
21 N.Y.2d 559 (1968) ....................10

*Eagle Eye Collection Corp. v. Shariff*,
190 A.D.3d 600 (1st Dep't 2021) ....................9

*EVEMeta, LLC v. Siemens Convergence Creators Corp.*,
No. 651484/2016, 2018 N.Y. Misc. LEXIS 4445
(Sup. Ct. N.Y. Cnty. Oct. 4, 2018)....................10

*In re: Genesis Global Holdco, LLC, et al.*,
No. 23-10063 (SHL) (Bankr. S.D.N.Y.)....................8

*Genger v. Genger*,
No. 651089/2010, 2015 N.Y. Misc. LEXIS 29
(Sup. Ct. N.Y. Cnty. Jan. 7, 2015)....................12

*Goldin v. Tag Virgin Is. Inc.*,
No. 651021/2013, 2014 N.Y. Misc. LEXIS 2300
(Sup. Ct. N.Y. Cnty. May 20, 2014)....................11

*Goldin v. TAG Virgin Is., Inc.*,
149 A.D.3d 467 (1st Dep't 2017) ....................11

*Heth v. Van Riet*,
No. 651437/2011, 2011 N.Y. Misc. LEXIS 6973
(Sup. Ct., N.Y. Cnty. Nov. 29, 2011) ....................12

*Karabu Corp. v. Pension Benefit Guar. Corp.*,
No. 96 Civ. 4960 (BSJ), 1997 U.S. Dist. LEXIS 19582
(S.D.N.Y. Dec. 9, 1997)....................6

*Point Prods. A.G. v. Sony Music Entm't, Inc.*,
No. 93 Civ. 4001 (NRB), 2000 U.S. Dist. LEXIS 10066
(S.D.N.Y. July 19, 2000) ....................6

*Riback v. Margulis*,
43 A.D.3d 1023 (2d Dep't 2007) ....................9, 10

*Steadman v. Zappin*,
No. 150591/2017, 2018 N.Y. Misc. LEXIS 854
(Sup. Ct. N.Y. Cnty. Mar. 13, 2018) ....................7

*Volt Sys Dev. Corp. v. Raytheon Co.*,
155 A.D.2d 309 (1st Dep't 1989) ....................10

*Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*,
946 F.2d 1003 (2d Cir. 1991) ....................7

*XL Diamonds LLC v. Rosen*,
No. 656102/2019, 2020 N.Y. Misc. LEXIS 3368
(Sup. Ct. N.Y. Cnty. July 15, 2020) ....................7

**Statutes**

New York Debtor and Creditor Law § 273 ....................3, 9

New York Debtor and Creditor Law § 274 ....................9

New York Debtor and Creditor Law § 275 ....................9

**Other Authorities**

CPLR 3016 ....................11

CPLR 3211 ....................14

Plaintiff / Counterclaim-Defendant GGC International Limited ("GGC International") respectfully submits this reply memorandum of law in further support of its motion to dismiss (the "Motion") the May 9, 2023 Counterclaims (the "Counterclaims" or the "CC") filed by Defendant / Counterclaim-Plaintiff Roger Ver.

## PRELIMINARY STATEMENT

Ver's Opposition to the Motion (NYSCEF No. 28, the "Opposition" or the "Opp.") makes clear that his Counterclaims against GGC International are meritless and should be dismissed.

As described in GGC International's affirmative Complaint against Ver for breach of contract, Ver failed to settle certain cryptocurrency options with GGC International with expiration dates of December 30, 2022. As a result of Ver's breach of contract, Ver owes GGC International at least $20,689,788, plus interest that continues to accrue.

Ver attempts to circumvent his payment obligations to GGC International by alleging that at some point in 2022, GGC International became insolvent for some unspecified amount of time (notwithstanding that GGCI International has never filed for any insolvency), and such insolvency was a breach of the 2002 ISDA Master Agreement (the "ISDA Master Agreement") to which the Parties entered through the June 22, 2020 Amended and Restated Master Confirmation Agreement for Virtual Currency Put and Call Options Transactions (the "Master Confirmation Agreement").

As explained in GGC International's moving memorandum of law in support of its Motion (NYSCEF No. 24, the "Moving Brief" or the "Moving Br."), Ver's claim that he should not have to pay GGC International because it was insolvent is both nonsensical and not supported by the relevant contracts.

The ISDA Master Agreement provides a very detailed contractual process if an "Event of Default" occurs. Following that process is a condition precedent to suit. The Opposition effectively concedes that Ver did not follow those procedures; indeed, the first time that Ver ever notified GGC International that he believed that an "Event of Default" occurred was in this litigation. The Opposition argues that Ver should be excused from following those contractual procedures because he allegedly did not learn about the supposed insolvency until late 2022 or early 2023, and because GGC International terminated the contracts due to Ver's failure to settle the trades. But the unambiguous language of the contracts – including the ISDA Master Agreement, an industry-standard document – does not allow Ver to declare an Event of Default for something that allegedly happened many months earlier, and does not allow Ver to try and put the Parties back in the position they would have been in back then. Ver is seeking relief that is simply not permitted by the contracts.

Ver's breach of contract claims fail for the additional reason that he has not sufficiently pleaded that GGC International was ever insolvent. It is uncontested that GGC International has never been the debtor in any bankruptcy or insolvency proceeding, either in mid-2022 or now (as opposed to other Genesis-related entities, some of which are currently debtors in a bankruptcy proceeding). It is uncontested that GGC International has never failed to pay any debts. The Counterclaims affirmatively plead that GGC International provided information to Ver showing positive equity, which Ver concedes in his Opposition. Simply put, Ver's own pleadings confirm that GGC International was never insolvent.

Nevertheless, Ver speculates that a hypothetical auditor might, in light of volatile market conditions and the illiquid nature of some of the assets, mark down the value of those assets, so if he squints hard enough, he can make out insolvency. That is insufficient. Ver provides no information as to what the value of those assets actually are. Under analogous cases under New York Debtor and Creditor Law (the "DCL") § 273, one cannot state a claim for insolvency without sufficient allegations of what the value of the assets and liabilities are. Even under a notice pleading standard, Ver's allegations do not suffice. The law is clear, but so is the reason for that law: if Ver's view of the law on this point were correct, any defendant who owes money under the ISDA Master Agreement could allege that the counterparty was insolvent, thus excusing payment. Neither the ISDA Master Agreement, nor New York law, work that way.

Finally, the Opposition does not rebut the Moving Brief's numerous arguments for why Ver's fraud and fraudulent inducement counterclaims should be dismissed.

Despite Ver's protestations to the contrary, his Counterclaims are a transparent attempt to avoid his payment obligations. The Counterclaims should be dismissed, and this litigation should proceed only with GGC International's affirmative claims against Ver.

## ARGUMENT

## I. THE BREACH OF CONTRACT COUNTERCLAIMS SHOULD BE DISMISSED

### A. Ver Failed to Comply with the ISDA Master Agreement's Conditions Precedent to Suit

The Moving Brief contains a detailed explanation of how Ver failed to follow the ISDA Master Agreement's conditions precedent to suit. Moving Br. at 11-15. Ver alleges that at some undetermined point in time around June 2022, GGC International became insolvent, which was an

"Event of Default" under the ISDA Master Agreement.[1]  Section 6(a) of the ISDA Master
Agreement provides that "[i]f at any time an Event of Default . . . has occurred and is then
continuing, the other party may, by not more than 20 days notice to the Defaulting Party specifying
the relevant Event of Default, designate" an "Early Termination Date in respect to all outstanding
Transactions," which will "occur on the date so designated."  ISDA Master Agreement §§ 6(a),
(c).  The ISDA Master Agreement then contains a detailed process for the Parties to calculate the
amount owed, which would vary with market conditions, and provide a "statement" showing how
much is owed.  ISDA Master Agreement §§ 6(d)-(f).

Regardless of the veracity of Ver's insolvency allegations – which GGC International
continues to deny – Ver never alleges that any Event of Default was "continuing," which triggers
the contractual provisions above.  Ver does not allege that he ever provided notice to GGC
International "specifying the relevant Event of Default."  He does not allege that he ever designated
an "Early Termination Date."

Ver does not contest that he failed to follow these procedures.  Instead, he spends multiple
pages arguing that it would have been "futile" to do so because he only found out about GGC
International's alleged insolvency in late 2022 or early 2023, after GGC International designated
an Early Termination Date due to Ver's failure to settle the cryptocurrency options trades at issue.
Opp. at 4-12.

Ver is wrong.  In order to declare an Early Termination Date, the Event of Default in
question must be "continuing."  If a party to the ISDA Master Agreement becomes insolvent, and

---

[1]        Ver also alleges that it was an "Event of Default" for GGC International to make a misrepresentation to Ver
about its solvency, and all of GGC International's arguments apply equally to this contention.

then becomes solvent again, the contractual mechanics do not permit the other party cannot to later declare a backdated Early Termination Date.

If Ver really did learn about the alleged insolvency in late 2022 or early 2023, and such insolvency was continuing, Ver could have followed the requirements of the contracts, declared an Early Termination Date, and paid what was owed to GGC International "in respect of the outstanding Transactions." But Ver, upon his own allegations, did not do so. (The reason he did not do so, undoubtedly, is that if he had, he would have owed as much, or more, as is stated in the Complaint.)

Instead, Ver is attempting to circumvent his payment obligations now by asserting that an Event of Default occurred at some point in the past. He claims that he does not have to follow the ISDA Master Agreement because he only found out about GGC International's alleged insolvency months after the fact. He claims that, due to that Event of Default, he can go back and time and put the parties back in the same position that they were in several months earlier.

The ISDA Master Agreement does not allow such gamesmanship. As noted in the Moving Brief, contracts mean what they say, and "courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include." *Ashwood Capital, Inc. v. OTG Mgmt., Inc.*, 99 A.D.3d 1, 7 (1st Dep't 2012) (citation omitted). *See also* Moving Br. at 11 (citing cases). Ver is effectively asking the court to ignore the plain language of the parties' agreements to create a new remedy for him, which is nonsensical and obviously not permitted under New York law. *See Ashwood*, 99 A.D.3d at 7 (courts "may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing").

The timing set forth in the ISDA Master Agreement – entered prior to the alleged insolvency – is critical. Because the assets being traded have a constantly changing market price, it is not possible to pick a historical date to unwind the relationship and put the parties back several months in the past. Moreover, as explained in the Moving Brief, because the market price of cryptocurrency assets is constantly changing, the non-defaulting party cannot designate an Early Termination Date more than twenty days into the future under Section 6(a) of the ISDA Master Agreement. Moving Br. at 14. Simply put, Ver is putting forth an interpretation of the ISDA Master Agreement that is completely contradicted by the plain, unambiguous language of the contract. The ISDA Master Agreement contains conditions precedent to suit, including a very particular contractual mechanism. Ver did not follow those strictures.

Ver cites case law for the proposition that a non-defaulting party does not need to provide notice and a cure period where "it would be futile." Opp. at 6. But GGC International is not arguing that Ver did not give it sufficient time to cure; GGC International is arguing that Ver failed to follow the contract's conditions precedent to suit, including that the Event of Default be "continuing." Even the cases cited by Ver make clear that only in "limited circumstances" can the "terminating party . . . terminate immediately, without affording the non-performing party notice and an opportunity to cure." *Point Prods. A.G. v. Sony Music Entm't, Inc.*, No. 93 Civ. 4001 (NRB), 2000 U.S. Dist. LEXIS 10066, at *13 (S.D.N.Y. July 19, 2000). Those "limited circumstances" include where the non-performing party "(1) expressly repudiates the parties' contract, or (2) abandons performance thereunder." *Id.* at *15 (internal citations omitted). There are no allegations that GGC International repudiated the contract or abandoned it. Indeed, in *Point Prods.* and *Karabu Corp. v. Pension Benefit Guar. Corp.*, No. 96 Civ. 4960 (BSJ), 1997 U.S. Dist.

LEXIS 19582, at *33 (S.D.N.Y. Dec. 9, 1997), both cited in the Opposition, the court found that the non-terminating party did not abandon or repudiate the contract, and thus did not excuse the terminating party's failure to give notice or a cure period. Ver also cites *Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*, 946 F.2d 1003, 1009 (2d Cir. 1991), but there, providing a cure period would have been a "useless act" because the non-terminating party abandoned performance under the contract. There are no similar allegations here.

Ver further admits that even if his unsupported theory is true that the Parties can be put back to June 2022, "[d]epending on the date of GGCI's insolvency, Ver may rightfully owe GGCI sums under the contract and is prepared to make the necessary payments." Opp. at 9-10. Ver owed GGC International significant sums of money – even more than GGC International is seeking in the litigation – at all times from the date of the alleged insolvency to the date of Ver's default. Thus, Ver's statement contradicts his Counterclaims allegations that his damages are over $20,000,000, CC ¶¶ 238, 246, 254, 262, and illustrates his failure to plead damages, a separate basis to dismiss his contract claims. *See XL Diamonds LLC v. Rosen*, No. 656102/2019, 2020 N.Y. Misc. LEXIS 3368, at *8 (Sup. Ct. N.Y. Cnty. July 15, 2020) ("where a plaintiff fails to allege any 'damages flowing from the breach allege[s] and relies, instead, on wholly speculative theories of damages, dismissal of the breach of contract claim is in order'"); *Steadman v. Zappin*, No. 150591/2017, 2018 N.Y. Misc. LEXIS 854, at *7 (Sup. Ct. N.Y. Cnty. Mar. 13, 2018) ("Without a clear demonstration of damages, there can be no claim for breach of contract").

### B. The Counterclaims Do Not Contain Sufficient Allegations of Insolvency

Ver's Opposition underscores that he has not pleaded sufficient allegations that GGC International was ever insolvent.[2] Ver does not contest that GGC International has never filed for bankruptcy,[3] has never been involuntarily put into an insolvency proceeding, has never been unable to pay its debts, and has never admitted such inability in writing. Moving Br. at 15-16.[4]

In support of his theory that GGC International was insolvent, the Opposition points to two unaudited statements of financial condition (each, an "SOFC") that GGC International voluntarily provided to Ver. Yet, the Opposition admits that both SOFCs "showed extremely thin positive equity" (emphasis added). Indeed, the Counterclaims allege that one SOFC showed positive equity of over $100 million and the other showed positive equity of $14 million. CC ¶¶ 177, 204. In other words, the Counterclaims affirmatively allege that GGC International was solvent; its assets were greater than its liabilities. The Opposition's abject speculation that due to the illiquid nature of the assets and the lack of liquidity in the market in general, some hypothetical auditor might have applied a discount to GGC International's assets, marking their value down to some undetermined value, cannot be countenanced, even on a notice pleading standard.

---

[2] The Opposition incorrectly states that GGC International argued that there is a heightened pleading standard in breach of contract cases. Opp. at 12-13. GGC International has made no such claim.

[3] Some other Genesis entities (Genesis Global Holdco, LLC, Genesis Global Capital, LLC, and Genesis Asia Pacific Pte. Ltd.) are debtors in a bankruptcy proceeding. *See* CC ¶ 67; *In re: Genesis Global Holdco, LLC, et al.*, No. 23-10063 (SHL) (Bankr. S.D.N.Y.). But several other Genesis entities, including GGC International, are not now and have never been debtors in any proceeding, because they have never been insolvent.

[4] Ver asserts that "GGCI's insolvency, whenever it may have occurred, meant that Ver would not be paid if his options trades were successful, as GGCI simply would not have the assets to meet their obligations and could/would file for bankruptcy protection." Opp. at 8. But there are no allegations in the Counterclaims that GGC International would not have sufficient assets to pay its debts such that it would have had to file for bankruptcy protection, even if technically "insolvent" under Ver's definition.

The Moving Brief cites several cases dismissing causes of action under DCL § 273 for failure to sufficiently plead insolvency. Moving Br. at 17 (citing cases). Contrary to Ver's argument that these cases are inapplicable, Opp. at 13, these cases are analogous because like here, in order to state a claim, the plaintiff must sufficiently plead that the defendant was insolvent. Indeed, neither Ver's breach of contract Counterclaims nor claims under DCL § 273 contain a heightened pleading requirement, underscoring the appropriateness of the analogy. *See Carlyle, LLC v. Quik Park 1633 Garage LLC*, 160 A.D.3d 476, 477 (1st Dep't 2018) (no heightened pleading standard for DCL § 273 claims). These cases uniformly show that conclusory allegations of insolvency do not suffice, particularly where the plaintiff does not make adequate allegations regarding the actual value of the assets in question. *See* Moving Br. at 17 (citing cases).[5]

Ver also mischaracterizes *Eagle Eye Collection Corp. v. Shariff*, 190 A.D.3d 600 (1st Dep't 2021), a case cited in the Moving Brief, in which the First Department affirmed dismissal of a DCL § 273 claim due to "conclusory allegations of insolvency" the same reason to dismiss Ver's Counterclaims. The Opposition contends that because the First Department in *Eagle Eye* cited *Riback v. Margulis*, 43 A.D.3d 1023 (2d Dep't 2007), then "GGCI must show that Ver's allegations of their insolvency are 'flatly contradicted by the record,' which is simply not the case." Opp. at 14. But neither case holds that the only way for a claim of insolvency to be dismissed at the pleading stage is for the defendant to show that the allegations of insolvency are "flatly contradicted by the record." To the contrary, in both cases, the insolvency claims were dismissed due to conclusory and speculative allegations, *Eagle Eye Collection Corp.*, 190 A.D.3d at 602;

---

5 The Opposition references DCL §§ 274 and 275, but neither statute concerns insolvency (despite Ver's argument that "§ 274 also references insolvency in the statute," Opp. at 14), and the Moving Brief doesn't make any arguments concerning those irrelevant statutes.

*Riback*, 43 A.D.3d at 1023. Ver's conclusory and speculative allegations of insolvency should suffer the same fate.

## II. THE FRAUD COUNTERCLAIMS SHOULD BE DISMISSED

### A. The Fraud Counterclaims Are Duplicative of the Breach of Contract Counterclaims

Longstanding New York law provides that a fraud claim will be dismissed if it duplicates a claim for breach of contract with respect to facts alleged and damages sought. The Moving Brief cites numerous cases, including very recent cases from the First Department, dismissing fraud claims as duplicative of contract claims. Moving Br. at 17-18. Indeed, even a case relied upon by Ver in the Opposition – cited for a different proposition – dismissed fraud claims as duplicative of breach of contract claims. *See EVEMeta, LLC v. Siemens Convergence Creators Corp.*, No. 651484/2016, 2018 N.Y. Misc. LEXIS 4445, at *19-20 (Sup. Ct. N.Y. Cnty. Oct. 4, 2018).

Ver does not contest this long line of case law. Instead, Ver makes the uncontroversial statement that a plaintiff is allowed to allege "inconsistent theories" and to plead in the alternative. Opp. at 16-17. But Ver's Counterclaims fail for the exact opposite reason – Ver pleads the exact same legal theories, set of facts, and quantum of damages as in his four breach of contract claims. Moving Br. at 18-19. Thus, Ver's argument that his fraud claims "are merely alternative causes of action to the breach of contract claims," Opp. at 17, should be rejected.[6]

---

[6] Neither case cited by Ver involves a situation where the plaintiff pleaded a duplicative fraud and breach of contract claim, as Ver did here. *Cohn v. Lionel Corp.,* 21 N.Y.2d 559, 563 (1968); *Volt Sys Dev. Corp. v. Raytheon Co.*, 155 A.D.2d 309, 309 (1st Dep't 1989).

**B. Ver Has Failed to Allege Fraud With Particularity**

Ver does not dispute that claims for fraud must be pleaded with particularity under CPLR 3016(b). Moving Br. at 19-20. The Moving Brief explains how the Counterclaims do not contain any affirmative misrepresentations, let alone any affirmative misrepresentations pleaded with particularity. The Counterclaims do not allege that either of the SOFCs was incorrect, only that a hypothetical auditor might have come to a different conclusion as to GGC International's solvency.

The Opposition claims that "224 paragraphs making up Ver's counterclaim provide substantial factual allegations regarding the specific misrepresentations or omissions made, the dates that they were made, the motive or intent of GGCI in making those intentional misrepresentations, and the resulting damages suffered as a result of GGCI's actions." Opp. at 18. Tellingly, however, the Opposition does not list a single example of any of the supposed "substantial" misrepresentations. There are none.

*Goldin v. TAG Virgin Is., Inc.*, 149 A.D.3d 467 (1st Dep't 2017), cited by Ver, Opp. at 17, is inapposite. Although the First Department decision does not list the allegations of fraud that it found sufficient under CPLR 3016(b), the Supreme Court decision states that the complaint alleged, *inter alia*, that the defendants, "while acting as investment advisors . . . supplied fraudulent and inadequate information to the Plaintiffs with respect to the holds in their accounts." *Goldin v. Tag Virgin Is. Inc.*, No. 651021/2013, 2014 N.Y. Misc. LEXIS 2300, at *31 (Sup. Ct. N.Y. Cnty. May 20, 2014) (ellipses in original). There are no non-conclusory allegations in the Counterclaims that GGC International provided incorrect information to Ver.

Ver fares no better with his citation to *EVEMeta* (where, as noted above, the court ultimately dismissed the fraud claims as duplicative of the contract claims). There, unlike here,

during negotiations with the plaintiff, the defendants allegedly made misrepresentations of fact that they were working towards a particular agreement, when in fact the defendants were allegedly working to cut the defendant out of the deal. *EVEMeta, LLC*, 2018 N.Y. Misc. LEXIS 4445, at *16-18.

### C.   Ver Cannot State a Counterclaim for Fraudulent Omission

The Opposition states that his Counterclaims "provide substantial factual allegations regarding the specific . . . omissions made." Opp. at 18. However, as explained in the Moving Brief, in order to state a claim for fraudulent omission, there must be a fiduciary relationship between the parties. Moving Br. at 20-21 (citing cases). There is no fiduciary relationship between the Parties, who were negotiating at arm's length. *See* Moving Br. at 20-21. The Parties even represented in the Master Confirmation Agreement that they were not acting as a fiduciary for the other party. Moving Br. at 21.

Ver does not address this argument. He just ignores it, and is thus deemed to have conceded it. *See Genger v. Genger*, No. 651089/2010, 2015 N.Y. Misc. LEXIS 29, at *29 (Sup. Ct. N.Y. Cnty. Jan. 7, 2015) ("In their opposition brief, [cross-claim plaintiffs] do not address or contest the argument, and thus are deemed to have conceded it"); *Heth v. Van Riet*, No. 651437/2011, 2011 N.Y. Misc. LEXIS 6973, at *7 (Sup. Ct., N.Y. Cnty. Nov. 29, 2011) ("Van Riet has not responded to this argument. The claim shall be deemed abandoned."). Accordingly, the Court should dismiss the fraud and fraudulent concealment claims to the extent they rely on any alleged omissions.

### D.   Ver Cannot State a Counterclaim For Fraudulent Inducement When the Trades at Issue Occurred Before the Allegedly Fraudulent Conduct

The Moving Brief explains how Ver cannot state a claim for fraudulent inducement because the three trades that GGC International allegedly induced occurred prior to the alleged

omissions comprising the claim. Moving Br. at 21. In response, Ver concedes that "GGCI may be correct that the rollover occurred a few days prior to their delivery of the misleading financial documents." Opp. at 18-19. Accordingly, Ver does not contest that the fraudulent inducement claim should be dismissed, as that claim pertains to the rollover of his options which led to the three cryptocurrency options trades comprising his claims.

Instead, Ver argues that the fraudulent inducement claim should proceed because he also alleges that "Ver made $60,000,000 in fraudulently inducement payments occurring after GGCI delivered the inaccurate documents and failed to disclose the issues with 3AC." Opp. at 19. The paragraph in the Counterclaims containing this allegation alleges that "[f]rom the date of his rollover, until those newly rolled over contracts expired, Ver made payments in excess of $60,000,000 to GGCI to maintain his positions, and had over $50,000,000 in collateral liquidated, that never would have paid to [GGC International] had they not omitted the material information regarding the 3AC margin call and liquidation."

In other words, Ver alleges that GGC International followed the contracts. The Master Confirmation Agreement, the ISDA Master Agreement, the Credit Support Annex,[7] and the Transaction Confirmations collectively provide for a very detailed process under which Ver provided collateral to GGC International in support of the amount that Ver already owed, and GGC International is permitted to liquidate collateral.[8] That is exactly what the Counterclaims allege

---

[7] The Credit Support Annex was not attached to GGC International's moving papers, but is attached as **Exhibit 6** to the July 28, 2023 Reply Affirmation of Alex van Voorhees.

[8] Indeed, as explained in GGC International's own affirmative claims against Ver, after Ver failed to settle the three options trades that comprise Ver's Counterclaims, GGC International set off the collateral that had been posted by Ver against the amount owed by Ver. *See* Compl. ¶ 47.

that GGC International did. The Counterclaims do not allege that any margin calls issued by GGC International were incorrect – let alone fraudulent, much less pleaded with sufficient particularity. Even if they did, such allegations would not suffice to state a claim for fraudulent inducement. GGC International is not aware of any case law for Ver's novel legal theory that he was induced into following the contracts, and Ver does not cite any such law.

### E. Ver Disclaimed Reliance on Extracontractual Representations

In the Master Confirmation Agreement, Ver disclaimed reliance on statements made by GGC International, represented that he would perform his own investigation, and acknowledged that cryptocurrency assets were volatile and unpredictable. Master Confirmation Agreement ¶¶ 9.a, 9.h, 9.h.i. Such disclaimers negate claims for fraud, and thus, both of Ver's fraud claims should be dismissed. Moving Br. at 22 (citing cases).

Ver ignores this argument. As explained above, Ver is thus deemed to have conceded it. The two fraud claims should be dismissed for lack of reliance.

## CONCLUSION

For the reasons cited herein, and the reasons set forth in the Moving Brief, the Court should issue an Order pursuant to CPLR 3211(a)(1) and 3211(a)(7) the Counterclaims in their entirety.

Dated: New York, New York
July 28, 2023

MORRISON COHEN LLP

By: *\/s/ Jason Gottlieb*

Jason Gottlieb
Michael Mix
Vani Upadhyaya
909 Third Avenue
New York, New York 10022
(212) 735-8600

*Counsel for Plaintiff / Counterclaim-Defendant GGC International Limited*

**WORD COUNT CERTIFICATION**

Pursuant to Rule 17 of subdivision (g) of section 202.70 of the Uniform Rules for the Supreme Court and County Court (Rules of Practice for the Commercial Division of the Supreme Court), I hereby certify that the total number of words in this memorandum of law, excluding the caption, signature block, and word count certification is 4,195.

Dated: New York, New York
July 28, 2023

*/s/ Jason Gottlieb*
Jason Gottlieb

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| GGC INTERNATIONAL LIMITED, Plaintiff v. ROGER VER, Defendant. | Index No. 650439/2023<br>Motion Seq. No. 001<br>**REPLY AFFIRMATION OF ALEX VAN VOORHEES** |

ALEX VAN VOORHEES, an attorney duly admitted to practice before the Courts of the State of New York, affirms the following to be true under penalties of perjury and pursuant to CPLR 2106:

1. I am an attorney and an authorized signatory for Plaintiff / Counterclaim-Defendant GGC International Limited ("GGC International"). I am fully familiar with the facts and circumstances contained in this affirmation.

2. I submit this reply affirmation in further support of GGC International's motion to dismiss the counterclaims of Defendant / Counterclaim-Plaintiff Roger Ver.

3. Attached hereto as **Exhibit 6** is a true and correct copy of the 1994 ISDA Credit Support Annex.

[*SIGNATURE APPEARS ON NEXT PAGE]*

Case 1:24-cv-01533-JPC Document 1-11 Filed 02/28/24 Page 23 of 39

Dated: New York, New York
July 27, 2023

ALEX VAN VOORHEES

**WORD COUNT CERTIFICATION**

Pursuant to Rule 17 of subdivision (g) of section 202.70 of the Uniform Rules for the Supreme Court and County Court (Rules of Practice for the Commercial Division of the Supreme Court), I hereby certify that the total number of words in this affirmation, excluding the caption, signature block, and word count certification is 106.

Dated: New York, New York
July 28, 2023

*/s/ Jason Gottlieb*
Jason Gottlieb

# Exhibit 6

**(Bilateral Form)** **(ISDA Agreements Subject to New York Law Only)**

International Swaps and Derivatives Association, Inc.

# CREDIT SUPPORT ANNEX

to the Schedule to the

………………………………………………………………………………….

dated as of ……………………….

between

………………………………………………………. and ……………………………………………………

("Party A") ("Party B")

This Annex supplements, forms part of, and is subject to, the above-referenced Agreement, is part of its Schedule and is a Credit Support Document under this Agreement with respect to each party.

Accordingly, the parties agree as follows:—

**Paragraph 1. Interpretation**

(a) ***Definitions and Inconsistency.*** Capitalized terms not otherwise defined herein or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 12, and all references in this Annex to Paragraphs are to Paragraphs of this Annex. In the event of any inconsistency between this Annex and the other provisions of this Schedule, this Annex will prevail, and in the event of any inconsistency between Paragraph 13 and the other provisions of this Annex, Paragraph 13 will prevail.

(b) ***Secured Party and Pledgor.*** All references in this Annex to the "Secured Party" will be to either party when acting in that capacity and all corresponding references to the "Pledgor" will be to the other party when acting in that capacity; *provided, however*, that if Other Posted Support is held by a party to this Annex, all references herein to that party as the Secured Party with respect to that Other Posted Support will be to that party as the beneficiary thereof and will not subject that support or that party as the beneficiary thereof to provisions of law generally relating to security interests and secured parties.

**Paragraph 2. Security Interest**

Each party, as the Pledgor, hereby pledges to the other party, as the Secured Party, as security for its Obligations, and grants to the Secured Party a first priority continuing security interest in, lien on and right of Set-off against all Posted Collateral Transferred to or received by the Secured Party hereunder. Upon the Transfer by the Secured Party to the Pledgor of Posted Collateral, the security interest and lien granted hereunder on that Posted Collateral will be released immediately and, to the extent possible, without any further action by either party.

Copyright © 1994 by International Swaps and Derivatives Association, Inc.

**Paragraph 3. Credit Support Obligations**

(a) ***Delivery Amount.*** Subject to Paragraphs 4 and 5, upon a demand made by the Secured Party on or promptly following a Valuation Date, if the Delivery Amount for that Valuation Date equals or exceeds the Pledgor's Minimum Transfer Amount, then the Pledgor will Transfer to the Secured Party Eligible Credit Support having a Value as of the date of Transfer at least equal to the applicable Delivery Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the ***"Delivery Amount"*** applicable to the Pledgor for any Valuation Date will equal the amount by which:

(i) the Credit Support Amount

exceeds

(ii) the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party.

(b) ***Return Amount.*** Subject to Paragraphs 4 and 5, upon a demand made by the Pledgor on or promptly following a Valuation Date, if the Return Amount for that Valuation Date equals or exceeds the Secured Party's Minimum Transfer Amount, then the Secured Party will Transfer to the Pledgor Posted Credit Support specified by the Pledgor in that demand having a Value as of the date of Transfer as close as practicable to the applicable Return Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the ***"Return Amount"*** applicable to the Secured Party for any Valuation Date will equal the amount by which:

(i) the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party

exceeds

(ii) the Credit Support Amount.

***"Credit Support Amount"*** means, unless otherwise specified in Paragraph 13, for any Valuation Date (i) the Secured Party's Exposure for that Valuation Date plus (ii) the aggregate of all Independent Amounts applicable to the Pledgor, if any, minus (iii) all Independent Amounts applicable to the Secured Party, if any, minus (iv) the Pledgor's Threshold; *provided, however*, that the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields a number less than zero.

**Paragraph 4. Conditions Precedent, Transfer Timing, Calculations and Substitutions**

(a) ***Conditions Precedent.*** Each Transfer obligation of the Pledgor under Paragraphs 3 and 5 and of the Secured Party under Paragraphs 3, 4(d)(ii), 5 and 6(d) is subject to the conditions precedent that:

(i) no Event of Default, Potential Event of Default or Specified Condition has occurred and is continuing with respect to the other party; and

(ii) no Early Termination Date for which any unsatisfied payment obligations exist has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the other party.

(b) ***Transfer Timing.*** Subject to Paragraphs 4(a) and 5 and unless otherwise specified, if a demand for the Transfer of Eligible Credit Support or Posted Credit Support is made by the Notification Time, then the relevant Transfer will be made not later than the close of business on the next Local Business Day; if a demand is made after the Notification Time, then the relevant Transfer will be made not later than the close of business on the second Local Business Day thereafter.

(c) ***Calculations.*** All calculations of Value and Exposure for purposes of Paragraphs 3 and 6(d) will be made by the Valuation Agent as of the Valuation Time. The Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) of its calculations not later than the Notification Time on the Local Business Day following the applicable Valuation Date (or in the case of Paragraph 6(d), following the date of calculation).

**(d) *Substitutions.***

(i) Unless otherwise specified in Paragraph 13, upon notice to the Secured Party specifying the items of Posted Credit Support to be exchanged, the Pledgor may, on any Local Business Day, Transfer to the Secured Party substitute Eligible Credit Support (the "Substitute Credit Support"); and

(ii) subject to Paragraph 4(a), the Secured Party will Transfer to the Pledgor the items of Posted Credit Support specified by the Pledgor in its notice not later than the Local Business Day following the date on which the Secured Party receives the Substitute Credit Support, unless otherwise specified in Paragraph 13 (the "Substitution Date"); *provided* that the Secured Party will only be obligated to Transfer Posted Credit Support with a Value as of the date of Transfer of that Posted Credit Support equal to the Value as of that date of the Substitute Credit Support.

**Paragraph 5. Dispute Resolution**

If a party (a "Disputing Party") disputes (I) the Valuation Agent's calculation of a Delivery Amount or a Return Amount or (II) the Value of any Transfer of Eligible Credit Support or Posted Credit Support, then (1) the Disputing Party will notify the other party and the Valuation Agent (if the Valuation Agent is not the other party) not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (2) subject to Paragraph 4(a), the appropriate party will Transfer the undisputed amount to the other party not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (3) the parties will consult with each other in an attempt to resolve the dispute and (4) if they fail to resolve the dispute by the Resolution Time, then:

(i) In the case of a dispute involving a Delivery Amount or Return Amount, unless otherwise specified in Paragraph 13, the Valuation Agent will recalculate the Exposure and the Value as of the Recalculation Date by:

(A) utilizing any calculations of Exposure for the Transactions (or Swap Transactions) that the parties have agreed are not in dispute;

(B) calculating the Exposure for the Transactions (or Swap Transactions) in dispute by seeking four actual quotations at mid-market from Reference Market-makers for purposes of calculating Market Quotation, and taking the arithmetic average of those obtained; *provided* that if four quotations are not available for a particular Transaction (or Swap Transaction), then fewer than four quotations may be used for that Transaction (or Swap Transaction); and if no quotations are available for a particular Transaction (or Swap Transaction), then the Valuation Agent's original calculations will be used for that Transaction (or Swap Transaction); and

(C) utilizing the procedures specified in Paragraph 13 for calculating the Value, if disputed, of Posted Credit Support.

(ii) In the case of a dispute involving the Value of any Transfer of Eligible Credit Support or Posted Credit Support, the Valuation Agent will recalculate the Value as of the date of Transfer pursuant to Paragraph 13.

Following a recalculation pursuant to this Paragraph, the Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) not later than the Notification Time on the Local Business Day following the Resolution Time. The appropriate party will, upon demand following that notice by the Valuation Agent or a resolution pursuant to (3) above and subject to Paragraphs 4(a) and 4(b), make the appropriate Transfer.

**Paragraph 6. Holding and Using Posted Collateral**

(a) ***Care of Posted Collateral.*** Without limiting the Secured Party's rights under Paragraph 6(c), the Secured Party will exercise reasonable care to assure the safe custody of all Posted Collateral to the extent required by applicable law, and in any event the Secured Party will be deemed to have exercised reasonable care if it exercises at least the same degree of care as it would exercise with respect to its own property. Except as specified in the preceding sentence, the Secured Party will have no duty with respect to Posted Collateral, including, without limitation, any duty to collect any Distributions, or enforce or preserve any rights pertaining thereto.

(b) ***Eligibility to Hold Posted Collateral; Custodians.***

(i) ***General.*** Subject to the satisfaction of any conditions specified in Paragraph 13 for holding Posted Collateral, the Secured Party will be entitled to hold Posted Collateral or to appoint an agent (a "Custodian") to hold Posted Collateral for the Secured Party. Upon notice by the Secured Party to the Pledgor of the appointment of a Custodian, the Pledgor's obligations to make any Transfer will be discharged by making the Transfer to that Custodian. The holding of Posted Collateral by a Custodian will be deemed to be the holding of that Posted Collateral by the Secured Party for which the Custodian is acting.

(ii) ***Failure to Satisfy Conditions.*** If the Secured Party or its Custodian fails to satisfy any conditions for holding Posted Collateral, then upon a demand made by the Pledgor, the Secured Party will, not later than five Local Business Days after the demand, Transfer or cause its Custodian to Transfer all Posted Collateral held by it to a Custodian that satisfies those conditions or to the Secured Party if it satisfies those conditions.

(iii) ***Liability.*** The Secured Party will be liable for the acts or omissions of its Custodian to the same extent that the Secured Party would be liable hereunder for its own acts or omissions.

(c) ***Use of Posted Collateral.*** Unless otherwise specified in Paragraph 13 and without limiting the rights and obligations of the parties under Paragraphs 3, 4(d)(ii), 5, 6(d) and 8, if the Secured Party is not a Defaulting Party or an Affected Party with respect to a Specified Condition and no Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then the Secured Party will, notwithstanding Section 9-207 of the New York Uniform Commercial Code, have the right to:

(i) sell, pledge, rehypothecate, assign, invest, use, commingle or otherwise dispose of, or otherwise use in its business any Posted Collateral it holds, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor; and

(ii) register any Posted Collateral in the name of the Secured Party, its Custodian or a nominee for either.

For purposes of the obligation to Transfer Eligible Credit Support or Posted Credit Support pursuant to Paragraphs 3 and 5 and any rights or remedies authorized under this Agreement, the Secured Party will be deemed to continue to hold all Posted Collateral and to receive Distributions made thereon, regardless of whether the Secured Party has exercised any rights with respect to any Posted Collateral pursuant to (i) or (ii) above.

(d) ***Distributions and Interest Amount.***

(i) ***Distributions.*** Subject to Paragraph 4(a), if the Secured Party receives or is deemed to receive Distributions on a Local Business Day, it will Transfer to the Pledgor not later than the following Local Business Day any Distributions it receives or is deemed to receive to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose).

(ii) ***Interest Amount.*** Unless otherwise specified in Paragraph 13 and subject to Paragraph 4(a), in lieu of any interest, dividends or other amounts paid or deemed to have been paid with respect to Posted Collateral in the form of Cash (all of which may be retained by the Secured Party), the Secured Party will Transfer to the Pledgor at the times specified in Paragraph 13 the Interest Amount to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose). The Interest Amount or portion thereof not Transferred pursuant to this Paragraph will constitute Posted Collateral in the form of Cash and will be subject to the security interest granted under Paragraph 2.

**Paragraph 7. Events of Default**

For purposes of Section 5(a)(iii)(1) of this Agreement, an Event of Default will exist with respect to a party if:

(i) that party fails (or fails to cause its Custodian) to make, when due, any Transfer of Eligible Collateral, Posted Collateral or the Interest Amount, as applicable, required to be made by it and that failure continues for two Local Business Days after notice of that failure is given to that party;

(ii) that party fails to comply with any restriction or prohibition specified in this Annex with respect to any of the rights specified in Paragraph 6(c) and that failure continues for five Local Business Days after notice of that failure is given to that party; or

(iii) that party fails to comply with or perform any agreement or obligation other than those specified in Paragraphs 7(i) and 7(ii) and that failure continues for 30 days after notice of that failure is given to that party.

**Paragraph 8. Certain Rights and Remedies**

(a) ***Secured Party's Rights and Remedies.*** If at any time (1) an Event of Default or Specified Condition with respect to the Pledgor has occurred and is continuing or (2) an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Pledgor, then, unless the Pledgor has paid in full all of its Obligations that are then due, the Secured Party may exercise one or more of the following rights and remedies:

(i) all rights and remedies available to a secured party under applicable law with respect to Posted Collateral held by the Secured Party;

(ii) any other rights and remedies available to the Secured Party under the terms of Other Posted Support, if any;

(iii) the right to Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(iv) the right to liquidate any Posted Collateral held by the Secured Party through one or more public or private sales or other dispositions with such notice, if any, as may be required under applicable law, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor (with the Secured Party having the right to purchase any or all of the Posted Collateral to be sold) and to apply the proceeds (or the Cash equivalent thereof) from the liquidation of the Posted Collateral to any amounts payable by the Pledgor with respect to any Obligations in that order as the Secured Party may elect.

Each party acknowledges and agrees that Posted Collateral in the form of securities may decline speedily in value and is of a type customarily sold on a recognized market, and, accordingly, the Pledgor is not entitled to prior notice of any sale of that Posted Collateral by the Secured Party, except any notice that is required under applicable law and cannot be waived.

(b) ***Pledgor's Rights and Remedies.*** If at any time an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then (except in the case of an Early Termination Date relating to less than all Transactions (or Swap Transactions) where the Secured Party has paid in full all of its obligations that are then due under Section 6(e) of this Agreement):

(i) the Pledgor may exercise all rights and remedies available to a pledgor under applicable law with respect to Posted Collateral held by the Secured Party;

(ii) the Pledgor may exercise any other rights and remedies available to the Pledgor under the terms of Other Posted Support, if any;

(iii) the Secured Party will be obligated immediately to Transfer all Posted Collateral and the Interest Amount to the Pledgor; and

(iv) to the extent that Posted Collateral or the Interest Amount is not so Transferred pursuant to (iii) above, the Pledgor may:

(A) Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(B) to the extent that the Pledgor does not Set-off under (iv)(A) above, withhold payment of any remaining amounts payable by the Pledgor with respect to any Obligations, up to the Value of any remaining Posted Collateral held by the Secured Party, until that Posted Collateral is Transferred to the Pledgor.

(c) ***Deficiencies and Excess Proceeds.*** The Secured Party will Transfer to the Pledgor any proceeds and Posted Credit Support remaining after liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b) after satisfaction in full of all amounts payable by the Pledgor with respect to any Obligations; the Pledgor in all events will remain liable for any amounts remaining unpaid after any liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b).

(d) ***Final Returns.*** When no amounts are or thereafter may become payable by the Pledgor with respect to any Obligations (except for any potential liability under Section 2(d) of this Agreement), the Secured Party will Transfer to the Pledgor all Posted Credit Support and the Interest Amount, if any.

**Paragraph 9. Representations**

Each party represents to the other party (which representations will be deemed to be repeated as of each date on which it, as the Pledgor, Transfers Eligible Collateral) that:

(i) it has the power to grant a security interest in and lien on any Eligible Collateral it Transfers as the Pledgor and has taken all necessary actions to authorize the granting of that security interest and lien;

(ii) it is the sole owner of or otherwise has the right to Transfer all Eligible Collateral it Transfers to the Secured Party hereunder, free and clear of any security interest, lien, encumbrance or other restrictions other than the security interest and lien granted under Paragraph 2;

(iii) upon the Transfer of any Eligible Collateral to the Secured Party under the terms of this Annex, the Secured Party will have a valid and perfected first priority security interest therein (assuming that any central clearing corporation or any third-party financial intermediary or other entity not within the control of the Pledgor involved in the Transfer of that Eligible Collateral gives the notices and takes the action required of it under applicable law for perfection of that interest); and

(iv) the performance by it of its obligations under this Annex will not result in the creation of any security interest, lien or other encumbrance on any Posted Collateral other than the security interest and lien granted under Paragraph 2.

**Paragraph 10. Expenses**

(a) ***General.*** Except as otherwise provided in Paragraphs 10(b) and 10(c), each party will pay its own costs and expenses in connection with performing its obligations under this Annex and neither party will be liable for any costs and expenses incurred by the other party in connection herewith.

(b) ***Posted Credit Support.*** The Pledgor will promptly pay when due all taxes, assessments or charges of any nature that are imposed with respect to Posted Credit Support held by the Secured Party upon becoming aware of the same, regardless of whether any portion of that Posted Credit Support is subsequently disposed of under Paragraph 6(c), except for those taxes, assessments and charges that result from the exercise of the Secured Party's rights under Paragraph 6(c).

(c) ***Liquidation/Application of Posted Credit Support.*** All reasonable costs and expenses incurred by or on behalf of the Secured Party or the Pledgor in connection with the liquidation and/or application of any Posted Credit Support under Paragraph 8 will be payable, on demand and pursuant to the Expenses Section of this Agreement, by the Defaulting Party or, if there is no Defaulting Party, equally by the parties.

**Paragraph 11. Miscellaneous**

(a) ***Default Interest.*** A Secured Party that fails to make, when due, any Transfer of Posted Collateral or the Interest Amount will be obligated to pay the Pledgor (to the extent permitted under applicable law) an amount equal to interest at the Default Rate multiplied by the Value of the items of property that were required to be Transferred, from (and including) the date that Posted Collateral or Interest Amount was required to be Transferred to (but excluding) the date of Transfer of that Posted Collateral or Interest Amount. This interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(b) ***Further Assurances.*** Promptly following a demand made by a party, the other party will execute, deliver, file and record any financing statement, specific assignment or other document and take any other action that may be necessary or desirable and reasonably requested by that party to create, preserve, perfect or validate any security interest or lien granted under Paragraph 2, to enable that party to exercise or enforce its rights under this Annex with respect to Posted Credit Support or an Interest Amount or to effect or document a release of a security interest on Posted Collateral or an Interest Amount.

(c) ***Further Protection.*** The Pledgor will promptly give notice to the Secured Party of, and defend against, any suit, action, proceeding or lien that involves Posted Credit Support Transferred by the Pledgor or that could adversely affect the security interest and lien granted by it under Paragraph 2, unless that suit, action, proceeding or lien results from the exercise of the Secured Party's rights under Paragraph 6(c).

(d) ***Good Faith and Commercially Reasonable Manner.*** Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner.

(e) ***Demands and Notices.*** All demands and notices made by a party under this Annex will be made as specified in the Notices Section of this Agreement, except as otherwise provided in Paragraph 13.

(f) ***Specifications of Certain Matters.*** Anything referred to in this Annex as being specified in Paragraph 13 also may be specified in one or more Confirmations or other documents and this Annex will be construed accordingly.

**Paragraph 12. Definitions**
As used in this Annex:—

***"Cash"*** means the lawful currency of the United States of America.

"***Credit Support Amount"*** has the meaning specified in Paragraph 3.

***"Custodian"*** has the meaning specified in Paragraphs 6(b)(i) and 13.

***"Delivery Amount"*** has the meaning specified in Paragraph 3(a).

***"Disputing Party"*** has the meaning specified in Paragraph 5.

***"Distributions"*** means with respect to Posted Collateral other than Cash, all principal, interest and other payments and distributions of cash or other property with respect thereto, regardless of whether the Secured Party has disposed of that Posted Collateral under Paragraph 6(c). Distributions will not include any item of property acquired by the Secured Party upon any disposition or liquidation of Posted Collateral or, with respect to any Posted Collateral in the form of Cash, any distributions on that collateral, unless otherwise specified herein.

***"Eligible Collateral"*** means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

***"Eligible Credit Support"*** means Eligible Collateral and Other Eligible Support.

***"Exposure"*** means for any Valuation Date or other date for which Exposure is calculated and subject to Paragraph 5 in the case of a dispute, the amount, if any, that would be payable to a party that is the Secured Party by the other party (expressed as a positive number) or by a party that is the Secured Party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(2)(A) of this Agreement as if all Transactions (or Swap Transactions) were being terminated as of the relevant Valuation Time; *provided* that Market Quotation will be determined by the Valuation Agent using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation").

***"Independent Amount"*** means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

***"Interest Amount"*** means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Posted Collateral in the form of Cash held by the Secured Party on that day, determined by the Secured Party for each such day as follows:

(x) the amount of that Cash on that day; multiplied by

(y) the Interest Rate in effect for that day; divided by

(z) 360.

***"Interest Period"*** means the period from (and including) the last Local Business Day on which an Interest Amount was Transferred (or, if no Interest Amount has yet been Transferred, the Local Business Day on which Posted Collateral in the form of Cash was Transferred to or received by the Secured Party) to (but excluding) the Local Business Day on which the current Interest Amount is to be Transferred.

***"Interest Rate"*** means the rate specified in Paragraph 13.

***"Local Business Day",*** unless otherwise specified in Paragraph 13, has the meaning specified in the Definitions Section of this Agreement, except that references to a payment in clause (b) thereof will be deemed to include a Transfer under this Annex.

***"Minimum Transfer Amount"*** means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

***"Notification Time"*** has the meaning specified in Paragraph 13.

***"Obligations"*** means, with respect to a party, all present and future obligations of that party under this Agreement and any additional obligations specified for that party in Paragraph 13.

***"Other Eligible Support"*** means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

***"Other Posted Support"*** means all Other Eligible Support Transferred to the Secured Party that remains in effect for the benefit of that Secured Party.

***"Pledgor"*** means either party, when that party (i) receives a demand for or is required to Transfer Eligible Credit Support under Paragraph 3(a) or (ii) has Transferred Eligible Credit Support under Paragraph 3(a).

***"Posted Collateral"*** means all Eligible Collateral, other property, Distributions, and all proceeds thereof that have been Transferred to or received by the Secured Party under this Annex and not Transferred to the Pledgor pursuant to Paragraph 3(b), 4(d)(ii) or 6(d)(i) or released by the Secured Party under Paragraph 8. Any Interest Amount or portion thereof not Transferred pursuant to Paragraph 6(d)(ii) will constitute Posted Collateral in the form of Cash.

***"Posted Credit Support"*** means Posted Collateral and Other Posted Support.

***"Recalculation Date"*** means the Valuation Date that gives rise to the dispute under Paragraph 5; *provided*, *however*, that if a subsequent Valuation Date occurs under Paragraph 3 prior to the resolution of the dispute, then the "Recalculation Date" means the most recent Valuation Date under Paragraph 3.

***"Resolution Time"*** has the meaning specified in Paragraph 13.

***"Return Amount"*** has the meaning specified in Paragraph 3(b).

***"Secured Party"*** means either party, when that party (i) makes a demand for or is entitled to receive Eligible Credit Support under Paragraph 3(a) or (ii) holds or is deemed to hold Posted Credit Support.

***"Specified Condition"*** means, with respect to a party, any event specified as such for that party in Paragraph 13.

***"Substitute Credit Support"*** has the meaning specified in Paragraph 4(d)(i).

***"Substitution Date"*** has the meaning specified in Paragraph 4(d)(ii).

***"Threshold"*** means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

***"Transfer"*** means, with respect to any Eligible Credit Support, Posted Credit Support or Interest Amount, and in accordance with the instructions of the Secured Party, Pledgor or Custodian, as applicable:

(i) in the case of Cash, payment or delivery by wire transfer into one or more bank accounts specified by the recipient;

(ii) in the case of certificated securities that cannot be paid or delivered by book-entry, payment or delivery in appropriate physical form to the recipient or its account accompanied by any duly executed instruments of transfer, assignments in blank, transfer tax stamps and any other documents necessary to constitute a legally valid transfer to the recipient;

(iii) in the case of securities that can be paid or delivered by book-entry, the giving of written instructions to the relevant depository institution or other entity specified by the recipient, together with a written copy thereof to the recipient, sufficient if complied with to result in a legally effective transfer of the relevant interest to the recipient; and

(iv) in the case of Other Eligible Support or Other Posted Support, as specified in Paragraph 13.

***"Valuation Agent"*** has the meaning specified in Paragraph 13.

***"Valuation Date"*** means each date specified in or otherwise determined pursuant to Paragraph 13.

***"Valuation Percentage"*** means, for any item of Eligible Collateral, the percentage specified in Paragraph 13.

***"Valuation Time"*** has the meaning specified in Paragraph 13.

***"Value"*** means for any Valuation Date or other date for which Value is calculated and subject to Paragraph 5 in the case of a dispute, with respect to:

(i) Eligible Collateral or Posted Collateral that is:

(A) Cash, the amount thereof; and

(B) a security, the bid price obtained by the Valuation Agent multiplied by the applicable Valuation Percentage, if any;

(ii) Posted Collateral that consists of items that are not specified as Eligible Collateral, zero; and

(iii) Other Eligible Support and Other Posted Support, as specified in Paragraph 13.

**Paragraph 13. Elections and Variables**

(a) *Security Interest for "Obligations"*. The term ***"Obligations"*** as used in this Annex includes the following additional obligations:

With respect to Party A: ..........................................................................................................................

With respect to Party B: ..........................................................................................................................

(b) *Credit Support Obligations.*

(i) ***Delivery Amount, Return Amount and Credit Support Amount.***

(A) ***"Delivery Amount"*** has the meaning specified in Paragraph 3(a), unless otherwise specified here: ..........................................................................................................................

(B) ***"Return Amount"*** has the meaning specified in Paragraph 3(b), unless otherwise specified here: ..........................................................................................................................

(C) ***"Credit Support Amount"*** has the meaning specified in Paragraph 3, unless otherwise specified here: ..........................................................................................................................

(ii) *Eligible Collateral.* The following items will qualify as ***"Eligible Collateral"*** for the party specified:

| | | Party A | Party B | Valuation Percentage |
|---|---|---|---|---|
| (A) | Cash | [ ] | [ ] | [ ]% |
| (B) | negotiable debt obligations issued by the U.S. Treasury Department having an original maturity at issuance of not more than one year ("Treasury Bills") | [ ] | [ ] | [ ]% |
| (c) | negotiable debt obligations issued by the U.S. Treasury Department having an original maturity at issuance of more than one year but not more than 10 years ("Treasury Notes") | [ ] | [ ] | [ ]% |
| (D) | negotiable debt obligations issued by the U.S. Treasury Department having an original maturity at issuance of more than 10 years ("Treasury Bonds") | [ ] | [ ] | [ ]% |
| (E) | other: .................................................................................. | [ ] | [ ] | [ ]% |

(iii) *Other Eligible Support.* The following items will qualify as ***"Other Eligible Support"*** for the party specified:

| | | Party A | Party B |
|---|---|---|---|
| (A) | .................................................................................. | [ ] | [ ] |
| (B) | .................................................................................. | [ ] | [ ] |

(iv) ***Thresholds.***

(A) ***"Independent Amount"*** means with respect to Party A: $ ..........
***"Independent Amount"*** means with respect to Party B: $ ..........

(B) ***"Threshold"*** means with respect to Party A: $ ..........
***"Threshold"*** means with respect to Party B: $ ..........

(C) ***"Minimum Transfer Amount"*** means with respect to Party A: $ ..........
***"Minimum Transfer Amount"*** means with respect to Party B: $ ..........

(D) **Rounding.** The Delivery Amount and the Return Amount will be rounded [down to the nearest integral multiple of $. . . . /up and down to the nearest integral multiple of $. . . ., respectively*].

(c) ***Valuation and Timing.***

(i) ***"Valuation Agent"*** means, for purposes of Paragraphs 3 and 5, the party making the demand under Paragraph 3, and, for purposes of Paragraph 6(d), the Secured Party receiving or deemed to receive the Distributions or the Interest Amount, as applicable, unless otherwise specified here: ..........

(ii) ***"Valuation Date"*** means: ..........

(iii) ***"Valuation Time"*** means:

[ ] the close of business in the city of the Valuation Agent on the Valuation Date or date of calculation, as applicable;

[ ] the close of business on the Local Business Day before the Valuation Date or date of calculation, as applicable;

*provided* that the calculations of Value and Exposure will be made as of approximately the same time on the same date.

(iv) ***"Notification Time"*** means 1:00 p.m., New York time, on a Local Business Day, unless otherwise specified here: ..........

(d) ***Conditions Precedent and Secured Party's Rights and Remedies.*** The following Termination Event(s) will be a ***"Specified Condition"*** for the party specified (that party being the Affected Party if the Termination Event occurs with respect to that party):

| | **Party A** | **Party B** |
|---|---|---|
| Illegality | [ ] | [ ] |
| Tax Event | [ ] | [ ] |
| Tax Event Upon Merger | [ ] | [ ] |
| Credit Event Upon Merger | [ ] | [ ] |
| Additional Termination Event(s):[1] | | |
| .......... | [ ] | [ ] |
| .......... | [ ] | [ ] |

* Delete as applicable.

[1] If the parties elect to designate an Additional Termination Event as a "Specified Condition", then they should only designate one or more Additional Termination Events that are designated as such in their Schedule.

(e) ***Substitution.***

(i) ***"Substitution Date"*** has the meaning specified in Paragraph 4(d)(ii), unless otherwise specified here: ..........

(ii) ***Consent.*** If specified here as applicable, then the Pledgor must obtain the Secured Party's consent for any substitution pursuant to Paragraph 4(d): [applicable/inapplicable *][2]

(f) ***Dispute Resolution.***

(i) ***"Resolution Time"*** means 1:00 p.m., New York time, on the Local Business Day following the date on which the notice is given that gives rise to a dispute under Paragraph 5, unless otherwise specified here: ..........

(ii) ***Value.*** For the purpose of Paragraphs 5(i)(C) and 5(ii), the Value of Posted Credit Support will be calculated as follows: ..........

(iii) ***Alternative.*** The provisions of Paragraph 5 will apply, unless an alternative dispute resolution procedure is specified here: ..........

(g) ***Holding and Using Posted Collateral.***

(i) ***Eligibility to Hold Posted Collateral; Custodians.*** Party A and its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b); *provided* that the following conditions applicable to it are satisfied:

(1) Party A is not a Defaulting Party.

(2) Posted Collateral may be held only in the following jurisdictions: ..........

(3) ..........

Initially, the **Custodian** for Party A is ..........

Party B and its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b); *provided* that the following conditions applicable to it are satisfied:

(1) Party B is not a Defaulting Party.

(2) Posted Collateral may be held only in the following jurisdictions: ..........

(3) ..........

Initially, the **Custodian** for Party B is ..........

(ii) ***Use of Posted Collateral.*** The provisions of Paragraph 6(c) will not apply to the [party/parties * ] specified here:

[ ] Party A

[ ] Party B

and [that party/those parties * ] will not be permitted to: ..........

---

* Delete as applicable.

[2] Parties should consider selecting "applicable" where substitution without consent could give rise to a registration requirement to perfect properly the security interest in Posted Collateral (*e.g.,* where a party to the Annex is the New York branch of an English bank).

(h) ***Distributions and Interest Amount.***

(i) ***Interest Rate.*** The ***"Interest Rate"*** will be: ..........................................................................................

(ii) ***Transfer of Interest Amount.*** The Transfer of the Interest Amount will be made on the last Local Business Day of each calendar month and on any Local Business Day that Posted Collateral in the form of Cash is Transferred to the Pledgor pursuant to Paragraph 3 (b), unless otherwise specified here: ...
..........................................................................................

(iii) ***Alternative to Interest Amount.*** The provisions of Paragraph 6(d)(ii) will apply, unless otherwise specified here: ..........................................................................................

(i) ***Additional Representation(s).***

[Party A/Party B*] represents to the other party (which representation(s) will be deemed to be repeated as of each date on which it, as the Pledgor, Transfers Eligible Collateral) that:

(i) ..........................................................................................

(ii) ..........................................................................................

(j) ***Other Eligible Support and Other Posted Support.***

(i) ***"Value"*** with respect to Other Eligible Support and Other Posted Support means:.......................................

(ii) ***"Transfer"*** with respect to Other Eligible Support and Other Posted Support means:.................................

(k) ***Demands and Notices***.

All demands, specifications and notices under this Annex will be made pursuant to the Notices Section of this Agreement, unless otherwise specified here:

Party A: ..........................................................................................

..........................................................................................

Party B: ..........................................................................................

..........................................................................................

(l) ***Addresses for Transfers.***

Party A: ..........................................................................................

..........................................................................................

Party B: ..........................................................................................

..........................................................................................

(m) ***Other Provisions.***

* Delete as applicable.