# EXHIBIT Q

Case 1:24-cv-01533-JPC    Document 1-17    Filed 02/28/24    Page 2 of 53

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| GGC INTERNATIONAL LIMITED, | Index No. 650439/2023 |
| Plaintiff, | |
| v. | |
| ROGER VER, | **DEFENDANT'S THIRD-PARTY SUMMONS** |
| Defendant. | |
| | |
| ROGER VER | |
| Third-Party Plaintiff, | |
| v. | |
| BARRY SILBERT, MICHAEL MORO, and DIGITAL CURRENCY GROUP, | |
| Third-Party Defendants. | |

TO THE ABOVE-NAMED THIRD-PARTY DEFENDANTS:

**PLEASE TAKE NOTICE you are hereby summoned** to answer the Third-Party

Complaint in this action and to serve a copy of your answer, or, if the Third-Party Complaint is

not served with this summons, to serve a notice of appearance, on the Third-Party Plaintiff's

attorney within 20 days after the service of this summons, exclusive of the day of service (or

within 30 days after the service is complete if this summons is not personally delivered to you

within the State of New York); and in case of your failure to appear or answer, judgment will be

taken against you by default for the relief demanded in the complaint.

Trial is desired in the County of New York.

TO:

Digital Currency Group
290 Harbor Drive
Stamford, CT 06902

Michael Moro
15-10 Jordan Road
Fairlawn, New Jersey 07410

Barry Silbert
135 Highland Road
Rye, New York 10580

                                             **KELMAN PLLC**

Dated: December 27, 2023

                                             Michael D. Handelsman
                                             Daniel J. Kelman
                                             1441 Broadway
                                             6th Floor, #6079
                                             New York, NY 10018
                                             (212) 380-3818
                                             mike@kelman.law
                                             daniel@kelman.law

Case 1:24-cv-01533-JPC   Document 1-17   Filed 02/28/24   Page 4 of 53

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| GGC INTERNATIONAL LIMITED, | Index No. 650439/2023 |
| Plaintiff, | |
| v. | **THIRD-PARTY COMPLAINT** |
| ROGER VER, | |
| Defendant. | |
| | |
| ROGER VER | |
| Third-Party Plaintiff, | |
| v. | |
| BARRY SILBERT, MICHAEL MORO, and DIGITAL CURRENCY GROUP, | |
| Third-Party Defendants. | |

Defendant, Roger Ver ("Ver"), by and through his attorneys, Kelman PLLC, herein, alleges as follows:

## INTRODUCTION

1.      This case exposes the deceptive tactics of an insolvent derivatives trading desk desperate to remain afloat.  GGCI's own derivatives contracts mandated continuous solvency. Yet when Ver sought confirmation of their financial status, GGCI deceived him with misleading financial information and induced him to provide tens of millions of dollars in additional collateral.

2.      In June 2022, GGCI faced insolvency as Three Arrows Capital ("3AC") started to collapse.  Desperate for assets, they targeted Ver, a significant customer with multiple expiring

Case 1:24-cv-01533-JPC   Document 1-17   Filed 02/28/24   Page 5 of 53

options that month.  To collect from him, GGCI let Ver's out-of-the-money options expire; to avoid paying him, GGCI persuaded Ver to roll in-the-money options to a later date.  Meanwhile, Genesis secretly planned to margin call and liquidate 3AC immediately after the roll, which would drive Ver's expiring positions to new lows.

3.     The moment Ver's out-of-the-money June options expired, GGCI abruptly demanded that Ver over-collateralize the positions he had just rolled by a staggering 300%.  This sudden and unprecedented low valuation raised Ver's suspicions about GGCI's solvency, because GGCI had always accepted digital assets as collateral at mark-to-market prices.

4.     In fact, GGCI, as well as its parent companies, was attempting to cover up its insolvency by squeezing Ver for exorbitant sums of collateral.  Although GGCI outwardly applied a low valuation to Ver's digital assets, once they had them in hand, GGCI would add them to their balance sheet as assets valued mark-to-market.  This accounting trick promised to boost GGCI's assets by several hundred million dollars and return them to solvency.

5.     GGCI employed this tactic with the guidance and direction of Barry Silbert, Michael Moro, Digital Currency Group ("DCG"), Genesis Global Holdco ("Genesis Holdco"), and Genesis Global Capital ("Genesis Global") (collectively with GGCI, referred to as the "Genesis Entities").

6.     Ver demanded proof of GGCI's solvency before he would provide any further collateral. GGCI then provided Ver with a Statement of Financial Condition ("SOFC") dated June 20, 2022, which misleadingly portrayed a narrow positive equity. In truth, however, GGCI was already insolvent.  The SOFC hid GGCI's insolvency by using the same accounting trick — overvaluing illiquid digital assets by using undiscounted mark-to-market prices. Had GGCI applied appropriate discounts to its digital assets as it demanded from Ver, their SOFC would

INDEX NO. 650439/2023
RECEIVED NYSCEF: 12/29/2023

Case 1:24-cv-01533-JPC   Document 1-17   Filed 02/28/24   Page 6 of 53

have revealed their insolvency and Ver would have terminated the contracts as a result of GGCI's default.

7.      In July 2022, GGCI continued to conceal its insolvency by misrepresenting that its parent company, Digital Currency Group ("DCG"), had assumed more than $1.1 billion in losses that Genesis had suffered. However, unbeknownst to Ver and the public at large, DCG never injected $1.1 billion into Genesis. Instead, DCG had merely provided Genesis with a promissory note that promised to pay it $1.1 billion over a *ten year* period. The fair market value of that promissory note — its *real* value — was far below its face value; it did not return Genesis or GGCI to solvency, nor did it help their liquidity issues. GGCI thereby deceived Ver into believing that it was solvent, which induced Ver to provide more than $60 million in collateral over the months that followed.

8.      During this time period, employees of DCG, Genesis Holdco, Genesis Global, and GGCI made a number of knowing misrepresentations to the public in an effort to keep its customers, including Ver, calm, comfortable, and invested in their products. Unbeknownst to these customers was the falsity of these statements and the true precarious nature of the finances of the Genesis Entities. Had the Genesis Entities been honest and forthright from the beginning, investors such as Ver would have closed their positions immediately, negating significant losses suffered after this date.

9.      Specifically, Mr. Barry Silbert, the CEO and founder of DCG and Mr. Michael Moro, the CEO of both Genesis Global and GGCI (and the signatory on many of the agreements at issue in this case) made a number of public statements with the knowledge, direction, and approval of the Genesis Entities. With knowledge of the falsity of their statements, Messrs. Silbert and Moro published a number of tweets designed to placate the public, keep them

invested, and conceal the financial perils that the Genesis Entities were truly facing. Unfortunately for Ver and countless other investors, they were successful in doing so, for a time.

10.    In December 2022, just as Ver's options were expiring, the collapse of the FTX exchange and Alameda Research revealed that Genesis and GGCI were insolvent all along. Ver was alerted to GGCI's insolvency by an interview wherein FTX and Alameda co-founder Sam Bankman-Fried stated that Alameda had repaid a $2.5 billion dollar loan to "Genesis" in August 2022. This appeared to be an obvious preference transfer that would be subject to clawback.

11.    Citing the $2.5 billion repayment from Alameda, Ver requested that GGCI provide further assurances that it had been solvent in June 2022. Ver reminded GGCI that he had faithfully provided additional collateral for months, including a substantial $37 million in payments just weeks earlier. GGCI acknowledged that the timing and size of Ver's recent collateral contributions underscored his genuine concern since he could have simply raised these arguments instead of paying GGCI $37 million dollars.

12.    Consequently, GGCI reluctantly shared its 2021 audited financials with Ver, and denied that it had ever had any involvement with FTX or Alameda. However, analysis of GGCI's 2021 financials directly contradicted these claims. GGCI's 2021 financials revealed that it had allowed a single counterparty to open a $2.5 billion position, collateralized exclusively by FTX's own FTT tokens, which were valued at inflated mark-to-market prices. It was evident that these FTT tokens had come from Alameda.

13.    Thereafter, as GGCI's parent filed for bankruptcy and began negotiating with creditors, Ver learned that Genesis and GGCI had never actually received funds from DCG and had indeed been insolvent the entire time.

Case 1:24-cv-01533-JPC   Document 1-17   Filed 02/28/24   Page 8 of 53

14.     Despite the repeated misrepresentations and false assurances of solvency by Barry
Silbert, Michael Moro, DCG, and GGCI, Ver maintains his willingness to pay any outstanding
sums owed, provided GGCI can finally demonstrate they were solvent at the relevant times.  To
date, they have yet to do so.

**The Parties**

15.     Roger Ver ("Ver") is the Defendant/Counter-Plaintiff/Third-Party Plaintiff in this
action.  Ver is a natural person and a resident and citizen of St. Kitts and Nevis.

16.     Genesis Global Capital International Limited ("GGCI") is a Counter-Defendant
in this action.  GGCI is a British Virgin Islands company limited by shares with a principal place
of business at 250 Park Avenue South, in New York County, New York.

17.     Third-Party Defendant Barry Silbert was the CEO, founder, and beneficial owner
of DCG at all times during the Relevant Period.  Silbert was one of three members of DCG's
board of directors during the Relevant Period.  Officers at DCG reported directly to Silbert.
Silbert is also the single-largest shareholder of DCG.  During the Relevant Period, Silbert
worked from DCG's offices in Connecticut, as well as from Genesis's offices at 250 Park Avenue
South, in New York County, New York.  Silbert founded the Genesis Entities and served on
Genesis Trading's board of directors from its founding until June 22, 2022.

18.     Third-Party Defendant Michael Moro served as the CEO or its functional
equivalent of the Genesis Entities, as well as their non-party affiliates, from at least February 2,
2021, through August 17, 2022.  For the same period, Moro also served on Genesis Trading's
board of directors, which served as the de facto board of directors for Genesis Holdco through at
least June 30, 2022.  Throughout the Relevant Period, Moro worked from and resided in the
State of New York.

19.     Third-Party Defendant DCG is a Delaware corporation doing business in the State of New York.  DCG maintains an office at 262 Harbor Drive, Stamford, CT 06902. DCG wholly owns the Genesis Entities.  During the Relevant Period, DCG's officers also worked from the Genesis Entities' office at 250 Park Avenue South, in New York County, New York.

**Related Non-Parties**

20.     Genesis Global Holdco, LLC ("Genesis Holdco") is a Delaware LLC with a principal place of business at 250 Park Avenue South, in New York County, New York. Genesis Holdco has filed for Chapter 11 bankruptcy protection in the Southern District of New York.

21.     Genesis Global Capital, LLC ("Genesis Global") is the direct parent of GGCI. Genesis Global is a Delaware LLC with a principal place of business at 250 Park Avenue South, in New York County, New York. Genesis Global has filed for Chapter 11 bankruptcy protection in the Southern District of New York.

22.     Genesis Holdco and Genesis Global had no independent board of directors until after June 30, 2022.  Instead, non-party Genesis Global Trading, Inc.'s ("Genesis Trading") board of directors heard matters pertaining to Genesis Holdco and Genesis Global through at least June 30, 2022.

23.     The Genesis Entities operated as a single entity during the Relevant Period.  They shared officers, capital, offices, IT infrastructure, and back-office functions.

24.     Genesis Asia Pacific Limited Pte ("GAP") is a Singapore private limited company that has filed for Chapter 11 bankruptcy protection in the Southern District of New York.

25.     Collectively, DCG, GGCI, Genesis Holdco, Genesis Global, GAP and their affiliates comprise the Genesis Group, and are referred to herein as "Genesis".

26.     Three Arrows Capital Limited ("3AC") was a Singapore-based investment firm incorporated in the BVI that specialized in trading and investing in cryptocurrencies and other digital assets before its stunning collapse in mid-2022.  They are now being liquidated in the BVI.

27.     Alameda Research LLC ("Alameda") was a quantitative cryptocurrency trading firm that was founded in 2017 by Sam Bankman-Fried. Alameda, along with FTX and more than 130 affiliated entities, filed for Chapter 11 bankruptcy protection in November 2022.

28.     FTX International Limited (aka FTX Trading Limited) ("FTX") is a cryptocurrency derivatives exchange that was launched in 2019 by Sam Bankman-Fried and others. As discussed above, FTX, and more than 130 affiliated entities, filed for Chapter 11 bankruptcy protection in November 2022.

29.     Sam Bankman-Fried ("SBF") is the now disgraced co-founder and CEO of both FTX and Alameda Research, and was at the heart of one of, if not the, largest cryptocurrency thefts in history, stealing billions of dollars from his customers and using those funds to pay down debts owed by companies he owned or controlled, including Alameda and FTX.

Case 1:24-cv-01533-JPC Document 1-17 Filed 02/28/24 Page 11 of 53



## Jurisdiction and Venue

30.      Jurisdiction and venue are based upon the residence of third-party defendants all of whom resided in, or maintained and operated from offices located within the State, County, and City of New York, and upon commission of tortious acts in the State, County, and City of New York, which caused Ver injury.

### DCG Owns and Operates the Genesis Entities

31.      Defendant DCG owns and operates various cryptocurrency businesses.

32.      DCG marketed the Genesis Entities and non-party Genesis Trading collectively as a premier institutional cryptocurrency and financial services company.  DCG marketed Genesis Global, the direct parent of GGCI, as its leading lending desk with billions of dollars in cryptocurrency loan originations.

33.      During the Relevant Period, DCG controlled the Genesis Entities' key hiring decisions, business strategy, and budget.  DCG and the Genesis Entities also shared IT

Case 1:24-cv-01533-JPC   Document 1-17   Filed 02/28/24   Page 12 of 53

infrastructure and DCG had direct access to the Genesis Entities' books and records.  Members of DCG's management team served as directors of Genesis Trading and Genesis Holdco, and sat on the Genesis Entities' Organizational Risk Committee, which managed risks arising from the Genesis Entities' lending business.

34.     Upon information and belief, GGCI was formed simply to conduct the same operations as Genesis Global, focusing instead on international clients. Though GGCI claims to be an offshore entity, that is simply a farce.

35.     The CEO of both GGCI and Genesis Global are the same individual, Mr. Michael Moro. Mr. Moro was the signatory for GGCI on a number of documents at issue herein. As an example, Mr. Moro, as CEO of GGCI, signed the Master Confirmation Agreement and Amended Master Confirmation Agreement discussed in further detail below.

36.     Further, both the Master Confirmation Agreement and Amended Confirmation Agreement entered into between Mr. Ver and GGCI stated that GGCI operated out of a single office, which was located in New York. Upon information and belief, that New York office is located at 250 Park Ave, the same address as DCG, Genesis Holdco, and Genesis Global.

37.     In addition, many, if not all, of the employees "working for GGCI" are also employed by Genesis Global and work out of the same NY office space, 250 Park Ave.  Upon information and belief, GGCI has no real offshore presence and is operated from NY with little or no separation between itself, Genesis Global, Genesis Holdco, and DCG.

### GGCI Solicits Ver's Business

38.     On June 10, 2020, GGCI approached Ver, a well-known Bitcoin Cash ("BCH") proponent, to trade BCH-based over-the-counter derivatives.  GGCI sought to start a BCH options book with Ver's help.

Case 1:24-cv-01533-JPC    Document 1-17    Filed 02/28/24    Page 13 of 53

39.     Though experienced in digital asset investment, Ver was new to options trading.

40.     Ver was initially hesitant to entrust GGCI with significant assets.  Seeking to win Ver's business, GGCI proposed a mechanism to earn interest on his collateral while his positions were open.

41.     On June 15, 2020, GGCI suggested that Ver could lend his BCH to GGCI at interest while simultaneously using the same assets as collateral for derivative contracts with GGCI.

42.     This arrangement, where Ver's interest-bearing loans served as collateral for GGCI trades, induced Ver to trade derivatives with GGCI.

### The Master Confirmation Agreement and Key Terms

43.     On June 15, 2020, Ver and GGCI executed a Master Loan Agreement ("MLA") which promised to pay Ver interest at agreed upon rates to be determined by the parties during the course of the agreement's term. GGCI and Genesis Global CEO Michael Moro signed on behalf of GGCI.

44.     On June 22, 2020, Ver and GGCI executed a Master Confirmation Agreement to govern their derivative contracts, which was then amended on July 13, 2020 (collectively, the "MCA").  This document was also signed by GGCI and Genesis Global CEO Michael Moro.

45.     The MCA referenced International Swaps and Derivatives Association (ISDA) form agreements, such as the 1994 Credit Support Annex and the 2002 ISDA Master Agreement. These agreements aimed to protect parties in over-the-counter derivatives transactions against potential issues, such as insolvency or misrepresentation.

46.     Although the parties agreed in various transaction confirmations that the 2002 ISDA Master Agreement and the 1994 Credit Annex formed part of the MCA, neither party ever

executed and/or signed either of these documents.  Consequently, none of the schedules to either of them formed part of its terms.

47.    In the 2002 ISDA Master Agreement, section 5(a)(vii)(2) required parties to remain solvent at all times, stating that it was an Event of Default if either party "becomes insolvent or is unable to pay its debts."

48.    Additionally, section 5(a)(iv) prohibited misrepresentation, declaring an Event of Default if a party made "[a] representation... [which] proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated."

49.    Each time Ver and GGCI transacted, they executed an individual transaction confirmation based on the MCA terms.  These terms specified collateral requirements, eligible collateral types, and valuation methods.  The MCA listed both US dollars and a "Reference Currency" as eligible collateral, with a valuation percentage of "100% at Spot Rate."

50.    The MCA's use of "Reference Currency" valued at "100% Spot Rate" meant that the underlying digital asset being traded in the derivative contract could serve as collateral, and it would be valued based on its mark-to-market value in the spot markets.

51.    Despite earlier Telegram communications stating otherwise, the confirmations did not mention Ver's loans as acceptable collateral.  However, GGCI disregarded ISDA's standards and the MCA's written terms and eased collateral requirements throughout their course of dealing.

52.    In fact, it was a common practice for GGCI to ease collateral requirements, not only for Ver, but also for its other counterparties.

Case 1:24-cv-01533-JPC   Document 1-17   Filed 02/28/24   Page 15 of 53

## The Importance of Solvency in Derivative Transactions

53.     Derivative transactions involve bets on the future price of an underlying asset.  If a counterparty becomes insolvent during the contract, the winning party may not be able to collect, undermining the transaction's sole purpose.

54.     To mitigate this counterparty risk, the 2002 Master ISDA required parties to maintain solvency at all times (the "Solvency Requirement").

55.     The Solvency Requirement was crucial for Ver's decision to enter the MCA, since it ensured that he could collect from GGCI if his derivative positions were successful.  The Solvency Requirement also benefited GGCI, as it could collect from Ver and potentially foreclose on collateral if needed.

56.     The Solvency Requirement was designed to apply to any bankruptcy or insolvency laws relevant to a party.  For GGCI, a BVI company operating in New York, insolvency under BVI or New York law would breach the requirement.  GGCI would be insolvent if it couldn't meet obligations when due, or if its liabilities exceeded its assets.

57.     GGCI's collateral policy was essential for compliance with the Solvency Requirement.  If a counterparty failed to pay, GGCI would incur losses, potentially leading to insolvency as assets were either removed from its balance sheet or had their value greatly reduced.

58.     To mitigate this risk, GGCI required counterparties to provide collateral before opening positions, and it was GGCI's responsibility to maintain adequate collateral and ensure its assets exceeded liabilities at all times.  Again, any failure to do so would undermine the entire purpose of the transactions.

Case 1:24-cv-01533-JPC   Document 1-17   Filed 02/28/24   Page 16 of 53

## GGCI Failed to Enforce Collateral Requirements

59.     The MCA and its Transaction Confirmations contained strict collateral requirements for Ver, but GGCI did not enforce them. Instead, GGCI allowed Ver and other customers to maintain undercollateralized positions and provide exotic, illiquid digital assets as collateral.

60.     Firstly, GGCI never required Ver to post US dollars or Reference Currency as collateral. They allowed Ver to use unrelated digital assets, such as Monero (XMR) and Binance Coin (BNB), even though these assets were unrelated to the underlying derivative transaction.

61.     GGCI permitted other customers to provide even more illiquid and exotic assets as collateral, such as FTT tokens.

62.     On information and belief, GGCI also allowed SOL, OXY, MPS and SRM as collateral to support billions in loans.

63.     Secondly, GGCI valued this exotic collateral at mark-to-market prices without applying appropriate discounts for illiquidity or potential losses during liquidation.

64.     Thirdly, GGCI allowed Ver to maintain collateral amounts below the required sum in the MCA.

65.     Fourthly, GGCI didn't request additional collateral from Ver when the US dollar value of his digital assets fell below key thresholds.

66.     Fifthly, GGCI permitted Ver to use digital assets he had loaned at interest as collateral, which meant that GGCI was taking on additional counterparty risk by redeploying Ver's collateral to profit from an interest rate spread.

Case 1:24-cv-01533-JPC   Document 1-17   Filed 02/28/24   Page 17 of 53

67.     GGCI's relaxed collateral requirements were not exclusive to Ver.  It extended the same or similar benefits to other counterparties, resulting in an increased risk of loss and insolvency if the market turned against them.

68.     Nor were GGCI's relaxed collateral requirements embodied in any agreement or official special status afforded to Ver or other particular customers.   Rather, GGCI simply neglected to enforce the written terms of its agreements.

**GGCI's Collateral Exposed to "Daisy Chain" of Debts**

69.     GGCI did not directly possess all of the digital asset collateral deposited by counterparties like Ver.  Instead, GGCI sought to generate profits by loaning out this collateral and profiting from the interest rate spread.  This practice, however, exposed GGCI's collateral value to increased counterparty risk, as it needed to recover the loaned collateral before liquidating it to cover a default.

70.     GGCI's collateral practices created a precarious chain of debt obligations. Essentially, a house of cards. Under normal market conditions, they could manage this debt chain by obtaining US dollars.  However, during times of market stress and illiquidity, a single default could render GGCI unable to access the collateral deposited by Ver or others, exposing them to immense loss.

71.     Without US dollar cash reserves, GGCI would be forced to liquidate investments at fire sale prices, or call in loans from borrowers who may default.  During periods of market illiquidity and stress, GGCI's relaxed collateral practices increased the risk of GGCI becoming undercollateralized and insolvent.

72.     On information and belief, GGCI would routinely loan out its digital assets to other Genesis entities, including GAP, who would loan it to counterparties such as 3AC.

73.     These related party loans would eventually become impaired by 3AC's insolvency.  In June 2022, 3AC defaulted on more than $2.3 billion to GAP, causing losses to GGCI as related party loans became impaired.

74.     Barry Silbert, who controlled GGCI and the Genesis Entities through his position as Chairman of DCG, was aware of this risk.  In a June 2021 tweet, he acknowledged the "daisy chain" of debts and emphasized the importance of understanding counterparty risk and identifying weak links in the chain.  Regrettably, Silbert failed to recognize that these weak links existed within his own organization, ultimately jeopardizing the safety of GGCI's collateral.



**GGCI Overstates its Financial Health: Deviating from ASC 820**

75.     GGCI's mark-to-market valuation of digital assets, including those not physically possessed, resulted in an overstatement of its financial health.

76.     Note 2 to GGCI's December 31, 2021 audited financial statement detailed the significant accounting policies and the methods used to derive valuations for its assets and liabilities.  The statement claimed compliance with accounting principles generally accepted in the United States of America (U.S. GAAP).

Case 1:24-cv-01533-JPC   Document 1-17   Filed 02/28/24   Page 19 of 53

77.   U.S. GAAP utilizes ASC 820 for determining "fair value," which is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.

78.   ASC 820 establishes a hierarchy of inputs for determining fair value, prioritizing observable inputs and requiring additional disclosures when unobservable inputs are relied on.

79.   GGCI concluded all digital assets and liabilities were recorded and valued based on Level 2 inputs – which are defined as "significant observable inputs".

80.   ASC 820's hierarchy includes three levels:

   a.   Level 1 (unadjusted spot price in an active market, such as the quoted price of Apple shares on the New York Stock Exchange);

   b.   Level 2 (spot prices from less active markets and may or may not be discounted); and

   c.   Level 3 (providing the most discretion, since the quoted price is unreliable and the evaluator is thus forced to rely on other inputs that are unobservable and significant to the overall fair value measurement).

81.   GGCI determined the fair market value of assets in "digital currency investments" and liabilities under "digital currency collateral payable" using Level 2.

82.   Digital assets are a famously volatile asset class, characterized by extreme price fluctuations and inherent unpredictability.  Market movements are driven by factors such as technological advancements, regulatory changes, market sentiment, global economic conditions, illiquidity, and, at times, price manipulation.

83.   At all times relevant, GGCI valued all of its digital assets at mark-to-market prices and never applied a discount to them.

84.   Upon information and belief, GGCI has employed the same inadequate accounting methods at all times during the life of the agreements at issue. As a result, GGCI has

been insolvent for as long as those methods have been employed. To the extent GGCI still employs the same valuation method, it remains insolvent to this day.

85.    Despite liquidity concerns and worsening market conditions beginning in May 2022, GGCI never applied a discount to their Level 2 assets.  All such assets continued to be valued at mark-to-market prices.

86.    GGCI's refusal to apply appropriate discounts to its Level 2 assets allowed GGCI to overstate its financial health and created a misleading picture of a solvent entity where one did not exist.

### Over Exposure to Alameda & FTX

87.    During the course of 2021, Genesis Entities engaged in a broad relaxation of their lending standards, and began to accept increasingly illiquid and exotic digital assets as collateral for loan and obligations and derivative contracts, creating a precarious financial situation.

88.    On information and belief, GGCI went insolvent at some point during 2021 when it made a loan of $2.5 billion and accepted FTT tokens as collateral.  GGCI valued these FTT tokens mark-to-market, which overstated the real value of FTT and resulted in a severe under collateralization, as Alameda had manipulated FTT's price higher to borrow against it.

89.    Consequently, GGCI was grossly overexposed to a single counterparty.  GGCI's 2021 audited financials reported that on December 31, 2021 the company held $2.370 billion in "digital collateral payable", 99% of which were FTT tokens owed to a single counterparty. These FTT tokens represented *nearly 70%* of GGCI's then total assets.

90.    However, the actual fair market value of these FTT tokens was far lower than the mark-to-market prices used by GGCI, which resulted in significantly fewer assets than reported.

Case 1:24-cv-01533-JPC    Document 1-17    Filed 02/28/24    Page 21 of 53

91.    Were GGCI to foreclose on the FTT tokens and sell them for US dollars, *they would have been unable to recover anywhere near the full amount owed.*

92.    GGCI's overexposure to FTT resulted from a quid pro quo relationship between Alameda and Genesis executives.

93.    FTX and Alameda granted Genesis executives early access to purchase FTT tokens at discounted rates before public issuance.

94.    This conflict of interest compromised GGCI's risk management policies and practices, as executives were incentivized to authorize GGCI to take excessive risks for their personal benefit.

95.    If not for these conflicts of interest, Genesis executives might have conducted adequate due diligence on their $2.5 billion loan and learned of Alameda's scheme to manipulate FTT prices and increase its borrowing ability.

96.    In a complaint against Alameda's former CEO, Caroline Ellison, the SEC details this manipulation.  Ellison engaged in automated FTT token purchases to inflate the value of Alameda's collateral, increasing risks for lenders accepting FTT as collateral.

97.    The market crash of May 2022 only worsened GGCI's finances, as Alameda suffered substantial losses, which exacerbated its inability to repay its loan to GGCI.

98.    After May 2022's market crash, Alameda focused its efforts on propping up the price of FTT token, continuing to engage in market operations and offering lines of credit to insolvent entities with large FTT positions to prevent FTT from being liquidated, which would have publicly revealed Alameda's insolvency.

99.    In August 2022, after realizing that Genesis and GGCI would liquidate FTT tokens and reveal their insolvency, Alameda misappropriated customer funds to repay Genesis

Case 1:24-cv-01533-JPC   Document 1-17   Filed 02/28/24   Page 22 of 53

and GGCI, which was a preferential transfer at the expense of FTX creditors subject to clawback.

100.    Afterwards, Alameda replaced the missing $2.5 billion in FTX customer deposits with the FTT tokens it had just received from Genesis and GGCI, and by valuing FTT at its inflated mark-to-market price created the illusion that FTX remained solvent.

101.    In November 2022, the digital asset exchange Binance called Alameda's bluff and threatened to sell their FTT tokens on the open market, which revealed its lack of liquidity.  FTX and Alameda were finally revealed to be insolvent and filed for bankruptcy less than three months after having repaid $2.5 billion to Genesis and GGCI.

**Over Exposure to 3AC & the Crash of May 2022**

102.    In May 2022, digital asset markets experienced a steep decline due to the collapse of digital assets LUNA and TerraUSD, causing significant losses, liquidations, and a snowball effect of defaults and insolvencies.

103.    3AC was central to the crash, resulting in substantial losses for GGCI and its counterparties.  3AC owed over $3 billion to creditors, including $2.3 billion to GAP, its largest creditor.

104.    Genesis and GAP were overexposed to 3AC, driven by conflicts of interest related to generating demand for the various digital asset trusts operated by Grayscale (the "Grayscale Trusts").  DCG, Genesis' parent company, owned the investment manager for the Grayscale Trusts and profited from the fees it generated.

105.    Since 2020, GAP had been loaning funds to 3AC to fund its Grayscale Trust purchases.  However, GBTC's[1] value declined, resulting in substantial unrealized losses for 3AC.

---

[1] GBTC is the Grayscale Bitcoin Trust, just one of a number of digital asset trusts operated by Grayscale and DCG.

While shares in GBTC traded at a premium to its net asset value when 3AC began conducting the trade in 2020, by June 2022 they were trading at a 30% discount.

106.    Genesis' concerns over its exposure to 3AC had reached a boiling point by January 2022.  That month, Genesis executives had 3AC pledge its GBTC shares to GAP as security.  But as the net asset value of GBTC continued to fall, so did the value of GAP's pledged assets.

107.    Upon information and belief, Genesis' 3AC exposure did not end with the Bitcoin trust, as 3AC was an investor in the other Grayscale Trusts.

108.    In May 2022, after LUNA's collapse, Genesis executives spoke with 3AC and, on information and belief, determined that 3AC was insolvent.

109.    However, GAP's significant exposure to 3AC posed a risk to the solvency of the entire Genesis enterprise, including GGCI, due to various related party loans and intercompany debts.  Consequently, Genesis opted not to issue margin calls to 3AC, despite the terms of their agreement permitting such action, in order to prevent further destabilizing its own financial situation.

110.    On information and belief, if not insolvent as a result of the $2.5 billion loan backed by FTT discussed herein, GGCI was insolvent as a result of 3AC's inability to repay GAP before the end of May 2022.

111.    On June 10, GGCI's need to obtain more capital became urgent.  That day, 3AC's accounts on the Deribit derivatives platform were liquidated.  Genesis executives, alarmed by the Deribit liquidations and cognizant of 3AC's insolvency, understood that 3AC's demise was near and formulated a strategy to avoid immediate recognition of a $2.3 billion loss.

112.    The plan centered on GAP seizing Grayscale BTC trust shares and other digital assets pledged by 3AC as security for their undercollateralized loans.  However, since issuing an unpayable margin call to 3AC would expose their insolvency, Genesis needed to act quickly before the market caught on.  By securing 3AC assets ahead of other creditors, GAP aimed to offset the substantial loss and safeguard both its own balance sheet and those of its affiliates.

113.    On June 12, Genesis executives set the plan in motion.  GAP issued a margin call to 3AC, demanding an additional $334 million in collateral payments, fully aware that 3AC would be unable to meet the requirement.

114.    On June 13, GAP served a notice of default on 3AC, enabling GAP to liquidate the limited collateral they held and pursue emergency relief to seize further 3AC assets ahead of other creditors.

115.    On June 15, GAP initiated arbitration against 3AC, seeking more than $2.3 billion in loan recovery and emergency relief.  This included seeking a preliminary injunction directing 3AC to freeze more than $2.3 billion, and to deposit the pledged assets with GAP, which were allegedly valued at $462 million at the time.

116.    In GAP's arbitration filing, it noted that "[d]ue to recent extreme volatility in the cryptocurrency markets, the value of the collateral already posted by Three Arrows decreased significantly in comparison to the loaned assets under the MLAs."

117.    On June 16, news of the notice of default GAP had issued to 3AC was publicized in the media, and numerous other 3AC lenders began making margin calls and issuing default notices.

Case 1:24-cv-01533-JPC   Document 1-17   Filed 02/28/24   Page 25 of 53

118.    On June 21, GAP's request for a preliminary injunction to freeze or seize certain 3AC pledged assets was denied.  A further hearing was scheduled for July 5, making it evident GAP wouldn't secure these assets by month's end.

119.    Due to the monthly reporting schedule followed by all Genesis entities, it became apparent that GAP and its affiliates, including GGCI, would have to recognize losses related to 3AC in their month-end financial reports for June 2022, which also coincided with their quarterly reporting obligations.

120.    Consequently, GGCI was insolvent in June 2022 due to various factors, including inaccurate loss recording, failure to apply appropriate discounts to Level 2 digital assets in the midst of a liquidity event, untimely recognition of substantial losses linked to 3AC and related parties, and untimely recognition of losses tied to the FTT-collateralized loan.

### Genesis' GGCI's Misrepresentations of Solvency

121.    In or about early June 2022, GGCI devised a plan to strengthen its balance sheet. It aimed to persuade its biggest clients, including Ver, to roll currently profitable options expiring that June to later dates, thereby allowing GGCI to avoid making payments.  Meanwhile, GGCI would allow Ver's currently unprofitable June options to expire, thereby bringing funds into GGCI from Ver and others.

122.    On information and belief, Genesis knew GGCI was insolvent by such time.

123.    On June 7, GGCI asked Ver to roll his deep in-the-money Ethereum options to a later date. Those options expired on June 24.  Ver declined.

124.    On June 9, GGCI sent Ver an article about Ethereum's progress to pique his interest about rolling the options. Ver did not respond.

125.    On June 10, Deribit's liquidation of 3AC signaled 3AC's imminent collapse.

126.    On June 11, GGCI again requested Ver to roll only his in-the-money Ethereum options to a later date, and offered him attractive terms.  Unaware that Genesis planned to margin call and liquidate 3AC immediately afterwards, Ver agreed to let GGCI roll his in-the-money options.

127.    On June 12 and 13, digital asset prices fell as 3AC was margin called, defaulted, and liquidations commenced, as had been planned by Genesis

128.    Meanwhile, on June 13, and again on the 14th, GGCI requested further collateral from Ver. On June 15, to keep Genesis executives happy, Ver reduced his exposure to GGCI by $22.5 million by buying certain BTC call options.

129.    On June 14, 2022, Silbert, on behalf of DCG's board, instructed Moro and Genesis "to continue aggressively shrinking the loan book and, until such time as we have the right controls, risk monitoring, etc. in place—and we're through the winter—… to limit the extension of any new loans to counterparties."

130.    Also on June 14, 2022, Silbert reported to DCG's board of directors regarding Genesis Global's strategy after Three Arrows' default.  In doing so, Silbert presented the option to "[j]ettison[] the Genesis Capital business" by not supplying Genesis Global with additional capital to strengthen its balance sheet.

131.    Nevertheless, on June 15, 2022, two days after Three Arrows' default, the Genesis Entities tweeted via their shared Twitter account:



132.    Silbert and DCG both re-tweeted this statement on June 15, 2022.

133.    Indeed, that same day, Silbert wrote to Moro and other Genesis Global personnel in a Microsoft Teams chat that "the word on the street is that genesis is the 'blue chip' in this mess….  we need to continue to perpetuate that of course."  In other words, Silbert directed Genesis Global personnel to perpetuate the idea that, within the cryptocurrency industry, Genesis Global was akin to highly stable "blue chip" companies.

134.    Then, on June 17, 2022, the Genesis Entities' CEO Moro tweeted the following:



135.    DCG's COO reviewed and edited these tweets before Moro posted them.  In strategizing the release of the tweets, DCG's COO directed Moro to send these tweets "from Moro['s] [personal Twitter account]" despite directions from Genesis Global's compliance department that these tweets should come from Genesis Global's corporate account.  The Genesis Entities reposted Moro's tweets that same day.

136.    The tweets and statements set forth above were false and misleading in a number of ways:

    a.    First, client funds had been impacted—the Three Arrows losses severely impaired Genesis Global's ability to repay its counterparties, including Earn investors.

Case 1:24-cv-01533-JPC    Document 1-17    Filed 02/28/24    Page 28 of 53

b.  Second, due to Three Arrows' default on June 13, 2022, the Genesis Entities' balance sheets were not strong, solvent, or capable of absorbing the losses; the Genesis Entities suffered a loss that exceeded their equity.  Indeed, in a June 21, 2022 email, Silbert informed colleagues at DCG that "the hole in Genesis equity due to the Three Arrows exposure is something they we [sic] will need to fill by 6/30," and asked his colleagues to "keep [that] between us."

c.  Three days later, Silbert further explained to DCG personnel "[w]e just can't allow people inside or outside [to] question Genesis' solvency" due to Silbert's concern that this could spark a bank run.

d.  Third, the tweets discussed the sale or hedging of all "liquid" collateral while concealing that hundreds of millions of dollars' worth of the loans were secured by illiquid collateral that could not be sold and was not hedged.

e.  Fourth, Genesis Global had not "shed the risk and moved on"—as of June 17, 2022, it still held a more than $1 billion receivable relating to Three Arrows as an uncollectible asset on its balance sheet.

137.  From June 16 to June 24, GGCI continued discussions with Ver about the additional types of collateral he could offer, and learned it was Ver's strong preference to post a combination of digital assets and certain shares in private companies.  GGCI indicated it was prepared to accept these assets as collateral, as it had done previously.

Case 1:24-cv-01533-JPC Document 1-17 Filed 02/28/24 Page 29 of 53

138.     Throughout the life of GGCI and Ver's two year business relationship, GGCI had always accepted different forms of collateral from Ver, and allowed him to maintain undercollateralized positions.  In fact, it had been GGCI's offer to pay Ver interest on his digital asset collateral, in direct violation of the MCA's collateral requirements, that had induced Ver to trade with GGCI and to continue trading up until that time.

139.     However, upon the expiration of Ver's out-of-the-money options on June 24, Genesis executives abruptly changed their policy.  They demanded that Ver immediately provide 100% of the required collateral in either US dollars or Reference Currency as stated in the MCA, or face a notice of default.

140.     Based on the course of the parties' dealings, GGCI knew Ver was not expecting to be required to pay the full sum of collateral in US dollars or Reference Currency on that day, which GGCI had never required him to do during their two year relationship.

141.     GGCI's plan was to extract an excessive sum of collateral from Ver.  GGCI offered to accept Ver's digital assets and shares as collateral, but only if he _over_-collateralized his position by 300% to 600%.  Were Ver to pay in digital assets, GGCI wanted him to supply 300% as much collateral as the value of his entire position.  If in private shares, 600%.

142.     As a result of the abrupt change in policy and attempt to extract an excessive sum of collateral, Ver began to suspect GGCI's insolvency.  He nonetheless agreed to discuss details with GGCI on a call the following day, June 25.

143.     On the June 25th call, Defendants threatened to issue a notice of default if Ver did not immediately pay the full amount in US dollars or Reference Currency or meet its excessive collateral demands.

144.    Considering the state of the markets, Ver responded to Defendants on the call by requesting proof of GGCI's solvency.

145.    That same day, June 25, Silbert sent a message to DCG personnel and explained that "[w]e just can't allow people inside or outside [to] question Genesis' solvency."   On information and belief, this was in direct response to Ver having just questioned GGCI's solvency.

146.     Thereafter, GGCI backed off its demands for excessive sums of collateral, began engaging in more constructive discussions to immediately accept certain digital assets, and continued discussions with Ver as to other assets to pledge as collateral.

147.    On information and belief, even using inflated mark-to-market prices for digital assets, GGCI was insolvent on June 25 and was therefore unable to provide Ver with proof of its solvency.

148.    GAP had just lost its bid to freeze 3AC assets in the emergency arbitration hearing on June 21.  At the very latest, GAP should have written down their impaired 3AC loans by such date, which would have resulted in GGCI also writing down any related party loans with GAP.

149.    On June 27, 2022, Genesis Global's then CEO, Moro, emailed DCG and Genesis Global executives, explaining the need to show a "well-capitalized" balance sheet to counterparties like Gemini on June 30, 2022:

> Once the equity problem is solved, the liquidity problem is much easier to solve.  I think we'll find people to lend us additional [cryptocurrency] with a well-capitalized 6/30 balance sheet.
>
> And yes, at some point, our losses in [Three Arrows] and potentially Babel will become public.  But if we're able to show our balance sheet after all of that happened and it still looks strong, I think that 1) people will care

Case 1:24-cv-01533-JPC   Document 1-17   Filed 02/28/24   Page 31 of 53

less about the losses and 2) we'll be better able to operate from a place of strength going forward.

But as I told Barry this evening, we have a lot of work to do before we can get back to full-steam-ahead on lending. Better to think of it in wind-down mode for the time being, and just manage liquidity as loans roll off. Then we can look to rebuild.

150. The next day, in a June 28, 2022 email, Moro wrote to Silbert that he had discussed with other Genesis Global representatives how to "best fill the equity hole", euphemistically referring to the Genesis Entities' negative equity value caused by the more than $1 billion in losses. Moro wrote that "[w]hile liquidity [was] still [Genesis Global's] number one focus, [they] only ha[d] a couple of days until quarter-end." Thus, he proposed an "overall plan" of injecting certain assets to "plug the equity hole" and then "work on consistent messaging to speak to the loss to counterparties when we put out [a] new balance sheet" in an effort to "[r]estore confidence in the market and keep looking to borrow with term." Moro continued:

We wouldn't necessarily need to touch the [proposed] assets [that DCG would inject] … for liquidity purposes, it could just be for balance sheet support. And then with a strengthened balance sheet, we would be able to source additional unsecured funding to be able to continue to manage our liquidity and withdrawal obligations.

151. Initially, GGCI declined to provide up-to-date solvency proof to Ver, stating it did not produce point-in-time financial statements.

152. However, on June 28, after Ver had informed GGCI that he was not comfortable sending any further collateral without proof of GGCI's solvency and Moro had discussed the need to "restore confidence in the market," GGCI provided an unaudited point in time financial statement. This statement of financial condition (the "June 20 SOFC") revealed GGCI's various assets and liabilities as of June 20.

Case 1:24-cv-01533-JPC   Document 1-17   Filed 02/28/24   Page 32 of 53

**Genesis Global Capital International Limited**
**Statement of Financial Condition (Unaudited)**
**June 20, 2022**
*(in thousands)*

| Assets | | |
|---|---|---|
| Cash | $ | 12,929 |
| Investments in digital currencies | | 1,594,209 |
| Derivative assets | | 442,733 |
| Collateral receivable | | 454,449 |
| Receivable from customers | | 159,182 |
| Loans receivable | | 399,560 |
| **Total assets** | $ | 3,063,062 |
| | | |
| **Liabilities and stockholder's equity** | | |
| **Liabilities** | | |
| Collateral payable | $ | 2,094,617 |
| Payable to customers | | 94,569 |
| Loans payable | | 606,477 |
| Derivative liabilities | | 167,132 |
| **Total liabilities** | $ | 2,962,795 |
| | | |
| **Stockholder's equity:** | | |
| Total stockholder's equity | | 100,267 |
| **Total liabilities and stockholder's equity** | $ | 3,063,062 |

153.   The June 20 SOFC claimed total assets of $3.063 billion and liabilities of $2.962 billion, which gave GGCI positive equity of just over $100 million. Given that $1.594 billion of GGCI's assets were digital assets ("Investments in digital currencies"), even a small fluctuation in the market would render it insolvent.

154.   Representatives for Ver also sent a number of questions to GGCI and Genesis Global employees regarding the firm's finances.

155.   Ver received a response to these inquiries on June 30th. At the direction of Moro, Silbert and the Genesis Entities, an employee of both GGCI and Genesis Global, and, upon information and belief, other Genesis Entities, made a number of representationss

a.   First, the employee alleged that they had no concern with GGCI counterparties. However, at the time they had over $1.6 billion in digital assets that they would be stuck with should the market experience a down turn and counterparties be unable to meet their obligations.

    b.   Second, the employee stated that GGCI has "no directional risk to any asset." This would imply that GGCI had hedged its $1.6 billion exposure to digital assets. As discussed above, this was not an accurate representation of GGCI and the Genesis Entities' "directional risk" as their digital assets were not hedged.

    c.   Third, the employee represented that it was business as usual despite the chaos and severe financial pressures being felt by all of the Genesis Entities as a result of the default of 3AC. Further, the employee failed to disclose that GGCI's working capital had been reduced from $100 million to $14 million in the 10 days between the date that the SOFC was provided to Ver and sending this email. As Moro had just explained that Genesis was in "wind-down mode," this statement was either intentionally misleading or willfully ignorant.

    d.   Finally, when asked if there would be a significant change between the information provided in the June 20th SOFC and the end of month statement, the employee responded that the "overall picture should remain the same." However, as stated above, what the employee failed to disclose the $86 million, or 86%, reduction in working capital in the 10 days since the June 20 SOFC had been prepared.

156.    Faced with an apparently solvent GGCI, who had by now backed off its demands for excessive collateral, Ver saw no choice but to keep his remaining positions open at GGCI and

Case 1:24-cv-01533-JPC   Document 1-17   Filed 02/28/24   Page 34 of 53

cooperate with it to ensure collateral levels were mutually acceptable until his remaining options expired, unless and until he was presented with evidence of its insolvency.

157.    However, what Ver did not know at the time was that the June 20 SOFC was an accounting farce. The $1.596 billion in digital assets was in fact worth far less, and consisted of a large sum of illiquid FTT tokens, which if sold would have left a large shortfall remaining to GGCI from an insolvent counterparty.

158.    This was recognized by Alex Van Vorhees, legal counsel to both Genesis Trading and GGCI. While discussing collateral and the Genesis Entities' demand that he overcollateralize, Van Vorhees stated "over collateralization is a function of the assets not being liquid." However, as would later become clear, GGCI and the Genesis Entities did not write down the value of any of its non-liquid cryptocurrency on its balance sheet.

159.    The SOFC's chosen date of June 20 was no accident and was a central part of that farce. The SOFC did not reflect the full write down of 3AC's impaired loans. On information and belief, the 3AC loans were deemed impaired by Genesis on June 21 when GAP's request for emergency relief was denied and GAP had no further collateral to support such debts.

160.    When GGCI's plan to seize exorbitant amounts of collateral from Ver failed, GGCI entered into discussions with its parent companies for an injection of capital to return it to solvency in time for its quarterly reporting obligations at the end of June.

**DCG's $1.1 Billion Promissory Note and Further Misrepresentations of Solvency**

161.    DCG and Genesis Global engaged in a communications campaign designed to conceal Genesis Global's financial condition and mislead counterparties into believing Genesis Global was operating "business as usual." Those counterparties included Ver, who was invested with GGCI.

Case 1:24-cv-01533-JPC   Document 1-17   Filed 02/28/24   Page 35 of 53

162.    From June 13, 2022, through July 2022, DCG employees and executives (including Silbert and DCG's Chief Operating Officer ("COO")) met with Genesis Global and GGCI's leadership daily, often multiple times a day.

163.    During these meetings, Silbert, Moro, DCG, and Genesis Global employees discussed how to communicate with counterparties about Three Arrows, and how to bolster the Genesis Entities' financial condition in the wake of these losses.  During the same 30-day period, DCG's COO and DCG's Head of Communications helped draft talking points documents for use by DCG and Genesis Global personnel in conversations with counterparties. It is important to note that GGCI and Genesis Global have the same employees, working out of the same office as the other Genesis Entities.

164.    On June 30, 2022 DCG and Genesis Global entered into a sham transaction designed to cover the insolvency of the Genesis Entities, including GGCI.  DCG executed an unsecured promissory note payable to Genesis Global in the amount of $1.1 billion (the "DCG Promissory Note").

165.    Silbert signed the Promissory Note as CEO of DCG.

166.    Moro signed the Promissory Note as the CEO of Genesis Global and Genesis Holdco, and as director of Genesis Asia Pacific.

167.    DCG dictated the terms of the Promissory Note, including the ten-year duration and 1% interest rate.  DCG provided no collateral to secure its obligations under the Promissory Note.  To the contrary, DCG's repayment of the Promissory Note was subordinate to DCG's repayment of an over $350 million credit facility to unrelated third parties.  DCG's pre-existing $350 million obligation reduced the likelihood that DCG could repay the Promissory Note.

168.    Genesis Global then added the DCG Promissory Note to its balance sheet as a current asset worth $1.1 billion, purportedly to "offset" the $1.2 billion loss it incurred from 3AC's collapse.  With a fresh $1.1 billion added to its balance sheet as a current asset, Genesis Global was then able to use that $1.1 billion to make an injection of capital into its subsidiary, GGCI.

169.    On information and belief, Genesis Global used the DCG Promissory Note to inject $151 million into its subsidiary, GGCI.  GGCI then recorded $151 million as a current asset on its balance sheet worth $151 million.  This was reflected in an unaudited June 30 SOFC, which Ver would later receive from GGCI.

**GGC International Limited**
**Statement of Financial Condition**
**June 30, 2022**
*(in thousands)*

| Assets | | |
|---|---|---:|
| Cash | $ | 3,232 |
| Investments in digital currencies and trusts | | 1,439,363 |
| Digital currency loans receivable, net of allowance for loan losses | | 1,250 |
| USD loans receivable, net of allowance for loan losses | | 1,900 |
| Digital currency collateral receivable | | 340,389 |
| Derivative assets | | 369,045 |
| Interest receivable, net of allowance | | 2,758 |
| Receivables from related parties | | 47,334 |
| Other assets | | 151,977 |
| **Total assets** | $ | 2,357,248 |
| | | |
| **Liabilities and member's equity** | | |
| **Liabilities** | | |
| Digital currency loans payable | $ | 370,737 |
| Digital currency collateral payable | | 891,080 |
| USD loans payable | | 18,073 |
| Option collateral payable | | 344,169 |
| Derivative liabilities | | 191,864 |
| Interest payable | | 5,645 |
| Accounts payable and accrued expenses | | 295,894 |
| Payables to related parties | | 225,364 |
| **Total liabilities** | | 2,342,826 |
| | | |
| **Member's equity** | | 14,422 |
| Total member's equity | | 14,422 |
| **Total liabilities and member's equity** | $ | 2,357,248 |

170.    The June 30 SOFC contained a brand new line item, "Other assets", which did not appear on the June 20 SOFC.  "Other assets" reported $151 million in assets.   On information and belief, "Other assets" represented funds that had been received by GGCI on June 30 as the result of the DCG Promissory Note.

171.    In reality, however, the fair market value of the DCG Promissory Note was just a small fraction of the $1.1 billion face amount.  The note would not mature for 10 years — not until June 30, 2032 — and bears interest at a rate of just 1%, far below the market interest rate that DCG would be required to pay for unsecured borrowing.  Accordingly, Genesis Global remained insolvent even upon receipt of the DCG Promissory Note.

172.    Likewise, the fair market value of the $151 million GGCI had received was also worth just a fraction of its reported face value, since on information and belief its value was derived from the DCG Promissory Note and did not represent an actual injection of cash.  Accordingly, GGCI remained insolvent afterwards, as the actual fair market value of what it had received was insufficient to cover the $136 million in negative equity reported on GGCI's June 30, 2022 SOFC.

173.    On information and belief, both Genesis and DCG had hoped that the DCG Promissory Note would simply serve as a short term bridge loan until the arbitration panel GAP had convened seeking emergency relief from 3AC could make its ruling on July 5, 2022, where GAP hoped to seize certain of 3AC's assets.  However, the arbitration panel denied GAP the relief it sought.

174.    The following day, July 6, Genesis set about to reassure the market that it remained solvent and was continuing business as usual.  That day, Genesis CEO Michael Moro released a public statement on Twitter and explained that "[w]e previously stated in June that we

mitigated our losses with respect to a large counterparty who failed to meet a margin call. Now that the BVI bankruptcy process has commenced, we can confirm that the counterparty was Three Arrows Capital." Moro asserted that "[t]he loans to this counterparty had a weighted average margin requirement of over 80%. Once they were unable to meet the margin call requirements, we immediately sold collateral and hedged our downside." He then claimed that, "[s]ince then, we worked with [DCG] to find the optimal strategy to further isolate the risk. **DCG has assumed certain liabilities of Genesis related to this counterparty to ensure we have the capital to operate and scale our business for the long term.**" In sum, Moro asserted that "[w]e deploy a number of risk management strategies to ring-fence our portfolio and utilize all capabilities to mitigate losses quickly and effectively."

175.    DCG's COO and Head of Communications edited and helped draft these tweets. Silbert reviewed these tweets before Moro posted them.

176.    GGCI's insolvency was never cured by an injection of capital from DCG. DCG never "assumed" or "absorbed" Genesis Global's losses. Instead, DCG and Genesis engaged in yet another accounting farce. The DCG Promissory Note was an accounting trick designed to make Genesis Global — and by extension, its subsidiary, GGCI — appear as if they had positive equity *without* ever requiring DCG to commit the financial support needed to actually make Genesis Global and GGCI solvent.

177.    The tweets were false, misleading, and omitted material facts. DCG did not simply "assume" the $1.1 billion, open-term liability related to Three Arrows, which could be called at any time; it replaced that liability with an illiquid ten-year Promissory Note.

178.    The Promissory Note failed to ensure that Genesis Global had sufficient capital to operate its business. The Promissory Note required DCG to provide cash payments in no sooner

than 10 years, whereas the Three Arrows-related liabilities DCG purportedly "assumed" were callable on demand; this created a mismatch between the Promissory Note and Genesis Global's billions of dollars' worth of on-demand obligations. Genesis Global's and DCG's internal documents reveal that the Promissory Note's ten-year duration and 1% interest rate failed to address the "structural hole" caused by the Three Arrows losses.

179.    In an internal document, Genesis Global's Chief Risk Officer acknowledged that the Promissory Note "wreaks havoc on our balance sheet impacting everything we do."

180.    On July 6, 2022, Genesis Global's Head of Communications and Public Relations sent a document titled "Talking Points to [Three Arrows] Questions" to Moro, as well as DCG's COO, DCG's Head of Communications, and various other senior employees at Genesis Global and DCG with instructions to "review and approve."  DCG's Head of Communications helped draft these talking points.  DCG's COO also reviewed these talking points on July 6, 2022. These talking points were to be used by Genesis Global personnel in conversations with counterparties, including Mr. Ver.

181.    Genesis Global's CFO and other personnel directed employees not to disclose the Promissory Note to counterpartie.  Indeed, many Genesis Global employees were not informed of the Promissory Note until months after its signature.

182.    When counterparties requested additional information concerning Genesis Global's financial statements, Genesis Global continued to conceal and suppress information that would have revealed the Promissory Note or losses on counterparty defaults.  In July 2022, Genesis Global's CFO directed other personnel to tell counterparties that the notes to Genesis Global's balance sheet—which would have explained the Promissory Note and its impact on Genesis Global's balance sheet—were not prepared more frequently than the end of the year.

Case 1:24-cv-01533-JPC   Document 1-17   Filed 02/28/24   Page 40 of 53

This was false.  Genesis Global prepared notes for its quarterly balance sheets in prior quarters, including its unaudited balance sheets for the second and third quarters of 2021 and the first quarter of 2022.

183.    In a July 2022 Microsoft Teams chat, Genesis Global's CFO confessed to her coworkers that the "real reason" why Genesis Global would not provide these footnotes to counterparties was because "[i]n the notes, we are required to disclose a lot of things [w]hich will highlight what happened" including the "assignment of liab[ilities]"—i.e., the Promissory Note.

184.    In another Microsoft Teams chat, in September 2022, Genesis Global's CFO explained to coworkers that without the footnotes, counterparties would not know about the Promissory Note from the balance sheet alone.

185.    After June 30, 2022, Genesis Global's CFO, in consultation with DCG, directed Genesis Global personnel not to share cash flow and income statements and to withhold Genesis Asia Pacific's financial statements from counterparties.  These financial statements would have revealed hundreds of millions of dollars in losses during the second quarter of 2022 and would have revealed that DCG did not "absorb the loss."

186.    Genesis Global personnel soon grew concerned that Genesis Global had provided false information to counterparties.  On September 1, 2022, Genesis Global's Director of Lending reported to its interim CEO: "I'm hearing concerns from front office folks….  They're concerned about the accuracy of information we have shared with clients re liquidity and variability in our equity….  There still is no liquidity infusion from DCG to fill the gap and instead we have a 'note'."  Nevertheless, neither DCG nor Genesis Global corrected the misstatements that Genesis Global employees made to counterparties, including Ver

187.     Ver was misled into believing that GGCI was solvent by the June 20 SOFC and Genesis CEO Moro's public statements.  Ver was thus unable to timely exercise his contractual right to terminate the ISDA due to GGCI's violation of the Solvency Requirement.

188.     From June 21, 2022 up until he discovered GGCI's insolvency in December 2022, Ver made payments to GGCI in excess of $60 million and GGCI liquidated a further $50,000,000 in collateral.

## Ver Discovers GGCI's Insolvency

189.     On November 11, 2022, FTX and Alameda filed for bankruptcy.  Their bankruptcy came after a rapid decline when Binance, another exchange, announced they would sell their FTT tokens on the open market.  Since FTT tokens were highly illiquid and their prices artificially inflated by Alameda, their value plunged by over 90% following Binance's announcement.

190.     The FTX and Alameda bankruptcies sent shockwaves through the digital asset markets.  Surprisingly, Sam Bankman-Fried ("SBF"), the controlling principal behind FTX and Alameda, started giving public interviews, asserting that FTX wasn't truly insolvent since its balance sheet held digital assets — primarily FTT tokens — with a mark-to-market value exceeding customer liabilities.  SBF was eventually indicted on numerous felony charges.

191.     Later that November, rumors circulated that Genesis and its subsidiaries were insolvent when its lending arm stopped withdrawals, trapping investor funds.  It was later revealed that GGCI was FTX's largest creditor.

192.     Genesis initiated a restructuring plan to save its business, which focused on transferring bad assets from GGCI to other Genesis entities destined for bankruptcy.  The plan aimed to raise capital to pay creditors by selling shares in a financially stable GGCI.

Case 1:24-cv-01533-JPC Document 1-17 Filed 02/28/24 Page 42 of 53

193.    Meanwhile, Ver continued to pay collateral to GGCI.  Since June 21, 2022, Ver made total payments to GGCI in excess of $60 million and GGCI liquidated collateral valued in excess of $50,000,000.

194.    On or about December 23, just weeks after Ver made $37 million in collateral payments to GGCI, and just one week before his options would expire, Ver became aware of information that made him question GGCI's earlier claim of solvency that had been supported by the June 20 SOFC.

195.    The news was a New York Times interview of SBF, who stated that Alameda had repaid a $2.5 billion loan to "Genesis" that August, about three months before filing for bankruptcy.  SBF added that the loan was repaid because Genesis had called in specific loans made to Alameda.

196.    Ver became concerned that GGCI might have been the entity that lent money to Alameda, potentially affecting GGCI's present solvency and their solvency in June 2022.

197.    As Alameda repaid the loan to Genesis in August, about three months before FTX's bankruptcy, it seemed like this repayment would potentially be subject to an automatic clawback as a preferential transfer.

198.    Ver investigated and learned that there was speculation that SBF had directed Alameda to misappropriate FTX customer funds to repay Genesis.  Alameda then used the FTT tokens it had received back from Genesis to pay FTX, who then used the FTT tokens to replace the missing customer deposits as an asset on its balance sheet.

199.    This caused Ver to grow more concerned, since if true, it would mean that GGCI had been doing what FTX had been doing: propping up its insolvent balance sheet with inflated FTT tokens.

Case 1:24-cv-01533-JPC   Document 1-17   Filed 02/28/24   Page 43 of 53

200.    Since Ver was considering rolling his expiring December 30 options with GGCI to a later date, he wanted to be sure GGCI remained solvent before doing so, and wanted to further confirm they had in fact been solvent that past June when he initially inquired.

201.    In late December 2022, Ver inquired with GGCI as to whether they remained solvent in the wake of the FTX and Alameda bankruptcies, and whether GGCI had any exposure to them, specifically whether it had been GGCI who had reportedly made a $2.5 billion loan to Alameda and was repaid in August 2022.

202.    GGCI responded that all of Ver's trades had been through GGCI. Despite having lost some funds on FTX, GGCI claimed that it remained solvent and had no further involvement or exposure to Alameda or FTX.

203.    Ver persisted in questioning specifically whether it had been GGCI who received the Alameda loan repayment referred to by SBF in the New York Times interview. GGCI informed Ver that those funds had been repaid to a different Genesis entity, not GGCI.

204.    At this point, Ver demanded proof of GGCI's present solvency, and demanded GGCI provide proof as to how they valued the assets on its June SOFC, which Ver now suspected had deployed the same misleading mark-to-market accounting that FTX had deployed to deceive its depositors.

205.    Ver reminded GGCI that he had faithfully paid in excess of $60 million in additional collateral since June, believing it his legal obligation to do so since GGCI remained solvent, including $37 million dollars in payments just weeks prior.

206.    Were Ver simply trying to avoid paying a debt to GGCI, as Counter-Defendant alleges in its complaint, he obviously would not have made payments totalling $37 million just weeks earlier, and would have raised concerns instead of paying.

Case 1:24-cv-01533-JPC   Document 1-17   Filed 02/28/24   Page 44 of 53

207.    Satisfied Ver's concerns were being raised in good faith, but while still denying

the validity of his claims, GGCI produced to Ver its 2021 audited financials, as well as an

unaudited SOFC dated June 30, 2022.

208.    However, both of those documents raised even further issues which revealed

GGCI to have been insolvent in June 2022 at the latest.

### The June 30 SOFC

209.    The June 30 SOFC revealed to Ver the dramatic and concerning changes which

had occurred since the June 20 SOFC.

| Genesis Global Capital International Limited Statement of Financial Condition (Unaudited) June 20, 2022 *(in thousands)* | | |
| --- | --- | --- |
| **Assets** | | |
| Cash | $ | 12,929 |
| Investments in digital currencies | | 1,594,209 |
| Derivative assets | | 442,733 |
| Collateral receivable | | 454,449 |
| Receivable from customers | | 159,182 |
| Loans receivable | | 399,560 |
| **Total assets** | $ | 3,063,062 |
| **Liabilities and stockholder's equity** | | |
| **Liabilities** | | |
| Collateral payable | $ | 2,094,617 |
| Payable to customers | | 94,569 |
| Loans payable | | 606,477 |
| Derivative liabilities | | 167,132 |
| **Total liabilities** | $ | 2,962,795 |
| **Stockholder's equity:** | | |
| Total stockholder's equity | | 100,267 |
| **Total liabilities and stockholder's equity** | $ | 3,063,062 |

| GGC International Limited Statement of Financial Condition June 30, 2022 *(in thousands)* | | |
| --- | --- | --- |
| **Assets** | | |
| Cash | $ | 3,252 |
| Investments in digital currencies and trusts | | 1,439,361 |
| Digital currency loans receivable, net of allowance for loan losses | | 1,550 |
| USD loans receivable, net of allowance for loan losses | | 11,600 |
| Digital currency collateral receivable | | 340,389 |
| Derivative assets | | 861,045 |
| Interest receivable, net of allowance | | 2,758 |
| Receivables from related parties | | 47,334 |
| Other assets | | 151,977 |
| **Total assets** | $ | 2,357,248 |
| **Liabilities and member's equity** | | |
| **Liabilities** | | |
| Digital currency loans payable | $ | 370,737 |
| Digital currency collateral payable | | 891,080 |
| USD loans payable | | 18,073 |
| Option collateral payable | | 344,169 |
| Derivative liabilities | | 191,864 |
| Interest payable | | 5,645 |
| Accounts payable and accrued expenses | | 295,894 |
| Payables to related parties | | 225,364 |
| **Total liabilities** | | 2,342,826 |
| **Member's equity** | | 14,422 |
| Total member's equity | | 14,422 |
| **Total liabilities and member's equity** | $ | 2,357,248 |

210.    First, there had been a significant reported drop in both positive equity and assets.

On June 20, there was positive equity of just $100 million on $3 billion in assets, which

indicated GGCI faced significant liquidity and volatility concerns. However, by June 30, positive

equity had shrunk to $14 million, with assets dropping by more than $400 million, exacerbating

these already significant concerns.

211.    Second, much of the fall in asset values was attributed to loans that had been written down.  On June 20, GGCI reported "loans receivable" of $399 million.  However, by June 30, loans receivable had been reduced to $2.25 million.[2]  This represented a loss of more than 99% of GGCI's loans receivable in just a ten day period.

212.    On information and belief, these loan write-downs represented losses related to 3AC, which had not been written down in the June 20 SOFC, but were known to Counter-Defendant when the June 20 SOFC was sent to Ver as proof of GGCI's solvency.

213.    Lastly, the June 30 SOFC contained a brand new line item, "Other", which had $151 million in assets.  There was no new corresponding line item in liabilities.

214.    On information and belief, this line item "Other" represented sums that were placed onto GGCI's balance sheet as a result of the DCG Promissory Note.

### GGCI's 2021 Audited Financials

215.    GGCI's 2021 audited financials revealed to Ver both that GGCI had been valuing digital assets at 100% mark-to-market, and that it had in fact been the entity that originated a $2.5 billion loan collateralized by FTT tokens.  Those FTT tokens had ultimately come from Alameda.

216.    The 2021 audited financials explained that GGCI accounted for collateral paid by counterparties as an asset with a corresponding liability.  Alameda's FTT tokens would have been counted on its balance sheet as an asset under "*Investments into digital assets*" and as a liability under "*digital currency collateral payable.*"

---

[2] The June 20 SOFC and June 30 SOFC differed in how they recorded loans receivable.  The June 20 SOFC contains a single line item for "loans receivable"; the June 30 SOFC contains two, one for USD and one for Digital assets. The line item "*USD Loans Receivable net of allowance for loan losses*" is recorded as $1 million, and "*Digital Currency Loans Receivable net of allowance for loan losses*" is recorded as $1.25 million.  Together, they represent "loans receivable" equal to $2.25 million as of June 30, 2022.

Case 1:24-cv-01533-JPC Document 1-17 Filed 02/28/24 Page 46 of 53

217. GGCI's balance sheet showed "*Investments in digital currencies*" equal to $2.825 billion, and "*Digital currency collateral payable*" equal to $2.370 billion.

218. Notably, the "*Digital currency collateral payable*" roughly equaled the $2.5 billion SBF had referred to during his New York Times interview. And while "*Investments in digital currencies*" was larger, it contained additional digital assets owned by GGCI.

219. GGCI's cash flow statement in the 2021 audited financials also contained a line item for "*Digital currency collateral payable*" under liabilities, which was equal to the same line item on the balance sheet, indicating these sums made their way onto GGCI's balance sheet in 2021.

220. GGCI's 2021 audited financials contained a section detailing significant exposures to various counterparties. The significant counterparties were not identified by name, only certain information about them was provided. The financials identified a "Counterparty I" who represented 99% of the digital currency collateral payable liability, which was further identified to consist of 99% FTT tokens.

221. Therefore, GGCI's 2021 financials showed that at some time in 2021 it had originated a loan to a single counterparty backed by FTT tokens, which were valued at $2.3 billion as of December 31, 2021. It was evident to Ver that "Counterparty I" was Alameda Research.

222. Lastly, GGCI's 2021 audited financials contained other figures that revealed yet other sources of GGCI's undercapitalization. The statement of cash flows identified a $105 million dollar operating loss for 2021. And the statement of changes in stockholder equity identified almost $41 million in distributions in 2021.

**GGCI's Shifting Explanations**

223.    When Ver pointed out that GGCI's 2021 audited financials identified a $2.5 billion loan obligation to Alameda, contrary to GGCI's prior representations, GGCI provided misleading information to Ver in an attempt to distance itself from Alameda.

224.    Incredibly, GGCI initially claimed that the financials Ver possessed were actually a consolidated report for multiple Genesis entities, and that the FTT tokens belonged to a different Genesis entity.

225.    However, the financials were clearly labeled as having been prepared exclusively for GGCI, which quickly disproved GGCI's claims.

226.    Once disproven, GGCI shifted its narrative and asserted that an affiliate had dealt with Alameda, who then borrowed from GGCI using the FTT tokens as collateral. GGCI then refused to provide any evidence to support this claim.

227.    Nonetheless, GGCI's claim that the FTT tokens belonged to an affiliate was a difference without distinction, since the tokens had ultimately come from Alameda and would be subject to a clawback in bankruptcy.

228.    In fact, on May 3, 2023, FTX filed a motion in the Southern District of New York, on behalf of itself and affiliated debtors, seeking $3.9 billion back from Genesis, including sums from GGCI.

229.    Ultimately, discussions with GGCI made clear that GGCI hadn't applied any discount to the digital assets on its SOFC.

230.    At one point, GGCI personnel even admitted that they "may have been underwater for a few days."

231.    Had GGCI applied appropriate discounts to its digital assets, as it demanded from Ver, its SOFC would have revealed its insolvency.

232.    As a result, Ver would have closed his positions to avoid trading with an insolvent counterparty and saved tens of millions of dollars.

## CAUSES OF ACTION

### COUNT ONE

### (Fraud)

233.    Defendant realleges and incorporates all preceding paragraphs as though fully set forth herein, and further alleges:

234.    As described herein, Defendants Silbert, Moro, and DCG crafted and issued a number of misrepresentations through a series of tweets. Those statements were inaccurate in the following ways and were made with full knowledge of their inaccuracies:

a.  First, client funds had been impacted—the Three Arrows losses severely impaired Genesis Global's ability to repay its counterparties, including Earn investors.

b.  Second, due to Three Arrows' default on June 13, 2022, the Genesis Entities' balance sheets were not strong, solvent, or capable of absorbing the losses; the Genesis Entities suffered a loss that exceeded their equity.  Indeed, in a June 21, 2022 email, Silbert informed colleagues at DCG that "the hole in Genesis equity due to the Three Arrows exposure is something they we [sic] will need to fill by 6/30," and asked his colleagues to "keep [that] between us."  Three days later, Silbert further explained to

Case 1:24-cv-01533-JPC   Document 1-17   Filed 02/28/24   Page 49 of 53

DCG personnel "[w]e just can't allow people inside or outside [to] question Genesis' solvency" due to Silbert's concern that this could spark a bank run.

c. Third, the tweets discussed the sale or hedging of all "liquid" collateral while concealing that hundreds of millions of dollars' worth of the loans were secured by illiquid collateral that could not be sold and was not hedged.

d. Fourth, Genesis Global had not "shed the risk and moved on"—as of June 17, 2022, it still held a more than $1 billion receivable relating to Three Arrows as an uncollectible asset on its balance sheet.

235. Third-Party Defendants' conduct was willful, wanton, malicious, and oppressive.

236. Ver relied, in part, on the public statements of Moro and Silbert when deciding to continue to maintain his option positions at GGCI.

237. In the months following the misleading statements referenced above, Ver made payments in excess of $60,000,000 to GGCI to maintain his positions and GGCI liquidated over $50,000,000 of Ver's collateral.

238. Had Silbert and Moro accurately represented the financial condition of the Genesis Entities in their various statements, Ver never would have continued to make payments to maintain his option positions and would have avoided the loss of additional collateral by closing out his positions.

239. Third-Party Defendants' fraud has directly, legally, and proximately caused and continues to cause injuries to Ver. Ver seeks an award of damages for, among other things,

Case 1:24-cv-01533-JPC   Document 1-17   Filed 02/28/24   Page 50 of 53

compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000, punitive or exemplary damages for Third-Party Defendants' malicious conduct, all costs and Court fees, reasonable attorneys' fees, as well as any other relief this Court deems just and proper.

## COUNT TWO

### (Civil Conspiracy (Fraud))

240.   Defendant realleges and incorporates all preceding paragraphs as though fully set forth herein, and further alleges:

241.   As described herein, and in Ver's Counterclaim, GGCI and the Genesis Entities made a series of misrepresentations both directly to Ver and in the public with the intent to lull Ver and others into a false sense of security and remain invested in his open option positions, despite the fact that they were aware that GGCI and the Genesis Entities were insolvent.

242.   The Third-Party Defendants and Counter-Defendants combined and agreed with each other and/or others to defraud Ver by intentionally misrepresenting the solvency of the Genesis Entities.

243.   Pursuant to their agreements, explicit or otherwise, Third-Party Defendant and Counter-Defendants acted in concert to support their common purpose of defrauding Ver so that he would maintain his positions with GGCI, despite their insolvency at the time.

244.   Each Third-Party Defendant committed at least one over act in furtherance of such conspiracy including misleading Ver through a series of public statements designed to mislead Ver, and others, into believing that GGCI and the Genesis Entities remained solvent.

245.    Each Third-Party Defendant and Counter-Defendant acted with the common intent to defraud Ver and understood that each shared in that common purpose.

246.    Third-Party Defendants' conduct was willful, wanton, malicious, and oppressive.

247.    Third-Party Defendants' unlawful conspiracy has directly, legally, and proximately caused and continues to cause injuries to Ver. Ver seeks an award of damages for, among other things, compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000, punitive or exemplary damages for Third-Party Defendants' malicious conduct, all costs and Court fees, reasonable attorneys' fees, as well as any other relief this Court deems just and proper.

## COUNT THREE

### (Aiding and Abetting (Fraud))

248.    Defendant realleges and incorporates all preceding paragraphs as though fully set forth herein, and further alleges:

249.    During all relevant times to this matter, Counter-Defendants have committed fraud by making intentional misrepresentations with knowledge of their falsity in an effort to induce Ver to maintain his option positions with GGCI, which he did to his detriment.

250.    During all relevant times to this matter, Third-Party Defendants coordinated with and were aware of the intentional misrepresentations made to Ver.

251.    During all relevant times to this matter, Third-Party Defendants provided substantial assistance and encouragement, materially contributed to, and otherwise aided and abetted this fraud by making intentionally misleading and inaccurate representations to Ver, and the public, regarding the solvency of the Genesis Entities.

Case 1:24-cv-01533-JPC   Document 1-17   Filed 02/28/24   Page 52 of 53

252.     Third-Party Defendants' aiding and abetting this fraud was an actual and proximate cause of Ver's harm, including but not limited to, the additional funds he paid to GGCI to keep his option positions active as a result of the various misrepresentations of Third-Party and Counter-Defendants.

253.     Third-Party Defendants' conduct was willful, wanton, malicious, and oppressive.

254.     Third-Party Defendants' aiding and abetting has directly, legally, and proximately caused and continues to cause injuries to Ver. Ver seeks an award of damages for, among other things, compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000, punitive or exemplary damages for Third-Party Defendants' malicious conduct, all costs and Court fees, reasonable attorneys' fees, as well as any other relief this Court deems just and proper.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Counter-Plaintiff Roger Ver respectfully requests that this Court:

1. Award compensatory damages from Third-Party Defendants in an amount to be proven at trial, but believed to be in excess of $20,000,000.00 in favor of Ver, as well as punitive or exemplary damages, incidental damages, and consequential damages;

2. Award Ver pre-judgment and post-judgment interest;

3. Award Ver reasonable attorney fees, expenses, and the costs of this action; and

4. Award Ver such other and further relief as this Court may deem just, proper, and equitable under the circumstances.

Case 1:24-cv-01533-JPC Document 1-17 Filed 02/28/24 Page 53 of 53

## DEMAND FOR JURY TRIAL

Third-Party Plaintiff Roger Ver hereby demands a trial by jury of all claims so triable.

KELMAN PLLC

Dated: December 27, 2023

Michael D. Handelsman
Daniel J. Kelman
1441 Broadway
6th Floor, #6079
New York, NY 10018
(212) 380-3818
mike@kelman.law
daniel@kelman.law