# EXHIBIT R

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

GGC INTERNATIONAL LIMITED,

       Plaintiff/Counterclaim Defendant

          v.

ROGER VER,

       Defendant/Counterclaim Plaintiff.

Index No. 650439/2023

Motion Seq. No. 003

**PLAINTIFF / COUNTERCLAIM-DEFENDANT GGC INTERNATIONAL LIMITED'S
OPPOSITION TO DEFENDANT / COUNTERCLAIM-PLAINTIFF
ROGER VER'S MOTION TO AMEND AND SUPPLEMENT HIS ANSWER AND
<u>COUNTERCLAIM</u>**

MORRISON COHEN LLP
Jason Gottlieb
Michael Mix
Vani Upadhyaya
909 Third Avenue
New York, New York 10022
(212) 735-8600

*Counsel for Plaintiff / Counterclaim-
Defendant GGC International Limited*

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ................................................... 1

STATEMENT OF FACTS ....................................................... 3

    GGC International and Ver Enter Into the Master Confirmation Agreement ................... 4

    GGC International and Ver Enter Into Options Transactions That Ver Fails to Settle ...... 5

    Procedural History ..................................................... 6

ARGUMENT ................................................................ 7

I.     LEGAL STANDARD GOVERNING A MOTION FOR LEAVE TO AMEND ............. 7

II.    THE NEW ALLEGATIONS DO NOT OVERCOME THE INSUFFICIENCY OF THE AMENDED COUNTERCLAIMS.................................................. 9

    A.    GGC International Is Not a Defendant, and Was Not Even Mentioned, in the Attorney General Complaint.................................................. 9

    B.    Ver Cannot Impute Other Entities' Actions to GGC International...................... 10

    C.    Ver's New Allegations Do Not Overcome the Legal Deficiencies Requiring Dismissal of Ver's Breach of Contract Counterclaims......................................... 12

    D.    Ver's New Allegations Do Not Overcome the Legal Deficiencies Requiring Dismissal of Ver's Fraud Counterclaim ............................................. 12

III.   THE NEW CAUSE OF ACTION FOR CIVIL CONSPIRACY IS PALPABLY INSUFFICENT AND CLEARLY DEVOID OF MERIT ............................................... 15

IV.   VER'S MOTION TO AMEND PREJUDICES GGC INTERNATIONAL..................... 17

CONCLUSION.............................................................. 18

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abacus Fed. Sav. Bank v. Lim*,
75 A.D.3d 472 (1st Dep't 2010) ..........................................................................16

*Bd. of Mgrs. of 325 Fifth Ave. Condo. v. Cont'l Residential Holdings LLC*,
149 A.D.3d 472 (1st Dep't 2017) ..........................................................................11

*Bd. of Mgrs. of the Philip House Condo. v. 141 E. 88th St., LLC*,
No. 153289/2019, 2020 N.Y. Misc. LEXIS 4948
(Sup. Ct. N.Y. Cnty. Aug. 28, 2020) ..................................................................11

*Cent. Amusement Int'l LLC v. Lexington Ins. Co.*,
162 A.D.3d 452 (1st Dep't 2018) ............................................................................8

*Ciccone v. Gotta Have It! Collectibles, Inc.*,
173 A.D.3d 415 (1st Dep't 2019) ............................................................................8

*EVEMeta, LLC v. Siemens Convergence Creators Corp.*,
173 A.D.3d 551 (1st Dep't 2019) ...................................................................15, 16

*Franklin v. Daily Holdings, Inc.*,
135 A.D.3d 87 (1st Dep't 2015) ............................................................................11

*The People of the State of New York, by Letitia James, Attorney General of the
State of New York v. Gemini Tr. Co., LLC, et al.*,
Index No. 452784/2023 ...........................................................................................2

*Jacobs v. Lewis*,
261 A.D.2d 127 (1st Dep't 1999) ..........................................................................15

*Jean v. Chinitz*,
163 A.D.3d 497 (1st Dep't 2018) ............................................................................8

*Koch v. Sherevsky, Aronson & Mayefsky LLP*,
161 A.D.3d 647 (1st Dep't 2018) ............................................................................8

*Laura Corio, M.D. PLLC v. R. Lewin Interior Design, Inc.*,
49 A.D.3d 411 (1st Dep't 2008) .....................................................................15, 16

*Mamoon v. Dot Net Inc.*,
135 A.D.3d 656 (1st Dep't 2016) ..........................................................................15

ii

*Mandarin Trading Ltd. v. Wildenstein*,
  16 N.Y.3d 173 (2011) ...........................................................................15

*Mandel v. CBRE, Inc.*,
  No. 650568/2019, 2020 N.Y. Misc. LEXIS 1943
  (Sup. Ct. N.Y. Cnty. Apr. 13, 2020) .......................................................8

*Primus Pac. Partners 1 v. Goldman Sachs Grp.*,
  192 A.D.3d 546 (1st Dep't 2021) .............................................................8

*Reyes v. BSP Realty Corp.*,
  171 A.D.3d 504 (1st Dep't 2019) .............................................................7

*Shanahan v. Shanahan*,
  92 A.D.2d 566 (2d Dep't 1983) .............................................................17

*Shared Commc'ns Servs. of ESR, Inc. v. Goldman Sachs & Co.*,
  23 A.D.3d 162 (1st Dep't 2005) .............................................................15

*Sheridan Broad. Corp. v. Small*,
  19 A.D.3d 331 (1st Dep't 2005) .............................................................10

*Weinberg v. Kaminsky*,
  No. 150869/2017, 2017 N.Y. Misc. LEXIS 2936
  (Sup. Ct. N.Y. Cnty. Aug. 4, 2017) .......................................................14

*Williams v. 268 W. 47th. Rest. Inc.*,
  160 A.D.3d 436 (1st Dep't 2018) .............................................................7

**Other Authorities**

CPLR 3025 ..............................................................................................6, 17

CPLR 3211 ...................................................................................................9

Plaintiff / Counterclaim-Defendant GGC International Limited ("GGC International") respectfully submits this memorandum of law in opposition to the motion of Defendant / Counterclaim-Plaintiff Roger Ver ("Ver") dated December 11, 2023 (Motion Seq. No. 003, the "Motion to Amend") to amend and supplement Ver's Answer and Counterclaim.

## PRELIMINARY STATEMENT

Ver will do anything to avoid his payment obligations, including this Motion to Amend, in order to prevent this case from moving past the pleading stage. His latest gambit is yet another obfuscation tactic, with no bearing on the simple truth at the heart of this case: Roger Ver owes GGC International money, and he really doesn't want to pay it.

GGC International initially commenced this action on January 23, 2023, filing a Summons with Notice, and then subsequently filed its Complaint on March 28, 2023 (the "Complaint"). GGC International's Complaint is simple; it asserts one cause of action for breach of contract as a result of Ver's failure to settle three cryptocurrency options agreements that expired on December 30, 2022. As of the time of the Complaint, Ver owed $20,869,788, plus interest. Ver does not contest that he never paid that amount to GGC International.

Instead, Ver has engaged in a prolonged campaign to obfuscate and delay. On May 9, 2023, he filed spurious counterclaims against GGC International (the "Original Counterclaims"), claiming that because GGC International allegedly was "insolvent" at some undetermined point in mid-2022, Ver should be excused from his payment obligations. GGC International moved to dismiss those Counterclaims (the "First MTD") for numerous reasons, including that Ver did not follow the contractual procedure to redress an alleged event of default under the relevant contract and that Ver did not sufficiently allege that GGC International actually was insolvent. <u>One business day</u> after the First MTD was fully briefed, Ver filed amended counterclaims (the

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 7 of 637

"Amended Counterclaims"), inappropriately manufacturing new "facts" – contradicting the Original Counterclaims – in a gambit to circumvent the arguments in GGC International's motion to dismiss.  Ver's Amended Counterclaims necessitated another round of motion to dismiss briefing (the "Second MTD"), and the Court scheduled oral argument on the Second MTD for January 11, 2024.

Now, in filing the instant Motion to Amend, Ver <u>again</u> is seeking to amend his Counterclaims (the "Proposed Second Amended Counterclaims" or the "Second CC").  Ver noticed the Motion to Amend with a return date in Room 130 of January 12, 2024, one day after oral argument on the Second MTD is scheduled.  Ver claims that his proposed amendment includes facts taken virtually verbatim from a complaint filed by the New York Attorney General against seven other parties, but <u>not GGC International</u>: *The People of the State of New York, by Letitia James, Attorney General of the State of New York v. Gemini Tr. Co., LLC, et al.*, Index No. <u>452784/2023</u>, NYSCEF No. <u>2</u> (Sup. Ct. N.Y. Cnty.) (the "Attorney General Complaint").  The Attorney General Complaint was filed on October 19, 2023, but Ver waited nearly two months, until December 11, 2023, to file the Motion to Amend.  The Attorney General Complaint is not asserted against GGC International.  It does not even mention GGC International.  Ver's Motion to Amend seizes on that complaint nevertheless, in a thinly veiled attempt to further delay this case, and impede GGC International from recovering the millions of dollars that Ver owes GGC International.

Ver's Motion to Amend is without merit, and should be denied.  The First Department has explained that a motion to amend a pleading should be denied when the proposed amendment is "palpably insufficient or clearly devoid of merit," and an amendment is clearly devoid of merit when it is "legally insufficient."  Ver's Proposed Second Amended Counterclaims are legally

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 8 of 637

insufficient because they add absolutely nothing of legal relevance to his Amended Counterclaims, which should be dismissed pursuant to the pending Second MTD.  Because the Attorney General Complaint contain no facts whatsoever about GGC International, Ver is left grasping at facts from the Attorney General Complaint that relate to <u>other</u> entities and individuals.  But New York law upholds corporate formalities; the facts from the Attorney General Complaint about those other entities and individuals, even were they true, cannot magically be imputed to GGC International. Ver vaguely hints – though never explicitly argues – that GGC International's corporate veil should be pierced, but Ver has come nowhere close to meeting the incredibly high standard to disregard the corporate form.

Accordingly, the new factual allegations do not overcome the numerous deficiencies articulated in the Second MTD that require dismissal of the operative Amended Counterclaims. Ver also adds one new claim, for civil conspiracy, but New York does not recognize civil conspiracy as a standalone claim, and in any event Ver has not sufficiently pleaded the elements.

Ver's Proposed Second Amended Counterclaims is therefore legally insufficient, and the Motion to Amend should be denied.  And for the reasons set forth in the Second MTD, the operative Amended Counterclaims should be dismissed, and the case should proceed against Ver so that he no longer avoids his payment obligations.

## **STATEMENT OF FACTS**

Because GGC International has already filed two motions to dismiss Ver's Counterclaims, each containing a recitation of the factual history between the parties and relevant documentary

3

evidence, GGC International does not repeat the full factual record here. GGC International respectfully refers the Court to the Second MTD for a full recitation of the facts.[1]

**GGC International and Ver Enter Into the Master Confirmation Agreement**

Ver describes himself as a "well-known Bitcoin Cash ('BCH') proponent" who is "experienced in digital asset investment." Second CC ¶¶ 83-84. On or about June 22, 2020, the Parties entered into the Amended and Restated Master Confirmation Agreement for Virtual Currency Put and Call Options Transactions dated as of June 22, 2020 (the "Master Confirmation Agreement")[2] so that the Parties could trade cryptocurrency options. The 2002 ISDA Master Agreement (the "ISDA Master Agreement"),[3] which Ver was deemed to have entered by virtue of the Master Confirmation Agreement, provides the general conditions for payment and delivery.

Section 5(a) of the ISDA Master Agreement lists several potential "Events of Default." As relevant to Ver's Counterclaims, Section 5(a)(iv) states that it is an Event of a Default if a party makes a representation that "proves to have been incorrect or misleading in any material respect." And Section 5(a)(vii) states that it is an Event of Default where a party "becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due."

The ISDA Master Agreement contains a very specific process as to what the non-defaulting party may elect to do after an Event of Default has occurred. Section 6(a) states that if an Event

---

[1]  A true and correct copy of the entire set of Second MTD moving papers, with all documentary evidence attached to it, is attached as Exhibit K to the January 5, 2024 Affirmation of Jason Gottlieb (the "Gottlieb Aff.").

[2]  A true and correct copy of the Master Confirmation Agreement was attached as Exhibit 3 to the Affirmation of Alex van Voorhees filed in connection with the Second MTD. Gottlieb Aff. Ex. K.

[3]  A true and correct copy of the ISDA Master Agreement was attached as Exhibit 1 to the Affirmation of Alex van Voorhees filed in connection with the Second MTD. Gottlieb Aff. Ex. K.

of Default "has occurred and is then continuing," the non-defaulting party may "designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions."  Section 6(e)(i) of the ISDA Master Agreement provides that "[i]f notice designating an Early Termination Date is given under Section 6(a) . . . the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default . . . is then continuing."  Upon an Early Termination Date, an "Early Termination Amount" is due.  Section 6(e)(i) of the ISDA Master Agreement sets forth the detailed formula to determine the "Early Termination Amount."

Section (6)(d)(i) of the ISDA Master Agreement also states that upon the "occurrence of an Early Termination Date, each party will make the calculations . . . contemplated by Section 6(e)" and will provide such statement to the other party.  Any "Early Termination Amount will be payable "on the day on which notice of the amount payable is effective in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default."  ISDA Master Agreement § 6(d)(2).  An "Early Termination Amount" payable by one party can be "set-off" by amounts due to that party.  ISDA Master Agreement § 6(f).

**GGC International and Ver Enter Into Options Transactions That Ver Fails to Settle**

GGC International and Ver entered into numerous cryptocurrency options transactions governed by the Master Confirmation and the ISDA Master Agreement.  GGC International's Complaint describes in detail how Ver failed to settle those three options transactions, which all expired in the money to GGC International on December 30, 2022.  After GGC International followed the enumerated contractual procedure, GGC International designated an "Early Termination Date," and provided Ver with a statement showing that he owed $20,869,788.  Ver

5

failed to pay that amount to GGC International, and as a result GGC International initiated lawsuit

against Ver.  Gottlieb Aff. Ex. E.

**Procedural History**

GGC International commenced this action on January 23, 2023 by filing a Summons with

Notice.  Gottlieb Aff. Ex. A.  On February 24, 2023, Ver filed a Notice of Removal to the S.D.N.Y.

Gottlieb Aff. Ex. B.  On March 7, 2023, the S.D.N.Y. remanded the action back to this Court due

to lack of diversity jurisdiction.  Gottlieb Aff. Ex. C.  On March 8, 2023, Ver filed a demand for a

complaint.  Gottlieb Aff. Ex. D.  GGC International filed the Complaint on March 28, 2023.

Gottlieb Aff. Ex. E.  Ver filed his original Answer with Counterclaims on May 9, 2023.  Gottlieb

Aff. Ex. F.  On June 14, 2023, GGC International moved to dismiss the Original Counterclaims.

Gottlieb Aff. Ex. G.  On July 12, 2023, Ver filed an opposition to the motion.  Gottlieb Aff. Ex.

H.  On July 28, 2023, GGC International filed its reply in further support of its motion to dismiss

the Original Counterclaims.  Gottlieb Aff. Ex. I.

One business day later, on July 31, 2023, Ver filed the Amended Counterclaims.  Gottlieb

Aff. Ex. J.  Under CPLR 3025, Ver was able to file the Amended Counterclaims as of right.  On

August 21, 2023, GGC International filed the Second MTD, arguing that, among other things, the

Amended Counterclaims improperly changed Ver's central theory, and even the improper new

allegations did not state a claim and were barred by documentary evidence.  Gottlieb Aff. Ex. K.

Ver filed his opposition on September 6, 2023, and GGC International filed its reply on September

12, 2023.  Gottlieb Aff. Exs. L-M.  The Court scheduled oral argument on GGC International's

motion to dismiss the First Amended Counterclaims for January 11, 2024.

On December 11, 2023, Ver filed the instant Motion to Amend, seeking to amend his

Counterclaims for the second time.  Cynically, Ver noticed the return date on his Motion to Amend

for January 12, 2024, one day after the scheduled date for oral argument on the Second MTD. Clearly, Ver is hoping that the oral argument will be pushed back so that the Motion to Amend can be considered along with the Second MTD.

After filing the Motion to Amend on December 11, 2023, Ver was not done adding new claims. Neither Ver's Original Counterclaims nor his Amended Counterclaims nor his Proposed Second Amended Counterclaims contained any third-party claims. Yet, on December 27, 2023, over two weeks after he made the instant Motion to Amend, Ver filed a Third-Party Complaint (the "Third Party Complaint") against Digital Currency Group, Inc. ("DCG"), Barry Silbert, and Michael Moro (collectively, the "Third-Party Defendants"). Gottlieb Aff. Ex. N. To date, there is no indication on the docket that the Third-Party Complaint has been served on any of the Third-Party Defendants.

## **ARGUMENT**

### I.   **LEGAL STANDARD GOVERNING A MOTION FOR LEAVE TO AMEND**

In his moving brief, Ver cites decades-old non-binding case law from the Second Department in support of the proposition that in determining a motion for leave to amend, the court "does not pass upon the legal sufficiency of the proposed pleading." Memorandum of Law in Support of Defendant's Motion for Leave to Amend and Supplement His Answer and Counterclaim (NYSCEF No. 55, the "Moving Brief" or the "Moving Br.") at 4 (citation omitted). Ver misstates the standard.

The First Department has explained that courts should not grant leave to amend where the moving party has "failed to show that the proffered amendment was 'not palpably insufficient or clearly devoid of merit.'" *Williams v. 268 W. 47th. Rest. Inc.*, 160 A.D.3d 436, 437 (1st Dep't 2018). An "amendment is devoid of merit where the allegations are legally insufficient." *Reyes*

*v. BSP Realty Corp.*, 171 A.D.3d 504, 504 (1st Dep't 2019) (affirming denial of motion to amend where plaintiff could not establish allegations as a matter of law) (emphasis added, citation omitted). *See also Cent. Amusement Int'l LLC v. Lexington Ins. Co.*, 162 A.D.3d 452 (1st Dep't 2018) ("the court's denial of plaintiff's motion to amend the complaint was properly denied since the proposed amendment was palpably improper or insufficient as a matter of law") (citations and quotation marks omitted); *Koch v. Sherevsky, Aronson & Mayefsky LLP*, 161 A.D.3d 647, 648 (1st Dep't 2018) (affirming denial of motion to amend complaint because "[t]he 22 proposed causes of action against plaintiff['s][ ] former attorneys are palpably insufficient and clearly devoid of merit"); *Mandel v. CBRE, Inc.*, No. 650568/2019, 2020 N.Y. Misc. LEXIS 1943, at * 11-12 (Sup. Ct. N.Y. Cnty. Apr. 13, 2020) ("Leave to amend is denied because the proposed amendment is patently devoid of merit. As discussed above, plaintiff has no cause of action, even assuming the truth of the facts in the proposed amended complaint that he verified") (internal citations and quotation marks omitted).

While Ver does cite to Second Department law utilizing the "palpably insufficient" and "devoid of merit" language, Moving Br. at 5, 8, he ignores the binding First Department law stating that an amendment is devoid of merit where the allegations are legally insufficient.

Courts also will deny a motion for leave to file an amended complaint where the "proposed amended complaint contained the same causes of action as plaintiff's earlier complaint, and the factual amendments did not change the substance of those claims." *Primus Pac. Partners 1 v. Goldman Sachs Grp.*, 192 A.D.3d 546, 547 (1st Dep't 2021). Similarly, courts will deny motions for leave to amend where the moving party has "failed . . . to correct the fundamental flaw" in the party's pleading. *Jean v. Chinitz*, 163 A.D.3d 497, 499-500 (1st Dep't 2018). *See also Ciccone v. Gotta Have It! Collectibles, Inc.*, 173 A.D.3d 415, 416 (1st Dep't 2019) (affirming denial of

8

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 14 of 637

motion for leave to amend where "[t]he new allegations asserted in the amended complaint do not change the determination" that the plaintiff could not maintain its claims against the defendants).

## II.    THE NEW ALLEGATIONS DO NOT OVERCOME THE INSUFFICIENCY OF THE AMENDED COUNTERCLAIMS

The new facts that Ver seeks to plead in his Proposed Second Amended Counterclaims do not overcome the legal deficiencies raised by GGC International in the Second MTD, in which GGC International explained how the operative Amended Counterclaims should be dismissed under CPLR 3211(a)(1) and CPLR 3211(a)(7).  GGC International fully adopts the Second MTD and incorporates it by reference, because the arguments in the Second MTD apply equally to Ver's Proposed Second Amended Counterclaims.

The new allegations in the Proposed Second Amended Counterclaims do not alter this conclusion, and the Court should deny the instant Motion.

### A.    GGC International Is Not a Defendant, and Was Not Even Mentioned, in the Attorney General Complaint

Most of the new factual allegations in the Proposed Second Amended Counterclaims are taken almost verbatim from the Attorney General Complaint, [4] which was not filed against GGC International.  *See* Moving Br. at 1.  *See also* Attorney General Complaint (listing Defendants in Attorney General Complaint as five entities and two individuals, none of which are GGC International).  GGC International is not even mentioned in the Attorney General Complaint.

Thus, Ver's argument that the Attorney General Complaint "revealed certain facts that made it clear GGCI knew it was facing financial difficulties, and that hiding GGCI's insolvency was part of a larger scheme choreographed by the Genesis Entities to defraud their customers into

---

[4]    A true and correct copy of the Attorney General Complaint is attached as Exhibit O to the Gottlieb Aff.

thinking the Genesis Entities were financially sound so they would continue providing the Genesis Entities additional capital," Moving Br. at 4, is plainly untrue.  There are no allegations whatsoever in the Attorney General Complaint about what GGC International knew or did not know, or did or did not do.  Ver is simply misrepresenting documents.

Ver's Moving Brief and Proposed Second Amended Counterclaims also repeatedly use the term "Genesis Entities" to refer the allegations in the Attorney General Complaint, but never defines that term.  The Attorney General Complaint defines the term "Genesis Entities" as three <u>other entities</u>, but <u>not</u> GGC International.  *See* Attorney General Complaint at 1.  There are no references to Ver in the Attorney General Complaint.  Ver has simply taken the Attorney General Complaint and improperly attempted to graft its allegations onto Ver's dispute with GGC International.

### B.    Ver Cannot Impute Other Entities' Actions to GGC International

To the extent that Ver thus is trying to somehow impute the actions of the defendants named in the Attorney General Complaint to GGC International, such attempt fails under New York law. The First Department has explained that "[p]arent and subsidiary or affiliated corporations are, as a rule, treated separately and independently so that one will not be held liable for the contractual obligations of the other absent a demonstration that there was an exercise of complete dominion and control."  *Sheridan Broad. Corp. v. Small*, <u>19 A.D.3d 331</u>, 332 (1st Dep't 2005).  GGC International is a standalone legal entity used for derivatives trading activity with customers; it is separate and independent from the defendants named in the Attorney General Complaint.

Ver does not expressly argue that GGC International's corporate veil should be pierced, but he does comment in the Proposed Second Amended Counterclaims that GGC International and Genesis Global Capital, LLC ("GGC," a defendant named in the Attorney General Complaint)

10

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 16 of 637

have "little or no separation" because they allegedly are affiliates and have overlapping employees and offices. Second CC ¶¶ 80-82. To the extent that such allegations could be construed as an attempt to pierce GGC International's corporate veil, that argument should be denied. "Piercing the corporate veil requires a showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury. Moreover, the party seeking to pierce the corporate veil must establish that the owners, through their domination, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against that party such that a court in equity will intervene." *Franklin v. Daily Holdings, Inc.*, 135 A.D.3d 87, 95-96 (1st Dep't 2015) (denying attempt to pierce corporate veil). *See also Bd. of Mgrs. of 325 Fifth Ave. Condo. v. Cont'l Residential Holdings LLC*, 149 A.D.3d 472, 475 (1st Dep't 2017) ("the court properly deemed plaintiffs' veil-piercing allegations insufficient as too conclusory"). Ver does not allege any facts that GGC or any other entity or individual exercised complete domination over GGC International, or that such dominion was used to commit a wrong against Ver. Even if Ver had alleged facts showing "complete domination," any alleged wrong against Ver is completely incidental to any abuse of the corporate form.

Ver's allegations of common ownership, officers, and office space also are plainly insufficient to plead a veil-piercing claim. *See Bd. of Mgrs. of the Philip House Condo. v. 141 E. 88th St., LLC*, No. 153289/2019, 2020 N.Y. Misc. LEXIS 4948, at *11-12 (Sup. Ct. N.Y. Cnty. Aug. 28, 2020) ("These allegations of overlapping ownership, common officers and common office space are, as Hewitt and Steig assert, insufficient for the purposes of stating a prima facie case for piercing the corporate veil").

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 17 of 637

Put simply, Ver is not legally permitted to impute the allegations in the Attorney General Complaint made against other entities and individuals to GGC International.

### C.   Ver's New Allegations Do Not Overcome the Legal Deficiencies Requiring Dismissal of Ver's Breach of Contract Counterclaims

As explained in greater detail in the Second MTD, Ver's counterclaims for breach of contract all fail because Ver failed to comply with the ISDA Master Agreement's Conditions Precedent to suit.  Even assuming *arguendo* that GGC International was insolvent at some point in 2022, Ver indisputably did not follow the procedures set forth in the ISDA Master Agreement available to a non-defaulting party in the event of insolvency of misrepresentation.  Ver did not provide notice to GGC International specifying the relevant Event of Default, and did not designate an early termination date.  The new allegations in the Proposed Second Amended Counterclaims are irrelevant to Ver's failure to follow the contract, and do not even attempt to remedy this fatal deficiency.

Likewise, the new allegations do not overcome that there are insufficient arguments of GGC International's insolvency.  As set forth in much greater detail in the Second MTD, there are no new allegations supporting Ver's claim that GGC International was insolvent in 2022 and that such insolvency is continuing.

Accordingly, for the same reasons set forth in the Second MTD, Ver's Counterclaims for breach of contract should be dismissed.

### D.   Ver's New Allegations Do Not Overcome the Legal Deficiencies Requiring Dismissal of Ver's Fraud Counterclaim

Ver proposes to "amend[] his fraud claims to show the misrepresentations were part of a larger scheme engineered by the Genesis Entities to conceal their insolvency and defraud

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 18 of 637

customers." Moving Br. at 7. Ver is wrong; his new allegations taken from the Attorney General Complaint do not overcome Ver's failure to state a claim for fraud.

As explained in the Second MTD, the fraud claim should be dismissed for multiple reasons, including that it is duplicative of the contract claim, is not pleaded with particularity, is barred by the fact that Ver expressly disclaimed reliance on extracontractual representations, and cannot assert a claim for fraudulent omissions absent a fiduciary relationship.

The new allegations in the Proposed Second Amended Claim presumably are meant to remedy Ver's failure to plead with particularity. But the allegations from the Attorney General Complaint that Ver seeks to add have nothing to do with GGC International or Ver, so they merely provide alleged background for what other affiliated entities to GGC International were doing vis-à-vis other parties besides Ver. *See, e.g.*, Second CC ¶¶ 174-81, 194-95, 206-08, 210-12, 220, 222-31.

In an attempt to overcome these deficiencies, Ver tries to insert himself into the narrative. For example, in one new allegation, Ver states that "upon information and belief," DCG CEO Barry Silbert's message to DCG personnel that "[w]e just can't allow people inside or outside [to] question Genesis' solvency" was "in direct response to Ver having just questioned GGCI's solvency." Second CC ¶ 190. This is utter nonsense. Even by Ver's telling, he raised concerns in a communication on June 25, 2022, Second CC ¶ 190 – but the Attorney General Complaint alleges that Silbert sent that message about solvency on June 24, 2022, the day before Ver claims he raised the issue (and thus it could not have had anything to do with Ver's alleged call). Attorney General Complaint ¶ 139 (alleging that such communication occurred three days after June 21, 2022). Silbert's message to DCG personnel also was, per the Attorney General Complaint, not about GGC International at all – it was about the "Genesis Entities", Attorney

13

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 19 of 637

General Complaint ¶ 139, which as noted above is a group that does not include GGC International.  Thus, Ver's allegation that this message was about him is contradicted by the Attorney General Complaint.  Finally, Ver is merely reciting allegations from another party in litigation, upon information and belief.  Such allegations cannot support his fraud claim.  *See Weinberg v. Kaminsky*, No. 150869/2017, <u>2017 N.Y. Misc. LEXIS 2936</u>, at *5 (Sup. Ct. N.Y. Cnty. Aug. 4, 2017) (denying motion to amend complaint because "the added facts made upon 'information and belief' [are] ineffective to plead fraud.").

Ver also refers to an allegation from the Attorney General Complaint that GGC disseminated talking points and speculates that "[t]hese talking points were to be used by [GGC] personnel in conversations with counterparties, including Mr. Ver."  Second CC ¶ 225.  Yet, neither the proposed Second Amended Counterclaims nor the equivalent paragraph in the Attorney General Complaint alleges that the talking points were drafted or utilized by GGC International.  Second CC ¶ 225; Attorney General Complaint ¶ 157.  Indeed, the equivalent paragraphs in the Attorney General Complaint explicitly references that the talking points were to be used by GGC personnel "in conversations with counterparties, including Gemini."  Attorney General Complaint ¶ 157.  Ver is GGC International's counterparty, <u>not</u> GGC's counterparty. Ver also does not actually identify any misrepresentations in the talking points.

Ver further adds new allegations concerning communications he had with "an employee of both GGCI and [GGC]" regarding "the firm's finances" that Ver alleges were inaccurate or misleading.  Second CC ¶¶ 199-200, 321-22.  Ver does not explain why he did not include these allegations – which do not come from the Attorney General Complaint – in his initial <u>two</u> sets of Counterclaims.  The statements in question – "they had no concern with GGCI counterparties," "GGCI has 'no directional risk to any asset,'" "it was business as usual," and "the overall picture

14

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 20 of 637

should be remain the same" – are not actionable as fraud.  *See Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 179 (2011) ("alleged misrepresentations amounted to no more than opinions and puffery or ultimately unfulfilled promises, and in either case were not actionable as fraud") (*quoting Jacobs v. Lewis*, 261 A.D.2d 127, 127-28 (1st Dep't 1999)).  Ver is desperately using the collapse of Three Arrows Capital and losses suffered systemically throughout the cryptocurrency industry to blur the lines between the Genesis corporate entities.

## III.  THE NEW CAUSE OF ACTION FOR CIVIL CONSPIRACY IS PALPABLY INSUFFICIENT AND CLEARLY DEVOID OF MERIT

Ver's Proposed Second Amended Counterclaims add one additional cause of action, for civil conspiracy.  But New York does not recognize a claim for civil conspiracy as an independent tort.  *See EVEMeta, LLC v. Siemens Convergence Creators Corp.*, 173 A.D.3d 551, 553 (1st Dep't 2019) ("The conspiracy claim was correctly dismissed because New York does not recognize an independent cause of action in tort for conspiracy.").  Courts routinely dismiss civil conspiracy claims at the pleading stage on this basis.  *See Mamoon v. Dot Net Inc.*, 135 A.D.3d 656, 658 (1st Dep't 2016) (holding that civil conspiracy claim should have been dismissed); *Laura Corio, M.D. PLLC v. R. Lewin Interior Design, Inc.*, 49 A.D.3d 411, 412 (1st Dep't 2008) ("the conspiracy claim . . . fails as well, since New York does not recognize civil conspiracy as an independent tort"); *Shared Commc'ns Servs. of ESR, Inc. v. Goldman Sachs & Co.*, 23 A.D.3d 162, 163 (1st Dep't 2005) ("civil conspiracy is not recognized as an independent tort in this State").

The proposed counterclaim for civil conspiracy is legally deficient – and therefore palpably insufficient and clearly devoid of merit – because it is pleaded as an independent tort.  Count Six of the Proposed Second Amended Counterclaims is entitled "Civil Conspiracy (Fraud)."  The only reason why the Proposed Second Amended Counterclaims contain a cause of action for "Fraud"

15

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 21 of 637

and a separate cause of action for "Civil Conspiracy (Fraud)" is that Ver is seeking to assert civil conspiracy as an independent tort. That cause of action is clearly prohibited by New York law, and Ver should not be granted leave to assert the civil conspiracy claim.

New York law does permit "allegations of conspiracy" in order to "connect the actions of separate defendants with an otherwise actionable tort."' *Abacus Fed. Sav. Bank v. Lim*, 75 A.D.3d 472, 474 (1st Dep't 2010). At the time that Ver filed in the Motion to Amend, GGC International was the only Defendant in the case – there were no other Defendants to connect to GGC International such that conspiracy allegations are necessary. As explained above, on December 27, 2023, over two weeks after Ver filed the Motion to Amend, Ver filed the Third-Party Complaint against the Third-Party Defendants. But even if Ver is utilizing his civil conspiracy claim to connect the actions of GGC International with the Third-Party Defendants, Ver has not sufficiently pleaded the elements of the claim. Under New York Law, to establish a claim of civil conspiracy, the plaintiff "must demonstrate the primary tort, plus the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury." *Abacus*, 75 A.D.3d at 474.

As explained above and in the Second MTD, Ver has not established the primary tort of fraud, and as a result the conspiracy claim fails. *See Laura Corio*, 49 A.D.3d at 412 (dismissing civil conspiracy claim because "there is no underlying tort to support this theory"); *EVEMeta*, 173 A.D.3d at 553 (dismissing civil conspiracy claim because "the underlying tort alleged in the conspiracy claim is fraud, and the fraud claims were correctly dismissed"). Ver also has not pleaded the other elements of the claim. Beyond conclusory allegations, there are no factual allegations that GGC International agreed with any Third-Party Defendant to do anything.

16

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 22 of 637

Without an agreement, GGC International could not have taken any overt acts in furtherance of that agreement, could not have intentionally participated in furtherance of the agreed-upon plan or purpose, and could not have damaged Ver.

## IV.   VER'S MOTION TO AMEND PREJUDICES GGC INTERNATIONAL

Ver's Motion to Amend prejudices GGC International because when considered in the context of Ver's prior actions and the timing of his amendments, it is evident that Ver is attempting to amend his Counterclaims again purely to delay the case.

This is not Ver's first amendment.  Ver previously amended his Counterclaims as of right on July 31, 2023, one business day after the First MTD was fully briefed, mooting an entire set of briefing.  After briefing on the Second MTD was complete and oral argument scheduled, Ver filed this Motion to Amend, in a thinly veiled attempt to delay the case even further.  If Ver is successful, that will likely necessitate a third round of motion to dismiss briefing. Notably, on December 27, 2023, Ver filed the Third-Party Complaint (the first time he has brought third-party claims) which will likely result in additional motion to dismiss briefing by those Third-Party Defendants.

Ver's gambit is prejudicial to GGC International.  *See Shanahan v. Shanahan*, 92 A.D.2d 566, 568 (2d Dep't 1983) ("While leave to amend a pleading under CPLR 3025 (subd [b]) is liberally granted, courts will deny relief when unjustified delay and consequent prejudice to the opposition is involved").  GGC International is the Plaintiff in this litigation.  Ver cannot keep amending his Counterclaims over and over again to thwart GGC International's ability to prosecute its case.  Enough is enough.  The Motion to Amend should be denied, the Second MTD should be granted, and after a year of Ver's gamesmanship, GGC International's case against Ver should proceed.

17

## <u>CONCLUSION</u>

For the reasons cited herein, the Motion to Amend should be denied.

Dated:  New York, New York
        January 5, 2024

MORRISON COHEN LLP

By:  _/s/ Jason Gottlieb_
        Jason Gottlieb
        Michael Mix
        Vani Upadhyaya
        909 Third Avenue
        New York, New York 10022
        (212) 735-8600

        *Counsel for Plaintiff / Counterclaim-
        Defendant GGC International
        Limited*

18

## **WORD COUNT CERTIFICATION**

Pursuant to Rule 17 of subdivision (g) of section 202.70 of the Uniform Rules for the

Supreme Court and County Court (Rules of Practice for the Commercial Division of the Supreme

Court), I hereby certify that the total number of words in this memorandum of law, excluding the

caption, signature block, and word count certification is 5,286.

Dated: New York, New York
      January 5, 2024

                                  _/s/ Jason Gottlieb_
                                    Jason Gottlieb

19

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

GGC INTERNATIONAL LIMITED,

                           Plaintiff,

        v.

ROGER VER,

                           Defendant.

Index No. 650439/2023

Motion Seq. No. 003

**AFFIRMATION OF JASON GOTTLIEB**

JASON GOTTLIEB, an attorney duly admitted to practice before the Courts of the State of New York, affirms the following to be true under penalties of perjury and pursuant to CPLR 2106:

1.      I am a member of Morrison Cohen LLP, attorneys for Plaintiff / Counterclaim-Defendant GGC International Limited ("GGC International").  I am fully familiar with the facts and circumstances contained in this affirmation.

2.      I submit this affirmation in opposition to the motion buy Defendant / Counterclaim-Plaintiff Roger Ver ("Ver") dated December 11, 2023 (Motion Seq. No. 003, the "Motion to Amend") to amend and supplement Ver's Answer and Counterclaim.

3.      Attached hereto as **Exhibit A** is a true and correct copy of GGC International's Summons with Notice filed in this action on January 23, 2023 (NYSCEF No. 1).

4.      Attached hereto as **Exhibit B** is a true and correct copy of Ver's Notice of Removal that Ver filed in this action on February 24, 2023 (NYSCEF No. 3).

5.      Attached hereto as **Exhibit C** is a true and correct copy of the March 7, 2023 Remand Order remanding the action back to this Court (NYSCEF No. 5).

Case 1:24-cv-01533-JPC Document 1-18 Filed 02/28/24 Page 26 of 637

6.      Attached hereto as **Exhibit D** is a true and correct copy of Ver's demand for a complaint filed in this action on March 8, 2023 (NYSCEF No. 6).

7.      Attached hereto as **Exhibit E** is a true and correct copy of GGC International's Complaint filed in this action on March 28, 2023 (NYSCEF No. 9).

8.      Attached hereto as **Exhibit F** is a true and correct copy of Ver's original Answer with Counterclaims filed in this action on May 9, 2023 (NYSCEF No. 11, the "Original Counterclaims").

9.      Attached hereto as **Exhibit G** is a true and correct copy of GGC International's Notice of Motion the Original Counterclaims filed in this action on June 14, 2023 (NYSCEF No. 13, the "First MTD") and the memorandum of law in support of the First MTD (NYSCEF No. 24).

10.     Attached hereto as **Exhibit H** is a true and correct copy of Ver's Opposition brief to the first MTD filed in this action on July 12, 2023 (NYSCEF No. 28).

11.     Attached hereto as **Exhibit I** is a true and correct copy of GGC International's Reply in further Support of the First MTD filed in this action on July 28, 2023 (NYSCEF No. 29).

12.     Attached hereto as **Exhibit J** is a true and correct copy of Ver's Amended Answer and Counterclaims filed in this action on July 31, 2023 (NYSCEF No. 32, the "Amended Counterclaims").

13.     Attached hereto as **Exhibit K** is a true and correct copy of GGC International's motion to dismiss the Amended Counterclaims filed in this action on August 21, 2023 (NYSCEF No. 34-47, the "Second MTD").

14.     Attached hereto as **Exhibit L** is a true and correct copy of Ver's opposition memorandum of law to the Second MTD filed in this action on September 6, 2023 (NYSCEF No. 48).

2

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 27 of 637

15.     Attached hereto as **Exhibit M** is a true and correct copy of GGC International's reply memorandum of law in further support of the Second MTD filed in this action on September 12, 2023 (NYSCEF No. 52).

16.     Attached hereto as **Exhibit N** is a true and correct copy of the Third-Party Complaint that Ver filed against Digital Currency Group, Inc., Barry Silbert, and Michael Moro on December 27, 2023 (NYSCEF No. 60).

17.     Attached hereto as **Exhibit O** is a true and correct copy of the complaint filed by the New York Attorney General in the Supreme Court for the State of New York, New York County against seven other parties, but not GGC International, captioned *The People of the State of New York, by Letitia James, Attorney General of the State of New York v. Gemini Tr. Co., LLC, et al.*, Index No. 452784/2023, NYSCEF No. 2 (Sup. Ct. N.Y. Cnty 2023.).

Dated: New York, New York
       January 5, 2024

                                             */s/    Jason Gottlieb*
                                             Jason Gottlieb

3

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 28 of 637

## <u>WORD COUNT CERTIFICATION</u>

Pursuant to Rule 17 of subdivision (g) of section 202.70 of the Uniform Rules for the

Supreme Court and County Court (Rules of Practice for the Commercial Division of the

Supreme Court), I hereby certify that the total number of words in this memorandum of law,

excluding the caption, signature block, and word count certification is 645.


Dated: New York, New York
      January 5, 2024

                                           */s/*    *Jason Gottlieb*
                                              Jason Gottlieb

# Exhibit A

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 30 of 637

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

GGC INTERNATIONAL LIMITED,

                      Plaintiff,

    - against –

ROGER VER,

                      Defendant.

Index No.

**SUMMONS**

Plaintiff designates New York County as the place of trial

To the above-named Defendant:

    **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of an answer on the plaintiff within twenty (20) days after the service of this summons, exclusive of the day of service (or within thirty (30) days after the service is complete, if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded herein.

    **NOTICE**:   This action seeks the following relief:  1) a judgment awarding Plaintiff money damages for Defendant's failure to settle cryptocurrency options transactions that expired on December 30, 2022, in an amount to be determined at trial but no less than $20,869,788; and 2) an award of Plaintiff's costs, expenses, and reasonable attorneys' fees incurred in bringing this action.

    In the case of your failure to appear or answer in this action, judgment will be taken against you by default for the relief demanded herein and the costs of this action.

Dated: New York, New York
          January 23, 2023

                                   Respectfully submitted,

                                   MORRISON COHEN LLP


                                   By:____/s/ Jason Gottlieb____
                                        Jason Gottlieb
                                        Michael Mix
                                        909 Third Avenue
                                        New York, NY 10022
                                        (212) 735-8600

                                        *Attorneys for Plaintiff GGC*
                                        *International Limited*

TO:    Roger Ver
       858 Zenway Blvd, Unit 15-203
       Frigate Bay
       St. Kitts and Nevis

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 32 of 637

# Exhibit B

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 33 of 637

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

GGC INTERNATIONAL LIMITED,

Plaintiff,

-v-

ROGER VER,

Defendant.

Index No. 650439/2023

**NOTICE OF FILING OF**
**NOTICE OF REMOVAL**

      **PLEASE TAKE NOTICE** that on February 24, 2023, Defendant Roger Ver in the above-captioned action removed this action from the Supreme Court of the State of New York, County of New York, to the United States District Court for the Southern District of New York, by filing a Notice of Removal in that Court. A copy of the Notice of Removal is annexed hereto as **Exhibit A**.

      **PLEASE TAKE FURTHER NOTICE** that, pursuant to 28 U.S.C. § 1446(d), this Court may proceed no further unless and until the case is remanded.

      DATED: February 24, 2022.

KELMAN PLLC

  s/: Daniel J. Kelman
Daniel J. Kelman
1501 Broadway, Suite 2972
New York, New York 10036
Telephone: (212) 380-3818
daniel@kelman.law

*Attorneys for Defendant Roger Ver.*

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 34 of 637

# Exhibit C

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 35 of 637

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

GGC INTERNATIONAL LIMITED,

                        Plaintiff,

          v.

ROGER VER,

                    Defendant.

Index No. 650439/2023

**NOTICE OF REMAND**

**PLEASE TAKE NOTICE**, that the within is a true copy of the Remand Order of the Hon. Gregory H. Woods, United States District Court, Southern District of New York, dated March 7, 2023.

Dated: New York, New York
       March 7, 2023

                               MORRISON COHEN LLP


                      By: /s/ Jason Gottlieb
                              Jason Gottlieb
                              Michael Mix
                              909 Third Avenue
                              New York, New York 10022
                              (212) 735-8600

                              *Attorneys for Plaintiff GGC*
                              *International Limited*


TO:    All Counsel of Record (via NYSCEF)

1

Case 1:23-cv-01560-GHW Document 187 Filed 03/28/23 Page 36 of 637

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                  :
GGC INTERNATIONAL LIMITED,                                        :
                                                                  :
                               Plaintiff,                         :          1:23-cv-1560-GHW
                                                                  :
               -against-                                          :          REMAND ORDER
                                                                  :
ROGER VER,                                                        :
                                                                  :
                               Defendant.                         :
                                                                  :
------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/7/2023

GREGORY H. WOODS, District Judge:

This action was removed from the Supreme Court of the State of New York, County of

New York, on February 24, 2023. Dkt. No. 1. As the basis for this Court's subject matter

jurisdiction, Defendant invokes 28 U.S.C. § 1332, asserting that the parties are diverse and that the

amount in controversy is over $75,000. Dkt. No. 1 ¶ 4. Because Defendant asserted that the parties

were diverse, notwithstanding the fact that Defendant was an alien, and there were indications on

the record that Plaintiff, too, was an alien, the Court issued an order to show cause why this case

should not be remanded to state court on March 1, 2023 (the "Order to Show Cause"). Dkt. No. 3.

The Order to Show Cause explained the basic requirements of diversity jurisdiction and noted that

"Plaintiff would be an alien if either it was incorporated outside of the United States *or* if its principal

place of business was located outside of the United States . . . ." *Id.* at 2 (emphasis added).

Defendant filed a response to the Order to Show Cause on March 6, 2023 (the "Response").

Dkt. No. 5. In the Response, Defendant acknowledges that Plaintiff "was formed under the laws of

the British Virgin Islands." Response at 2. But Defendant argues that the exercise of diversity

jurisdiction here is appropriate nonetheless because Plaintiff has its principal place of business in

New York.

To support that argument Defendant points to the Supreme Court's decision in *Daimler AG v. Bauman*, 571 U.S. 117 (2014). Defendant writes the following:

> In *Daimler AG v. Bauman*, 571 U.S. 117 (2014), the Supreme Court abrogated the "doing business" test and held that jurisdiction can only extend over a foreign entity that is "at home" in the state. Absent an "exceptional case," a company is only "at home" in (1) its state of incorporation *or* (2) the state in which it maintains a principal place of business.

Response at 1 (emphasis added).

Defendant's reference to *Daimler* does not support his argument for at least two reasons. First off, *Daimler* is a case about the constitutional limitations on a court's exercise of personal jurisdiction. *Daimler*, 571 U.S. at 121 ("The question presented is whether the Due Process Clause of the Fourteenth Amendment precludes the District Court from exercising jurisdiction over Daimler in this case . . . ."). The issue raised here is about another kind of jurisdiction: the scope of the Court's subject matter jurisdiction.

Second, even if *Daimler* applied here—and it does not—counsel for Defendant's argument is based on a profoundly erroneous misreading of its holding and the law on the issue of general jurisdiction. For Defendant states that the relevant law is that barring exceptional circumstances a company "is *only* 'at home' in (1) its state of incorporation *or* (2) the state in which is maintains a principal place of business." Response at 1. But as even the most cursory review of *Daimler* and the related case law would reveal, Defendant's "or" should be an "and." *See, e.g.*, *Daimler*, 571 U.S. at 137 ("*Goodyear* did not hold that a corporation may be subject to general jurisdiction *only* in a forum where it is incorporated *or* has its principal place of business . . . .") (emphasis added). Put differently, a company is at home for purposes of general jurisdiction *both* where it is incorporated *and* where it has its principal place of business. *See, e.g.*, *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 225 (2d Cir. 2014) ("The paradigm forum for general jurisdiction over an individual is the individual's domicile, his home. For a corporation, it is an equivalent place, with the place of incorporation and the principal place of business being the paradigm bases.").

2

The second fundamental flaw in Defendant's Response rests in its failure to consider the statutory language of 28 U.S.C. § 1332(c).  Pursuant to the statute "a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated *and* of the State or foreign state where it has its principal place of business . . . ."  28 U.S.C. § 1332(c) (emphasis added). "The principal effect of Section 1332(c) is obviously to establish dual citizenship for most corporations—in the state of a company's incorporation and in the state in which the organization's principal place of business is located—thereby reducing the options for establishing corporate diversity jurisdiction."  13F Fed. Prac. & Proc. Juris. § 3624 (3d ed.).

Defendant's Response points to the Supreme Court's decision in *Hertz Corp. v. Friend*, 559 U.S. 77 (2010).  Response at 2.  The citation to *Hertz*, unlike Defendant's reference to *Daimler*, is on point to a degree:  *Hertz* relates to the issue of citizenship in the context of diversity jurisdiction. And Defendant's Response fairly outlines the holding of *Hertz* regarding how one determines the location of a corporation's principal place of business.  *Id.*  But the Response fails to recognize that the location of Plaintiff's principal place of business is immaterial because a corporation is a citizen of *both* the place where it is incorporated *and* where it has its principal place of business.  *See Hertz*, 559 U.S. at 80 ("The federal diversity jurisdiction statute provides that 'a corporation shall be deemed to be a citizen of any State by which it has been incorporated *and of the State where it has its principal place of business*.'  We seek here to resolve different interpretations that the Circuits have given this phrase.") (emphasis in original) (internal citation omitted); *see also* 13F Fed. Prac. & Proc. Juris. § 3628 (3d ed.) ("The 2011 Federal Jurisdiction and Venue Clarification Act has simplified this question immensely, as the statute now explicitly states that corporations are citizens of their state of incorporation and the state of their principal place of business, regardless of whether those states are foreign or domestic.").[1]

---

[1] The Order to Show Cause makes clear that the Court understood that jurisdiction would be lacking if the corporation was either incorporated in or had its principal place of business in a foreign jurisdiction.  Order to Show Cause at 2

The Court does not have subject matter jurisdiction over this action. "Where, as here, jurisdiction is asserted by a defendant in a removal petition, it follows that the defendant has the burden of establishing that removal is proper." *United Food & Commercial Workers Union, Local 919, AFL-CIO v. CenterMark Properties Meriden Square, Inc.*, 30 F.3d 298, 301 (2d Cir. 1994). To establish jurisdiction under 28 U.S.C. § 1332, there must be complete diversity of citizenship, such that "*each* defendant is a citizen of a different State from *each* plaintiff." *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 373 (1978). Because, according to the Response, Plaintiff was incorporated in the British Virgin Islands, it is an alien. And Defendant is an alien. It is well established that "diversity is lacking . . . where the only parties are foreign entities, or where on one side there are citizens and aliens and on the opposite side there are only aliens." *Universal Licensing Corp. v. Paola del Lungo S.p.A.*, 293 F.3d 579, 581 (2d Cir. 2002). Therefore, the Court lacks diversity jurisdiction over this action and remands it to the Supreme Court of the State of New York, County of New York.

The Clerk of Court is directed to remand this case to Supreme Court of the State of New York, County of New York without delay.

SO ORDERED.

Dated: March 7, 2023
New York, New York

_____
GREGORY H. WOODS
United States District Judge

---

("Plaintiff would be an alien if either it was incorporated outside of the United States or if its principal place of business was located outside of the United States, as stated in the notice of removal."). By focusing only on the issue of the location of Plaintiff's principal place of business, Defendant's Response did not address the concern highlighted by the Court.

4

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 40 of 637

# Exhibit D

SUPREME COURT OF THE STATE OF
NEW YORK COUNTY OF NEW YORK

---

GGC INTERNATIONAL LIMITED,

Plaintiff,

-v-

ROGER VER,

Defendant.

---

Index No. 650439/2023

**NOTICE OF APPEARANCE
AND DEMAND**

**PLEASE TAKE NOTICE** that Daniel J. Kelman is admitted to practice in this court and hereby enters an appearance in the above-captioned case on behalf of Defendant, Roger Ver, and demands you serve a copy of the Complaint and all notices and other papers in this action upon the Defendant at the address below.

DATED: March 8, 2023.

KELMAN PLLC

s/: Daniel J. Kelman
Daniel J. Kelman
1501 Broadway, Suite 2972
New York, New York 10036
Telephone: (212) 380-3818
daniel@kelman.law

*Attorneys for Defendant Roger Ver.*

# Exhibit E

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 43 of 637

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

GGC INTERNATIONAL LIMITED,

                                    Plaintiff,

        - against –

ROGER VER,

                                    Defendant.

Index No. 650439/2023

**COMPLAINT**

Plaintiff GGC International Limited ("GGC International"), as for its Complaint against Defendant Roger Ver ("Ver," and together with GGC International, the "Parties"), alleges as follows:

**PRELIMINARY STATEMENT**

1.      This action seeks to redress Ver's straightforward failure to settle three cryptocurrency options agreements that expired on December 30, 2022.

2.      Ver failed to make payments on those transactions even though Ver had agreed to and recognized them.  This action does not result from any collateral that Ver had transferred to GGC International to partially collateralize his obligations.

3.      GGC International and Ver entered into the Amended and Restated Master Confirmation Agreement for Virtual Currency Put and Call Options Transactions dated as of June 22, 2020 (the "Master Confirmation Agreement").  Pursuant to the Master Confirmation Agreement, the Parties are deemed to enter into the 2002 ISDA Master Agreement (the "ISDA Master Agreement") and the 1994 ISDA Credit Support Annex (the "ISDA Credit Support Annex"), with certain supplements.  Accordingly, unless stated otherwise, when this Complaint

references the Master Confirmation Agreement, it also is incorporating by reference the ISDA Master Agreement and the ISDA Credit Support Annex.

4.    The ISDA Master Agreement and the ISDA Credit Support Annex are industry-standard documents that provide market participants with relationship-level terms that govern the trading of over-the-counter derivative transactions.

5.    The Master Confirmation Agreement makes certain elections and modifications to the ISDA Master Agreement and ISDA Credit Support Annex.  The Master Confirmation Agreement – as includes the terms of the ISDA Master Agreement and the ISDA Credit Support Annex – sets forth the terms under which GGC International and Ver may enter into transactions for the purchase and sale of cryptocurrency put and call options.

6.    In 2022 alone, the Parties entered into thirty-one cryptocurrency options transactions.  The terms of each transaction were memorialized in a written "Transaction Confirmation," which refers back to the Master Confirmation Agreement.

7.    Three options with expiration dates of December 30, 2022 gave rise to this action.

8.    Upon the settlement date for the three options, Ver owed GGC International roughly $110 million in exchange for the underlying tokens, minus amounts owing by GGC International to Ver.  However, Ver did not make that payment.

9.    GGC International thereafter sent several notices to Ver.  On January 12, 2023, GGC International sent a notice to Ver notifying him that as a result of his nonpayment, an "Event of Default" would occur if Ver failed to pay the amount owed within one business day.  Ver once again failed to pay the amount owed.

10.    On January 17, 2023, GGC International sent another notice to Ver that due to the Event of Default that had occurred and was continuing, GGC International designated January 19,

2

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 45 of 637

2023 as the "Early Termination Date" under the ISDA Master Agreement.  Then, on January 20,

2023, GGC International sent Ver a "Calculation Statement," in which GGC International set off

certain collateral previously delivered by Ver against the amounts owed by Ver, resulting in an

amount of $20,869,788 owing from Ver to GGC International.

11.    Ver failed to pay this amount to GGC International, despite the multiple written

notices and multiple oral conversations with Ver.

12.    Ver's failure to pay constitutes a breach of contract.

13.    As a result of Ver's breach of contract, GGC International has been damaged.  GGC

International is entitled to at least $20,869,788, plus interest.  The ISDA Master Agreement also

entitles GGC International to indemnity for GGC International's out-of-pocket expenses,

including attorneys' fees.

## THE PARTIES

14.    Plaintiff GGC International Limited is a corporation organized and existing under

the laws of the British Virgin Islands.

15.    Defendant Roger Ver is an individual residing at 858 Zenway Blvd. Unit 15-203,

Frigate Bay, St. Kitts and Nevis.

## JURISDICTION AND VENUE

16.    This court has personal jurisdiction over Ver because he contractually consented to

jurisdiction in the courts of the State of New York.  In particular, Section 13(b)(i)(2) of the ISDA

Master Agreement states that "[w]ith respect to any suit, action or proceedings related to any

dispute arising out of or in connection with this Agreement . . . each party irrevocably . . . submits

. . . if this Agreement is expressed to be governed by the laws of the State of New York, to the

non-exclusive jurisdiction of the courts of the State of New York and the United States District

Court located in the Borough of Manhattan in New York City."

3

17.     Section 7(a)(i) of the Master Confirmation Agreement sets the governing law as New York, and as such, pursuant to Section 13(b)(i)(2) of the ISDA Master Agreement, Ver has agreed to jurisdiction in the courts of New York.

18.     Venue is also proper because the Parties contractually consented to have disputes heard by the courts in the State of New York.

## STATEMENT OF FACTS

### GGC International and Ver Enter into the Master Confirmation Agreement

19.     The Master Confirmation Agreement between GGC International[1] and Ver sets forth the terms under which the Parties may enter into cryptocurrency put and call option transactions.

20.     The Master Confirmation Agreement states that GGC International and Ver are deemed to have entered into the ISDA Master Agreement and the ISDA Credit Support Annex.

21.     Section 3 of the Master Confirmation Agreement provides that when the parties enter into an option transaction, they are to confirm the economic terms of such transaction in a "Transaction Confirmation."  Sections 4 and 5 of the Master Confirmation Agreement provide the terms to be included in each Transaction Confirmation.

### The ISDA Master Agreement Sets Forth the General Payment Terms

22.     The ISDA Master Agreement, which Ver was deemed to have entered by virtue of the Master Confirmation Agreement, provides the general conditions for payment and delivery.

---

[1]     The signature page of the Master Confirmation Agreement erroneously lists the relevant party as "Genesis Global Capital International Ltd" instead of GGC International.  However, the heading of the Master Confirmation Agreement correctly refers to GGC International, as does every relevant Transaction Confirmation.

4

23.    In particular, Section 2(a)(i) of the ISDA Master Agreement states that "[e]ach party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement."

24.    Section 2(a)(ii) of the ISDA Master Agreement provides that "[p]ayments under this Agreement will be made on the due date for value on the date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency."

25.    Section 2(c) of the ISDA Master Agreement states that the

> parties may elect in respect of two or more Transactions that a net amount and payment obligation will be determined in respect of all amounts payable on the same date in the same currency in respect of those Transactions, regardless of whether such amounts are payable in respect of the same Transaction.  The election may be made in the Schedule or any Confirmation by specifying that "Multiple Transaction Payment Netting" applies to the Transactions identified as being subject to the election . . . . If Multiple Transaction Payment Netting is applicable to Transactions, it will apply to those Transactions with effect from the starting date specified in the Schedule or such Confirmation, or, if a starting date is not specified in the Schedule or such Confirmation, the starting date otherwise agreed by the parties in writing.  This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

26.    Section 7(a)(iii) of the Master Confirmation Agreement states that "Multiple Transaction Payment Netting," as described above, is applicable.

**Failure to Pay Amounts Due Will Result in an Event of Default**

27.    Section 5(a) of the ISDA Master Agreement lists several potential "Events of Default."

28.    As relevant to this dispute, Section 5(a)(i) of the ISDA Master Agreement states that it is an "Event of Default" if a party fails to:

> make, when due, any payment under this Agreement or delivery
> under Section 2(a)(i) or 9(h)(i)(2) or (4) required to be made by it if
> such failure is not remedied on or before the first Local Business
> Day in the case of any such payment or the first Local Delivery Day
> in the case of any such delivery after, in each case, notice of such
> failure is given to the party.

29.     Section 6(a) of the ISDA Master Agreement permits a non-defaulting party to declare an "Early Termination Date" upon not more than twenty days' notice where an Event of Default has occurred.

30.     Section 6(e)(i) of the ISDA Master Agreement provides that "[i]f notice designating an Early Termination Date is given under Section 6(a) . . . the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default . . . is then continuing."

31.     Upon an Early Termination Date, an "Early Termination Amount" is due. Section 6(e)(i) of the ISDA Master Agreement sets forth the formula to determine the "Early Termination Amount."

32.     Section 7(a)(i) of the Master Confirmation Agreement states that New York law shall govern any transactions between GGC International and Ver.

33.     Section 11 of the ISDA Master Agreement provides that a "Defaulting Party will on demand indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees . . . incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection."

6

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 49 of 637

**GGC International and Ver Enter Into Options Transactions**

34.    After entering into the Master Confirmation Agreement, GGC International and Ver entered into various options transactions.  For each transaction, the Parties entered into a Transaction Confirmation memorializing the terms.

35.    Throughout 2022, as a result of the transactions entered into by the Parties, Ver owed money to GGC International, including as much as $135 million in June 2022.  GGC International repeatedly accommodated Ver when he suffered from liquidity problems and was unable to post required collateral.  During this period, GGC International performed all of its contractual obligations to Ver.  Regardless, Ver's contractual remedy for any type of default, insolvency or otherwise, would have been to terminate the agreement; Ver never did so, and any such termination would have resulted in him owing such significant sums to GGC International.

36.    The three options which expired on December 30, 2022 are the subject of this action and detailed below:

(a)    Pursuant to a trade confirmation dated March 22, 2022, GGC International agreed to purchase from Ver a put option for 70,000 units of Bitcoin Cash ("BCH"), with a strike price of $545 per BCH.

(b)    Pursuant to a trade confirmation dated June 10, 2022, GGC International agreed to purchase from Ver a put option for 10,000 Ether ("ETH"), with a strike price of $5,000 per ETH.

(c)    Pursuant to a trade confirmation dated June 11, 2022, GGC International agreed to purchase from Ver a put option for 500 Bitcoin ("BTC"), with a strike price of $26,000 per BTC.

7

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 50 of 637

37.     Each of the three confirmations states that the "Settlement Date" is same as the "Expiration Date" of each option.

**Ver Fails to Settle the Three Options Transactions**

38.     The three options in question expired on December 30, 2022.

39.     As noted above, the "Settlement Date" for each of the three options was the same as the "Expiration Date," i.e., December 30, 2022.  As such, Ver was required to settle the options on December 30, 2022.  He failed to do so.

40.     On January 12, 2023, GGC International sent a letter to Ver with the subject line "NOTICE OF DEFAULT: FAILURE TO PAY" (the "January 12 Notice").  The January 12 Notice informed Ver that he "failed to pay the amount of $71,221,052 due and owing on the Settlement Date (December 30, 2022) under the Transaction Confirmations.  The consequence of [Ver's] failure to make payment is that an Event of Default will occur under Section 5(a)(i) of the Master Agreement, to the extent [Ver's] failure to pay continues for one Local Business Day, after the effective date of this notice."

41.     Ver failed to make payment as required within one Local Business Day after the January 12 Notice.

42.     On January 17, 2023, GGC International sent a letter to Ver with the subject line "NOTICE OF EVENT OF DEFAULT AND DESIGNATION OF EARLY TERMINATION DATE" (the "January 17 Notice").  The January 17 Notice informed Ver that he had "failed to pay $71,221,052, which was the amount due and owing on the Settlement Date (December 30, 2022) under the Transaction Confirmations.  Pursuant to Section 6(a) of the Master Agreement, this letter serves as notice, effective as of the date of this notice, that an Event of Default under Section 5(a)(i) of the Master Agreement has occurred and is continuing with respect to [Ver]."

8

43.     In the January 17 Notice, GGC International further "designates January 19, 2023, as the Early Termination Date," and "will make the calculations required under Section 6(e) of the Master Agreement and, in accordance with the Master Agreement, will notify you of the amount calculated thereunder and the date on which such amount will be payable."

44.     Ver failed to make payment after receipt of the January 17 Notice.

45.     On January 20, 2023, GGC International sent a letter to Ver with the subject line "CALCULATION STATEMENT FOR PAYMENT ON EARLY TERMINATION" (the "January 20 Statement").

46.     The January 20 Statement constituted the statement required by Section 6(d)(i) of the ISDA Master Agreement detailing the calculation of the amount that remains payable by Ver to GGC International.

47.     The January 20 Statement stated that Ver owed GGC International $67,850,000 across the three options.  That amount was calculated by subtracting the amount owed by GGC International to Ver from the amount owed by Ver to GGC International.[2]  In that January 20 Statement, GGC International then set off collateral posted by Ver valued at $46,980,212 against the $67,850,000 owed by Ver, resulting in a "Termination Payment Amount" of $20,869,788.

48.     Ver failed to make payment after receipt of the January 20 Statement.

49.     GGC International is seeking that amount in this action, plus fees, expenses, and interest.

---

[2]      As noted above, the Parties elected to apply "Multiple Transaction Payment Netting" under the ISDA Master Agreement.

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 52 of 637

## CLAIMS FOR RELIEF

### CLAIM ONE

*(Breach of Contract)*

50.     GGC International hereby incorporates by reference all allegations set forth previously in this Complaint as though fully set forth herein.

51.     GGC International and Ver are parties to the Master Confirmation Agreement and are deemed to enter into the ISDA Master Agreement and ISDA Credit Support Annex.

52.     GGC International complied with all of its contractual obligations under the Master Confirmation Agreement, the ISDA Master Agreement, and ISDA Credit Support Annex.

53.     As set forth above, Ver breached the Master Confirmation Agreement, and the transactions entered thereunder, by failing to settle three options transactions that expired on December 30, 2022.  Such failure constituted an "Event of Default" under the relevant agreements and is a breach of contract.

54.     Under the three options, and subtracting amounts owed by GGC International to Ver, Ver owes a total of $67,850,000.  In light of the $46,980,212 in collateral that Ver already delivered, the net amount owed by Ver is $20,689,788.

55.     Accordingly, as a result of Ver's breach of contract, GGC International has been damaged in an amount to be determined at trial, but believed to be in excess of $20,689,788, plus interest.

56.     In addition, GGC International is entitled to the repayment of its attorneys' fees and costs pursuant to Section 11 of the ISDA Master Agreement.

### REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff GGC International respectfully demands the judgment against Defendant Ver as follows:

10

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 53 of 637

1.    On GGC International's First Cause of Action, for an order awarding GGC International damages in an amount to be determined at trial but in no event less than $20,689,788, plus interest at the New York statutory rate, plus repayment of GGC International's attorneys' fees and costs; and

2.    Such other and further relief as the Court deems just and proper.

Dated: New York, New York
       March 28, 2023

                                MORRISON COHEN LLP


                                By: /s/ Jason P. Gottlieb
                                    Jason P. Gottlieb
                                    Michael Mix
                                909 Third Avenue
                                New York, NY  10022
                                Telephone: 212-735-8600
                                Facsimile:  212-735-8708

                                *Attorneys for Plaintiff GGC International Limited*

11

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 54 of 637

# Exhibit F

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

GENESIS GLOBAL CAPITAL
INTERNATIONAL LIMITED,

                                    Plaintiff,

                    v.

ROGER VER,

                                    Defendant.

Index No. 650439/2023

**ANSWER AND
COUNTERCLAIM OF
ROGER VER**

Defendant, Roger Ver ("Ver"), by and through his attorneys, Kelman PLLC, in response to the allegations contained in the complaint of Genesis Global Capital International Limited ("GGCI") filed herein, alleges as follows:

**INTRODUCTION**

This case exposes the deceptive tactics of an insolvent derivatives trading desk desperate to remain afloat.  GGCI's own derivatives contracts mandated continuous solvency.  Yet when Ver sought confirmation of their financial status, GGCI deceived him with misleading financial information and induced him to provide tens of millions of dollars in additional collateral.

In June 2022, GGCI faced insolvency as Three Arrows Capital ("3AC") started to collapse.  Desperate for assets, they targeted Ver, a significant customer with multiple expiring options that month.  To collect from him, GGCI let Ver's out-of-the-money options expire; to avoid paying him, GGCI persuaded Ver to roll in-the-money options to a later date.  Meanwhile, Genesis secretly planned to margin call and liquidate 3AC immediately after the roll, which would drive Ver's expiring positions to new lows.

The moment Ver's out-of-the-money June options expired, GGCI abruptly demanded that Ver over-collateralize the positions he had just rolled by a staggering 300%.  Since GGCI had

always accepted digital assets as collateral at mark-to-market prices, this sudden and unprecedented low valuation raised Ver's suspicions about GGCI's solvency.

In fact, GGCI was attempting to cover up their insolvency by squeezing Ver for exorbitant sums of collateral. Although GGCI outwardly applied a low valuation to Ver's digital assets, once they had them in hand, GGCI would add them to their balance sheet as assets valued mark-to-market. This accounting trick promised to boost GGCI's assets by several hundred million dollars and return them to solvency.

Ver demanded proof of GGCI's solvency before he would provide any further collateral. GGCI then provided Ver with a Statement of Financial Condition ("SOFC") dated June 20, 2022, which misleadingly portrayed a narrow positive equity. In truth, however, GGCI was already insolvent. The SOFC hid GGCI's insolvency by using the same accounting trick — overvaluing illiquid digital assets by using undiscounted mark-to-market prices. Had GGCI applied appropriate discounts to their digital assets, as they demanded from Ver, their SOFC would have revealed their insolvency and Ver would have terminated the contracts as a result of GGCI's default.

In December 2022, the collapse of the FTX exchange and Alameda Research revealed that GGCI had been insolvent all along. Ver was alerted to GGCI's insolvency by an interview wherein FTX and Alameda co-founder Sam Bankman-Fried stated that Alameda had repaid a $2.5 billion dollar loan to "Genesis" in August 2022. This appeared to be an obvious preference transfer that would be subject to clawback.

Citing the $2.5 billion repayment from Alameda, Ver requested that GGCI provide further assurances that it had been solvent in June 2022. Ver reminded GGCI that he had faithfully provided additional collateral for months, including a substantial $37 million in

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 57 of 637

payments just weeks earlier.  GGCI acknowledged that the timing and size of Ver's recent collateral contributions underscored his genuine concern, since he could have simply raised these arguments instead of paying GGCI $37 million dollars.

Consequently, GGCI reluctantly shared its 2021 audited financials with Ver, and denied that it had ever had any involvement with FTX or Alameda.  However, analysis of GGCI's 2021 financials directly contradicted these claims.  GGCI's 2021 financials revealed that it had allowed a single counterparty to open a $2.5 billion position, collateralized exclusively by FTX's own FTT tokens, which were valued at inflated mark-to-market prices.  It was evident that these FTT tokens had come from Alameda.

Despite GGCI's repeated misrepresentations and false assurances of solvency, Ver maintains his willingness to pay any outstanding sums owed, provided GGCI can finally demonstrate they were solvent at the relevant times.  To date, they have yet to do so.

## ANSWER TO THE COMPLAINT

### Preliminary Statement

1.      Defendant denies the allegations of paragraph 1.

2.      Defendant denies the allegations of paragraph 2.

3.      Defendant denies the allegations of paragraph 3 and alleges the documents referenced therein speak for themselves.  Further, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms.  Further, the parties also did not execute the ISDA Credit Support Annex, and no elections were made as to Section 13 of that agreement, entitled "Elections and Variables."

3

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 58 of 637

4.      Defendant lacks sufficient information and knowledge to form a belief as to the allegations contained in paragraph 4.

5.      Defendant admits that the Master Confirmation Agreement makes certain elections and modifications to the 2002 ISDA Master Agreement and the ISDA Credit Support Annex as alleged in paragraph 5.  However, the parties never executed a 2002 ISDA Master Agreement or the ISDA Credit Support Annex, and no elections were made as to the schedule to the 2002 ISDA Master Agreement or Section 13 of the ISDA Support Annex, each of which contain material terms.

6.      Defendant lacks sufficient information and knowledge to form a belief as to the allegations contained in paragraph 6, but believes same to be true.

7.      Defendant denies the allegations contained in paragraph 7.  As discussed in Mr. Ver's counterclaim below GGCI was likely insolvent well in advance of December 2022.  The precise date of GGCI's insolvency is not currently known, but this dispute may implicate option contracts with different expiration dates.

8.      Defendant denies the allegations contained in paragraph 8.  As will be evident from Mr. Ver's counterclaim, Plaintiff was in default of the option agreements well in advance of December 2022 and, in fact, owes Mr. Ver damages estimated to be well in excess of $20 million.

9.      Defendant admits receiving the notices referenced in paragraph 9 but denies that he owed GGCI anything as a result of its default and breach of the contracts between the parties.

10.     Defendant admits receiving the "Calculation Statement" referenced in paragraph 10 but denies that he owed GGCI anything as a result of its default and breach of the contracts between the parties.

4

11.     Defendant admits the allegations contained in paragraph 11 that he has failed to pay the sums identified in paragraph 10 as the funds requested are not duly owed as a result of GGCI's default and breach of the contracts between the parties.

12.     Defendant denies the allegations contained in paragraph 12.

13.     Defendant denies the allegations contained in paragraph 13 and states that the parties did not execute a 2002 ISDA Master Agreement or the schedules attached thereto which contain material terms.

### The Parties

14.     Defendant lacks sufficient knowledge and information to form a belief as to the allegations contained in paragraph 14.

15.     Defendant admits the allegations contained in paragraph 15.  Mr. Ver is a citizen of St. Kitts, but does not reside at 858 Zenway Blvd. Unit 15-203, Frigate Bay, St. Kitts and Nevis.

### Jurisdiction and Venue

16.     Defendant admits the allegations contained in paragraph 16.  While the Master Confirmation makes reference to the 2002 ISDA Master Agreement and ISDA Support Annex, no such agreements were executed by the parties, and no elections were made as to the schedule to the 2002 ISDA Master Agreement or Section 13 of the ISDA Support Annex, which contain material terms.

17.     Defendant admits the allegations contained in paragraph 17.

18.     Defendant admits the allegations contained in paragraph 18.

### Statement of Facts

19.     Defendant admits the allegations contained in paragraph 19.

5

20.     Defendant denies the allegations contained in paragraph 20.  While the Master Confirmation makes reference to the 2002 ISDA Master Agreement and ISDA Support Annex, no such agreements were executed by the parties, and no elections were made as to the schedule to the 2002 ISDA Master Agreement or Section 13 of the ISDA Support Annex, which contain material terms.

21.     Defendant admits the allegations contained in paragraph 21.

22.     Defendant admits that the 2002 ISDA Master Agreement "provides general conditions for payment and delivery" as alleged in paragraph 22.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

23.     Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 23.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

24.     Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 24.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

25.     Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 25.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

6

26.      Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 26.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

27.      Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 27.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

28.      Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 28.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

29.      Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 29.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

30.      Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 30.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.   Further, the document speaks for itself.

31.      Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 31.  However, the parties never executed a 2002 ISDA Master Agreement,

7

and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

32.     Defendant admits the allegations contained in paragraph 32.   Further, the document speaks for itself.

33.     Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 33.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

34.     Defendant admits that the parties executed various option transactions as alleged in paragraph 34 but currently lacks sufficient knowledge and information to form a belief as to whether a transaction confirmation was sent for each and every transaction.

35.     Defendant denies the allegations contained in paragraph 35.  However, Mr. Ver admits that he did not terminate the contracts as a direct result of GGCI's multiple intentional misrepresentations regarding its solvency and other related issues.

36.     Defendant denies the allegations contained in paragraph 36 to the extent that GGCI is attempting to limit this dispute to three transactions.  Upon information and belief, GGCI was insolvent by June 2022 and, in fact, owed Mr. Ver substantial sums.  Defendant admits that the terms of the three option contracts reflected in paragraph 36 are accurate.

37.     Defendant admits the allegations contained in paragraph 37.   Further, the documents speak for themselves.

38.     Defendant admits that three option contracts expired in December 2022 as alleged in paragraph 38, but denies that these are the only option contracts at issue in this dispute.

8

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 63 of 637

39.     Defendant admits the allegations contained in paragraph 39, but denies that any sums were owed to GGCI as a result of its breach of the agreements between the parties and is owed substantial sums from GGCI.

40.     Defendant admits to receiving the notice referenced in paragraph 40.  Further, the document speaks for itself.

41.     Defendant admits the allegations contained in paragraph 41, but denies that any sums were duly owed to GGCI as a result of its default and various breaches of the agreements.

42.     Defendant admits to receiving the notice referenced in paragraph 42.  Further, the document speaks for itself.

43.     Defendant admits to receiving the notice referenced in paragraph 43.  Further, the document speaks for itself.

44.     Defendant admits the allegations contained in paragraph 41, but denies that any sums were duly owed to GGCI as a result of its own default and various breaches of the agreements.

45.     Defendant admits to receiving the notice referenced in paragraph 45.  Further, the document speaks for itself.

46.     Defendant lacks sufficient knowledge and information to form a belief as to the allegations contained in paragraph 46.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

47.     Defendant admits to receiving the notice referenced in paragraph 47 but denies the accuracy of the alleged sums owed contained therein.  Further, the document speaks for itself.

9

48.     Defendant admits the allegations contained in paragraph 41, but denies that any sums were duly owed to GGCI as a result of its own default and various breaches of the agreements.

49.     Defendant admits the allegations contained in paragraph 49.

**Claims for Relief**
**Claim One**

50.     Defendant repeats and incorporates in full his responses each allegation set forth in paragraphs 1–49.

51.     The allegations in paragraph 51 state legal conclusions to which no response is required.  To the extent a response is required, the parties did not execute a 2002 ISDA Master Agreement or ISDA Support Annex, and no elections were made as to the schedule to the 2002 ISDA Master Agreement or Section 13 of the ISDA Support Annex, which contain material terms.

52.     The allegations in paragraph 52 state legal conclusions to which no response is required.  To the extent a response is required, Defendant denies the allegations contained therein as GGCI failed to meet its contractual obligations to Mr. Ver.

53.     The allegations in paragraph 53 state legal conclusions to which no response is required.  To the extent a response is required, Defendant denies the allegations of paragraph 53.

54.     Defendant denies the allegations contained in paragraph 54.

55.     The allegations in paragraph 55 state legal conclusions to which no response is required.  To the extent a response is required, Defendant denies the allegations of paragraph 55.

56.     The allegations in paragraph 56 state legal conclusions to which no response is required.  To the extent a response is required, Defendant denies the allegations of paragraph 56.

10

### Request for Relief

Defendant denies the allegations in the Request for Relief, including the "Wherefore" clause, that Plaintiff is entitled to any form or any amount of relief.

### Affirmative Defenses

57.    Plaintiff has failed to state a claim upon which relief can be granted.

58.    Plaintiff has failed to produce all of the relevant agreements between the parties, including agreements related to the ISDA Master Agreement, including but not limited to the confirmations, definition booklets and credit support documentation.

59.    The Plaintiff's requests for relief are barred by the doctrine of unclean hands.

60.    Plaintiff lacks standing to avail itself of the Courts of the State of New York in that it is a foreign corporation, doing business in New York, without payment of the required taxes and fees in connection with its business operations.

61.    Plaintiff failed to act in a commercially reasonable manner.

62.    Plaintiff has breached the agreement between the parties, barring Plaintiff's request for relief.

### <u>COUNTERCLAIM</u>

### The Parties

63.    Roger Ver ("Ver") is the Counter-Plaintiff in this action.  Ver is a natural person and a resident and citizen of St. Kitts and Nevis.

64.    Genesis Global Capital International Limited ("GGCI") is the Counter-Defendant in this action.  GGCI is a British Virgin Islands company limited by shares with a principal place of business in New York.

11

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 66 of 637

**Related Non-Parties**

65.     Genesis Global Limited ("Genesis Global") is the ultimate parent of GGCI.

66.     Genesis Global Trading, Inc. ("Genesis Trading") is a subsidiary of Digital Currency Group, and it is a leading cryptocurrency trading and lending firm that primarily serves institutional clients.

67.     Genesis Asia Pacific Limited Pte ("GAP") is a Singapore private limited company that has filed for Chapter 11 bankruptcy protection in the Southern District of New York.

68.     Collectively, GGCI, Genesis Global, Genesis Trading, GAP and their affiliates are referred to as "Genesis".

69.     Digital Currency Group, Inc ("DCG") is a global venture capital company that invests in blockchain and digital currency-related companies.  DCG is the ultimate parent of Genesis.

70.     Three Arrows Capital Limited ("3AC") was a Singapore-based investment firm that specialized in trading and investing in cryptocurrencies and other digital assets before its stunning collapse in mid-2022.  They are now being liquidated in the BVI.

71.     Alameda Research LLC ("Alameda") was a quantitative cryptocurrency trading firm that was founded in 2017 by Sam Bankman-Fried. Alameda, along with FTX and more than 130 affiliated entities, filed for Chapter 11 bankruptcy protection in November 2022.

72.     FTX International Limited (aka FTX Trading Limited) ("FTX") is a cryptocurrency derivatives exchange that was launched in 2019 by Sam Bankman-Fried and others. As discussed above, FTX, and more than 130 affiliated entities, filed for Chapter 11 bankruptcy protection in November 2022.

12

73.     Sam Bankman-Fried ("SBF") is the now disgraced co-founder and CEO of both FTX and Alameda Research, and was at the heart of one of, if not the, largest cryptocurrency thefts in history, stealing billions of dollars from his customers and using those funds to pay down debts owed by companies he owned or controlled, including Alameda and FTX.

### GGCI Solicits Ver's Business

74.     On June 10, 2020, GGCI approached Ver, a well-known Bitcoin Cash ("BCH") proponent, to trade BCH-based over-the-counter derivatives.  GGCI sought to start a BCH options book with Ver's help.

75.     Though experienced in digital asset investment, Ver was new to options trading.

76.     Ver was initially hesitant to entrust GGCI with significant assets.  Seeking to win Ver's business, GGCI proposed a mechanism to earn interest on his collateral while his positions were open.

77.     On June 15, 2020, GGCI suggested that Ver could lend his BCH to GGCI at interest while simultaneously using the same assets as collateral for derivative contracts with GGCI.

78.     This arrangement, where Ver's interest-bearing loans served as collateral for GGCI trades, induced Ver to trade derivatives with GGCI.

### The Master Confirmation Agreement and Key Terms

79.     On June 15, 2020, Ver and GGCI executed a Master Loan Agreement ("MLA") which promised to pay Ver interest at agreed upon rates to be determined by the parties during the course of the agreement's term.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 68 of 637

80.     On June 22, 2020, Ver and GGCI executed a Master Confirmation Agreement to govern their derivative contracts, which was then amended on July 13, 2020 (collectively, the "MCA").

81.     The MCA referenced International Swaps and Derivatives Association (ISDA) form agreements, such as the 1994 Credit Support Annex and the 2002 ISDA Master Agreement. These agreements aimed to protect parties in over-the-counter derivatives transactions against potential issues, such as insolvency or misrepresentation.

82.     Although the parties agreed in various transaction confirmations that the 2002 ISDA Master Agreement and the 1994 Credit Annex formed part of the MCA, neither party ever executed and/or signed either of these documents.  Consequently, none of the schedules to either of them formed part of its terms.

83.     In the 2002 ISDA Master Agreement, section 5(a)(vii)(2) required parties to remain solvent at all times, stating that it was an Event of Default if either party "becomes insolvent or is unable to pay its debts."

84.     Additionally, section 5(a)(iv) prohibited misrepresentation, declaring an Event of Default if a party made "[a] representation... [which] proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated."

85.     Each time Ver and GGCI transacted, they executed an individual transaction confirmation based on the MCA terms.  These terms specified collateral requirements, eligible collateral types, and valuation methods.  The MCA listed both US dollars and a "Reference Currency" as eligible collateral, with a valuation percentage of "100% at Spot Rate."

86.     The MCA's use of "Reference Currency" valued at "100% Spot Rate" meant that the underlying digital asset being traded in the derivative contract could serve as collateral, and it would be valued based on its mark-to-market value in the spot markets.

87.     Despite earlier Telegram communications stating otherwise, the confirmations did not mention Ver's loans as acceptable collateral.  However, GGCI disregarded ISDA's standards and the MCA's written terms and eased collateral requirements throughout their course of dealing.

88.     In fact, it was a common practice for GGCI to ease collateral requirements, not only for Ver, but also for its other counterparties.

**The Importance of Solvency in Derivative Transactions**

89.     Derivative transactions involve bets on the future price of an underlying asset.  If a counterparty becomes insolvent during the contract, the winning party may not be able to collect, undermining the transaction's sole purpose.

90.     To mitigate this counterparty risk, the 2002 Master ISDA required parties to maintain solvency at all times (the "Solvency Requirement").

91.     The Solvency Requirement was crucial for Ver's decision to enter the MCA, since it ensured that he could collect from GGCI if his derivative positions were successful.  The Solvency Requirement also benefited GGCI, as they could collect from Ver and potentially foreclose on collateral if needed.

92.     The Solvency Requirement was designed to apply to any bankruptcy or insolvency laws relevant to a party.  For GGCI, a BVI company operating in New York, insolvency under BVI or New York law would breach the requirement.  GGCI would be insolvent if it couldn't meet obligations when due, or if its liabilities exceeded its assets.

15

93.    GGCI's collateral policy was essential for compliance with the Solvency Requirement.  If a counterparty failed to pay, GGCI would incur losses, potentially leading to insolvency as assets were either removed from their balance sheet or had their value greatly reduced.

94.    To mitigate this risk, GGCI required counterparties to provide collateral before opening positions, and it was GGCI's responsibility to maintain adequate collateral and ensure their assets exceeded liabilities at all times.  Again, any failure to do so would undermine the entire purpose of the transactions.

### GGCI Failed to Enforce Collateral Requirements

95.    The MCA and its Transaction Confirmations contained strict collateral requirements for Ver, but GGCI did not enforce them.  Instead, GGCI allowed Ver and other customers to maintain undercollateralized positions and provide exotic, illiquid digital assets as collateral.

96.    Firstly, GGCI never required Ver to post US dollars or Reference Currency as collateral.  They allowed Ver to use unrelated digital assets, such as Monero (XMR) and Binance Coin (BNB), even though these assets were unrelated to the underlying derivative transaction.

97.    GGCI permitted other customers to provide even more illiquid and exotic assets as collateral, such as FTT tokens.

98.    On information and belief, GGCI also allowed SOL, OXY, MPS and SRM as collateral to support billions in loans.

99.    Secondly, GGCI valued this exotic collateral at mark-to-market prices without applying appropriate discounts for illiquidity or potential losses during liquidation.

16

100.     Thirdly, GGCI allowed Ver to maintain collateral amounts below the required sum in the MCA.

101.     Fourthly, GGCI didn't request additional collateral from Ver when the US dollar value of his digital assets fell below key thresholds.

102.     Fifthly, GGCI permitted Ver to use digital assets he had loaned at interest as collateral, which meant that GGCI was taking on additional counterparty risk by redeploying Ver's collateral to profit from an interest rate spread.

103.     GGCI's relaxed collateral requirements were not exclusive to Ver.  They extended the same or similar benefits to other counterparties, resulting in an increased risk of loss and insolvency if the market turned against them.

104.     Nor were GGCI's relaxed collateral requirements embodied in any agreement or official special status afforded to Ver or other particular customers.  Rather, GGCI simply neglected to enforce the written terms of their agreements.

### GGCI's Collateral Exposed to "Daisy Chain" of Debts

105.     GGCI did not directly possess all of the digital asset collateral deposited by counterparties like Ver.  Instead, GGCI sought to generate profits by loaning out this collateral and profiting from the interest rate spread.  This practice, however, exposed GGCI's collateral value to increased counterparty risk, as they needed to recover the loaned collateral before liquidating it to cover a default.

106.     GGCI's collateral practices created a precarious chain of debt obligations. Essentially, a house of cards. Under normal market conditions, they could manage this debt chain by obtaining US dollars.  However, during times of market stress and illiquidity, a single default

17

could render GGCI unable to access the collateral deposited by Ver or others, exposing them to immense loss.

107.    Without US dollar cash reserves, GGCI would be forced to liquidate investments at fire sale prices, or call in loans from borrowers who may default.  During periods of market illiquidity and stress, GGCI's relaxed collateral practices increased the risk of GGCI becoming undercollateralized and insolvent.

108.    On information and belief, GGCI would routinely loan out their digital assets to other Genesis entities, including GAP, who would loan it to counterparties such as 3AC.

109.    These related party loans would eventually become impaired by 3AC's insolvency.  In June 2022, 3AC defaulted on more than $2.3 billion to GAP, causing losses to GGCI as related party loans became impaired.

110.    Barry Silbert, who controlled GGCI and the Genesis Entities through his position as Chairman of DCG, was aware of this risk.  In a June 2021 tweet, he acknowledged the "daisy chain" of debts and emphasized the importance of understanding counterparty risk and identifying weak links in the chain.  Regrettably, Silbert failed to recognize that these weak links existed within his own organization, ultimately jeopardizing the safety of GGCI's collateral.



## GGCI Overstates its Financial Health: Deviating from ASC 820

111.    GGCI's mark-to-market valuation of digital assets, including those not physically possessed, resulted in an overstatement of its financial health.

112.    Note 2 to GGCI's December 31, 2021 audited financial statement detailed the significant accounting policies and the methods used to derive valuations for its assets and liabilities.  The statement claimed compliance with accounting principles generally accepted in the United States of America (U.S. GAAP).

113.    U.S. GAAP utilizes ASC 820 for determining "fair value," which is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.

114.    ASC 820 establishes a hierarchy of inputs for determining fair value, prioritizing observable inputs and requiring additional disclosures when unobservable inputs are relied on.

115.    GGCI concluded all digital assets and liabilities were recorded and valued based on Level 2 inputs – which are defined as "significant observable inputs".

116.    ASC 820's hierarchy includes three levels:

   a.  Level 1 (unadjusted spot price in an active market, such as the quoted price of Apple shares on the New York Stock Exchange);

   b.  Level 2 (spot prices from less active markets and may or may not be discounted); and

   c.  Level 3 (providing the most discretion, since the quoted price is unreliable and the evaluator is thus forced to rely on other inputs that are unobservable and significant to the overall fair value measurement).

117.    GGCI determined the fair market value of assets in "digital currency investments" and liabilities under "digital currency collateral payable" using Level 2.

118.    Digital assets are a famously volatile asset class, characterized by extreme price fluctuations and inherent unpredictability.  Market movements are driven by factors such as technological advancements, regulatory changes, market sentiment, global economic conditions, illiquidity, and, at times, price manipulation.

119.    At all times relevant, GGCI valued all of their digital assets at mark-to-market prices and never applied a discount to them.

120.    Despite liquidity concerns and worsening market conditions beginning in May 2022, GGCI never applied a discount to their Level 2 assets.  All such assets continued to be valued at mark-to-market prices.

121.    GGCI's refusal to apply appropriate discounts to its Level 2 assets allowed GGCI to overstate its financial health and created a misleading picture of a solvent entity where one did not exist.

**Over Exposure to Alameda & FTX**

122.    During the course of 2021, Genesis entities engaged in a broad relaxation of their lending standards, and began to accept increasingly illiquid and exotic digital assets as collateral for loan and obligations and derivative contracts, creating a precarious financial situation.

123.    On information and belief, GGCI went insolvent at some point during 2021 when it made a loan of $2.5 billion and accepted FTT tokens as collateral.  GGCI valued these FTT tokens mark-to-market, which overstated the real value of FTT and resulted in a severe under collateralization, as Alameda had manipulated FTT's price higher to borrow against it.

124.    Consequently, GGCI was grossly overexposed to a single counterparty.  GGCI's 2021 audited financials reported that on December 31, 2021 the company held $2.370 billion in

20

"digital collateral payable", 99% of which were FTT tokens owed to a single counterparty. These FTT tokens represented *nearly 70% of GGCI's then total assets.*

125.    However, the actual fair market value of these FTT tokens was far lower than the mark-to-market prices used by GGCI, which resulted in significantly fewer assets than reported.

126.    Were GGCI to foreclose on the FTT tokens and sell them for US dollars, *they would have been unable to recover anywhere near the full amount owed.*

127.    GGCI's overexposure to FTT resulted from a quid pro quo relationship between Alameda and Genesis executives.

128.    FTX and Alameda granted Genesis executives early access to purchase FTT tokens at discounted rates before public issuance.

129.    This conflict of interest compromised GGCI's risk management policies and practices, as executives were incentivized to authorize GGCI to take excessive risks for their personal benefit.

130.    If not for these conflicts of interest, Genesis executives might have conducted adequate due diligence on their $2.5 billion loan and learned of Alameda's scheme to manipulate FTT prices and increase its borrowing ability.

131.    In a complaint against Alameda's former CEO, Caroline Ellison, the SEC details this manipulation.  Ellison engaged in automated FTT token purchases to inflate the value of Alameda's collateral, increasing risks for lenders accepting FTT as collateral.

132.    The market crash of May 2022 only worsened GGCI's finances, as Alameda suffered substantial losses, which exacerbated its inability to repay its loan to GGCI.

133.    After May 2022's market crash, Alameda focused its efforts on propping up the price of FTT token, continuing to engage in market operations and offering lines of credit to

21

insolvent entities with large FTT positions to prevent FTT from being liquidated, which would have publicly revealed Alameda's insolvency.

134.    In August 2022, after realizing that Genesis and GGCI would liquidate FTT tokens and reveal their insolvency, Alameda misappropriated customer funds to repay Genesis and GGCI, which was a preferential transfer at the expense of FTX creditors subject to clawback.

135.    Afterwards, Alameda replaced the missing $2.5 billion in FTX customer deposits with the FTT tokens they had just received from Genesis and GGCI, and by valuing FTT at its inflated mark-to-market price created the illusion that FTX remained solvent.

136.    In November 2022, the digital asset exchange Binance called Alameda's bluff and threatened to sell their FTT tokens on the open market, which revealed their lack of liquidity. FTX and Alameda were finally revealed to be insolvent and filed for bankruptcy less than three months after having repaid $2.5 billion to Genesis and GGCI.

### Over Exposure to 3AC & the Crash of May 2022

137.    In May 2022, digital asset markets experienced a steep decline due to the collapse of digital assets LUNA and TerraUSD, causing significant losses, liquidations, and a snowball effect of defaults and insolvencies.

138.    3AC was central to the crash, resulting in substantial losses for GGCI and its counterparties.  3AC owed over $3 billion to creditors, including $2.3 billion to GAP, its largest creditor.

139.    Genesis and GAP were overexposed to 3AC, driven by conflicts of interest related to generating demand for the various digital asset trusts operated by Grayscale (the

"Grayscale Trusts").  DCG, Genesis' parent company, owned the investment manager for the Grayscale Trusts and profited from the fees it generated.

140.    Since 2020, GAP had been loaning funds to 3AC to fund its Grayscale Trust purchases.  However, GBTC's[1] value declined, resulting in substantial unrealized losses for 3AC. While shares in GBTC traded at a premium to its net asset value when 3AC began conducting the trade in 2020, by June 2022 they were trading at a 30% discount.

141.    Genesis' concerns over their exposure to 3AC had reached a boiling point by January 2022.  That month, Genesis executives had 3AC pledge their GBTC shares to GAP as security.  But as the net asset value of GBTC continued to fall, so did the value of GAP's pledged assets.

142.    Upon information and belief, Genesis' 3AC exposure did not end with the Bitcoin trust, as 3AC was an investor in the other Grayscale Trusts.

143.    In May 2022, after LUNA's collapse, Genesis executives spoke with 3AC and, on information and belief, determined that 3AC was insolvent.

144.    However, GAP's significant exposure to 3AC posed a risk to the solvency of the entire Genesis enterprise, including GGCI, due to various related party loans and intercompany debts.  Consequently, Genesis opted not to issue margin calls to 3AC, despite the terms of their agreement permitting such action, in order to prevent further destabilizing their own financial situation.

145.    On information and belief, if not insolvent as a result of the $2.5 billion loan backed by FTT discussed herein, GGCI was insolvent as a result of 3AC's inability to repay GAP by the end of May 2022.

---

[1] GBTC is the Grayscale Bitcoin Trust, just one of a number of digital asset trusts operated by Grayscale and DCG.

23

146.    On June 10, GGCI's need to obtain more capital became urgent.  That day, 3AC's accounts on the Deribit derivatives platform were liquidated.  Genesis executives, alarmed by the Deribit liquidations and cognizant of 3AC's insolvency, understood that 3AC's demise was near and formulated a strategy to avoid immediate recognition of a $2.3 billion loss.

147.    The plan centered on GAP seizing Grayscale BTC trust shares and other digital assets pledged by 3AC as security for their undercollateralized loans.  However, since issuing an unpayable margin call to 3AC would expose their insolvency, Genesis needed to act quickly before the market caught on.  By securing 3AC assets ahead of other creditors, GAP aimed to offset the substantial loss and safeguard both its own balance sheet and those of its affiliates.

148.    On June 12, Genesis executives set the plan in motion.  GAP issued a margin call to 3AC, demanding an additional $334 million in collateral payments, fully aware that 3AC would be unable to meet the requirement.

149.    On June 13, GAP served a notice of default on 3AC, enabling GAP to liquidate the limited collateral they held and pursue emergency relief to seize further 3AC assets ahead of other creditors.

150.    On June 15, GAP initiated arbitration against 3AC, seeking more than $2.3 billion in loan recovery and emergency relief.  This included seeking a preliminary injunction directing 3AC to freeze more than $2.3 billion, and to deposit the pledged assets with GAP, which were allegedly valued at $462 million at the time.

151.    In their arbitration filing, GAP noted that "[d]ue to recent extreme volatility in the cryptocurrency markets, the value of the collateral already posted by Three Arrows decreased significantly in comparison to the loaned assets under the MLAs."

152.   On June 16, news of the notice of default GAP had issued to 3AC was publicized in the media, and numerous other 3AC lenders began making margin calls and issuing default notices.

153.   On June 21, GAP's request for a preliminary injunction to freeze or seize certain 3AC pledged assets was denied.  A further hearing scheduled for July 5, making it evident GAP wouldn't secure these assets by month's end.

154.   Due to the monthly reporting schedule followed by all Genesis entities, it became apparent that GAP and its affiliates, including GGCI, would have to recognize losses related to 3AC in their month-end financial reports for June 2022, which also coincided with their quarterly reporting obligations.

155.   On June 30, DCG had accepted that GAP, GGCI, and other entities were insolvent and needed capital injections.  Accordingly, DCG loaned $1.1 billion to Genesis Global.

156.   On information and belief, Genesis Global then injected $150 million into GGCI. This amount was recorded as an asset in a newly added line item, "Other", to GGCI's June 30, 2022, SOFC.  Without this, GGCI's negative equity would have exceeded $136 million on June 30.

157.   Consequently, at the latest, GGCI was insolvent in June due to various factors, including inaccurate loss recording, failure to apply appropriate discounts to Level 2 digital assets in the midst of a liquidity event, untimely recognition of substantial losses linked to 3AC and related parties, and untimely recognition of losses tied to the FTT-collateralized loan.

**GGCI's Misrepresentations of Solvency**

158.   In or about early June, GGCI devised a plan to strengthen its balance sheet.  They aimed to persuade their biggest clients, including Ver, to roll currently profitable options expiring

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 80 of 637

in June to later dates, thereby allowing GGCI to avoid making payments.  Meanwhile, GGCI would allow Ver's currently unprofitable June options to expire, thereby bringing funds into GGCI from Ver and others.

159.    On information and belief, Genesis knew GGCI was insolvent by such time.

160.    On June 7, GGCI asked Ver to roll his deep in-the-money Ethereum options to a later date. Those options expired on June 24.  Ver declined.

161.    On June 9, GGCI sent Ver an article about Ethereum's progress to pique his interest about rolling the options  Ver did not respond.

162.    On June 10, Deribit's liquidation of 3AC signaled 3AC's imminent collapse.

163.    On June 11, GGCI again requested Ver to roll only his in-the-money Ethereum options to a later date, and offered him attractive terms.  Unaware that Genesis planned to margin call and liquidate 3AC immediately afterwards, Ver agreed to let GGCI roll his in-the-money options.

164.    On June 12 and 13, digital asset prices fell as 3AC was margin called, defaulted, and liquidations commenced, as had been planned by Genesis

165.    Meanwhile, on June 13, and again on the 14th, GGCI requested further collateral from Ver.  On June 15, to keep Genesis executives happy, Ver reduced his exposure to GGCI by $22.5 million by buying certain BTC call options.

166.    From June 16 to June 24, GGCI continued discussions with Ver about the additional types of collateral he could offer, and learned it was Ver's strong preference to post a combination of digital assets and certain shares in private companies.  GGCI indicated they were prepared to accept these assets as collateral, as they had done previously.

26

167.    Throughout the life of their two year business relationship, GGCI had always accepted different forms of collateral from Ver, and allowed him to maintain undercollateralized positions.  In fact, it had been GGCI's offer to pay Ver interest on his digital asset collateral, in direct violation of the MCA's collateral requirements, that had induced Ver to trade with GGCI and to continue trading up until that time.

168.    However, upon the expiration of Ver's out-of-the-money options on June 24, Genesis executives abruptly changed their policy.  They demanded that Ver immediately provide 100% of the required collateral in either US dollars or Reference Currency as stated in the MCA, or face a notice of default.

169.    Based on the course of the parties' dealings, GGCI knew Ver was not expecting to be required to pay the full sum of collateral in US dollars or Reference Currency on that day, which GGCI had never required him to do during their two year relationship.

170.    GGCI's plan was to extract an excessive sum of collateral from Ver.  GGCI offered to accept his digital assets and shares as collateral, but only if he *over*-collateralized his position by 300% to 600%.  Were Ver to pay in digital assets, GGCI wanted him to supply 300% as much collateral as the value of his entire position.  If in private shares, 600%.

171.    As a result of the abrupt change in policy and attempt to extract an excessive sum of collateral, Ver began to suspect GGCI's insolvency.  He nonetheless agreed to discuss details with GGCI on a call the following day, June 25.

172.    On the June 25th call, Defendants threatened to issue a notice of default if Ver did not immediately pay the full amount in US dollars or Reference Currency or meet their excessive collateral demands.

27

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 82 of 637

173.    Considering the state of the markets, Ver requested proof of GGCI's solvency. Thereafter, GGCI backed off their demands for excessive sums of collateral, began engaging in more constructive discussions to immediately accept certain digital assets, and continued discussions with Ver as to other assets to pledge as collateral.

174.    On information and belief, even using inflated mark-to-market prices for digital assets, GGCI was insolvent on June 25 and were therefore unable to provide Ver with proof of their solvency.

175.    GAP had just lost its bid to freeze 3AC assets in the emergency arbitration hearing on June 21.  At the very latest, GAP should have written down their impaired 3AC loans by such date, which would have resulted in GGCI also writing down any related party loans with GAP.

176.    Initially, GGCI declined to provide up-to-date solvency proof to Ver, stating they did not produce point-in-time financial statements.

177.    However, on June 28, after Ver had informed GGCI that he was not comfortable sending any further collateral without proof of GGCI's solvency, GGCI provided a point in time financial statement.  This statement of financial condition (the "June 20 SOFC") revealed GGCI's various assets and liabilities as of June 20.

178.    The June 20 SOFC claimed total assets of $3.063 billion and liabilities of $2.962 billion, which gave GGCI positive equity of just over $100 million.  Given that $1.594 billion of GGCI's assets were digital assets ("Investments in digital currencies"), even a small fluctuation in the market would render them insolvent.

**Genesis Global Capital International Limited**
**Statement of Financial Condition (Unaudited)**
**June 20, 2022**
*(in thousands)*

| | | |
|---|---|---:|
| **Assets** | | |
| Cash | $ | 12,929 |
| Investments in digital currencies | | 1,594,209 |
| Derivative assets | | 442,733 |
| Collateral receivable | | 454,449 |
| Receivable from customers | | 159,182 |
| Loans receivable | | 399,560 |
| **Total assets** | $ | 3,063,062 |
| | | |
| **Liabilities and stockholder's equity** | | |
| **Liabilities** | | |
| Collateral payable | $ | 2,094,617 |
| Payable to customers | | 94,569 |
| Loans payable | | 606,477 |
| Derivative liabilities | | 167,132 |
| **Total liabilities** | $ | 2,962,795 |
| | | |
| **Stockholder's equity:** | | |
| Total stockholder's equity | | 100,267 |
| **Total liabilities and stockholder's equity** | $ | 3,063,062 |

179.    Faced with an apparently solvent GGCI, who had by now backed off their demands for excessive collateral, Ver saw no choice but to keep his remaining positions open at GGCI and cooperate with them to ensure collateral levels were mutually acceptable until his remaining options expired.

180.    However, what Ver did not know at the time was that the June 20 SOFC was an accounting farce.  The $1.596 billion in digital assets was in fact worth far less, and consisted of a large sum of illiquid FTT tokens, which if sold would have left a large shortfall remaining to GGCI from an insolvent counterparty.

181.    The SOFC's chosen date of June 20 was no accident and was a central part of that farce.  The SOFC did not reflect the full write down of 3AC's impaired loans.  On information

29

and belief, the 3AC loans were deemed impaired by Genesis on June 21 when GAP's request for emergency relief was denied and GAP had no further collateral to support such debts.

182.    When GGCI's plan to seize exorbitant amounts of collateral from Ver failed, GGCI entered discussions with their parent company to receive an injection of capital, which occurred on June 30 when DCG injected $1.1 billion into Genesis.

### Ver Discovers GGCI's Insolvency

183.    On November 11, 2022, FTX and Alameda filed for bankruptcy. Their bankruptcy came after a rapid decline when Binance, another exchange, announced they would sell their FTT tokens on the open market. Since FTT tokens were highly illiquid and their prices artificially inflated by Alameda, their value plunged by over 90% following Binance's announcement.

184.    The FTX and Alameda bankruptcies sent shockwaves through the digital asset markets. Surprisingly, Sam Bankman-Fried ("SBF"), the controlling principal behind FTX and Alameda, started giving public interviews, asserting that FTX wasn't truly insolvent since its balance sheet held digital assets—primarily FTT tokens—with a mark-to-market value exceeding customer liabilities. SBF was eventually indicted on numerous felony charges.

185.    Later that November, rumors circulated that Genesis and its subsidiaries were insolvent when its lending arm stopped withdrawals, trapping investor funds. It was later revealed that GGCI was FTX's largest creditor.

186.    Genesis initiated a restructuring plan to save its business, which focused on transferring bad assets from GGCI to other Genesis entities destined for bankruptcy. The plan aimed to raise capital to pay creditors by selling shares in a financially stable GGCI.

187.    Meanwhile, Ver continued to pay collateral to GGCI.  Since June 21, 2022, Ver has made total payments to GGCI in excess of $60 million and GGCI has liquidated collateral valued in excess of $50,000,000.

188.    On or about December 23, just weeks after Ver made $37 million in collateral payments to GGCI, he became aware of information that made him question GGCI's earlier claim of solvency that had been supported by the June 20 SOFC.

189.    The news was a New York Times interview of SBF, who stated that Alameda had repaid a $2.5 billion loan to "Genesis" that August, about three months before filing for bankruptcy.  SBF added that the loan was repaid because Genesis had called in specific loans made to Alameda.

190.    Ver became concerned that GGCI might have been the entity that lent money to Alameda, potentially affecting GGCI's present solvency and their solvency in June 2022.

191.    As Alameda repaid the loan to Genesis in August, about three months before FTX's bankruptcy, it seemed like this repayment would potentially be subject to an automatic clawback as a preferential transfer.

192.    Ver investigated and learned that there was speculation that SBF had directed Alameda to misappropriate FTX customer funds to repay Genesis.  Alameda then used the FTT tokens it had received back from Genesis to pay FTX, who then used the FTT tokens to replace the missing customer deposits as an asset on their balance sheet.

193.    This caused Ver to grow more concerned, since if true, it would mean that GGCI had been doing what FTX had been doing: propping up their insolvent balance sheet with inflated FTT tokens.

31

194.    Since Ver was considering rolling his expiring December 30 options with GGCI to a later date, he wanted to be sure GGCI remained solvent before doing so, and wanted to further confirm they had in fact been solvent that past June when he initially inquired.

195.    In late December 2022, Ver inquired with GGCI as to whether they remained solvent in the wake of the FTX and Alameda bankruptcies, and whether GGCI had any exposure to them, specifically whether it had been GGCI who had reportedly made a $2.5 billion loan to Alameda and was repaid in August 2022.

196.    GGCI responded that all of Ver's trades had been through GGCI.  Despite having lost some funds on FTX, GGCI claimed that it remained solvent and had no further involvement or exposure to Alameda or FTX.

197.    Ver persisted in questioning specifically whether it had been GGCI who received the Alameda loan repayment referred to by SBF in the New York Times interview.  GGCI informed Ver that those funds had been repaid to a different Genesis entity, not GGCI.

198.    At this point, Ver demanded proof of GGCI's present solvency, and demanded GGCI provide proof as to how they valued the assets on their June SOFC, which Ver now suspected had deployed the same misleading mark-to-market accounting that FTX had deployed to deceive their depositors.

199.    Ver reminded GGCI that he had faithfully paid in excess of $60 million in additional collateral since June, believing it his legal obligation to do so since GGCI remained solvent, including $37 million dollars in payments just weeks prior.

200.    Were Ver simply trying to avoid paying a debt to GGCI, as Counter-Defendant alleges in its complaint, he obviously would not have made payments totalling $37 million just weeks earlier, and would have raised concerns instead of paying.

32

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 87 of 637

201.    Satisfied Ver's concerns were being raised in good faith, but while still denying the validity of his claims, GGCI produced to Ver their audited 2021 financials, as well as an SOFC dated June 30, 2022.

202.    However, both of those documents raised even further issues which revealed GGCI to have been insolvent in June 2022 at the latest.

**GGCI's June 30 SOFC and 2021 Audited Financials**

203.    The June 30 SOFC revealed dramatic and concerning changes which had occurred since the June 20 SOFC.

204.    First, there had been a significant reported drop in both positive equity and assets. On June 20, there was positive equity of just $100 million on $3 billion in assets, which indicated GGCI faced significant liquidity and volatility concerns. However, by June 30, positive equity had shrunk to $14 million, with assets dropping by more than $400 million, exacerbating the already troubling liquidity and volatility concerns.

205.    Second, much of the fall in asset values was attributed to loans that had been written down.  On June 20, GGCI reported "loans receivable" of $399 million.  However, by June 30 (which had broken "loans receivable" to two line items), loans receivable had been reduced to $1 million and related party loans $47 million.  This represented a combined loss of over $350 million in loan write downs in just ten days.

206.    On information and belief, these loan write-downs represented losses related to 3AC, which had not been written down in the June 20 SOFC, but were known to Counter-Defendant when the June 20 SOFC was sent to Mr. Ver as proof of GGCI's solvency.

207.    Lastly, the June 30 SOFC contained a brand new line item, "Other", which had $151 million in assets.  There was no new corresponding line item in liabilities.

33

208.    On information and belief, this line item "Other" represented funds that had recently been injected as the result of DCG's $1.1 billion capital injection on June 30.

**GGC International Limited**
**Statement of Financial Condition**
**June 30, 2022**
*(in thousands)*

| | | |
|---|---|---:|
| **Assets** | | |
| Cash | $ | 3,232 |
| Investments in digital currencies and trusts | | 1,439,363 |
| Digital currency loans receivable, net of allowance for loan losses | | 1,250 |
| USD loans receivable, net of allowance for loan losses | | 1,900 |
| Digital currency collateral receivable | | 340,389 |
| Derivative assets | | 869,045 |
| Interest receivable, net of allowance | | 2,758 |
| Receivables from related parties | | 47,334 |
| Other assets | | 151,977 |
| **Total assets** | $ | 2,357,248 |
| | | |
| **Liabilities and member's equity** | | |
| **Liabilities** | | |
| Digital currency loans payable | $ | 370,737 |
| Digital currency collateral payable | | 891,080 |
| USD loans payable | | 18,073 |
| Option collateral payable | | 344,169 |
| Derivative liabilities | | 191,864 |
| Interest payable | | 5,645 |
| Accounts payable and accrued expenses | | 295,894 |
| Payables to related parties | | 225,364 |
| **Total liabilities** | | 2,342,826 |
| | | |
| **Member's equity** | | 14,422 |
| Total member's equity | | 14,422 |
| **Total liabilities and member's equity** | $ | 2,357,248 |

209.    GGCI's 2021 audited financials revealed both that GGCI had been valuing digital assets at 100% mark-to-market, and that it had in fact been the entity that originated a $2.5 billion loan collateralized by FTT tokens.  Those FTT tokens had ultimately come from Alameda.

210.    The 2021 audited financials explained that GGCI accounted for collateral paid by counterparties as an asset with a corresponding liability.  Alameda's FTT tokens would have been counted on their balance sheet as an asset under "*Investments into digital assets*" and as a liability under "*digital currency collateral payable.*"

211.    GGCI's balance sheet showed "*Investments in digital currencies*" equal to $2.825 billion, and "*Digital currency collateral payable*" equal to $2.370 billion.

212.    Notably, the "*Digital currency collateral payable*" roughly equaled the $2.5 billion SBF had referred to during his New York Times interview.  And while "*Investments in digital currencies*" was larger, it contained additional digital assets owned by GGCI.

213.    GGCI's cash flow statement in the 2021 audited financials also contained a line item for "*Digital currency collateral payable*" under liabilities, which was equal to the same line item on the balance sheet, indicating these sums made their way onto GGCI's balance sheet in 2021.

214.    GGCI's 2021 audited financials contained a section detailing significant exposures to various counterparties.  The significant counterparties were not identified by name, only certain information about them was provided.  The financials identified a "Counterparty I" who represented 99% of the digital currency collateral payable liability, which was further identified to consist of 99% FTT tokens.

215.    Therefore, GGCI's 2021 financials showed that at some time in 2021 it had originated a loan to a single counterparty backed by FTT tokens, which were valued at $2.3 billion as of December 31, 2021.  Accordingly, it became evident to Ver that "Counterparty I" was Alameda Research.

35

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 90 of 637

216.    Lastly, GGCI's 2021 audited financials contained other figures that revealed yet other sources of GGCI's undercapitalization.  The statement of cash flows identified a $105 million dollar operating loss for 2021.  And the statement of changes in stockholder equity identified almost $41 million in distributions in 2021.

### GGCI's Shifting Explanations

217.    When Ver pointed out that GGCI's 2021 audited financials identified a $2.5 billion loan obligation to Alameda, contrary to GGCI's prior representations, GGCI provided misleading information to Ver in an attempt to distance itself from Alameda.

218.    Incredibly, GGCI initially claimed that the financials Ver possessed were actually a consolidated report for multiple Genesis entities, and that the FTT tokens belonged to a different Genesis entity.

219.    However, the financials were clearly labeled as having been prepared exclusively for GGCI, which quickly disproved GGCI's claims.

220.    Once disproven, GGCI shifted its narrative and asserted that an affiliate had dealt with Alameda, who then borrowed from GGCI using the FTT tokens as collateral.  GGCI then refused to provide any evidence to support this claim.

221.    Nonetheless, GGCI's claim that the FTT tokens belonged to an affiliate was a difference without distinction, since the tokens had ultimately come from Alameda and would be subject to a clawback in bankruptcy.

222.    In fact, on May 3, 2023, FTX filed a motion in the Southern District of New York, on behalf of itself and affiliated debtors, seeking $3.9 billion back from Genesis, including sums from GGCI.

223.    Ultimately, discussions with GGCI made clear that GGCI hadn't applied any discount to the digital assets on their SOFC.

224.    At one point, GGCI personnel even admitted that they "may have been underwater for a few days."

225.    Had GGCI applied appropriate discounts to their digital assets, as they demanded from Ver, their SOFC would have revealed their insolvency.

226.    As a result, Ver would have closed his positions to avoid trading with an insolvent counterparty and saved tens of millions of dollars.

## CAUSES OF ACTION

### COUNT ONE

### (Breach of Contract (Insolvency))

227.    Defendant realleges and incorporates all preceding paragraphs as though fully set forth herein, and further alleges:

228.    As discussed herein, GGCI and Ver were parties to the Master Confirmation which incorporated the ISDA Master Agreement and ISDA Credit Support Annex by reference.

229.    During the life of the parties' relationship, there were well over 100 transactions conducted by GGCI on behalf of Ver.

230.    The Master Confirmation executed in connection with each transaction incorporated the 2002 ISDA Master Agreement by reference.

231.    The 2002 ISDA Master Agreement defines a number of Events of Default.  One such event of default is the insolvency of either party.

232.    As described herein, GGCI became insolvent at some point prior to July 1, 2022.

233.    At the point of insolvency, GGCI was in breach of all option contracts then open between the parties and subject to the 2002 ISDA Master Agreement.

234.    As per the agreements between the parties, in the event of default, all transactions were to be terminated, and the parties were expected to settle any financial obligations at that point.

235.    However, as a result of GGCI's failure to notify Ver of their insolvency, and their campaign of obfuscation, Ver did not become aware of the insolvency for quite some time.

236.    Following the insolvency, but prior to Ver becoming aware of same, Ver contributed substantial additional funds to maintain his then open options positions, which never should have been paid to GGCI as a result of its insolvency.

237.    Ver has suffered significant damages as a direct result of GGCI's breach of the agreements between the parties.

238.    Accordingly, Ver respectfully requests that this Court award all relevant damages caused by Counter-Defendant's breach of contract, including, but not limited to, compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000.00, punitive or exemplary damages for their malicious conduct, all costs and Court fees, reasonable attorneys' fees, as well as any other relief this Court deems just and proper.

**COUNT TWO**

**(Breach of Contract (Misrepresentation) - BCH Options)**

239.    Defendant realleges and incorporates all preceding paragraphs as though fully set forth herein, and further alleges:

240.    As discussed herein, GGCI and Ver were parties to the Master Confirmation which incorporated the ISDA Master Agreement and ISDA Credit Support Annex by reference.

38

241.    Pursuant to a trade confirmation dated March 22, 2022, GGCI agreed to purchase from Ver a put option for 70,000 units of Bitcoin Cash ("BCH"), with a strike price of $545 per BCH.

242.    The Master Confirmation executed in connection with this transaction incorporated the 2002 ISDA Master Agreement by reference.

243.    The 2002 ISDA Master Agreement defines a Misrepresentation by either party as an Event of Default as well.  Pursuant to the 2002 ISDA Master Agreement, any representation that "proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated" would be considered an Event of Default.

244.    As discussed herein, GGCI made, and repeated, a number of material misrepresentations and omissions regarding its solvency.  These repeated misrepresentations and omissions constitute a material breach of the agreement.

245.    Ver has suffered, and continues to suffer, irreparable harm as a direct and proximate result of Counter-Defendant's breach of the agreement.

246.    Accordingly, Ver respectfully requests that this Court award all relevant damages caused by Counter-Defendant's breach of contract, including, but not limited to, compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000.00, punitive or exemplary damages for their malicious conduct, all costs and Court fees, reasonable attorneys' fees, as well as any other relief this Court deems just and proper.

### COUNT THREE

### (Breach of Contract (Misrepresentation) - ETH Options)

247.    Defendant realleges and incorporates all preceding paragraphs as though fully set forth herein, and further alleges:

39

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 94 of 637

248.    As discussed herein, GGCI and Ver were parties to the Master Confirmation which incorporated the ISDA Master Agreement and ISDA Credit Support Annex by reference.

249.    Pursuant to a trade confirmation dated June 10, 2022, GGCI agreed to purchase from Ver a put option for 10,000 Ether ("ETH"), with a strike price of $5,000 per ETH.

250.    The Master Confirmation executed in connection with this transaction incorporated the 2002 ISDA Master Agreement by reference.

251.    The 2002 ISDA Master Agreement defines a Misrepresentation by either party as an Event of Default as well.  Pursuant to the 2002 ISDA Master Agreement, any representation that "proves to have been incorrect or misleading in any material respect when made or deemed to have been made or repeated" would be considered an Event of Default.

252.    As discussed herein, GGCI made, and repeated, a number of material misrepresentations and omissions regarding its solvency.  These repeated misrepresentations and omissions constitute a material breach of the agreement.

253.    Ver has suffered, and continues to suffer, irreparably harm as a direct and proximate result of Counter-Defendant's breach of the agreement.

254.    Accordingly, Ver respectfully requests that this Court award all relevant damages caused by Counter-Defendant's breach of contract, including, but not limited to, compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000.00, punitive or exemplary damages for their malicious conduct, all costs and Court fees, reasonable attorneys' fees, as well as any other relief this Court deems just and proper.

40

## COUNT FOUR

### (Breach of Contract (Misrepresentation) - BTC Options)

255.    Defendant realleges and incorporates all preceding paragraphs as though fully set forth herein, and further alleges:

256.    As discussed herein, GGCI and Ver were parties to the Master Confirmation which incorporated the ISDA Master Agreement and ISDA Credit Support Annex by reference.

257.    Pursuant to a trade confirmation dated June 11, 2022, GGCI agreed to purchase from Ver a put option for 500 Bitcoin ("BTC"), with a strike price of $26,000 per BTC.

258.    The Master Confirmation executed in connection with this transaction incorporated the 2002 ISDA Master Agreement by reference.

259.    The 2002 ISDA Master Agreement defines a Misrepresentation by either party as an Event of Default as well.  Pursuant to the 2002 ISDA Master Agreement, any representation that "proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated" would be considered an Event of Default.

260.    As discussed herein, GGCI made, and repeated, a number of material misrepresentations and omissions regarding its solvency.  These repeated misrepresentations and omissions constitute a material breach of the agreement.

261.    Ver has suffered, and continues to suffer, irreparably harm as a direct and proximate result of Counter-Defendant's breach of the agreement.

262.    Accordingly, Ver respectfully requests that this Court award all relevant damages caused by Counter-Defendant's breach of contract, including, but not limited to, compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000.00,

41

punitive or exemplary damages for their malicious conduct, all costs and Court fees, reasonable attorneys' fees, as well as any other relief this Court deems just and proper.

## COUNT FIVE

### (Fraud)

263.     Defendant realleges and incorporates all preceding paragraphs as though fully set forth herein, and alleges as follows:

264.     On June 7, 2022, GGCI began contacting Mr. Ver regarding rolling over his in-the-money Ethereum option.  However, Mr. Ver was not interested.

265.     Over the next few days, GGCI continued to try and convince Mr. Ver that rolling over his options was the right thing to do, sending articles about the performance of ETH and proposing more favorable terms.  Mr. Ver eventually agreed to roll his options.

266.     Shortly after electing to roll over his in-the-money options, GGCI began making collateral demands that were 1) above and beyond any level of collateral required by the parties' agreements and 2) not in line with the parties' previous course of dealing.

267.     Considering the state of the market, namely the Luna and 3AC collapses, Mr. Ver was concerned about the solvency of GGCI and began to ask questions.  On June 25, 2022, Mr. Ver requested that GGCI provide proof of its solvency.

268.     On June 28, 2022, GGCI delivered a statement of financial condition dated June 20, 2022 (the previously discussed June 20 SOFC).  However, on June 21, 2022, GAP's request for emergency relief in its arbitration against 3AC was denied, requiring GAP and, in turn, GGCI to write down hundreds of millions of dollars in assets.

269.     By sending an incomplete, or otherwise misleading SOFC, GGCI knowingly made a material misrepresentation to Mr. Ver regarding its current financial condition.

42

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 97 of 637

270.     This material misrepresentation or omission was made by GGCI with the express intent to induce Mr. Ver to maintain his Ethereum option position with GGCI and prevent him from discovering GGCI's insolvency and exercising his right to terminate the contract as a result.

271.     Mr. Ver relied on the June 20 SOFC statement, accepting the representations of GGCI as accurate, and did in fact continue to maintain his option positions at GGCI.

272.     In the months following the delivery of the intentionally misleading June 20 SOFC, Mr. Ver made payments in excess of $60,000,000 to GGCI to maintain his positions and GGCI liquidated over $50,000,000 of Ver's collateral.

273.      Had GGCI disclosed accurate financial information as of June 28, 2022, or otherwise disclosed the 3AC write downs resulting from its failure in the 3AC arbitration, Mr. Ver never would have continued to make payments to maintain the option and would have terminated the option contracts as a result of GGCI's insolvency.

274.     However, as a direct result of GGCI's intentional misrepresentations Mr. Ver has suffered significant damages.

275.     Accordingly, Ver respectfully requests that this Court award all relevant damages caused by Counter-Defendant's fraud, including, but not limited to, compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000.00, punitive or exemplary damages for their malicious conduct, all costs and Court fees, reasonable attorneys' fees, as well as any other relief this Court deems just and proper.

## COUNT SIX

### (Fraudulent Inducement)

276.     Defendant realleges and incorporates all preceding paragraphs as though fully set forth herein, and further alleges:

43

277.   As described herein, during June 2022, GGCI personnel launched a campaign to convince Ver to allow his out-of-the-money options expire, while rolling over his in-the-money options to a later date.

278.   At first, Ver was not interested in such a plan.  However, after a series of discussions and representations by GGCI, Ver elected to follow their suggestion and roll over his in-the-money options to a later expiration date.

279.   Unbeknownst to Ver, at the same time that GGCI was convincing him to rollover his options, GAP, a closely related entity, was engaging in a plan to liquidate one of its biggest customers, 3AC.

280.   What was known to GGCI, but unknown to Ver as a result of GGCI's material omission, was that this liquidation was going to have a large negative impact on Ver's expiring options.

281.   The liquidation of 3AC's collateral, as well as the ensuing fall out from one of the space's largest players teetering on bankruptcy, could have no other effect than to drive down market prices, thereby hurting Ver's position.

282.   GGCI knew that had they disclosed GAP's plan to margin call and/or liquidate 3AC, Ver would have rejected any rollovers and instead, let his in-the-money options expire, and collect his profits from those trades, further increasing the financial strain being felt by Counter-Defendant and its related entities.

283.   Ver justifiably relied on this omission when making his decision to roll over his open options contracts.

284.   Not surprisingly, least of all to GGCI, the downfall of 3AC, and the ensuing panic, had a drastic effect on the markets, greatly hurting Ver's open positions.

285.    But for the actions of GGCI, the options Ver had rolled would have expired in profit on June 24.

286.    Further, following the fraudulently induced rollover, Ver was required to meet various margin calls.  From the date of his rollover, until those newly rolled over contracts expired, Ver made in payments in excess of $60,000,000 to GGCI to maintain his positions, and had over $50,000,000 in collateral liquidated, that never would have been paid to Counter-Defendant had they not omitted the material information regarding the 3AC margin call and liquidation.

287.    Accordingly, Ver respectfully requests that this Court award all relevant damages caused by Counter-Defendant's fraudulent inducement, including, but not limited to, compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000.00, punitive or exemplary damages for their malicious conduct, all costs and Court fees, reasonable attorneys' fees, as well as any other relief this Court deems just and proper.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Counter-Plaintiff Roger Ver respectfully requests that this Court:

1. Deny Counter-Defendant's claims for relief in their entirety;

2. Award compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000.00 in favor of Mr. Ver on his Counterclaims, as well as punitive or exemplary damages, incidental damages, and consequential damages;

3. Award Counter-Plaintiff pre-judgment and post-judgment interest;

4. Award Counter-Plaintiff's reasonable attorney fees, expenses, and the costs of this action; and

45

5.  Award Counter-Plaintiff such other and further relief as this Court may deem just, proper, and equitable under the circumstances.

## DEMAND FOR JURY TRIAL

Counter-Plaintiff hereby demands a trial by jury of all claims so triable.

**KELMAN PLLC**

Dated: May 9, 2023

By:   s/: Daniel J. Kelman
       Daniel J. Kelman
       Michael D. Handelsman
       1501 Broadway,
       12th Floor, #2972
       New York, NY 10036
       daniel@kelman.law
       mike@kelman.law

46

# Exhibit G

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 102 of 637

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

GGC INTERNATIONAL LIMITED,

                            Plaintiff,

        v.

ROGER VER,

                            Defendant.

Index No. 650439/2023

Motion Seq. No. 001

**NOTICE OF MOTION**

       **PLEASE TAKE NOTICE**, that upon the accompanying memorandum of law; the Affirmation of Jason Gottlieb dated June 14, 2023 and the exhibits annexed thereto; the Affirmation of Alex van Voorhees dated June 14, 2023 and the exhibits annexed thereto; and upon all prior proceedings heretofore had herein, Plaintiff / Counterclaim-Defendant GGC International Limited will move this Court in the Motion Submission Part Courtroom, Room 130, at the Courthouse located at 60 Centre Street, New York, New York, on the 30th day of June, 2023 at 9:30 am, or as soon thereafter as counsel may be heard, for an order pursuant to CPLR 3211(a)(1) and 3211(a)(7) dismissing the Counterclaims, dated May 9, 2023, filed by Defendant / Counterclaim-Plaintiff Roger Ver, and for such other, further, and different relief that the Court deems just and proper.

       **PLEASE TAKE FURTHER NOTICE**, that pursuant to CPLR 2214(b), answering papers, if any, are required to be served upon the undersigned so as to be received at least seven (7) days before the return date of this motion.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 103 of 637

Dated:  New York, New York
        June 14, 2023

                                    MORRISON COHEN LLP


                                    By: */s/ Jason Gottlieb*
                                        Jason Gottlieb
                                        Michael Mix
                                        909 Third Avenue
                                        New York, New York 10022
                                        (212) 735-8600

                                        *Counsel for Plaintiff and*
                                        *Counterclaim Defendant GGC*
                                        *International Limited*

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 104 of 637

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

GGC INTERNATIONAL LIMITED,

                         Plaintiff

        v.

ROGER VER,

                    Defendant.

Index No. 650439/2023

Motion Seq. No. 001

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF / COUNTERCLAIM-DEFENDANT GGC INTERNATIONAL LIMITED'S
## MOTION TO DISMISS DEFENDANT / COUNTERCLAIM-PLAINTIFF
## <u>ROGER VER'S COUNTERCLAIMS</u>

MORRISON COHEN LLP
Jason Gottlieb
Michael Mix
909 Third Avenue
New York, New York 10022
(212) 735-8600

*Counsel for Plaintiff / Counterclaim-
Defendant GGC International Limited*

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ....................................................................... 1

STATEMENT OF FACTS .............................................................................. 4

LEGAL STANDARD..................................................................................... 10

ARGUMENT ................................................................................................. 11

    I.      THE BREACH OF CONTRACT COUNTERCLAIMS SHOULD BE
           DISMISSED ........................................................................... 11

           A.    Ver Failed to Comply with the ISDA Master Agreement's
                  Conditions Precedent to Suit................................................. 11

           B.    The Counterclaims Do Not Contain Sufficient
                  Allegations of Insolvency ....................................................... 15

    II.     THE FRAUD COUNTERCLAIMS SHOULD BE DISMISSED........................ 17

           A.    The Fraud Counterclaims Are Duplicative of the Breach of Contract
                  Counterclaims ........................................................................ 17

           B.    Ver Has Failed to Allege Fraud With Particularity ................................. 19

           C.    Ver Cannot State a Counterclaim for Fraudulent Omission .................... 20

           D.    Ver Cannot State a Counterclaim For Fraudulent Inducement When the
                  Trades at Issue Occurred Before the Allegedly Fraudulent Conduct ....... 21

           E.    Ver Disclaimed Reliance on Extracontractual Representations .............. 22

CONCLUSION.................................................................................................. 22

WORD COUNT CERTIFICATION ................................................................. 24

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACE Sec. Corp., Home Equity Loan Tr., Series 2006-SL2 v. DB Structured
Prods., Inc.*,
25 N.Y.3d 581 (2015) .................................................................................13

*Aetna Cas. & Sur. Co. v. Merchants Mut. Ins. Co.*,
84 A.D.2d 736 (1st Dep't 1981) ................................................................10

*Ashwood Capital, Inc. v. OTG Mgmt., Inc.*,
99 A.D.3d 1 (1st Dep't 2012) ...............................................................11, 12

*Bloom v. Papadakis & Gonzalez D.D.S., PLLC*,
180 N.Y.S.3d 21 (1st Dep't 2022) ..............................................................18

*Chase Manhattan Bank v. N.H. Ins. Co.*,
304 A.D.2d 423 (1st Dep't 2003) ...............................................................23

*Cronos Grp. Ltd. v. XComIP, LLC*,
156 A.D.3d 54 (1st Dep't 2017) .................................................................18

*Dinerman v. Jewish Bd. of Family & Children's Servs., Inc.*,
55 A.D.3d 530 (2d Dep't 2008) ..................................................................10

*Eagle Eye Collection Corp. v. Shariff*,
190 A.D.3d 600 (1st Dep't 2021) ...............................................................17

*Erickson Air-Crane, Inc. v. EAC Holdings, L.L.C.*,
84 A.D.3d 464 (1st Dep't 2011) .................................................................13

*Eurycleia Partners, LP v. Seward & Kissel, LLP*,
12 N.Y.3d 553 (2009) .....................................................................20, 21, 22

*Fawer v. Shipkevich PLLC*,
213 A.D.3d 408 (1st Dep't 2023) ...............................................................10

*Ferro Fabricators, Inc. v. 1807-1811 Park Ave. Dev. Corp.*,
127 A.D.3d 479 (1st Dep't 2015) ...............................................................20

*Gaidon v. Guardian Life Ins. Co. of Am.*,
94 N.Y.2d 330 (1999) .................................................................................20

ii

*Goldberg v. EEI Holdco, Inc.*,
   Index No. 654617/2020, 2021 N.Y. Misc. LEXIS 6244
   (Sup. Ct. N.Y. Cnty. Dec. 7, 2021) ........................................................................18

*Golub v. Tanenbaum-Harber Co., Inc.*,
   88 A.D.3d 622 (1st Dep't 2011) ...............................................................................21

*Greenfield v. Philles Records*,
   98 N.Y.2d 562 (2002) .............................................................................................12

*Harris v. Seward Park Hous. Corp.*,
   79 A.D.3d 425 (1st Dep't 2010) ...............................................................................12

*High Tides, LLC v. DeMichele*,
   88 A.D.3d 954 (2d Dep't 2011) ................................................................................22

*Hinnant v. Carrington Mtge. Servs., LLC*,
   56 Misc. 3d 1205(A) (Sup. Ct. Kings Cnty. 2017) ...................................................11

*HSH Nordbank AG v. UBS AG*,
   95 A.D.3d 185 (1st Dep't 2012) ...............................................................................22

*Jackson v. YAM Holding Corp.*,
   97 A.D.3d 637 (2d Dep't 2012) ................................................................................12

*In re Lehman Brothers Holdings, Inc., et al.*,
   No. 08-13555 (JMP), 2011 Bankr. LEXIS 1899
   (S.D.N.Y. Bankr. May 23, 2011) .............................................................................15

*Manipal Educ. Ams., LLC v. Taufiq*,
   203 A.D.3d 662 (1st Dep't 2022) .............................................................................18

*MHR Capital Partners LP v. Presstek, Inc.*,
   12 N.Y.3d 640 (2009) .............................................................................................13

*Mid-Hudson Val. Fed. Credit Union v. Quartararo & Lois, PLLC*,
   31 N.Y.3d 1090 (2018) ...........................................................................................10

*Morgenthow & Latham v. Bank of N.Y. Co.*,
   305 A.D.2d 74 (1st Dep't 2003) ...............................................................................11

*Matter of Northwest 5th & 45th Realty Corp. v. Mitchell, Maxwell & Jackson*,
   164 A.D.3d 1158 (1st Dep't 2018) ...........................................................................17

*Pappas v. Tzolis*,
   20 N.Y.3d 233 (2012) .............................................................................................22

iii

*Reiss v. Fin. Performance Corp.*,
    97 N.Y.2d 195 (2001) ...........................................................................................11

*Rising Sun Constr. L.L.C. v. CabGram Dev. LLC*,
    202 A.D.3d 557 (1st Dep't 2022) .......................................................................18

*Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*,
    60 A.D.3d 61 (1st Dep't 2008) ...........................................................................12

*Sea v. Thread Counsel, Inc.*,
    Index No. 653551/2020, 2021 N.Y. Misc. LEXIS 12791
    (Sup. Ct. N.Y. Cnty. Oct. 29, 2021)...................................................................19

*Sebastian Holdings, Inc. v. Deutsche Bank AG*,
    78 A.D.3d 446 (1st Dep't 2010) .........................................................................21

*Sheila C. v. Povich*,
    11 A.D.3d 120 (1st Dep't 2004) .........................................................................10

*SSC NY Corp. v. Inveshare, Inc.*,
    No. 655048/2016, 2018 N.Y. Misc. LEXIS 3202
    (Sup. Ct. N.Y. Cnty. July 24, 2018)...................................................................15

*Vt. Teddy Bear Co. v. 538 Madison Realty Co.*,
    1 N.Y.3d 470 (2004) ...........................................................................................11

*W.W.W. Assocs. v. Giancontieri*,
    77 N.Y.2d 157 (1990) .........................................................................................11

**Other Authorities**

CPLR 3013..................................................................................................................10

CPLR 3016(b)........................................................................................................20, 21

CPLR 3211(a)(1) and 3211(a)(7).........................................................................1, 23

iv

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 109 of 637

Plaintiff / Counterclaim-Defendant GGC International Limited ("GGC International") respectfully submits this memorandum of law in support of its motion (the "Motion"), pursuant to CPLR 3211(a)(1) and 3211(a)(7) to dismiss the Counterclaims, dated May 9, 2023 (the "Counterclaims") filed by Defendant / Counterclaim-Plaintiff Roger Ver ("Ver," and together with GGC International, the "Parties").[1]

## PRELIMINARY STATEMENT

Contracts mean what they say, and Ver's Counterclaims plainly reveal that Ver did not follow the contractual prerequisites to file suit.

Ver, who describes himself as "experienced in digital asset investment," entered an agreement with GGC International to trade cryptocurrency options, the Amended and Restated Master Confirmation Agreement for Virtual Currency Put and Call Options Transactions dated as of June 22, 2020 (the "Master Confirmation Agreement").[2]  Through the Master Confirmation Agreement, the Parties also entered the 2002 ISDA Master Agreement (the "ISDA Master Agreement")[3] and the 1994 ISDA Credit Support Annex (the "ISDA Credit Support Annex"), including certain negotiated elections.  The ISDA Master Agreement and the ISDA Credit Support Annex are industry-standard documents that provide market participants with relationship terms that govern the trading of over-the-counter derivative transactions.  Although Ver asserts several times that the Parties never signed the ISDA Master Agreement or the ISDA Credit Support Annex, the Master Confirmation Agreement explicitly states that the parties are

---

[1]      The Counterclaims are attached as Exhibit A to the June 14, 2023 Affirmation of Jason Gottlieb (the "Gottlieb Aff.").

[2]      A true and correct copy of the Master Confirmation Agreement is attached as Exhibit 2 to the June 14, 2023 Affirmation of Alex van Voorhees (the "van Voorhees Aff.").

[3]      A true and correct copy of the ISDA Master Agreement is attached as Exhibit 3 to the van Voorhees Aff.

deemed to enter into these documents, and indeed most of Ver's claims rely on the ISDA Master Agreement.

Pursuant to those relationship terms, the Parties entered numerous cryptocurrency options transactions with each other. Ver failed to settle certain options with expiration dates of December 30, 2022, which was an "Event of Default" under the ISDA Master Agreement. Thereafter, GGC International followed the contractual requirements of the ISDA Master Agreement; it provided notice of the default, designated an "Early Termination Date" and then sent Ver a "Calculation Statement" evidencing the amounts owed by Ver in light of his failure to settle the trades. After Ver failed to pay this amount owed, GGC International filed this action (ECF No. 9, the "Complaint").[4]

Ver answered the Complaint and asserted six Counterclaims: four for breach of contract, one for fraud, and one for fraudulent inducement. All of Ver's Counterclaims are legally insufficient and should be dismissed.

Ver's Counterclaims are each premised on the same set of allegations – that GGC International was insolvent, misrepresented its insolvency and omitted facts pertaining to its insolvency to Ver. Regardless of the veracity of such allegations – which GGC International vehemently denies – they are insufficient, even at the pleading stage.

Ver asserts that GGC International's alleged insolvency and misrepresentations – which allegedly occurred in mid-June 2022 – constituted an "Event of Default" under the ISDA Master Agreement. But assuming an Event of Default had occurred, Ver had a choice. He could have followed the conditions precedent to suit contained in the ISDA Master Agreement, including providing notice to the defaulting party of the alleged Event of Default, designating an "Early

---

[4]    The Complaint is attached as Exhibit B to the Gottlieb Aff.

2

Termination Date," and providing a "statement" showing how much is owed. Ver, by his own allegations, chose not to do so, likely because if Ver had actually thought that GGC International was insolvent, and followed the proper procedures, he still would have been required to pay GGC International a substantial sum under the relevant trades. Because GGC International had paid a premium to purchase the options from Ver, there was no possibility that GGC International would be required to make a net payment; if the options became valueless, GGC International would have just declined to exercise them. Ver instead allowed the contract to remain outstanding, presumably hoping that he would owe less, and then refused to make the required payment when the options matured. He is now attempting to circumvent his payment obligations to GGC International by alleging that an Event of Default occurred at some point nearly a year earlier. But that is not how the ISDA Master Agreement works. Ver's failure to follow the ISDA Master Agreement is fatal to his breach of contract Counterclaims.

The breach of contract Counterclaims also fail to state a claim because by Ver's own allegations, GGC International was never insolvent. Ver alleges that GGC International provided information about its solvency to Ver, but that information uniformly showed that GGC International's assets were greater than its liabilities. There are no allegations that GGC International has ever been unable to pay any debts, or has ever had any bankruptcy proceeding filed against it. By Ver's own allegations, GGC International is not insolvent, and never was.

Ver's fraud and fraudulent inducement Counterclaims are also insufficient, for several reasons. They concern the same facts and seek the same quantum of damages as the breach of contract Counterclaims, and thus should be dismissed as duplicative. They fail to plead any misrepresentation with particularity, and to the extent they rely on fraudulent omissions, such claims fail for lack of a fiduciary relationship. The fraudulent inducement Counterclaim fails

3

because the trades that Ver was allegedly induced to enter into were agreed by the parties before

the allegedly fraudulent acts. And Ver disclaimed reliance in the relevant contracts, destroying

his ability to bring fraud and fraudulent inducement Counterclaims now.

In sum, Ver's Counterclaims are a thinly disguised attempt to circumvent his own breach

of contract. The Counterclaims should be dismissed.

## STATEMENT OF FACTS

This statement of facts is based on the allegations in the Counterclaims, taken as true for

purposes of this Motion, as well as documentary evidence cited herein.[5]

### GGC International and Ver Enter Into the Master Confirmation Agreement

Ver describes himself as a "well-known Bitcoin Cash ('BCH') proponent" who is

"experienced in digital asset investment." CC ¶¶ 74-75. On or about June 22, 2020, the Parties

entered into the Master Confirmation Agreement. Although Ver states that the Master

Confirmation merely "referenced" the ISDA Master Agreement and the ISDA Credit Support

Annex and that "neither party ever executed and/or signed either of these documents," CC ¶¶ 81-

82, the Master Confirmation Agreement – which Ver alleges he did execute, CC ¶ 80 – explicitly

states that GGC International and Ver are "deemed" to have entered into the ISDA Master

Agreement and the ISDA Credit Support Annex. Master Confirmation Agreement § 1(b). And

Section 7(a) of the Master Confirmation Agreement states that the Master Confirmation

Agreement "shall supplement, form part of, and be subject to the Form ISDA Master

Agreement."[6]

---

[5]      While not relevant for this Motion, Ver's Counterclaims contain numerous factual inaccuracies, even
outside of the infirmities enumerated in this Motion.

[6]      Ver's Counterclaims also are premised on the allegation that GGC International violated the ISDA Master
Agreement. As such, even Ver does not believe that the fact that the Parties did not formally sign the ISDA Master
Agreement has any legal significance.

4

The ISDA Master Agreement, which Ver was deemed to have entered by virtue of the Master Confirmation Agreement, provides the general conditions for payment and delivery. In particular, Section 2(a)(i) of the ISDA Master Agreement states that "[e]ach party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement." Section 2(a)(ii) of the ISDA Master Agreement provides that "[p]ayments under this Agreement will be made on the due date for value on the date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency."

Section 5(a) of the ISDA Master Agreement lists several potential "Events of Default." As relevant to Ver's Counterclaims, Section 5(a)(iv) states that it is an Event of a Default if a party makes a representation that "proves to have been incorrect or misleading in any material respect." And Section 5(a)(vii) states that it is an Event of Default where a party "becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due."

The ISDA Master Agreement contains a very specific process as to what the non-defaulting party may elect to do after an Event of Default has occurred. Section 6(a) states that in the event that an Event of Default "has occurred and is then continuing," the non-defaulting party may "designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions." Section 6(e)(i) of the ISDA Master Agreement provides that "[i]f notice designating an Early Termination Date is given under Section 6(a) . . . the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default . . . is then continuing."

5

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 114 of 637

Upon an Early Termination Date, an "Early Termination Amount" is due. Section 6(e)(i) of the ISDA Master Agreement sets forth the detailed formula to determine the "Early Termination Amount":

Section (6)(d)(i) of the ISDA Master Agreement also states that upon the "occurrence of an Early Termination Date, each party will make the calculations . . . contemplated by Section 6(e)" and will provide such statement to the other party. Section 6(d)(2) of the ISDA Master Agreement states that any "Early Termination Amount will be payable "on the day on which notice of the amount payable is effective in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default." Section 6(f) of the ISDA Master Agreement provides that an "Early Termination Amount" payable by one party can be "set-off" by amounts due to that party.

Section (9)(a) of the ISDA Master Agreement states that "[t]his Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter. Each of the parties acknowledges that in entering into this Agreement it has not relied on any oral or written representation, warranty or other assurance (except as provided for or referred to in this Agreement) and waives all rights and remedies which might otherwise be available to it in respect thereof, except that nothing in this Agreement will limit or exclude any liability of a party for fraud." And Section 9.a of the Master Confirmation Agreement states that each party is "not relying on any representations except those expressly set forth in the Agreement or this Confirmation."

The Master Confirmation Agreement contains numerous disclaimers. In particular, in Section 9.a of the Master Confirmation Agreement, each Party represented that "it is not relying upon any representations except those expressly set forth in the Agreement or this

6

Confirmation," that "it has made its own investment, hedging, and trading decisions based upon its own judgment and upon any view expressed by the other party or any of its agents," and "it is entering into each Transaction with a full understanding of the terms, conditions and risks thereof and it is capable of and willing to assume those risks." Master Confirmation Agreement § 9.a(iii)-(v).

Section 9.h of the Master Confirmation Agreement contains an additional disclaimer, in capitalized lettering: Ver "ACKNOWLEDGED THAT THE RISK OF LOSS IN TRADING VIRTUAL CURRENCIES SUCH AS BTC OR ETH CAN BE SUBSTANTIAL AND, THEREFORE [VER] HAS CAREFULLY CONSIDERED WHETHER SUCH TRADING IS APPROPRIATE FOR IT IN LIGHT OF ITS CIRCUMSTANCES AND FINANCIAL RESOURCES." Master Confirmation Agreement § 9.h. Ver further acknowledged that the "volatility and unpredictability of the price of Virtual Currency relative to fiat currency may result in significant loss over a short period of time." Master Confirmation Agreement § 9.h.i. Ver also acknowledged that the "value of the Reference Currency or other Virtual Currency may be derived from the continued willingness of market participants to exchange fiat currency or other Virtual Currency for it, which may result in the potential for permanent and total loss of value of a particular Virtual Currency (such as the Reference Currency) should the market for that Virtual Currency disappear." Master Confirmation Agreement § 9.h.vii.

**GGC International and Ver Enter Into Options Transactions That Ver Fails to Settle**

GGC International and Ver entered into numerous cryptocurrency options transactions governed by the Master Confirmation and the ISDA Master Agreement. Ver references three specific transactions in his Counterclaims, each of which was deep in the money to GGC International. Pursuant to a trade confirmation dated March 22, 2022, Ver agreed to sell a put

option to GGC International for 70,000 units of BCH, with a strike price of $545 per BCH. CC ¶ 241; van Voorhees Aff. Ex. 3. Pursuant to a trade confirmation dated June 10, 2022, Ver agreed to sell a put option to GGC International for 10,000 Ether ("ETH"), with a strike price of $5,000 per ETH. CC ¶ 249; van Voorhees Aff. Ex. 4. Pursuant to a trade confirmation dated June 11, 2022, Ver agreed to sell a put option to GGC International for 500 Bitcoin ("BTC"), with a strike price of $26,000 per BTC. CC ¶ 257; van Voorhees Aff. Ex. 5. In each of the three options, GGC International agreed to pay a premium to Ver. van Voorhees Aff. Exs. 3-5. Those three options trades are also the subject of GGC International's affirmative claims for Ver's nonpayment. Compl. ¶ 36.

GGC International's Complaint describes how Ver failed to settle those three options transactions, which all expired in the money to GGC International on December 30, 2022. After GGC International followed the enumerated contractual procedure, GGC International designated an "Early Termination Date," and provided Ver with a statement showing that he owed $20,869,788. Compl. ¶¶ 38-49. Ver failed to pay that amount to GGC International, leading to GGC International initiating this lawsuit against Ver.

**Ver Baldly Alleges that He Is Excused From His Breach Due to Alleged Insolvency**

Ver alleges in his Counterclaims that at some point during the contractual relationship between the Parties, GGC International became insolvent. Ver claims that on June 28, 2022, GGC International voluntarily provided Ver with an unaudited statement of financial condition showing its assets and liabilities as of June 20, 2022 (the "June 20 SOFC"). CC ¶ 177. The June 20 SOFC "claimed total assets of $3.063 billion and liabilities of $2.962 billion, which gave GGCI positive equity of just over $100 million." CC ¶ 178.

8

Ver alleges that GGCI's affiliate Genesis Asia Pacific Limited Pte ("GAP") had made loans to third party Three Arrows Capital Limited ("3AC"), a Singapore-based cryptocurrency hedge fund, and when 3AC was on the verge of collapse, GAP made margin calls to 3AC, liquidated 3AC's collateral, and initiated an arbitration against 3AC, including a request for emergency relief. CC ¶¶ 148-50.[7] Ver alleges that after GAP failed to obtain that emergency relief, "Genesis Global then injected $150 million into GGCI." CC ¶¶ 153-56.

Ver claims that when he subsequently received an unaudited statement of financial condition showing GGC International's assets and liabilities as of June 30, 2022 (the "June 30 SOFC"), "positive equity had shrunk to $14 million due to loans written down." CC ¶ 204.

Ver further alleges that GGC International held a significant amount of FTT tokens, the token issued by cryptocurrency exchange FTX, which subsequently went bankrupt in November 2022. CC ¶¶ 71, 123. Ver believes that such tokens were overvalued. Ver also alleges that he did not discover GGC International's significant FTT exposure until he subsequently received GGC International's 2021 audited financial statement (the "2021 Audited Financial Statement"). CC ¶¶ 209-16.

Ver thus asserts that "GGCI was insolvent in June due to various factors, including inaccurate loss recording, failure to apply appropriate discounts to Level 2 digital assets in the midst of a liquidity event, untimely recognition of substantial losses linked to 3AC and related parties, and untimely recognition of losses tied to the FTT-collateralized loan." CC ¶ 157.

---

[7]    While Ver uses inflammatory rhetoric to describe GAP's actions with respect to its arbitration against 3AC, *see, e.g.* CC ¶ 148 ("On June 12, Genesis executives set the plan in motion"), Ver does not allege that GAP did anything unlawful or inappropriate in that arbitration.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 118 of 637

## **LEGAL STANDARD**

The sole criterion in considering a motion to dismiss for failure to state a cause of action is whether "from the complaint's four corners factual allegations are discerned which taken together manifest any cause of action cognizable at law." *Dinerman v. Jewish Bd. of Family & Children's Servs., Inc.*, 55 A.D.3d 530, 531 (2d Dep't 2008); *see also Sheila C. v. Povich*, 11 A.D.3d 120, 122 (1st Dep't 2004). A "defendant is entitled to notice of the material elements of each cause of action." *Aetna Cas. & Sur. Co. v. Merchants Mut. Ins. Co.*, 84 A.D.2d 736, 736 (1st Dep't 1981). Even "[l]iberally construing plaintiffs' allegations," a complaint must contain "specificity needed to apprise defendant of the occurrences at issue." *Fawer v. Shipkevich PLLC*, 213 A.D.3d 408, 408 (1st Dep't 2023). *See also Mid-Hudson Val. Fed. Credit Union v. Quartararo & Lois, PLLC*, 31 N.Y.3d 1090, 1091 (2018) (a complaint will be dismissed when it "failed to allege facts 'sufficiently particular to give the court and defendants notice of the transactions, occurrences, or series of transactions or occurrences, intended to be proved.'") (citing CPLR 3013). And while a court "will not dismiss a complaint simply because of poor draftsmanship, [where as] here, the court cannot strain to give meaning to a pleading which generally fails to state any cognizable claim against the defendants" dismissal is warranted. *Hinnant v. Carrington Mtge. Servs., LLC*, 56 Misc. 3d 1205(A), 1205A (Sup. Ct. Kings Cnty. 2017).

"In those circumstances where the legal conclusions and factual allegations are flatly contradicted by documentary evidence, they are not presumed to be true or accorded every favorable inference." *Morgenthow & Latham v. Bank of N.Y. Co.*, 305 A.D.2d 74, 78 (1st Dep't 2003) (citations and quotation marks omitted).

10

**ARGUMENT**

**I.**    <u>**THE BREACH OF CONTRACT COUNTERCLAIMS SHOULD BE DISMISSED**</u>

    **A.**    **Ver Failed to Comply with the ISDA Master Agreement's Conditions Precedent to Suit**

"According to well-established rules of contract interpretation, 'when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms.'" *Ashwood Capital, Inc. v. OTG Mgmt., Inc.*, <u>99 A.D.3d 1</u>, 7 (1st Dep't 2012) (quoting *W.W.W. Assocs. v. Giancontieri*, <u>77 N.Y.2d 157</u>, 162 (1990)). In "commercial contracts negotiated at arm's length by sophisticated counseled businesspeople . . . 'courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include.'" *Ashwood Capital*, *Inc.* <u>99 A.D.3d at 7</u> (quoting *Vt. Teddy Bear Co. v. 538 Madison Realty Co.*, <u>1 N.Y.3d 470</u>, 475 (2004)). Courts "may not by construction add or excise terms, nor distort the meaning of those used and thereby 'make a new contract for the parties under the guise of interpreting the writing.'" *Ashwood Capital, Inc.*, <u>99 A.D.3d at 7</u> (quoting *Reiss v. Fin. Performance Corp.*, <u>97 N.Y.2d 195</u>, 199 (2001)).

A "contract is unambiguous if 'on its face it is reasonably susceptible of only one meaning.' Parol evidence cannot be used to create an ambiguity where the words of the parties' agreement are otherwise clear and unambiguous." *Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, <u>60 A.D.3d 61</u>, 66 (1st Dep't 2008) (quoting *Greenfield v. Philles Records*, <u>98 N.Y.2d 562</u>, 569 (2002)). "[C]lear contractual language does not become ambiguous simply because the parties to the litigation argue different interpretations." *Riverside S. Planning Corp.*, <u>60 A.D.3d at 67</u> (citations omitted). "Whether a contract is ambiguous must be determined by the court as a matter of law, looking solely to the plain language used by the parties within the

11

four corners of the contract to discern its meaning and not to extrinsic sources." *Ashwood Capital, Inc.*, 99 A.D.3d at 7-8.

The elements of breach of contract are "the existence of a contract, the plaintiff's performance thereunder, the defendant's breach thereof, and resulting damages." *Harris v. Seward Park Hous. Corp.*, 79 A.D.3d 425, 426 (1st Dep't 2010) (citation omitted). Courts will dismiss claims for breach of contract if the contract unambiguously contradicts the plaintiff's allegations. *See* 99 A.D.3d at 8-9; 60 A.D.3d at 67; *Jackson v. YAM Holding Corp.*, 97 A.D.3d 637, 638-39 (2d Dep't 2012) (dismissing claim for breach of contract and declining to consider extrinsic evidence of parties' intent).

Ver has asserted four Counterclaims for breach of contract. Each is premised on Ver's allegation that GGC International was insolvent. The first Counterclaim alleges that GGC International breached the ISDA Master Agreement because it is an "Event of Default" under that agreement for a party to be insolvent. CC ¶¶ 227-38. While the first Counterclaim fails to reference a specific clause in the ISDA Master Agreement, it is apparent that Ver is alleging a breach of Section 5(a)(vii) of the ISDA Master Agreement, quoted above. The second to fourth Counterclaims assert that GGC International made a "misrepresentation" about its solvency to Ver. CC ¶¶ 239-62. While the second to fourth Counterclaims fail to reference a specific clause in the ISDA Master Agreement, it is evident that Ver is alleging a breach of Section 5(a)(iv) of the ISDA Master Agreement, stating that it is an "Event of Default" under the ISDA Master Agreement for one party to make a misrepresentation to the other party.

Regardless of the truth of Ver's allegations (which are absolutely false), the four Counterclaims for breach of contract each suffer from the identical key legal flaw requiring

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 121 of 637

dismissal – Ver failed to follow the ISDA Master Agreement's contractual pre-requisites to sue for breach of that agreement, which served as conditions precedent.

The Court of Appeals has explained that a condition precedent to recovery is an "act or event, other than a lapse in time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises." *MHR Capital Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 645 (2009) (affirming dismissal of complaint) (citation and quotation marks omitted). The Court of Appeals "recognized that the use of terms such as 'if,' 'unless' and 'until' constitutes 'unmistakable language of condition.'" *Id.* (quotation marks omitted). "Express conditions must be literally performed; substantial performance will not suffice." *Id. See also ACE Sec. Corp., Home Equity Loan Tr., Series 2006-SL2 v. DB Structured Prods., Inc.*, 25 N.Y.3d 581, 589 (2015) ("the two certificateholders did not validly commence this action because they failed to comply with the contractual condition precedent to suit"); *Erickson Air-Crane, Inc. v. EAC Holdings, L.L.C.*, 84 A.D.3d 464, 465 (1st Dep't 2011) (affirming dismissal of complaint for plaintiff's failure to comply with a condition precedent).

As explained above, the ISDA Master Agreement contains a very specific procedure that is available to a non-defaulting party in the event of the party's insolvency or misrepresentation. The ISDA Master Agreement plainly states that "[i]f at any time an Event of Default with respect to a party . . . has occurred and is then continuing, the other party may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate" an "Early Termination Date in respect to all outstanding Transactions," which will "occur on the date so designated." ISDA Master Agreement §§ 6(a), (c). Then, the ISDA Master Agreement contains a detailed process by which the parties make calculations as to how much is owed (factoring in set-offs for other transactions), and provide a "statement" showing those calculations. ISDA

13

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 122 of 637

Master Agreement §§ 6(d)-(f).  Indeed, Ver concedes this contractual procedure; he alleges that "in the event of default, all transactions were to be terminated, and the parties were expected to settle any financial obligations at that point."  CC ¶ 234.  Notably, Section 6(a) uses conditional language; it only permits the non-defaulting party to declare an Early Termination Date – in turn requiring the parties to engage in the process set forth in Sections (6)(c)-(f) of the ISDA Master Agreement – "[i]f at any time an Event of Default . . . has occurred and is then occurring" (emphasis added).  The ISDA Master Agreement thus utilizes the conditional language indicative of a condition precedent as explained by the Court of Appeals in *MHR Capital Partners*.

Thus, after the non-defaulting party follows the procedures in Section 6 of the ISDA Master Agreement, if the defaulting party does not pay the amount owed, that failure to pay would be a breach.  Indeed, Ver's failure to pay after GGC International followed these procedures is precisely what GGC International is asserting in its claims against Ver.

Section 6's requirements make logical sense.  When a non-defaulting party takes no action after its counterparty defaults, it does not need to change its market position or re-hedge its risk.  This is also why a non-defaulting party cannot designate an Early Termination Date more than twenty days into the future under Section 6(a) of the ISDA Master Agreement:  timing of the valuation matters.  A party should not be permanently excused from making payments on its obligations or should be allowed to circumvent its contractual obligations by arguing that its counterparty was in breach at some point in the distant past.  *See, e.g.*, *SSC NY Corp. v. Inveshare, Inc.*, No. 655048/2016, 2018 N.Y. Misc. LEXIS 3202, at *10-11 (Sup. Ct. N.Y. Cnty. July 24, 2018) (denying motion for leave to assert counterclaim and explaining that an immaterial breach did not excuse the non-defaulting party's payment obligations).  *See also* Gottlieb Aff. Ex. C (relevant portions of transcript of oral decision in *In re Lehman Brothers*

14

*Holdings, Inc., et al.*, No. 08-13555 (JMP), 2011 Bankr. LEXIS 1899 (S.D.N.Y. Bankr. May 23,
2011) finding that counterparty to ISDA agreement governing derivatives transactions was not
excused from its payment obligations despite Lehman Brothers' bankruptcy).

Ver does not allege that he followed these pre-requisites to suit or that he provided any
notice whatsoever of GGC International's alleged default.  He does not allege that any purported
Event of Default is "continuing."   He does not allege that he provided notice to GGC
International "specifying the relevant Event of Default."  He does not allege that he ever
designated an "Early Termination Date."  Instead, he allowed the contracts to be terminated by
GGC International (after his own breach), and is trying to circumvent his contractual obligations
by alleging that GGC International was at one point insolvent nearly a year ago.  That is not
permitted by the relevant contracts.  Ver's entire Counterclaims are thus premised on a made-for-
litigation allegation that should be rejected even at the pleading stage.

Accordingly, having failed to follow the ISDA Master Agreement's conditions precedent
to recovery, Ver's four breach of contract Counterclaims fail to state a claim and should be
dismissed.

### B.    The Counterclaims Do Not Contain Sufficient Allegations of Insolvency

Ver's four Counterclaims for breach of contract fail for the additional reason that there
are insufficient allegations of GGC International's insolvency.  To the contrary, Ver's allegations
support the allegation that GGC International was <u>not</u> insolvent.

Section 5(a)(vii) states that it is an "Event of Default" if a party, *inter alia*, "becomes
insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its
debts as they become due."  Ver fails to allege any filed insolvency proceeding for GGC
International, because GGC International has never filed for insolvency (or been involuntarily

15

put into an insolvency proceeding).[8]  Ver does not allege that GGC International has ever been unable to pay its debts or has admitted such inability in writing.  Ver pleads that he received multiple financial documents from GGC International but, upon his own allegations, all of them show that GGC International's assets were greater than its liabilities.  *See* CC ¶¶ 177-178, 204, 208.

In an attempt to circumvent that basic math, Ver points to a number of facts (including facts extrinsic to GGC International) and makes the conclusory allegation that GGC International's financial statements must be wrong.  For example, he complains that GGC International's balance sheet utilized the mark-to-market value of certain cryptocurrency tokens within GGC International's possession without discounting the assets' value given the potential for volatility or illiquidity in the market, CC ¶¶ 111-21, even though Ver admits that the mark-to-market valuation was set forth in its <u>audited</u> financial statement, i.e., was determined by GGC International's auditor as of the date set forth therein.  CC ¶ 209.  He also does not allege what the value of those tokens should have been.

Next, Ver alleges that GGC International suffered losses because an affiliate, Genesis Asia Pacific Limited Pte (not GGC International) lost a motion in an arbitration against failing cryptocurrency hedge fund 3AC to temporarily freeze certain assets, causing GGC International to write down its assets, CC ¶ 153, but again alleges that GGC International had positive equity by the June 30 SOFC.  CC ¶ 204.  Ver speculates that GGC International must have been insolvent on June 25, 2022, between the June 20 SOFC and the June 30 SOFC, CC ¶ 174, but does not explain why he chose that date or what GGC International's assets and liabilities were on that exact date.  Ver makes the post-hoc allegation that certain FTT tokens possessed by GGC

---

[8]     To the contrary, as Ver admits, <u>other</u> Genesis entities have filed for bankruptcy protection in the Southern District of New York, CC ¶ 67; GGC International notably is not part of the bankruptcy.

International were overvalued because months later, FTX collapsed and filed for bankruptcy protection (in <u>November</u> 2022), CC ¶¶ 122-36, but FTX's November 2022 failure does not *ipso facto* mean that GGC International was insolvent three months earlier.

In total, Ver's allegations are completely speculative and conclusory and do not suffice. His Counterclaims for breach of contract should be dismissed.  *See Matter of Northwest 5th & 45th Realty Corp. v. Mitchell, Maxwell & Jackson*, <u>164 A.D.3d 1158</u>, 1158 (1st Dep't 2018) (denying petition under Debtor and Creditor law and finding that petitioner did failed to make a prima facie case of respondent's insolvency where "petition made no allegations about the fair salable value of [respondent's] assets"); *Eagle Eye Collection Corp. v. Shariff*, <u>190 A.D.3d 600</u>, 602 (1st Dep't 2021) (affirming dismissal of cause of action under Debtor and Creditor Law because "plaintiff's conclusory allegations of insolvency does not suffice to support its claim"); *Goldberg v. EEI Holdco, Inc.*, Index No. 654617/2020, <u>2021 N.Y. Misc. LEXIS 6244</u>, at *4-5 (Sup. Ct. N.Y. Cnty. Dec. 7, 2021) ("plaintiff's conclusory allegation of insolvency does not suffice," noting that "it is not Defendants' burden to show that Holdco/EEI was *not* insolvent" and dismissing cause of action under Debtor and Creditor Law) (emphasis in original).

## II.      THE FRAUD COUNTERCLAIMS SHOULD BE DISMISSED

### A.      The Fraud Counterclaims Are Duplicative of the Breach of Contract Counterclaims

Ver's two fraud Counterclaims should be dismissed as duplicative of Ver's four breach of contract Counterclaims.   Under longstanding New York law, "a fraud claim is not stated by allegations that simply duplicate, in the facts alleged and damages sought, a claim for breach of contract." *Cronos Grp. Ltd. v. XComIP, LLC*, <u>156 A.D.3d 54</u>, 62 (1st Dep't 2017).  The First Department "has held numerous times that a fraud claim that arises from the same facts as an accompanying contract claim, seeks identical damages and does not allege a breach of any duty

17

collateral to or independent of the parties' agreements is subject to dismissal as redundant of the contract claim." *Id.* at 62-63 (citations and internal quotation marks).

Applying this principle, courts routinely dismiss as duplicative fraud claims based on the same facts underlying a contract claim. *See, e.g.*, *Bloom v. Papadakis & Gonzalez D.D.S., PLLC*, 180 N.Y.S.3d 21, 22 (1st Dep't 2022) ("Plaintiff's claim for fraudulent inducement against defendant Zachary Papadakis was properly dismissed, as it was duplicative of the breach of contract claim"); *Manipal Educ. Ams., LLC v. Taufiq*, 203 A.D.3d 662, 663 (1st Dep't 2022) ("The fraud claim against these defendants should also be dismissed . . . as duplicative of the breach of contract claim"); *Rising Sun Constr. L.L.C. v. CabGram Dev. LLC*, 202 A.D.3d 557, 559 (1st Dep't 2022) ("Defendants have failed to properly allege a counterclaim for fraudulent inducement in this straightforward breach of contract action"); *Land 'n Sea v. Thread Counsel, Inc.*, Index No. 653551/2020, 2021 N.Y. Misc. LEXIS 12791 (Sup. Ct. N.Y. Cnty. Oct. 29, 2021) (dismissing fraud claims that "are based on the same facts as its breach of contract cause of action and plaintiff[s] seeks the same damages on its fraud and breach of contract claims").

Here, Ver's fraud Counterclaim (Count Five) and fraudulent inducement Counterclaim (Count Six) duplicate his four breach of contract Counterclaims. As explained in greater detail above, each of the four breach of contract Counterclaims are premised on Ver's allegation that GGC International was insolvent and made misrepresentations about such insolvency (including about a dispute with an unrelated third party 3AC), in violation of the ISDA Master Agreement. Ver's fraud Counterclaims are based on the exact same set of facts. Ver's fraud Counterclaim alleges that GGC International "knowingly made a material misrepresentation to Mr. Ver regarding its current financial condition" and that he was prevented "from discovering GGCI's insolvency and exercising his right to terminate the contract as a result." CC ¶¶ 269-70. Ver's

18

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 127 of 637

fraudulent inducement Counterclaim alleges that GGC did not tell Ver that it had submitted margin calls to 3AC and that it was liquidating collateral held by 3AC. CC ¶¶ 279-82. Each of the six causes of action seeks the <u>exact same quantum of damages</u>: $20,000,000, plus punitive damages, and attorneys' fees and costs. *Compare* CC ¶¶ 238, 46, 54, 62 *with* CC ¶¶ 75, 87.

New York law thus requires dismissal of the fraud and fraudulent inducement Counterclaims as duplicative of the breach of contract Counterclaims.

### B.    Ver Has Failed to Allege Fraud With Particularity

"The elements of a cause of action for fraud require a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages." *Eurycleia Partners, LP v. Seward & Kissel, LLP*, <u>12 N.Y.3d 553</u>, 559 (2009). Similarly, the elements of fraudulent inducement are: (1) a misrepresentation of material fact by the defendant; (2) which induced the plaintiff to enter into the contract; (3) scienter; (4) reasonable reliance; and (5) resulting injury. *Gaidon v. Guardian Life Ins. Co. of Am.*, <u>94 N.Y.2d 330</u>, 348 (1999).

Critically, "claim[s] rooted in fraud must be pleaded with the requisite particularity under CPLR 3016(b)."[9] *Eurycleia Partners*, *LP*, <u>12 N.Y.3d at 559</u>. *See also Ferro Fabricators, Inc. v. 1807-1811 Park Ave. Dev. Corp.*, <u>127 A.D.3d 479</u>, 480 (1st Dep't 2015) ("[T]he third-party complaint only contains general allegations as to the alleged misrepresentations and virtually no information as to when and by whom these representations were made.").

Ver's Counterclaims for fraud and fraudulent inducement fail to satisfy <u>CPLR 3016(b)</u>.

---

[9]     <u>CPLR 3016(b)</u> states that "[w]here a cause of action or defense is based upon misrepresentation, fraud, mistake, willful default, breach of trust or undue influence, the circumstances constituting the wrong shall be stated in detail."

19

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 128 of 637

The fraud Counterclaim fails to plead any misrepresentation with particularity. At most, Ver pleads that GGC International provided Ver with the June 20 SOFC but did not provide Ver with information about an arbitrator's denial of emergency relief sought by a different Genesis entity, GAP, against a third party 3AC, which Ver believes caused GGCI to "write down hundreds of millions of dollars in assets." CC ¶ 268. But, as explained above, the June 20 SOFC does not contain any misrepresentations, nor does Ver allege any such misrepresentations with particularity. And the fraudulent inducement counterclaim contains no affirmative misrepresentations whatsoever; it only contains omissions (which, as explained below, are also insufficient). CC ¶¶ 276-87.

Because the fraud and fraudulent inducement Counterclaims fail to meet CPLR 3016(b), they should be dismissed.

### C.   Ver Cannot State a Counterclaim for Fraudulent Omission

To the extent that Ver is alleging fraudulent omissions to support his Counterclaims for fraud and fraudulent inducement, such claims would fail because "an omission does not constitute fraud unless there is a fiduciary relationship between the parties." *Eurycleia Partners, LP*, 46 A.D.3d at 402. *See also Golub v. Tanenbaum-Harber Co., Inc.*, 88 A.D.3d 622, 622 (1st Dep't 2011) (same); *Sebastian Holdings, Inc. v. Deutsche Bank AG*, 78 A.D.3d 446, 447 (1st Dep't 2010) ("[T]he lack of a fiduciary relationship between the parties is fatal to plaintiff's claims for . . . fraudulent concealment.").

Ver's allegation that when GGC International provided Ver with the June 20 SOFC on June 28, 2022, it omitted to inform Ver of an order in the 3AC arbitration that had occurred on June 21, 2022, CC ¶¶ 268-69, is plainly an alleged omission, not an affirmative misrepresentation. Ver's allegation that GGC International did not disclose to Ver that its

20

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 129 of 637

affiliate GAP was issuing margin calls to 3AC and liquidating 3AC's collateral is also an omission. Yet, Ver does not allege that it had any fiduciary relationship with GGC International. To the contrary, each Party represented in the Master Confirmation Agreement that "neither the other party nor any of its agents are acting as a fiduciary for it." Master Confirmation Agreement § 9.a(ii). And the Counterclaims plainly allege that GGC International and Ver had an arms' length business relationship. Because there is no fiduciary relationship between GGC International and Ver, Ver cannot assert a claim against GGC International based on an allegedly fraudulent omission.

### D.   Ver Cannot State a Counterclaim For Fraudulent Inducement When the Trades at Issue Occurred Before the Allegedly Fraudulent Conduct

The fraudulent inducement claim fails for the additional reason that the three cryptocurrency options trades that are the subject of Ver's Counterclaims (and also the subject of GGC International's claim against Ver for breach of contract) were dated March 22, 2022, June 10, 2022, and June 11, 2022. CC ¶¶ 241, 249, 257. The alleged omissions center on the failure to inform Ver of margin calls and liquidations occurred at a later date, on June 12-13, 2022. CC ¶¶ 148-49. These omissions thus could not have induced Ver to enter into the three transactions, as Ver cannot rely on something that has not occurred yet. *See Eurycleia Partners, LP*, 46 A.D.3d at 402-03 (dismissing fraud claim because plaintiffs allegedly made purchases between December 1, 2004 and June 1, 2005, and so they "could not have relied on such alleged misrepresentations" that occurred afterwards, in June and July 2005); *High Tides, LLC v. DeMichele*, 88 A.D.3d 954, 958 (2d Dep't 2011) (plaintiff cannot state claims for fraudulent inducement when alleged misrepresentations and omissions "which occurred after [plaintiff] made investments in Kainos. . . . since the element of reliance is necessarily absent").

21

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 130 of 637

### E.   Ver Disclaimed Reliance on Extracontractual Representations

Ver's fraud Counterclaims fail for the additional that he disclaimed reliance on any extracontractual representations.  Under New York law, disclaimers that parties are "not relying on any representations as to the very matter as to which they now claim they were defrauded," will render a fraud claim deficient.  *Pappas v. Tzolis*, 20 N.Y.3d 233 (2012) (disclaimers in a pre-litigation agreement governing the sale of LLC membership interests precluded fraud claims).  *See also HSH Nordbank AG v. UBS AG*, 95 A.D.3d 185, 201 (1st Dep't 2012) ("[t]o permit [plaintiff] to sue [defendant] for fraud based on extracontractual representations concerning the risk level of the notes would 'in effect condone [plaintiff's] own fraud in deliberately misrepresenting its true intention' when it disclaimed reliance on any such representations at the time of contracting."); *Chase Manhattan Bank v. N.H. Ins. Co.*, 304 A.D.2d 423, 424 (1st Dep't 2003) ("fraud claims cannot be brought by a contracting party who specifically disclaimed reliance on extracontractual representations and indicated that it would make its own investigation of the risks involved").

Here, as explained in greater detail above, the documentary evidence unambiguously shows that Ver agreed that he was not relying on statements made by GGC International, would perform his own investigation, and acknowledged that cryptocurrency assets were volatile and unpredictable.  Master Confirmation Agreement ¶¶ 9.a, 9.h, 9.h.i.  Based on these provisions, Ver disclaimed reliance on any alleged extracontractual representations purportedly made by GGC International.  Without a basis to plead reliance, Ver cannot state a claim for fraud or fraudulent inducement.

### CONCLUSION

For the reasons cited herein, the Court should issue an Order pursuant to CPLR 3211(a)(1) and 3211(a)(7) the Counterclaims in their entirety.

22

Dated:  New York, New York
        June 14, 2023

MORRISON COHEN LLP


By: ___/s/ Jason Gottlieb_____
    Jason Gottlieb
    Michael Mix
    909 Third Avenue
    New York, New York 10022
    (212) 735-8600

    *Counsel for Plaintiff / Counterclaim-*
    *Defendant GGC International*
    *Limited*

23

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 132 of 637

## <u>WORD COUNT CERTIFICATION</u>

Pursuant to Rule 17 of subdivision (g) of section 202.70 of the Uniform Rules for the

Supreme Court and County Court (Rules of Practice for the Commercial Division of the

Supreme Court), I hereby certify that the total number of words in this memorandum of law,

excluding the caption, signature block, and word count certification is 6,767.


Dated: New York, New York
      June 14, 2023

                                        */s/ Jason Gottlieb* _____
                                              Jason Gottlieb

24

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 133 of 637

# Exhibit H

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 134 of 637

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

GENESIS GLOBAL CAPITAL
INTERNATIONAL LIMITED,

                                Plaintiff,

            v.

ROGER VER,

                            Defendant.

---

Index No. 650439/2023

**Motion Seq. No. 001**

## MEMORANDUM OF LAW IN OPPOSITION TO COUNTER-DEFENDANT'S MOTION TO DISMISS COUNTERCLAIMS OF COUNTER-PLAINTIFF

Daniel J. Kelman
Michael D. Handelsman
1501 Broadway,
12th Floor, #2972
New York, NY 10036
daniel@kelman.law
mike@kelman.law

*Attorneys for Roger Ver*

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 135 of 637

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT.................................................................................................1

FACTUAL BACKGROUND..................................................................................................1

LEGAL STANDARD...........................................................................................................3

ARGUMENT.......................................................................................................................4

    I. THE BREACH OF CONTRACT CLAIMS................................................................4

        A. GGCI Terminated the Contract....................................................................4

        B. Ver's Allegations Meet the Contract Pleading Standard................................. 12

    II. THE FRAUD CLAIMS.........................................................................................16

        A. Fraud Claims Are Plead In The Alternative...............................................16

        B. Ver Plead Fraud With Particularity.............................................................17

        C. Fraudulent Inducement.............................................................................18

CONCLUSION...................................................................................................................19

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Burlington Loan Mgt. Ltd. v SMBC Nikko Capital Mkts. Ltd.,*
        2015 N.Y. Misc. LEXIS 1986 (Sup. Ct. N.Y. Cnty. June 3, 2015)………………...4, 12

*Cohn v Lionel Corp.,*
        21 N.Y.2d 559, 563 (1968)..................................................................................16

*Cortlandt St. Recovery Corp. v. TPG Capital Mgt., L.P.,*
        2022 N.Y. Misc. LEXIS 6181…..…………………………………………....13

*Eagle Eye Collection Corp. v Shariff,*
        190 A.D.3d 600 (1st Dep't 2021)..............................................................14

*EVEMeta, LLC v Siemens Convergence Creators Corp.,*
        2018 NY Slip Op 32530[U] (Sup. Ct., N.Y. Cnty. 2018)...........……………………17

*Gelita, LLC v. 133 Second Ave., LLC,*
        42 Misc. 3d 1216(A)...........…………………………………………………14

*Goldberg v EEI Holdco, Inc.,*
        2021 N.Y. Misc. LEXIS 6244……………………………………………….13, 14

*Goldin v TAG Virgin islands, Inc.,*
        149 A.D.3d 467 (1st Dep't 2017)..............................................17, 18

*Harris v Seward Park Hous. Corp.,*
        79 A.D.3d 425 (1st Dep't 2010)...........................................................13

*Houtenbos v Fordune Assn., Inc.,*
        200 A.D.3d 662 (2d Dep't 2021)...........................................................3, 4

*In re Lehman Brothers Holdings, Inc., et al.,*
        No. 08-13555 (JMP), 2011 Bankr. LEXIS 1899
        (S.D.N.Y. Bankr. May 23, 2011)...........................................................10, 11

*Jackson v YAM Holding Corp.,*
        97 A.D.3d 637 (2d Dep't 2012).................................................................13

ii

*Karabu v Pension Benefit Guaranty Corp.*,
    1997 U.S. Dist. LEXIS 19582 (S.D.N.Y. Dec. 10, 1997)..................................................... 6

*Leon v Martinez*,
    84 N.Y.2d 83 (1994)...................................................................................................3, 4, 12

*Matter of Northwest 5th & 45th Realty Corp. v Mitchell, Maxwell & Jackson*,
    164 A.D.3d 1158 (1st Dep't 2018)................................................................................... 13

*Point Prods. A.G. v. Sony Music Entm't, Inc.*,
    2000 U.S. Dist. LEXIS 10066……………………………………………………...6, 12

*Phillips v Taco Bell Corp.*,
    152 A.D.3d 806 (2d Dep't 2017).........................................................................................3

*Riback v Margulis*,
    43 A.D.3d 1023 (2d Dep't 2007) ……………………………………………………14

*Sokol v Leader*,
    74 A.D.3d 1180 (2d Dep't 2010)....................................................................................…3

*SSC NY Corp. v. Inveshare, Inc.*,
    No. 655048/2016, 2018 N.Y. Misc. LEXIS 3202
    (Sup. Ct. N.Y. Cnty. July 24, 2018).............................................................................7, 9

*Vandashield Ltd. v. Isaacson*,
    146 A.D.3d 552 (1st Dep't 2017)..................................................................................... 13

*Volt Systems Development Corp.  v Raytheon Co.*
    155 A.D.2d 309 (1st Dep't 1989)..................................................................................... 16

*Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*,
    946 F.2d 1003 (2d Cir. 1991)........................................................................................6, 12

*150 Broadway Ny Assocs., L.P. v Bodner*,
    14 A.D.3d 1 (1st Dep't 2004)..............................................................................................4

*511 W 232nd Owners Corp. v Jennifer Realty Co.*,
    98 N.Y.2d 144……………………………………………………………………………4

iii

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 138 of 637

**Other Authorities**

CPLR 3014……………………………………………………………………16

CPLR 3016(b)……………………………………………………………………17

CPLR 3017……………………………………………………………………16

CPLR 3211(a)(1)……………………………………………………………4, 12

CPLR 3211(a)(7)……………………………………………………………3, 4, 12

NY CLS Dr & Cr § 273…………………………………………………...13, 14

NY CLS Dr & Cr § 274……………………………………………………14

NY CLS Dr & Cr § 275……………………………………………………14

iv

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 139 of 637

Defendant / Counter-Plaintiff Roger Ver ("Ver"), by and through his attorneys, Kelman PLLC, respectfully submits this memorandum of law in opposition to Plaintiff / Counter-Defendant GGC International Limited's ("GGCI") motion to dismiss Ver's Counterclaims. For the reasons stated herein, Ver respectfully requests that this court deny GGCI's Motion to Dismiss.

## PRELIMINARY STATEMENT

This case exposes the deceptive tactics of an insolvent derivatives trading desk desperate to remain afloat. GGCI's own derivatives contracts mandated continuous solvency. Yet when Ver sought confirmation of their financial status, GGCI deceived him with misleading financial information and induced him to provide tens of millions of dollars in additional collateral, concealing their insolvency until after the agreements at issue had been terminated by GGCI.

## FACTUAL BACKGROUND

In June 2022, GGCI faced insolvency as Three Arrows Capital ("3AC") started to collapse. *See* Ver Counterclaim ("Counterclaim") at ¶ 1 (Dkt. #11). Desperate for assets, they targeted Ver, a significant customer with multiple expiring options that month. *Id*. To collect from him, GGCI let Ver's out-of-the-money options expire; to avoid paying him, GGCI persuaded Ver to roll in-the-money options to a later date. *Id*. Meanwhile, Genesis secretly planned to margin call and liquidate 3AC immediately after the roll, which would drive Ver's expiring positions to new lows. *Id*.

1

Ver demanded proof of GGCI's solvency before he would provide any further collateral. *See* Counterclaim at ¶ 2 (Dkt. #11). GGCI then provided Ver with a Statement of Financial Condition ("SOFC") dated June 20, 2022, which misleadingly portrayed narrow positive equity. *Id*. In truth, however, GGCI was already insolvent. *Id*. The SOFC hid GGCI's insolvency by overvaluing illiquid digital assets by using undiscounted mark-to-market prices. *Id*. Had GGCI applied appropriate discounts to their digital assets, as they demanded from Ver, their SOFC would have revealed their insolvency and Ver would have terminated the contracts because of GGCI's default. *Id*.

In December 2022, the collapse of the FTX exchange and Alameda Research revealed that GGCI had been insolvent all along. *Id*. Ver was alerted to GGCI's insolvency by an interview wherein FTX and Alameda co-founder Sam Bankman-Fried stated that Alameda had repaid a $2.5 billion dollar loan to "Genesis" in August 2022. *Id*. This appeared to be an obvious preference transfer that would be subject to clawback. *Id*.

As stated in GGCI's own complaint, the "[t]hree options with expiration dates of December 30, 2022 gave rise to this action." *See* Plaintiff's Complaint ("Comp.") at ¶ 7 (Dkt. #9). On January 12, 2023, GGCI sent notice to Ver that an event of default had occurred. *Id*. at ¶ 9. On January 17, 2023, GGCI sent an additional notice to Ver setting January 19, 2023, as the "Early Termination Date." *Id*. at ¶ 10. As a result, as of January 19, 2023, the contract between the parties was terminated. In addition, just 4 days later,

on January 23, 2023, GGCI filed a Summons with Notice with this court initiating this action. *See* Summons with Notice (Dkt. #1).

Despite becoming aware of GGCI's insolvency in late December 2022, GGCI terminated the contract before Ver could send a notice of default. Once GGCI terminated the contract, a notice of default and an opportunity to cure were futile or a useless act. Further, considering the allegations contained in the counterclaim, i.e., that GGCI was insolvent prior to June 2022, if not much earlier, GGCI could not have cured the default months, or even years later, in late 2022 or 2023.

## LEGAL STANDARD

"On a motion to dismiss pursuant to CPLR 3211(a)(7), 'the standard is whether the pleading states a cause of action.'" *Houtenbos v Fordune Assn., Inc.*, 200 A.D.3d 662, 663 (2d Dep't 2021), (quoting *Sokol v Leader*, 74 A.D.3d 1180, 1180-1181 (2d Dep't 2010)). In considering such a motion, "the court must afford the pleading a liberal construction, accept all facts as alleged in the pleading to be true, accord the [non-moving party] the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory." *Phillips v Taco Bell Corp.*, 152 A.D.3d 806, 807 (2d Dep't 2017); *see Leon v Martinez*, 84 N.Y.2d 83, 87-88 (1994); *Houtenbos v Fordune Assn., Inc.*, 200 A.D.3d at 663; *Sokol v Leader*, 74 A.D.3d at 1181).

A motion to dismiss under CPLR § 3211(a)(7), for "failure to state a cause of action, must be denied if the factual allegations contained within 'the pleadings' four

3

corners . . . manifest any cause of action cognizable at law.'" *Burlington Loan Mgt. Ltd. v SMBC Nikko Capital Mkts. Ltd.*, 2015 N.Y. Misc. LEXIS 1986 (Sup. Ct. N.Y. Cnty. June 3, 2015), *5 (court considering claim of breach of contract under ISDA agreement); quoting *511 W 232nd Owners Corp. v Jennifer Realty Co.*, 98 N.Y.2d 144, 151-52 (2002).

Where the motion to dismiss is based on documentary evidence under CPLR § 3211(a)(1), the claim will be dismissed "if the documentary evidence submitted conclusively establishes a defense to the asserted claims as a matter of law." *Id.*, quoting *Leon*, 84 N.Y.2d at 88; *see 150 Broadway NY Assocs., L.P. v Bodner*, 14 A.D.3d 1, 5 (1st Dep't 2004).

For the reasons set forth herein, GGCI has failed to meet its burden and Ver respectfully requests that GGCI's motion to dismiss be denied.

## ARGUMENT

### I. THE BREACH OF CONTRACT CLAIMS

#### A. GGCI Terminated the Contract.

According to GGCI, Ver's four contract claims should be dismissed because he "failed to follow the ISDA Master Agreement's conditions precedent to recovery." GGCI's position is that under the agreements between the parties, a notice of default must be given by Ver prior to terminating the contract as a result of that breach if same is not cured by the designated termination date. *See* Memo of Law ISO Motion to

4

Dismiss at 13 (Dkt. #24). Then, and only then, according to GGCI, can Ver sue for breach of the agreement.

However, one can only come to such a conclusion if they completely ignore the realities of the situation. Namely, GGCI terminated the contract *__before__* Ver could send a notice of default.

This leads to a rather interesting question - how does one terminate an agreement that has already been terminated? Simply put, they cannot.

As stated in GGCI's own complaint, the "[t]hree options with expiration dates of December 30, 2022 gave rise to this action." *See* Comp. at ¶ 7 (Dkt. #9). On January 12, 2023, GGCI sent notice to Ver that an event of default had occurred. *Id*. at ¶ 9. On January 17, 2023, GGCI sent an additional notice to Ver setting January 19, 2023, as the "Early Termination Date." *Id*. at ¶ 10. Therefore, as of January 19, 2023, the contract between the parties was terminated. In addition, just four days later, on January 23, 2023, GGCI filed a Summons with Notice with this court initiating this action. *See* Summons with Notice (Dkt. #1).

GGCI would have this court believe that despite the fact that it already terminated the contract and filed suit in this court, Ver should have served a Notice of Default, which if not timely cured, would lead to the termination of the already terminated agreement.

Not only was a Notice of Default entirely futile at that point, considering GGCI had terminated the contract and filed the instant lawsuit, such notice was also moot.

GGCI may be correct that generally, "a party asserting nonperformance must afford a defaulting party any contractually-secured opportunity to cure prior to terminating a contract." *Karabu v. Pension Benefit Guaranty Corp.*, 1997 U.S. Dist. LEXIS 19582, *23 (S.D.N.Y. Dec. 10, 1997).

However, "[p]roviding notice and cure is not required where it would be futile." *Point Prods. A.G. v. Sony Music Entm't, Inc.*, 2000 U.S. Dist. LEXIS 10066, *12, citing *Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*, 946 F.2d 1003, 1009 (2d Cir. 1991) (strict adherence to cure provision would have been a "useless act" given plaintiff's abandonment of contract and unjustified ultimatums).

Given the fact that GGCI had already terminated the contract, strict adherence to the notice and cure provisions of the agreements at issue certainly would have been a "useless act."

Assuming *arguendo* that GGCI had not previously terminated the contract, providing notice to GGCI of its default as a result of its insolvency still would have been a futile, or "useless act."

As alleged in Ver's counterclaim, GGCI became insolvent by June 2022 at the latest, if not much earlier. *See* Counterclaim at ¶¶ 36, 123, 145, 157-159, 190, and others

6

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 145 of 637

(Dkt. #11). However, it was not until late 2022, or early 2023, that Ver became aware of GGCI's insolvency.

Providing GGCI with a notice of default in January 2023, or even in November or December 2022, regarding insolvency that had occurred at least 5-7 months prior to that is a "useless act." Without a time machine, GGCI could not go back and cure their insolvency. Further, GGCI was aware of Ver's concerns regarding solvency since at least June 2022 and continued to maintain that they were solvent, going so far as to provide clearly and obviously misleading documents to support that position.

It is clear, given the allegations of the Counterclaim that a Notice of Default, especially one filed after this case was initiated, would have been a futile and "useless act." After all, GGCI continues to maintain that they are solvent.

Further, GGCI's reliance on *SSC NY Corp. v. Inveshare, Inc.*, No. 655048/2016, 2018 N.Y. Misc. LEXIS 3202, at *10-11 (Sup. Ct. N.Y. Cnty. July 24, 2018) is entirely misplaced. As GGCI points out, in that case, the Court denied a "motion for leave to assert counterclaim and explain[ed] that an ***immaterial breach*** did not excuse the non-defaulting party's payment obligations." (emphasis added). However, there is nothing immaterial about GGCI's breach in this matter.

Assuming that Ver's allegations that GGCI is/was insolvent are true, as is the required standard when deciding a motion to dismiss, GGCI essentially set up a "heads I win, tails Ver loses" situation. If Ver's option finished out of the money, he would pay.

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 146 of 637

If Ver's options finished in the money, an insolvent GGCI would almost certainly be unable to pay given its precarious financial situation. There is nothing immaterial about the counterparty in a series of options transactions being insolvent, and hence, being unable to pay. From the moment GGCI was insolvent, the options contracts were transformed into a lose-lose situation for Ver.

This is likely why GGCI pushed so hard to have Ver roll his in-the-money options in June '22, while encouraging him to let his out-of-the-money options expire. *See* Counterclaim at ¶¶ 158-163 (Dkt. #11). It meant that GGCI could take money in and not have to pay any money out.

GGCI's insolvency, whenever it may have occurred, meant that Ver would not be paid if his options trades were successful, as GGCI simply would not have the assets to meet their obligations and could/would file for bankruptcy protection. GGCI referring to their own insolvency as immaterial, when the contract at issue makes it a fundamental obligation, is beyond the pale.

Section 3 of the ISDA Master Agreement, entitled "Representations," contains a series of representations made by both parties. *See* Section 3 of the ISDA Master Agreement attached as Exhibit 3 to the June 14, 2023 Affirmation of Alex van Voorhees (the "van Voorhees Aff."). Specifically, section 3 states that each party makes the representations contained in 3(a), 3(b), 3(c), 3(d), 3(e) and 3(f), and same are "deemed to be repeated by each party on each date on which a Transaction is entered." *Id*.

8

Recognizing the significance of an Event of Default, including the insolvency of the parties, in connection with each and every transaction the parties affirmed that "No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party." *Id*. at 3(b).

As discussed by both parties throughout, insolvency was one such event of default. *Id*. 5(a)(vii). As such, the significance of both sides' remaining solvent cannot be referred to as an immaterial breach. Arguably, the insolvency of either party is the most significant breach that can occur under options transactions such as those at issue.

In addition to solvency being material, Ver is not trying to "excuse [his] payment obligations," as was the case in *SSC NY Corp. v. Inveshare, Inc.*, nor has he tried to avoid duly owed sums at any point during the parties' relationship. On the contrary, "[d]espite GGCI's repeated misrepresentations and false assurances of solvency, Ver maintains his willingness to pay any outstanding sums owed, provided GGCI can finally demonstrate they were solvent at the relevant times." *See* Counterclaim at ¶ 3 (Dkt. #11).

Depending on the date of GGCI's insolvency, Ver may rightfully owe GGCI sums under the contract and is prepared to make the necessary payments. This is evidenced by the fact that since June 2022, Ver has paid GGCI in excess of $60 million, $37 million

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 148 of 637

of which was paid within a few weeks of GGCI terminating the contract, in reliance on its claims that it was solvent. *Id*. at ¶ 199.

Further, pursuant to Section 6b of the ISDA Master Agreement, "If a Termination Event other than a Force Majeure Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction, and will also give the other party such other information about that Termination Event as the other party may reasonably require." *Id*. at 6(b).

As discussed, Ver did not become aware of GGCI's insolvency until late 2022. As such, Ver did not have the opportunity to "promptly upon becoming aware of it, notify the other party." GGCI terminated the contracts and filed the instant lawsuit within weeks of Ver becoming aware.

GGCI's reliance on *In re Lehman Brothers Holdings, Inc., et al.*, No. 08-13555 (JMP), 2011 Bankr. LEXIS 1899 (S.D.N.Y. Bankr. May 23, 2011) is also misplaced.[1] *See* Ex. C to Gottlieb Aff. (Dkt. # 14). The transcript provided by GGCI makes clear that the case at issue therein is inapposite to the matter at hand. Most importantly, the contract, in that case, ***had not yet been terminated*** by either party and was still in full force and effect. *Id*. at 106:11-14 ("Metavante has not, however, attempted to terminate the Agreement").

---

[1] Further, it should be noted that GGCI has only included a partial copy of the transcript upon which they rely. A full 94 pages from the middle of the transcript were not included or provided to the Court, further there is no way to know how many additional pages follow page 113 of the Transcript, which is clearly not the last page.

10

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 149 of 637

Further, there is no indication anywhere in the transcript that Lehman, the counterparty in that case, made any effort to terminate the contract. In fact, all indications are that Lehman was fighting to keep the contract in force, a far cry from the facts before the court in this matter, where GGCI terminated the contracts at issue, and both parties are alleging breach.

Because the contract had not been terminated by either party, the Court held that "[a]lthough complicated at its core the Agreement is, in fact, a garden variety executory contract, one for which there remains something still to be done on both sides." *Id*. at 109:19-21. The agreement in this case was terminated by GGCI in January 2023. Neither GGCI nor Ver are arguing or have otherwise put forward that the contract is anything other than terminated.

The Court took umbrage with Metavante "riding the market for the period of one year [following the Lehman bankruptcy filing], while taking no action whatsoever." *Id*. at 110: 22-23. However, Ver is not trying to "rid[e] the market," but rather filed his counterclaim after learning of GGCI's insolvency following a review of the documents they provided in late 2022 just as the options were expiring.

Moreover, *In re Lehman Brothers Holdings, Inc., et al.* was a bankruptcy case and discussed the interplay between bankruptcy law and contract law. *Id*. The matter at hand does not involve claims under bankruptcy law. As a result, *In re Lehman Brothers Holdings, Inc.* is simply inapposite and should be disregarded.

11

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 150 of 637

Here, GGCI terminated the contracts at issue shortly after Ver's knowledge of the insolvency. Further, it is axiomatic that Ver could not have terminated a contract GGCI already terminated. Most importantly, in January 2023, it would have been impossible for GGCI to cure a breach that occurred, at a minimum, 7 months earlier. As such, any notice of default would have been futile and a "useless act" and is thus, excused. *Point Prods. A.G. v Sony Music Entm't, Inc.*, 2000 U.S. Dist. LEXIS 10066, *12, citing *Wolff & Munier, Inc. v Whiting-Turner Contracting Co.*, 946 F.2d 1003, 1009 (2d Cir. 1991).

For these reasons, Ver respectfully requests that this court deny GGCI's motion to dismiss his counterclaim pursuant to CPLR § 3211(a)(7). Further, as stated above, the documentary evidence submitted by Claimant, i.e., the contract at issue, does not "conclusively establish[] a defense to the asserted claims as a matter of law" and Ver's counterclaim should not be dismissed pursuant to CPLR § 3211(a)(1). *Burlington Loan Mgt. Ltd. v SMBC Nikko Capital Mkts. Ltd.*, 2015 N.Y. Misc. LEXIS 1986, *5; quoting *Leon v Martinez*, 84 NY2d 83 at 88.

**B.  Ver's Allegations Meet the Contract Pleading Standard**

Ver's specific allegations that GGCI's liabilities exceeded their assets at material times in breach of the ISDA meet the standard required to plead a breach of contract claim. GGCI appears to argue that Ver's breach of contract claim is required to meet a heightened pleading standard, but such a standard does not exist in the realm of contract law.  Simply put, there is "no requirement of heightened particularity in a

12

contract claim." *Cortlandt St. Recovery Corp v TPG Capital Mgt., L.P.*, 2022 N.Y. Misc. LEXIS 6181, *47; quoting *Vandashield Ltd. v Isaacson*, 146 A.D.3d 552, 554 (1st Dep't 2017).

As GGCI correctly states in their motion, the elements of breach of contract are "the existence of a contract, the plaintiff's performance thereunder, the defendant's breach thereof, and resulting damages." *Harris v Seward Park Hous. Corp.*, 79 A.D.3d 425, 426 (1st Dep't 2010) (citation omitted). Courts will dismiss claims for breach of contract if the contract unambiguously contradicts the plaintiff's allegations. *Jackson v YAM Holding Corp.*, 97 A.D.3d 637, 638-39 (2d Dep't 2012) (dismissing claim for breach of contract and declining to consider extrinsic evidence of parties' intent). Such is not the case here, as the ISDA unambiguously makes continuous solvency a binding term and Ver alleges GGCI was insolvent at material times.

One need look no further than the cases GGCI cites in support of its argument to see the shortcomings of its position. Each case cited by GGCI involves the application of the Debtor and Creditor Law ("DCL") as it applies to fraudulent transfers. Further, GGCI has not cited a single case involving ISDA Master Agreements, or any contract where insolvency was the basis for the breach.

For example, in *Matter of Northwest 5th & 45th Realty Corp v Mitchell, Maxwell & Jackson*, 164 A.D.3d 1158, 1158 (1st Dep't 2018), "[t]he petition invoked Debtor and Creditor Law § 273, *which required insolvency*." (emphasis added) *See* NY DCL § 273. Further, in *Goldberg v EEI Holdco, Inc.*, 2021 N.Y. Misc. LEXIS 6244, the claims were

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 152 of 637

based on DCL §§ 273, 274 and 275. As was the case with § 273, § 274 also references insolvency in the statute, and therefore, claims proceeding pursuant to that section have insolvency as a condition precedent.[2]  Finally, in *Eagle Eye Collection Corp. v Shariff*, 190 A.D.3d 600, 601 (1st Dep't 2021), the claims at issue were also based on DCL § 273, and were dismissed as being "conclusory allegations" based on the holding in *Riback v Margulis*, 43 A.D.3d 1023, 1023 (2d Dep't 2007). *Riback*, in turn, makes clear that "the facts pleaded are *presumed to be true* and are accorded every favorable inference, bare legal conclusions as well as factual claims *flatly contradicted by the record* are not entitled to any such consideration". (Emphasis added.)  As such, GGCI must show that Ver's allegations of their insolvency are "flatly contradicted by the record", which is simply not the case.

A breach of contract claim is "merely subject to notice pleading standards" and at the motion to dismiss stage, "it is premature and indeed unnecessary to precisely circumscribe the viable scope of plaintiffs' breach of contract claim. Discovery will flesh out the facts, and the court can revisit which itemized breaches are viable at the summary judgment stage." *Gelita, LLC v. 133 Second Ave., LLC*, 42 Misc. 3d 1216(A), 1216A.

---

[2] NY DCL § 275 does not require insolvency but is instead used to determine when a transfer is deemed to have occurred under the DCL and is not instructive in the matter currently before the court. Although there was a contract claim involved in *Goldberg v. EEI Holdco, Inc.*, it was not decided based on the issue of insolvency and that portion of the decision (which denied the motion to dismiss the contract claims) is not cited to, or relied on, by GGCI.

14

19 of 26

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 153 of 637

Ver's allegations clearly meet the applicable notice pleading standards. There is nothing conclusory about Ver's allegations of GGCI's insolvency, nor are they "flatly contradicted by the record".  As one of many examples,[3] GGCI's sole evidence that they were solvent at the relevant period in June 2022 consists of a pair of *unaudited* statements of financial condition ("SOFCs").  *See* Counterclaim at ¶ 178 & 208 (Dkt. #11).[4]  Those SOFCs showed an extremely thin positive equity, which largely consisted of illiquid digital assets valued by GGCI at mark-to-market valuations. Compounding this, GGCI is reporting these valuations at a time when digital asset markets were freezing up and these assets were even less liquid than usual. *See* Counterclaim at ¶ 151 (Dkt. #11) (citing to an arbitration filing by GGCI's affiliate which stated that "[d]ue to recent extreme volatility in the cryptocurrency markets, the value of the collateral already posted by Three Arrows decreased significantly in comparison to the loaned assets under the MLAs."). Here, even a small discount from mark-to-market would result in GGCI's insolvency.  In the June 20 SOFC, for example, applying a discount of just seven percent to GGCI's "Investments in Digital Currencies" would be sufficient to cause liabilities to exceed assets. See Counterclaim at ¶ 178 (Dkt. #11) ("The June 20 SOFC claimed total assets of $3.063 billion and liabilities of $2.962 billion, which gave

---

[3] Other examples include (1) GGCI's failure to enforce collateral requirements, *see* Counterclaim at ¶ 95 et seq. (Dkt. #11); (2) GGCI's collateral exposed to a daisy chain of debts, *see* Id. at ¶ 105 (Dkt. #11); (3) GGCI's deviation from ASC 820, *see* Id. at ¶ 111 (Dkt. #11); (4) GGCI's over exposure to FTX and Alameda, *see* Id at ¶ 122 (Dkt. #11); (5) GGCI's over exposure to 3AC, *see* Id at ¶ 137 (Dkt. #11).

[4] The image of the June 20, 2022 SOFC is clearly labeled in its caption as "Unaudited".  Likewise, both the June 20, 2022 SOFC and the June 30, 2022 SOFC were watermarked "Unaudited", which was partially cut off when inserted into the complaint as an image.

15

GGCI positive equity of just over $100 million. Given that $1.594 billion of GGCI's assets were digital assets ("Investments in digital currencies"), even a small fluctuation in the market would render them insolvent.") In fact, it is conclusory of GGCI to presume that an auditor would not have applied even a modest discount to the digital assets in the SOFC given their illiquid nature and the then prevailing market conditions.

For these reasons, Ver respectfully requests that GGCI's motion to dismiss be denied.

## II.   THE FRAUD CLAIMS

### A.  Fraud Claims Are Plead In The Alternative

As declared by the New York Court of Appeals decades ago, "[u]ndeniably, a plaintiff is entitled to advance inconsistent theories in alleging a right to recovery." *Cohn v Lionel Corp.*, 21 N.Y.2d 559, 563 (1968). Indeed, it is the "clear mandate of CPLR §§ 3014 and 3017 which permit, and in fact, encourage pleading of claims and remedies in the alternative, as well as New York practice which provides that the election of remedies, if any, 'need not be made until all the proof has been presented.'" *Volt Systems Development Corp. v Raytheon Co.*, 155 A.D.2d 309, 309 (1st Dep't 1989); quoting 3 *Weinstein-Korn-Miller, N.Y. Civ. Prac.*, ¶ 3002.04 at 30-122 (1988).

Pursuant to CPLR § 3014 entitled "Statements," "Causes of action or defenses may be stated alternatively or hypothetically." CPLR § 3014. Further, pursuant to CPLR

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 155 of 637

§ 3017(a), entitled "Demand for Relief," "Relief in the alternative or of several different types may be demanded." CPLR § 3017.

For these reasons, Ver's fraud claims, which are merely alternative causes of action to the breach of contract claims, should not be dismissed, and Ver respectfully requests that GGCI's motion is denied.

### B. Ver Plead Fraud With Particularity

Pursuant to CPLR § 3016(b), "[w]here a cause of action or defense is based upon misrepresentation, fraud, mistake, wilful default, breach of trust or undue influence, the circumstances constituting the wrong shall be stated in detail." CPLR § 3016.

To meet the heightened pleading standard for fraud, the "Plaintiff must merely allege facts sufficient to permit a reasonable inference of the alleged misconduct to each Defendant." *EVEMeta, LLC v Siemens Convergence Creators Corp.*, 2018 NY Slip Op 32530[U], *13-14 (Sup. Ct., N.Y. Cnty. 2018); citing *Goldin v TAG Virgin Islands, Inc.*, 149 A.D.3d 467, 467 (1st Dep't 2017) (holding that under CPLR 3016's heightened pleading requirement the Defendants must be able to reasonably infer what the misconduct was from the pleadings).

Specifically, according to *Goldin*, "even absent details of time and place" a complaint that "allege[s] facts sufficient to permit a reasonable inference of the alleged misconduct" is deemed to have met "the heightened pleading requirement of CPLR 3016(b). *Goldin*, supra at 467.

17

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 156 of 637

It is clear, based on a cursory review of the counterclaim that Ver has met this burden. The 224 paragraphs making up Ver's counterclaim provide substantial factual allegations regarding the specific misrepresentations or omissions made, the dates that they were made, the motive or intent of GGCI in making those intentional misrepresentations, and the resulting damages suffered as a result of GGCI's actions. *See e.g.*, Counterclaim (Dkt. #11). Simply put, the counterclaim goes above and beyond the requirements that it merely "allege facts sufficient to permit a reasonable inference of the alleged misconduct." *Goldin*, supra at 467.

Therefore, GGCI's motion to dismiss should be denied.

### C.  Fraudulent Inducement

In addition to being fraudulently induced to rollover his options, Count Six of the counterclaim also alleges that "following the fraudulently induced rollover, Ver was required to meet various margin calls. From the date of his rollover, until those newly rolled over contracts expired, Ver made in payments in excess of $60,000,000 to GGCI to maintain his positions, and had over $50,000,000 in collateral liquidated, that never would have been paid to Counter-Defendant had they not omitted the material information regarding the 3AC margin call and liquidation." *See* Counterclaim at ¶ 286 (Dkt. #11).

For GGCI to allege that the fraudulent inducement claim is limited to the rollover only, ignores the allegations of the counterclaim. While GGCI may be correct that the

rollover occurred a few days prior to their delivery of the misleading financial documents, Ver is not relying solely on this fact *in and of itself* as the basis of a fraudulent inducement claim — that is not where Ver's allegations end.

Cause 6 of the counterclaim, realleges all previous paragraphs set forth within the counterclaim. It also alleges that Ver made $60,000,000 in fraudulently induced payments occurring after GGCI delivered the inaccurate documents and failed to disclose the issues with 3AC. *See* Counterclaim at ¶ 286 (Dkt. #11).

As a result, even if the intentionally misleading financial statements were provided to Ver after the date of his rollover, had GGCI provided Ver with accurate financial statements at that time, he never would have made additional payments following his receipt of the misleading document totaling $60,000,000. It is those additional payments, as well as the $50,000,000 in liquidations, that were fraudulently induced.

Ver was induced to make those payments as a result of GGCI intentionally delivering misleading financial statements in June of 2022 that it knew did not accurately represent GGCI's true financial situation.

For these reasons, Ver respectfully requests that GGCI's motion to dismiss his fraudulent inducement claim be denied.

19

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 158 of 637

## CONCLUSION

For the foregoing reasons, Ver respectfully requests that the Court deny GGCI's

motion to dismiss his contract and fraudulent inducement claims.

**KELMAN PLLC**

Dated: July 12, 2023                          By:    s/: Daniel J. Kelman

                                                     Daniel J. Kelman
                                                     Michael D. Handelsman
                                                     1501 Broadway,
                                                     12th Floor, #2972
                                                     New York, NY 10036
                                                     daniel@kelman.law
                                                     mike@kelman.law

20

## WORD COUNT CERTIFICATION

Pursuant to Rule 17 of subdivision (g) of section 202.70 of the Uniform Rules for the Supreme Court and County Court (Rules of Practice for the Commercial Division of the Supreme Court), I hereby certify that the total number of words in this memorandum of law, excluding the caption, signature block, and word count certification is 4664.

Dated: July 12, 2023

By:   <u>s/: Daniel J. Kelman</u>
Daniel J. Kelman
Michael D. Handelsman
1501 Broadway,
12th Floor, #2972
New York, NY 10036
daniel@kelman.law
mike@kelman.law

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 160 of 637

# Exhibit I

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 161 of 637

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

GGC INTERNATIONAL LIMITED,

Plaintiff

v.

ROGER VER,

Defendant.

Index No. 650439/2023

Motion Seq. No. 001

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
PLAINTIFF / COUNTERCLAIM-DEFENDANT GGC INTERNATIONAL LIMITED'S
MOTION TO DISMISS DEFENDANT / COUNTERCLAIM-PLAINTIFF
<u>ROGER VER'S COUNTERCLAIMS</u>**

MORRISON COHEN LLP
Jason Gottlieb
Michael Mix
Vani Upadhyaya
909 Third Avenue
New York, New York 10022
(212) 735-8600

*Counsel for Plaintiff / Counterclaim-
Defendant GGC International Limited*

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT .................................................................................. 1

ARGUMENT ........................................................................................................... 3

    I.     THE BREACH OF CONTRACT COUNTERCLAIMS SHOULD BE
          DISMISSED ................................................................................................. 3

          A.    Ver Failed to Comply with the ISDA Master Agreement's Conditions
              Precedent to Suit ........................................................................ 3

          B.    The Counterclaims Do Not Contain Sufficient Allegations of
              Insolvency ................................................................................... 8

    II.    THE FRAUD COUNTERCLAIMS SHOULD BE DISMISSED ....................... 10

          A.    The Fraud Counterclaims Are Duplicative of the Breach of Contract
              Counterclaims .............................................................................. 10

          B.    Ver Has Failed to Allege Fraud With Particularity ................................... 11

          C.    Ver Cannot State a Counterclaim for Fraudulent Omission ..................... 12

          D.    Ver Cannot State a Counterclaim For Fraudulent Inducement When the
              Trades at Issue Occurred Before the Allegedly Fraudulent Conduct ....... 12

          E.    Ver Disclaimed Reliance on Extracontractual Representations ............... 14

CONCLUSION ....................................................................................................... 14

WORD COUNT CERTIFICATION ......................................................................... 16

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashwood Capital, Inc. v. OTG Mgmt., Inc.*,
    99 A.D.3d 1 (1st Dep't 2012) ...................................................................5

*Carlyle, LLC v. Quik Park 1633 Garage LLC*,
    160 A.D.3d 476 (1st Dep't 2018) .............................................................9

*Cohn v. Lionel Corp.*,
    21 N.Y.2d 559 (1968) ...............................................................................10

*Eagle Eye Collection Corp. v. Shariff*,
    190 A.D.3d 600 (1st Dep't 2021) .............................................................9

*EVEMeta, LLC v. Siemens Convergence Creators Corp.*,
    No. 651484/2016, 2018 N.Y. Misc. LEXIS 4445
    (Sup. Ct. N.Y. Cnty. Oct. 4, 2018).........................................................10

*In re: Genesis Global Holdco, LLC, et al.*,
    No. 23-10063 (SHL) (Bankr. S.D.N.Y.) ...................................................8

*Genger v. Genger*,
    No. 651089/2010, 2015 N.Y. Misc. LEXIS 29
    (Sup. Ct. N.Y. Cnty. Jan. 7, 2015)........................................................12

*Goldin v. Tag Virgin Is. Inc.*,
    No. 651021/2013, 2014 N.Y. Misc. LEXIS 2300
    (Sup. Ct. N.Y. Cnty. May 20, 2014).......................................................11

*Goldin v. TAG Virgin Is., Inc.*,
    149 A.D.3d 467 (1st Dep't 2017) ...........................................................11

*Heth v. Van Riet*,
    No. 651437/2011, 2011 N.Y. Misc. LEXIS 6973
    (Sup. Ct., N.Y. Cnty. Nov. 29, 2011)......................................................12

*Karabu Corp. v. Pension Benefit Guar. Corp.*,
    No. 96 Civ. 4960 (BSJ), 1997 U.S. Dist. LEXIS 19582
    (S.D.N.Y. Dec. 9, 1997)............................................................................6

iii

*Point Prods. A.G. v. Sony Music Entm't, Inc.*,
   No. 93 Civ. 4001 (NRB), 2000 U.S. Dist. LEXIS 10066
   (S.D.N.Y. July 19, 2000) ...................................................................................6

*Riback v. Margulis*,
   43 A.D.3d 1023 (2d Dep't 2007) .................................................................9, 10

*Steadman v. Zappin*,
   No. 150591/2017, 2018 N.Y. Misc. LEXIS 854
   (Sup. Ct. N.Y. Cnty. Mar. 13, 2018) ................................................................7

*Volt Sys Dev. Corp. v. Raytheon Co.*,
   155 A.D.2d 309 (1st Dep't 1989) ...................................................................10

*Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*,
   946 F.2d 1003 (2d Cir. 1991) .............................................................................7

*XL Diamonds LLC v. Rosen*,
   No. 656102/2019, 2020 N.Y. Misc. LEXIS 3368
   (Sup. Ct. N.Y. Cnty. July 15, 2020) .................................................................7

**Statutes**

New York Debtor and Creditor Law § 273 ...............................................................3, 9

New York Debtor and Creditor Law § 274 ..................................................................9

New York Debtor and Creditor Law § 275 ..................................................................9

**Other Authorities**

CPLR 3016 ................................................................................................................11

CPLR 3211 ................................................................................................................14

iv

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 165 of 637

Plaintiff / Counterclaim-Defendant GGC International Limited ("GGC International") respectfully submits this reply memorandum of law in further support of its motion to dismiss (the "Motion") the May 9, 2023 Counterclaims (the "Counterclaims" or the "CC") filed by Defendant / Counterclaim-Plaintiff Roger Ver.

## PRELIMINARY STATEMENT

Ver's Opposition to the Motion (NYSCEF No. 28, the "Opposition" or the "Opp.") makes clear that his Counterclaims against GGC International are meritless and should be dismissed.

As described in GGC International's affirmative Complaint against Ver for breach of contract, Ver failed to settle certain cryptocurrency options with GGC International with expiration dates of December 30, 2022. As a result of Ver's breach of contract, Ver owes GGC International at least $20,689,788, plus interest that continues to accrue.

Ver attempts to circumvent his payment obligations to GGC International by alleging that at some point in 2022, GGC International became insolvent for some unspecified amount of time (notwithstanding that GGCI International has never filed for any insolvency), and such insolvency was a breach of the 2002 ISDA Master Agreement (the "ISDA Master Agreement") to which the Parties entered through the June 22, 2020 Amended and Restated Master Confirmation Agreement for Virtual Currency Put and Call Options Transactions (the "Master Confirmation Agreement").

As explained in GGC International's moving memorandum of law in support of its Motion (NYSCEF No. 24, the "Moving Brief" or the "Moving Br."), Ver's claim that he should not have to pay GGC International because it was insolvent is both nonsensical and not supported by the relevant contracts.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 166 of 637

The ISDA Master Agreement provides a very detailed contractual process if an "Event of Default" occurs. Following that process is a condition precedent to suit. The Opposition effectively concedes that Ver did not follow those procedures; indeed, the first time that Ver ever notified GGC International that he believed that an "Event of Default" occurred was in this litigation. The Opposition argues that Ver should be excused from following those contractual procedures because he allegedly did not learn about the supposed insolvency until late 2022 or early 2023, and because GGC International terminated the contracts due to Ver's failure to settle the trades. But the unambiguous language of the contracts – including the ISDA Master Agreement, an industry-standard document – does not allow Ver to declare an Event of Default for something that allegedly happened many months earlier, and does not allow Ver to try and put the Parties back in the position they would have been in back then. Ver is seeking relief that is simply not permitted by the contracts.

Ver's breach of contract claims fail for the additional reason that he has not sufficiently pleaded that GGC International was ever insolvent. It is uncontested that GGC International has never been the debtor in any bankruptcy or insolvency proceeding, either in mid-2022 or now (as opposed to other Genesis-related entities, some of which are currently debtors in a bankruptcy proceeding). It is uncontested that GGC International has never failed to pay any debts. The Counterclaims affirmatively plead that GGC International provided information to Ver showing positive equity, which Ver concedes in his Opposition. Simply put, Ver's own pleadings confirm that GGC International was never insolvent.

2

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 167 of 637

Nevertheless, Ver speculates that a hypothetical auditor might, in light of volatile market conditions and the illiquid nature of some of the assets, mark down the value of those assets, so if he squints hard enough, he can make out insolvency. That is insufficient. Ver provides no information as to what the value of those assets actually are. Under analogous cases under New York Debtor and Creditor Law (the "DCL") § 273, one cannot state a claim for insolvency without sufficient allegations of what the value of the assets and liabilities are. Even under a notice pleading standard, Ver's allegations do not suffice. The law is clear, but so is the reason for that law: if Ver's view of the law on this point were correct, any defendant who owes money under the ISDA Master Agreement could allege that the counterparty was insolvent, thus excusing payment. Neither the ISDA Master Agreement, nor New York law, work that way.

Finally, the Opposition does not rebut the Moving Brief's numerous arguments for why Ver's fraud and fraudulent inducement counterclaims should be dismissed.

Despite Ver's protestations to the contrary, his Counterclaims are a transparent attempt to avoid his payment obligations. The Counterclaims should be dismissed, and this litigation should proceed only with GGC International's affirmative claims against Ver.

## ARGUMENT

## I.     THE BREACH OF CONTRACT COUNTERCLAIMS SHOULD BE DISMISSED

### A.     Ver Failed to Comply with the ISDA Master Agreement's Conditions Precedent to Suit

The Moving Brief contains a detailed explanation of how Ver failed to follow the ISDA Master Agreement's conditions precedent to suit. Moving Br. at 11-15. Ver alleges that at some undetermined point in time around June 2022, GGC International became insolvent, which was an

3

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 168 of 637

"Event of Default" under the ISDA Master Agreement.[1]   Section 6(a) of the ISDA Master

Agreement provides that "[i]f at any time an Event of Default . . . has occurred and is then

continuing, the other party may, by not more than 20 days notice to the Defaulting Party specifying

the relevant Event of Default, designate" an "Early Termination Date in respect to all outstanding

Transactions," which will "occur on the date so designated."   ISDA Master Agreement §§ 6(a),

(c).  The ISDA Master Agreement then contains a detailed process for the Parties to calculate the

amount owed, which would vary with market conditions, and provide a "statement" showing how

much is owed.  ISDA Master Agreement §§ 6(d)-(f).

Regardless of the veracity of Ver's insolvency allegations – which GGC International

continues to deny – Ver never alleges that any Event of Default was "continuing," which triggers

the contractual provisions above.  Ver does not allege that he ever provided notice to GGC

International "specifying the relevant Event of Default."  He does not allege that he ever designated

an "Early Termination Date."

Ver does not contest that he failed to follow these procedures.  Instead, he spends multiple

pages arguing that it would have been "futile" to do so because he only found out about GGC

International's alleged insolvency in late 2022 or early 2023, after GGC International designated

an Early Termination Date due to Ver's failure to settle the cryptocurrency options trades at issue.

Opp. at 4-12.

Ver is wrong.  In order to declare an Early Termination Date, the Event of Default in

question must be "continuing."  If a party to the ISDA Master Agreement becomes insolvent, and

---

[1]       Ver also alleges that it was an "Event of Default" for GGC International to make a misrepresentation to Ver
about its solvency, and all of GGC International's arguments apply equally to this contention.

4

then becomes solvent again, the contractual mechanics do not permit the other party cannot to later declare a backdated Early Termination Date.

If Ver really did learn about the alleged insolvency in late 2022 or early 2023, and such insolvency was continuing, Ver could have followed the requirements of the contracts, declared an Early Termination Date, and paid what was owed to GGC International "in respect of the outstanding Transactions." But Ver, upon his own allegations, did not do so. (The reason he did not do so, undoubtedly, is that if he had, he would have owed as much, or more, as is stated in the Complaint.)

Instead, Ver is attempting to circumvent his payment obligations now by asserting that an Event of Default occurred at some point in the past. He claims that he does not have to follow the ISDA Master Agreement because he only found out about GGC International's alleged insolvency months after the fact. He claims that, due to that Event of Default, he can go back and time and put the parties back in the same position that they were in several months earlier.

The ISDA Master Agreement does not allow such gamesmanship. As noted in the Moving Brief, contracts mean what they say, and "courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include." *Ashwood Capital, Inc. v. OTG Mgmt., Inc.*, 99 A.D.3d 1, 7 (1st Dep't 2012) (citation omitted). *See also* Moving Br. at 11 (citing cases). Ver is effectively asking the court to ignore the plain language of the parties' agreements to create a new remedy for him, which is nonsensical and obviously not permitted under New York law. *See Ashwood*, 99 A.D.3d at 7 (courts "may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing").

5

The timing set forth in the ISDA Master Agreement – entered prior to the alleged insolvency – is critical.  Because the assets being traded have a constantly changing market price, it is not possible to pick a historical date to unwind the relationship and put the parties back several months in the past.  Moreover, as explained in the Moving Brief, because the market price of cryptocurrency assets is constantly changing, the non-defaulting party cannot designate an Early Termination Date more than twenty days into the future under Section 6(a) of the ISDA Master Agreement.  Moving Br. at 14.  Simply put, Ver is putting forth an interpretation of the ISDA Master Agreement that is completely contradicted by the plain, unambiguous language of the contract.  The ISDA Master Agreement contains conditions precedent to suit, including a very particular contractual mechanism.  Ver did not follow those strictures.

Ver cites case law for the proposition that a non-defaulting party does not need to provide notice and a cure period where "it would be futile."  Opp. at 6.  But GGC International is not arguing that Ver did not give it sufficient time to cure; GGC International is arguing that Ver failed to follow the contract's conditions precedent to suit, including that the Event of Default be "continuing."  Even the cases cited by Ver make clear that only in "limited circumstances" can the "terminating party . . . terminate immediately, without affording the non-performing party notice and an opportunity to cure."  *Point Prods. A.G. v. Sony Music Entm't, Inc.*, No. 93 Civ. 4001 (NRB), 2000 U.S. Dist. LEXIS 10066, at *13 (S.D.N.Y. July 19, 2000).  Those "limited circumstances" include where the non-performing party "(1) expressly repudiates the parties' contract, or (2) abandons performance thereunder."  *Id.* at *15 (internal citations omitted).  There are no allegations that GGC International repudiated the contract or abandoned it.  Indeed, in *Point Prods.* and *Karabu Corp. v. Pension Benefit Guar. Corp.*, No. 96 Civ. 4960 (BSJ), 1997 U.S. Dist.

6

LEXIS 19582, at *33 (S.D.N.Y. Dec. 9, 1997), both cited in the Opposition, the court found that the non-terminating party did not abandon or repudiate the contract, and thus did not excuse the terminating party's failure to give notice or a cure period.  Ver also cites *Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*, 946 F.2d 1003, 1009 (2d Cir. 1991), but there, providing a cure period would have been a "useless act" because the non-terminating party abandoned performance under the contract.  There are no similar allegations here.

Ver further admits that even if his unsupported theory is true that the Parties can be put back to June 2022, "[d]epending on the date of GGCI's insolvency, Ver may rightfully owe GGCI sums under the contract and is prepared to make the necessary payments."  Opp. at 9-10.  Ver owed GGC International significant sums of money – even more than GGC International is seeking in the litigation – at all times from the date of the alleged insolvency to the date of Ver's default. Thus, Ver's statement contradicts his Counterclaims allegations that his damages are over $20,000,000, CC ¶¶ 238, 246, 254, 262, and illustrates his failure to plead damages, a separate basis to dismiss his contract claims.  *See XL Diamonds LLC v. Rosen*, No. 656102/2019, 2020 N.Y. Misc. LEXIS 3368, at *8 (Sup. Ct. N.Y. Cnty. July 15, 2020) ("where a plaintiff fails to allege any 'damages flowing from the breach allege[s] and relies, instead, on wholly speculative theories of damages, dismissal of the breach of contract claim is in order'"); *Steadman v. Zappin*, No. 150591/2017, 2018 N.Y. Misc. LEXIS 854, at *7 (Sup. Ct. N.Y. Cnty. Mar. 13, 2018) ("Without a clear demonstration of damages, there can be no claim for breach of contract").

7

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 172 of 637

### B.     The Counterclaims Do Not Contain Sufficient Allegations of Insolvency

Ver's Opposition underscores that he has not pleaded sufficient allegations that GGC International was <u>ever</u> insolvent.[2]  Ver does not contest that GGC International has never filed for bankruptcy,[3] has never been involuntarily put into an insolvency proceeding, has never been unable to pay its debts, and has never admitted such inability in writing.  <u>Moving Br. at 15-16</u>.[4]

In support of his theory that GGC International was insolvent, the Opposition points to two unaudited statements of financial condition (each, an "SOFC") that GGC International voluntarily provided to Ver.   Yet, the Opposition admits that both SOFCs "showed extremely thin <u>positive</u> equity" (emphasis added).  Indeed, the Counterclaims allege that one SOFC showed positive equity of over $100 million and the other showed positive equity of $14 million.  <u>CC</u> ¶¶ 177, 204.  In other words, the Counterclaims affirmatively allege that GGC International was solvent; its assets were greater than its liabilities.  The Opposition's abject speculation that due to the illiquid nature of the assets and the lack of liquidity in the market in general, some hypothetical auditor might have applied a discount to GGC International's assets, marking their value down to some undetermined value, cannot be countenanced, even on a notice pleading standard.

---

[2]     The Opposition incorrectly states that GGC International argued that there is a heightened pleading standard in breach of contract cases.  <u>Opp. at 12-13</u>.  GGC International has made no such claim.

[3]     Some other Genesis entities (Genesis Global Holdco, LLC, Genesis Global Capital, LLC, and Genesis Asia Pacific Pte. Ltd.) are debtors in a bankruptcy proceeding.  *See* CC ¶ 67; *In re: Genesis Global Holdco, LLC, et al.*, <u>No. 23-10063</u> (SHL) (Bankr. S.D.N.Y.).  But several other Genesis entities, including GGC International, are not now and have never been debtors in any proceeding, because they have never been insolvent.

[4]     Ver asserts that "GGCI's insolvency, whenever it may have occurred, meant that Ver would not be paid if his options trades were successful, as GGCI simply would not have the assets to meet their obligations and could/would file for bankruptcy protection."  <u>Opp. at 8</u>.  But there are no allegations in the Counterclaims that GGC International would not have sufficient assets to pay its debts such that it would have had to file for bankruptcy protection, even if technically "insolvent" under Ver's definition.

8

The Moving Brief cites several cases dismissing causes of action under DCL § 273 for failure to sufficiently plead insolvency.  Moving Br. at 17 (citing cases).  Contrary to Ver's argument that these cases are inapplicable, Opp. at 13, these cases are analogous because like here, in order to state a claim, the plaintiff must sufficiently plead that the defendant was insolvent. Indeed, neither Ver's breach of contract Counterclaims nor claims under DCL § 273 contain a heightened pleading requirement, underscoring the appropriateness of the analogy.  *See Carlyle, LLC v. Quik Park 1633 Garage LLC*, 160 A.D.3d 476, 477 (1st Dep't 2018) (no heightened pleading standard for DCL § 273 claims).  These cases uniformly show that conclusory allegations of insolvency do not suffice, particularly where the plaintiff does not make adequate allegations regarding the actual value of the assets in question.  *See* Moving Br. at 17 (citing cases).[5]

Ver also mischaracterizes *Eagle Eye Collection Corp. v. Shariff*, 190 A.D.3d 600 (1st Dep't 2021), a case cited in the Moving Brief, in which the First Department affirmed dismissal of a DCL § 273 claim due to "conclusory allegations of insolvency" the same reason to dismiss Ver's Counterclaims.  The Opposition contends that because the First Department in *Eagle Eye* cited *Riback v. Margulis*, 43 A.D.3d 1023 (2d Dep't 2007), then "GGCI must show that Ver's allegations of their insolvency are 'flatly contradicted by the record,' which is simply not the case." Opp. at 14.  But neither case holds that the only way for a claim of insolvency to be dismissed at the pleading stage is for the defendant to show that the allegations of insolvency are "flatly contradicted by the record."  To the contrary, in both cases, the insolvency claims were dismissed due to conclusory and speculative allegations, *Eagle Eye Collection Corp.*, 190 A.D.3d at 602;

---

[5]     The Opposition references DCL §§ 274 and 275, but neither statute concerns insolvency (despite Ver's argument that "§ 274 also references insolvency in the statute," Opp. at 14), and the Moving Brief doesn't make any arguments concerning those irrelevant statutes.

9

*Riback*, 43 A.D.3d at 1023. Ver's conclusory and speculative allegations of insolvency should suffer the same fate.

## II.    THE FRAUD COUNTERCLAIMS SHOULD BE DISMISSED

### A.    The Fraud Counterclaims Are Duplicative of the Breach of Contract Counterclaims

Longstanding New York law provides that a fraud claim will be dismissed if it duplicates a claim for breach of contract with respect to facts alleged and damages sought. The Moving Brief cites numerous cases, including very recent cases from the First Department, dismissing fraud claims as duplicative of contract claims. Moving Br. at 17-18. Indeed, even a case relied upon by Ver in the Opposition – cited for a different proposition – dismissed fraud claims as duplicative of breach of contract claims. *See EVEMeta, LLC v. Siemens Convergence Creators Corp.*, No. 651484/2016, 2018 N.Y. Misc. LEXIS 4445, at *19-20 (Sup. Ct. N.Y. Cnty. Oct. 4, 2018).

Ver does not contest this long line of case law. Instead, Ver makes the uncontroversial statement that a plaintiff is allowed to allege "inconsistent theories" and to plead in the alternative. Opp. at 16-17. But Ver's Counterclaims fail for the exact opposite reason – Ver pleads the exact same legal theories, set of facts, and quantum of damages as in his four breach of contract claims. Moving Br. at 18-19. Thus, Ver's argument that his fraud claims "are merely alternative causes of action to the breach of contract claims," Opp. at 17, should be rejected.[6]

---

[6]    Neither case cited by Ver involves a situation where the plaintiff pleaded a duplicative fraud and breach of contract claim, as Ver did here. *Cohn v. Lionel Corp.*, 21 N.Y.2d 559, 563 (1968); *Volt Sys Dev. Corp. v. Raytheon Co.*, 155 A.D.2d 309, 309 (1st Dep't 1989).

10

### B.    Ver Has Failed to Allege Fraud With Particularity

Ver does not dispute that claims for fraud must be pleaded with particularity under CPLR 3016(b). Moving Br. at 19-20. The Moving Brief explains how the Counterclaims do not contain any affirmative misrepresentations, let alone any affirmative misrepresentations pleaded with particularity. The Counterclaims do not allege that either of the SOFCs was incorrect, only that a hypothetical auditor might have come to a different conclusion as to GGC International's solvency.

The Opposition claims that "224 paragraphs making up Ver's counterclaim provide substantial factual allegations regarding the specific misrepresentations or omissions made, the dates that they were made, the motive or intent of GGCI in making those intentional misrepresentations, and the resulting damages suffered as a result of GGCI's actions." Opp. at 18. Tellingly, however, the Opposition does not list a single example of any of the supposed "substantial" misrepresentations. There are none.

*Goldin v. TAG Virgin Is., Inc.*, 149 A.D.3d 467 (1st Dep't 2017), cited by Ver, Opp. at 17, is inapposite. Although the First Department decision does not list the allegations of fraud that it found sufficient under CPLR 3016(b), the Supreme Court decision states that the complaint alleged, *inter alia*, that the defendants, "while acting as investment advisors . . . supplied fraudulent and inadequate information to the Plaintiffs with respect to the holds in their accounts." *Goldin v. Tag Virgin Is. Inc.*, No. 651021/2013, 2014 N.Y. Misc. LEXIS 2300, at *31 (Sup. Ct. N.Y. Cnty. May 20, 2014) (ellipses in original). There are no non-conclusory allegations in the Counterclaims that GGC International provided incorrect information to Ver.

Ver fares no better with his citation to *EVEMeta* (where, as noted above, the court ultimately dismissed the fraud claims as duplicative of the contract claims). There, unlike here,

11

during negotiations with the plaintiff, the defendants allegedly made misrepresentations of fact that they were working towards a particular agreement, when in fact the defendants were allegedly working to cut the defendant out of the deal. *EVEMeta, LLC*, 2018 N.Y. Misc. LEXIS 4445, at *16-18.

### C.  Ver Cannot State a Counterclaim for Fraudulent Omission

The Opposition states that his Counterclaims "provide substantial factual allegations regarding the specific . . . omissions made." Opp. at 18.  However, as explained in the Moving Brief, in order to state a claim for fraudulent omission, there must be a fiduciary relationship between the parties. Moving Br. at 20-21 (citing cases).  There is no fiduciary relationship between the Parties, who were negotiating at arm's length.  *See* Moving Br. at 20-21.  The Parties even represented in the Master Confirmation Agreement that they were not acting as a fiduciary for the other party.  Moving Br. at 21.

Ver does not address this argument.  He just ignores it, and is thus deemed to have conceded it.  *See Genger v. Genger*, No. 651089/2010, 2015 N.Y. Misc. LEXIS 29, at *29 (Sup. Ct. N.Y. Cnty. Jan. 7, 2015) ("In their opposition brief, [cross-claim plaintiffs] do not address or contest the argument, and thus are deemed to have conceded it"); *Heth v. Van Riet*, No. 651437/2011, 2011 N.Y. Misc. LEXIS 6973, at *7 (Sup. Ct., N.Y. Cnty. Nov. 29, 2011) ("Van Riet has not responded to this argument.  The claim shall be deemed abandoned.").  Accordingly, the Court should dismiss the fraud and fraudulent concealment claims to the extent they rely on any alleged omissions.

### D.  Ver Cannot State a Counterclaim For Fraudulent Inducement When the Trades at Issue Occurred Before the Allegedly Fraudulent Conduct

The Moving Brief explains how Ver cannot state a claim for fraudulent inducement because the three trades that GGC International allegedly induced occurred prior to the alleged

omissions comprising the claim.  Moving Br. at 21.  In response, Ver concedes that "GGCI may

be correct that the rollover occurred a few days prior to their delivery of the misleading financial

documents."  Opp. at 18-19.  Accordingly, Ver does not contest that the fraudulent inducement

claim should be dismissed, as that claim pertains to the rollover of his options which led to the

three cryptocurrency options trades comprising his claims.

    Instead, Ver argues that the fraudulent inducement claim should proceed because he also

alleges that "Ver made $60,000,000 in fraudulently inducement payments occurring after GGCI

delivered the inaccurate documents and failed to disclose the issues with 3AC."  Opp. at 19.  The

paragraph in the Counterclaims containing this allegation alleges that "[f]rom the date of his

rollover, until those newly rolled over contracts expired, Ver made payments in excess of

$60,000,000 to GGCI to maintain his positions, and had over $50,000,000 in collateral liquidated,

that never would have paid to [GGC International] had they not omitted the material information

regarding the 3AC margin call and liquidation."

    In other words, Ver alleges that GGC International followed the contracts.  The Master

Confirmation Agreement, the ISDA Master Agreement, the Credit Support Annex,[7] and the

Transaction Confirmations collectively provide for a very detailed process under which Ver

provided collateral to GGC International in support of the amount that Ver already owed, and GGC

International is permitted to liquidate collateral.[8]  That is exactly what the Counterclaims allege

---

[7]    The Credit Support Annex was not attached to GGC International's moving papers, but is attached as **Exhibit 6** to the July 28, 2023 Reply Affirmation of Alex van Voorhees.

[8]    Indeed, as explained in GGC International's own affirmative claims against Ver, after Ver failed to settle the three options trades that comprise Ver's Counterclaims, GGC International set off the collateral that had been posted by Ver against the amount owed by Ver.  *See* Compl. ¶ 47.

13

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 178 of 637

that GGC International did.  The Counterclaims do not allege that any margin calls issued by GGC International were incorrect – let alone fraudulent, much less pleaded with sufficient particularity. Even if they did, such allegations would not suffice to state a claim for fraudulent inducement. GGC International is not aware of any case law for Ver's novel legal theory that he was induced into following the contracts, and Ver does not cite any such law.

### E. Ver Disclaimed Reliance on Extracontractual Representations

In the Master Confirmation Agreement, Ver disclaimed reliance on statements made by GGC International, represented that he would perform his own investigation, and acknowledged that cryptocurrency assets were volatile and unpredictable.  Master Confirmation Agreement ¶¶ 9.a, 9.h, 9.h.i.  Such disclaimers negate claims for fraud, and thus, both of Ver's fraud claims should be dismissed.  Moving Br. at 22 (citing cases).

Ver ignores this argument.  As explained above, Ver is thus deemed to have conceded it. The two fraud claims should be dismissed for lack of reliance.

## CONCLUSION

For the reasons cited herein, and the reasons set forth in the Moving Brief, the Court should issue an Order pursuant to CPLR 3211(a)(1) and 3211(a)(7) the Counterclaims in their entirety.

14

Dated: New York, New York
      July 28, 2023

MORRISON COHEN LLP


By:    */s/ Jason Gottlieb*
      Jason Gottlieb
      Michael Mix
      Vani Upadhyaya
      909 Third Avenue
      New York, New York 10022
      (212) 735-8600

      *Counsel for Plaintiff / Counterclaim-*
      *Defendant GGC International*
      *Limited*

15

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 180 of 637

## **WORD COUNT CERTIFICATION**

Pursuant to Rule 17 of subdivision (g) of section 202.70 of the Uniform Rules for the

Supreme Court and County Court (Rules of Practice for the Commercial Division of the Supreme

Court), I hereby certify that the total number of words in this memorandum of law, excluding the

caption, signature block, and word count certification is 4,195.

Dated: New York, New York
         July 28, 2023

                                         _____*/s/ Jason Gottlieb*_____
                                              Jason Gottlieb

16

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 181 of 637

# Exhibit J

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 182 of 637

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

GENESIS GLOBAL CAPITAL
INTERNATIONAL LIMITED,

                              Plaintiff,

              v.

ROGER VER,

                              Defendant.

Index No. 650439/2023

**AMENDED ANSWER AND
COUNTERCLAIM OF
ROGER VER**

Defendant, Roger Ver ("Ver"), by and through his attorneys, Kelman PLLC, in response
to the allegations contained in the complaint of Genesis Global Capital International Limited
("GGCI") filed herein, alleges as follows:

## INTRODUCTION

This case exposes the deceptive tactics of an insolvent derivatives trading desk desperate
to remain afloat.  GGCI's own derivatives contracts mandated continuous solvency.  Yet when
Ver sought confirmation of their financial status, GGCI deceived him with misleading financial
information and induced him to provide tens of millions of dollars in additional collateral.

In June 2022, GGCI faced insolvency as Three Arrows Capital ("3AC") started to
collapse.  Desperate for assets, they targeted Ver, a significant customer with multiple expiring
options that month.  To collect from him, GGCI let Ver's out-of-the-money options expire; to
avoid paying him, GGCI persuaded Ver to roll in-the-money options to a later date.  Meanwhile,
Genesis secretly planned to margin call and liquidate 3AC immediately after the roll, which
would drive Ver's expiring positions to new lows.

The moment Ver's out-of-the-money June options expired, GGCI abruptly demanded that
Ver over-collateralize the positions he had just rolled by a staggering 300%.  This sudden and

unprecedented low valuation raised Ver's suspicions about GGCI's solvency, because GGCI had always accepted digital assets as collateral at mark-to-market prices.

In fact, GGCI was attempting to cover up its insolvency by squeezing Ver for exorbitant sums of collateral. Although GGCI outwardly applied a low valuation to Ver's digital assets, once they had them in hand, GGCI would add them to their balance sheet as assets valued mark-to-market. This accounting trick promised to boost GGCI's assets by several hundred million dollars and return them to solvency.

Ver demanded proof of GGCI's solvency before he would provide any further collateral. GGCI then provided Ver with a Statement of Financial Condition ("SOFC") dated June 20, 2022, which misleadingly portrayed a narrow positive equity. In truth, however, GGCI was already insolvent. The SOFC hid GGCI's insolvency by using the same accounting trick — overvaluing illiquid digital assets by using undiscounted mark-to-market prices. Had GGCI applied appropriate discounts to its digital assets as it demanded from Ver, their SOFC would have revealed their insolvency and Ver would have terminated the contracts as a result of GGCI's default.

In July 2022, GGCI continued to conceal its insolvency by misrepresenting that its parent company, Digital Currency Group ("DCG"), had assumed more than $1.1 billion in losses that Genesis had suffered. However, unbeknownst to Ver and the public at large, DCG never injected $1.1 billion into Genesis. Instead, DCG had merely provided Genesis with a promissory note that promised to pay it $1.1 billion over a *ten year* period. The fair market value of that promissory note — its *real* value — was far below its face value; it did not return Genesis or GGCI to solvency, nor did it help their liquidity issues. GGCI thereby deceived Ver into believing that it

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 184 of 637

was solvent, which induced Ver to provide more than $60 million in collateral over the months that followed.

In December 2022, just as Ver's options were expiring, the collapse of the FTX exchange and Alameda Research revealed that Genesis and GGCI were insolvent all along. Ver was alerted to GGCI's insolvency by an interview wherein FTX and Alameda co-founder Sam Bankman-Fried stated that Alameda had repaid a $2.5 billion dollar loan to "Genesis" in August 2022. This appeared to be an obvious preference transfer that would be subject to clawback.

Citing the $2.5 billion repayment from Alameda, Ver requested that GGCI provide further assurances that it had been solvent in June 2022. Ver reminded GGCI that he had faithfully provided additional collateral for months, including a substantial $37 million in payments just weeks earlier. GGCI acknowledged that the timing and size of Ver's recent collateral contributions underscored his genuine concern, since he could have simply raised these arguments instead of paying GGCI $37 million dollars.

Consequently, GGCI reluctantly shared its 2021 audited financials with Ver, and denied that it had ever had any involvement with FTX or Alameda. However, analysis of GGCI's 2021 financials directly contradicted these claims. GGCI's 2021 financials revealed that it had allowed a single counterparty to open a $2.5 billion position, collateralized exclusively by FTX's own FTT tokens, which were valued at inflated mark-to-market prices. It was evident that these FTT tokens had come from Alameda.

Thereafter, as GGCI's parent filed for bankruptcy and began negotiating with creditors, Ver learned that Genesis and GGCI had never actually received funds from DCG and had indeed been insolvent the entire time.

3

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 185 of 637

Despite GGCI's repeated misrepresentations and false assurances of solvency, Ver maintains his willingness to pay any outstanding sums owed, provided GGCI can finally demonstrate they were solvent at the relevant times. To date, they have yet to do so.

## ANSWER TO THE COMPLAINT

### Preliminary Statement

1.      Defendant denies the allegations of paragraph 1.

2.      Defendant denies the allegations of paragraph 2.

3.      Defendant denies the allegations of paragraph 3 and alleges the documents referenced therein speak for themselves. Further, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms. Further, the parties also did not execute the ISDA Credit Support Annex, and no elections were made as to Section 13 of that agreement, entitled "Elections and Variables."

4.      Defendant lacks sufficient information and knowledge to form a belief as to the allegations contained in paragraph 4.

5.      Defendant admits that the Master Confirmation Agreement makes certain elections and modifications to the 2002 ISDA Master Agreement and the ISDA Credit Support Annex as alleged in paragraph 5. However, the parties never executed a 2002 ISDA Master Agreement or the ISDA Credit Support Annex, and no elections were made as to the schedule to the 2002 ISDA Master Agreement or Section 13 of the ISDA Support Annex, each of which contain material terms.

6.      Defendant lacks sufficient information and knowledge to form a belief as to the allegations contained in paragraph 6, but believes same to be true.

4

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 186 of 637

7.    Defendant denies the allegations contained in paragraph 7.  As discussed in Ver's counterclaim below GGCI was likely insolvent well in advance of December 2022.  The precise date of GGCI's insolvency is not currently known, but this dispute may implicate option contracts with different expiration dates.

8.    Defendant denies the allegations contained in paragraph 8.  As will be evident from Ver's counterclaim, Plaintiff was in default of the option agreements well in advance of December 2022 and, in fact, owes Ver damages estimated to be well in excess of $20 million.

9.    Defendant admits receiving the notices referenced in paragraph 9 but denies that he owed GGCI anything as a result of its default and breach of the contracts between the parties.

10.    Defendant admits receiving the "Calculation Statement" referenced in paragraph 10 but denies that he owed GGCI anything as a result of its default and breach of the contracts between the parties.

11.    Defendant admits the allegations contained in paragraph 11 that he has failed to pay the sums identified in paragraph 10 as the funds requested are not duly owed as a result of GGCI's default and breach of the contracts between the parties.

12.    Defendant denies the allegations contained in paragraph 12.

13.    Defendant denies the allegations contained in paragraph 13 and states that the parties did not execute a 2002 ISDA Master Agreement or the schedules attached thereto which contain material terms.

### The Parties

14.    Defendant lacks sufficient knowledge and information to form a belief as to the allegations contained in paragraph 14.

15.     Defendant admits the allegations contained in paragraph 15.  Mr. Ver is a citizen of St. Kitts, but does not reside at 858 Zenway Blvd. Unit 15-203, Frigate Bay, St. Kitts and Nevis.

### Jurisdiction and Venue

16.     Defendant admits the allegations contained in paragraph 16.  While the Master Confirmation makes reference to the 2002 ISDA Master Agreement and ISDA Support Annex, no such agreements were executed by the parties, and no elections were made as to the schedule to the 2002 ISDA Master Agreement or Section 13 of the ISDA Support Annex, which contain material terms.

17.     Defendant admits the allegations contained in paragraph 17.

18.     Defendant admits the allegations contained in paragraph 18.

### Statement of Facts

19.     Defendant admits the allegations contained in paragraph 19.

20.     Defendant denies the allegations contained in paragraph 20.  While the Master Confirmation makes reference to the 2002 ISDA Master Agreement and ISDA Support Annex, no such agreements were executed by the parties, and no elections were made as to the schedule to the 2002 ISDA Master Agreement or Section 13 of the ISDA Support Annex, which contain material terms.

21.     Defendant admits the allegations contained in paragraph 21.

22.     Defendant admits that the 2002 ISDA Master Agreement "provides general conditions for payment and delivery" as alleged in paragraph 22.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the

6

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 188 of 637

2002 ISDA Master Agreement, which contains material terms of the agreement. Further, the document speaks for itself.

23.    Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 23. However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement. Further, the document speaks for itself.

24.    Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 24. However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement. Further, the document speaks for itself.

25.    Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 25. However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement. Further, the document speaks for itself.

26.    Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 26. However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement. Further, the document speaks for itself.

27.    Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 27. However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement. Further, the document speaks for itself.

7

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 189 of 637

28.    Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 28.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

29.    Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 29.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

30.    Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 30.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.   Further, the document speaks for itself.

31.    Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 31.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

32.    Defendant admits the allegations contained in paragraph 32.   Further, the document speaks for itself.

33.    Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 33.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

8

34.     Defendant admits that the parties executed various option transactions as alleged in paragraph 34 but currently lacks sufficient knowledge and information to form a belief as to whether a transaction confirmation was sent for each and every transaction.

35.     Defendant denies the allegations contained in paragraph 35.  However, Ver admits that he did not terminate the contracts as a direct result of GGCI's multiple intentional misrepresentations regarding its solvency and other related issues.

36.     Defendant denies the allegations contained in paragraph 36 to the extent that GGCI is attempting to limit this dispute to three transactions.  Upon information and belief, GGCI was insolvent by June 2022 and, in fact, owed Ver substantial sums.  Defendant admits that the terms of the three option contracts reflected in paragraph 36 are accurate.

37.     Defendant admits the allegations contained in paragraph 37.  Further, the documents speak for themselves.

38.     Defendant admits that three option contracts expired in December 2022 as alleged in paragraph 38, but denies that these are the only option contracts at issue in this dispute.

39.     Defendant admits the allegations contained in paragraph 39, but denies that any sums were owed to GGCI as a result of its breach of the agreements between the parties and is owed substantial sums from GGCI.

40.     Defendant admits to receiving the notice referenced in paragraph 40.  Further, the document speaks for itself.

41.     Defendant admits the allegations contained in paragraph 41, but denies that any sums were duly owed to GGCI as a result of its default and various breaches of the agreements.

42.     Defendant admits to receiving the notice referenced in paragraph 42.  Further, the document speaks for itself.

9

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 191 of 637

43.     Defendant admits to receiving the notice referenced in paragraph 43.  Further, the document speaks for itself.

44.     Defendant admits the allegations contained in paragraph 41, but denies that any sums were duly owed to GGCI as a result of its own default and various breaches of the agreements.

45.     Defendant admits to receiving the notice referenced in paragraph 45.  Further, the document speaks for itself.

46.     Defendant lacks sufficient knowledge and information to form a belief as to the allegations contained in paragraph 46.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

47.     Defendant admits to receiving the notice referenced in paragraph 47 but denies the accuracy of the alleged sums owed contained therein.  Further, the document speaks for itself.

48.     Defendant admits the allegations contained in paragraph 41, but denies that any sums were duly owed to GGCI as a result of its own default and various breaches of the agreements.

49.     Defendant admits the allegations contained in paragraph 49.

### Claims for Relief
### Claim One

50.     Defendant repeats and incorporates in full his responses to each allegation set forth in paragraphs 1–49.

51.     The allegations in paragraph 51 state legal conclusions to which no response is required.  To the extent a response is required, the parties did not execute a 2002 ISDA Master

10

Agreement or ISDA Support Annex, and no elections were made as to the schedule to the 2002 ISDA Master Agreement or Section 13 of the ISDA Support Annex, which contain material terms.

52.      The allegations in paragraph 52 state legal conclusions to which no response is required.  To the extent a response is required, Defendant denies the allegations contained therein as GGCI failed to meet its contractual obligations to Ver.

53.      The allegations in paragraph 53 state legal conclusions to which no response is required.  To the extent a response is required, Defendant denies the allegations of paragraph 53.

54.      Defendant denies the allegations contained in paragraph 54.

55.      The allegations in paragraph 55 state legal conclusions to which no response is required.  To the extent a response is required, Defendant denies the allegations of paragraph 55.

56.      The allegations in paragraph 56 state legal conclusions to which no response is required.  To the extent a response is required, Defendant denies the allegations of paragraph 56.

## Request for Relief

Defendant denies the allegations in the Request for Relief, including the "Wherefore" clause, that Plaintiff is entitled to any form or any amount of relief.

## Affirmative Defenses

57.      Plaintiff has failed to state a claim upon which relief can be granted.

58.      Plaintiff has failed to produce all of the relevant agreements between the parties, including agreements related to the ISDA Master Agreement, including but not limited to the confirmations, definition booklets and credit support documentation.

59.      The Plaintiff's requests for relief are barred by the doctrine of unclean hands.

60.     Plaintiff lacks standing to avail itself of the Courts of the State of New York in that it is a foreign corporation, doing business in New York, without payment of the required taxes and fees in connection with its business operations.

61.     Plaintiff failed to act in a commercially reasonable manner.

62.     Plaintiff has breached the agreement between the parties, barring Plaintiff's request for relief.

## **COUNTERCLAIM**

### **The Parties**

63.     Roger Ver ("Ver") is the Counter-Plaintiff in this action.  Ver is a natural person and a resident and citizen of St. Kitts and Nevis.

64.     Genesis Global Capital International Limited ("GGCI") is the Counter-Defendant in this action.  GGCI is a British Virgin Islands company limited by shares with a principal place of business in New York.

### **Related Non-Parties**



12

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 194 of 637

65.     Digital Currency Group, Inc ("DCG") is a global venture capital company that invests in blockchain and digital currency-related companies.  DCG is the ultimate parent of the entities that comprise the Genesis Group (pictured above), which includes GGCI.

66.     Genesis Global Holdco, LLC ("Genesis Holdco") is a subsidiary of Digital Currency Group.  Genesis Holdco is a Delaware LLC that has filed for Chapter 11 bankruptcy protection in the Southern District of New York.

67.     Genesis Global Capital, LLC ("Genesis Global") is a subsidiary of Genesis Holdco.  Genesis Global is also the ultimate parent of GGCI.  Genesis Global is a Delaware LLC that has filed for Chapter 11 bankruptcy protection in the Southern District of New York.

68.     Genesis Asia Pacific Limited Pte ("GAP") is a Singapore private limited company that has filed for Chapter 11 bankruptcy protection in the Southern District of New York.

69.     Collectively, GGCI, Genesis Holdco, Genesis Global, GAP and their affiliates comprise the Genesis Group, and are referred to herein as "Genesis".

70.     Three Arrows Capital Limited ("3AC") was a Singapore-based investment firm incorporated in the BVI that specialized in trading and investing in cryptocurrencies and other digital assets before its stunning collapse in mid-2022.  They are now being liquidated in the BVI.

71.     Alameda Research LLC ("Alameda") was a quantitative cryptocurrency trading firm that was founded in 2017 by Sam Bankman-Fried. Alameda, along with FTX and more than 130 affiliated entities, filed for Chapter 11 bankruptcy protection in November 2022.

72.     FTX International Limited (aka FTX Trading Limited) ("FTX") is a cryptocurrency derivatives exchange that was launched in 2019 by Sam Bankman-Fried and

13

others. As discussed above, FTX, and more than 130 affiliated entities, filed for Chapter 11 bankruptcy protection in November 2022.

73.     Sam Bankman-Fried ("SBF") is the now disgraced co-founder and CEO of both FTX and Alameda Research, and was at the heart of one of, if not the, largest cryptocurrency thefts in history, stealing billions of dollars from his customers and using those funds to pay down debts owed by companies he owned or controlled, including Alameda and FTX.

### GGCI Solicits Ver's Business

74.     On June 10, 2020, GGCI approached Ver, a well-known Bitcoin Cash ("BCH") proponent, to trade BCH-based over-the-counter derivatives.   GGCI sought to start a BCH options book with Ver's help.

75.     Though experienced in digital asset investment, Ver was new to options trading.

76.     Ver was initially hesitant to entrust GGCI with significant assets.  Seeking to win Ver's business, GGCI proposed a mechanism to earn interest on his collateral while his positions were open.

77.     On June 15, 2020, GGCI suggested that Ver could lend his BCH to GGCI at interest while simultaneously using the same assets as collateral for derivative contracts with GGCI.

78.     This arrangement, where Ver's interest-bearing loans served as collateral for GGCI trades, induced Ver to trade derivatives with GGCI.

### The Master Confirmation Agreement and Key Terms

79.     On June 15, 2020, Ver and GGCI executed a Master Loan Agreement ("MLA") which promised to pay Ver interest at agreed upon rates to be determined by the parties during the course of the agreement's term.

14

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 196 of 637

80.     On June 22, 2020, Ver and GGCI executed a Master Confirmation Agreement to govern their derivative contracts, which was then amended on July 13, 2020 (collectively, the "MCA").

81.     The MCA referenced International Swaps and Derivatives Association (ISDA) form agreements, such as the 1994 Credit Support Annex and the 2002 ISDA Master Agreement. These agreements aimed to protect parties in over-the-counter derivatives transactions against potential issues, such as insolvency or misrepresentation.

82.     Although the parties agreed in various transaction confirmations that the 2002 ISDA Master Agreement and the 1994 Credit Annex formed part of the MCA, neither party ever executed and/or signed either of these documents.  Consequently, none of the schedules to either of them formed part of its terms.

83.     In the 2002 ISDA Master Agreement, section 5(a)(vii)(2) required parties to remain solvent at all times, stating that it was an Event of Default if either party "becomes insolvent or is unable to pay its debts."

84.     Additionally, section 5(a)(iv) prohibited misrepresentation, declaring an Event of Default if a party made "[a] representation... [which] proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated."

85.     Each time Ver and GGCI transacted, they executed an individual transaction confirmation based on the MCA terms.  These terms specified collateral requirements, eligible collateral types, and valuation methods.  The MCA listed both US dollars and a "Reference Currency" as eligible collateral, with a valuation percentage of "100% at Spot Rate."

15

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 197 of 637

86.     The MCA's use of "Reference Currency" valued at "100% Spot Rate" meant that the underlying digital asset being traded in the derivative contract could serve as collateral, and it would be valued based on its mark-to-market value in the spot markets.

87.     Despite earlier Telegram communications stating otherwise, the confirmations did not mention Ver's loans as acceptable collateral.  However, GGCI disregarded ISDA's standards and the MCA's written terms and eased collateral requirements throughout their course of dealing.

88.     In fact, it was a common practice for GGCI to ease collateral requirements, not only for Ver, but also for its other counterparties.

### The Importance of Solvency in Derivative Transactions

89.     Derivative transactions involve bets on the future price of an underlying asset.  If a counterparty becomes insolvent during the contract, the winning party may not be able to collect, undermining the transaction's sole purpose.

90.     To mitigate this counterparty risk, the 2002 Master ISDA required parties to maintain solvency at all times (the "Solvency Requirement").

91.     The Solvency Requirement was crucial for Ver's decision to enter the MCA, since it ensured that he could collect from GGCI if his derivative positions were successful.  The Solvency Requirement also benefited GGCI, as it could collect from Ver and potentially foreclose on collateral if needed.

92.     The Solvency Requirement was designed to apply to any bankruptcy or insolvency laws relevant to a party.  For GGCI, a BVI company operating in New York, insolvency under BVI or New York law would breach the requirement.  GGCI would be insolvent if it couldn't meet obligations when due, or if its liabilities exceeded its assets.

16

93.     GGCI's collateral policy was essential for compliance with the Solvency Requirement.  If a counterparty failed to pay, GGCI would incur losses, potentially leading to insolvency as assets were either removed from its balance sheet or had their value greatly reduced.

94.     To mitigate this risk, GGCI required counterparties to provide collateral before opening positions, and it was GGCI's responsibility to maintain adequate collateral and ensure its assets exceeded liabilities at all times.  Again, any failure to do so would undermine the entire purpose of the transactions.

### GGCI Failed to Enforce Collateral Requirements

95.     The MCA and its Transaction Confirmations contained strict collateral requirements for Ver, but GGCI did not enforce them.  Instead, GGCI allowed Ver and other customers to maintain undercollateralized positions and provide exotic, illiquid digital assets as collateral.

96.     Firstly, GGCI never required Ver to post US dollars or Reference Currency as collateral.  They allowed Ver to use unrelated digital assets, such as Monero (XMR) and Binance Coin (BNB), even though these assets were unrelated to the underlying derivative transaction.

97.     GGCI permitted other customers to provide even more illiquid and exotic assets as collateral, such as FTT tokens.

98.     On information and belief, GGCI also allowed SOL, OXY, MPS and SRM as collateral to support billions in loans.

99.     Secondly, GGCI valued this exotic collateral at mark-to-market prices without applying appropriate discounts for illiquidity or potential losses during liquidation.

17

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 199 of 637

100.     Thirdly, GGCI allowed Ver to maintain collateral amounts below the required sum in the MCA.

101.     Fourthly, GGCI didn't request additional collateral from Ver when the US dollar value of his digital assets fell below key thresholds.

102.     Fifthly, GGCI permitted Ver to use digital assets he had loaned at interest as collateral, which meant that GGCI was taking on additional counterparty risk by redeploying Ver's collateral to profit from an interest rate spread.

103.     GGCI's relaxed collateral requirements were not exclusive to Ver.  It extended the same or similar benefits to other counterparties, resulting in an increased risk of loss and insolvency if the market turned against them.

104.     Nor were GGCI's relaxed collateral requirements embodied in any agreement or official special status afforded to Ver or other particular customers.  Rather, GGCI simply neglected to enforce the written terms of its agreements.

### GGCI's Collateral Exposed to "Daisy Chain" of Debts

105.     GGCI did not directly possess all of the digital asset collateral deposited by counterparties like Ver.  Instead, GGCI sought to generate profits by loaning out this collateral and profiting from the interest rate spread.  This practice, however, exposed GGCI's collateral value to increased counterparty risk, as it needed to recover the loaned collateral before liquidating it to cover a default.

106.     GGCI's collateral practices created a precarious chain of debt obligations. Essentially, a house of cards. Under normal market conditions, they could manage this debt chain by obtaining US dollars.  However, during times of market stress and illiquidity, a single default

18

could render GGCI unable to access the collateral deposited by Ver or others, exposing them to immense loss.

107.     Without US dollar cash reserves, GGCI would be forced to liquidate investments at fire sale prices, or call in loans from borrowers who may default.  During periods of market illiquidity and stress, GGCI's relaxed collateral practices increased the risk of GGCI becoming undercollateralized and insolvent.

108.     On information and belief, GGCI would routinely loan out its digital assets to other Genesis entities, including GAP, who would loan it to counterparties such as 3AC.

109.     These related party loans would eventually become impaired by 3AC's insolvency.  In June 2022, 3AC defaulted on more than $2.3 billion to GAP, causing losses to GGCI as related party loans became impaired.

110.     Barry Silbert, who controlled GGCI and the Genesis Entities through his position as Chairman of DCG, was aware of this risk.  In a June 2021 tweet, he acknowledged the "daisy chain" of debts and emphasized the importance of understanding counterparty risk and identifying weak links in the chain.  Regrettably, Silbert failed to recognize that these weak links existed within his own organization, ultimately jeopardizing the safety of GGCI's collateral.



Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 201 of 637

## GGCI Overstates its Financial Health: Deviating from ASC 820

111.    GGCI's mark-to-market valuation of digital assets, including those not physically possessed, resulted in an overstatement of its financial health.

112.    Note 2 to GGCI's December 31, 2021 audited financial statement detailed the significant accounting policies and the methods used to derive valuations for its assets and liabilities.  The statement claimed compliance with accounting principles generally accepted in the United States of America (U.S. GAAP).

113.    U.S. GAAP utilizes ASC 820 for determining "fair value," which is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.

114.    ASC 820 establishes a hierarchy of inputs for determining fair value, prioritizing observable inputs and requiring additional disclosures when unobservable inputs are relied on.

115.    GGCI concluded all digital assets and liabilities were recorded and valued based on Level 2 inputs – which are defined as "significant observable inputs".

116.    ASC 820's hierarchy includes three levels:

    a.  Level 1 (unadjusted spot price in an active market, such as the quoted price of Apple shares on the New York Stock Exchange);

    b.  Level 2 (spot prices from less active markets and may or may not be discounted); and

    c.  Level 3 (providing the most discretion, since the quoted price is unreliable and the evaluator is thus forced to rely on other inputs that are unobservable and significant to the overall fair value measurement).

117.    GGCI determined the fair market value of assets in "digital currency investments" and liabilities under "digital currency collateral payable" using Level 2.

20

118.    Digital assets are a famously volatile asset class, characterized by extreme price fluctuations and inherent unpredictability.  Market movements are driven by factors such as technological advancements, regulatory changes, market sentiment, global economic conditions, illiquidity, and, at times, price manipulation.

119.    At all times relevant, GGCI valued all of its digital assets at mark-to-market prices and never applied a discount to them.

120.    Upon information and belief, GGCI has employed the same inadequate accounting methods at all times during the life of the agreements at issue. As a result, GGCI has been insolvent for as long as those methods have been employed. To the extent GGCI still employs the same valuation method, it remains insolvent to this day.

121.    Despite liquidity concerns and worsening market conditions beginning in May 2022, GGCI never applied a discount to their Level 2 assets.  All such assets continued to be valued at mark-to-market prices.

122.    GGCI's refusal to apply appropriate discounts to its Level 2 assets allowed GGCI to overstate its financial health and created a misleading picture of a solvent entity where one did not exist.

### Over Exposure to Alameda & FTX

123.    During the course of 2021, Genesis entities engaged in a broad relaxation of their lending standards, and began to accept increasingly illiquid and exotic digital assets as collateral for loan and obligations and derivative contracts, creating a precarious financial situation.

124.    On information and belief, GGCI went insolvent at some point during 2021 when it made a loan of $2.5 billion and accepted FTT tokens as collateral.  GGCI valued these FTT

21

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 203 of 637

tokens mark-to-market, which overstated the real value of FTT and resulted in a severe under

collateralization, as Alameda had manipulated FTT's price higher to borrow against it.

125.    Consequently, GGCI was grossly overexposed to a single counterparty. GGCI's

2021 audited financials reported that on December 31, 2021 the company held $2.370 billion in

"digital collateral payable", 99% of which were FTT tokens owed to a single counterparty.

These FTT tokens represented *nearly 70%* of GGCI's then total assets.

126.    However, the actual fair market value of these FTT tokens was far lower than the

mark-to-market prices used by GGCI, which resulted in significantly fewer assets than reported.

127.    Were GGCI to foreclose on the FTT tokens and sell them for US dollars, *they

would have been unable to recover anywhere near the full amount owed.*

128.    GGCI's overexposure to FTT resulted from a quid pro quo relationship between

Alameda and Genesis executives.

129.    FTX and Alameda granted Genesis executives early access to purchase FTT

tokens at discounted rates before public issuance.

130.    This conflict of interest compromised GGCI's risk management policies and

practices, as executives were incentivized to authorize GGCI to take excessive risks for their

personal benefit.

131.    If not for these conflicts of interest, Genesis executives might have conducted

adequate due diligence on their $2.5 billion loan and learned of Alameda's scheme to manipulate

FTT prices and increase its borrowing ability.

132.    In a complaint against Alameda's former CEO, Caroline Ellison, the SEC details

this manipulation. Ellison engaged in automated FTT token purchases to inflate the value of

Alameda's collateral, increasing risks for lenders accepting FTT as collateral.

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 204 of 637

133.    The market crash of May 2022 only worsened GGCI's finances, as Alameda suffered substantial losses, which exacerbated its inability to repay its loan to GGCI.

134.    After May 2022's market crash, Alameda focused its efforts on propping up the price of FTT token, continuing to engage in market operations and offering lines of credit to insolvent entities with large FTT positions to prevent FTT from being liquidated, which would have publicly revealed Alameda's insolvency.

135.    In August 2022, after realizing that Genesis and GGCI would liquidate FTT tokens and reveal their insolvency, Alameda misappropriated customer funds to repay Genesis and GGCI, which was a preferential transfer at the expense of FTX creditors subject to clawback.

136.    Afterwards, Alameda replaced the missing $2.5 billion in FTX customer deposits with the FTT tokens it had just received from Genesis and GGCI, and by valuing FTT at its inflated mark-to-market price created the illusion that FTX remained solvent.

137.    In November 2022, the digital asset exchange Binance called Alameda's bluff and threatened to sell their FTT tokens on the open market, which revealed its lack of liquidity. FTX and Alameda were finally revealed to be insolvent and filed for bankruptcy less than three months after having repaid $2.5 billion to Genesis and GGCI.

### Over Exposure to 3AC & the Crash of May 2022

138.    In May 2022, digital asset markets experienced a steep decline due to the collapse of digital assets LUNA and TerraUSD, causing significant losses, liquidations, and a snowball effect of defaults and insolvencies.

23

139.   3AC was central to the crash, resulting in substantial losses for GGCI and its counterparties.  3AC owed over $3 billion to creditors, including $2.3 billion to GAP, its largest creditor.

140.   Genesis and GAP were overexposed to 3AC, driven by conflicts of interest related to generating demand for the various digital asset trusts operated by Grayscale (the "Grayscale Trusts").  DCG, Genesis' parent company, owned the investment manager for the Grayscale Trusts and profited from the fees it generated.

141.   Since 2020, GAP had been loaning funds to 3AC to fund its Grayscale Trust purchases.  However, GBTC's[1] value declined, resulting in substantial unrealized losses for 3AC. While shares in GBTC traded at a premium to its net asset value when 3AC began conducting the trade in 2020, by June 2022 they were trading at a 30% discount.

142.   Genesis' concerns over its exposure to 3AC had reached a boiling point by January 2022.  That month, Genesis executives had 3AC pledge its GBTC shares to GAP as security.  But as the net asset value of GBTC continued to fall, so did the value of GAP's pledged assets.

143.   Upon information and belief, Genesis' 3AC exposure did not end with the Bitcoin trust, as 3AC was an investor in the other Grayscale Trusts.

144.   In May 2022, after LUNA's collapse, Genesis executives spoke with 3AC and, on information and belief, determined that 3AC was insolvent.

145.   However, GAP's significant exposure to 3AC posed a risk to the solvency of the entire Genesis enterprise, including GGCI, due to various related party loans and intercompany debts.  Consequently, Genesis opted not to issue margin calls to 3AC, despite the terms of their

---

[1] GBTC is the Grayscale Bitcoin Trust, just one of a number of digital asset trusts operated by Grayscale and DCG.

24

agreement permitting such action, in order to prevent further destabilizing its own financial situation.

146.     On information and belief, if not insolvent as a result of the $2.5 billion loan backed by FTT discussed herein, GGCI was insolvent as a result of 3AC's inability to repay GAP before the end of May 2022.

147.     On June 10, GGCI's need to obtain more capital became urgent.  That day, 3AC's accounts on the Deribit derivatives platform were liquidated.  Genesis executives, alarmed by the Deribit liquidations and cognizant of 3AC's insolvency, understood that 3AC's demise was near and formulated a strategy to avoid immediate recognition of a $2.3 billion loss.

148.     The plan centered on GAP seizing Grayscale BTC trust shares and other digital assets pledged by 3AC as security for their undercollateralized loans.  However, since issuing an unpayable margin call to 3AC would expose their insolvency, Genesis needed to act quickly before the market caught on.  By securing 3AC assets ahead of other creditors, GAP aimed to offset the substantial loss and safeguard both its own balance sheet and those of its affiliates.

149.     On June 12, Genesis executives set the plan in motion.  GAP issued a margin call to 3AC, demanding an additional $334 million in collateral payments, fully aware that 3AC would be unable to meet the requirement.

150.     On June 13, GAP served a notice of default on 3AC, enabling GAP to liquidate the limited collateral they held and pursue emergency relief to seize further 3AC assets ahead of other creditors.

151.     On June 15, GAP initiated arbitration against 3AC, seeking more than $2.3 billion in loan recovery and emergency relief.  This included seeking a preliminary injunction directing

25

3AC to freeze more than $2.3 billion, and to deposit the pledged assets with GAP, which were allegedly valued at $462 million at the time.

152.     In GAP's arbitration filing, it noted that "[d]ue to recent extreme volatility in the cryptocurrency markets, the value of the collateral already posted by Three Arrows decreased significantly in comparison to the loaned assets under the MLAs."

153.     On June 16, news of the notice of default GAP had issued to 3AC was publicized in the media, and numerous other 3AC lenders began making margin calls and issuing default notices.

154.     On June 21, GAP's request for a preliminary injunction to freeze or seize certain 3AC pledged assets was denied. A further hearing was scheduled for July 5, making it evident GAP wouldn't secure these assets by month's end.

155.     Due to the monthly reporting schedule followed by all Genesis entities, it became apparent that GAP and its affiliates, including GGCI, would have to recognize losses related to 3AC in their month-end financial reports for June 2022, which also coincided with their quarterly reporting obligations.

156.     Consequently, GGCI was insolvent in June 2022 due to various factors, including inaccurate loss recording, failure to apply appropriate discounts to Level 2 digital assets in the midst of a liquidity event, untimely recognition of substantial losses linked to 3AC and related parties, and untimely recognition of losses tied to the FTT-collateralized loan.

**GGCI's Misrepresentations of Solvency**

157.     In or about early June 2022, GGCI devised a plan to strengthen its balance sheet. It aimed to persuade its biggest clients, including Ver, to roll currently profitable options expiring that June to later dates, thereby allowing GGCI to avoid making payments. Meanwhile, GGCI

26

would allow Ver's currently unprofitable June options to expire, thereby bringing funds into GGCI from Ver and others.

158.    On information and belief, Genesis knew GGCI was insolvent by such time.

159.    On June 7, GGCI asked Ver to roll his deep in-the-money Ethereum options to a later date. Those options expired on June 24.  Ver declined.

160.    On June 9, GGCI sent Ver an article about Ethereum's progress to pique his interest about rolling the options Ver did not respond.

161.    On June 10, Deribit's liquidation of 3AC signaled 3AC's imminent collapse.

162.    On June 11, GGCI again requested Ver to roll only his in-the-money Ethereum options to a later date, and offered him attractive terms.  Unaware that Genesis planned to margin call and liquidate 3AC immediately afterwards, Ver agreed to let GGCI roll his in-the-money options.

163.    On June 12 and 13, digital asset prices fell as 3AC was margin called, defaulted, and liquidations commenced, as had been planned by Genesis

164.    Meanwhile, on June 13, and again on the 14th, GGCI requested further collateral from Ver. On June 15, to keep Genesis executives happy, Ver reduced his exposure to GGCI by $22.5 million by buying certain BTC call options.

165.    From June 16 to June 24, GGCI continued discussions with Ver about the additional types of collateral he could offer, and learned it was Ver's strong preference to post a combination of digital assets and certain shares in private companies.  GGCI indicated it was prepared to accept these assets as collateral, as it had done previously.

166.    Throughout the life of GGCI and Ver's two year business relationship, GGCI had always accepted different forms of collateral from Ver, and allowed him to maintain

undercollateralized positions.  In fact, it had been GGCI's offer to pay Ver interest on his digital asset collateral, in direct violation of the MCA's collateral requirements, that had induced Ver to trade with GGCI and to continue trading up until that time.

167.    However, upon the expiration of Ver's out-of-the-money options on June 24, Genesis executives abruptly changed their policy.  They demanded that Ver immediately provide 100% of the required collateral in either US dollars or Reference Currency as stated in the MCA, or face a notice of default.

168.    Based on the course of the parties' dealings, GGCI knew Ver was not expecting to be required to pay the full sum of collateral in US dollars or Reference Currency on that day, which GGCI had never required him to do during their two year relationship.

169.    GGCI's plan was to extract an excessive sum of collateral from Ver.  GGCI offered to accept Ver's digital assets and shares as collateral, but only if he _over_-collateralized his position by 300% to 600%. Were Ver to pay in digital assets, GGCI wanted him to supply 300% as much collateral as the value of his entire position.  If in private shares, 600%.

170.    As a result of the abrupt change in policy and attempt to extract an excessive sum of collateral, Ver began to suspect GGCI's insolvency.  He nonetheless agreed to discuss details with GGCI on a call the following day, June 25.

171.    On the June 25th call, Defendants threatened to issue a notice of default if Ver did not immediately pay the full amount in US dollars or Reference Currency or meet its excessive collateral demands.

172.    Considering the state of the markets, Ver requested proof of GGCI's solvency. Thereafter, GGCI backed off its demands for excessive sums of collateral, began engaging in

28

more constructive discussions to immediately accept certain digital assets, and continued discussions with Ver as to other assets to pledge as collateral.

173.     On information and belief, even using inflated mark-to-market prices for digital assets, GGCI was insolvent on June 25 and was therefore unable to provide Ver with proof of its solvency.

174.     GAP had just lost its bid to freeze 3AC assets in the emergency arbitration hearing on June 21.  At the very latest, GAP should have written down their impaired 3AC loans by such date, which would have resulted in GGCI also writing down any related party loans with GAP.

175.     Initially, GGCI declined to provide up-to-date solvency proof to Ver, stating it did not produce point-in-time financial statements.

176.     However, on June 28, after Ver had informed GGCI that he was not comfortable sending any further collateral without proof of GGCI's solvency, GGCI provided an unaudited point in time financial statement.  This statement of financial condition (the "June 20 SOFC") revealed GGCI's various assets and liabilities as of June 20.

**Genesis Global Capital International Limited**
**Statement of Financial Condition (Unaudited)**
**June 20, 2022**
*(in thousands)*

| | | |
|---|---|---:|
| **Assets** | | |
| Cash | $ | 12,929 |
| Investments in digital currencies | | 1,594,209 |
| Derivative assets | | 442,733 |
| Collateral receivable | | 454,449 |
| Receivable from customers | | 159,182 |
| Loans receivable | | 399,560 |
| **Total assets** | $ | 3,063,062 |
| | | |
| **Liabilities and stockholder's equity** | | |
| **Liabilities** | | |
| Collateral payable | $ | 2,094,617 |
| Payable to customers | | 94,569 |
| Loans payable | | 606,477 |
| Derivative liabilities | | 167,132 |
| **Total liabilities** | $ | 2,962,795 |
| | | |
| **Stockholder's equity:** | | |
| Total stockholder's equity | | 100,267 |
| **Total liabilities and stockholder's equity** | $ | 3,063,062 |

177.    The June 20 SOFC claimed total assets of $3.063 billion and liabilities of $2.962 billion, which gave GGCI positive equity of just over $100 million.  Given that $1.594 billion of GGCI's assets were digital assets ("Investments in digital currencies"), even a small fluctuation in the market would render it insolvent.

178.    Faced with an apparently solvent GGCI, who had by now backed off its demands for excessive collateral, Ver saw no choice but to keep his remaining positions open at GGCI and cooperate with it to ensure collateral levels were mutually acceptable until his remaining options expired, unless and until he was presented with evidence of its insolvency.

179.    However, what Ver did not know at the time was that the June 20 SOFC was an accounting farce.  The $1.596 billion in digital assets was in fact worth far less, and consisted of

30

a large sum of illiquid FTT tokens, which if sold would have left a large shortfall remaining to GGCI from an insolvent counterparty.

180.    The SOFC's chosen date of June 20 was no accident and was a central part of that farce.  The SOFC did not reflect the full write down of 3AC's impaired loans.  On information and belief, the 3AC loans were deemed impaired by Genesis on June 21 when GAP's request for emergency relief was denied and GAP had no further collateral to support such debts.

181.    When GGCI's plan to seize exorbitant amounts of collateral from Ver failed, GGCI entered into discussions with its parent companies for an injection of capital to return it to solvency in time for its quarterly reporting obligations at the end of June.

**DCG's $1.1 Billion Promissory Note and Further Misrepresentations of Solvency**

182.    On June 30, 2022 DCG and Genesis Global entered into a sham transaction designed to cover the insolvency of Genesis, including GGCI.  DCG executed an unsecured promissory note payable to Genesis Global in the amount of $1.1 billion (the "DCG Promissory Note").

183.    Genesis Global then added the DCG Promissory Note to its balance sheet as a current asset worth $1.1 billion, purportedly to "offset" the $1.2 billion loss it incurred from 3AC's collapse.  With a fresh $1.1 billion added to its balance sheet as a current asset, Genesis Global was then able to use that $1.1 billion to make an injection of capital into its subsidiary, GGCI.

184.    On information and belief, Genesis Global used the DCG Promissory Note to inject $151 million into its subsidiary, GGCI.  GGCI then recorded $151 million as a current asset on its balance sheet worth $151 million.  This was reflected in an unaudited June 30 SOFC, which Ver would later receive from GGCI.

31

**GGC International Limited**
**Statement of Financial Condition**
**June 30, 2022**
*(in thousands)*

| Assets | | |
|---|---|---|
| Cash | $ | 3,232 |
| Investments in digital currencies and trusts | | 1,439,363 |
| Digital currency loans receivable, net of allowance for loan losses | | 1,250 |
| USD loans receivable, net of allowance for loan losses | | 1,000 |
| Digital currency collateral receivable | | 340,389 |
| Derivative assets | | 369,045 |
| Interest receivable, net of allowance | | 2,758 |
| Receivables from related parties | | 47,334 |
| Other assets | | 151,977 |
| **Total assets** | $ | 2,357,248 |
| | | |
| **Liabilities and member's equity** | | |
| **Liabilities** | | |
| Digital currency loans payable | $ | 370,737 |
| Digital currency collateral payable | | 891,080 |
| USD loans payable | | 18,073 |
| Option collateral payable | | 344,169 |
| Derivative liabilities | | 191,864 |
| Interest payable | | 5,645 |
| Accounts payable and accrued expenses | | 295,894 |
| Payables to related parties | | 225,364 |
| **Total liabilities** | | 2,342,826 |
| | | |
| Member's equity | | 14,422 |
| Total member's equity | | 14,422 |
| **Total liabilities and member's equity** | $ | 2,357,248 |

185.    The June 30 SOFC contained a brand new line item, "Other assets", which did not appear on the June 20 SOFC.  "Other assets" reported $151 million in assets.   On information and belief, "Other assets" represented funds that had been received by GGCI on June 30 as the result of the DCG Promissory Note.

186.    In reality, however, the fair market value of the DCG Promissory Note was just a small fraction of the $1.1 billion face amount.  The note would not mature for 10 years — not until June 30, 2032 — and bears interest at a rate of just 1%, far below the market interest rate that DCG would be required to pay for unsecured borrowing.   Accordingly, Genesis Global remained insolvent even upon receipt of the DCG Promissory Note.

32

187.    Likewise, the fair market value of the $151 million GGCI had received was also worth just a fraction of its reported face value, since on information and belief its value was derived from the DCG Promissory Note and did not represent an actual injection of cash. Accordingly, GGCI remained insolvent afterwards, as the actual fair market value of what it had received was insufficient to cover the $136 million in negative equity reported on GGCI's June 30, 2022 SOFC.

188.    On information and belief, both Genesis and DCG had hoped that the DCG Promissory Note would simply serve as a short term bridge loan until the arbitration panel GAP had convened seeking emergency relief from 3AC could make its ruling on July 5, 2022, where GAP hoped to seize certain of 3AC's assets.  However, the arbitration panel denied GAP the relief it sought.

189.    The following day, July 6, Genesis set about to reassure the market that it remained solvent and was continuing business as usual.  That day, Genesis CEO Michael Moro released a public statement on Twitter and explained that "[w]e previously stated in June that we mitigated our losses with respect to a large counterparty who failed to meet a margin call.  Now that the BVI bankruptcy process has commenced, we can confirm that the counterparty was Three Arrows Capital."  Moro asserted that "[t]he loans to this counterparty had a weighted average margin requirement of over 80%.  Once they were unable to meet the margin call requirements, we immediately sold collateral and hedged our downside."  He then claimed that, "[s]ince then, we worked with [DCG] to find the optimal strategy to further isolate the risk. **DCG has assumed certain liabilities of Genesis related to this counterparty to ensure we have the capital to operate and scale our business for the long term."**  In sum, Moro asserted

33

that "[w]e deploy a number of risk management strategies to ring-fence our portfolio and utilize all capabilities to mitigate losses quickly and effectively."

190.    GGCI's insolvency was never cured by an injection of capital from DCG.  DCG never "assumed" or "absorbed" Genesis Global's losses.  Instead, DCG and Genesis engaged in yet another accounting farce.  The DCG Promissory Note was an accounting trick designed to make Genesis Global — and by extension, its subsidiary, GGCI — appear as if they had positive equity *without* ever requiring DCG to commit the financial support needed to actually make Genesis Global and GGCI solvent.

191.    Ver was misled into believing that GGCI was solvent by the June 20 SOFC and Genesis CEO Moro's July 6 public statements.  Ver was thus unable to timely exercise his contractual right to terminate the ISDA due to GGCI's violation of the Solvency Requirement.

192.    From June 21, 2022 up until he discovered GGCI's insolvency in December 2022, Ver made payments to GGCI in excess of $60 million and GGCI liquidated a further $50,000,000 in collateral.

**Ver Discovers GGCI's Insolvency**

193.    On November 11, 2022, FTX and Alameda filed for bankruptcy.  Their bankruptcy came after a rapid decline when Binance, another exchange, announced they would sell their FTT tokens on the open market.  Since FTT tokens were highly illiquid and their prices artificially inflated by Alameda, their value plunged by over 90% following Binance's announcement.

194.    The FTX and Alameda bankruptcies sent shockwaves through the digital asset markets.  Surprisingly, Sam Bankman-Fried ("SBF"), the controlling principal behind FTX and Alameda, started giving public interviews, asserting that FTX wasn't truly insolvent since its

balance sheet held digital assets — primarily FTT tokens — with a mark-to-market value exceeding customer liabilities.  SBF was eventually indicted on numerous felony charges.

195.    Later that November, rumors circulated that Genesis and its subsidiaries were insolvent when its lending arm stopped withdrawals, trapping investor funds.  It was later revealed that GGCI was FTX's largest creditor.

196.    Genesis initiated a restructuring plan to save its business, which focused on transferring bad assets from GGCI to other Genesis entities destined for bankruptcy.  The plan aimed to raise capital to pay creditors by selling shares in a financially stable GGCI.

197.    Meanwhile, Ver continued to pay collateral to GGCI.  Since June 21, 2022, Ver made total payments to GGCI in excess of $60 million and GGCI liquidated collateral valued in excess of $50,000,000.

198.    On or about December 23, just weeks after Ver made $37 million in collateral payments to GGCI, and just one week before his options would expire, Ver became aware of information that made him question GGCI's earlier claim of solvency that had been supported by the June 20 SOFC.

199.    The news was a New York Times interview of SBF, who stated that Alameda had repaid a $2.5 billion loan to "Genesis" that August, about three months before filing for bankruptcy.  SBF added that the loan was repaid because Genesis had called in specific loans made to Alameda.

200.    Ver became concerned that GGCI might have been the entity that lent money to Alameda, potentially affecting GGCI's present solvency and their solvency in June 2022.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 217 of 637

201.    As Alameda repaid the loan to Genesis in August, about three months before FTX's bankruptcy, it seemed like this repayment would potentially be subject to an automatic clawback as a preferential transfer.

202.    Ver investigated and learned that there was speculation that SBF had directed Alameda to misappropriate FTX customer funds to repay Genesis.  Alameda then used the FTT tokens it had received back from Genesis to pay FTX, who then used the FTT tokens to replace the missing customer deposits as an asset on its balance sheet.

203.    This caused Ver to grow more concerned, since if true, it would mean that GGCI had been doing what FTX had been doing: propping up its insolvent balance sheet with inflated FTT tokens.

204.    Since Ver was considering rolling his expiring December 30 options with GGCI to a later date, he wanted to be sure GGCI remained solvent before doing so, and wanted to further confirm they had in fact been solvent that past June when he initially inquired.

205.    In late December 2022, Ver inquired with GGCI as to whether they remained solvent in the wake of the FTX and Alameda bankruptcies, and whether GGCI had any exposure to them, specifically whether it had been GGCI who had reportedly made a $2.5 billion loan to Alameda and was repaid in August 2022.

206.    GGCI responded that all of Ver's trades had been through GGCI.  Despite having lost some funds on FTX,  GGCI claimed that it remained solvent and had no further involvement or exposure to Alameda or FTX.

207.    Ver persisted in questioning specifically whether it had been GGCI who received the Alameda loan repayment referred to by SBF in the New York Times interview.  GGCI informed Ver that those funds had been repaid to a different Genesis entity, not GGCI.

36

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 218 of 637

208.    At this point, Ver demanded proof of GGCI's present solvency, and demanded

GGCI provide proof as to how they valued the assets on its June SOFC, which Ver now

suspected had deployed the same misleading mark-to-market accounting that FTX had deployed

to deceive its depositors.

209.    Ver reminded GGCI that he had faithfully paid in excess of $60 million in

additional collateral since June, believing it his legal obligation to do so since GGCI remained

solvent, including $37 million dollars in payments just weeks prior.

210.    Were Ver simply trying to avoid paying a debt to GGCI, as Counter-Defendant

alleges in its complaint, he obviously would not have made payments totalling $37 million just

weeks earlier, and would have raised concerns instead of paying.

211.    Satisfied Ver's concerns were being raised in good faith, but while still denying

the validity of his claims, GGCI produced to Ver its 2021 audited financials, as well as an

unaudited SOFC dated June 30, 2022.

212.    However, both of those documents raised even further issues which revealed

GGCI to have been insolvent in June 2022 at the latest.

**The June 30 SOFC**

213.    The June 30 SOFC revealed to Ver the dramatic and concerning changes which

had occurred since the June 20 SOFC.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 219 of 637

**Genesis Global Capital International Limited**
**Statement of Financial Condition (Unaudited)**
**June 20, 2022**
*(in thousands)*

| Assets | | |
|---|---|---|
| Cash | $ | 12,929 |
| Investments in digital currencies | | 1,594,209 |
| Derivative assets | | 442,733 |
| Collateral receivable | | 454,449 |
| Receivable from customers | | 159,182 |
| Loans receivable | | 399,560 |
| **Total assets** | $ | 3,063,062 |
| | | |
| **Liabilities and stockholder's equity** | | |
| **Liabilities** | | |
| Collateral payable | $ | 2,094,617 |
| Payable to customers | | 94,569 |
| Loans payable | | 606,477 |
| Derivative liabilities | | 167,132 |
| **Total liabilities** | $ | 2,962,795 |
| | | |
| **Stockholder's equity:** | | |
| Total stockholder's equity | | 100,267 |
| **Total liabilities and stockholder's equity** | $ | 3,063,062 |

**GGC International Limited**
**Statement of Financial Condition**
**June 30, 2022**
*(in thousands)*

| Assets | | |
|---|---|---|
| Cash | $ | 3,252 |
| Investments in digital currencies and trusts | | 1,439,361 |
| Digital currency loans receivable, net of allowance for loan losses | | 1,250 |
| USD loans receivable, net of allowance for loan losses | | 1,000 |
| Digital currency collateral receivable | | 840,389 |
| Derivative assets | | 369,045 |
| Interest receivable, net of allowance | | 2,758 |
| Receivables from related parties | | 47,334 |
| Other assets | | 151,977 |
| **Total assets** | $ | 2,357,248 |
| | | |
| **Liabilities and member's equity** | | |
| **Liabilities** | | |
| Digital currency loans payable | $ | 370,737 |
| Digital currency collateral payable | | 891,080 |
| USD loans payable | | 18,073 |
| Option collateral payable | | 344,169 |
| Derivative liabilities | | 191,864 |
| Interest payable | | 5,645 |
| Accounts payable and accrued expenses | | 295,894 |
| Payables to related parties | | 225,364 |
| **Total liabilities** | | 2,342,826 |
| | | |
| **Member's equity** | | 14,422 |
| Total member's equity | | 14,422 |
| **Total liabilities and member's equity** | $ | 2,357,248 |

214.    First, there had been a significant reported drop in both positive equity and assets. On June 20, there was positive equity of just $100 million on $3 billion in assets, which indicated GGCI faced significant liquidity and volatility concerns. However, by June 30, positive equity had shrunk to $14 million, with assets dropping by more than $400 million, exacerbating the already troubling liquidity and volatility concerns.

215.    Second, much of the fall in asset values was attributed to loans that had been written down.  On June 20, GGCI reported "loans receivable" of $399 million.  However, by June 30, loans receivable had been reduced to $2.25 million.[2]  This represented a loss of more than 99% of GGCI's loans receivable in just a ten day period.

---

[2] The June 20 SOFC and June 30 SOFC differed in how they recorded loans receivable.  The June 20 SOFC contains a single line item for "loans receivable"; the June 30 SOFC contains two, one for USD and one for Digital assets. The line item "*USD Loans Receivable net of allowance for loan losses*" is recorded as $1 million, and "*Digital Currency Loans Receivable net of allowance for loan losses*" is recorded as $1.25 million.  Together, they represent "loans receivable" equal to $2.25 million as of June 30, 2022.

38

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 220 of 637

216.    On information and belief, these loan write-downs represented losses related to 3AC, which had not been written down in the June 20 SOFC, but were known to Counter-Defendant when the June 20 SOFC was sent to Ver as proof of GGCI's solvency.

217.    Lastly, the June 30 SOFC contained a brand new line item, "Other", which had $151 million in assets.  There was no new corresponding line item in liabilities.

218.    On information and belief, this line item "Other" represented sums that were placed onto GGCI's balance sheet as a result of the DCG Promissory Note.

### GGCI's 2021 Audited Financials

219.    GGCI's 2021 audited financials revealed to Ver both that GGCI had been valuing digital assets at 100% mark-to-market, and that it had in fact been the entity that originated a $2.5 billion loan collateralized by FTT tokens.  Those FTT tokens had ultimately come from Alameda.

220.    The 2021 audited financials explained that GGCI accounted for collateral paid by counterparties as an asset with a corresponding liability.  Alameda's FTT tokens would have been counted on its balance sheet as an asset under "*Investments into digital assets*" and as a liability under "*digital currency collateral payable.*"

221.    GGCI's balance sheet showed "*Investments in digital currencies*" equal to $2.825 billion, and "*Digital currency collateral payable*" equal to $2.370 billion.

222.    Notably, the "*Digital currency collateral payable*" roughly equaled the $2.5 billion SBF had referred to during his New York Times interview.  And while "*Investments in digital currencies*" was larger, it contained additional digital assets owned by GGCI.

223.    GGCI's cash flow statement in the 2021 audited financials also contained a line item for "*Digital currency collateral payable*" under liabilities, which was equal to the same line

item on the balance sheet, indicating these sums made their way onto GGCI's balance sheet in 2021.

224.    GGCI's 2021 audited financials contained a section detailing significant exposures to various counterparties.  The significant counterparties were not identified by name, only certain information about them was provided.  The financials identified a "Counterparty I" who represented 99% of the digital currency collateral payable liability, which was further identified to consist of 99% FTT tokens.

225.    Therefore, GGCI's 2021 financials showed that at some time in 2021 it had originated a loan to a single counterparty backed by FTT tokens, which were valued at $2.3 billion as of December 31, 2021.  Accordingly, it became evident to Ver that "Counterparty I" was Alameda Research.

226.    Lastly, GGCI's 2021 audited financials contained other figures that revealed yet other sources of GGCI's undercapitalization.  The statement of cash flows identified a $105 million dollar operating loss for 2021.  And the statement of changes in stockholder equity identified almost $41 million in distributions in 2021.

### GGCI's Shifting Explanations

227.    When Ver pointed out that GGCI's 2021 audited financials identified a $2.5 billion loan obligation to Alameda, contrary to GGCI's prior representations, GGCI provided misleading information to Ver in an attempt to distance itself from Alameda.

228.    Incredibly, GGCI initially claimed that the financials Ver possessed were actually a consolidated report for multiple Genesis entities, and that the FTT tokens belonged to a different Genesis entity.

40

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 222 of 637

229.    However, the financials were clearly labeled as having been prepared exclusively for GGCI, which quickly disproved GGCI's claims.

230.    Once disproven, GGCI shifted its narrative and asserted that an affiliate had dealt with Alameda, who then borrowed from GGCI using the FTT tokens as collateral.  GGCI then refused to provide any evidence to support this claim.

231.    Nonetheless, GGCI's claim that the FTT tokens belonged to an affiliate was a difference without distinction, since the tokens had ultimately come from Alameda and would be subject to a clawback in bankruptcy.

232.    In fact, on May 3, 2023, FTX filed a motion in the Southern District of New York, on behalf of itself and affiliated debtors, seeking $3.9 billion back from Genesis, including sums from GGCI.

233.    Ultimately, discussions with GGCI made clear that GGCI hadn't applied any discount to the digital assets on its SOFC.

234.    At one point, GGCI personnel even admitted that they "may have been underwater for a few days."

235.    Had GGCI applied appropriate discounts to its digital assets, as it demanded from Ver, its SOFC would have revealed its insolvency.

236.    As a result, Ver would have closed his positions to avoid trading with an insolvent counterparty and saved tens of millions of dollars.

41

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 223 of 637

# CAUSES OF ACTION

## COUNT ONE

### (Breach of Contract (Insolvency))

237.    Defendant realleges and incorporates all preceding paragraphs as though fully set forth herein, and further alleges:

238.    As discussed herein, GGCI and Ver were parties to the Master Confirmation which incorporated the ISDA Master Agreement and ISDA Credit Support Annex by reference.

239.    During the life of the parties' relationship, there were well over 100 transactions conducted by GGCI on behalf of Ver.

240.    The Master Confirmation executed in connection with each transaction incorporated the 2002 ISDA Master Agreement by reference.

241.    The 2002 ISDA Master Agreement defines a number of Events of Default.  One such event of default is the insolvency of either party.

242.    As described herein, GGCI became insolvent at some point prior to July 1, 2022.

243.    At the point of insolvency, GGCI was in breach of all option contracts then open between the parties and subject to the 2002 ISDA Master Agreement.

244.    As per the agreements between the parties, in the event of default, all transactions were to be terminated, and the parties were expected to settle any financial obligations at that point.

245.    However, as a result of GGCI's failure to notify Ver of its insolvency, and its campaign of obfuscation, Ver did not become aware of the insolvency for quite some time.

246.     Following the insolvency, but prior to Ver becoming aware of same, Ver contributed substantial additional funds to maintain his then open options positions, which never should have been paid to GGCI as a result of its insolvency.

247.     Ver has suffered significant damages as a direct result of GGCI's breach of the agreements between the parties.

248.     Accordingly, Ver respectfully requests that this Court award all relevant damages caused by Counter-Defendant's breach of contract, including, but not limited to, compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000.00, punitive or exemplary damages for their malicious conduct, all costs and Court fees, reasonable attorneys' fees, as well as any other relief this Court deems just and proper.

## COUNT TWO

### (Breach of Contract (Misrepresentation) - BCH Options)

249.     Defendant realleges and incorporates all preceding paragraphs as though fully set forth herein, and further alleges:

250.     As discussed herein, GGCI and Ver were parties to the Master Confirmation which incorporated the ISDA Master Agreement and ISDA Credit Support Annex by reference.

251.     Pursuant to a trade confirmation dated March 22, 2022, GGCI agreed to purchase from Ver a put option for 70,000 units of Bitcoin Cash ("BCH"), with a strike price of $545 per BCH.

252.     The Master Confirmation executed in connection with this transaction incorporated the 2002 ISDA Master Agreement by reference.

253.     The 2002 ISDA Master Agreement defines a Misrepresentation by either party as an Event of Default as well.  Pursuant to the 2002 ISDA Master Agreement, any representation

43

that "proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated" would be considered an Event of Default.

254.     As discussed herein, GGCI made, and repeated, a number of material misrepresentations and omissions regarding its solvency.  These repeated misrepresentations and omissions constitute a material breach of the agreement.

255.     Ver has suffered, and continues to suffer, irreparable harm as a direct and proximate result of Counter-Defendant's breach of the agreement.

256.     Accordingly, Ver respectfully requests that this Court award all relevant damages caused by Counter-Defendant's breach of contract, including, but not limited to, compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000.00, punitive or exemplary damages for its malicious conduct, all costs and Court fees, reasonable attorneys' fees, as well as any other relief this Court deems just and proper.

## COUNT THREE

### (Breach of Contract (Misrepresentation) - ETH Options)

257.     Defendant realleges and incorporates all preceding paragraphs as though fully set forth herein, and further alleges:

258.     As discussed herein, GGCI and Ver were parties to the Master Confirmation which incorporated the ISDA Master Agreement and ISDA Credit Support Annex by reference.

259.     Pursuant to a trade confirmation dated June 10, 2022, GGCI agreed to purchase from Ver a put option for 10,000 Ether ("ETH"), with a strike price of $5,000 per ETH.

260.     The Master Confirmation executed in connection with this transaction incorporated the 2002 ISDA Master Agreement by reference.

44

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 226 of 637

261.     The 2002 ISDA Master Agreement defines a Misrepresentation by either party as an Event of Default as well.  Pursuant to the 2002 ISDA Master Agreement, any representation that "proves to have been incorrect or misleading in any material respect when made or deemed to have been made or repeated" would be considered an Event of Default.

262.     As discussed herein, GGCI made, and repeated, a number of material misrepresentations and omissions regarding its solvency.  These repeated misrepresentations and omissions constitute a material breach of the agreement.

263.     Ver has suffered, and continues to suffer, irreparable harm as a direct and proximate result of Counter-Defendant's breach of the agreement.

264.     Accordingly, Ver respectfully requests that this Court award all relevant damages caused by Counter-Defendant's breach of contract, including, but not limited to, compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000.00, punitive or exemplary damages for their malicious conduct, all costs and Court fees, reasonable attorneys' fees, as well as any other relief this Court deems just and proper.

## COUNT FOUR

### (Breach of Contract (Misrepresentation) - BTC Options)

265.     Defendant realleges and incorporates all preceding paragraphs as though fully set forth herein, and further alleges:

266.     As discussed herein, GGCI and Ver were parties to the Master Confirmation which incorporated the ISDA Master Agreement and ISDA Credit Support Annex by reference.

267.     Pursuant to a trade confirmation dated June 11, 2022, GGCI agreed to purchase from Ver a put option for 500 Bitcoin ("BTC"), with a strike price of $26,000 per BTC.

45

268.    The Master Confirmation executed in connection with this transaction incorporated the 2002 ISDA Master Agreement by reference.

269.    The 2002 ISDA Master Agreement defines a Misrepresentation by either party as an Event of Default as well.  Pursuant to the 2002 ISDA Master Agreement, any representation that "proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated" would be considered an Event of Default.

270.    As discussed herein, GGCI made, and repeated, a number of material misrepresentations and omissions regarding its solvency.  These repeated misrepresentations and omissions constitute a material breach of the agreement.

271.    Ver has suffered, and continues to suffer, irreparable harm as a direct and proximate result of Counter-Defendant's breach of the agreement.

272.    Accordingly, Ver respectfully requests that this Court award all relevant damages caused by Counter-Defendant's breach of contract, including, but not limited to, compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000.00, punitive or exemplary damages for its malicious conduct, all costs and Court fees, reasonable attorneys' fees, as well as any other relief this Court deems just and proper.

## COUNT FIVE

### (Fraud)

273.    Defendant realleges and incorporates all preceding paragraphs as though fully set forth herein, and alleges as follows:

274.    On June 7, 2022, GGCI began contacting Ver regarding rolling over his in-the-money Ethereum option.  However, Ver was not interested.

46

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 228 of 637

275.    Over the next few days, GGCI continued to try and convince Ver that rolling over his options was the right thing to do, sending articles about the performance of ETH and proposing more favorable terms.  Ver eventually agreed to roll his options.

276.    Shortly after electing to roll over his in-the-money options, GGCI began making collateral demands that were 1) above and beyond any level of collateral required by the parties' agreements and 2) not in line with the parties' previous course of dealing.

277.    Considering the state of the market, namely the Luna and 3AC collapses, Ver was concerned about the solvency of GGCI and began to ask questions.  On June 25, 2022, Ver requested that GGCI provide proof of its solvency.

278.    On June 28, 2022, GGCI delivered a statement of financial condition dated June 20, 2022 (the previously discussed June 20 SOFC).  However, on June 21, 2022, GAP's request for emergency relief in its arbitration against 3AC was denied, requiring GAP and, in turn, GGCI to write down hundreds of millions of dollars in assets.

279.    By sending an incomplete, or otherwise misleading SOFC, GGCI knowingly made a material misrepresentation to Ver regarding its current financial condition.

280.    This material misrepresentation or omission was made by GGCI with the express intent to cause Ver to maintain his Ethereum option position with GGCI and prevent him from discovering GGCI's insolvency and exercising his right to terminate the contract as a result.

281.    Ver relied on the June 20 SOFC statement, accepting the representations of GGCI as accurate, and did in fact continue to maintain his option positions at GGCI.

282.    In the months following the delivery of the intentionally misleading June 20 SOFC, Ver made payments in excess of $60,000,000 to GGCI to maintain his positions and GGCI liquidated over $50,000,000 of Ver's collateral.

47

283.     Had GGCI not knowingly provided inaccurate financial information via the June 20 SOFC, or otherwise disclosed the 3AC write downs resulting from its failure in the 3AC arbitration, Ver never would have continued to make payments to maintain the option and would have terminated the option contracts as a result of GGCI's insolvency.

284.     However, as a direct result of GGCI's intentional misrepresentations Ver did make additional payments and has suffered significant damages.

285.     Accordingly, Ver respectfully requests that this Court award all relevant damages caused by Counter-Defendant's fraud, including, but not limited to, compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000.00, punitive or exemplary damages for their malicious conduct, all costs and Court fees, reasonable attorneys' fees, as well as any other relief this Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Counter-Plaintiff Roger Ver respectfully requests that this Court:

1. Deny Counter-Defendant's claims for relief in their entirety;

2. Award compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000.00 in favor of Ver on his Counterclaims, as well as punitive or exemplary damages, incidental damages, and consequential damages;

3. Award Counter-Plaintiff pre-judgment and post-judgment interest;

4. Award Counter-Plaintiff's reasonable attorney fees, expenses, and the costs of this action; and

5. Award Counter-Plaintiff such other and further relief as this Court may deem just, proper, and equitable under the circumstances.

48

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 230 of 637

## DEMAND FOR JURY TRIAL

Counter-Plaintiff hereby demands a trial by jury of all claims so triable.


**KELMAN PLLC**


Dated: July 31, 2023                    By:      s/: Daniel J. Kelman
                                                 Daniel J. Kelman
                                                 Michael D. Handelsman
                                                 1501 Broadway,
                                                 12th Floor, #2972
                                                 New York, NY 10036
                                                 daniel@kelman.law
                                                 mike@kelman.law

49

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 231 of 637

# Exhibit K

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 232 of 637

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

GGC INTERNATIONAL LIMITED,

                                    Plaintiff,

                v.

ROGER VER,

                                    Defendant.

Index No. 650439/2023

Motion Seq. No. 002

**NOTICE OF MOTION**

**PLEASE TAKE NOTICE**, that upon the accompanying memorandum of law; the Affirmation of Jason Gottlieb dated August 21, 2023 and the exhibits annexed thereto; the Affirmation of Alex van Voorhees dated August 21, 2023 and the exhibits annexed thereto; and upon all prior proceedings heretofore had herein, Plaintiff / Counterclaim-Defendant GGC International Limited will move this Court in the Motion Submission Part Courtroom, Room 130, at the Courthouse located at 60 Centre Street, New York, New York, on the 13th day of September, 2023 at 9:30 am, or as soon thereafter as counsel may be heard, for an order pursuant to CPLR 3211(a)(1) and 3211(a)(7) dismissing the Counterclaims, dated July 31, 2023, filed by Defendant / Counterclaim-Plaintiff Roger Ver, and for such other, further, and different relief that the Court deems just and proper.

**PLEASE TAKE FURTHER NOTICE**, that pursuant to CPLR 2214(b), answering papers, if any, are required to be served upon the undersigned so as to be received at least seven (7) days before the return date of this motion.

Dated:  New York, New York
        August 21, 2023

                                           MORRISON COHEN LLP


                           By: /s/ Jason Gottlieb
                                 Jason Gottlieb
                                 Michael Mix
                                 Vani Upadhyaya
                                 909 Third Avenue
                                 New York, New York 10022
                                 (212) 735-8600

                                 *Counsel for Plaintiff and*
                                 *Counterclaim Defendant GGC*
                                 *International Limited*

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 234 of 637

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

GGC INTERNATIONAL LIMITED,

                              Plaintiff

        v.

ROGER VER,

                              Defendant.

---

Index No. 650439/2023

Motion Seq. No. 002

<br>

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF / COUNTERCLAIM-DEFENDANT GGC INTERNATIONAL LIMITED'S
## MOTION TO DISMISS DEFENDANT / COUNTERCLAIM-PLAINTIFF
## ROGER VER'S AMENDED COUNTERCLAIMS

<br>

MORRISON COHEN LLP
Jason Gottlieb
Michael Mix
Vani Upadhyaya
909 Third Avenue
New York, New York 10022
(212) 735-8600

*Counsel for Plaintiff / Counterclaim-Defendant GGC International Limited*

## TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ...................................................................................... 4

LEGAL STANDARD.............................................................................................. 10

ARGUMENT ........................................................................................................ 11

    I.      VER'S AMENDED ALLEGATIONS ARE INAPPROPRIATE ...................... 11

    II.     THE BREACH OF CONTRACT COUNTERCLAIMS SHOULD BE
           DISMISSED ............................................................................................ 13

           A.     Ver Failed to Comply with the ISDA Master Agreement's Conditions
                  Precedent to Suit ......................................................................... 13

           B.     The Counterclaims Do Not Contain Sufficient Allegations of Insolvency
                  .................................................................................................. 18

    III.    THE FRAUD COUNTERCLAIM SHOULD BE DISMISSED ......................... 20

           A.     The Fraud Counterclaim Is Duplicative of the Breach of Contract
                  Counterclaims ............................................................................. 20

           B.     Ver Has Failed to Allege Fraud With Particularity .................................. 22

           C.     Ver Cannot State a Counterclaim for Fraudulent Omission ..................... 23

           D.     Ver Disclaimed Reliance on Extracontractual Representations ............... 23

CONCLUSION...................................................................................................... 24

WORD COUNT CERTIFICATION ........................................................................ 26

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACE Sec. Corp., Home Equity Loan Tr., Series 2006-SL2 v. DB Structured Prods., Inc.*,
25 N.Y.3d 581 (2015) .......................................................................................................15

*Aetna Cas. & Sur. Co. v. Merchants Mut. Ins. Co.*,
84 A.D.2d 736 (1st Dep't 1981) .....................................................................................11

*Ashwood Capital, Inc. v. OTG Mgmt., Inc.*,
99 A.D.3d 1 (1st Dep't 2012) ....................................................................................13, 14

*Bogoni v. Friedlander*,
197 A.D.2d 281 (1st Dep't 1994) ...................................................................................12

*Chase Manhattan Bank v. N.H. Ins. Co.*,
304 A.D.2d 423 (1st Dep't 2003) ...................................................................................24

*Cronos Grp. Ltd. v. XComIP, LLC*,
156 A.D.3d 54 (1st Dep't 2017) .....................................................................................21

*Dinerman v. Jewish Bd. of Family & Children's Servs., Inc.*,
55 A.D.3d 530 (2d Dep't 2008) ......................................................................................10

*Eagle Eye Collection Corp. v. Shariff*,
190 A.D.3d 600 (1st Dep't 2021) ...................................................................................20

*Erickson Air-Crane, Inc. v. EAC Holdings, L.L.C.*,
84 A.D.3d 464 (1st Dep't 2011) .....................................................................................15

*Eurycleia Partners, LP v. Seward & Kissel, LLP*,
12 N.Y.3d 553 (2009) ...............................................................................................22, 23

*Fawer v. Shipkevich PLLC*,
213 A.D.3d 408 (1st Dep't 2023) ...................................................................................11

*Ferro Fabricators, Inc. v. 1807-1811 Park Ave. Dev. Corp.*,
127 A.D.3d 479 (1st Dep't 2015) ...................................................................................22

ii

*Goldberg v. EEI Holdco, Inc.*,
   Index No. 654617/2020, 2021 N.Y. Misc. LEXIS 6244
   (Sup. Ct. N.Y. Cnty. Dec. 7, 2021) ........................................................................20

*Golub v. Tanenbaum-Harber Co., Inc.*,
   88 A.D.3d 622 (1st Dep't 2011) .............................................................................23

*Greenfield v. Philles Records*,
   98 N.Y.2d 562 (2002) .............................................................................................14

*Harris v. Seward Park Hous. Corp.*,
   79 A.D.3d 425 (1st Dep't 2010) .............................................................................14

*Hinnant v. Carrington Mtge. Servs., LLC*,
   56 Misc. 3d 1205(A) (Sup. Ct. Kings Cnty. 2017) .................................................11

*HSH Nordbank AG v. UBS AG*,
   95 A.D.3d 185 (1st Dep't 2012) .............................................................................24

*Jackson v. YAM Holding Corp.*,
   97 A.D.3d 637 (2d Dep't 2012) ..............................................................................14

*In re Lehman Brothers Holdings, Inc., et al.*,
   No. 08-13555 (JMP), 2011 Bankr. LEXIS 1899
   (S.D.N.Y. Bankr. May 23, 2011) ............................................................................17

*Manipal Educ. Ams., LLC v. Taufiq*,
   203 A.D.3d 662 (1st Dep't 2022) ...........................................................................21

*MHR Capital Partners LP v. Presstek, Inc.*,
   12 N.Y.3d 640 (2009) .............................................................................................15

*Mid-Hudson Val. Fed. Credit Union v. Quartararo & Lois, PLLC*,
   31 N.Y.3d 1090 (2018) ...........................................................................................11

*Morgenthow & Latham v. Bank of N.Y. Co.*,
   305 A.D.2d 74 (1st Dep't 2003) .............................................................................11

*Matter of Northwest 5th & 45th Realty Corp. v. Mitchell, Maxwell & Jackson*,
   164 A.D.3d 1158 (1st Dep't 2018) .........................................................................20

*Pappas v. Tzolis*,
   20 N.Y.3d 233 (2012) .............................................................................................24

*Reiss v. Fin. Performance Corp.*,
   97 N.Y.2d 195 (2001) .............................................................................................13

iii

*Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*,
    60 A.D.3d 61 (1st Dep't 2008) ......................................................................13, 14

*Sea v. Thread Counsel, Inc.*,
    Index No. 653551/2020, 2021 N.Y. Misc. LEXIS 12791
    (Sup. Ct. N.Y. Cnty. Oct. 29, 2021)..............................................................21

*Sebastian Holdings, Inc. v. Deutsche Bank AG*,
    78 A.D.3d 446 (1st Dep't 2010) ....................................................................23

*Sheila C. v. Povich*,
    11 A.D.3d 120 (1st Dep't 2004) ....................................................................10

*SSC NY Corp. v. Inveshare, Inc.*,
    No. 655048/2016, 2018 N.Y. Misc. LEXIS 3202
    (Sup. Ct. N.Y. Cnty. July 24, 2018)..............................................................17

*Vt. Teddy Bear Co. v. 538 Madison Realty Co.*,
    1 N.Y.3d 470 (2004) ......................................................................................13

*W.W.W. Assocs. v. Giancontieri*,
    77 N.Y.2d 157 (1990) ....................................................................................13

*XL Diamonds LLC v. Rosen*,
    No. 656102/2019, 2020 N.Y. Misc. LEXIS 3368
    (Sup. Ct. N.Y. Cnty. July 15, 2020)..............................................................17

**Other Authorities**

CPLR 3013...........................................................................................................11

CPLR 3016.....................................................................................................22, 23

CPLR 3025...........................................................................................................12

CPLR 3211........................................................................................................1, 25

iv

Plaintiff / Counterclaim-Defendant GGC International Limited ("GGC International") originally moved to dismiss the Counterclaims, dated May 9, 2023 filed by Defendant / Counterclaim-Plaintiff Roger Ver ("Ver") (ECF No. 11, the "May 9 Counterclaims").[1]  After GGC International's motion to dismiss was fully briefed, Ver filed an Amended Answer and Counterclaims on July 31, 2023 (ECF No. 32).  Now, GGC International respectfully submits this memorandum of law in support of its motion (the "Motion"), pursuant to CPLR 3211(a)(1) and 3211(a)(7) to dismiss the Amended Counterclaims, dated July 31, 2023 (the "Counterclaims") filed by Ver (together with GGC International, the "Parties").[2]

## PRELIMINARY STATEMENT

Contracts mean what they say, and Ver's Counterclaims plainly reveal that Ver did not follow the contractual prerequisites to file suit.

Ver, who describes himself as "experienced in digital asset investment," entered an agreement with GGC International to trade cryptocurrency options, the Amended and Restated Master Confirmation Agreement for Virtual Currency Put and Call Options Transactions dated as of June 22, 2020 (the "Master Confirmation Agreement").[3]  Through the Master Confirmation Agreement, the Parties also entered the 2002 ISDA Master Agreement (the "ISDA Master

---

[1]    The May 9 Counterclaims are attached as Exhibit A to the August 21, 2023 Affirmation of Jason Gottlieb (the "Gottlieb Aff.").

[2]    The Counterclaims are attached as Exhibit B to the August 21, 2023 Affirmation of Jason Gottlieb (the "Gottlieb Aff.").

[3]    A true and correct copy of the Master Confirmation Agreement is attached as Exhibit 3 to the August 21, 2023 Affirmation of Alex van Voorhees (the "van Voorhees Aff.").

Agreement")[4] and the 1994 ISDA Credit Support Annex (the "ISDA Credit Support Annex")[5], including certain negotiated elections. The ISDA Master Agreement and the ISDA Credit Support Annex are industry-standard documents that provide market participants with relationship terms that govern the trading of over-the-counter derivative transactions. Although Ver asserts several times that the Parties never signed the ISDA Master Agreement or the ISDA Credit Support Annex, the Master Confirmation Agreement explicitly states that the parties are deemed to enter into these documents, and indeed most of Ver's claims rely on the ISDA Master Agreement.

Pursuant to those relationship terms, the Parties entered numerous cryptocurrency options transactions with each other. Ver failed to settle certain options with expiration dates of December 30, 2022, which was an "Event of Default" under the ISDA Master Agreement. Thereafter, GGC International followed the contractual requirements of the ISDA Master Agreement; it provided notice of the default, designated an "Early Termination Date" and then sent Ver a "Calculation Statement" evidencing the amounts owed by Ver in light of his failure to settle the trades. After Ver failed to pay this amount owed, GGC International filed this action (ECF No. 9, the "Complaint").[6]

Ver answered the Complaint and asserted six Counterclaims: four for breach of contract, one for fraud, and one for fraudulent inducement. Ver dropped the fraudulent inducement counterclaim in his Amended Answer and Counterclaims, but still asserts the breach of contract

---

[4]      A true and correct copy of the ISDA Master Agreement is attached as Exhibit 1 to the van Voorhees Aff.

[5]      A true and correct copy of the Credit Support Annex is attached as Exhibit 2 to the van Voorhees Aff.

[6]      The Complaint is attached as Exhibit C to the Gottlieb Aff.

2

and fraud Counterclaims.  All of Ver's Counterclaims are legally insufficient and should be dismissed.

Ver's Counterclaims are each premised on the same set of allegations – that GGC International was insolvent, misrepresented its insolvency and omitted facts pertaining to its insolvency to Ver.  Regardless of the veracity of such allegations – which GGC International vehemently denies – they are insufficient, even at the pleading stage.

Ver asserts that GGC International's alleged insolvency and misrepresentations – which allegedly occurred in mid-June 2022 – constituted an "Event of Default" under the ISDA Master Agreement.  But assuming an Event of Default had occurred, Ver had a choice.  He could have followed the conditions precedent to suit contained in the ISDA Master Agreement, including providing notice to the defaulting party of the alleged Event of Default, designating an "Early Termination Date," and providing a "statement" showing how much is owed.  Ver, by his own allegations, chose not to do so, likely because if Ver had actually thought that GGC International was insolvent, and followed the proper procedures, he still would have been required to pay GGC International a substantial sum under the relevant trades.  Because GGC International paid a premium to purchase the options from Ver, there was no possibility that GGC International would be required to make a net payment; if the options became valueless, GGC International would have just declined to exercise them.  Ver instead allowed the contract to remain outstanding, presumably hoping that he would owe less, and then refused to make the required payment when the options matured.  He is now attempting to circumvent his payment obligations to GGC International by alleging that an Event of Default occurred at some point nearly a year earlier.  But that is not how

3

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 242 of 637

the ISDA Master Agreement works.  Ver's failure to follow the ISDA Master Agreement is fatal to his breach of contract Counterclaims.

The breach of contract Counterclaims also fail to state a claim because GGC International was never insolvent.  Ver alleges that GGC International provided information about its solvency to Ver, but that information uniformly showed that GGC International's assets were greater than its liabilities.  There are no allegations that GGC International has ever been unable to pay any debts, or has ever had any bankruptcy proceeding filed against it.  By Ver's own allegations, GGC International is not insolvent, and never was.

Ver's fraud Counterclaim is also insufficient, for several reasons.  It concerns the same facts and seeks the same quantum of damages as the breach of contract Counterclaims, and thus should be dismissed as duplicative.  Ver fails to plead any misrepresentation with particularity, and to the extent his claim relies on fraudulent omissions, such claim fails for lack of a fiduciary relationship.  And, Ver disclaimed reliance in the relevant contracts, destroying his ability to bring a fraud Counterclaim now.

In sum, Ver's Counterclaims are a thinly disguised attempt to circumvent his own breach of contract.  The Counterclaims should be dismissed.

## STATEMENT OF FACTS

This statement of facts is based on the allegations in the Counterclaims, taken as true for purposes of this Motion, as well as documentary evidence cited herein.[7]

### GGC International and Ver Enter Into the Master Confirmation Agreement

---

[7] While not relevant for this Motion, Ver's Counterclaims contain numerous factual inaccuracies, even outside of the infirmities enumerated in this Motion.

4

Ver describes himself as a "well-known Bitcoin Cash ('BCH') proponent" who is "experienced in digital asset investment." CC ¶¶ 74-75. On or about June 22, 2020, the Parties entered into the Master Confirmation Agreement. Although Ver states that the Master Confirmation merely "referenced" the ISDA Master Agreement and the ISDA Credit Support Annex and that "neither party ever executed and/or signed either of these documents," CC ¶¶ 81-82, the Master Confirmation Agreement – which Ver alleges he did execute, CC ¶ 80 – explicitly states that GGC International and Ver are "deemed" to have entered into the ISDA Master Agreement and the ISDA Credit Support Annex. Master Confirmation Agreement § 1(b). And Section 7(a) of the Master Confirmation Agreement states that the Master Confirmation Agreement "shall supplement, form part of, and be subject to the Form ISDA Master Agreement."[8]

The ISDA Master Agreement, which Ver was deemed to have entered by virtue of the Master Confirmation Agreement, provides the general conditions for payment and delivery. Section 2(a)(i) of the ISDA Master Agreement states that "[e]ach party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement." Section 2(a)(ii) of the ISDA Master Agreement provides that "[p]ayments under this Agreement will be made on the due date for value on the date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency."

Section 5(a) of the ISDA Master Agreement lists several potential "Events of Default." As relevant to Ver's Counterclaims, Section 5(a)(iv) states that it is an Event of a Default if a party

---

[8]    Ver's Counterclaims also are premised on the allegation that GGC International violated the ISDA Master Agreement. As such, even Ver does not believe that the fact that the Parties did not formally sign the ISDA Master Agreement has any legal significance.

5

makes a representation that "proves to have been incorrect or misleading in any material respect."
And Section 5(a)(vii) states that it is an Event of Default where a party "becomes insolvent or is
unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they
become due."

      The ISDA Master Agreement contains a very specific process as to what the non-defaulting
party may elect to do after an Event of Default has occurred.  Section 6(a) states that if an Event
of Default "has occurred and is then continuing," the non-defaulting party may "designate a day
not earlier than the day such notice is effective as an Early Termination Date in respect of all
outstanding Transactions."  Section 6(e)(i) of the ISDA Master Agreement provides that "[i]f
notice designating an Early Termination Date is given under Section 6(a) . . . the Early Termination
Date will occur on the date so designated, whether or not the relevant Event of Default . . . is then
continuing."

      Upon an Early Termination Date, an "Early Termination Amount" is due.  Section 6(e)(i)
of the ISDA Master Agreement sets forth the detailed formula to determine the "Early Termination
Amount."

      Section (6)(d)(i) of the ISDA Master Agreement also states that upon the "occurrence of
an Early Termination Date, each party will make the calculations . . . contemplated by Section
6(e)" and will provide such statement to the other party.  Any "Early Termination Amount will be
payable "on the day on which notice of the amount payable is effective in the case of an Early
Termination Date which is designated or occurs as a result of an Event of Default."  ISDA Master
Agreement § 6(d)(2).  An "Early Termination Amount" payable by one party can be "set-off" by
amounts due to that party.  ISDA Master Agreement § 6(f).

6

Section (9)(a) of the ISDA Master Agreement states that "[t]his Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter. Each of the parties acknowledges that in entering into this Agreement it has not relied on any oral or written representation, warranty or other assurance (except as provided for or referred to in this Agreement) and waives all rights and remedies which might otherwise be available to it in respect thereof, except that nothing in this Agreement will limit or exclude any liability of a party for fraud." And Section 9.a of the Master Confirmation Agreement states that each party is "not relying on any representations except those expressly set forth in the Agreement or this Confirmation."

The Master Confirmation Agreement contains numerous disclaimers. In particular, each Party represented that "it is not relying upon any representations except those expressly set forth in the Agreement or this Confirmation," that "it has made its own investment, hedging, and trading decisions based upon its own judgment and upon any view expressed by the other party or any of its agents," and "it is entering into each Transaction with a full understanding of the terms, conditions and risks thereof and it is capable of and willing to assume those risks." Master Confirmation Agreement § 9.a(iii)-(v).

Section 9.h of the Master Confirmation Agreement contains an additional disclaimer, in capitalized lettering: Ver "ACKNOWLEDGED THAT THE RISK OF LOSS IN TRADING VIRTUAL CURRENCIES SUCH AS BTC OR ETH CAN BE SUBSTANTIAL AND, THEREFORE [VER] HAS CAREFULLY CONSIDERED WHETHER SUCH TRADING IS APPROPRIATE FOR IT IN LIGHT OF ITS CIRCUMSTANCES AND FINANCIAL RESOURCES." Ver further acknowledged that the "volatility and unpredictability of the price of

7

Virtual Currency relative to fiat currency may result in significant loss over a short period of time."

Master Confirmation Agreement § 9.h.i.  Ver also acknowledged that the "value of the Reference

Currency or other Virtual Currency may be derived from the continued willingness of market

participants to exchange fiat currency or other Virtual Currency for it, which may result in the

potential for permanent and total loss of value of a particular Virtual Currency (such as the

Reference Currency) should the market for that Virtual Currency disappear."  Master Confirmation

Agreement § 9.h.vii.

**GGC International and Ver Enter Into Options Transactions That Ver Fails to Settle**

GGC International and Ver entered into numerous cryptocurrency options transactions

governed by the Master Confirmation and the ISDA Master Agreement.  Ver references three

specific transactions in his Counterclaims, each of which was deep in the money to GGC

International.  Pursuant to a trade confirmation dated March 22, 2022, Ver agreed to sell a put

option to GGC International for 70,000 units of BCH, with a strike price of $545 per BCH.  CC ¶

251; van Voorhees Aff. Ex. 4.  Pursuant to a trade confirmation dated June 10, 2022, Ver agreed

to sell a put option to GGC International for 10,000 Ether ("ETH"), with a strike price of $5,000

per ETH.  CC ¶ 259; van Voorhees Aff. Ex. 5.  Pursuant to a trade confirmation dated June 11,

2022, Ver agreed to sell a put option to GGC International for 500 Bitcoin ("BTC"), with a strike

price of $26,000 per BTC.  CC ¶ 267; van Voorhees Aff. Ex. 6.  In each of the three options, GGC

International agreed to pay a premium to Ver.  van Voorhees Aff. Exs. 4-6. Those three options

trades are also the subject of GGC International's affirmative claims for Ver's nonpayment.

Compl. ¶ 36.

8

GGC International's Complaint describes how Ver failed to settle those three options transactions, which all expired in the money to GGC International on December 30, 2022. After GGC International followed the enumerated contractual procedure, GGC International designated an "Early Termination Date," and provided Ver with a statement showing that he owed $20,869,788. Compl. ¶¶ 38-49. Ver failed to pay that amount to GGC International, leading to GGC International initiating this lawsuit against Ver.

## Ver Baldly Alleges that He Is Excused From His Breach Due to Alleged Insolvency

Ver alleges in his Counterclaims that at some point during the contractual relationship between the Parties, GGC International became insolvent. Ver claims that on June 28, 2022, GGC International voluntarily provided Ver with an unaudited statement of financial condition showing its assets and liabilities as of June 20, 2022 (the "June 20 SOFC"). CC ¶ 176. The June 20 SOFC "claimed total assets of $3.063 billion and liabilities of $2.962 billion, which gave GGCI positive equity of just over $100 million." CC ¶ 177.

Ver alleges that GGCI's affiliate Genesis Asia Pacific Limited Pte ("GAP") made loans to third party Three Arrows Capital Limited ("3AC"), a Singapore-based cryptocurrency hedge fund, and when 3AC was on the verge of collapse, GAP made margin calls to 3AC, liquidated 3AC's collateral, and initiated an arbitration against 3AC, including a request for emergency relief. CC ¶¶ 149-51.[9] Ver alleges that after GAP failed to obtain that emergency relief, Genesis Global then injected $151 million into GGCI. CC ¶ 184.

---

[9]     While Ver uses inflammatory rhetoric to describe GAP's actions with respect to its arbitration against 3AC, *see, e.g.* CC ¶ 149 ("On June 12, Genesis executives set the plan in motion"), Ver does not allege that GAP did anything unlawful or inappropriate in that arbitration.

9

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 248 of 637

Ver claims that when he subsequently received an unaudited statement of financial condition showing GGC International's assets and liabilities as of June 30, 2022 (the "June 30 SOFC"), "positive equity had shrunk to $14 million." CC ¶ 214.

Ver further alleges that GGC International held a significant amount of FTT tokens, the token issued by cryptocurrency exchange FTX, which subsequently went bankrupt in November 2022. CC ¶¶ 71, 124. Ver believes that such tokens were overvalued. Ver also alleges that he did not discover GGC International's significant FTT exposure until he subsequently received GGC International's 2021 audited financial statement (the "2021 Audited Financial Statement"). CC ¶¶ 219-26.

Ver thus asserts that "GGCI was insolvent in June 2022 due to various factors, including inaccurate loss recording, failure to apply appropriate discounts to Level 2 digital assets in the midst of a liquidity event, untimely recognition of substantial losses linked to 3AC and related parties, and untimely recognition of losses tied to the FTT-collateralized loan." CC ¶ 156.

## **LEGAL STANDARD**

The sole criterion in considering a motion to dismiss for failure to state a cause of action is whether "from the complaint's four corners factual allegations are discerned which taken together manifest any cause of action cognizable at law." *Dinerman v. Jewish Bd. of Family & Children's Servs., Inc.*, 55 A.D.3d 530, 531 (2d Dep't 2008); *see also Sheila C. v. Povich*, 11 A.D.3d 120, 122 (1st Dep't 2004). A "defendant is entitled to notice of the material elements of each cause of action." *Aetna Cas. & Sur. Co. v. Merchants Mut. Ins. Co.*, 84 A.D.2d 736, 736 (1st Dep't 1981). Even "[l]iberally construing plaintiffs' allegations," a complaint must contain "specificity needed to apprise defendant of the occurrences at issue." *Fawer v. Shipkevich PLLC*, 213 A.D.3d 408,

10

Case 1:24-cv-01533-JPC     Document 1-18     Filed 02/28/24     Page 249 of 637

408 (1st Dep't 2023). *See also Mid-Hudson Val. Fed. Credit Union v. Quartararo & Lois, PLLC*, 31 N.Y.3d 1090, 1091 (2018) (a complaint will be dismissed when it "failed to allege facts 'sufficiently particular to give the court and defendants notice of the transactions, occurrences, or series of transactions or occurrences, intended to be proved.'") (citing CPLR 3013). And "the court cannot strain to give meaning to a pleading which generally fails to state any cognizable claim against the defendants." *Hinnant v. Carrington Mtge. Servs., LLC*, 56 Misc. 3d 1205(A), 1205A (Sup. Ct. Kings Cnty. 2017).

"In those circumstances where the legal conclusions and factual allegations are flatly contradicted by documentary evidence, they are not presumed to be true or accorded every favorable inference." *Morgenthow & Latham v. Bank of N.Y. Co.*, 305 A.D.2d 74, 78 (1st Dep't 2003) (citations and quotation marks omitted).

## ARGUMENT

### I.    VER'S AMENDED ALLEGATIONS ARE INAPPROPRIATE

In his Amended Answer and Counterclaims, Ver inappropriately amends allegations regarding GGC International's alleged insolvency in a transparent attempt to circumvent GGC International's arguments in its Motion to Dismiss and Reply Brief. In particular, in his original Answer and Counterclaims, Ver alleged that GGC International was insolvent in June 2022, but did not include allegations of any insolvency after that point. *See* May 9 Counterclaims ¶¶ 158, 174, 202. Indeed, in Ver's Opposition to GGC International's Motion to Dismiss, Ver continued to argue that GGC International was insolvent in mid-2022, but not after that. In both its Motion to Dismiss and Reply Brief, GGC International argued that Ver failed to allege that any Event of

11

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 250 of 637

Default was "continuing," which triggers the contractual provisions for "Event of Default" under the ISDA Master Agreement. *See* ISDA Master Agreement §§ 6(a), (c).

Then, one business day after GGC International filed its Reply Brief, Ver amended his allegations to speculate not only that GGC International was insolvent at some point in 2022, but that "GGCI's insolvency was never cured by an injection of capital from DCG," and that "GGCI remained insolvent..." CC ¶¶ 187, 190. Ver's new allegations are manufactured solely to get around GGC International's arguments that Ver never alleged that any Event of Default was "continuing." Ver twice filed papers alleging GGC International's insolvency in mid-2022 only, and now impermissibly attempts to alter material facts to pretend that an alleged insolvency was "continuing" in a desperate attempt to preserve his claims.

The First Department admonished similar attempts to inappropriately amend pleadings: "A word is in order regarding the function and scope of an amendment of pleadings pursuant to CPLR 3025. The purpose of this procedural device is to permit the plaintiff to amend his theory of recovery to comply with the facts as they unfold, not to permit the plaintiff to alter his representation of material facts to best suit his theory of recovery and thereby overcome defenses raised in opposition." *See Bogoni v. Friedlander*, 197 A.D.2d 281, 292 (1st Dep't 1994). Ver's new allegations are an inappropriate attempt to amend material facts involving the timing of GGC International's alleged insolvency to comply with his theory of recovery, and overcome the meritorious defenses that GGC International fully briefed in its Motion to Dismiss and Reply Brief.

In light of clear First Department precedent, this Court should disregard Ver's inappropriately manufactured allegations that GGC International's insolvency was "continuing."

12

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 251 of 637

Additionally, for the reasons discussed below, including the unambiguous language of the ISDA Master Agreement, Ver's futile attempts at amending these allegations still fail.

## II.  THE BREACH OF CONTRACT COUNTERCLAIMS SHOULD BE DISMISSED

### A.  Ver Failed to Comply with the ISDA Master Agreement's Conditions Precedent to Suit

"According to well-established rules of contract interpretation, 'when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms.'" *Ashwood Capital, Inc. v. OTG Mgmt., Inc.*, 99 A.D.3d 1, 7 (1st Dep't 2012) (quoting *W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990)). In "commercial contracts negotiated at arm's length by sophisticated counseled businesspeople . . . 'courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include.'" *Ashwood Capital*, *Inc.* 99 A.D.3d at 7 (quoting *Vt. Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004)). Courts "may not by construction add or excise terms, nor distort the meaning of those used and thereby 'make a new contract for the parties under the guise of interpreting the writing.'" *Ashwood Capital, Inc.*, 99 A.D.3d at 7 (quoting *Reiss v. Fin. Performance Corp.*, 97 N.Y.2d 195, 199 (2001)).

A "contract is unambiguous if 'on its face it is reasonably susceptible of only one meaning.' Parol evidence cannot be used to create an ambiguity where the words of the parties' agreement are otherwise clear and unambiguous." *Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 60 A.D.3d 61, 66 (1st Dep't 2008) (quoting *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (2002)). "[C]lear contractual language does not become ambiguous simply because the parties to the litigation argue different interpretations." *Riverside S. Planning Corp.*, 60 A.D.3d at 67

13

(citations omitted). "Whether a contract is ambiguous must be determined by the court as a matter of law, looking solely to the plain language used by the parties within the four corners of the contract to discern its meaning and not to extrinsic sources." *Ashwood Capital, Inc.*, 99 A.D.3d at 7-8.

The elements of breach of contract are "the existence of a contract, the plaintiff's performance thereunder, the defendant's breach thereof, and resulting damages." *Harris v. Seward Park Hous. Corp.*, 79 A.D.3d 425, 426 (1st Dep't 2010) (citation omitted). Courts will dismiss claims for breach of contract if the contract unambiguously contradicts the plaintiff's allegations. *See* 99 A.D.3d at 8-9; 60 A.D.3d at 67; *Jackson v. YAM Holding Corp.*, 97 A.D.3d 637, 638-39 (2d Dep't 2012) (dismissing claim for breach of contract and declining to consider extrinsic evidence of parties' intent).

Ver asserts four Counterclaims for breach of contract. Each is premised on Ver's allegation that GGC International was insolvent. The first Counterclaim alleges that GGC International breached the ISDA Master Agreement because it is an "Event of Default" under that agreement for a party to be insolvent. CC ¶¶ 237-48. While this Counterclaim fails to reference a specific clause in the ISDA Master Agreement, it is apparent that Ver is alleging a breach of Section 5(a)(vii) of the ISDA Master Agreement. The second to fourth Counterclaims assert that GGC International made a "misrepresentation" about its solvency to Ver. CC ¶¶ 249-72. While these Counterclaims fail to reference a specific clause in the ISDA Master Agreement, it is evident that Ver is alleging a breach of Section 5(a)(iv) of the ISDA Master Agreement, stating that it is an "Event of Default" for one party to make a misrepresentation to the other party.

14

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 253 of 637

Regardless of the truth of Ver's allegations (which are absolutely false), the four Counterclaims for breach of contract each suffer from the identical key legal flaw requiring dismissal – Ver failed to follow the ISDA Master Agreement's contractual pre-requisites to sue for breach of that agreement, which served as conditions precedent.

The Court of Appeals has explained that a condition precedent to recovery is an "act or event, other than a lapse in time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises." *MHR Capital Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 645 (2009) (affirming dismissal of complaint) (citation and quotation marks omitted). The Court of Appeals "recognized that the use of terms such as 'if,' 'unless' and 'until' constitutes 'unmistakable language of condition.'" *Id.* (quotation marks omitted). "Express conditions must be literally performed; substantial performance will not suffice." *Id.  See also ACE Sec. Corp., Home Equity Loan Tr., Series 2006-SL2 v. DB Structured Prods., Inc.*, 25 N.Y.3d 581, 589 (2015) ("the two certificateholders did not validly commence this action because they failed to comply with the contractual condition precedent to suit"); *Erickson Air-Crane, Inc. v. EAC Holdings, L.L.C.*, 84 A.D.3d 464, 465 (1st Dep't 2011) (affirming dismissal for plaintiff's failure to comply with a condition precedent).

As explained above, the ISDA Master Agreement contains a very specific procedure that is available to a non-defaulting party in the event of insolvency or misrepresentation. The ISDA Master Agreement plainly states that "[i]f at any time an Event of Default with respect to a party . . . has occurred and is then continuing, the other party may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate" an "Early Termination Date in respect to all outstanding Transactions," which will "occur on the date so designated."  ISDA

15

Master Agreement §§ 6(a), (c).  Then, the ISDA Master Agreement contains a detailed process by which the parties make calculations as to how much is owed (factoring in set-offs for other transactions), and provide a "statement" showing those calculations.  ISDA Master Agreement §§ 6(d)-(f).  Ver concedes this contractual procedure; he alleges that "in the event of default, all transactions were to be terminated, and the parties were expected to settle any financial obligations at that point."  CC ¶ 244.  Notably, Section 6(a) uses conditional language; it only permits the non-defaulting party to declare an Early Termination Date – in turn requiring the parties to engage in the process set forth in Sections (6)(c)-(f) of the ISDA Master Agreement – "[i]f at any time an Event of Default . . . has occurred and is then occurring" (emphasis added).  The ISDA Master Agreement thus utilizes the conditional language indicative of a condition precedent as explained by the Court of Appeals in *MHR Capital Partners*.

Thus, after the non-defaulting party follows the procedures in Section 6 of the ISDA Master Agreement, if the defaulting party does not pay the amount owed, that failure to pay would be a breach.  Indeed, Ver's failure to pay after GGC International followed these procedures is precisely what GGC International is asserting in its claims against Ver.

Section 6's requirements make logical sense.  When a non-defaulting party takes no action after its counterparty defaults, it does not need to change its market position or re-hedge its risk.  This is also why a non-defaulting party cannot designate an Early Termination Date more than twenty days into the future under Section 6(a) of the ISDA Master Agreement:  timing of the valuation matters.  A party should not be permanently excused from making payments on its obligations or allowed to circumvent its contractual obligations by arguing that its counterparty was in breach at some point in the distant past.  *See, e.g.*, *SSC NY Corp. v. Inveshare, Inc.*, No.

16

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 255 of 637

655048/2016, 2018 N.Y. Misc. LEXIS 3202, at *10-11 (Sup. Ct. N.Y. Cnty. July 24, 2018)

(denying motion for leave to assert counterclaim and explaining that an immaterial breach did not

excuse the non-defaulting party's payment obligations). *See also* Gottlieb Aff. Ex. D (relevant

portions of transcript of oral decision in *In re Lehman Brothers Holdings, Inc., et al.*, No. 08-13555

(JMP), 2011 Bankr. LEXIS 1899 (S.D.N.Y. Bankr. May 23, 2011) finding that counterparty to

ISDA agreement governing derivatives transactions was not excused from its payment obligations

despite Lehman Brothers' bankruptcy).

Ver does not allege that he followed these pre-requisites to suit or that he provided any

notice whatsoever of GGC International's alleged default. He does not allege that he provided

notice to GGC International "specifying the relevant Event of Default." He does not allege that

he ever designated an "Early Termination Date." And, he ignores the significant sums of money

that he owes GGC International, and does not sufficiently allege damages stemming from the

purported breach of contract. *See XL Diamonds LLC v. Rosen*, No. 656102/2019, 2020 N.Y. Misc.

LEXIS 3368, at *8 (Sup. Ct. N.Y. Cnty. July 15, 2020) ("where a plaintiff fails to allege any

'damages flowing from the breach allege[s] and relies, instead, on wholly speculative theories of

damages, dismissal of the breach of contract claim is in order'").

For the first time in his Amended Answer and Counterclaims, Ver implies that GGC

International's purported insolvency is "continuing." CC ¶¶ 187, 190. Even if this Court chooses

not to disregard these allegations as discussed above, these allegations are nonsensical. Ver alleges

that GGC International employed "inadequate accounting methods" and "[a]s a result, GGCI has

been insolvent for as long as those methods have been employed." CC ¶ 120. Even assuming

*arguendo* that GGC International's accounting methods are "inadequate," Ver fails to explain why

17

that would mean that GGC International is insolvent. Ver offers no facts about GGC International's purported insolvency following mid-2022, or any facts indicating that an alleged insolvency is "continuing" to this day. Even with these amended allegations, Ver fails to meet the contractual prerequisites to bring suit.

After his own breach, Ver allowed the contracts to be terminated by GGC International and is now trying to circumvent his contractual obligations by alleging that GGC International was insolvent. That is not permitted by the relevant contracts. Ver's entire Counterclaims are thus premised on a made-for-litigation allegation that should be rejected even at the pleading stage.

Accordingly, having failed to follow the ISDA Master Agreement's conditions precedent to recovery, Ver's four breach of contract Counterclaims fail to state a claim and should be dismissed.

### B.  The Counterclaims Do Not Contain Sufficient Allegations of Insolvency

Ver's four Counterclaims for breach of contract fail for the additional reason that there are insufficient allegations of GGC International's insolvency. To the contrary, Ver's allegations support the allegation that GGC International was not insolvent.

Section 5(a)(vii) states that it is an "Event of Default" if a party, *inter alia*, "becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due." Ver fails to allege any filed insolvency proceeding for GGC International, because GGC International has never filed for insolvency (or been involuntarily put into an insolvency proceeding).[10] Ver does not allege that GGC International has ever been unable

---

[10]    To the contrary, as Ver admits, other Genesis entities have filed for bankruptcy protection in the Southern District of New York, CC ¶ 68; GGC International notably is not part of the bankruptcy.

18

to pay its debts or has admitted such inability in writing. Ver pleads that he received multiple financial documents from GGC International but, upon his own allegations, all of them show that GGC International's assets were greater than its liabilities. *See* CC ¶¶ 176-177, 214.

In an attempt to circumvent that basic math, Ver points to a number of facts (including facts extrinsic to GGC International) and makes the conclusory allegation that GGC International's financial statements must be wrong. For example, he complains that GGC International's balance sheet utilized the mark-to-market value of certain cryptocurrency tokens within GGC International's possession without discounting the assets' value given the potential for volatility or illiquidity in the market, CC ¶¶ 111-22, even though Ver admits that the mark-to-market valuation was set forth in its <u>audited</u> financial statement, i.e., was determined by GGC International's auditor as of the date set forth therein. CC ¶ 219. He also does not allege what the value of those tokens should have been.

Next, Ver alleges that GGC International suffered losses because an affiliate, Genesis Asia Pacific Limited Pte (not GGC International) lost a motion in an arbitration to temporarily freeze certain assets, causing GGC International to write down its assets, CC ¶ 154, but again alleges that GGC International had positive equity by the June 30 SOFC. CC ¶ 214. Ver speculates that GGC International must have been insolvent on June 25, 2022, between the June 20 SOFC and the June 30 SOFC, CC ¶ 173, but does not explain why he chose that date or what GGC International's assets and liabilities were on that exact date. Ver makes the post-hoc allegation that certain FTT tokens possessed by GGC International were overvalued because months later, FTX collapsed and filed for bankruptcy protection (in <u>November</u> 2022), CC ¶¶ 123-37, but FTX's November 2022 failure does not *ipso facto* mean that GGC International was insolvent three months earlier.

19

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 258 of 637

Then, Ver alleges that DCG executed a promissory note payable to Genesis Global, and Genesis Global injected $151 million of capital into GGC International. CC ¶¶ 182, 184. Despite this, Ver alleges that DCG and Genesis Global engaged in an "accounting farce," CC ¶ 190, and that "GGCI remained insolvent afterwards." CC ¶ 187. These abstract allegations echo Ver's speculations that GGC International's financial statements must be wrong, and are belied by the documents themselves. CC ¶ 214.

In total, Ver's allegations are completely speculative and conclusory and do not suffice. His Counterclaims for breach of contract should be dismissed. *See Matter of Northwest 5th & 45th Realty Corp. v. Mitchell, Maxwell & Jackson*, 164 A.D.3d 1158, 1158 (1st Dep't 2018) (denying petition and finding that petitioner failed to make a prima facie case of respondent's insolvency where "petition made no allegations about the fair salable value of [respondent's] assets"); *Eagle Eye Collection Corp. v. Shariff*, 190 A.D.3d 600, 602 (1st Dep't 2021) (affirming dismissal of cause of action because "plaintiff's conclusory allegations of insolvency does not suffice to support its claim"); *Goldberg v. EEI Holdco, Inc.*, Index No. 654617/2020, 2021 N.Y. Misc. LEXIS 6244, at *4-5 (Sup. Ct. N.Y. Cnty. Dec. 7, 2021) ("plaintiff's conclusory allegation of insolvency does not suffice," noting that "it is not Defendants' burden to show that Holdco/EEI was *not* insolvent") (emphasis in original).

## III.  THE FRAUD COUNTERCLAIM SHOULD BE DISMISSED

### A.  The Fraud Counterclaim Is Duplicative of the Breach of Contract Counterclaims

Ver's fraud Counterclaim should be dismissed as duplicative of Ver's four breach of contract Counterclaims. Under longstanding New York law, "a fraud claim is not stated by allegations that simply duplicate, in the facts alleged and damages sought, a claim for breach of

20

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 259 of 637

contract." *Cronos Grp. Ltd. v. XComIP, LLC*, <u>156 A.D.3d 54</u>, 62 (1st Dep't 2017).  The First Department "has held numerous times that a fraud claim that arises from the same facts as an accompanying contract claim, seeks identical damages and does not allege a breach of any duty collateral to or independent of the parties' agreements is subject to dismissal as redundant of the contract claim." *Id.* at 62-63 (citations and internal quotation marks).

Applying this principle, courts routinely dismiss as duplicative fraud claims based on the same facts underlying a contract claim.  *See, e.g.*, *Manipal Educ. Ams., LLC v. Taufiq*, <u>203 A.D.3d 662</u>, 663 (1st Dep't 2022) ("The fraud claim against these defendants should also be dismissed . . . as duplicative of the breach of contract claim"); *Land 'n Sea v. Thread Counsel, Inc.*, Index No. 653551/2020, <u>2021 N.Y. Misc. LEXIS 12791</u> (Sup. Ct. N.Y. Cnty. Oct. 29, 2021) (dismissing fraud claims that "are based on the same facts as its breach of contract cause of action and plaintiff[s] seeks the same damages on its fraud and breach of contract claims").

Ver's fraud Counterclaim duplicates his four breach of contract Counterclaims.  Each of his four breach of contract Counterclaims are premised on Ver's allegation that GGC International was insolvent and made misrepresentations about such insolvency (including about a dispute with an unrelated third party 3AC), in violation of the ISDA Master Agreement.   Ver's fraud Counterclaim is based on the exact same set of facts.  Ver's fraud Counterclaim alleges that GGC International "knowingly made a material misrepresentation to Mr. Ver regarding its current financial condition" and that he was prevented "from discovering GGCI's insolvency and exercising his right to terminate the contract as a result."  CC ¶¶ 279-80.  Each of the five causes of action seeks the <u>exact same quantum of damages</u>:  $20,000,000, plus punitive damages, and attorneys' fees and costs.  *Compare* CC ¶¶ 248, 256, 264, 272 *with* CC ¶¶ 285.

21

New York law thus requires dismissal of the fraud Counterclaim as duplicative of the breach of contract Counterclaims.

### B.     Ver Has Failed to Allege Fraud With Particularity

"The elements of a cause of action for fraud require a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages." *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559 (2009). Critically, "claim[s] rooted in fraud must be pleaded with the requisite particularity under CPLR 3016(b)."[11] *Id.  See also Ferro Fabricators, Inc. v. 1807-1811 Park Ave. Dev. Corp.*, 127 A.D.3d 479, 480 (1st Dep't 2015) ("[T]he third-party complaint only contains general allegations as to the alleged misrepresentations and virtually no information as to when and by whom these representations were made.").

Ver's Counterclaim for fraud fails to satisfy CPLR 3016(b).

The fraud Counterclaim fails to plead any misrepresentation with particularity.  At most, Ver pleads that GGC International provided Ver with the June 20 SOFC but did not provide Ver with information about an arbitrator's denial of emergency relief sought by a different Genesis entity, GAP, against a third party 3AC, which Ver believes caused GGCI to "write down hundreds of millions of dollars in assets."  CC ¶ 278.  But, as explained above, the June 20 SOFC does not contain any misrepresentations, nor does Ver allege any such misrepresentations with particularity. Because the fraud Counterclaim fails to meet CPLR 3016(b), it should be dismissed.

---

[11]     CPLR 3016(b) states that "[w]here a cause of action or defense is based upon misrepresentation, fraud, mistake, willful default, breach of trust or undue influence, the circumstances constituting the wrong shall be stated in detail."

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 261 of 637

### C.    <u>Ver Cannot State a Counterclaim for Fraudulent Omission</u>

To the extent that Ver is alleging fraudulent <u>omissions</u> to support his fraud Counterclaim, such claims would fail because "an omission does not constitute fraud unless there is a fiduciary relationship between the parties." *Eurycleia Partners, LP*, 46 A.D.3d at 402. *See also Golub v. Tanenbaum-Harber Co., Inc.*, 88 A.D.3d 622, 622 (1st Dep't 2011) (same); *Sebastian Holdings, Inc. v. Deutsche Bank AG*, 78 A.D.3d 446, 447 (1st Dep't 2010) ("[T]he lack of a fiduciary relationship between the parties is fatal to plaintiff's claims for . . . fraudulent concealment.").

Ver's allegation that when GGC International provided Ver with the June 20 SOFC on June 28, 2022, it omitted to inform Ver of an order in the 3AC arbitration that had occurred on June 21, 2022, CC ¶¶ 278-79, is plainly an alleged omission, not an affirmative misrepresentation. Ver's allegation that GGC International did not disclose to Ver that its affiliate GAP was issuing margin calls to 3AC and liquidating 3AC's collateral is also an omission. Yet, Ver does not allege that it had any fiduciary relationship with GGC International. To the contrary, each Party represented in the Master Confirmation Agreement that "neither the other party nor any of its agents are acting as a fiduciary for it." Master Confirmation Agreement § 9.a(ii). And the Counterclaims plainly allege that GGC International and Ver had an arms' length business relationship. Because there is no fiduciary relationship between GGC International and Ver, Ver cannot assert a claim against GGC International based on an allegedly fraudulent omission.

### D.    <u>Ver Disclaimed Reliance on Extracontractual Representations</u>

Ver's fraud Counterclaim fails for the additional reason that he disclaimed reliance on any extracontractual representations. Under New York law, disclaimers that parties are "not relying on any representations as to the very matter as to which they now claim they were defrauded," will

render a fraud claim deficient.  *Pappas v. Tzolis*, <u>20 N.Y.3d 233</u> (2012) (disclaimers in a pre-litigation agreement governing the sale of LLC membership interests precluded fraud claims).  *See also HSH Nordbank AG v. UBS AG*, <u>95 A.D.3d 185</u>, 201 (1st Dep't 2012) ("[t]o permit [plaintiff] to sue [defendant] for fraud based on extracontractual representations concerning the risk level of the notes would 'in effect condone [plaintiff's] own fraud in deliberately misrepresenting its true intention' when it disclaimed reliance on any such representations at the time of contracting.");  *Chase Manhattan Bank v. N.H. Ins. Co.*, <u>304 A.D.2d 423</u>, 424 (1st Dep't 2003).

Here, the documentary evidence unambiguously shows that Ver agreed he was not relying on statements made by GGC International, would perform his own investigation, and acknowledged that cryptocurrency assets were volatile and unpredictable.  Master Confirmation Agreement ¶¶ 9.a, 9.h, 9.h.i.  Based on these provisions, Ver disclaimed reliance on any alleged extracontractual representations purportedly made by GGC International.  Without a basis to plead reliance, Ver cannot state a claim for fraud.

<u>CONCLUSION</u>

For the reasons cited herein, the Court should issue an Order pursuant to CPLR <u>3211(a)(1)</u> and <u>3211(a)(7)</u> the Counterclaims in their entirety.

24

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 263 of 637

Dated:  New York, New York
        August 21, 2023

                                MORRISON COHEN LLP


                                By:    /s/ *Jason Gottlieb*
                                       Jason Gottlieb
                                       Michael Mix
                                       Vani Upadhyaya
                                       909 Third Avenue
                                       New York, New York 10022
                                       (212) 735-8600

                                       *Counsel for Plaintiff / Counterclaim-*
                                       *Defendant GGC International*
                                       *Limited*

25

## **WORD COUNT CERTIFICATION**

Pursuant to Rule 17 of subdivision (g) of section 202.70 of the Uniform Rules for the

Supreme Court and County Court (Rules of Practice for the Commercial Division of the

Supreme Court), I hereby certify that the total number of words in this memorandum of law,

excluding the caption, signature block, and word count certification is 6,984.


Dated: New York, New York
      August 21, 2023

                                        _____*/s/ Jason Gottlieb*_____
                                                Jason Gottlieb

26

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| GGC INTERNATIONAL LIMITED, | Index No. 650439/2023 |
| Plaintiff, | Motion Seq. No. 002 |
| v. | **AFFIRMATION OF JASON GOTTLIEB** |
| ROGER VER, | |
| Defendant. | |

JASON GOTTLIEB, an attorney duly admitted to practice before the Courts of the State of New York, affirms the following to be true under penalties of perjury and pursuant to CPLR 2106:

1.      I am a member of Morrison Cohen LLP, attorneys for Plaintiff / Counterclaim-Defendant GGC International Limited ("GGC International").  I am fully familiar with the facts and circumstances contained in this affirmation.

2.      I submit this affirmation in support of GGC International's motion to dismiss the counterclaims of Defendant / Counterclaim-Plaintiff Roger Ver ("Ver").

3.      Attached hereto as **Exhibit A** is a true and correct copy of Ver's Answer and Counterclaims dated May 9, 2023 (NYSCEF 11).

4.      Attached hereto as **Exhibit B** is a true and correct copy of Ver's Amended Answer and Counterclaims dated July 31, 2023 (NYSCEF 32).

5.      Attached hereto as **Exhibit C** is a true and correct copy of GGC International's Complaint against Ver, dated March 28, 2023 (NYSCEF No. 9).

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 266 of 637

6.      Attached hereto as **Exhibit D** is a true and correct copy of relevant portions of a

transcript of an oral decision, obtained from PACER, in *In re Lehman Brothers Holdings, Inc., et*

*al.*, No. 08-13555 (JMP), 2011 Bankr. LEXIS 1899 (S.D.N.Y. Bankr. May 23, 2011).

Dated:  New York, New York
        August 21, 2023


                                              _/s/ Jason Gottlieb _____
                                              Jason Gottlieb

2

## **WORD COUNT CERTIFICATION**

Pursuant to Rule 17 of subdivision (g) of section 202.70 of the Uniform Rules for the

Supreme Court and County Court (Rules of Practice for the Commercial Division of the

Supreme Court), I hereby certify that the total number of words in this memorandum of law,

excluding the caption, signature block, and word count certification is 204.

Dated: New York, New York
      August 21, 2023

                                  _/s/ Jason Gottlieb_ _____
                                         Jason Gottlieb

# Exhibit A

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 269 of 637

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| GENESIS GLOBAL CAPITAL<br>INTERNATIONAL LIMITED,<br><br>                      Plaintiff,<br><br>                v.<br><br>ROGER VER,<br><br>                    Defendant. | Index No. 650439/2023<br><br>**ANSWER AND<br>COUNTERCLAIM OF<br>ROGER VER** |

Defendant, Roger Ver ("Ver"), by and through his attorneys, Kelman PLLC, in response to the allegations contained in the complaint of Genesis Global Capital International Limited ("GGCI") filed herein, alleges as follows:

## INTRODUCTION

This case exposes the deceptive tactics of an insolvent derivatives trading desk desperate to remain afloat. GGCI's own derivatives contracts mandated continuous solvency. Yet when Ver sought confirmation of their financial status, GGCI deceived him with misleading financial information and induced him to provide tens of millions of dollars in additional collateral.

In June 2022, GGCI faced insolvency as Three Arrows Capital ("3AC") started to collapse. Desperate for assets, they targeted Ver, a significant customer with multiple expiring options that month. To collect from him, GGCI let Ver's out-of-the-money options expire; to avoid paying him, GGCI persuaded Ver to roll in-the-money options to a later date. Meanwhile, Genesis secretly planned to margin call and liquidate 3AC immediately after the roll, which would drive Ver's expiring positions to new lows.

The moment Ver's out-of-the-money June options expired, GGCI abruptly demanded that Ver over-collateralize the positions he had just rolled by a staggering 300%. Since GGCI had

1

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 270 of 637

always accepted digital assets as collateral at mark-to-market prices, this sudden and unprecedented low valuation raised Ver's suspicions about GGCI's solvency.

In fact, GGCI was attempting to cover up their insolvency by squeezing Ver for exorbitant sums of collateral. Although GGCI outwardly applied a low valuation to Ver's digital assets, once they had them in hand, GGCI would add them to their balance sheet as assets valued mark-to-market. This accounting trick promised to boost GGCI's assets by several hundred million dollars and return them to solvency.

Ver demanded proof of GGCI's solvency before he would provide any further collateral. GGCI then provided Ver with a Statement of Financial Condition ("SOFC") dated June 20, 2022, which misleadingly portrayed a narrow positive equity. In truth, however, GGCI was already insolvent. The SOFC hid GGCI's insolvency by using the same accounting trick — overvaluing illiquid digital assets by using undiscounted mark-to-market prices. Had GGCI applied appropriate discounts to their digital assets, as they demanded from Ver, their SOFC would have revealed their insolvency and Ver would have terminated the contracts as a result of GGCI's default.

In December 2022, the collapse of the FTX exchange and Alameda Research revealed that GGCI had been insolvent all along. Ver was alerted to GGCI's insolvency by an interview wherein FTX and Alameda co-founder Sam Bankman-Fried stated that Alameda had repaid a $2.5 billion dollar loan to "Genesis" in August 2022. This appeared to be an obvious preference transfer that would be subject to clawback.

Citing the $2.5 billion repayment from Alameda, Ver requested that GGCI provide further assurances that it had been solvent in June 2022. Ver reminded GGCI that he had faithfully provided additional collateral for months, including a substantial $37 million in

2

payments just weeks earlier. GGCI acknowledged that the timing and size of Ver's recent collateral contributions underscored his genuine concern, since he could have simply raised these arguments instead of paying GGCI $37 million dollars.

Consequently, GGCI reluctantly shared its 2021 audited financials with Ver, and denied that it had ever had any involvement with FTX or Alameda. However, analysis of GGCI's 2021 financials directly contradicted these claims. GGCI's 2021 financials revealed that it had allowed a single counterparty to open a $2.5 billion position, collateralized exclusively by FTX's own FTT tokens, which were valued at inflated mark-to-market prices. It was evident that these FTT tokens had come from Alameda.

Despite GGCI's repeated misrepresentations and false assurances of solvency, Ver maintains his willingness to pay any outstanding sums owed, provided GGCI can finally demonstrate they were solvent at the relevant times. To date, they have yet to do so.

## ANSWER TO THE COMPLAINT

### Preliminary Statement

1.      Defendant denies the allegations of paragraph 1.

2.      Defendant denies the allegations of paragraph 2.

3.      Defendant denies the allegations of paragraph 3 and alleges the documents referenced therein speak for themselves. Further, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms. Further, the parties also did not execute the ISDA Credit Support Annex, and no elections were made as to Section 13 of that agreement, entitled "Elections and Variables."

3

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 272 of 637

4.      Defendant lacks sufficient information and knowledge to form a belief as to the allegations contained in paragraph 4.

5.      Defendant admits that the Master Confirmation Agreement makes certain elections and modifications to the 2002 ISDA Master Agreement and the ISDA Credit Support Annex as alleged in paragraph 5.  However, the parties never executed a 2002 ISDA Master Agreement or the ISDA Credit Support Annex, and no elections were made as to the schedule to the 2002 ISDA Master Agreement or Section 13 of the ISDA Support Annex, each of which contain material terms.

6.      Defendant lacks sufficient information and knowledge to form a belief as to the allegations contained in paragraph 6, but believes same to be true.

7.      Defendant denies the allegations contained in paragraph 7.  As discussed in Mr. Ver's counterclaim below GGCI was likely insolvent well in advance of December 2022.  The precise date of GGCI's insolvency is not currently known, but this dispute may implicate option contracts with different expiration dates.

8.      Defendant denies the allegations contained in paragraph 8.  As will be evident from Mr. Ver's counterclaim, Plaintiff was in default of the option agreements well in advance of December 2022 and, in fact, owes Mr. Ver damages estimated to be well in excess of $20 million.

9.      Defendant admits receiving the notices referenced in paragraph 9 but denies that he owed GGCI anything as a result of its default and breach of the contracts between the parties.

10.     Defendant admits receiving the "Calculation Statement" referenced in paragraph 10 but denies that he owed GGCI anything as a result of its default and breach of the contracts between the parties.

4

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 273 of 637

11.     Defendant admits the allegations contained in paragraph 11 that he has failed to pay the sums identified in paragraph 10 as the funds requested are not duly owed as a result of GGCI's default and breach of the contracts between the parties.

12.     Defendant denies the allegations contained in paragraph 12.

13.     Defendant denies the allegations contained in paragraph 13 and states that the parties did not execute a 2002 ISDA Master Agreement or the schedules attached thereto which contain material terms.

## The Parties

14.     Defendant lacks sufficient knowledge and information to form a belief as to the allegations contained in paragraph 14.

15.     Defendant admits the allegations contained in paragraph 15.  Mr. Ver is a citizen of St. Kitts, but does not reside at 858 Zenway Blvd. Unit 15-203, Frigate Bay, St. Kitts and Nevis.

## Jurisdiction and Venue

16.     Defendant admits the allegations contained in paragraph 16.  While the Master Confirmation makes reference to the 2002 ISDA Master Agreement and ISDA Support Annex, no such agreements were executed by the parties, and no elections were made as to the schedule to the 2002 ISDA Master Agreement or Section 13 of the ISDA Support Annex, which contain material terms.

17.     Defendant admits the allegations contained in paragraph 17.

18.     Defendant admits the allegations contained in paragraph 18.

## Statement of Facts

19.     Defendant admits the allegations contained in paragraph 19.

5

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 274 of 637

20.    Defendant denies the allegations contained in paragraph 20.  While the Master Confirmation makes reference to the 2002 ISDA Master Agreement and ISDA Support Annex, no such agreements were executed by the parties, and no elections were made as to the schedule to the 2002 ISDA Master Agreement or Section 13 of the ISDA Support Annex, which contain material terms.

21.    Defendant admits the allegations contained in paragraph 21.

22.    Defendant admits that the 2002 ISDA Master Agreement "provides general conditions for payment and delivery" as alleged in paragraph 22.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

23.    Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 23.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

24.    Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 24.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

25.    Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 25.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

6

26.     Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 26.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

27.     Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 27.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

28.     Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 28.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

29.     Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 29.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

30.     Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 30.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.   Further, the document speaks for itself.

31.     Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 31.  However, the parties never executed a 2002 ISDA Master Agreement,

7

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 276 of 637

and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement. Further, the document speaks for itself.

32.     Defendant admits the allegations contained in paragraph 32. Further, the document speaks for itself.

33.     Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 33. However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement. Further, the document speaks for itself.

34.     Defendant admits that the parties executed various option transactions as alleged in paragraph 34 but currently lacks sufficient knowledge and information to form a belief as to whether a transaction confirmation was sent for each and every transaction.

35.     Defendant denies the allegations contained in paragraph 35. However, Mr. Ver admits that he did not terminate the contracts as a direct result of GGCI's multiple intentional misrepresentations regarding its solvency and other related issues.

36.     Defendant denies the allegations contained in paragraph 36 to the extent that GGCI is attempting to limit this dispute to three transactions. Upon information and belief, GGCI was insolvent by June 2022 and, in fact, owed Mr. Ver substantial sums. Defendant admits that the terms of the three option contracts reflected in paragraph 36 are accurate.

37.     Defendant admits the allegations contained in paragraph 37. Further, the documents speak for themselves.

38.     Defendant admits that three option contracts expired in December 2022 as alleged in paragraph 38, but denies that these are the only option contracts at issue in this dispute.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 277 of 637

39.     Defendant admits the allegations contained in paragraph 39, but denies that any sums were owed to GGCI as a result of its breach of the agreements between the parties and is owed substantial sums from GGCI.

40.     Defendant admits to receiving the notice referenced in paragraph 40.  Further, the document speaks for itself.

41.     Defendant admits the allegations contained in paragraph 41, but denies that any sums were duly owed to GGCI as a result of its default and various breaches of the agreements.

42.     Defendant admits to receiving the notice referenced in paragraph 42.  Further, the document speaks for itself.

43.     Defendant admits to receiving the notice referenced in paragraph 43.  Further, the document speaks for itself.

44.     Defendant admits the allegations contained in paragraph 41, but denies that any sums were duly owed to GGCI as a result of its own default and various breaches of the agreements.

45.     Defendant admits to receiving the notice referenced in paragraph 45.  Further, the document speaks for itself.

46.     Defendant lacks sufficient knowledge and information to form a belief as to the allegations contained in paragraph 46.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

47.     Defendant admits to receiving the notice referenced in paragraph 47 but denies the accuracy of the alleged sums owed contained therein.  Further, the document speaks for itself.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 278 of 637

48.     Defendant admits the allegations contained in paragraph 41, but denies that any sums were duly owed to GGCI as a result of its own default and various breaches of the agreements.

49.     Defendant admits the allegations contained in paragraph 49.

**Claims for Relief**
**Claim One**

50.     Defendant repeats and incorporates in full his responses each allegation set forth in paragraphs 1–49.

51.     The allegations in paragraph 51 state legal conclusions to which no response is required.  To the extent a response is required, the parties did not execute a 2002 ISDA Master Agreement or ISDA Support Annex, and no elections were made as to the schedule to the 2002 ISDA Master Agreement or Section 13 of the ISDA Support Annex, which contain material terms.

52.     The allegations in paragraph 52 state legal conclusions to which no response is required.  To the extent a response is required, Defendant denies the allegations contained therein as GGCI failed to meet its contractual obligations to Mr. Ver.

53.     The allegations in paragraph 53 state legal conclusions to which no response is required.  To the extent a response is required, Defendant denies the allegations of paragraph 53.

54.     Defendant denies the allegations contained in paragraph 54.

55.     The allegations in paragraph 55 state legal conclusions to which no response is required.  To the extent a response is required, Defendant denies the allegations of paragraph 55.

56.     The allegations in paragraph 56 state legal conclusions to which no response is required.  To the extent a response is required, Defendant denies the allegations of paragraph 56.

10

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 279 of 637

## Request for Relief

Defendant denies the allegations in the Request for Relief, including the "Wherefore" clause, that Plaintiff is entitled to any form or any amount of relief.

## Affirmative Defenses

57.    Plaintiff has failed to state a claim upon which relief can be granted.

58.    Plaintiff has failed to produce all of the relevant agreements between the parties, including agreements related to the ISDA Master Agreement, including but not limited to the confirmations, definition booklets and credit support documentation.

59.    The Plaintiff's requests for relief are barred by the doctrine of unclean hands.

60.    Plaintiff lacks standing to avail itself of the Courts of the State of New York in that it is a foreign corporation, doing business in New York, without payment of the required taxes and fees in connection with its business operations.

61.    Plaintiff failed to act in a commercially reasonable manner.

62.    Plaintiff has breached the agreement between the parties, barring Plaintiff's request for relief.

## <u>COUNTERCLAIM</u>

### The Parties

63.    Roger Ver ("Ver") is the Counter-Plaintiff in this action.  Ver is a natural person and a resident and citizen of St. Kitts and Nevis.

64.    Genesis Global Capital International Limited ("GGCI") is the Counter-Defendant in this action.  GGCI is a British Virgin Islands company limited by shares with a principal place of business in New York.

11

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 280 of 637

**Related Non-Parties**

65.   Genesis Global Limited ("Genesis Global") is the ultimate parent of GGCI.

66.   Genesis Global Trading, Inc. ("Genesis Trading") is a subsidiary of Digital Currency Group, and it is a leading cryptocurrency trading and lending firm that primarily serves institutional clients.

67.   Genesis Asia Pacific Limited Pte ("GAP") is a Singapore private limited company that has filed for Chapter 11 bankruptcy protection in the Southern District of New York.

68.   Collectively, GGCI, Genesis Global, Genesis Trading, GAP and their affiliates are referred to as "Genesis".

69.   Digital Currency Group, Inc ("DCG") is a global venture capital company that invests in blockchain and digital currency-related companies.  DCG is the ultimate parent of Genesis.

70.   Three Arrows Capital Limited ("3AC") was a Singapore-based investment firm that specialized in trading and investing in cryptocurrencies and other digital assets before its stunning collapse in mid-2022.  They are now being liquidated in the BVI.

71.   Alameda Research LLC ("Alameda") was a quantitative cryptocurrency trading firm that was founded in 2017 by Sam Bankman-Fried. Alameda, along with FTX and more than 130 affiliated entities, filed for Chapter 11 bankruptcy protection in November 2022.

72.   FTX International Limited (aka FTX Trading Limited) ("FTX") is a cryptocurrency derivatives exchange that was launched in 2019 by Sam Bankman-Fried and others. As discussed above, FTX, and more than 130 affiliated entities, filed for Chapter 11 bankruptcy protection in November 2022.

12

73.     Sam Bankman-Fried ("SBF") is the now disgraced co-founder and CEO of both FTX and Alameda Research, and was at the heart of one of, if not the, largest cryptocurrency thefts in history, stealing billions of dollars from his customers and using those funds to pay down debts owed by companies he owned or controlled, including Alameda and FTX.

### GGCI Solicits Ver's Business

74.     On June 10, 2020, GGCI approached Ver, a well-known Bitcoin Cash ("BCH") proponent, to trade BCH-based over-the-counter derivatives.  GGCI sought to start a BCH options book with Ver's help.

75.     Though experienced in digital asset investment, Ver was new to options trading.

76.     Ver was initially hesitant to entrust GGCI with significant assets.  Seeking to win Ver's business, GGCI proposed a mechanism to earn interest on his collateral while his positions were open.

77.     On June 15, 2020, GGCI suggested that Ver could lend his BCH to GGCI at interest while simultaneously using the same assets as collateral for derivative contracts with GGCI.

78.     This arrangement, where Ver's interest-bearing loans served as collateral for GGCI trades, induced Ver to trade derivatives with GGCI.

### The Master Confirmation Agreement and Key Terms

79.     On June 15, 2020, Ver and GGCI executed a Master Loan Agreement ("MLA") which promised to pay Ver interest at agreed upon rates to be determined by the parties during the course of the agreement's term.

13

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 282 of 637

80.     On June 22, 2020, Ver and GGCI executed a Master Confirmation Agreement to govern their derivative contracts, which was then amended on July 13, 2020 (collectively, the "MCA").

81.     The MCA referenced International Swaps and Derivatives Association (ISDA) form agreements, such as the 1994 Credit Support Annex and the 2002 ISDA Master Agreement. These agreements aimed to protect parties in over-the-counter derivatives transactions against potential issues, such as insolvency or misrepresentation.

82.     Although the parties agreed in various transaction confirmations that the 2002 ISDA Master Agreement and the 1994 Credit Annex formed part of the MCA, neither party ever executed and/or signed either of these documents.  Consequently, none of the schedules to either of them formed part of its terms.

83.     In the 2002 ISDA Master Agreement, section 5(a)(vii)(2) required parties to remain solvent at all times, stating that it was an Event of Default if either party "becomes insolvent or is unable to pay its debts."

84.     Additionally, section 5(a)(iv) prohibited misrepresentation, declaring an Event of Default if a party made "[a] representation... [which] proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated."

85.     Each time Ver and GGCI transacted, they executed an individual transaction confirmation based on the MCA terms.  These terms specified collateral requirements, eligible collateral types, and valuation methods.  The MCA listed both US dollars and a "Reference Currency" as eligible collateral, with a valuation percentage of "100% at Spot Rate."

14

86. The MCA's use of "Reference Currency" valued at "100% Spot Rate" meant that the underlying digital asset being traded in the derivative contract could serve as collateral, and it would be valued based on its mark-to-market value in the spot markets.

87. Despite earlier Telegram communications stating otherwise, the confirmations did not mention Ver's loans as acceptable collateral. However, GGCI disregarded ISDA's standards and the MCA's written terms and eased collateral requirements throughout their course of dealing.

88. In fact, it was a common practice for GGCI to ease collateral requirements, not only for Ver, but also for its other counterparties.

**The Importance of Solvency in Derivative Transactions**

89. Derivative transactions involve bets on the future price of an underlying asset. If a counterparty becomes insolvent during the contract, the winning party may not be able to collect, undermining the transaction's sole purpose.

90. To mitigate this counterparty risk, the 2002 Master ISDA required parties to maintain solvency at all times (the "Solvency Requirement").

91. The Solvency Requirement was crucial for Ver's decision to enter the MCA, since it ensured that he could collect from GGCI if his derivative positions were successful. The Solvency Requirement also benefited GGCI, as they could collect from Ver and potentially foreclose on collateral if needed.

92. The Solvency Requirement was designed to apply to any bankruptcy or insolvency laws relevant to a party. For GGCI, a BVI company operating in New York, insolvency under BVI or New York law would breach the requirement. GGCI would be insolvent if it couldn't meet obligations when due, or if its liabilities exceeded its assets.

15

93.     GGCI's collateral policy was essential for compliance with the Solvency Requirement.  If a counterparty failed to pay, GGCI would incur losses, potentially leading to insolvency as assets were either removed from their balance sheet or had their value greatly reduced.

94.     To mitigate this risk, GGCI required counterparties to provide collateral before opening positions, and it was GGCI's responsibility to maintain adequate collateral and ensure their assets exceeded liabilities at all times.  Again, any failure to do so would undermine the entire purpose of the transactions.

**GGCI Failed to Enforce Collateral Requirements**

95.     The MCA and its Transaction Confirmations contained strict collateral requirements for Ver, but GGCI did not enforce them.  Instead, GGCI allowed Ver and other customers to maintain undercollateralized positions and provide exotic, illiquid digital assets as collateral.

96.     Firstly, GGCI never required Ver to post US dollars or Reference Currency as collateral.  They allowed Ver to use unrelated digital assets, such as Monero (XMR) and Binance Coin (BNB), even though these assets were unrelated to the underlying derivative transaction.

97.     GGCI permitted other customers to provide even more illiquid and exotic assets as collateral, such as FTT tokens.

98.     On information and belief, GGCI also allowed SOL, OXY, MPS and SRM as collateral to support billions in loans.

99.     Secondly, GGCI valued this exotic collateral at mark-to-market prices without applying appropriate discounts for illiquidity or potential losses during liquidation.

16

100.    Thirdly, GGCI allowed Ver to maintain collateral amounts below the required sum in the MCA.

101.    Fourthly, GGCI didn't request additional collateral from Ver when the US dollar value of his digital assets fell below key thresholds.

102.    Fifthly, GGCI permitted Ver to use digital assets he had loaned at interest as collateral, which meant that GGCI was taking on additional counterparty risk by redeploying Ver's collateral to profit from an interest rate spread.

103.    GGCI's relaxed collateral requirements were not exclusive to Ver.  They extended the same or similar benefits to other counterparties, resulting in an increased risk of loss and insolvency if the market turned against them.

104.    Nor were GGCI's relaxed collateral requirements embodied in any agreement or official special status afforded to Ver or other particular customers.  Rather, GGCI simply neglected to enforce the written terms of their agreements.

### GGCI's Collateral Exposed to "Daisy Chain" of Debts

105.    GGCI did not directly possess all of the digital asset collateral deposited by counterparties like Ver.  Instead, GGCI sought to generate profits by loaning out this collateral and profiting from the interest rate spread.  This practice, however, exposed GGCI's collateral value to increased counterparty risk, as they needed to recover the loaned collateral before liquidating it to cover a default.

106.    GGCI's collateral practices created a precarious chain of debt obligations. Essentially, a house of cards. Under normal market conditions, they could manage this debt chain by obtaining US dollars.  However, during times of market stress and illiquidity, a single default

could render GGCI unable to access the collateral deposited by Ver or others, exposing them to immense loss.

107.    Without US dollar cash reserves, GGCI would be forced to liquidate investments at fire sale prices, or call in loans from borrowers who may default.  During periods of market illiquidity and stress, GGCI's relaxed collateral practices increased the risk of GGCI becoming undercollateralized and insolvent.

108.    On information and belief, GGCI would routinely loan out their digital assets to other Genesis entities, including GAP, who would loan it to counterparties such as 3AC.

109.    These related party loans would eventually become impaired by 3AC's insolvency.  In June 2022, 3AC defaulted on more than $2.3 billion to GAP, causing losses to GGCI as related party loans became impaired.

110.    Barry Silbert, who controlled GGCI and the Genesis Entities through his position as Chairman of DCG, was aware of this risk.  In a June 2021 tweet, he acknowledged the "daisy chain" of debts and emphasized the importance of understanding counterparty risk and identifying weak links in the chain.  Regrettably, Silbert failed to recognize that these weak links existed within his own organization, ultimately jeopardizing the safety of GGCI's collateral.



## GGCI Overstates its Financial Health: Deviating from ASC 820

111.    GGCI's mark-to-market valuation of digital assets, including those not physically possessed, resulted in an overstatement of its financial health.

112.    Note 2 to GGCI's December 31, 2021 audited financial statement detailed the significant accounting policies and the methods used to derive valuations for its assets and liabilities.  The statement claimed compliance with accounting principles generally accepted in the United States of America (U.S. GAAP).

113.    U.S. GAAP utilizes ASC 820 for determining "fair value," which is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.

114.    ASC 820 establishes a hierarchy of inputs for determining fair value, prioritizing observable inputs and requiring additional disclosures when unobservable inputs are relied on.

115.    GGCI concluded all digital assets and liabilities were recorded and valued based on Level 2 inputs – which are defined as "significant observable inputs".

116.    ASC 820's hierarchy includes three levels:

   a.   Level 1 (unadjusted spot price in an active market, such as the quoted price of Apple shares on the New York Stock Exchange);

   b.   Level 2 (spot prices from less active markets and may or may not be discounted); and

   c.   Level 3 (providing the most discretion, since the quoted price is unreliable and the evaluator is thus forced to rely on other inputs that are unobservable and significant to the overall fair value measurement).

117.    GGCI determined the fair market value of assets in "digital currency investments" and liabilities under "digital currency collateral payable" using Level 2.

19

118.    Digital assets are a famously volatile asset class, characterized by extreme price fluctuations and inherent unpredictability.  Market movements are driven by factors such as technological advancements, regulatory changes, market sentiment, global economic conditions, illiquidity, and, at times, price manipulation.

119.    At all times relevant, GGCI valued all of their digital assets at mark-to-market prices and never applied a discount to them.

120.    Despite liquidity concerns and worsening market conditions beginning in May 2022, GGCI never applied a discount to their Level 2 assets.  All such assets continued to be valued at mark-to-market prices.

121.    GGCI's refusal to apply appropriate discounts to its Level 2 assets allowed GGCI to overstate its financial health and created a misleading picture of a solvent entity where one did not exist.

### Over Exposure to Alameda & FTX

122.    During the course of 2021, Genesis entities engaged in a broad relaxation of their lending standards, and began to accept increasingly illiquid and exotic digital assets as collateral for loan and obligations and derivative contracts, creating a precarious financial situation.

123.    On information and belief, GGCI went insolvent at some point during 2021 when it made a loan of $2.5 billion and accepted FTT tokens as collateral.  GGCI valued these FTT tokens mark-to-market, which overstated the real value of FTT and resulted in a severe under collateralization, as Alameda had manipulated FTT's price higher to borrow against it.

124.    Consequently, GGCI was grossly overexposed to a single counterparty.  GGCI's 2021 audited financials reported that on December 31, 2021 the company held $2.370 billion in

20

"digital collateral payable", 99% of which were FTT tokens owed to a single counterparty. These FTT tokens represented *nearly 70% of GGCI's then total assets.*

125.    However, the actual fair market value of these FTT tokens was far lower than the mark-to-market prices used by GGCI, which resulted in significantly fewer assets than reported.

126.    Were GGCI to foreclose on the FTT tokens and sell them for US dollars, *they would have been unable to recover anywhere near the full amount owed.*

127.    GGCI's overexposure to FTT resulted from a quid pro quo relationship between Alameda and Genesis executives.

128.    FTX and Alameda granted Genesis executives early access to purchase FTT tokens at discounted rates before public issuance.

129.    This conflict of interest compromised GGCI's risk management policies and practices, as executives were incentivized to authorize GGCI to take excessive risks for their personal benefit.

130.    If not for these conflicts of interest, Genesis executives might have conducted adequate due diligence on their $2.5 billion loan and learned of Alameda's scheme to manipulate FTT prices and increase its borrowing ability.

131.    In a complaint against Alameda's former CEO, Caroline Ellison, the SEC details this manipulation.  Ellison engaged in automated FTT token purchases to inflate the value of Alameda's collateral, increasing risks for lenders accepting FTT as collateral.

132.    The market crash of May 2022 only worsened GGCI's finances, as Alameda suffered substantial losses, which exacerbated its inability to repay its loan to GGCI.

133.    After May 2022's market crash, Alameda focused its efforts on propping up the price of FTT token, continuing to engage in market operations and offering lines of credit to

21

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 290 of 637

insolvent entities with large FTT positions to prevent FTT from being liquidated, which would have publicly revealed Alameda's insolvency.

134.    In August 2022, after realizing that Genesis and GGCI would liquidate FTT tokens and reveal their insolvency, Alameda misappropriated customer funds to repay Genesis and GGCI, which was a preferential transfer at the expense of FTX creditors subject to clawback.

135.    Afterwards, Alameda replaced the missing $2.5 billion in FTX customer deposits with the FTT tokens they had just received from Genesis and GGCI, and by valuing FTT at its inflated mark-to-market price created the illusion that FTX remained solvent.

136.    In November 2022, the digital asset exchange Binance called Alameda's bluff and threatened to sell their FTT tokens on the open market, which revealed their lack of liquidity. FTX and Alameda were finally revealed to be insolvent and filed for bankruptcy less than three months after having repaid $2.5 billion to Genesis and GGCI.

### Over Exposure to 3AC & the Crash of May 2022

137.    In May 2022, digital asset markets experienced a steep decline due to the collapse of digital assets LUNA and TerraUSD, causing significant losses, liquidations, and a snowball effect of defaults and insolvencies.

138.    3AC was central to the crash, resulting in substantial losses for GGCI and its counterparties.  3AC owed over $3 billion to creditors, including $2.3 billion to GAP, its largest creditor.

139.    Genesis and GAP were overexposed to 3AC, driven by conflicts of interest related to generating demand for the various digital asset trusts operated by Grayscale (the

22

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 291 of 637

"Grayscale Trusts"). DCG, Genesis' parent company, owned the investment manager for the Grayscale Trusts and profited from the fees it generated.

140.     Since 2020, GAP had been loaning funds to 3AC to fund its Grayscale Trust purchases. However, GBTC's[1] value declined, resulting in substantial unrealized losses for 3AC. While shares in GBTC traded at a premium to its net asset value when 3AC began conducting the trade in 2020, by June 2022 they were trading at a 30% discount.

141.     Genesis' concerns over their exposure to 3AC had reached a boiling point by January 2022. That month, Genesis executives had 3AC pledge their GBTC shares to GAP as security. But as the net asset value of GBTC continued to fall, so did the value of GAP's pledged assets.

142.     Upon information and belief, Genesis' 3AC exposure did not end with the Bitcoin trust, as 3AC was an investor in the other Grayscale Trusts.

143.     In May 2022, after LUNA's collapse, Genesis executives spoke with 3AC and, on information and belief, determined that 3AC was insolvent.

144.     However, GAP's significant exposure to 3AC posed a risk to the solvency of the entire Genesis enterprise, including GGCI, due to various related party loans and intercompany debts. Consequently, Genesis opted not to issue margin calls to 3AC, despite the terms of their agreement permitting such action, in order to prevent further destabilizing their own financial situation.

145.     On information and belief, if not insolvent as a result of the $2.5 billion loan backed by FTT discussed herein, GGCI was insolvent as a result of 3AC's inability to repay GAP by the end of May 2022.

---

[1] GBTC is the Grayscale Bitcoin Trust, just one of a number of digital asset trusts operated by Grayscale and DCG.

23

146.    On June 10, GGCI's need to obtain more capital became urgent.  That day, 3AC's accounts on the Deribit derivatives platform were liquidated.  Genesis executives, alarmed by the Deribit liquidations and cognizant of 3AC's insolvency, understood that 3AC's demise was near and formulated a strategy to avoid immediate recognition of a $2.3 billion loss.

147.    The plan centered on GAP seizing Grayscale BTC trust shares and other digital assets pledged by 3AC as security for their undercollateralized loans.  However, since issuing an unpayable margin call to 3AC would expose their insolvency, Genesis needed to act quickly before the market caught on.  By securing 3AC assets ahead of other creditors, GAP aimed to offset the substantial loss and safeguard both its own balance sheet and those of its affiliates.

148.    On June 12, Genesis executives set the plan in motion.  GAP issued a margin call to 3AC, demanding an additional $334 million in collateral payments, fully aware that 3AC would be unable to meet the requirement.

149.    On June 13, GAP served a notice of default on 3AC, enabling GAP to liquidate the limited collateral they held and pursue emergency relief to seize further 3AC assets ahead of other creditors.

150.    On June 15, GAP initiated arbitration against 3AC, seeking more than $2.3 billion in loan recovery and emergency relief.  This included seeking a preliminary injunction directing 3AC to freeze more than $2.3 billion, and to deposit the pledged assets with GAP, which were allegedly valued at $462 million at the time.

151.    In their arbitration filing, GAP noted that "[d]ue to recent extreme volatility in the cryptocurrency markets, the value of the collateral already posted by Three Arrows decreased significantly in comparison to the loaned assets under the MLAs."

152.    On June 16, news of the notice of default GAP had issued to 3AC was publicized in the media, and numerous other 3AC lenders began making margin calls and issuing default notices.

153.    On June 21, GAP's request for a preliminary injunction to freeze or seize certain 3AC pledged assets was denied.  A further hearing scheduled for July 5, making it evident GAP wouldn't secure these assets by month's end.

154.    Due to the monthly reporting schedule followed by all Genesis entities, it became apparent that GAP and its affiliates, including GGCI, would have to recognize losses related to 3AC in their month-end financial reports for June 2022, which also coincided with their quarterly reporting obligations.

155.    On June 30, DCG had accepted that GAP, GGCI, and other entities were insolvent and needed capital injections.  Accordingly, DCG loaned $1.1 billion to Genesis Global.

156.    On information and belief, Genesis Global then injected $150 million into GGCI. This amount was recorded as an asset in a newly added line item, "Other", to GGCI's June 30, 2022, SOFC.  Without this, GGCI's negative equity would have exceeded $136 million on June 30.

157.    Consequently, at the latest, GGCI was insolvent in June due to various factors, including inaccurate loss recording, failure to apply appropriate discounts to Level 2 digital assets in the midst of a liquidity event, untimely recognition of substantial losses linked to 3AC and related parties, and untimely recognition of losses tied to the FTT-collateralized loan.

**GGCI's Misrepresentations of Solvency**

158.    In or about early June, GGCI devised a plan to strengthen its balance sheet.  They aimed to persuade their biggest clients, including Ver, to roll currently profitable options expiring

in June to later dates, thereby allowing GGCI to avoid making payments.  Meanwhile, GGCI would allow Ver's currently unprofitable June options to expire, thereby bringing funds into GGCI from Ver and others.

159.   On information and belief, Genesis knew GGCI was insolvent by such time.

160.   On June 7, GGCI asked Ver to roll his deep in-the-money Ethereum options to a later date. Those options expired on June 24.  Ver declined.

161.   On June 9, GGCI sent Ver an article about Ethereum's progress to pique his interest about rolling the options  Ver did not respond.

162.   On June 10, Deribit's liquidation of 3AC signaled 3AC's imminent collapse.

163.   On June 11, GGCI again requested Ver to roll only his in-the-money Ethereum options to a later date, and offered him attractive terms.  Unaware that Genesis planned to margin call and liquidate 3AC immediately afterwards, Ver agreed to let GGCI roll his in-the-money options.

164.   On June 12 and 13, digital asset prices fell as 3AC was margin called, defaulted, and liquidations commenced, as had been planned by Genesis

165.   Meanwhile, on June 13, and again on the 14th, GGCI requested further collateral from Ver.  On June 15, to keep Genesis executives happy, Ver reduced his exposure to GGCI by $22.5 million by buying certain BTC call options.

166.   From June 16 to June 24, GGCI continued discussions with Ver about the additional types of collateral he could offer, and learned it was Ver's strong preference to post a combination of digital assets and certain shares in private companies.  GGCI indicated they were prepared to accept these assets as collateral, as they had done previously.

26

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 295 of 637

167.     Throughout the life of their two year business relationship, GGCI had always accepted different forms of collateral from Ver, and allowed him to maintain undercollateralized positions.  In fact, it had been GGCI's offer to pay Ver interest on his digital asset collateral, in direct violation of the MCA's collateral requirements, that had induced Ver to trade with GGCI and to continue trading up until that time.

168.     However, upon the expiration of Ver's out-of-the-money options on June 24, Genesis executives abruptly changed their policy.  They demanded that Ver immediately provide 100% of the required collateral in either US dollars or Reference Currency as stated in the MCA, or face a notice of default.

169.     Based on the course of the parties' dealings, GGCI knew Ver was not expecting to be required to pay the full sum of collateral in US dollars or Reference Currency on that day, which GGCI had never required him to do during their two year relationship.

170.     GGCI's plan was to extract an excessive sum of collateral from Ver.  GGCI offered to accept his digital assets and shares as collateral, but only if he *over*-collateralized his position by 300% to 600%.  Were Ver to pay in digital assets, GGCI wanted him to supply 300% as much collateral as the value of his entire position.  If in private shares, 600%.

171.     As a result of the abrupt change in policy and attempt to extract an excessive sum of collateral, Ver began to suspect GGCI's insolvency.  He nonetheless agreed to discuss details with GGCI on a call the following day, June 25.

172.     On the June 25th call, Defendants threatened to issue a notice of default if Ver did not immediately pay the full amount in US dollars or Reference Currency or meet their excessive collateral demands.

27

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 296 of 637

173.    Considering the state of the markets, Ver requested proof of GGCI's solvency. Thereafter, GGCI backed off their demands for excessive sums of collateral, began engaging in more constructive discussions to immediately accept certain digital assets, and continued discussions with Ver as to other assets to pledge as collateral.

174.    On information and belief, even using inflated mark-to-market prices for digital assets, GGCI was insolvent on June 25 and were therefore unable to provide Ver with proof of their solvency.

175.    GAP had just lost its bid to freeze 3AC assets in the emergency arbitration hearing on June 21.  At the very latest, GAP should have written down their impaired 3AC loans by such date, which would have resulted in GGCI also writing down any related party loans with GAP.

176.    Initially, GGCI declined to provide up-to-date solvency proof to Ver, stating they did not produce point-in-time financial statements.

177.    However, on June 28, after Ver had informed GGCI that he was not comfortable sending any further collateral without proof of GGCI's solvency, GGCI provided a point in time financial statement.  This statement of financial condition (the "June 20 SOFC") revealed GGCI's various assets and liabilities as of June 20.

178.    The June 20 SOFC claimed total assets of $3.063 billion and liabilities of $2.962 billion, which gave GGCI positive equity of just over $100 million.  Given that $1.594 billion of GGCI's assets were digital assets ("Investments in digital currencies"), even a small fluctuation in the market would render them insolvent.

**Genesis Global Capital International Limited**
**Statement of Financial Condition (Unaudited)**
**June 20, 2022**
*(in thousands)*

| | | |
|---|---|---:|
| **Assets** | | |
| Cash | $ | 12,929 |
| Investments in digital currencies | | 1,594,209 |
| Derivative assets | | 442,733 |
| Collateral receivable | | 454,449 |
| Receivable from customers | | 159,182 |
| Loans receivable | | 399,560 |
| **Total assets** | $ | 3,063,062 |
| | | |
| **Liabilities and stockholder's equity** | | |
| **Liabilities** | | |
| Collateral payable | $ | 2,094,617 |
| Payable to customers | | 94,569 |
| Loans payable | | 606,477 |
| Derivative liabilities | | 167,132 |
| **Total liabilities** | $ | 2,962,795 |
| | | |
| **Stockholder's equity:** | | |
| Total stockholder's equity | | 100,267 |
| **Total liabilities and stockholder's equity** | $ | 3,063,062 |

179.    Faced with an apparently solvent GGCI, who had by now backed off their demands for excessive collateral, Ver saw no choice but to keep his remaining positions open at GGCI and cooperate with them to ensure collateral levels were mutually acceptable until his remaining options expired.

180.    However, what Ver did not know at the time was that the June 20 SOFC was an accounting farce.  The $1.596 billion in digital assets was in fact worth far less, and consisted of a large sum of illiquid FTT tokens, which if sold would have left a large shortfall remaining to GGCI from an insolvent counterparty.

181.    The SOFC's chosen date of June 20 was no accident and was a central part of that farce.  The SOFC did not reflect the full write down of 3AC's impaired loans.  On information

29

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 298 of 637

and belief, the 3AC loans were deemed impaired by Genesis on June 21 when GAP's request for emergency relief was denied and GAP had no further collateral to support such debts.

182.    When GGCI's plan to seize exorbitant amounts of collateral from Ver failed, GGCI entered discussions with their parent company to receive an injection of capital, which occurred on June 30 when DCG injected $1.1 billion into Genesis.

**Ver Discovers GGCI's Insolvency**

183.    On November 11, 2022, FTX and Alameda filed for bankruptcy.    Their bankruptcy came after a rapid decline when Binance, another exchange, announced they would sell their FTT tokens on the open market.    Since FTT tokens were highly illiquid and their prices artificially inflated by Alameda, their value plunged by over 90% following Binance's announcement.

184.    The FTX and Alameda bankruptcies sent shockwaves through the digital asset markets.    Surprisingly, Sam Bankman-Fried ("SBF"), the controlling principal behind FTX and Alameda, started giving public interviews, asserting that FTX wasn't truly insolvent since its balance sheet held digital assets—primarily FTT tokens—with a mark-to-market value exceeding customer liabilities.    SBF was eventually indicted on numerous felony charges.

185.    Later that November, rumors circulated that Genesis and its subsidiaries were insolvent when its lending arm stopped withdrawals, trapping investor funds.    It was later revealed that GGCI was FTX's largest creditor.

186.    Genesis initiated a restructuring plan to save its business, which focused on transferring bad assets from GGCI to other Genesis entities destined for bankruptcy.    The plan aimed to raise capital to pay creditors by selling shares in a financially stable GGCI.

30

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 299 of 637

187.    Meanwhile, Ver continued to pay collateral to GGCI.  Since June 21, 2022, Ver has made total payments to GGCI in excess of $60 million and GGCI has liquidated collateral valued in excess of $50,000,000.

188.    On or about December 23, just weeks after Ver made $37 million in collateral payments to GGCI, he became aware of information that made him question GGCI's earlier claim of solvency that had been supported by the June 20 SOFC.

189.    The news was a New York Times interview of SBF, who stated that Alameda had repaid a $2.5 billion loan to "Genesis" that August, about three months before filing for bankruptcy.  SBF added that the loan was repaid because Genesis had called in specific loans made to Alameda.

190.    Ver became concerned that GGCI might have been the entity that lent money to Alameda, potentially affecting GGCI's present solvency and their solvency in June 2022.

191.    As Alameda repaid the loan to Genesis in August, about three months before FTX's bankruptcy, it seemed like this repayment would potentially be subject to an automatic clawback as a preferential transfer.

192.    Ver investigated and learned that there was speculation that SBF had directed Alameda to misappropriate FTX customer funds to repay Genesis.  Alameda then used the FTT tokens it had received back from Genesis to pay FTX, who then used the FTT tokens to replace the missing customer deposits as an asset on their balance sheet.

193.    This caused Ver to grow more concerned, since if true, it would mean that GGCI had been doing what FTX had been doing: propping up their insolvent balance sheet with inflated FTT tokens.

31

194.    Since Ver was considering rolling his expiring December 30 options with GGCI to a later date, he wanted to be sure GGCI remained solvent before doing so, and wanted to further confirm they had in fact been solvent that past June when he initially inquired.

195.    In late December 2022, Ver inquired with GGCI as to whether they remained solvent in the wake of the FTX and Alameda bankruptcies, and whether GGCI had any exposure to them, specifically whether it had been GGCI who had reportedly made a $2.5 billion loan to Alameda and was repaid in August 2022.

196.    GGCI responded that all of Ver's trades had been through GGCI.  Despite having lost some funds on FTX,  GGCI claimed that it remained solvent and had no further involvement or exposure to Alameda or FTX.

197.    Ver persisted in questioning specifically whether it had been GGCI who received the Alameda loan repayment referred to by SBF in the New York Times interview.  GGCI informed Ver that those funds had been repaid to a different Genesis entity, not GGCI.

198.    At this point, Ver demanded proof of GGCI's present solvency, and demanded GGCI provide proof as to how they valued the assets on their June SOFC, which Ver now suspected had deployed the same misleading mark-to-market accounting that FTX had deployed to deceive their depositors.

199.    Ver reminded GGCI that he had faithfully paid in excess of $60 million in additional collateral since June, believing it his legal obligation to do so since GGCI remained solvent, including $37 million dollars in payments just weeks prior.

200.    Were Ver simply trying to avoid paying a debt to GGCI, as Counter-Defendant alleges in its complaint, he obviously would not have made payments totalling $37 million just weeks earlier, and would have raised concerns instead of paying.

32

201.    Satisfied Ver's concerns were being raised in good faith, but while still denying the validity of his claims, GGCI produced to Ver their audited 2021 financials, as well as an SOFC dated June 30, 2022.

202.    However, both of those documents raised even further issues which revealed GGCI to have been insolvent in June 2022 at the latest.

### GGCI's June 30 SOFC and 2021 Audited Financials

203.    The June 30 SOFC revealed dramatic and concerning changes which had occurred since the June 20 SOFC.

204.    First, there had been a significant reported drop in both positive equity and assets. On June 20, there was positive equity of just $100 million on $3 billion in assets, which indicated GGCI faced significant liquidity and volatility concerns. However, by June 30, positive equity had shrunk to $14 million, with assets dropping by more than $400 million, exacerbating the already troubling liquidity and volatility concerns.

205.    Second, much of the fall in asset values was attributed to loans that had been written down.  On June 20, GGCI reported "loans receivable" of $399 million.  However, by June 30 (which had broken "loans receivable" to two line items), loans receivable had been reduced to $1 million and related party loans $47 million.  This represented a combined loss of over $350 million in loan write downs in just ten days.

206.    On information and belief, these loan write-downs represented losses related to 3AC, which had not been written down in the June 20 SOFC, but were known to Counter-Defendant when the June 20 SOFC was sent to Mr. Ver as proof of GGCI's solvency.

207.    Lastly, the June 30 SOFC contained a brand new line item, "Other", which had $151 million in assets.  There was no new corresponding line item in liabilities.

33

208.    On information and belief, this line item "Other" represented funds that had

recently been injected as the result of DCG's $1.1 billion capital injection on June 30.

### GGC International Limited
### Statement of Financial Condition
### June 30, 2022
*(in thousands)*

| Assets | | |
|---|---|---:|
| Cash | $ | 3,232 |
| Investments in digital currencies and trusts | | 1,439,363 |
| Digital currency loans receivable, net of allowance for loan losses | | 1,250 |
| USD loans receivable, net of allowance for loan losses | | 1,900 |
| Digital currency collateral receivable | | 340,389 |
| Derivative assets | | 369,045 |
| Interest receivable, net of allowance | | 2,758 |
| Receivables from related parties | | 47,334 |
| Other assets | | 151,977 |
| **Total assets** | $ | 2,357,248 |
| | | |
| **Liabilities and member's equity** | | |
| **Liabilities** | | |
| Digital currency loans payable | $ | 370,737 |
| Digital currency collateral payable | | 891,080 |
| USD loans payable | | 18,073 |
| Option collateral payable | | 344,169 |
| Derivative liabilities | | 191,864 |
| Interest payable | | 5,645 |
| Accounts payable and accrued expenses | | 295,894 |
| Payables to related parties | | 225,364 |
| **Total liabilities** | | 2,342,826 |
| | | |
| **Member's equity** | | 14,422 |
| Total member's equity | | 14,422 |
| **Total liabilities and member's equity** | $ | 2,357,248 |

209.    GGCI's 2021 audited financials revealed both that GGCI had been valuing digital

assets at 100% mark-to-market, and that it had in fact been the entity that originated a $2.5

billion loan collateralized by FTT tokens.    Those FTT tokens had ultimately come from

Alameda.

34

210.     The 2021 audited financials explained that GGCI accounted for collateral paid by counterparties as an asset with a corresponding liability.  Alameda's FTT tokens would have been counted on their balance sheet as an asset under "*Investments into digital assets*" and as a liability under "*digital currency collateral payable.*"

211.     GGCI's balance sheet showed "*Investments in digital currencies*" equal to $2.825 billion, and "*Digital currency collateral payable*" equal to $2.370 billion.

212.     Notably, the "*Digital currency collateral payable*" roughly equaled the $2.5 billion SBF had referred to during his New York Times interview.  And while "*Investments in digital currencies*" was larger, it contained additional digital assets owned by GGCI.

213.     GGCI's cash flow statement in the 2021 audited financials also contained a line item for "*Digital currency collateral payable*" under liabilities, which was equal to the same line item on the balance sheet, indicating these sums made their way onto GGCI's balance sheet in 2021.

214.     GGCI's 2021 audited financials contained a section detailing significant exposures to various counterparties.  The significant counterparties were not identified by name, only certain information about them was provided.  The financials identified a "Counterparty I" who represented 99% of the digital currency collateral payable liability, which was further identified to consist of 99% FTT tokens.

215.     Therefore, GGCI's 2021 financials showed that at some time in 2021 it had originated a loan to a single counterparty backed by FTT tokens, which were valued at $2.3 billion as of December 31, 2021.  Accordingly, it became evident to Ver that "Counterparty I" was Alameda Research.

216.    Lastly, GGCI's 2021 audited financials contained other figures that revealed yet other sources of GGCI's undercapitalization.  The statement of cash flows identified a $105 million dollar operating loss for 2021.  And the statement of changes in stockholder equity identified almost $41 million in distributions in 2021.

### GGCI's Shifting Explanations

217.    When Ver pointed out that GGCI's 2021 audited financials identified a $2.5 billion loan obligation to Alameda, contrary to GGCI's prior representations, GGCI provided misleading information to Ver in an attempt to distance itself from Alameda.

218.    Incredibly, GGCI initially claimed that the financials Ver possessed were actually a consolidated report for multiple Genesis entities, and that the FTT tokens belonged to a different Genesis entity.

219.    However, the financials were clearly labeled as having been prepared exclusively for GGCI, which quickly disproved GGCI's claims.

220.    Once disproven, GGCI shifted its narrative and asserted that an affiliate had dealt with Alameda, who then borrowed from GGCI using the FTT tokens as collateral.  GGCI then refused to provide any evidence to support this claim.

221.    Nonetheless, GGCI's claim that the FTT tokens belonged to an affiliate was a difference without distinction, since the tokens had ultimately come from Alameda and would be subject to a clawback in bankruptcy.

222.    In fact, on May 3, 2023, FTX filed a motion in the Southern District of New York, on behalf of itself and affiliated debtors, seeking $3.9 billion back from Genesis, including sums from GGCI.

36

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 305 of 637

223.    Ultimately, discussions with GGCI made clear that GGCI hadn't applied any discount to the digital assets on their SOFC.

224.    At one point, GGCI personnel even admitted that they "may have been underwater for a few days."

225.    Had GGCI applied appropriate discounts to their digital assets, as they demanded from Ver, their SOFC would have revealed their insolvency.

226.    As a result, Ver would have closed his positions to avoid trading with an insolvent counterparty and saved tens of millions of dollars.

## CAUSES OF ACTION

## COUNT ONE

### (Breach of Contract (Insolvency))

227.    Defendant realleges and incorporates all preceding paragraphs as though fully set forth herein, and further alleges:

228.    As discussed herein, GGCI and Ver were parties to the Master Confirmation which incorporated the ISDA Master Agreement and ISDA Credit Support Annex by reference.

229.    During the life of the parties' relationship, there were well over 100 transactions conducted by GGCI on behalf of Ver.

230.    The Master Confirmation executed in connection with each transaction incorporated the 2002 ISDA Master Agreement by reference.

231.    The 2002 ISDA Master Agreement defines a number of Events of Default. One such event of default is the insolvency of either party.

232.    As described herein, GGCI became insolvent at some point prior to July 1, 2022.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 306 of 637

233.    At the point of insolvency, GGCI was in breach of all option contracts then open between the parties and subject to the 2002 ISDA Master Agreement.

234.    As per the agreements between the parties, in the event of default, all transactions were to be terminated, and the parties were expected to settle any financial obligations at that point.

235.    However, as a result of GGCI's failure to notify Ver of their insolvency, and their campaign of obfuscation, Ver did not become aware of the insolvency for quite some time.

236.    Following the insolvency, but prior to Ver becoming aware of same, Ver contributed substantial additional funds to maintain his then open options positions, which never should have been paid to GGCI as a result of its insolvency.

237.    Ver has suffered significant damages as a direct result of GGCI's breach of the agreements between the parties.

238.    Accordingly, Ver respectfully requests that this Court award all relevant damages caused by Counter-Defendant's breach of contract, including, but not limited to, compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000.00, punitive or exemplary damages for their malicious conduct, all costs and Court fees, reasonable attorneys' fees, as well as any other relief this Court deems just and proper.

## COUNT TWO

### (Breach of Contract (Misrepresentation) - BCH Options)

239.    Defendant realleges and incorporates all preceding paragraphs as though fully set forth herein, and further alleges:

240.    As discussed herein, GGCI and Ver were parties to the Master Confirmation which incorporated the ISDA Master Agreement and ISDA Credit Support Annex by reference.

38

241.    Pursuant to a trade confirmation dated March 22, 2022, GGCI agreed to purchase from Ver a put option for 70,000 units of Bitcoin Cash ("BCH"), with a strike price of $545 per BCH.

242.    The Master Confirmation executed in connection with this transaction incorporated the 2002 ISDA Master Agreement by reference.

243.    The 2002 ISDA Master Agreement defines a Misrepresentation by either party as an Event of Default as well.  Pursuant to the 2002 ISDA Master Agreement, any representation that "proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated" would be considered an Event of Default.

244.    As discussed herein, GGCI made, and repeated, a number of material misrepresentations and omissions regarding its solvency.  These repeated misrepresentations and omissions constitute a material breach of the agreement.

245.    Ver has suffered, and continues to suffer, irreparable harm as a direct and proximate result of Counter-Defendant's breach of the agreement.

246.    Accordingly, Ver respectfully requests that this Court award all relevant damages caused by Counter-Defendant's breach of contract, including, but not limited to, compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000.00, punitive or exemplary damages for their malicious conduct, all costs and Court fees, reasonable attorneys' fees, as well as any other relief this Court deems just and proper.

## COUNT THREE

### (Breach of Contract (Misrepresentation) - ETH Options)

247.    Defendant realleges and incorporates all preceding paragraphs as though fully set forth herein, and further alleges:

39

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 308 of 637

248.    As discussed herein, GGCI and Ver were parties to the Master Confirmation which incorporated the ISDA Master Agreement and ISDA Credit Support Annex by reference.

249.    Pursuant to a trade confirmation dated June 10, 2022, GGCI agreed to purchase from Ver a put option for 10,000 Ether ("ETH"), with a strike price of $5,000 per ETH.

250.    The Master Confirmation executed in connection with this transaction incorporated the 2002 ISDA Master Agreement by reference.

251.    The 2002 ISDA Master Agreement defines a Misrepresentation by either party as an Event of Default as well.  Pursuant to the 2002 ISDA Master Agreement, any representation that "proves to have been incorrect or misleading in any material respect when made or deemed to have been made or repeated" would be considered an Event of Default.

252.    As discussed herein, GGCI made, and repeated, a number of material misrepresentations and omissions regarding its solvency.  These repeated misrepresentations and omissions constitute a material breach of the agreement.

253.    Ver has suffered, and continues to suffer, irreparably harm as a direct and proximate result of Counter-Defendant's breach of the agreement.

254.    Accordingly, Ver respectfully requests that this Court award all relevant damages caused by Counter-Defendant's breach of contract, including, but not limited to, compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000.00, punitive or exemplary damages for their malicious conduct, all costs and Court fees, reasonable attorneys' fees, as well as any other relief this Court deems just and proper.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 309 of 637

## COUNT FOUR

### (Breach of Contract (Misrepresentation) - BTC Options)

255.    Defendant realleges and incorporates all preceding paragraphs as though fully set forth herein, and further alleges:

256.    As discussed herein, GGCI and Ver were parties to the Master Confirmation which incorporated the ISDA Master Agreement and ISDA Credit Support Annex by reference.

257.    Pursuant to a trade confirmation dated June 11, 2022, GGCI agreed to purchase from Ver a put option for 500 Bitcoin ("BTC"), with a strike price of $26,000 per BTC.

258.    The Master Confirmation executed in connection with this transaction incorporated the 2002 ISDA Master Agreement by reference.

259.    The 2002 ISDA Master Agreement defines a Misrepresentation by either party as an Event of Default as well.  Pursuant to the 2002 ISDA Master Agreement, any representation that "proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated" would be considered an Event of Default.

260.    As discussed herein, GGCI made, and repeated, a number of material misrepresentations and omissions regarding its solvency.  These repeated misrepresentations and omissions constitute a material breach of the agreement.

261.    Ver has suffered, and continues to suffer, irreparably harm as a direct and proximate result of Counter-Defendant's breach of the agreement.

262.    Accordingly, Ver respectfully requests that this Court award all relevant damages caused by Counter-Defendant's breach of contract, including, but not limited to, compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000.00,

41

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 310 of 637

punitive or exemplary damages for their malicious conduct, all costs and Court fees, reasonable attorneys' fees, as well as any other relief this Court deems just and proper.

## COUNT FIVE

### (Fraud)

263.    Defendant realleges and incorporates all preceding paragraphs as though fully set forth herein, and alleges as follows:

264.    On June 7, 2022, GGCI began contacting Mr. Ver regarding rolling over his in-the-money Ethereum option.  However, Mr. Ver was not interested.

265.    Over the next few days, GGCI continued to try and convince Mr. Ver that rolling over his options was the right thing to do, sending articles about the performance of ETH and proposing more favorable terms.  Mr. Ver eventually agreed to roll his options.

266.    Shortly after electing to roll over his in-the-money options, GGCI began making collateral demands that were 1) above and beyond any level of collateral required by the parties' agreements and 2) not in line with the parties' previous course of dealing.

267.    Considering the state of the market, namely the Luna and 3AC collapses, Mr. Ver was concerned about the solvency of GGCI and began to ask questions.  On June 25, 2022, Mr. Ver requested that GGCI provide proof of its solvency.

268.    On June 28, 2022, GGCI delivered a statement of financial condition dated June 20, 2022 (the previously discussed June 20 SOFC).  However, on June 21, 2022, GAP's request for emergency relief in its arbitration against 3AC was denied, requiring GAP and, in turn, GGCI to write down hundreds of millions of dollars in assets.

269.    By sending an incomplete, or otherwise misleading SOFC, GGCI knowingly made a material misrepresentation to Mr. Ver regarding its current financial condition.

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 311 of 637

270.    This material misrepresentation or omission was made by GGCI with the express intent to induce Mr. Ver to maintain his Ethereum option position with GGCI and prevent him from discovering GGCI's insolvency and exercising his right to terminate the contract as a result.

271.    Mr. Ver relied on the June 20 SOFC statement, accepting the representations of GGCI as accurate, and did in fact continue to maintain his option positions at GGCI.

272.    In the months following the delivery of the intentionally misleading June 20 SOFC, Mr. Ver made payments in excess of $60,000,000 to GGCI to maintain his positions and GGCI liquidated over $50,000,000 of Ver's collateral.

273.    Had GGCI disclosed accurate financial information as of June 28, 2022, or otherwise disclosed the 3AC write downs resulting from its failure in the 3AC arbitration, Mr. Ver never would have continued to make payments to maintain the option and would have terminated the option contracts as a result of GGCI's insolvency.

274.    However, as a direct result of GGCI's intentional misrepresentations Mr. Ver has suffered significant damages.

275.    Accordingly, Ver respectfully requests that this Court award all relevant damages caused by Counter-Defendant's fraud, including, but not limited to, compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000.00, punitive or exemplary damages for their malicious conduct, all costs and Court fees, reasonable attorneys' fees, as well as any other relief this Court deems just and proper.

## COUNT SIX

### (Fraudulent Inducement)

276.    Defendant realleges and incorporates all preceding paragraphs as though fully set forth herein, and further alleges:

43

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 312 of 637

277.    As described herein, during June 2022, GGCI personnel launched a campaign to convince Ver to allow his out-of-the-money options expire, while rolling over his in-the-money options to a later date.

278.    At first, Ver was not interested in such a plan.  However, after a series of discussions and representations by GGCI, Ver elected to follow their suggestion and roll over his in-the-money options to a later expiration date.

279.    Unbeknownst to Ver, at the same time that GGCI was convincing him to rollover his options, GAP, a closely related entity, was engaging in a plan to liquidate one of its biggest customers, 3AC.

280.    What was known to GGCI, but unknown to Ver as a result of GGCI's material omission, was that this liquidation was going to have a large negative impact on Ver's expiring options.

281.    The liquidation of 3AC's collateral, as well as the ensuing fall out from one of the space's largest players teetering on bankruptcy, could have no other effect than to drive down market prices, thereby hurting Ver's position.

282.    GGCI knew that had they disclosed GAP's plan to margin call and/or liquidate 3AC, Ver would have rejected any rollovers and instead, let his in-the-money options expire, and collect his profits from those trades, further increasing the financial strain being felt by Counter-Defendant and its related entities.

283.    Ver justifiably relied on this omission when making his decision to roll over his open options contracts.

284.    Not surprisingly, least of all to GGCI, the downfall of 3AC, and the ensuing panic, had a drastic effect on the markets, greatly hurting Ver's open positions.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 313 of 637

285.    But for the actions of GGCI, the options Ver had rolled would have expired in profit on June 24.

286.    Further, following the fraudulently induced rollover, Ver was required to meet various margin calls.  From the date of his rollover, until those newly rolled over contracts expired, Ver made in payments in excess of $60,000,000 to GGCI to maintain his positions, and had over $50,000,000 in collateral liquidated, that never would have been paid to Counter-Defendant had they not omitted the material information regarding the 3AC margin call and liquidation.

287.    Accordingly, Ver respectfully requests that this Court award all relevant damages caused by Counter-Defendant's fraudulent inducement, including, but not limited to, compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000.00, punitive or exemplary damages for their malicious conduct, all costs and Court fees, reasonable attorneys' fees, as well as any other relief this Court deems just and proper.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Counter-Plaintiff Roger Ver respectfully requests that this Court:

1.  Deny Counter-Defendant's claims for relief in their entirety;

2.  Award compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000.00 in favor of Mr. Ver on his Counterclaims, as well as punitive or exemplary damages, incidental damages, and consequential damages;

3.  Award Counter-Plaintiff pre-judgment and post-judgment interest;

4.  Award Counter-Plaintiff's reasonable attorney fees, expenses, and the costs of this action; and

45

5. Award Counter-Plaintiff such other and further relief as this Court may deem just, proper, and equitable under the circumstances.

### DEMAND FOR JURY TRIAL

Counter-Plaintiff hereby demands a trial by jury of all claims so triable.

**KELMAN PLLC**

Dated: May 9, 2023          By:    <u>s/: Daniel J. Kelman</u>
Daniel J. Kelman
Michael D. Handelsman
1501 Broadway,
12th Floor, #2972
New York, NY 10036
daniel@kelman.law
mike@kelman.law

46

# Exhibit B

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 316 of 637

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| GENESIS GLOBAL CAPITAL<br>INTERNATIONAL LIMITED,<br><br>                                  Plaintiff,<br><br>                      v.<br><br>ROGER VER,<br><br>                                 Defendant. | Index No. 650439/2023<br><br>**AMENDED ANSWER AND<br>COUNTERCLAIM OF<br>ROGER VER** |

Defendant, Roger Ver ("Ver"), by and through his attorneys, Kelman PLLC, in response

to the allegations contained in the complaint of Genesis Global Capital International Limited

("GGCI") filed herein, alleges as follows:

**INTRODUCTION**

This case exposes the deceptive tactics of an insolvent derivatives trading desk desperate

to remain afloat. GGCI's own derivatives contracts mandated continuous solvency. Yet when

Ver sought confirmation of their financial status, GGCI deceived him with misleading financial

information and induced him to provide tens of millions of dollars in additional collateral.

In June 2022, GGCI faced insolvency as Three Arrows Capital ("3AC") started to

collapse. Desperate for assets, they targeted Ver, a significant customer with multiple expiring

options that month. To collect from him, GGCI let Ver's out-of-the-money options expire; to

avoid paying him, GGCI persuaded Ver to roll in-the-money options to a later date. Meanwhile,

Genesis secretly planned to margin call and liquidate 3AC immediately after the roll, which

would drive Ver's expiring positions to new lows.

The moment Ver's out-of-the-money June options expired, GGCI abruptly demanded that

Ver over-collateralize the positions he had just rolled by a staggering 300%. This sudden and

unprecedented low valuation raised Ver's suspicions about GGCI's solvency, because GGCI had always accepted digital assets as collateral at mark-to-market prices.

In fact, GGCI was attempting to cover up its insolvency by squeezing Ver for exorbitant sums of collateral. Although GGCI outwardly applied a low valuation to Ver's digital assets, once they had them in hand, GGCI would add them to their balance sheet as assets valued mark-to-market. This accounting trick promised to boost GGCI's assets by several hundred million dollars and return them to solvency.

Ver demanded proof of GGCI's solvency before he would provide any further collateral. GGCI then provided Ver with a Statement of Financial Condition ("SOFC") dated June 20, 2022, which misleadingly portrayed a narrow positive equity. In truth, however, GGCI was already insolvent. The SOFC hid GGCI's insolvency by using the same accounting trick — overvaluing illiquid digital assets by using undiscounted mark-to-market prices. Had GGCI applied appropriate discounts to its digital assets as it demanded from Ver, their SOFC would have revealed their insolvency and Ver would have terminated the contracts as a result of GGCI's default.

In July 2022, GGCI continued to conceal its insolvency by misrepresenting that its parent company, Digital Currency Group ("DCG"), had assumed more than $1.1 billion in losses that Genesis had suffered. However, unbeknownst to Ver and the public at large, DCG never injected $1.1 billion into Genesis. Instead, DCG had merely provided Genesis with a promissory note that promised to pay it $1.1 billion over a *ten year* period. The fair market value of that promissory note — its *real* value — was far below its face value; it did not return Genesis or GGCI to solvency, nor did it help their liquidity issues. GGCI thereby deceived Ver into believing that it

2

was solvent, which induced Ver to provide more than $60 million in collateral over the months that followed.

In December 2022, just as Ver's options were expiring, the collapse of the FTX exchange and Alameda Research revealed that Genesis and GGCI were insolvent all along. Ver was alerted to GGCI's insolvency by an interview wherein FTX and Alameda co-founder Sam Bankman-Fried stated that Alameda had repaid a $2.5 billion dollar loan to "Genesis" in August 2022. This appeared to be an obvious preference transfer that would be subject to clawback.

Citing the $2.5 billion repayment from Alameda, Ver requested that GGCI provide further assurances that it had been solvent in June 2022. Ver reminded GGCI that he had faithfully provided additional collateral for months, including a substantial $37 million in payments just weeks earlier. GGCI acknowledged that the timing and size of Ver's recent collateral contributions underscored his genuine concern, since he could have simply raised these arguments instead of paying GGCI $37 million dollars.

Consequently, GGCI reluctantly shared its 2021 audited financials with Ver, and denied that it had ever had any involvement with FTX or Alameda. However, analysis of GGCI's 2021 financials directly contradicted these claims. GGCI's 2021 financials revealed that it had allowed a single counterparty to open a $2.5 billion position, collateralized exclusively by FTX's own FTT tokens, which were valued at inflated mark-to-market prices. It was evident that these FTT tokens had come from Alameda.

Thereafter, as GGCI's parent filed for bankruptcy and began negotiating with creditors, Ver learned that Genesis and GGCI had never actually received funds from DCG and had indeed been insolvent the entire time.

3

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 319 of 637

Despite GGCI's repeated misrepresentations and false assurances of solvency, Ver maintains his willingness to pay any outstanding sums owed, provided GGCI can finally demonstrate they were solvent at the relevant times. To date, they have yet to do so.

## ANSWER TO THE COMPLAINT

### Preliminary Statement

1.      Defendant denies the allegations of paragraph 1.

2.      Defendant denies the allegations of paragraph 2.

3.      Defendant denies the allegations of paragraph 3 and alleges the documents referenced therein speak for themselves. Further, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms. Further, the parties also did not execute the ISDA Credit Support Annex, and no elections were made as to Section 13 of that agreement, entitled "Elections and Variables."

4.      Defendant lacks sufficient information and knowledge to form a belief as to the allegations contained in paragraph 4.

5.      Defendant admits that the Master Confirmation Agreement makes certain elections and modifications to the 2002 ISDA Master Agreement and the ISDA Credit Support Annex as alleged in paragraph 5. However, the parties never executed a 2002 ISDA Master Agreement or the ISDA Credit Support Annex, and no elections were made as to the schedule to the 2002 ISDA Master Agreement or Section 13 of the ISDA Support Annex, each of which contain material terms.

6.      Defendant lacks sufficient information and knowledge to form a belief as to the allegations contained in paragraph 6, but believes same to be true.

4

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 320 of 637

7.     Defendant denies the allegations contained in paragraph 7.  As discussed in Ver's counterclaim below GGCI was likely insolvent well in advance of December 2022.  The precise date of GGCI's insolvency is not currently known, but this dispute may implicate option contracts with different expiration dates.

8.     Defendant denies the allegations contained in paragraph 8.  As will be evident from Ver's counterclaim, Plaintiff was in default of the option agreements well in advance of December 2022 and, in fact, owes Ver damages estimated to be well in excess of $20 million.

9.     Defendant admits receiving the notices referenced in paragraph 9 but denies that he owed GGCI anything as a result of its default and breach of the contracts between the parties.

10.     Defendant admits receiving the "Calculation Statement" referenced in paragraph 10 but denies that he owed GGCI anything as a result of its default and breach of the contracts between the parties.

11.     Defendant admits the allegations contained in paragraph 11 that he has failed to pay the sums identified in paragraph 10 as the funds requested are not duly owed as a result of GGCI's default and breach of the contracts between the parties.

12.     Defendant denies the allegations contained in paragraph 12.

13.     Defendant denies the allegations contained in paragraph 13 and states that the parties did not execute a 2002 ISDA Master Agreement or the schedules attached thereto which contain material terms.

**The Parties**

14.     Defendant lacks sufficient knowledge and information to form a belief as to the allegations contained in paragraph 14.

15.     Defendant admits the allegations contained in paragraph 15.  Mr. Ver is a citizen of St. Kitts, but does not reside at 858 Zenway Blvd. Unit 15-203, Frigate Bay, St. Kitts and Nevis.

### Jurisdiction and Venue

16.     Defendant admits the allegations contained in paragraph 16.  While the Master Confirmation makes reference to the 2002 ISDA Master Agreement and ISDA Support Annex, no such agreements were executed by the parties, and no elections were made as to the schedule to the 2002 ISDA Master Agreement or Section 13 of the ISDA Support Annex, which contain material terms.

17.     Defendant admits the allegations contained in paragraph 17.

18.     Defendant admits the allegations contained in paragraph 18.

### Statement of Facts

19.     Defendant admits the allegations contained in paragraph 19.

20.     Defendant denies the allegations contained in paragraph 20.  While the Master Confirmation makes reference to the 2002 ISDA Master Agreement and ISDA Support Annex, no such agreements were executed by the parties, and no elections were made as to the schedule to the 2002 ISDA Master Agreement or Section 13 of the ISDA Support Annex, which contain material terms.

21.     Defendant admits the allegations contained in paragraph 21.

22.     Defendant admits that the 2002 ISDA Master Agreement "provides general conditions for payment and delivery" as alleged in paragraph 22.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the

6

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 322 of 637

2002 ISDA Master Agreement, which contains material terms of the agreement. Further, the document speaks for itself.

23.    Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 23. However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement. Further, the document speaks for itself.

24.    Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 24. However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement. Further, the document speaks for itself.

25.    Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 25. However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement. Further, the document speaks for itself.

26.    Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 26. However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement. Further, the document speaks for itself.

27.    Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 27. However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement. Further, the document speaks for itself.

7

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 323 of 637

28.     Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 28.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

29.     Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 29.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

30.     Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 30.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.   Further, the document speaks for itself.

31.     Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 31.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

32.     Defendant admits the allegations contained in paragraph 32.   Further, the document speaks for itself.

33.     Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 33.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

8

34.     Defendant admits that the parties executed various option transactions as alleged in paragraph 34 but currently lacks sufficient knowledge and information to form a belief as to whether a transaction confirmation was sent for each and every transaction.

35.     Defendant denies the allegations contained in paragraph 35.  However, Ver admits that he did not terminate the contracts as a direct result of GGCI's multiple intentional misrepresentations regarding its solvency and other related issues.

36.     Defendant denies the allegations contained in paragraph 36 to the extent that GGCI is attempting to limit this dispute to three transactions.  Upon information and belief, GGCI was insolvent by June 2022 and, in fact, owed Ver substantial sums.  Defendant admits that the terms of the three option contracts reflected in paragraph 36 are accurate.

37.     Defendant admits the allegations contained in paragraph 37.  Further, the documents speak for themselves.

38.     Defendant admits that three option contracts expired in December 2022 as alleged in paragraph 38, but denies that these are the only option contracts at issue in this dispute.

39.     Defendant admits the allegations contained in paragraph 39, but denies that any sums were owed to GGCI as a result of its breach of the agreements between the parties and is owed substantial sums from GGCI.

40.     Defendant admits to receiving the notice referenced in paragraph 40.  Further, the document speaks for itself.

41.     Defendant admits the allegations contained in paragraph 41, but denies that any sums were duly owed to GGCI as a result of its default and various breaches of the agreements.

42.     Defendant admits to receiving the notice referenced in paragraph 42.  Further, the document speaks for itself.

9

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 325 of 637

43.     Defendant admits to receiving the notice referenced in paragraph 43.  Further, the document speaks for itself.

44.     Defendant admits the allegations contained in paragraph 41, but denies that any sums were duly owed to GGCI as a result of its own default and various breaches of the agreements.

45.     Defendant admits to receiving the notice referenced in paragraph 45.  Further, the document speaks for itself.

46.     Defendant lacks sufficient knowledge and information to form a belief as to the allegations contained in paragraph 46.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

47.     Defendant admits to receiving the notice referenced in paragraph 47 but denies the accuracy of the alleged sums owed contained therein.  Further, the document speaks for itself.

48.     Defendant admits the allegations contained in paragraph 41, but denies that any sums were duly owed to GGCI as a result of its own default and various breaches of the agreements.

49.     Defendant admits the allegations contained in paragraph 49.

### Claims for Relief
### Claim One

50.     Defendant repeats and incorporates in full his responses to each allegation set forth in paragraphs 1–49.

51.     The allegations in paragraph 51 state legal conclusions to which no response is required.  To the extent a response is required, the parties did not execute a 2002 ISDA Master

Case 1:24-cv-01533-JPC     Document 1-18     Filed 02/28/24     Page 326 of 637

Agreement or ISDA Support Annex, and no elections were made as to the schedule to the 2002 ISDA Master Agreement or Section 13 of the ISDA Support Annex, which contain material terms.

52.     The allegations in paragraph 52 state legal conclusions to which no response is required.  To the extent a response is required, Defendant denies the allegations contained therein as GGCI failed to meet its contractual obligations to Ver.

53.     The allegations in paragraph 53 state legal conclusions to which no response is required.  To the extent a response is required, Defendant denies the allegations of paragraph 53.

54.     Defendant denies the allegations contained in paragraph 54.

55.     The allegations in paragraph 55 state legal conclusions to which no response is required.  To the extent a response is required, Defendant denies the allegations of paragraph 55.

56.     The allegations in paragraph 56 state legal conclusions to which no response is required.  To the extent a response is required, Defendant denies the allegations of paragraph 56.

### Request for Relief

Defendant denies the allegations in the Request for Relief, including the "Wherefore" clause, that Plaintiff is entitled to any form or any amount of relief.

### Affirmative Defenses

57.     Plaintiff has failed to state a claim upon which relief can be granted.

58.     Plaintiff has failed to produce all of the relevant agreements between the parties, including agreements related to the ISDA Master Agreement, including but not limited to the confirmations, definition booklets and credit support documentation.

59.     The Plaintiff's requests for relief are barred by the doctrine of unclean hands.

11

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 327 of 637

60.     Plaintiff lacks standing to avail itself of the Courts of the State of New York in that it is a foreign corporation, doing business in New York, without payment of the required taxes and fees in connection with its business operations.

61.     Plaintiff failed to act in a commercially reasonable manner.

62.     Plaintiff has breached the agreement between the parties, barring Plaintiff's request for relief.

## COUNTERCLAIM

### The Parties

63.     Roger Ver ("Ver") is the Counter-Plaintiff in this action.  Ver is a natural person and a resident and citizen of St. Kitts and Nevis.

64.     Genesis Global Capital International Limited ("GGCI") is the Counter-Defendant in this action.  GGCI is a British Virgin Islands company limited by shares with a principal place of business in New York.

### Related Non-Parties



12

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 328 of 637

65.     Digital Currency Group, Inc ("DCG") is a global venture capital company that invests in blockchain and digital currency-related companies.  DCG is the ultimate parent of the entities that comprise the Genesis Group (pictured above), which includes GGCI.

66.     Genesis Global Holdco, LLC ("Genesis Holdco") is a subsidiary of Digital Currency Group.  Genesis Holdco is a Delaware LLC that has filed for Chapter 11 bankruptcy protection in the Southern District of New York.

67.     Genesis Global Capital, LLC ("Genesis Global") is a subsidiary of Genesis Holdco.  Genesis Global is also the ultimate parent of GGCI.  Genesis Global is a Delaware LLC that has filed for Chapter 11 bankruptcy protection in the Southern District of New York.

68.     Genesis Asia Pacific Limited Pte ("GAP") is a Singapore private limited company that has filed for Chapter 11 bankruptcy protection in the Southern District of New York.

69.     Collectively, GGCI, Genesis Holdco, Genesis Global, GAP and their affiliates comprise the Genesis Group, and are referred to herein as "Genesis".

70.     Three Arrows Capital Limited ("3AC") was a Singapore-based investment firm incorporated in the BVI that specialized in trading and investing in cryptocurrencies and other digital assets before its stunning collapse in mid-2022.  They are now being liquidated in the BVI.

71.     Alameda Research LLC ("Alameda") was a quantitative cryptocurrency trading firm that was founded in 2017 by Sam Bankman-Fried. Alameda, along with FTX and more than 130 affiliated entities, filed for Chapter 11 bankruptcy protection in November 2022.

72.     FTX International Limited (aka FTX Trading Limited) ("FTX") is a cryptocurrency derivatives exchange that was launched in 2019 by Sam Bankman-Fried and

others. As discussed above, FTX, and more than 130 affiliated entities, filed for Chapter 11 bankruptcy protection in November 2022.

73.     Sam Bankman-Fried ("SBF") is the now disgraced co-founder and CEO of both FTX and Alameda Research, and was at the heart of one of, if not the, largest cryptocurrency thefts in history, stealing billions of dollars from his customers and using those funds to pay down debts owed by companies he owned or controlled, including Alameda and FTX.

### GGCI Solicits Ver's Business

74.     On June 10, 2020, GGCI approached Ver, a well-known Bitcoin Cash ("BCH") proponent, to trade BCH-based over-the-counter derivatives.  GGCI sought to start a BCH options book with Ver's help.

75.     Though experienced in digital asset investment, Ver was new to options trading.

76.     Ver was initially hesitant to entrust GGCI with significant assets.  Seeking to win Ver's business, GGCI proposed a mechanism to earn interest on his collateral while his positions were open.

77.     On June 15, 2020, GGCI suggested that Ver could lend his BCH to GGCI at interest while simultaneously using the same assets as collateral for derivative contracts with GGCI.

78.     This arrangement, where Ver's interest-bearing loans served as collateral for GGCI trades, induced Ver to trade derivatives with GGCI.

### The Master Confirmation Agreement and Key Terms

79.     On June 15, 2020, Ver and GGCI executed a Master Loan Agreement ("MLA") which promised to pay Ver interest at agreed upon rates to be determined by the parties during the course of the agreement's term.

14

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 330 of 637

80.     On June 22, 2020, Ver and GGCI executed a Master Confirmation Agreement to govern their derivative contracts, which was then amended on July 13, 2020 (collectively, the "MCA").

81.     The MCA referenced International Swaps and Derivatives Association (ISDA) form agreements, such as the 1994 Credit Support Annex and the 2002 ISDA Master Agreement. These agreements aimed to protect parties in over-the-counter derivatives transactions against potential issues, such as insolvency or misrepresentation.

82.     Although the parties agreed in various transaction confirmations that the 2002 ISDA Master Agreement and the 1994 Credit Annex formed part of the MCA, neither party ever executed and/or signed either of these documents.  Consequently, none of the schedules to either of them formed part of its terms.

83.     In the 2002 ISDA Master Agreement, section 5(a)(vii)(2) required parties to remain solvent at all times, stating that it was an Event of Default if either party "becomes insolvent or is unable to pay its debts."

84.     Additionally, section 5(a)(iv) prohibited misrepresentation, declaring an Event of Default if a party made "[a] representation... [which] proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated."

85.     Each time Ver and GGCI transacted, they executed an individual transaction confirmation based on the MCA terms.  These terms specified collateral requirements, eligible collateral types, and valuation methods.  The MCA listed both US dollars and a "Reference Currency" as eligible collateral, with a valuation percentage of "100% at Spot Rate."

15

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 331 of 637

86.     The MCA's use of "Reference Currency" valued at "100% Spot Rate" meant that the underlying digital asset being traded in the derivative contract could serve as collateral, and it would be valued based on its mark-to-market value in the spot markets.

87.     Despite earlier Telegram communications stating otherwise, the confirmations did not mention Ver's loans as acceptable collateral.  However, GGCI disregarded ISDA's standards and the MCA's written terms and eased collateral requirements throughout their course of dealing.

88.     In fact, it was a common practice for GGCI to ease collateral requirements, not only for Ver, but also for its other counterparties.

**The Importance of Solvency in Derivative Transactions**

89.     Derivative transactions involve bets on the future price of an underlying asset.  If a counterparty becomes insolvent during the contract, the winning party may not be able to collect, undermining the transaction's sole purpose.

90.     To mitigate this counterparty risk, the 2002 Master ISDA required parties to maintain solvency at all times (the "Solvency Requirement").

91.     The Solvency Requirement was crucial for Ver's decision to enter the MCA, since it ensured that he could collect from GGCI if his derivative positions were successful.  The Solvency Requirement also benefited GGCI, as it could collect from Ver and potentially foreclose on collateral if needed.

92.     The Solvency Requirement was designed to apply to any bankruptcy or insolvency laws relevant to a party.  For GGCI, a BVI company operating in New York, insolvency under BVI or New York law would breach the requirement.  GGCI would be insolvent if it couldn't meet obligations when due, or if its liabilities exceeded its assets.

16

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 332 of 637

93.     GGCI's collateral policy was essential for compliance with the Solvency Requirement.  If a counterparty failed to pay, GGCI would incur losses, potentially leading to insolvency as assets were either removed from its balance sheet or had their value greatly reduced.

94.     To mitigate this risk, GGCI required counterparties to provide collateral before opening positions, and it was GGCI's responsibility to maintain adequate collateral and ensure its assets exceeded liabilities at all times.  Again, any failure to do so would undermine the entire purpose of the transactions.

### GGCI Failed to Enforce Collateral Requirements

95.     The MCA and its Transaction Confirmations contained strict collateral requirements for Ver, but GGCI did not enforce them.  Instead, GGCI allowed Ver and other customers to maintain undercollateralized positions and provide exotic, illiquid digital assets as collateral.

96.     Firstly, GGCI never required Ver to post US dollars or Reference Currency as collateral.  They allowed Ver to use unrelated digital assets, such as Monero (XMR) and Binance Coin (BNB), even though these assets were unrelated to the underlying derivative transaction.

97.     GGCI permitted other customers to provide even more illiquid and exotic assets as collateral, such as FTT tokens.

98.     On information and belief, GGCI also allowed SOL, OXY, MPS and SRM as collateral to support billions in loans.

99.     Secondly, GGCI valued this exotic collateral at mark-to-market prices without applying appropriate discounts for illiquidity or potential losses during liquidation.

17

100.    Thirdly, GGCI allowed Ver to maintain collateral amounts below the required sum in the MCA.

101.    Fourthly, GGCI didn't request additional collateral from Ver when the US dollar value of his digital assets fell below key thresholds.

102.    Fifthly, GGCI permitted Ver to use digital assets he had loaned at interest as collateral, which meant that GGCI was taking on additional counterparty risk by redeploying Ver's collateral to profit from an interest rate spread.

103.    GGCI's relaxed collateral requirements were not exclusive to Ver.  It extended the same or similar benefits to other counterparties, resulting in an increased risk of loss and insolvency if the market turned against them.

104.    Nor were GGCI's relaxed collateral requirements embodied in any agreement or official special status afforded to Ver or other particular customers.  Rather, GGCI simply neglected to enforce the written terms of its agreements.

### GGCI's Collateral Exposed to "Daisy Chain" of Debts

105.    GGCI did not directly possess all of the digital asset collateral deposited by counterparties like Ver.  Instead, GGCI sought to generate profits by loaning out this collateral and profiting from the interest rate spread.  This practice, however, exposed GGCI's collateral value to increased counterparty risk, as it needed to recover the loaned collateral before liquidating it to cover a default.

106.    GGCI's collateral practices created a precarious chain of debt obligations. Essentially, a house of cards. Under normal market conditions, they could manage this debt chain by obtaining US dollars.  However, during times of market stress and illiquidity, a single default

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 334 of 637

could render GGCI unable to access the collateral deposited by Ver or others, exposing them to immense loss.

107.    Without US dollar cash reserves, GGCI would be forced to liquidate investments at fire sale prices, or call in loans from borrowers who may default.  During periods of market illiquidity and stress, GGCI's relaxed collateral practices increased the risk of GGCI becoming undercollateralized and insolvent.

108.    On information and belief, GGCI would routinely loan out its digital assets to other Genesis entities, including GAP, who would loan it to counterparties such as 3AC.

109.    These related party loans would eventually become impaired by 3AC's insolvency.  In June 2022, 3AC defaulted on more than $2.3 billion to GAP, causing losses to GGCI as related party loans became impaired.

110.    Barry Silbert, who controlled GGCI and the Genesis Entities through his position as Chairman of DCG, was aware of this risk.  In a June 2021 tweet, he acknowledged the "daisy chain" of debts and emphasized the importance of understanding counterparty risk and identifying weak links in the chain.  Regrettably, Silbert failed to recognize that these weak links existed within his own organization, ultimately jeopardizing the safety of GGCI's collateral.



**GGCI Overstates its Financial Health: Deviating from ASC 820**

111.   GGCI's mark-to-market valuation of digital assets, including those not physically possessed, resulted in an overstatement of its financial health.

112.   Note 2 to GGCI's December 31, 2021 audited financial statement detailed the significant accounting policies and the methods used to derive valuations for its assets and liabilities.  The statement claimed compliance with accounting principles generally accepted in the United States of America (U.S. GAAP).

113.   U.S. GAAP utilizes ASC 820 for determining "fair value," which is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.

114.   ASC 820 establishes a hierarchy of inputs for determining fair value, prioritizing observable inputs and requiring additional disclosures when unobservable inputs are relied on.

115.   GGCI concluded all digital assets and liabilities were recorded and valued based on Level 2 inputs – which are defined as "significant observable inputs".

116.   ASC 820's hierarchy includes three levels:

   a.   Level 1 (unadjusted spot price in an active market, such as the quoted price of Apple shares on the New York Stock Exchange);

   b.   Level 2 (spot prices from less active markets and may or may not be discounted); and

   c.   Level 3 (providing the most discretion, since the quoted price is unreliable and the evaluator is thus forced to rely on other inputs that are unobservable and significant to the overall fair value measurement).

117.   GGCI determined the fair market value of assets in "digital currency investments" and liabilities under "digital currency collateral payable" using Level 2.

20

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 336 of 637

118.    Digital assets are a famously volatile asset class, characterized by extreme price fluctuations and inherent unpredictability.  Market movements are driven by factors such as technological advancements, regulatory changes, market sentiment, global economic conditions, illiquidity, and, at times, price manipulation.

119.    At all times relevant, GGCI valued all of its digital assets at mark-to-market prices and never applied a discount to them.

120.    Upon information and belief, GGCI has employed the same inadequate accounting methods at all times during the life of the agreements at issue. As a result, GGCI has been insolvent for as long as those methods have been employed. To the extent GGCI still employs the same valuation method, it remains insolvent to this day.

121.    Despite liquidity concerns and worsening market conditions beginning in May 2022, GGCI never applied a discount to their Level 2 assets.  All such assets continued to be valued at mark-to-market prices.

122.    GGCI's refusal to apply appropriate discounts to its Level 2 assets allowed GGCI to overstate its financial health and created a misleading picture of a solvent entity where one did not exist.

### Over Exposure to Alameda & FTX

123.    During the course of 2021, Genesis entities engaged in a broad relaxation of their lending standards, and began to accept increasingly illiquid and exotic digital assets as collateral for loan and obligations and derivative contracts, creating a precarious financial situation.

124.    On information and belief, GGCI went insolvent at some point during 2021 when it made a loan of $2.5 billion and accepted FTT tokens as collateral.  GGCI valued these FTT

tokens mark-to-market, which overstated the real value of FTT and resulted in a severe under collateralization, as Alameda had manipulated FTT's price higher to borrow against it.

125.    Consequently, GGCI was grossly overexposed to a single counterparty. GGCI's 2021 audited financials reported that on December 31, 2021 the company held $2.370 billion in "digital collateral payable", 99% of which were FTT tokens owed to a single counterparty. These FTT tokens represented *nearly 70%* of GGCI's then total assets.

126.    However, the actual fair market value of these FTT tokens was far lower than the mark-to-market prices used by GGCI, which resulted in significantly fewer assets than reported.

127.    Were GGCI to foreclose on the FTT tokens and sell them for US dollars, *they would have been unable to recover anywhere near the full amount owed.*

128.    GGCI's overexposure to FTT resulted from a quid pro quo relationship between Alameda and Genesis executives.

129.    FTX and Alameda granted Genesis executives early access to purchase FTT tokens at discounted rates before public issuance.

130.    This conflict of interest compromised GGCI's risk management policies and practices, as executives were incentivized to authorize GGCI to take excessive risks for their personal benefit.

131.    If not for these conflicts of interest, Genesis executives might have conducted adequate due diligence on their $2.5 billion loan and learned of Alameda's scheme to manipulate FTT prices and increase its borrowing ability.

132.    In a complaint against Alameda's former CEO, Caroline Ellison, the SEC details this manipulation. Ellison engaged in automated FTT token purchases to inflate the value of Alameda's collateral, increasing risks for lenders accepting FTT as collateral.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 338 of 637

133.     The market crash of May 2022 only worsened GGCI's finances, as Alameda suffered substantial losses, which exacerbated its inability to repay its loan to GGCI.

134.     After May 2022's market crash, Alameda focused its efforts on propping up the price of FTT token, continuing to engage in market operations and offering lines of credit to insolvent entities with large FTT positions to prevent FTT from being liquidated, which would have publicly revealed Alameda's insolvency.

135.     In August 2022, after realizing that Genesis and GGCI would liquidate FTT tokens and reveal their insolvency, Alameda misappropriated customer funds to repay Genesis and GGCI, which was a preferential transfer at the expense of FTX creditors subject to clawback.

136.     Afterwards, Alameda replaced the missing $2.5 billion in FTX customer deposits with the FTT tokens it had just received from Genesis and GGCI, and by valuing FTT at its inflated mark-to-market price created the illusion that FTX remained solvent.

137.     In November 2022, the digital asset exchange Binance called Alameda's bluff and threatened to sell their FTT tokens on the open market, which revealed its lack of liquidity.  FTX and Alameda were finally revealed to be insolvent and filed for bankruptcy less than three months after having repaid $2.5 billion to Genesis and GGCI.

### Over Exposure to 3AC & the Crash of May 2022

138.     In May 2022, digital asset markets experienced a steep decline due to the collapse of digital assets LUNA and TerraUSD, causing significant losses, liquidations, and a snowball effect of defaults and insolvencies.

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 339 of 637

139.    3AC was central to the crash, resulting in substantial losses for GGCI and its counterparties.  3AC owed over $3 billion to creditors, including $2.3 billion to GAP, its largest creditor.

140.    Genesis and GAP were overexposed to 3AC, driven by conflicts of interest related to generating demand for the various digital asset trusts operated by Grayscale (the "Grayscale Trusts").  DCG, Genesis' parent company, owned the investment manager for the Grayscale Trusts and profited from the fees it generated.

141.    Since 2020, GAP had been loaning funds to 3AC to fund its Grayscale Trust purchases.  However, GBTC's[1] value declined, resulting in substantial unrealized losses for 3AC. While shares in GBTC traded at a premium to its net asset value when 3AC began conducting the trade in 2020, by June 2022 they were trading at a 30% discount.

142.    Genesis' concerns over its exposure to 3AC had reached a boiling point by January 2022.  That month, Genesis executives had 3AC pledge its GBTC shares to GAP as security.  But as the net asset value of GBTC continued to fall, so did the value of GAP's pledged assets.

143.    Upon information and belief, Genesis' 3AC exposure did not end with the Bitcoin trust, as 3AC was an investor in the other Grayscale Trusts.

144.    In May 2022, after LUNA's collapse, Genesis executives spoke with 3AC and, on information and belief, determined that 3AC was insolvent.

145.    However, GAP's significant exposure to 3AC posed a risk to the solvency of the entire Genesis enterprise, including GGCI, due to various related party loans and intercompany debts.  Consequently, Genesis opted not to issue margin calls to 3AC, despite the terms of their

---

[1] GBTC is the Grayscale Bitcoin Trust, just one of a number of digital asset trusts operated by Grayscale and DCG.

24

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 340 of 637

agreement permitting such action, in order to prevent further destabilizing its own financial situation.

146.    On information and belief, if not insolvent as a result of the $2.5 billion loan backed by FTT discussed herein, GGCI was insolvent as a result of 3AC's inability to repay GAP before the end of May 2022.

147.    On June 10, GGCI's need to obtain more capital became urgent.  That day, 3AC's accounts on the Deribit derivatives platform were liquidated.  Genesis executives, alarmed by the Deribit liquidations and cognizant of 3AC's insolvency, understood that 3AC's demise was near and formulated a strategy to avoid immediate recognition of a $2.3 billion loss.

148.    The plan centered on GAP seizing Grayscale BTC trust shares and other digital assets pledged by 3AC as security for their undercollateralized loans.  However, since issuing an unpayable margin call to 3AC would expose their insolvency, Genesis needed to act quickly before the market caught on.  By securing 3AC assets ahead of other creditors, GAP aimed to offset the substantial loss and safeguard both its own balance sheet and those of its affiliates.

149.    On June 12, Genesis executives set the plan in motion.  GAP issued a margin call to 3AC, demanding an additional $334 million in collateral payments, fully aware that 3AC would be unable to meet the requirement.

150.    On June 13, GAP served a notice of default on 3AC, enabling GAP to liquidate the limited collateral they held and pursue emergency relief to seize further 3AC assets ahead of other creditors.

151.    On June 15, GAP initiated arbitration against 3AC, seeking more than $2.3 billion in loan recovery and emergency relief.  This included seeking a preliminary injunction directing

25

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 341 of 637

3AC to freeze more than $2.3 billion, and to deposit the pledged assets with GAP, which were allegedly valued at $462 million at the time.

152.   In GAP's arbitration filing, it noted that "[d]ue to recent extreme volatility in the cryptocurrency markets, the value of the collateral already posted by Three Arrows decreased significantly in comparison to the loaned assets under the MLAs."

153.   On June 16, news of the notice of default GAP had issued to 3AC was publicized in the media, and numerous other 3AC lenders began making margin calls and issuing default notices.

154.   On June 21, GAP's request for a preliminary injunction to freeze or seize certain 3AC pledged assets was denied.  A further hearing was scheduled for July 5, making it evident GAP wouldn't secure these assets by month's end.

155.   Due to the monthly reporting schedule followed by all Genesis entities, it became apparent that GAP and its affiliates, including GGCI, would have to recognize losses related to 3AC in their month-end financial reports for June 2022, which also coincided with their quarterly reporting obligations.

156.   Consequently, GGCI was insolvent in June 2022 due to various factors, including inaccurate loss recording, failure to apply appropriate discounts to Level 2 digital assets in the midst of a liquidity event, untimely recognition of substantial losses linked to 3AC and related parties, and untimely recognition of losses tied to the FTT-collateralized loan.

**GGCI's Misrepresentations of Solvency**

157.   In or about early June 2022, GGCI devised a plan to strengthen its balance sheet. It aimed to persuade its biggest clients, including Ver, to roll currently profitable options expiring that June to later dates, thereby allowing GGCI to avoid making payments.  Meanwhile, GGCI

26

would allow Ver's currently unprofitable June options to expire, thereby bringing funds into GGCI from Ver and others.

158.    On information and belief, Genesis knew GGCI was insolvent by such time.

159.    On June 7, GGCI asked Ver to roll his deep in-the-money Ethereum options to a later date. Those options expired on June 24.  Ver declined.

160.    On June 9, GGCI sent Ver an article about Ethereum's progress to pique his interest about rolling the options Ver did not respond.

161.    On June 10, Deribit's liquidation of 3AC signaled 3AC's imminent collapse.

162.    On June 11, GGCI again requested Ver to roll only his in-the-money Ethereum options to a later date, and offered him attractive terms.  Unaware that Genesis planned to margin call and liquidate 3AC immediately afterwards, Ver agreed to let GGCI roll his in-the-money options.

163.    On June 12 and 13, digital asset prices fell as 3AC was margin called, defaulted, and liquidations commenced, as had been planned by Genesis

164.    Meanwhile, on June 13, and again on the 14th, GGCI requested further collateral from Ver. On June 15, to keep Genesis executives happy, Ver reduced his exposure to GGCI by $22.5 million by buying certain BTC call options.

165.    From June 16 to June 24, GGCI continued discussions with Ver about the additional types of collateral he could offer, and learned it was Ver's strong preference to post a combination of digital assets and certain shares in private companies.  GGCI indicated it was prepared to accept these assets as collateral, as it had done previously.

166.    Throughout the life of GGCI and Ver's two year business relationship, GGCI had always accepted different forms of collateral from Ver, and allowed him to maintain

27

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 343 of 637

undercollateralized positions.  In fact, it had been GGCI's offer to pay Ver interest on his digital

asset collateral, in direct violation of the MCA's collateral requirements, that had induced Ver to

trade with GGCI and to continue trading up until that time.

167.    However, upon the expiration of Ver's out-of-the-money options on June 24,

Genesis executives abruptly changed their policy.  They demanded that Ver immediately provide

100% of the required collateral in either US dollars or Reference Currency as stated in the MCA,

or face a notice of default.

168.    Based on the course of the parties' dealings, GGCI knew Ver was not expecting to

be required to pay the full sum of collateral in US dollars or Reference Currency on that day,

which GGCI had never required him to do during their two year relationship.

169.    GGCI's plan was to extract an excessive sum of collateral from Ver.  GGCI

offered to accept Ver's digital assets and shares as collateral, but only if he *over*-collateralized his

position by 300% to 600%.  Were Ver to pay in digital assets, GGCI wanted him to supply 300%

as much collateral as the value of his entire position.  If in private shares, 600%.

170.    As a result of the abrupt change in policy and attempt to extract an excessive sum

of collateral, Ver began to suspect GGCI's insolvency.  He nonetheless agreed to discuss details

with GGCI on a call the following day, June 25.

171.    On the June 25th call, Defendants threatened to issue a notice of default if Ver did

not immediately pay the full amount in US dollars or Reference Currency or meet its excessive

collateral demands.

172.    Considering the state of the markets, Ver requested proof of GGCI's solvency.

Thereafter, GGCI backed off its demands for excessive sums of collateral, began engaging in

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 344 of 637

more constructive discussions to immediately accept certain digital assets, and continued discussions with Ver as to other assets to pledge as collateral.

173.    On information and belief, even using inflated mark-to-market prices for digital assets, GGCI was insolvent on June 25 and was therefore unable to provide Ver with proof of its solvency.

174.    GAP had just lost its bid to freeze 3AC assets in the emergency arbitration hearing on June 21.  At the very latest, GAP should have written down their impaired 3AC loans by such date, which would have resulted in GGCI also writing down any related party loans with GAP.

175.    Initially, GGCI declined to provide up-to-date solvency proof to Ver, stating it did not produce point-in-time financial statements.

176.    However, on June 28, after Ver had informed GGCI that he was not comfortable sending any further collateral without proof of GGCI's solvency, GGCI provided an unaudited point in time financial statement.  This statement of financial condition (the "June 20 SOFC") revealed GGCI's various assets and liabilities as of June 20.

**Genesis Global Capital International Limited**
**Statement of Financial Condition (Unaudited)**
**June 20, 2022**
*(in thousands)*

| | | |
|---|---|---:|
| **Assets** | | |
| Cash | $ | 12,929 |
| Investments in digital currencies | | 1,594,209 |
| Derivative assets | | 442,733 |
| Collateral receivable | | 454,449 |
| Receivable from customers | | 159,182 |
| Loans receivable | | 399,560 |
| **Total assets** | $ | 3,063,062 |
| | | |
| **Liabilities and stockholder's equity** | | |
| **Liabilities** | | |
| Collateral payable | $ | 2,094,617 |
| Payable to customers | | 94,569 |
| Loans payable | | 606,477 |
| Derivative liabilities | | 167,132 |
| **Total liabilities** | $ | 2,962,795 |
| | | |
| **Stockholder's equity:** | | |
| Total stockholder's equity | | 100,267 |
| **Total liabilities and stockholder's equity** | $ | 3,063,062 |

177.    The June 20 SOFC claimed total assets of $3.063 billion and liabilities of $2.962 billion, which gave GGCI positive equity of just over $100 million.  Given that $1.594 billion of GGCI's assets were digital assets ("Investments in digital currencies"), even a small fluctuation in the market would render it insolvent.

178.    Faced with an apparently solvent GGCI, who had by now backed off its demands for excessive collateral, Ver saw no choice but to keep his remaining positions open at GGCI and cooperate with it to ensure collateral levels were mutually acceptable until his remaining options expired, unless and until he was presented with evidence of its insolvency.

179.    However, what Ver did not know at the time was that the June 20 SOFC was an accounting farce.  The $1.596 billion in digital assets was in fact worth far less, and consisted of

30

a large sum of illiquid FTT tokens, which if sold would have left a large shortfall remaining to GGCI from an insolvent counterparty.

180.    The SOFC's chosen date of June 20 was no accident and was a central part of that farce.  The SOFC did not reflect the full write down of 3AC's impaired loans.  On information and belief, the 3AC loans were deemed impaired by Genesis on June 21 when GAP's request for emergency relief was denied and GAP had no further collateral to support such debts.

181.    When GGCI's plan to seize exorbitant amounts of collateral from Ver failed, GGCI entered into discussions with its parent companies for an injection of capital to return it to solvency in time for its quarterly reporting obligations at the end of June.

**DCG's $1.1 Billion Promissory Note and Further Misrepresentations of Solvency**

182.    On June 30, 2022 DCG and Genesis Global entered into a sham transaction designed to cover the insolvency of Genesis, including GGCI.  DCG executed an unsecured promissory note payable to Genesis Global in the amount of $1.1 billion (the "DCG Promissory Note").

183.    Genesis Global then added the DCG Promissory Note to its balance sheet as a current asset worth $1.1 billion, purportedly to "offset" the $1.2 billion loss it incurred from 3AC's collapse.  With a fresh $1.1 billion added to its balance sheet as a current asset, Genesis Global was then able to use that $1.1 billion to make an injection of capital into its subsidiary, GGCI.

184.    On information and belief, Genesis Global used the DCG Promissory Note to inject $151 million into its subsidiary, GGCI.  GGCI then recorded $151 million as a current asset on its balance sheet worth $151 million.  This was reflected in an unaudited June 30 SOFC, which Ver would later receive from GGCI.

31

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 347 of 637

**GGC International Limited**
**Statement of Financial Condition**
**June 30, 2022**
*(in thousands)*

| Assets | | |
|---|---|---|
| Cash | $ | 3,232 |
| Investments in digital currencies and trusts | | 1,439,363 |
| Digital currency loans receivable, net of allowance for loan losses | | 1,250 |
| USD loans receivable, net of allowance for loan losses | | 1,000 |
| Digital currency collateral receivable | | 340,389 |
| Derivative assets | | 369,045 |
| Interest receivable, net of allowance | | 2,758 |
| Receivables from related parties | | 47,334 |
| Other assets | | 151,977 |
| **Total assets** | $ | 2,357,248 |
| | | |
| **Liabilities and member's equity** | | |
| **Liabilities** | | |
| Digital currency loans payable | $ | 370,737 |
| Digital currency collateral payable | | 891,080 |
| USD loans payable | | 18,073 |
| Option collateral payable | | 344,169 |
| Derivative liabilities | | 191,864 |
| Interest payable | | 5,645 |
| Accounts payable and accrued expenses | | 295,894 |
| Payables to related parties | | 225,364 |
| **Total liabilities** | | 2,342,826 |
| | | |
| Member's equity | | 14,422 |
| Total member's equity | | 14,422 |
| **Total liabilities and member's equity** | $ | 2,357,248 |

185.    The June 30 SOFC contained a brand new line item, "Other assets", which did not appear on the June 20 SOFC.  "Other assets" reported $151 million in assets.   On information and belief, "Other assets" represented funds that had been received by GGCI on June 30 as the result of the DCG Promissory Note.

186.    In reality, however, the fair market value of the DCG Promissory Note was just a small fraction of the $1.1 billion face amount.  The note would not mature for 10 years — not until June 30, 2032 — and bears interest at a rate of just 1%, far below the market interest rate that DCG would be required to pay for unsecured borrowing.  Accordingly, Genesis Global remained insolvent even upon receipt of the DCG Promissory Note.

32

187.    Likewise, the fair market value of the $151 million GGCI had received was also worth just a fraction of its reported face value, since on information and belief its value was derived from the DCG Promissory Note and did not represent an actual injection of cash. Accordingly, GGCI remained insolvent afterwards, as the actual fair market value of what it had received was insufficient to cover the $136 million in negative equity reported on GGCI's June 30, 2022 SOFC.

188.    On information and belief, both Genesis and DCG had hoped that the DCG Promissory Note would simply serve as a short term bridge loan until the arbitration panel GAP had convened seeking emergency relief from 3AC could make its ruling on July 5, 2022, where GAP hoped to seize certain of 3AC's assets.  However, the arbitration panel denied GAP the relief it sought.

189.    The following day, July 6, Genesis set about to reassure the market that it remained solvent and was continuing business as usual.  That day, Genesis CEO Michael Moro released a public statement on Twitter and explained that "[w]e previously stated in June that we mitigated our losses with respect to a large counterparty who failed to meet a margin call.  Now that the BVI bankruptcy process has commenced, we can confirm that the counterparty was Three Arrows Capital."  Moro asserted that "[t]he loans to this counterparty had a weighted average margin requirement of over 80%.  Once they were unable to meet the margin call requirements, we immediately sold collateral and hedged our downside."  He then claimed that, "[s]ince then, we worked with [DCG] to find the optimal strategy to further isolate the risk.  **DCG has assumed certain liabilities of Genesis related to this counterparty to ensure we have the capital to operate and scale our business for the long term."**  In sum, Moro asserted

that "[w]e deploy a number of risk management strategies to ring-fence our portfolio and utilize all capabilities to mitigate losses quickly and effectively."

190.    GGCI's insolvency was never cured by an injection of capital from DCG.  DCG never "assumed" or "absorbed" Genesis Global's losses.  Instead, DCG and Genesis engaged in yet another accounting farce.  The DCG Promissory Note was an accounting trick designed to make Genesis Global — and by extension, its subsidiary, GGCI — appear as if they had positive equity *without* ever requiring DCG to commit the financial support needed to actually make Genesis Global and GGCI solvent.

191.    Ver was misled into believing that GGCI was solvent by the June 20 SOFC and Genesis CEO Moro's July 6 public statements.  Ver was thus unable to timely exercise his contractual right to terminate the ISDA due to GGCI's violation of the Solvency Requirement.

192.    From June 21, 2022 up until he discovered GGCI's insolvency in December 2022, Ver made payments to GGCI in excess of $60 million and GGCI liquidated a further $50,000,000 in collateral.

**Ver Discovers GGCI's Insolvency**

193.    On November 11, 2022, FTX and Alameda filed for bankruptcy.  Their bankruptcy came after a rapid decline when Binance, another exchange, announced they would sell their FTT tokens on the open market.  Since FTT tokens were highly illiquid and their prices artificially inflated by Alameda, their value plunged by over 90% following Binance's announcement.

194.    The FTX and Alameda bankruptcies sent shockwaves through the digital asset markets.  Surprisingly, Sam Bankman-Fried ("SBF"), the controlling principal behind FTX and Alameda, started giving public interviews, asserting that FTX wasn't truly insolvent since its

34

balance sheet held digital assets — primarily FTT tokens — with a mark-to-market value exceeding customer liabilities.  SBF was eventually indicted on numerous felony charges.

195.    Later that November, rumors circulated that Genesis and its subsidiaries were insolvent when its lending arm stopped withdrawals, trapping investor funds.  It was later revealed that GGCI was FTX's largest creditor.

196.    Genesis initiated a restructuring plan to save its business, which focused on transferring bad assets from GGCI to other Genesis entities destined for bankruptcy.  The plan aimed to raise capital to pay creditors by selling shares in a financially stable GGCI.

197.    Meanwhile, Ver continued to pay collateral to GGCI.  Since June 21, 2022, Ver made total payments to GGCI in excess of $60 million and GGCI liquidated collateral valued in excess of $50,000,000.

198.    On or about December 23, just weeks after Ver made $37 million in collateral payments to GGCI, and just one week before his options would expire, Ver became aware of information that made him question GGCI's earlier claim of solvency that had been supported by the June 20 SOFC.

199.    The news was a New York Times interview of SBF, who stated that Alameda had repaid a $2.5 billion loan to "Genesis" that August, about three months before filing for bankruptcy.  SBF added that the loan was repaid because Genesis had called in specific loans made to Alameda.

200.    Ver became concerned that GGCI might have been the entity that lent money to Alameda, potentially affecting GGCI's present solvency and their solvency in June 2022.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 351 of 637

201.    As Alameda repaid the loan to Genesis in August, about three months before FTX's bankruptcy, it seemed like this repayment would potentially be subject to an automatic clawback as a preferential transfer.

202.    Ver investigated and learned that there was speculation that SBF had directed Alameda to misappropriate FTX customer funds to repay Genesis. Alameda then used the FTT tokens it had received back from Genesis to pay FTX, who then used the FTT tokens to replace the missing customer deposits as an asset on its balance sheet.

203.    This caused Ver to grow more concerned, since if true, it would mean that GGCI had been doing what FTX had been doing: propping up its insolvent balance sheet with inflated FTT tokens.

204.    Since Ver was considering rolling his expiring December 30 options with GGCI to a later date, he wanted to be sure GGCI remained solvent before doing so, and wanted to further confirm they had in fact been solvent that past June when he initially inquired.

205.    In late December 2022, Ver inquired with GGCI as to whether they remained solvent in the wake of the FTX and Alameda bankruptcies, and whether GGCI had any exposure to them, specifically whether it had been GGCI who had reportedly made a $2.5 billion loan to Alameda and was repaid in August 2022.

206.    GGCI responded that all of Ver's trades had been through GGCI. Despite having lost some funds on FTX, GGCI claimed that it remained solvent and had no further involvement or exposure to Alameda or FTX.

207.    Ver persisted in questioning specifically whether it had been GGCI who received the Alameda loan repayment referred to by SBF in the New York Times interview. GGCI informed Ver that those funds had been repaid to a different Genesis entity, not GGCI.

36

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 352 of 637

208.    At this point, Ver demanded proof of GGCI's present solvency, and demanded GGCI provide proof as to how they valued the assets on its June SOFC, which Ver now suspected had deployed the same misleading mark-to-market accounting that FTX had deployed to deceive its depositors.

209.    Ver reminded GGCI that he had faithfully paid in excess of $60 million in additional collateral since June, believing it his legal obligation to do so since GGCI remained solvent, including $37 million dollars in payments just weeks prior.

210.    Were Ver simply trying to avoid paying a debt to GGCI, as Counter-Defendant alleges in its complaint, he obviously would not have made payments totalling $37 million just weeks earlier, and would have raised concerns instead of paying.

211.    Satisfied Ver's concerns were being raised in good faith, but while still denying the validity of his claims, GGCI produced to Ver its 2021 audited financials, as well as an unaudited SOFC dated June 30, 2022.

212.    However, both of those documents raised even further issues which revealed GGCI to have been insolvent in June 2022 at the latest.

**The June 30 SOFC**

213.    The June 30 SOFC revealed to Ver the dramatic and concerning changes which had occurred since the June 20 SOFC.

37

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 353 of 637

| Genesis Global Capital International Limited Statement of Financial Condition (Unaudited) June 20, 2022 (in thousands) | | |
| --- | --- | --- |
| **Assets** | | |
| Cash | $ | 12,929 |
| Investments in digital currencies | | 1,594,209 |
| Derivative assets | | 442,733 |
| Collateral receivable | | 454,449 |
| Receivable from customers | | 159,182 |
| Loans receivable | | 399,560 |
| **Total assets** | $ | 3,063,062 |
| **Liabilities and stockholder's equity** | | |
| **Liabilities** | | |
| Collateral payable | $ | 2,094,617 |
| Payable to customers | | 94,569 |
| Loans payable | | 606,477 |
| Derivative liabilities | | 167,132 |
| **Total liabilities** | $ | 2,962,795 |
| **Stockholder's equity:** | | |
| Total stockholder's equity | | 100,267 |
| **Total liabilities and stockholder's equity** | $ | 3,063,062 |

| GGC International Limited Statement of Financial Condition June 30, 2022 (in thousands) | | |
| --- | --- | --- |
| **Assets** | | |
| Cash | $ | 3,232 |
| Investments in digital currencies and trusts | | 1,439,361 |
| Digital currency loans receivable, net of allowance for loan losses | | 1,250 |
| USD loans receivable, net of allowance for loan losses | | 1,000 |
| Digital currency collateral receivable | | 340,389 |
| Derivative assets | | 369,045 |
| Interest receivable, net of allowance | | 2,758 |
| Receivables from related parties | | 47,334 |
| Other assets | | 151,977 |
| **Total assets** | $ | 2,357,248 |
| **Liabilities and member's equity** | | |
| **Liabilities** | | |
| Digital currency loans payable | $ | 370,737 |
| Digital currency collateral payable | | 891,080 |
| USD loans payable | | 18,073 |
| Option collateral payable | | 344,169 |
| Derivative liabilities | | 191,864 |
| Interest payable | | 5,645 |
| Accounts payable and accrued expenses | | 295,894 |
| Payables to related parties | | 225,364 |
| **Total liabilities** | | 2,342,826 |
| **Member's equity** | | 14,422 |
| Total member's equity | | 14,422 |
| **Total liabilities and member's equity** | $ | 2,357,248 |

214.    First, there had been a significant reported drop in both positive equity and assets. On June 20, there was positive equity of just $100 million on $3 billion in assets, which indicated GGCI faced significant liquidity and volatility concerns. However, by June 30, positive equity had shrunk to $14 million, with assets dropping by more than $400 million, exacerbating the already troubling liquidity and volatility concerns.

215.    Second, much of the fall in asset values was attributed to loans that had been written down.  On June 20, GGCI reported "loans receivable" of $399 million.  However, by June 30, loans receivable had been reduced to $2.25 million.[2]  This represented a loss of more than 99% of GGCI's loans receivable in just a ten day period.

---

[2] The June 20 SOFC and June 30 SOFC differed in how they recorded loans receivable.  The June 20 SOFC contains a single line item for "loans receivable"; the June 30 SOFC contains two, one for USD and one for Digital assets. The line item "*USD Loans Receivable net of allowance for loan losses*" is recorded as $1 million, and "*Digital Currency Loans Receivable net of allowance for loan losses*" is recorded as $1.25 million.  Together, they represent "loans receivable" equal to $2.25 million as of June 30, 2022.

38

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 354 of 637

216.    On information and belief, these loan write-downs represented losses related to 3AC, which had not been written down in the June 20 SOFC, but were known to Counter-Defendant when the June 20 SOFC was sent to Ver as proof of GGCI's solvency.

217.    Lastly, the June 30 SOFC contained a brand new line item, "Other", which had $151 million in assets.  There was no new corresponding line item in liabilities.

218.    On information and belief, this line item "Other" represented sums that were placed onto GGCI's balance sheet as a result of the DCG Promissory Note.

**GGCI's 2021 Audited Financials**

219.    GGCI's 2021 audited financials revealed to Ver both that GGCI had been valuing digital assets at 100% mark-to-market, and that it had in fact been the entity that originated a $2.5 billion loan collateralized by FTT tokens.  Those FTT tokens had ultimately come from Alameda.

220.    The 2021 audited financials explained that GGCI accounted for collateral paid by counterparties as an asset with a corresponding liability.  Alameda's FTT tokens would have been counted on its balance sheet as an asset under "*Investments into digital assets*" and as a liability under "*digital currency collateral payable.*"

221.    GGCI's balance sheet showed "*Investments in digital currencies*" equal to $2.825 billion, and "*Digital currency collateral payable*" equal to $2.370 billion.

222.    Notably, the "*Digital currency collateral payable*" roughly equaled the $2.5 billion SBF had referred to during his New York Times interview.  And while "*Investments in digital currencies*" was larger, it contained additional digital assets owned by GGCI.

223.    GGCI's cash flow statement in the 2021 audited financials also contained a line item for "*Digital currency collateral payable*" under liabilities, which was equal to the same line

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 355 of 637

item on the balance sheet, indicating these sums made their way onto GGCI's balance sheet in 2021.

224.    GGCI's 2021 audited financials contained a section detailing significant exposures to various counterparties.  The significant counterparties were not identified by name, only certain information about them was provided.  The financials identified a "Counterparty I" who represented 99% of the digital currency collateral payable liability, which was further identified to consist of 99% FTT tokens.

225.    Therefore, GGCI's 2021 financials showed that at some time in 2021 it had originated a loan to a single counterparty backed by FTT tokens, which were valued at $2.3 billion as of December 31, 2021.  Accordingly, it became evident to Ver that "Counterparty I" was Alameda Research.

226.    Lastly, GGCI's 2021 audited financials contained other figures that revealed yet other sources of GGCI's undercapitalization.  The statement of cash flows identified a $105 million dollar operating loss for 2021.  And the statement of changes in stockholder equity identified almost $41 million in distributions in 2021.

**GGCI's Shifting Explanations**

227.    When Ver pointed out that GGCI's 2021 audited financials identified a $2.5 billion loan obligation to Alameda, contrary to GGCI's prior representations, GGCI provided misleading information to Ver in an attempt to distance itself from Alameda.

228.    Incredibly, GGCI initially claimed that the financials Ver possessed were actually a consolidated report for multiple Genesis entities, and that the FTT tokens belonged to a different Genesis entity.

229.    However, the financials were clearly labeled as having been prepared exclusively for GGCI, which quickly disproved GGCI's claims.

230.    Once disproven, GGCI shifted its narrative and asserted that an affiliate had dealt with Alameda, who then borrowed from GGCI using the FTT tokens as collateral.  GGCI then refused to provide any evidence to support this claim.

231.    Nonetheless, GGCI's claim that the FTT tokens belonged to an affiliate was a difference without distinction, since the tokens had ultimately come from Alameda and would be subject to a clawback in bankruptcy.

232.    In fact, on May 3, 2023, FTX filed a motion in the Southern District of New York, on behalf of itself and affiliated debtors, seeking $3.9 billion back from Genesis, including sums from GGCI.

233.    Ultimately, discussions with GGCI made clear that GGCI hadn't applied any discount to the digital assets on its SOFC.

234.    At one point, GGCI personnel even admitted that they "may have been underwater for a few days."

235.    Had GGCI applied appropriate discounts to its digital assets, as it demanded from Ver, its SOFC would have revealed its insolvency.

236.    As a result, Ver would have closed his positions to avoid trading with an insolvent counterparty and saved tens of millions of dollars.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 357 of 637

## CAUSES OF ACTION

## COUNT ONE

## (Breach of Contract (Insolvency))

237.    Defendant realleges and incorporates all preceding paragraphs as though fully set forth herein, and further alleges:

238.    As discussed herein, GGCI and Ver were parties to the Master Confirmation which incorporated the ISDA Master Agreement and ISDA Credit Support Annex by reference.

239.    During the life of the parties' relationship, there were well over 100 transactions conducted by GGCI on behalf of Ver.

240.    The Master Confirmation executed in connection with each transaction incorporated the 2002 ISDA Master Agreement by reference.

241.    The 2002 ISDA Master Agreement defines a number of Events of Default.  One such event of default is the insolvency of either party.

242.    As described herein, GGCI became insolvent at some point prior to July 1, 2022.

243.    At the point of insolvency, GGCI was in breach of all option contracts then open between the parties and subject to the 2002 ISDA Master Agreement.

244.    As per the agreements between the parties, in the event of default, all transactions were to be terminated, and the parties were expected to settle any financial obligations at that point.

245.    However, as a result of GGCI's failure to notify Ver of its insolvency, and its campaign of obfuscation, Ver did not become aware of the insolvency for quite some time.

246.     Following the insolvency, but prior to Ver becoming aware of same, Ver contributed substantial additional funds to maintain his then open options positions, which never should have been paid to GGCI as a result of its insolvency.

247.     Ver has suffered significant damages as a direct result of GGCI's breach of the agreements between the parties.

248.     Accordingly, Ver respectfully requests that this Court award all relevant damages caused by Counter-Defendant's breach of contract, including, but not limited to, compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000.00, punitive or exemplary damages for their malicious conduct, all costs and Court fees, reasonable attorneys' fees, as well as any other relief this Court deems just and proper.

## COUNT TWO

### (Breach of Contract (Misrepresentation) - BCH Options)

249.     Defendant realleges and incorporates all preceding paragraphs as though fully set forth herein, and further alleges:

250.     As discussed herein, GGCI and Ver were parties to the Master Confirmation which incorporated the ISDA Master Agreement and ISDA Credit Support Annex by reference.

251.     Pursuant to a trade confirmation dated March 22, 2022, GGCI agreed to purchase from Ver a put option for 70,000 units of Bitcoin Cash ("BCH"), with a strike price of $545 per BCH.

252.     The Master Confirmation executed in connection with this transaction incorporated the 2002 ISDA Master Agreement by reference.

253.     The 2002 ISDA Master Agreement defines a Misrepresentation by either party as an Event of Default as well.  Pursuant to the 2002 ISDA Master Agreement, any representation

43

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 359 of 637

that "proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated" would be considered an Event of Default.

254.    As discussed herein, GGCI made, and repeated, a number of material misrepresentations and omissions regarding its solvency. These repeated misrepresentations and omissions constitute a material breach of the agreement.

255.    Ver has suffered, and continues to suffer, irreparable harm as a direct and proximate result of Counter-Defendant's breach of the agreement.

256.    Accordingly, Ver respectfully requests that this Court award all relevant damages caused by Counter-Defendant's breach of contract, including, but not limited to, compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000.00, punitive or exemplary damages for its malicious conduct, all costs and Court fees, reasonable attorneys' fees, as well as any other relief this Court deems just and proper.

## COUNT THREE

### (Breach of Contract (Misrepresentation) - ETH Options)

257.    Defendant realleges and incorporates all preceding paragraphs as though fully set forth herein, and further alleges:

258.    As discussed herein, GGCI and Ver were parties to the Master Confirmation which incorporated the ISDA Master Agreement and ISDA Credit Support Annex by reference.

259.    Pursuant to a trade confirmation dated June 10, 2022, GGCI agreed to purchase from Ver a put option for 10,000 Ether ("ETH"), with a strike price of $5,000 per ETH.

260.    The Master Confirmation executed in connection with this transaction incorporated the 2002 ISDA Master Agreement by reference.

44

261.    The 2002 ISDA Master Agreement defines a Misrepresentation by either party as an Event of Default as well.  Pursuant to the 2002 ISDA Master Agreement, any representation that "proves to have been incorrect or misleading in any material respect when made or deemed to have been made or repeated" would be considered an Event of Default.

262.    As discussed herein, GGCI made, and repeated, a number of material misrepresentations and omissions regarding its solvency.  These repeated misrepresentations and omissions constitute a material breach of the agreement.

263.    Ver has suffered, and continues to suffer, irreparable harm as a direct and proximate result of Counter-Defendant's breach of the agreement.

264.    Accordingly, Ver respectfully requests that this Court award all relevant damages caused by Counter-Defendant's breach of contract, including, but not limited to, compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000.00, punitive or exemplary damages for their malicious conduct, all costs and Court fees, reasonable attorneys' fees, as well as any other relief this Court deems just and proper.

## COUNT FOUR

### (Breach of Contract (Misrepresentation) - BTC Options)

265.    Defendant realleges and incorporates all preceding paragraphs as though fully set forth herein, and further alleges:

266.    As discussed herein, GGCI and Ver were parties to the Master Confirmation which incorporated the ISDA Master Agreement and ISDA Credit Support Annex by reference.

267.    Pursuant to a trade confirmation dated June 11, 2022, GGCI agreed to purchase from Ver a put option for 500 Bitcoin ("BTC"), with a strike price of $26,000 per BTC.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 361 of 637

268.     The Master Confirmation executed in connection with this transaction incorporated the 2002 ISDA Master Agreement by reference.

269.     The 2002 ISDA Master Agreement defines a Misrepresentation by either party as an Event of Default as well.  Pursuant to the 2002 ISDA Master Agreement, any representation that "proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated" would be considered an Event of Default.

270.     As discussed herein, GGCI made, and repeated, a number of material misrepresentations and omissions regarding its solvency.  These repeated misrepresentations and omissions constitute a material breach of the agreement.

271.     Ver has suffered, and continues to suffer, irreparable harm as a direct and proximate result of Counter-Defendant's breach of the agreement.

272.     Accordingly, Ver respectfully requests that this Court award all relevant damages caused by Counter-Defendant's breach of contract, including, but not limited to, compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000.00, punitive or exemplary damages for its malicious conduct, all costs and Court fees, reasonable attorneys' fees, as well as any other relief this Court deems just and proper.

## COUNT FIVE

### (Fraud)

273.     Defendant realleges and incorporates all preceding paragraphs as though fully set forth herein, and alleges as follows:

274.     On June 7, 2022, GGCI began contacting Ver regarding rolling over his in-the-money Ethereum option.  However, Ver was not interested.

46

275.    Over the next few days, GGCI continued to try and convince Ver that rolling over his options was the right thing to do, sending articles about the performance of ETH and proposing more favorable terms.  Ver eventually agreed to roll his options.

276.    Shortly after electing to roll over his in-the-money options, GGCI began making collateral demands that were 1) above and beyond any level of collateral required by the parties' agreements and 2) not in line with the parties' previous course of dealing.

277.    Considering the state of the market, namely the Luna and 3AC collapses, Ver was concerned about the solvency of GGCI and began to ask questions.  On June 25, 2022, Ver requested that GGCI provide proof of its solvency.

278.    On June 28, 2022, GGCI delivered a statement of financial condition dated June 20, 2022 (the previously discussed June 20 SOFC).  However, on June 21, 2022, GAP's request for emergency relief in its arbitration against 3AC was denied, requiring GAP and, in turn, GGCI to write down hundreds of millions of dollars in assets.

279.    By sending an incomplete, or otherwise misleading SOFC, GGCI knowingly made a material misrepresentation to Ver regarding its current financial condition.

280.    This material misrepresentation or omission was made by GGCI with the express intent to cause Ver to maintain his Ethereum option position with GGCI and prevent him from discovering GGCI's insolvency and exercising his right to terminate the contract as a result.

281.    Ver relied on the June 20 SOFC statement, accepting the representations of GGCI as accurate, and did in fact continue to maintain his option positions at GGCI.

282.    In the months following the delivery of the intentionally misleading June 20 SOFC, Ver made payments in excess of $60,000,000 to GGCI to maintain his positions and GGCI liquidated over $50,000,000 of Ver's collateral.

47

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 363 of 637

283.    Had GGCI not knowingly provided inaccurate financial information via the June 20 SOFC, or otherwise disclosed the 3AC write downs resulting from its failure in the 3AC arbitration, Ver never would have continued to make payments to maintain the option and would have terminated the option contracts as a result of GGCI's insolvency.

284.    However, as a direct result of GGCI's intentional misrepresentations Ver did make additional payments and has suffered significant damages.

285.    Accordingly, Ver respectfully requests that this Court award all relevant damages caused by Counter-Defendant's fraud, including, but not limited to, compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000.00, punitive or exemplary damages for their malicious conduct, all costs and Court fees, reasonable attorneys' fees, as well as any other relief this Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Counter-Plaintiff Roger Ver respectfully requests that this Court:

1. Deny Counter-Defendant's claims for relief in their entirety;

2. Award compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000.00 in favor of Ver on his Counterclaims, as well as punitive or exemplary damages, incidental damages, and consequential damages;

3. Award Counter-Plaintiff pre-judgment and post-judgment interest;

4. Award Counter-Plaintiff's reasonable attorney fees, expenses, and the costs of this action; and

5. Award Counter-Plaintiff such other and further relief as this Court may deem just, proper, and equitable under the circumstances.

48

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 364 of 637

## DEMAND FOR JURY TRIAL

Counter-Plaintiff hereby demands a trial by jury of all claims so triable.

**KELMAN PLLC**

Dated: July 31, 2023

By:   s/: Daniel J. Kelman
      Daniel J. Kelman
      Michael D. Handelsman
      1501 Broadway,
      12th Floor, #2972
      New York, NY 10036
      daniel@kelman.law
      mike@kelman.law

49

# Exhibit C

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 366 of 637

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

GGC INTERNATIONAL LIMITED,

                              Plaintiff,

      - against –

ROGER VER,

                              Defendant.

Index No. 650439/2023

**COMPLAINT**

---

Plaintiff GGC International Limited ("GGC International"), as for its Complaint against Defendant Roger Ver ("Ver," and together with GGC International, the "Parties"), alleges as follows:

## PRELIMINARY STATEMENT

1.      This action seeks to redress Ver's straightforward failure to settle three cryptocurrency options agreements that expired on December 30, 2022.

2.      Ver failed to make payments on those transactions even though Ver had agreed to and recognized them.  This action does not result from any collateral that Ver had transferred to GGC International to partially collateralize his obligations.

3.      GGC International and Ver entered into the Amended and Restated Master Confirmation Agreement for Virtual Currency Put and Call Options Transactions dated as of June 22, 2020 (the "Master Confirmation Agreement").  Pursuant to the Master Confirmation Agreement, the Parties are deemed to enter into the 2002 ISDA Master Agreement (the "ISDA Master Agreement") and the 1994 ISDA Credit Support Annex (the "ISDA Credit Support Annex"), with certain supplements.  Accordingly, unless stated otherwise, when this Complaint

references the Master Confirmation Agreement, it also is incorporating by reference the ISDA Master Agreement and the ISDA Credit Support Annex.

4.      The ISDA Master Agreement and the ISDA Credit Support Annex are industry-standard documents that provide market participants with relationship-level terms that govern the trading of over-the-counter derivative transactions.

5.      The Master Confirmation Agreement makes certain elections and modifications to the ISDA Master Agreement and ISDA Credit Support Annex.  The Master Confirmation Agreement – as includes the terms of the ISDA Master Agreement and the ISDA Credit Support Annex – sets forth the terms under which GGC International and Ver may enter into transactions for the purchase and sale of cryptocurrency put and call options.

6.      In 2022 alone, the Parties entered into thirty-one cryptocurrency options transactions.  The terms of each transaction were memorialized in a written "Transaction Confirmation," which refers back to the Master Confirmation Agreement.

7.      Three options with expiration dates of December 30, 2022 gave rise to this action.

8.      Upon the settlement date for the three options, Ver owed GGC International roughly $110 million in exchange for the underlying tokens, minus amounts owing by GGC International to Ver.  However, Ver did not make that payment.

9.      GGC International thereafter sent several notices to Ver.  On January 12, 2023, GGC International sent a notice to Ver notifying him that as a result of his nonpayment, an "Event of Default" would occur if Ver failed to pay the amount owed within one business day.  Ver once again failed to pay the amount owed.

10.     On January 17, 2023, GGC International sent another notice to Ver that due to the Event of Default that had occurred and was continuing, GGC International designated January 19,

2023 as the "Early Termination Date" under the ISDA Master Agreement. Then, on January 20,

2023, GGC International sent Ver a "Calculation Statement," in which GGC International set off

certain collateral previously delivered by Ver against the amounts owed by Ver, resulting in an

amount of $20,869,788 owing from Ver to GGC International.

11.     Ver failed to pay this amount to GGC International, despite the multiple written

notices and multiple oral conversations with Ver.

12.     Ver's failure to pay constitutes a breach of contract.

13.     As a result of Ver's breach of contract, GGC International has been damaged. GGC

International is entitled to at least $20,869,788, plus interest. The ISDA Master Agreement also

entitles GGC International to indemnity for GGC International's out-of-pocket expenses,

including attorneys' fees.

## THE PARTIES

14.     Plaintiff GGC International Limited is a corporation organized and existing under

the laws of the British Virgin Islands.

15.     Defendant Roger Ver is an individual residing at 858 Zenway Blvd. Unit 15-203,

Frigate Bay, St. Kitts and Nevis.

## JURISDICTION AND VENUE

16.     This court has personal jurisdiction over Ver because he contractually consented to

jurisdiction in the courts of the State of New York. In particular, Section 13(b)(i)(2) of the ISDA

Master Agreement states that "[w]ith respect to any suit, action or proceedings related to any

dispute arising out of or in connection with this Agreement . . . each party irrevocably . . . submits

. . . if this Agreement is expressed to be governed by the laws of the State of New York, to the

non-exclusive jurisdiction of the courts of the State of New York and the United States District

Court located in the Borough of Manhattan in New York City."

3

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 369 of 637

17.     Section 7(a)(i) of the Master Confirmation Agreement sets the governing law as New York, and as such, pursuant to Section 13(b)(i)(2) of the ISDA Master Agreement, Ver has agreed to jurisdiction in the courts of New York.

18.     Venue is also proper because the Parties contractually consented to have disputes heard by the courts in the State of New York.

## STATEMENT OF FACTS

### GGC International and Ver Enter into the Master Confirmation Agreement

19.     The Master Confirmation Agreement between GGC International[1] and Ver sets forth the terms under which the Parties may enter into cryptocurrency put and call option transactions.

20.     The Master Confirmation Agreement states that GGC International and Ver are deemed to have entered into the ISDA Master Agreement and the ISDA Credit Support Annex.

21.     Section 3 of the Master Confirmation Agreement provides that when the parties enter into an option transaction, they are to confirm the economic terms of such transaction in a "Transaction Confirmation."  Sections 4 and 5 of the Master Confirmation Agreement provide the terms to be included in each Transaction Confirmation.

### The ISDA Master Agreement Sets Forth the General Payment Terms

22.     The ISDA Master Agreement, which Ver was deemed to have entered by virtue of the Master Confirmation Agreement, provides the general conditions for payment and delivery.

---

[1]     The signature page of the Master Confirmation Agreement erroneously lists the relevant party as "Genesis Global Capital International Ltd" instead of GGC International.  However, the heading of the Master Confirmation Agreement correctly refers to GGC International, as does every relevant Transaction Confirmation.

4

23.     In particular, Section 2(a)(i) of the ISDA Master Agreement states that "[e]ach party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement."

24.     Section 2(a)(ii) of the ISDA Master Agreement provides that "[p]ayments under this Agreement will be made on the due date for value on the date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency."

25.     Section 2(c) of the ISDA Master Agreement states that the

> parties may elect in respect of two or more Transactions that a net amount and payment obligation will be determined in respect of all amounts payable on the same date in the same currency in respect of those Transactions, regardless of whether such amounts are payable in respect of the same Transaction.  The election may be made in the Schedule or any Confirmation by specifying that "Multiple Transaction Payment Netting" applies to the Transactions identified as being subject to the election . . . . If Multiple Transaction Payment Netting is applicable to Transactions, it will apply to those Transactions with effect from the starting date specified in the Schedule or such Confirmation, or, if a starting date is not specified in the Schedule or such Confirmation, the starting date otherwise agreed by the parties in writing.  This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

26.     Section 7(a)(iii) of the Master Confirmation Agreement states that "Multiple Transaction Payment Netting," as described above, is applicable.

**Failure to Pay Amounts Due Will Result in an Event of Default**

27.     Section 5(a) of the ISDA Master Agreement lists several potential "Events of Default."

28.     As relevant to this dispute, Section 5(a)(i) of the ISDA Master Agreement states that it is an "Event of Default" if a party fails to:

5

make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 9(h)(i)(2) or (4) required to be made by it if such failure is not remedied on or before the first Local Business Day in the case of any such payment or the first Local Delivery Day in the case of any such delivery after, in each case, notice of such failure is given to the party.

29.     Section 6(a) of the ISDA Master Agreement permits a non-defaulting party to declare an "Early Termination Date" upon not more than twenty days' notice where an Event of Default has occurred.

30.     Section 6(e)(i) of the ISDA Master Agreement provides that "[i]f notice designating an Early Termination Date is given under Section 6(a) . . . the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default . . . is then continuing."

31.     Upon an Early Termination Date, an "Early Termination Amount" is due.  Section 6(e)(i) of the ISDA Master Agreement sets forth the formula to determine the "Early Termination Amount."

32.     Section 7(a)(i) of the Master Confirmation Agreement states that New York law shall govern any transactions between GGC International and Ver.

33.     Section 11 of the ISDA Master Agreement provides that a "Defaulting Party will on demand indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees . . . incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection."

6

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 372 of 637

**GGC International and Ver Enter Into Options Transactions**

34.     After entering into the Master Confirmation Agreement, GGC International and Ver entered into various options transactions.  For each transaction, the Parties entered into a Transaction Confirmation memorializing the terms.

35.     Throughout 2022, as a result of the transactions entered into by the Parties, Ver owed money to GGC International, including as much as $135 million in June 2022.  GGC International repeatedly accommodated Ver when he suffered from liquidity problems and was unable to post required collateral.  During this period, GGC International performed all of its contractual obligations to Ver.  Regardless, Ver's contractual remedy for any type of default, insolvency or otherwise, would have been to terminate the agreement; Ver never did so, and any such termination would have resulted in him owing such significant sums to GGC International.

36.     The three options which expired on December 30, 2022 are the subject of this action and detailed below:

(a)     Pursuant to a trade confirmation dated March 22, 2022, GGC International agreed to purchase from Ver a put option for 70,000 units of Bitcoin Cash ("BCH"), with a strike price of $545 per BCH.

(b)     Pursuant to a trade confirmation dated June 10, 2022, GGC International agreed to purchase from Ver a put option for 10,000 Ether ("ETH"), with a strike price of $5,000 per ETH.

(c)     Pursuant to a trade confirmation dated June 11, 2022, GGC International agreed to purchase from Ver a put option for 500 Bitcoin ("BTC"), with a strike price of $26,000 per BTC.

7

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 373 of 637

37.     Each of the three confirmations states that the "Settlement Date" is same as the "Expiration Date" of each option.

**Ver Fails to Settle the Three Options Transactions**

38.     The three options in question expired on December 30, 2022.

39.     As noted above, the "Settlement Date" for each of the three options was the same as the "Expiration Date," i.e., December 30, 2022.  As such, Ver was required to settle the options on December 30, 2022.  He failed to do so.

40.     On January 12, 2023, GGC International sent a letter to Ver with the subject line "NOTICE OF DEFAULT: FAILURE TO PAY" (the "January 12 Notice").  The January 12 Notice informed Ver that he "failed to pay the amount of $71,221,052 due and owing on the Settlement Date (December 30, 2022) under the Transaction Confirmations.  The consequence of [Ver's] failure to make payment is that an Event of Default will occur under Section 5(a)(i) of the Master Agreement, to the extent [Ver's] failure to pay continues for one Local Business Day, after the effective date of this notice."

41.     Ver failed to make payment as required within one Local Business Day after the January 12 Notice.

42.     On January 17, 2023, GGC International sent a letter to Ver with the subject line "NOTICE OF EVENT OF DEFAULT AND DESIGNATION OF EARLY TERMINATION DATE" (the "January 17 Notice").  The January 17 Notice informed Ver that he had "failed to pay $71,221,052, which was the amount due and owing on the Settlement Date (December 30, 2022) under the Transaction Confirmations.  Pursuant to Section 6(a) of the Master Agreement, this letter serves as notice, effective as of the date of this notice, that an Event of Default under Section 5(a)(i) of the Master Agreement has occurred and is continuing with respect to [Ver]."

8

43.     In the January 17 Notice, GGC International further "designates January 19, 2023, as the Early Termination Date," and "will make the calculations required under Section 6(e) of the Master Agreement and, in accordance with the Master Agreement, will notify you of the amount calculated thereunder and the date on which such amount will be payable."

44.     Ver failed to make payment after receipt of the January 17 Notice.

45.     On January 20, 2023, GGC International sent a letter to Ver with the subject line "CALCULATION STATEMENT FOR PAYMENT ON EARLY TERMINATION" (the "January 20 Statement").

46.     The January 20 Statement constituted the statement required by Section 6(d)(i) of the ISDA Master Agreement detailing the calculation of the amount that remains payable by Ver to GGC International.

47.     The January 20 Statement stated that Ver owed GGC International $67,850,000 across the three options.  That amount was calculated by subtracting the amount owed by GGC International to Ver from the amount owed by Ver to GGC International.[2]  In that January 20 Statement, GGC International then set off collateral posted by Ver valued at $46,980,212 against the $67,850,000 owed by Ver, resulting in a "Termination Payment Amount" of $20,869,788.

48.     Ver failed to make payment after receipt of the January 20 Statement.

49.     GGC International is seeking that amount in this action, plus fees, expenses, and interest.

---

[2]     As noted above, the Parties elected to apply "Multiple Transaction Payment Netting" under the ISDA Master Agreement.

9

## CLAIMS FOR RELIEF

## CLAIM ONE

*(Breach of Contract)*

50.     GGC International hereby incorporates by reference all allegations set forth previously in this Complaint as though fully set forth herein.

51.     GGC International and Ver are parties to the Master Confirmation Agreement and are deemed to enter into the ISDA Master Agreement and ISDA Credit Support Annex.

52.     GGC International complied with all of its contractual obligations under the Master Confirmation Agreement, the ISDA Master Agreement, and ISDA Credit Support Annex.

53.     As set forth above, Ver breached the Master Confirmation Agreement, and the transactions entered thereunder, by failing to settle three options transactions that expired on December 30, 2022.  Such failure constituted an "Event of Default" under the relevant agreements and is a breach of contract.

54.     Under the three options, and subtracting amounts owed by GGC International to Ver, Ver owes a total of $67,850,000.  In light of the $46,980,212 in collateral that Ver already delivered, the net amount owed by Ver is $20,689,788.

55.     Accordingly, as a result of Ver's breach of contract, GGC International has been damaged in an amount to be determined at trial, but believed to be in excess of $20,689,788, plus interest.

56.     In addition, GGC International is entitled to the repayment of its attorneys' fees and costs pursuant to Section 11 of the ISDA Master Agreement.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff GGC International respectfully demands the judgment against Defendant Ver as follows:

10

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 376 of 637

1.    On GGC International's First Cause of Action, for an order awarding GGC

International damages in an amount to be determined at trial but in no event less

than $20,689,788, plus interest at the New York statutory rate, plus repayment of

GGC International's attorneys' fees and costs; and

2.    Such other and further relief as the Court deems just and proper.

Dated: New York, New York
       March 28, 2023

                              MORRISON COHEN LLP


                              By: /s/ Jason P. Gottlieb_____
                                  Jason P. Gottlieb
                                  Michael Mix
                              909 Third Avenue
                              New York, NY  10022
                              Telephone: 212-735-8600
                              Facsimile:  212-735-8708

                              *Attorneys for Plaintiff GGC International Limited*

11

# Exhibit D

FILED: NEW YORK COUNTY CLERK 08/05/2023 06:43 PM
INDEX NO. 650439/2023
NYSCEF DOC. NO. 46
RECEIVED NYSCEF: 08/25/2024

08-13555-smb Doc 52633 Filed 03/08/14 Entered 03/08/14 21:40: 37 Main Document
Pg 1 of 170

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555(JMP)

Case No. 08-01420(JMP)(SIPA)

Adv. Case No. 09-01258

Adv. Case No. 08-01743

Adv. Case No. 09-01242

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS, INC., et al.,

                    Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS INC.,

                    Debtor.

- - - - - - - - - - - - - - - - - - - -x

NEUBERGER BERMAN, LLC,

                    Plaintiff,

          -against-

PNC BANK, NATIONAL ASSOCIATION,

LEHMAN BROTHERS INC., AND LEHMAN

BROTHERS COMMERICAL CORPORATION,

                    Defendants.

- - - - - - - - - - - - - - - - - - - -x

2

```
 1    - - - - - - - - - - - - - - - - - - -x
 2   STATE STREET BANK AND TRUST COMPANY,
 3                  Plaintiff,
 4   LEHMAN COMMERCIAL PAPER INC.,
 5          -against-
 6                  Defendant.
 7    - - - - - - - - - - - - - - - - - - -x
 8   LEHMAN BROTHERS SPECIAL FINANCING INC.,
 9                  Plaintiff,
10   BNY CORPORATE TRUSTEE SERVICES, LTD.,
11          -against-
12                  Defendant.
13    - - - - - - - - - - - - - - - - - - -x
14
15            U.S. Bankruptcy Court
16            One Bowling Green
17            New York, New York
18
19            September 15, 2009
20            10:03 a.m.
21
22   B E F O R E:
23   HON. JAMES M. PECK
24   U.S. BANKRUPTCY JUDGE
25
```

3

1

2      RE: CASE NOS. 08-13555(JMP) and 08-01420(JMP)(SIPA)

3      HEARING re Interim Applications for Allowance of Compensation

4      for Professional Services Rendered and for Reimbursement of

5      Actual and Necessary Expenses [Docket No. 4839]

6

7      HEARING re Motion of Wells Fargo, NA for Relief from the

8      Automatic Stay [Docket No. 4640]

9

10     HEARING re Motion of Wells Fargo, NA for Relief from the

11     Automatic Stay [Docket No. 4671]

12

13     HEARING re Motion of Washington Mutual Bank f/k/a Washington

14     Mutual Bank, FA. For Relief from the Automatic Stay [Docket No.

15     4759]

16

17     HEARING re Motion of A/P Hotel, LLC for Relief from the

18     Automatic Stay [Docket No. 4950]

19

20     HEARING re Motion for Authorization to Assume an Interest Rate

21     Swap with MEG Energy Corp. [Docket No. 5012]

22

23

24

25

4

```
 1

 2     HEARING re Debtors' Motion for Establishment of Procedures for

 3     the Debtors to Transfer Their Interests in Respect of

 4     Residential and Commercial Loans Subject to Foreclosure to

 5     Wholly-Owned Non-Debtor Subsidiaries [Docket No. 4966]

 6

 7     HEARING re Debtors' Motion for Establishment of Procedures for

 8     the Debtors to Compromise Claims of the Debtors in Respect of

 9     Real Estate Loans [Docket No. 4942]

10

11     HEARING re Motion of Landwirtschaftliche Rentenbank for 2004

12     Examination [Docket No. 4800]

13

14     HEARING re Debtors' Motion for Authorization to Implement

15     Alternative Dispute Resolution Procedures for Affirmative

16     Claims of Debtors Under Derivative Contracts [Docket No. 4453]

17

18     HEARING re Debtors' Motion to Compel Performance of Metavante

19     Corporation's Obligations Under an Executory Contract and to

20     Enforce the Automatic Stay [Docket No. 3691]

21

22     HEARING re Motion of DnB Nor Bank ASA for Allowance and Payment

23     of Administrative Expense Claim and Allowing Setoff of Such

24     Claim [Docket No. 4054]

25
```

FILED: NEW YORK COUNTY CLERK 08/05/2023 06:43 PM
INDEX NO. 650439/2023
NYSCEF DOC. NO. 46
RECEIVED NYSCEF: 08/25/2023

5

1

2      HEARING re Motion of William Kuntz, III for Review of Dismissal

3      of Appeal [Docket No. 1261]

4

5      RE: ADV. CASE NO. 09-01258:

6      PRE-TRIAL CONFERENCE

7

8      RE: ADV. CASE NO. 08-01743:

9      PRE-TRIAL CONFERENCE

10

11     RE: ADV. CASE NO. 09-01242:

12     Motion of BNY Corporate Trustee Services Limited to Stay

13     Further Proceedings Pending Disposition of its Motion for Leave

14     to Appeal the August 12, 2009 Order Denying BNY's Motion to

15     Dismiss and any Disposition of the Merits of that Appeal

16

17

18

19

20

21

22

23

24     Transcribed by:   Clara Rubin

25                       Pnina Eilberg

1   that it has been presented and will make some judgments as to

2   the identity of the mediators in consultation with counsel for

3   the debtors and for the creditors' committee who have been so

4   active in developing these procedures.

5          I recognize that a lot of people who are in court at

6   this moment are here for the ADR procedures, and I'm going to

7   give people who want to leave an opportunity to leave.  I'm

8   also going to give everybody an opportunity for a break.  But

9   because of the congestion of this docket, I think I'm going to

10  go until 1 o'clock.  So let's take a break for ten minutes, and

11  then resume, and then go until 1 o'clock and then break for

12  lunch.  We're adjourned until then.

13          MR. GRUENBERGER:  Thank you, Your Honor.

14      (Recess from 12:12 p.m. to 12:28 p.m.)

15          THE COURT:  Be seated please.  Number 11, Metavante.

16          MR. SLACK:  Your Honor, Richard Slack from Weil,

17  Gotshal for the debtors.  We're here on the debtors' motion to

18  compel performance of Metavante Corporation.  As Your Honor

19  knows, two months ago we had argument, after fully briefing the

20  issue.  Your Honor is in receipt of letters from both

21  Metavante's counsel and from the debtors, which I think

22  provides the status of where we are in terms of discussions,

23  which is, essentially, that the parties have not had

24  substantial discussions, as the letters which are docketed

25  state.

FILED: NEW YORK COUNTY CLERK 08/25/2023 06:43 PM
INDEX NO. 650439/2023
NYSCEF DOC. NO. 46
RECEIVED NYSCEF: 08/25/2023

08-13555-scc Doc 62513-3 Filed 09/14/... Entered 09/14/... Main Document
Pg 100 of 170

100

 1          The debtors were requested to make a proposal to

 2   resolve it, which we did.  We have not received a proposal from

 3   Metavante in the two months since the hearing, and Metavante

 4   has not responded to our proposal that we've made.

 5          Your Honor has mentioned Metavante a couple of times

 6   today, and so Your Honor may have a plan for the conference,

 7   but it is the debtors' position that this matter should be

 8   considered and decided, at the Court's discretion, obviously.

 9          THE COURT:  Understood.  I'm ready to rule today.

10          MR. ARNOLD:  May it please the Court, mindful of that

11   comment, I want you to know why we wrote the letter, so that

12   you have in mind that parties do take into account the risks of

13   not settling, and you were quite clear at the hearing on July

14   14th that there was an opportunity for the parties to consider

15   resolving this matter.

16          For the Court's information, neither Lehman nor its

17   counsel have been obdurate, ornery, or in any fashion

18   unprofessional.  Our dealings have been quite, to the contrary,

19   exceptional throughout the history of our relationships.  I

20   reached out to counsel for the debtors to explain how it is

21   that an impending transaction which will close on October 1st

22   would, in my judgment, have a favorable impact on the

23   likelihood of this matter resolving consensually.  That was the

24   singular purpose for us writing the letter to the Court.  We

25   are not here today to reargue the motion.  The Court heard

FILED: NEW YORK COUNTY CLERK 08/05/2024 06:43 PM INDEX NO. 650439/2023
NYSCEF DOC. NO. 46 RECEIVED NYSCEF: 08/25/2024

1    extensive oral argument.  It has been well briefed.  The issues

2    have come up again in, frankly, in other instances and motions

3    and adversary proceedings.  I wanted the Court to know that it

4    was not by design, neglect or deliberately ignoring your

5    comments on July 14th that the settlement has not proceeded

6    further than it has.  About a week ago we received a settlement

7    proposal.  I am authorized to state by both Fidelity and

8    Metavante that post-closing of the merged entity we expect to,

9    and intend to, and will make a settlement proposal, but we're

10   also mindful that it hasn't been settled, and if it is the

11   Court's desire to rule on the matter today, we govern ourselves

12   accordingly.  I just wanted the Court to know what I've done

13   since July 14th to try to move this matter on.

14          THE COURT:  Okay.  Thank you for that update.

15          MR. ARNOLD:  Thank you, Your Honor.

16          THE COURT:  The Metavante matter consumed the better

17   part of an afternoon's oral argument.  My best recollection is

18   that we specially listed it on the afternoon before the July

19   omnibus hearing.  Candidly, I don't recall why it was specially

20   listed all by itself, but it's just as well that it happened,

21   because it took a lot of time.

22          It's correct that I encouraged the parties to attempt

23   to resolve this consensually, and I appreciate the fact that

24   large enterprises, particularly those that are involved in

25   major transactions in which acquisitions are literally weeks

102

1    away from being consummated, may be distracted or may have

2    other priorities.  But I also believe that when I suggested

3    that this be listed for the September 15th omnibus hearing it

4    was with the notion that, in effect, time would be up.

5          I'm also mindful of the fact that on today's calendar

6    a matter very similar to this, item 6, has been consensually

7    resolved, involving the payment of fifty percent more dollars

8    to the debtors than are at issue in this current dispute.

9          I am prepared to rule and will do so now.  Recognize

10   that what I'm about to do will take some time and will probably

11   take us to the lunch hour.  If there is anyone here who doesn't

12   want to hear the ruling in this case I'd like you to be free to

13   both leave, because I won't be offended, or, if at some point

14   during my rendition of this ruling you say to yourself this is

15   something I don't need to hear, you're also free to leave at

16   that point.

17         LBSF requests that the Court compel Metavante to

18   perform its obligations under that certain 1992 ISDA Master

19   Agreement dated as of November 20, 2007, defined as the "Master

20   Agreement".  And that certain trade confirmation dated December

21   4, 2007, defined as the "Confirmation", and together with the

22   Master Agreement, the "Agreement".

23         The Master Agreement provides the basic terms of the

24   parties' contractual relationship and contemplates being

25   supplemented by trade confirmations that provide the economic

1    terms of the specific transactions agreed to by the parties.

2    Under the Master Agreement, Metavante and LBSF entered into an

3    interest rate swap transaction, the terms of which were

4    documented pursuant to the Confirmation.

5           LBHI is a credit support provider for LBSF's payment

6    obligations under the Agreement.

7           Due to declining interest rates the value of LBSF's

8    position under the Agreement has increased.  As of May 2009,

9    under the payment terms of the Agreement, Metavante owed LBSF

10   in excess of 6 million dollars, representing quarterly payments

11   due November, 2008, February, 2009 and May, 2009, plus default

12   interest in excess of 300,000 dollars.

13          It is possible that due to current market conditions

14   and to the quarterly payment schedule prescribed by the

15   Agreement the amounts that Metavante owes to LBSF as of today

16   are even higher than those stated in the motion.  Metavante has

17   refused to make any payments to LBSF.  In fact, it has refused

18   to perform its obligations under the Agreement, as of November

19   3, 2008.  Instead, Metavante claims that LBSF and LBHI, via the

20   filing of their respective Chapter 11 cases, each caused an

21   event of default under the Agreement.

22          Metavante argues that due to such events of default it

23   has the right, but not the obligation, under the safe harbor

24   provisions of the Bankruptcy Code, to terminate all outstanding

25   derivative transactions under the Agreement.  Metavante also

FILED: NEW YORK COUNTY CLERK 08/05/2023 06:43 PM          INDEX NO. 650439/2023

NYSCEF DOC. NO. 46          08-13555-scc   Doc 62611-3   Filed 09/15/14   Entered 09/15/14 21:40:38   Main Document          RECEIVED NYSCEF: 08/25/2023

Pg 104 of 170

104

1     maintains that it is not otherwise required to perform under

2     the Agreement.

3          The parties presented their arguments to the Court at

4     a hearing held on July 14, 2009.  Notably at the hearing

5     counsel to Metavante stated that, quote, "the opportunity to

6     settle the matter", is a possibility.  The reference in the

7     transcript is page 58, lines 18 to 19.  The Court took the

8     matter under advisement and suggested that it be calendared for

9     the September 15, 2009 omnibus hearing for purposes of either a

10    bench ruling or a status conference on any progress the parties

11    may have made towards a resolution.

12         I want to make clear that I am proceeding with this

13    ruling because I view the letter described by counsel for

14    Metavante, which talked about a possible settlement

15    counterproposal occurring sometime after the closing of a

16    merger on October 1, as being an insufficient commitment to a

17    timely settlement.

18         On September 14, 2009 the Court received letters from

19    counsel to each of the parties.  Counsel to Metavante requests

20    an adjournment to October 14.  Counsel states that an

21    adjournment will facilitate the parties' settlement

22    negotiations but explains that Metavante may not make a

23    counterproposal to LBSF's September 5, 2009 settlement proposal

24    until after the proposed October 1, 2009 closing of a merger.

25    Counsel also suggests that an adjournment will allow the Court

105

1    to put the motion on the same track as two other motions

2    currently pending before the Court.  Which motions, counsel

3    claims, raise similar issues to the motion?  Counsel to LBSF

4    and LBHI maintain that inasmuch as Metavante has done nothing

5    since July 14, 2009 to settle this matter other than asking

6    LBSF and LBHI to make a settlement proposal, the parties are no

7    closer to settlement than they were at the hearing, and,

8    therefore, the status conference should go forward as planned.

9           While each of the matters reference by counsel to

10   Metavante may have overlapping issues with those presented in

11   the current dispute, each matter involves its own distinct set

12   of fats.  Moreover, each of the two referenced matters is in

13   its infancy.  No response has been filed in either one, which

14   may further delay resolution here.

15          This is a dispute that has been fully briefed and

16   argued and is ripe for determination.  Moreover, I note that

17   the settlement that was achieved with MEG Energy that was

18   referenced this morning indicates that parties who are willing

19   to settle can, and do.

20          Under the Agreement LBSF is obligated to pay the

21   floating three month USD LIBOR BBA interest rate on a notional

22   amount of 600 million dollars, which notional amount declines

23   over time, beginning in May, 2010.  Metavante, in turn, is

24   obligated to pay a fixed interest rate, 3.865 percent, on the

25   notional amount.  The Agreement is set to expire on February 1,

106

1    2012.  The Agreement defines event of default to include the

2    bankruptcy of any party or credit support provider.  Under the

3    terms of the Agreement, upon an event of default the non-

4    defaulting party may designate an early termination date.  Upon

5    termination a final payment is calculated and paid in order to

6    put the parties into the same economic position as if the

7    termination had not occurred.

8         In the instant case Metavante has refused to perform

9    under the Agreement on account of the event of default that has

10   occurred, and is continuing, on account of the bankruptcies of

11   LBSF and LBHI.  Metavante has not, however, attempted to

12   terminate the Agreement.  Instead, Metavante entered into a

13   replacement hedge covering the period from November 3, 2008

14   through February 1, 2010.

15        LBSF and LBHI argue that the Agreement is an executory

16   contract because material performance, specifically payment

17   obligations, remain due by both LBSF and Metavante.  Under

18   Bankruptcy Code Section 365(a) a debtor in possession may,

19   "subject to the court's approval, assume or reject any

20   executory contract".  The case law makes clear, however, that

21   while a debtor determines whether to assume or reject an

22   executory contract the counterparty to such contract must

23   continue to perform.

24        LBSF and LBHI further argue that the safe harbor

25   provisions do not excuse Metavante's failure to perform.

08-13555-scc  Doc 62513-3  Filed 08/14/24  Entered 08/14/24 21:40:39  Main Document
                              Pg 107 of 170

107

1    Indeed, the safe harbor provisions permit qualifying non-debtor

2    counterparties to derivative contracts to exercise certain

3    limited contractual rights triggered by, among other things, a

4    Chapter 11 filing.  They're available, however, only to the

5    extent that a counterparty seeks to one, liquidate, terminate

6    or accelerate its contracts or two, net out its positions.  All

7    other uses of ipso facto provisions remain unenforceable under

8    the Bankruptcy Code.

9              Notably, Metavante does not dispute that it has failed

10   to perform under the Agreement.  Instead, Metavante argues that

11   the occurrence of an event of default under the Agreement gives

12   rise to its right, as the non-defaulting party, to terminate

13   under the safe harbor provisions.  According to Metavante the

14   occurrence of an event of default does not, however, create the

15   obligation for it to terminate under the safe harbor

16   provisions.  Metavante emphasizes the term, quote, "condition

17   precedent" set forth in Sections 2(a), 1 and 3 of the

18   Agreement, which subject payment obligations to the condition

19   precedent that no event of default with respect to the party

20   has occurred and is continuing.

21             Metavante argues that under New York State contract

22   law a failure of a condition precedent excuses a party's

23   obligation to perform.  Metavante states that its unequivocal

24   right to suspend payments until the termination of the

25   Agreement is fundamental to the manner in which swap parties

1    government themselves.  Metavante takes issue with LBSF and

2    LBHI in asking the Court to treat the Agreement like a garden

3    variety executory contract, arguing that it cannot be compelled

4    to pay because LBSF and LBHI cannot provide the essential item

5    of value Metavante bargained for, namely an effective

6    counterparty.

7          Metavante further argues on information and belief

8    that LBSF and LBHI also are in default under certain

9    unspecified indebtedness that allegedly may have created a

10   cross default under the Agreement, asserting, as a result, an

11   alleged need to engage in the discovery process.

12         It is clear that the filing of bankruptcy petitions by

13   LBHI and LBSF constitute events of default under the Agreement.

14   Specifically, Section 5(a)(vii) of the Agreement provides that

15   it shall constitute an event of default should a party to the

16   Agreement or any credit support provider of such party

17   institute a proceeding seeking a judgment of insolvency or

18   bankruptcy, or any other relief under any bankruptcy insolvency

19   law or similar law affecting creditors' rights.

20         Section 2(a)(i) and 3 of the Agreement, in turn,

21   subject payment obligations to the condition precedent that no

22   event of default with respect to the other party has occurred

23   and is continuing.  It is also clear, however, that the safe

24   harbor provisions, primarily Bankruptcy Code Sections 560 and

25   561, protect a non-defaulting swap counterparty's contractual

1    rights solely to liquidate, terminate or accelerate one or more

2    swap agreements because of a condition of the kind specified in

3    Section 365(e)(1), or to "offset or net out any termination

4    values or payment amounts arising under or in connection with

5    the termination, liquidation or acceleration of one or more

6    swap agreements".  That language comes from Section 560.

7           In the instant matter Metavante has attempted neither

8    to liquidate, terminate or accelerate the Agreement, nor to

9    offset or net out its position as a result of the events of

10   default caused by the filing of bankruptcy petitions by LBHI

11   and LBSF.  Metavante simply is withholding performance, relying

12   on the conditions precedent language in Sections 2(a)(i) and

13   (iii) under the Agreement.

14          The question presented in this matter and the issue

15   that was argued by the parties at the hearing is whether

16   Metavante's withholding of performance is permitted, either

17   under the safe harbor provisions or under terms of the

18   Agreement itself.  It is not.

19          Although complicated at its core the Agreement is, in

20   fact, a garden variety executory contract, one for which there

21   remains something still to be done on both sides.  Each party

22   to the Agreement still is obligated to make quarterly payments

23   based on a floating or fixed interest rate of a notional

24   amount, it being understood that the net obligor actually makes

25   a payment after the parties respective positions are calculated

110

1    on a quarterly basis, in February, May, August and November of

2    each calendar year.

3            Under relevant case law it is clear that while an un-

4    assumed executory contract is not enforceable against a debtor,

5    see NLRB v. Bildisco & Bildisco, 465 US 513 at 531, such a

6    contract is enforceable by a debtor against the counterparty.

7    See McLean Industries, Inc. v. Medical Laboratory Automation,

8    Inc., 96 B.R. 440 at 449 (Bankr. S.D.N.Y. 1989).  Metavante

9    relies on In re Lucre, Inc., 339 BR 648 (WD Mich.) for the

10   proposition that a debtor's uncured pre-petition breach of its

11   executory contract, here the event of default caused by the

12   bankruptcy filings of LBHI and LBSF, will, in and of itself,

13   justify continued nonperformance by the non-debtor

14   counterparty, and mere commencement of bankruptcy proceedings

15   and the imposition of the automatic stay does not empower the

16   debtor to compel performance from a non-debtor party.

17           The Court rejects the Lucre decision as nonbinding and

18   non-persuasive.  While Metavante's argument for the events of

19   default caused by the bankruptcy filings of LBHI and LBSF do

20   create an obligation for it to terminate the Agreement under

21   the safe harbor provisions, that's a tenable argument.  Its

22   conduct of riding the market for the period of one year, while

23   taking no action whatsoever, is simply unacceptable and

24   contrary to the spirit of these provisions of the Bankruptcy

25   Code.

111

```
 1          First, inasmuch as the Bankruptcy Code trumps any

 2    state law excuse of nonperformance, Metavante's reliance on New

 3    York contract law is misplaced.  Moreover, legislative history

 4    evidences Congress's intent to allow for the prompt closing out

 5    or liquidation of open accounts upon the commencement of a

 6    bankruptcy case.  Citation is to the Congressional history of

 7    this, H.R. Rep. 97-420 at 1 (1982), as well as its stated

 8    rationale that the immediate termination for default and the

 9    netting provisions are critical aspects of swap transactions

10    and are necessary for the protection of all parties in light of

11    the potential for rapid changes in the financial markets.

12    Citation to the Senate Report number 101-285 at 1 (1990).

13          The safe harbor provisions specifically permit

14    termination solely, quote, "because of a condition of the kind

15    specified in Section 365(e)(1) that is the insolvency or

16    financial condition of the debtor and the commencement of a

17    bankruptcy case.  See also In re Enron Corp., 2005. WL 3874285,

18    at *4, Judge Gonzalez's case, 2005.  Noting that a

19    counterparty's action under the safe harbor provisions must be

20    made fairly contemporaneously with the bankruptcy filing, less

21    the contract be rendered just another ordinary executory

22    contract.

23          The Court finds that Metavante's window to act

24    promptly under the safe harbor provisions has passed, and while

25    it may not have had the obligation to terminate immediately
```

FILED: NEW YORK COUNTY CLERK 08/05/2023 06:43 PM                    INDEX NO. 650439/2023

NYSCEF DOC. NO. 46    08-13555-scc Doc 62513-3 Filed 08/07/14 Entered 08/09/14 21:40:39 Main Document              RECEIVED NYSCEF: 08/25/2023

Pg 112 of 170

112

1    upon the filing of LBHI or LBSF, its failure to do so, at this

2    juncture, constitutes a waiver of that right at this point.

3            Metavante's references to defaults under certain

4    unspecified indebtedness that allegedly may have created a

5    cross default under the Agreement are of no moment.  First,

6    Metavante failed to set forth the basis, either in its papers

7    or at the hearing, for its information and belief that such a

8    default may have occurred.  Its assertion that such a default

9    may have occurred indicates that Metavante is not aware of any

10   such default, and, therefore, did not rely on that default in

11   its refusal to perform under the Agreement or lacks knowledge

12   of what that default may be.

13           Additionally, the argument that LBSF or LBHI may have

14   defaulted under other specified indebtedness, as that term is

15   defined in the Agreement, relies upon the financial condition

16   of bankruptcy debtors to withhold performance.  That is also

17   unenforceable as an ipso facto clause that may not be enforced

18   under the Bankruptcy Code Section 365(e)(1)(A).

19           LBSF and LBHI are entitled to continued receipt of

20   payments under the Agreement.  Metavante's attempts to control

21   LBSF's right to receive payment under the Agreement constitute,

22   in effect, an attempt to control property of the estate.  See

23   In re Enron Corp., 300 B.R. 201 at 212 (S.D.N.Y. 2003),

24   recognizing that contract rights are property of the estate and

25   that therefore those rights are protected by the automated

113

1      stay.

2             This is a violation of the automatic stay imposed by

3      Code Section 362.  Accordingly, for the reasons set forth in

4      LBSF's and LBHI's papers, for the reasons stated on the record

5      at the hearing and for the reasons stated on the record today,

6      pursuant to Bankruptcy Code Sections 105(a), 362 and 365,

7      Metavante is directed to perform under the Agreement until such

8      time as LBSF and LBHI determine whether to assume or reject.

9      That's the ruling of the Court.

10            MR. KRASNOW:  Good afternoon, Your Honor.  Richard

11     Krasnow, Weil, Gotshal & Manges, for the Chapter 11 debtors.

12     We are close to the end of this morning's agenda, but not quite

13     there as yet.  The next item, Your Honor, is number 12.  It is

14     the motion of DnB Nor Bank described in the agenda.  Your

15     Honor, that matter has been fully submitted to the Court, fully

16     briefed, arguments held on November 5th, and today is the

17     scheduled status conference.

18            THE COURT:  Okay.  I'm ready to rule on that, but

19     given the hour I'm not going to take the time to do that now.

20     But we'll issue a short memorandum in due course.  So as to not

21     create any undue suspense for those parties who are here in

22     connection with the DnB Nor matter, I am deciding that in favor

23     of the debtors and against DnB Nor, denying DnB Nor's motion

24     for allowance of an administrative expense claim, substantially

25     for the reasons set forth in the committee's papers.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

GGC INTERNATIONAL LIMITED,

                          Plaintiff

            v.

ROGER VER,

                         Defendant.

Index No. 650439/2023

Motion Seq. No. 002

**AFFIRMATION OF ALEX
VAN VOORHEES**

ALEX VAN VOORHEES, an attorney duly admitted to practice before the Courts of the

State of New York, affirms the following to be true under penalties of perjury and pursuant to

CPLR 2106:

      1.      I am an attorney and an authorized signatory for Plaintiff / Counterclaim-Defendant

GGC International Limited ("GGC International"). I am fully familiar with the facts and

circumstances contained in this affirmation.

      2.      I submit this affirmation in support of GGC International's motion to dismiss the

counterclaims of Defendant / Counterclaim-Plaintiff Roger Ver ("Ver").

      3.      Attached hereto as **Exhibit 1** is a true and correct copy of the 2002 ISDA Master

Agreement.

      4.      Attached hereto as **Exhibit 2** is a true and correct copy of the 1994 ISDA Credit

Support Annex.

      5.      Attached hereto as **Exhibit 3** is a true and correct copy of the Amended and

Restated Master Confirmation Agreement for Virtual Currency Put and Call Options Transactions

dated as of June 22, 2020, between GGC International and Ver.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 399 of 637

6.      Attached hereto as **Exhibit 4** is a true and correct copy of a trade confirmation dated March 22, 2022 in which Ver agreed to sell a put option to GGC International for 70,000 units of Bitcoin Cash.

7.      Attached hereto as **Exhibit 5** is a true and correct copy of a trade confirmation dated June 10, 2022, in which Ver agreed to sell a put option to GGC International for 10,000 Ether.

8.      Attached hereto as **Exhibit 6** is a true and correct copy of a trade confirmation dated June 11, 2022, in which Ver agreed to sell a put option to GGC International for 500 Bitcoin.

*[SIGNATURE APPEARS ON NEXT PAGE]*

2

Dated: New York, New York
        August 21, 2023

ALEX VAN VOORHEES

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 401 of 637

## <u>WORD COUNT CERTIFICATION</u>

Pursuant to Rule 17 of subdivision (g) of section 202.70 of the Uniform Rules for the

Supreme Court and County Court (Rules of Practice for the Commercial Division of the

Supreme Court), I hereby certify that the total number of words in this affirmation, excluding the

caption, signature block, and word count certification is 270.


Dated: New York, New York
          August 21, 2023


                                        _/s/ Jason Gottlieb _____
                                          Jason Gottlieb

Case 1:24-cv-01533-JPC Document 1-18 Filed 02/28/24 Page 402 of 637

# Exhibit 1

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 403 of 637



# ISDA®

International Swaps and Derivatives Association, Inc.

# 2002 MASTER AGREEMENT

dated as of ...................................................................

.................................................................   and   .................................................................................

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this 2002 Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties or otherwise effective for the purpose of confirming or evidencing those Transactions. This 2002 Master Agreement and the Schedule are together referred to as this "Master Agreement".

Accordingly, the parties agree as follows:—

**1.     Interpretation**

(a)     *Definitions.* The terms defined in Section 14 and elsewhere in this Master Agreement will have the meanings therein specified for the purpose of this Master Agreement.

(b)     *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement, such Confirmation will prevail for the purpose of the relevant Transaction.

(c)     *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

**2.     Obligations**

(a)     *General Conditions.*

(i)     Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)     Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

Copyright © 2002 by International Swaps and Derivatives Association, Inc.

(iii)   Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other condition specified in this Agreement to be a condition precedent for the purpose of this Section 2(a)(iii).

(b)   *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the Scheduled Settlement Date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)   *Netting of Payments.* If on any date amounts would otherwise be payable:—

(i)   in the same currency; and

(ii)   in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by which the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount and payment obligation will be determined in respect of all amounts payable on the same date in the same currency in respect of those Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or any Confirmation by specifying that "Multiple Transaction Payment Netting" applies to the Transactions identified as being subject to the election (in which case clause (ii) above will not apply to such Transactions). If Multiple Transaction Payment Netting is applicable to Transactions, it will apply to those Transactions with effect from the starting date specified in the Schedule or such Confirmation, or, if a starting date is not specified in the Schedule or such Confirmation, the starting date otherwise agreed by the parties in writing. This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)   *Deduction or Withholding for Tax.*

(i)   *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

(1)   promptly notify the other party ("Y") of such requirement;

(2)   pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

(3)   promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 405 of 637

(4)     if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required.  However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

(A)     the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

(B)     the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, after a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

(ii)     *Liability.* If:—

(1)     X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)     X does not so deduct or withhold; and

(3)     a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

**3.     Representations**

Each party makes the representations contained in Sections 3(a), 3(b), 3(c), 3(d), 3(e) and 3(f) and, if specified in the Schedule as applying, 3(g) to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement).  If any "Additional Representation" is specified in the Schedule or any Confirmation as applying, the party or parties specified for such Additional Representation will make and, if applicable, be deemed to repeat such Additional Representation at the time or times specified for such Additional Representation.

(a)     *Basic Representations.*

(i)     *Status.*  It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)     *Powers.*  It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

ISDA® 2002

(iii)     *No Violation or Conflict.*  Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)     *Consents.*  All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)     *Obligations Binding.*  Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b)     *Absence of Certain Events.*  No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)     *Absence of Litigation.*  There is not pending or, to its knowledge, threatened against it, any of its Credit Support Providers or any of its applicable Specified Entities any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)     *Accuracy of Specified Information.*  All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)     *Payer Tax Representation.*  Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)     *Payee Tax Representations.*  Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

(g)     *No Agency.*  It is entering into this Agreement, including each Transaction, as principal and not as agent of any person or entity.

## 4.     Agreements

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)     *Furnish Specified Information.*  It will deliver to the other party or, in certain cases under clause (iii) below, to such government or taxing authority as the other party reasonably directs:—

(i)     any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii)     any other documents specified in the Schedule or any Confirmation; and

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 407 of 637

(iii)    upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)    *Maintain Authorisations.*  It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)    *Comply With Laws.*  It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)    *Tax Agreement.*  It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)    *Payment of Stamp Tax.*  Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated, organised, managed and controlled or considered to have its seat, or where an Office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction"), and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

## 5.    Events of Default and Termination Events

(a)    *Events of Default.*  The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes (subject to Sections 5(c) and 6(e)(iv)) an event of default (an "Event of Default") with respect to such party:—

(i)    *Failure to Pay or Deliver.*  Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 9(h)(i)(2) or (4) required to be made by it if such failure is not remedied on or before the first Local Business Day in the case of any such payment or the first Local Delivery Day in the case of any such delivery after, in each case, notice of such failure is given to the party;

(ii)    *Breach of Agreement; Repudiation of Agreement.*

(1)    Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 9(h)(i)(2) or (4) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied within 30 days after notice of such failure is given to the party; or

(2)    the party disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, this Master Agreement, any Confirmation executed and delivered by that party or any

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 408 of 637

Transaction evidenced by such a Confirmation (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(iii)    *Credit Support Default.*

(1)    Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)    the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document, or any security interest granted by such party or such Credit Support Provider to the other party pursuant to any such Credit Support Document, to be in full force and effect for the purpose of this Agreement (in each case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(iv)    *Misrepresentation.*  A representation (other than a representation under Section 3(e) or 3(f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)    *Default Under Specified Transaction.*  The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

(1)    defaults (other than by failing to make a delivery) under a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction;

(2)    defaults, after giving effect to any applicable notice requirement or grace period, in making any payment due on the last payment or exchange date of, or any payment on early termination of, a Specified Transaction (or, if there is no applicable notice requirement or grace period, such default continues for at least one Local Business Day);

(3)    defaults in making any delivery due under (including any delivery due on the last delivery or exchange date of) a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or an early termination of, all transactions outstanding under the documentation applicable to that Specified Transaction; or

(4)    disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, a Specified Transaction or any credit support arrangement relating to a Specified Transaction that is, in either case, confirmed or evidenced by a document or other confirming evidence executed and delivered by that party, Credit Support Provider or Specified Entity (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)  **Cross-Default.** If "Cross-Default" is specified in the Schedule as applying to the party, the occurrence or existence of:—

(1)  a default, event of default or other similar condition or event (however described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) where the aggregate principal amount of such agreements or instruments, either alone or together with the amount, if any, referred to in clause (2) below, is not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments before it would otherwise have been due and payable; or

(2)  a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments under such agreements or instruments on the due date for payment (after giving effect to any applicable notice requirement or grace period) in an aggregate amount, either alone or together with the amount, if any, referred to in clause (1) above, of not less than the applicable Threshold Amount;

(vii)  **Bankruptcy.** The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4)(A) institutes or has instituted against it, by a regulator, supervisor or any similar official with primary insolvency, rehabilitative or regulatory jurisdiction over it in the jurisdiction of its incorporation or organisation or the jurisdiction of its head or home office, a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by it or such regulator, supervisor or similar official, or (B) has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and such proceeding or petition is instituted or presented by a person or entity not described in clause (A) above and either (I) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (II) is not dismissed, discharged, stayed or restrained in each case within 15 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 15 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) above (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii)     *Merger Without Assumption.* The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, or reorganises, reincorporates or reconstitutes into or as, another entity and, at the time of such consolidation, amalgamation, merger, transfer, reorganisation, reincorporation or reconstitution:—

     (1)     the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party; or

     (2)     the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)     *Termination Events.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes (subject to Section 5(c)) an Illegality if the event is specified in clause (i) below, a Force Majeure Event if the event is specified in clause (ii) below, a Tax Event if the event is specified in clause (iii) below, a Tax Event Upon Merger if the event is specified in clause (iv) below, and, if specified to be applicable, a Credit Event Upon Merger if the event is specified pursuant to clause (v) below or an Additional Termination Event if the event is specified pursuant to clause (vi) below:—

     (i)     *Illegality.* After giving effect to any applicable provision, disruption fallback or remedy specified in, or pursuant to, the relevant Confirmation or elsewhere in this Agreement, due to an event or circumstance (other than any action taken by a party or, if applicable, any Credit Support Provider of such party) occurring after a Transaction is entered into, it becomes unlawful under any applicable law (including without limitation the laws of any country in which payment, delivery or compliance is required by either party or any Credit Support Provider, as the case may be), on any day, or it would be unlawful if the relevant payment, delivery or compliance were required on that day (in each case, other than as a result of a breach by the party of Section 4(b)):—

          (1)     for the Office through which such party (which will be the Affected Party) makes and receives payments or deliveries with respect to such Transaction to perform any absolute or contingent obligation to make a payment or delivery in respect of such Transaction, to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

          (2)     for such party or any Credit Support Provider of such party (which will be the Affected Party) to perform any absolute or contingent obligation to make a payment or delivery which such party or Credit Support Provider has under any Credit Support Document relating to such Transaction, to receive a payment or delivery under such Credit Support Document or to comply with any other material provision of such Credit Support Document;

     (ii)     *Force Majeure Event.* After giving effect to any applicable provision, disruption fallback or remedy specified in, or pursuant to, the relevant Confirmation or elsewhere in this Agreement, by reason of force majeure or act of state occurring after a Transaction is entered into, on any day:—

          (1)     the Office through which such party (which will be the Affected Party) makes and receives payments or deliveries with respect to such Transaction is prevented from performing any absolute or contingent obligation to make a payment or delivery in respect of such Transaction, from receiving a payment or delivery in respect of such Transaction or from complying with any other material provision of this Agreement relating to such Transaction (or would be so prevented if such payment, delivery or compliance were required on that day), or it becomes impossible or

8        **ISDA® 2002**

impracticable for such Office so to perform, receive or comply (or it would be impossible or impracticable for such Office so to perform, receive or comply if such payment, delivery or compliance were required on that day); or

(2)      such party or any Credit Support Provider of such party (which will be the Affected Party) is prevented from performing any absolute or contingent obligation to make a payment or delivery which such party or Credit Support Provider has under any Credit Support Document relating to such Transaction, from receiving a payment or delivery under such Credit Support Document or from complying with any other material provision of such Credit Support Document (or would be so prevented if such payment, delivery or compliance were required on that day), or it becomes impossible or impracticable for such party or Credit Support Provider so to perform, receive or comply (or it would be impossible or impracticable for such party or Credit Support Provider so to perform, receive or comply if such payment, delivery or compliance were required on that day),

so long as the force majeure or act of state is beyond the control of such Office, such party or such Credit Support Provider, as appropriate, and such Office, party or Credit Support Provider could not, after using all reasonable efforts (which will not require such party or Credit Support Provider to incur a loss, other than immaterial, incidental expenses), overcome such prevention, impossibility or impracticability;

(iii)      **Tax Event.**  Due to (1) any action taken by a taxing authority, or brought in a court of competent jurisdiction, after a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (2) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Settlement Date (A) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 9(h)) or (B) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 9(h)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iv)      **Tax Event Upon Merger.**  The party (the "Burdened Party") on the next succeeding Scheduled Settlement Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 9(h)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets (or any substantial part of the assets comprising the business conducted by it as of the date of this Master Agreement) to, or reorganising, reincorporating or reconstituting into or as, another entity (which will be the Affected Party) where such action does not constitute a Merger Without Assumption;

(v)      **Credit Event Upon Merger.**  If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, a Designated Event (as defined below) occurs with respect to such party, any Credit Support Provider of such party or any applicable Specified Entity of such party (in each case, "X") and such Designated Event does not constitute a Merger Without Assumption, and the creditworthiness of X or, if applicable, the successor, surviving or transferee entity of X, after taking into account any applicable Credit Support Document, is materially weaker immediately after the occurrence of such Designated Event than that of X immediately prior to the occurrence of such Designated Event (and, in any such event, such party or its successor, surviving or transferee entity, as appropriate, will be the Affected Party). A "Designated Event" with respect to X means that:—

(1)      X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets (or any substantial part of the assets comprising the business conducted by X as of the

date of this Master Agreement) to, or reorganises, reincorporates or reconstitutes into or as, another entity;

(2)        any person, related group of persons or entity acquires directly or indirectly the beneficial ownership of (A) equity securities having the power to elect a majority of the board of directors (or its equivalent) of X or (B) any other ownership interest enabling it to exercise control of X; or

(3)        X effects any substantial change in its capital structure by means of the issuance, incurrence or guarantee of debt or the issuance of (A) preferred stock or other securities convertible into or exchangeable for debt or preferred stock or (B) in the case of entities other than corporations, any other form of ownership interest; or

(vi)        *Additional Termination Event.*  If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties will be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)        *Hierarchy of Events.*

(i)        An event or circumstance that constitutes or gives rise to an Illegality or a Force Majeure Event will not, for so long as that is the case, also constitute or give rise to an Event of Default under Section 5(a)(i), 5(a)(ii)(1) or 5(a)(iii)(1) insofar as such event or circumstance relates to the failure to make any payment or delivery or a failure to comply with any other material provision of this Agreement or a Credit Support Document, as the case may be.

(ii)        Except in circumstances contemplated by clause (i) above, if an event or circumstance which would otherwise constitute or give rise to an Illegality or a Force Majeure Event also constitutes an Event of Default or any other Termination Event, it will be treated as an Event of Default or such other Termination Event, as the case may be, and will not constitute or give rise to an Illegality or a Force Majeure Event.

(iii)        If an event or circumstance which would otherwise constitute or give rise to a Force Majeure Event also constitutes an Illegality, it will be treated as an Illegality, except as described in clause (ii) above, and not a Force Majeure Event.

(d)        *Deferral of Payments and Deliveries During Waiting Period.*  If an Illegality or a Force Majeure Event has occurred and is continuing with respect to a Transaction, any payment or delivery which would otherwise be required to be made under that Transaction will be deferred to, and will not be due until:—

(i)        the first Local Business Day or, in the case of a delivery, the first Local Delivery Day (or the first day that would have been a Local Business Day or Local Delivery Day, as appropriate, but for the occurrence of the event or circumstance constituting or giving rise to that Illegality or Force Majeure Event) following the end of any applicable Waiting Period in respect of that Illegality or Force Majeure Event, as the case may be; or

(ii)        if earlier, the date on which the event or circumstance constituting or giving rise to that Illegality or Force Majeure Event ceases to exist or, if such date is not a Local Business Day or, in the case of a delivery, a Local Delivery Day, the first following day that is a Local Business Day or Local Delivery Day, as appropriate.

(e)        *Inability of Head or Home Office to Perform Obligations of Branch.*  If (i) an Illegality or a Force Majeure Event occurs under Section 5(b)(i)(1) or 5(b)(ii)(1) and the relevant Office is not the Affected Party's head or home office, (ii) Section 10(a) applies, (iii) the other party seeks performance of the relevant obligation or

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 413 of 637

compliance with the relevant provision by the Affected Party's head or home office and (iv) the Affected Party's head or home office fails so to perform or comply due to the occurrence of an event or circumstance which would, if that head or home office were the Office through which the Affected Party makes and receives payments and deliveries with respect to the relevant Transaction, constitute or give rise to an Illegality or a Force Majeure Event, and such failure would otherwise constitute an Event of Default under Section 5(a)(i) or 5(a)(iii)(1) with respect to such party, then, for so long as the relevant event or circumstance continues to exist with respect to both the Office referred to in Section 5(b)(i)(1) or 5(b)(ii)(1), as the case may be, and the Affected Party's head or home office, such failure will not constitute an Event of Default under Section 5(a)(i) or 5(a)(iii)(1).

## 6.    Early Termination; Close-Out Netting

(a)    ***Right to Terminate Following Event of Default.*** If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    ***Right to Terminate Following Termination Event.***

(i)    ***Notice.*** If a Termination Event other than a Force Majeure Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction, and will also give the other party such other information about that Termination Event as the other party may reasonably require. If a Force Majeure Event occurs, each party will, promptly upon becoming aware of it, use all reasonable efforts to notify the other party, specifying the nature of that Force Majeure Event, and will also give the other party such other information about that Force Majeure Event as the other party may reasonably require.

(ii)    ***Transfer to Avoid Termination Event.*** If a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, other than immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)    ***Two Affected Parties.*** If a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice of such occurrence is given under Section 6(b)(i) to avoid that Termination Event.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 414 of 637

(iv)   **Right to Terminate.**

   (1)   If:—

      (A)   a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

      (B)   a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

   the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there are two Affected Parties, or the Non-affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, if the relevant Termination Event is then continuing, by not more than 20 days notice to the other party, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

   (2)   If at any time an Illegality or a Force Majeure Event has occurred and is then continuing and any applicable Waiting Period has expired:—

      (A)   Subject to clause (B) below, either party may, by not more than 20 days notice to the other party, designate (I) a day not earlier than the day on which such notice becomes effective as an Early Termination Date in respect of all Affected Transactions or (II) by specifying in that notice the Affected Transactions in respect of which it is designating the relevant day as an Early Termination Date, a day not earlier than two Local Business Days following the day on which such notice becomes effective as an Early Termination Date in respect of less than all Affected Transactions.  Upon receipt of a notice designating an Early Termination Date in respect of less than all Affected Transactions, the other party may, by notice to the designating party, if such notice is effective on or before the day so designated, designate that same day as an Early Termination Date in respect of any or all other Affected Transactions.

      (B)   An Affected Party (if the Illegality or Force Majeure Event relates to performance by such party or any Credit Support Provider of such party of an obligation to make any payment or delivery under, or to compliance with any other material provision of, the relevant Credit Support Document) will only have the right to designate an Early Termination Date under Section 6(b)(iv)(2)(A) as a result of an Illegality under Section 5(b)(i)(2) or a Force Majeure Event under Section 5(b)(ii)(2) following the prior designation by the other party of an Early Termination Date, pursuant to Section 6(b)(iv)(2)(A), in respect of less than all Affected Transactions.

(c)   **Effect of Designation.**

   (i)   If notice designating an Early Termination Date is given under Section 6(a) or 6(b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

   (ii)   Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 9(h)(i) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement.  The amount, if any, payable in respect of an Early Termination Date will be determined pursuant to Sections 6(e) and 9(h)(ii).

(d)     *Calculations; Payment Date.*

(i)     *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (I) showing, in reasonable detail, such calculations (including any quotations, market data or information from internal sources used in making such calculations), (2) specifying (except where there are two Affected Parties) any Early Termination Amount payable and (3) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation or market data obtained in determining a Close-out Amount, the records of the party obtaining such quotation or market data will be conclusive evidence of the existence and accuracy of such quotation or market data.

(ii)    *Payment Date.* An Early Termination Amount due in respect of any Early Termination Date will, together with any amount of interest payable pursuant to Section 9(h)(ii)(2), be payable (1) on the day on which notice of the amount payable is effective in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default and (2) on the day which is two Local Business Days after the day on which notice of the amount payable is effective (or, if there are two Affected Parties, after the day on which the statement provided pursuant to clause (i) above by the second party to provide such a statement is effective) in the case of an Early Termination Date which is designated as a result of a Termination Event.

(e)     *Payments on Early Termination.* If an Early Termination Date occurs, the amount, if any, payable in respect of that Early Termination Date (the "Early Termination Amount") will be determined pursuant to this Section 6(e) and will be subject to Section 6(f).

(i)     *Events of Default.* If the Early Termination Date results from an Event of Default, the Early Termination Amount will be an amount equal to (1) the sum of (A) the Termination Currency Equivalent of the Close-out Amount or Close-out Amounts (whether positive or negative) determined by the Non-defaulting Party for each Terminated Transaction or group of Terminated Transactions, as the case may be, and (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (2) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If the Early Termination Amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of the Early Termination Amount to the Defaulting Party.

(ii)    *Termination Events.* If the Early Termination Date results from a Termination Event:—

(1)     *One Affected Party.* Subject to clause (3) below, if there is one Affected Party, the Early Termination Amount will be determined in accordance with Section 6(e)(i), except that references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and to the Non-affected Party, respectively.

(2)     *Two Affected Parties.* Subject to clause (3) below, if there are two Affected Parties, each party will determine an amount equal to the Termination Currency Equivalent of the sum of the Close-out Amount or Close-out Amounts (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions, as the case may be, and the Early Termination Amount will be an amount equal to (A) the sum of (I) one-half of the difference between the higher amount so determined (by party "X") and the lower amount so determined (by party "Y") and (II) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to Y. If the Early Termination Amount is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of the Early Termination Amount to Y.

(3)    *Mid-Market Events.* If that Termination Event is an Illegality or a Force Majeure Event, then the Early Termination Amount will be determined in accordance with clause (1) or (2) above, as appropriate, except that, for the purpose of determining a Close-out Amount or Close-out Amounts, the Determining Party will:—

(A)    if obtaining quotations from one or more third parties (or from any of the Determining Party's Affiliates), ask each third party or Affiliate (I) not to take account of the current creditworthiness of the Determining Party or any existing Credit Support Document and (II) to provide mid-market quotations; and

(B)    in any other case, use mid-market values without regard to the creditworthiness of the Determining Party.

(iii)    **Adjustment for Bankruptcy.** In circumstances where an Early Termination Date occurs because Automatic Early Termination applies in respect of a party, the Early Termination Amount will be subject to such adjustments as are appropriate and permitted by applicable law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)    **Adjustment for Illegality or Force Majeure Event.** The failure by a party or any Credit Support Provider of such party to pay, when due, any Early Termination Amount will not constitute an Event of Default under Section 5(a)(i) or 5(a)(iii)(1) if such failure is due to the occurrence of an event or circumstance which would, if it occurred with respect to payment, delivery or compliance related to a Transaction, constitute or give rise to an Illegality or a Force Majeure Event. Such amount will (1) accrue interest and otherwise be treated as an Unpaid Amount owing to the other party if subsequently an Early Termination Date results from an Event of Default, a Credit Event Upon Merger or an Additional Termination Event in respect of which all outstanding Transactions are Affected Transactions and (2) otherwise accrue interest in accordance with Section 9(h)(ii)(2).

(v)    **Pre-Estimate.** The parties agree that an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks, and, except as otherwise provided in this Agreement, neither party will be entitled to recover any additional damages as a consequence of the termination of the Terminated Transactions.

(f)    *Set-Off.* Any Early Termination Amount payable to one party (the "Payee") by the other party (the "Payer"), in circumstances where there is a Defaulting Party or where there is one Affected Party in the case where either a Credit Event Upon Merger has occurred or any other Termination Event in respect of which all outstanding Transactions are Affected Transactions has occurred, will, at the option of the Non-defaulting Party or the Non-affected Party, as the case may be ("X") (and without prior notice to the Defaulting Party or the Affected Party, as the case may be), be reduced by its set-off against any other amounts ("Other Amounts") payable by the Payee to the Payer (whether or not arising under this Agreement, matured or contingent and irrespective of the currency, place of payment or place of booking of the obligation). To the extent that any Other Amounts are so set off, those Other Amounts will be discharged promptly and in all respects. X will give notice to the other party of any set-off effected under this Section 6(f).

For this purpose, either the Early Termination Amount or the Other Amounts (or the relevant portion of such amounts) may be converted by X into the currency in which the other is denominated at the rate of exchange at which such party would be able, in good faith and using commercially reasonable procedures, to purchase the relevant amount of such currency.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 417 of 637

If an obligation is unascertained, X may in good faith estimate that obligation and set off in respect of the estimate, subject to the relevant party accounting to the other when the obligation is ascertained.

Nothing in this Section 6(f) will be effective to create a charge or other security interest. This Section 6(f) will be without prejudice and in addition to any right of set-off, offset, combination of accounts, lien, right of retention or withholding or similar right or requirement to which any party is at any time otherwise entitled or subject (whether by operation of law, contract or otherwise).

## 7.     Transfer

Subject to Section 6(b)(ii) and to the extent permitted by applicable law, neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:—

(a)       a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)       a party may make such a transfer of all or any part of its interest in any Early Termination Amount payable to it by a Defaulting Party, together with any amounts payable on or with respect to that interest and any other rights associated with that interest pursuant to Sections 8, 9(h) and 11.

Any purported transfer that is not in compliance with this Section 7 will be void.

## 8.     Contractual Currency

(a)       *Payment in the Contractual Currency.* Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in good faith and using commercially reasonable procedures in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)       *Judgments.* To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in clause (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purpose of such judgment or order and the rate of exchange at which such party is able, acting in good faith and using

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 418 of 637

commercially reasonable procedures in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party.

(c)    **Separate Indemnities.**  To the extent permitted by applicable law, the indemnities in this Section 8 constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    **Evidence of Loss.**  For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

**9.    Miscellaneous**

(a)    **Entire Agreement.**  This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter.  Each of the parties acknowledges that in entering into this Agreement it has not relied on any oral or written representation, warranty or other assurance (except as provided for or referred to in this Agreement) and waives all rights and remedies which might otherwise be available to it in respect thereof, except that nothing in this Agreement will limit or exclude any liability of a party for fraud.

(b)    **Amendments.**  An amendment, modification or waiver in respect of this Agreement will only be effective if in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system.

(c)    **Survival of Obligations.**  Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    **Remedies Cumulative.**  Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    **Counterparts and Confirmations.**

    (i)    This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission and by electronic messaging system), each of which will be deemed an original.

    (ii)    The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise).  A Confirmation will be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes, by an exchange of electronic messages on an electronic messaging system or by an exchange of e-mails, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement.  The parties will specify therein or through another effective means that any such counterpart, telex, electronic message or e-mail constitutes a Confirmation.

(f)    **No Waiver of Rights.**  A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    **Headings.**  The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

(h)   *Interest and Compensation.*

(i)   *Prior to Early Termination.* Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction:—

(1)   *Interest on Defaulted Payments.* If a party defaults in the performance of any payment obligation, it will, to the extent permitted by applicable law and subject to Section 6(c), pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as the overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment (and excluding any period in respect of which interest or compensation in respect of the overdue amount is due pursuant to clause (3)(B) or (C) below), at the Default Rate.

(2)   *Compensation for Defaulted Deliveries.* If a party defaults in the performance of any obligation required to be settled by delivery, it will on demand (A) compensate the other party to the extent provided for in the relevant Confirmation or elsewhere in this Agreement and (B) unless otherwise provided in the relevant Confirmation or elsewhere in this Agreement, to the extent permitted by applicable law and subject to Section 6(c), pay to the other party interest (before as well as after judgment) on an amount equal to the fair market value of that which was required to be delivered in the same currency as that amount, for the period from (and including) the originally scheduled date for delivery to (but excluding) the date of actual delivery (and excluding any period in respect of which interest or compensation in respect of that amount is due pursuant to clause (4) below), at the Default Rate. The fair market value of any obligation referred to above will be determined as of the originally scheduled date for delivery, in good faith and using commercially reasonable procedures, by the party that was entitled to take delivery.

(3)   *Interest on Deferred Payments.* If:—

(A)   a party does not pay any amount that, but for Section 2(a)(iii), would have been payable, it will, to the extent permitted by applicable law and subject to Section 6(c) and clauses (B) and (C) below, pay interest (before as well as after judgment) on that amount to the other party on demand (after such amount becomes payable) in the same currency as that amount, for the period from (and including) the date the amount would, but for Section 2(a)(iii), have been payable to (but excluding) the date the amount actually becomes payable, at the Applicable Deferral Rate;

(B)   a payment is deferred pursuant to Section 5(d), the party which would otherwise have been required to make that payment will, to the extent permitted by applicable law, subject to Section 6(c) and for so long as no Event of Default or Potential Event of Default with respect to that party has occurred and is continuing, pay interest (before as well as after judgment) on the amount of the deferred payment to the other party on demand (after such amount becomes payable) in the same currency as the deferred payment, for the period from (and including) the date the amount would, but for Section 5(d), have been payable to (but excluding) the earlier of the date the payment is no longer deferred pursuant to Section 5(d) and the date during the deferral period upon which an Event of Default or Potential Event of Default with respect to that party occurs, at the Applicable Deferral Rate; or

(C)   a party fails to make any payment due to the occurrence of an Illegality or a Force Majeure Event (after giving effect to any deferral period contemplated by clause (B) above), it will, to the extent permitted by applicable law, subject to Section 6(c) and for so long as the event or circumstance giving rise to that Illegality or Force Majeure Event

continues and no Event of Default or Potential Event of Default with respect to that party has occurred and is continuing, pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as the overdue amount, for the period from (and including) the date the party fails to make the payment due to the occurrence of the relevant Illegality or Force Majeure Event (or, if later, the date the payment is no longer deferred pursuant to Section 5(d)) to (but excluding) the earlier of the date the event or circumstance giving rise to that Illegality or Force Majeure Event ceases to exist and the date during the period upon which an Event of Default or Potential Event of Default with respect to that party occurs (and excluding any period in respect of which interest or compensation in respect of the overdue amount is due pursuant to clause (B) above), at the Applicable Deferral Rate.

(4)  *Compensation for Deferred Deliveries.* If:—

(A)  a party does not perform any obligation that, but for Section 2(a)(iii), would have been required to be settled by delivery;

(B)  a delivery is deferred pursuant to Section 5(d); or

(C)  a party fails to make a delivery due to the occurrence of an Illegality or a Force Majeure Event at a time when any applicable Waiting Period has expired,

the party required (or that would otherwise have been required) to make the delivery will, to the extent permitted by applicable law and subject to Section 6(c), compensate and pay interest to the other party on demand (after, in the case of clauses (A) and (B) above, such delivery is required) if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

(ii)  **Early Termination.** Upon the occurrence or effective designation of an Early Termination Date in respect of a Transaction:—

(1)  *Unpaid Amounts.* For the purpose of determining an Unpaid Amount in respect of the relevant Transaction, and to the extent permitted by applicable law, interest will accrue on the amount of any payment obligation or the amount equal to the fair market value of any obligation required to be settled by delivery included in such determination in the same currency as that amount, for the period from (and including) the date the relevant obligation was (or would have been but for Section 2(a)(iii) or 5(d)) required to have been performed to (but excluding) the relevant Early Termination Date, at the Applicable Close-out Rate.

(2)  *Interest on Early Termination Amounts.* If an Early Termination Amount is due in respect of such Early Termination Date, that amount will, to the extent permitted by applicable law, be paid together with interest (before as well as after judgment) on that amount in the Termination Currency, for the period from (and including) such Early Termination Date to (but excluding) the date the amount is paid, at the Applicable Close-out Rate.

(iii)  **Interest Calculation.** Any interest pursuant to this Section 9(h) will be calculated on the basis of daily compounding and the actual number of days elapsed.

ISDA® 2002

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 421 of 637

**10.     Offices; Multibranch Parties**

(a)     If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to and agrees with the other party that, notwithstanding the place of booking or its jurisdiction of incorporation or organisation, its obligations are the same in terms of recourse against it as if it had entered into the Transaction through its head or home office, except that a party will not have recourse to the head or home office of the other party in respect of any payment or delivery deferred pursuant to Section 5(d) for so long as the payment or delivery is so deferred.  This representation and agreement will be deemed to be repeated by each party on each date on which the parties enter into a Transaction.

(b)     If a party is specified as a Multibranch Party in the Schedule, such party may, subject to clause (c) below, enter into a Transaction through, book a Transaction in and make and receive payments and deliveries with respect to a Transaction through any Office listed in respect of that party in the Schedule (but not any other Office unless otherwise agreed by the parties in writing).

(c)     The Office through which a party enters into a Transaction will be the Office specified for that party in the relevant Confirmation or as otherwise agreed by the parties in writing, and, if an Office for that party is not specified in the Confirmation or otherwise agreed by the parties in writing, its head or home office.  Unless the parties otherwise agree in writing, the Office through which a party enters into a Transaction will also be the Office in which it books the Transaction and the Office through which it makes and receives payments and deliveries with respect to the Transaction.  Subject to Section 6(b)(ii), neither party may change the Office in which it books the Transaction or the Office through which it makes and receives payments or deliveries with respect to a Transaction without the prior written consent of the other party.

**11.     Expenses**

A Defaulting Party will on demand indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, execution fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.     Notices**

(a)     *Effectiveness.*  Any notice or other communication in respect of this Agreement may be given in any manner described below (except that a notice or other communication under Section 5 or 6 may not be given by electronic messaging system or e-mail) to the address or number or in accordance with the electronic messaging system or e-mail details provided (see the Schedule) and will be deemed effective as indicated:—

(i)     if in writing and delivered in person or by courier, on the date it is delivered;

(ii)     if sent by telex, on the date the recipient's answerback is received;

(iii)     if sent by facsimile transmission, on the date it is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)     if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date it is delivered or its delivery is attempted;

(v)     if sent by electronic messaging system, on the date it is received; or

**ISDA® 2002**

(vi)     if sent by e-mail, on the date it is delivered,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication will be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Details.* Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system or e-mail details at which notices or other communications are to be given to it.

**13.    Governing Law and Jurisdiction**

(a)    *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction.* With respect to any suit, action or proceedings relating to any dispute arising out of or in connection with this Agreement ("Proceedings"), each party irrevocably:—

    (i)    submits:—

        (1)    if this Agreement is expressed to be governed by English law, to (A) the non-exclusive jurisdiction of the English courts if the Proceedings do not involve a Convention Court and (B) the exclusive jurisdiction of the English courts if the Proceedings do involve a Convention Court; or

        (2)    if this Agreement is expressed to be governed by the laws of the State of New York, to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City;

    (ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party; and

    (iii)    agrees, to the extent permitted by applicable law, that the bringing of Proceedings in any one or more jurisdictions will not preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Service of Process.* Each party irrevocably appoints the Process Agent, if any, specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12(a)(i), 12(a)(iii) or 12(a)(iv). Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by applicable law.

(d)    *Waiver of Immunities.* Each party irrevocably waives, to the extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction or order for specific performance or recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

          **ISDA® 2002**

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 423 of 637

## 14.     Definitions

As used in this Agreement:—

*"Additional Representation"* has the meaning specified in Section 3.

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Force Majeure Event, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event (which, in the case of an Illegality under Section 5(b)(i)(2) or a Force Majeure Event under Section 5(b)(ii)(2), means all Transactions unless the relevant Credit Support Document references only certain Transactions, in which case those Transactions and, if the relevant Credit Support Document constitutes a Confirmation for a Transaction, that Transaction) and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person.  For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Agreement"* has the meaning specified in Section 1(c).

*"Applicable Close-out Rate"* means:—

(a)     in respect of the determination of an Unpaid Amount:—

    (i)     in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

    (ii)     in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate;

    (iii)     in respect of obligations deferred pursuant to Section 5(d), if there is no Defaulting Party and for so long as the deferral period continues, the Applicable Deferral Rate; and

    (iv)     in all other cases following the occurrence of a Termination Event (except where interest accrues pursuant to clause (iii) above), the Applicable Deferral Rate; and

(b)     in respect of an Early Termination Amount:—

    (i)     for the period from (and including) the relevant Early Termination Date to (but excluding) the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable:—

        (1)     if the Early Termination Amount is payable by a Defaulting Party, the Default Rate;

        (2)     if the Early Termination Amount is payable by a Non-defaulting Party, the Non-default Rate; and

        (3)     in all other cases, the Applicable Deferral Rate; and

(ii)        for the period from (and including) the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable to (but excluding) the date of actual payment:—

(1)        if a party fails to pay the Early Termination Amount due to the occurrence of an event or circumstance which would, if it occurred with respect to a payment or delivery under a Transaction, constitute or give rise to an Illegality or a Force Majeure Event, and for so long as the Early Termination Amount remains unpaid due to the continuing existence of such event or circumstance, the Applicable Deferral Rate;

(2)        if the Early Termination Amount is payable by a Defaulting Party (but excluding any period in respect of which clause (1) above applies), the Default Rate;

(3)        if the Early Termination Amount is payable by a Non-defaulting Party (but excluding any period in respect of which clause (1) above applies), the Non-default Rate; and

(4)        in all other cases, the Termination Rate.

*"Applicable Deferral Rate"* means:—

(a)        for the purpose of Section 9(h)(i)(3)(A), the rate certified by the relevant payer to be a rate offered to the payer by a major bank in a relevant interbank market for overnight deposits in the applicable currency, such bank to be selected in good faith by the payer for the purpose of obtaining a representative rate that will reasonably reflect conditions prevailing at the time in that relevant market;

(b)        for purposes of Section 9(h)(i)(3)(B) and clause (a)(iii) of the definition of Applicable Close-out Rate, the rate certified by the relevant payer to be a rate offered to prime banks by a major bank in a relevant interbank market for overnight deposits in the applicable currency, such bank to be selected in good faith by the payer after consultation with the other party, if practicable, for the purpose of obtaining a representative rate that will reasonably reflect conditions prevailing at the time in that relevant market; and

(c)        for purposes of Section 9(h)(i)(3)(C) and clauses (a)(iv), (b)(i)(3) and (b)(ii)(1) of the definition of Applicable Close-out Rate, a rate equal to the arithmetic mean of the rate determined pursuant to clause (a) above and a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount.

*"Automatic Early Termination"* has the meaning specified in Section 6(a).

*"Burdened Party"* has the meaning specified in Section 5(b)(iv).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs after the parties enter into the relevant Transaction.

*"Close-out Amount"* means, with respect to each Terminated Transaction or each group of Terminated Transactions and a Determining Party, the amount of the losses or costs of the Determining Party that are or would be incurred under then prevailing circumstances (expressed as a positive number) or gains of the Determining Party that are or would be realised under then prevailing circumstances (expressed as a negative number) in replacing, or in providing for the Determining Party the economic equivalent of, (a) the material terms of that Terminated Transaction or group of Terminated Transactions, including the payments and deliveries by the parties under Section 2(a)(i) in respect of that Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date (assuming satisfaction of the conditions precedent in

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 425 of 637

Section 2(a)(iii)) and (b) the option rights of the parties in respect of that Terminated Transaction or group of Terminated Transactions.

Any Close-out Amount will be determined by the Determining Party (or its agent), which will act in good faith and use commercially reasonable procedures in order to produce a commercially reasonable result. The Determining Party may determine a Close-out Amount for any group of Terminated Transactions or any individual Terminated Transaction but, in the aggregate, for not less than all Terminated Transactions. Each Close-out Amount will be determined as of the Early Termination Date or, if that would not be commercially reasonable, as of the date or dates following the Early Termination Date as would be commercially reasonable.

Unpaid Amounts in respect of a Terminated Transaction or group of Terminated Transactions and legal fees and out-of-pocket expenses referred to in Section 11 are to be excluded in all determinations of Close-out Amounts.

In determining a Close-out Amount, the Determining Party may consider any relevant information, including, without limitation, one or more of the following types of information:—

(i)      quotations (either firm or indicative) for replacement transactions supplied by one or more third parties that may take into account the creditworthiness of the Determining Party at the time the quotation is provided and the terms of any relevant documentation, including credit support documentation, between the Determining Party and the third party providing the quotation;

(ii)      information consisting of relevant market data in the relevant market supplied by one or more third parties including, without limitation, relevant rates, prices, yields, yield curves, volatilities, spreads, correlations or other relevant market data in the relevant market; or

(iii)      information of the types described in clause (i) or (ii) above from internal sources (including any of the Determining Party's Affiliates) if that information is of the same type used by the Determining Party in the regular course of its business for the valuation of similar transactions.

The Determining Party will consider, taking into account the standards and procedures described in this definition, quotations pursuant to clause (i) above or relevant market data pursuant to clause (ii) above unless the Determining Party reasonably believes in good faith that such quotations or relevant market data are not readily available or would produce a result that would not satisfy those standards. When considering information described in clause (i), (ii) or (iii) above, the Determining Party may include costs of funding, to the extent costs of funding are not and would not be a component of the other information being utilised. Third parties supplying quotations pursuant to clause (i) above or market data pursuant to clause (ii) above may include, without limitation, dealers in the relevant markets, end-users of the relevant product, information vendors, brokers and other sources of market information.

Without duplication of amounts calculated based on information described in clause (i), (ii) or (iii) above, or other relevant information, and when it is commercially reasonable to do so, the Determining Party may in addition consider in calculating a Close-out Amount any loss or cost incurred in connection with its terminating, liquidating or re-establishing any hedge related to a Terminated Transaction or group of Terminated Transactions (or any gain resulting from any of them).

Commercially reasonable procedures used in determining a Close-out Amount may include the following:—

(1)      application to relevant market data from third parties pursuant to clause (ii) above or information from internal sources pursuant to clause (iii) above of pricing or other valuation models that are, at the time of the determination of the Close-out Amount, used by the Determining Party in the regular course of its business in pricing or valuing transactions between the Determining Party and unrelated third parties that are similar to the Terminated Transaction or group of Terminated Transactions; and

**ISDA® 2002**

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 426 of 637

(2)        application of different valuation methods to Terminated Transactions or groups of Terminated Transactions depending on the type, complexity, size or number of the Terminated Transactions or group of Terminated Transactions.

*"Confirmation"* has the meaning specified in the preamble.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Contractual Currency"* has the meaning specified in Section 8(a).

*"Convention Court"* means any court which is bound to apply to the Proceedings either Article 17 of the 1968 Brussels Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters or Article 17 of the 1988 Lugano Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Cross-Default"* means the event specified in Section 5(a)(vi).

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Designated Event"* has the meaning specified in Section 5(b)(v).

*"Determining Party"* means the party determining a Close-out Amount.

*"Early Termination Amount"* has the meaning specified in Section 6(e).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"electronic messages"* does not include e-mails but does include documents expressed in markup languages, and *"electronic messaging system"* will be construed accordingly.

*"English law"* means the law of England and Wales, and *"English"* will be construed accordingly.

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Force Majeure Event"* has the meaning specified in Section 5(b).

*"General Business Day"* means a day on which commercial banks are open for general business (including dealings in foreign exchange and foreign currency deposits).

*"Illegality"* has the meaning specified in Section 5(b).

**ISDA® 2002**

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 427 of 637

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority), and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means (a) in relation to any obligation under Section 2(a)(i), a General Business Day in the place or places specified in the relevant Confirmation and a day on which a relevant settlement system is open or operating as specified in the relevant Confirmation or, if a place or a settlement system is not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) for the purpose of determining when a Waiting Period expires, a General Business Day in the place where the event or circumstance that constitutes or gives rise to the Illegality or Force Majeure Event, as the case may be, occurs, (c) in relation to any other payment, a General Business Day in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment and, if that currency does not have a single recognised principal financial centre, a day on which the settlement system necessary to accomplish such payment is open, (d) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), a General Business Day (or a day that would have been a General Business Day but for the occurrence of an event or circumstance which would, if it occurred with respect to payment, delivery or compliance related to a Transaction, constitute or give rise to an Illegality or a Force Majeure Event) in the place specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (e) in relation to Section 5(a)(v)(2), a General Business Day in the relevant locations for performance with respect to such Specified Transaction.

*"Local Delivery Day"* means, for purposes of Sections 5(a)(i) and 5(d), a day on which settlement systems necessary to accomplish the relevant delivery are generally open for business so that the delivery is capable of being accomplished in accordance with customary market practice, in the place specified in the relevant Confirmation or, if not so specified, in a location as determined in accordance with customary market practice for the relevant delivery.

*"Master Agreement"* has the meaning specified in the preamble.

*"Merger Without Assumption"* means the event specified in Section 5(a)(viii).

*"Multiple Transaction Payment Netting"* has the meaning specified in Section 2(c).

*"Non-affected Party"* means, so long as there is only one Affected Party, the other party.

*"Non-default Rate"* means the rate certified by the Non-defaulting Party to be a rate offered to the Non-defaulting Party by a major bank in a relevant interbank market for overnight deposits in the applicable currency, such bank to be selected in good faith by the Non-defaulting Party for the purpose of obtaining a representative rate that will reasonably reflect conditions prevailing at the time in that relevant market.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Other Amounts"* has the meaning specified in Section 6(f).

ISDA® 2002

*"Payee"* has the meaning specified in Section 6(f).

*"Payer"* has the meaning specified in Section 6(f).

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Proceedings"* has the meaning specified in Section 13(b).

*"Process Agent"* has the meaning specified in the Schedule.

*"rate of exchange"* includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Schedule"* has the meaning specified in the preamble.

*"Scheduled Settlement Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Specified Entity"* has the meaning specified in the Schedule.

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect to any such transaction) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is not a Transaction under this Agreement but (i) which is a rate swap transaction, swap option, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option, credit protection transaction, credit swap, credit default swap, credit default option, total return swap, credit spread transaction, repurchase transaction, reverse repurchase transaction, buy/sell-back transaction, securities lending transaction, weather index transaction or forward purchase or sale of a security, commodity or other financial instrument or interest (including any option with respect to any of these transactions) or (ii) which is a type of transaction that is similar to any transaction referred to in clause (i) above that is currently, or in the future becomes, recurrently entered into in the financial markets (including terms and conditions incorporated by reference in such agreement) and which is a forward, swap, future, option or other derivative on one or more rates, currencies, commodities, equity securities or other equity instruments, debt securities or other debt instruments, economic indices or measures of economic risk or value, or other benchmarks against which payments or deliveries are to be made, (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Stamp Tax Jurisdiction"* has the meaning specified in Section 4(e).

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means, with respect to any Early Termination Date, (a) if resulting from an Illegality or a Force Majeure Event, all Affected Transactions specified in the notice given pursuant to Section 6(b)(iv), (b) if resulting from any other Termination Event, all Affected Transactions and (c) if resulting from an Event of Default, all Transactions in effect either immediately before the effectiveness of the notice designating that Early Termination Date or, if Automatic Early Termination applies, immediately before that Early Termination Date.

*"Termination Currency"* means (a) if a Termination Currency is specified in the Schedule and that currency is freely available, that currency, and (b) otherwise, euro if this Agreement is expressed to be governed by English law or United States Dollars if this Agreement is expressed to be governed by the laws of the State of New York.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Close-out Amount is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Force Majeure Event, a Tax Event, a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Threshold Amount"* means the amount, if any, specified as such in the Schedule.

*"Transaction"* has the meaning specified in the preamble.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii) or due but for Section 5(d)) to such party under Section 2(a)(i) or 2(d)(i)(4) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date, (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii) or 5(d)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market value of that which was (or would have been) required to be delivered and (c) if the Early Termination Date results from an Event of Default, a Credit Event Upon Merger or an Additional Termination Event in respect of which all outstanding Transactions are Affected Transactions, any Early Termination Amount due prior to such Early Termination Date and which remains unpaid as of such Early Termination Date, in each case together with any amount of interest accrued or other

compensation in respect of that obligation or deferred obligation, as the case may be, pursuant to Section 9(h)(ii)(1) or (2), as appropriate. The fair market value of any obligation referred to in clause (b) above will be determined as of the originally scheduled date for delivery, in good faith and using commercially reasonable procedures, by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it will be the average of the Termination Currency Equivalents of the fair market values so determined by both parties.

*"Waiting Period"* means:—

(a)    in respect of an event or circumstance under Section 5(b)(i), other than in the case of Section 5(b)(i)(2) where the relevant payment, delivery or compliance is actually required on the relevant day (in which case no Waiting Period will apply), a period of three Local Business Days (or days that would have been Local Business Days but for the occurrence of that event or circumstance) following the occurrence of that event or circumstance; and

(b)    in respect of an event or circumstance under Section 5(b)(ii), other than in the case of Section 5(b)(ii)(2) where the relevant payment, delivery or compliance is actually required on the relevant day (in which case no Waiting Period will apply), a period of eight Local Business Days (or days that would have been Local Business Days but for the occurrence of that event or circumstance) following the occurrence of that event or circumstance.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

..............................................................    ..............................................................
(Name of Party)    (Name of Party)

By: ...........................................................    By: ...........................................................
    Name:    Name:
    Title:    Title:
    Date:    Date:

ISDA® 2002

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 431 of 637



# ISDA®

International Swaps and Derivatives Association, Inc.

## SCHEDULE
## to the
## 2002 Master Agreement

dated as of ................................................................

between ....................................................... and ...................................................................
("Party A")                                                                                  ("Party B")

[*established as a [COUNTERPARTY TYPE]*]        [*established as a [COUNTERPARTY TYPE]*]

[*with company number [NUMBER]*]               [*with company number [NUMBER]*]

[*under the laws of [JURISDICTION]*]            [*under the laws of [JURISDICTION]*]

[*acting through its [BRANCH]*]*                [*acting through its [BRANCH]*]*

Part 1.   **Termination Provisions.**

(a)       **"*Specified Entity*"** means in relation to Party A for the purpose of:—

Section 5(a)(v), ...........................................................................................................................

Section 5(a)(vi), ..........................................................................................................................

Section 5(a)(vii), .........................................................................................................................

Section 5(b)(v), ...........................................................................................................................

and in relation to Party B for the purpose of:—

Section 5(a)(v), ...........................................................................................................................

Section 5(a)(vi), ..........................................................................................................................

Section 5(a)(vii), .........................................................................................................................

Section 5(b)(v), ...........................................................................................................................

---
*       Include if applicable.

(b)   *"Specified Transaction"* [will have the meaning specified in Section 14 of this Agreement.][means .............

.............................................................................................................................................................

.........................................................................................................................................................]*

(c)   The *"Cross-Default"* provisions of Section 5(a)(vi) [will][will not]* apply to Party A

[will][will not]* apply to Party B

[*"Specified Indebtedness"* [will have the meaning specified in Section 14 of this Agreement.][means ...........

.........................................................................................................................................................]*

*"Threshold Amount"* means .............................................................................................................

.......................................................................................................................................................]**

(d)   The *"Credit Event Upon Merger"* provisions of Section 5(b)(v) [will][will not]* apply to Party A

[will][will not]* apply to Party B

(e)   The *"Automatic Early Termination"* provision of Section 6(a) [will][will not]* apply to Party A

[will][will not]* apply to Party B

(f)   *"Termination Currency"* [will have the meaning specified in Section 14 of this Agreement.][means ...........

.........................................................................................................................................................]*

(g)   *Additional Termination Event* [will][will not]* apply.   [The following will constitute an Additional

Termination Event:— .................................................................................................................................

.......................................................................................................................................................................

.......................................................................................................................................................................

.......................................................................................................................................................................

For the purpose of the foregoing Termination Event, the Affected Party or Affected Parties will be:— .........

....................................................................................................................................................... ]***

## Part 2.  Tax Representations.****

(a)   *Payer Representations.*  For the purpose of Section 3(e) of this Agreement[, Party A and Party B do not
make any representations.][:—

[[(i)]   [Party A] [and] [Party B] [each] make[s] the following representation:—

It is not required by any applicable law, as modified by the practice of any relevant governmental
revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on
account of any Tax from any payment (other than interest under Section 9(h) of this Agreement) to

---

\*       Delete as applicable.

\*\*      Include if Cross-Default will apply to either Party A or Party B.

\*\*\*     Include if Additional Termination Event will apply.

\*\*\*\*    N.B.: the following representations may need modification if either party is a Multibranch Party.

ISDA® 2002

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 433 of 637

be made by it to the other party under this Agreement. In making this representation, it may rely on (i) the accuracy of any representations made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction of the agreement contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, except that it will not be a breach of this representation where reliance is placed on clause (ii) above and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.]*

[[(ii)]    [Party A] [and] [Party B] [each] make[s] the following representation[s]:— ..............................

................................................................................................................................................................

................................................................................................................................................................

................................................................................................................................ ]]*

(b)    **Payee Representations.**  For the purpose of Section 3(f) of this Agreement[, Party A and Party B do not make any representations.][:—

[[(i)]    [Party A] [and] [Party B] [each] make[s] the following representation:—

It is fully eligible for the benefits of the "Business Profits" or "Industrial and Commercial Profits" provision, as the case may be, the "interest" provision or the "Other Income" provision, if any, of the Specified Treaty with respect to any payment described in such provisions and received or to be received by it in connection with this Agreement and no such payment is attributable to a trade or business carried on by it through a permanent establishment in the Specified Jurisdiction.

**"Specified Treaty"** means with respect to Party A ..............................................................................

**"Specified Jurisdiction"** means with respect to Party A ....................................................................

**"Specified Treaty"** means with respect to Party B ..............................................................................

**"Specified Jurisdiction"** means with respect to Party B ..................................................................]*

[[(ii)]    [Party A] [and] [Party B] [each] make[s] the following representation:—

Each payment received or to be received by it in connection with this Agreement will be effectively connected with its conduct of a trade or business in the Specified Jurisdiction.

**"Specified Jurisdiction"** means with respect to Party A ....................................................................

**"Specified Jurisdiction"** means with respect to Party B ..................................................................]*

[[(iii)]    [Party A] [and] [Party B] [each] make[s] the following representation:—

It is a "U.S. person" (as that term is used in section 1.1441-4(a)(3)(ii) of United States Treasury Regulations) for United States federal income tax purposes.]*

_____
*        Delete as applicable.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 434 of 637

[[(iv)]    [Party A] [and] [Party B] [each] make[s] the following representation:—

It is a "non-U.S. branch of a foreign person" (as that term is used in section 1.1441-4(a)(3)(ii) of United States Treasury Regulations) for United States federal income tax purposes.]*

[[(v)]    [Party A] [and] [Party B] [each] make[s] the following representation:—

With respect to payments made to an address outside the United States or made by a transfer of funds to an account outside the United States, it is a "non-U.S. branch of a foreign person" (as that term is used in section 1.1441-4(a)(3)(ii) of United States Treasury Regulations) for United States federal income tax purposes.]*

[[(vi)]    [Party A] [and] [Party B] [each] make[s] the following representation:—

It is a "foreign person" (as that term is used in section 1.6041-4(a)(4) of United States Treasury Regulations) for United States federal income tax purposes.]*

[[(vii)]    [Party A] [and] [Party B] [each] make[s] the following representation[s]:—

................................................................................................................................................................

................................................................................................................................................................

...........................................................................................................................................................]]*

Part 3.   **Agreement to Deliver Documents.**

For the purpose of Sections 4(a)(i) and 4(a)(ii) of this Agreement, each party agrees to deliver the following documents, as applicable:—

(a)       Tax forms, documents or certificates to be delivered are[: none][:—

| Party required to<br>deliver document | Form/Document/<br>Certificate | Date by which<br>to be delivered |
|---|---|---|
| ............................... | ................................................... | .......................................................... |
| ............................... | ................................................... | .......................................................... |
| ............................... | ................................................... | .......................................................... |
| ............................... | ................................................... | .......................................................... |
| ............................... | ................................................... | ...................................................... ]* |

---

\*        Delete as applicable.

ISDA® 2002

(b)    Other documents to be delivered are[: none][:—

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| ................................. | ................................................... | ................................. | [Yes][No] |
| ................................. | ................................................... | ................................. | [Yes][No] |
| ................................. | ................................................... | ................................. | [Yes][No] |
| ................................. | ................................................... | ................................. | [Yes][No] |
| ................................. | ................................................... | ................................. | [Yes][No]]* |

Part 4.    **Miscellaneous.**

(a)    *Addresses for Notices.*  For the purpose of Section 12(a) of this Agreement:—

Address for notices or communications to Party A:—

Address: ....................................................................................................................................................

Attention: .................................................................................................................................................

Telex No.: ........................................................    Answerback: .............................................................

Facsimile No.: ..................................................    Telephone No.: ........................................................

E-mail:......................................................................................................................................................

Electronic Messaging System Details: ....................................................................................................

Specific Instructions: ...............................................................................................................................

Address for notices or communications to Party B:—

Address: ....................................................................................................................................................

Attention: .................................................................................................................................................

Telex No.: ........................................................    Answerback: .............................................................

Facsimile No.: ..................................................    Telephone No.: ........................................................

E-mail:......................................................................................................................................................

Electronic Messaging System Details: ....................................................................................................

Specific Instructions: ...............................................................................................................................

---

*          Delete as applicable.

                                                                            **ISDA® 2002**

(b)  *Process Agent.*  For the purpose of Section 13(c) of this Agreement:—

Party A appoints as its Process Agent: [not applicable][ ...............................................................]*

Party B appoints as its Process Agent: [not applicable][ ...............................................................]*

(c)  *Offices.*  The provisions of Section 10(a) [will][will not]* apply to this Agreement.

(d)  *Multibranch Party.*  For the purpose of Section 10(b) of this Agreement:—

Party A [is not a Multibranch Party.][is a Multibranch Party and may enter into a Transaction through any of the following Offices:—

........................................    ........................................    ........................................

........................................    ........................................    .............................]*

Party B [is not a Multibranch Party.][is a Multibranch Party and may enter into a Transaction through any of the following Offices:—

........................................    ........................................    ........................................

........................................    ........................................    .............................]*

[(e)  *Calculation Agent.*  The Calculation Agent is ...................................................... , unless otherwise specified in a Confirmation in relation to the relevant Transaction.]**

[(f)  *Credit Support Document.*  Details of any Credit Support Document:— [none][ ...........................................

...............................................................................................................................................................

...............................................................................................................................................................

...............................................................................................................................]*

[(g)  *Credit Support Provider.*  Credit Support Provider means in relation to Party A, [none][ ...............................

...............................................................................................................................................................

...............................................................................................................................]*

Credit Support Provider means in relation to Party B, [none][...................................................................

...............................................................................................................................................................

...............................................................................................................................]*

[(h)  *Governing Law.*  This Agreement will be governed by and construed in accordance with [English law][the laws of the State of New York (without reference to choice of law doctrine)]*.

<hr>

\*   Delete as applicable.

\*\*  Include if applicable.

[(i)]     ***Netting of Payments.*** "Multiple Transaction Payment Netting" [will not apply for the purpose of Section 2(c) of this Agreement.][will apply for the purpose of Section 2(c) of this Agreement to [all Transactions][the following Transactions or groups of Transactions:— .........................................................

.................................................................................................................................................... ]

(in each case starting from [the date of this Agreement][ ........................................................]])]*

[(j)]     ***"Affiliate"*** [will have the meaning specified in Section 14 of this Agreement.][means ....................................

..................................................................................................................................................................]*

[(k)]     ***Absence of Litigation.***   For the purpose of Section 3(c):—

          ***"Specified Entity"*** means in relation to Party A, .....................................................................................

          ***"Specified Entity"*** means in relation to Party B, .....................................................................................

[(l)]     ***No Agency.***   The provisions of Section 3(g) [will][will not]* apply to this Agreement.

[(m)]    ***Additional Representation*** [will][will not]* apply.   [For the purpose of Section 3 of this Agreement, the following will constitute an Additional Representation:—

         [[(i)]     ***Relationship Between Parties.***   Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):—

                  [(1)]     *Non-Reliance.* It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary.  It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction, it being understood that information and explanations related to the terms and conditions of a Transaction will not be considered investment advice or a recommendation to enter into that Transaction.  No communication (written or oral) received from the other party will be deemed to be an assurance or guarantee as to the expected results of that Transaction.

                  [(2)]     *Assessment and Understanding.* It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction.  It is also capable of assuming, and assumes, the risks of that Transaction.

                  [(3)]     *Status of Parties.* The other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction.]]*

[[(n)]   ***Recording of Conversations.***   Each party (i) consents to the recording of telephone conversations between the trading, marketing and other relevant personnel of the parties in connection with this Agreement or any potential Transaction, (ii) agrees to obtain any necessary consent of, and give any necessary notice of such recording to, its relevant personnel and (iii) agrees, to the extent permitted by applicable law, that recordings may be submitted in evidence in any Proceedings.]**

---

\*      Delete as applicable.
\*\*    Include if applicable.

Part 5.   **Other Provisions.**

............................................................        ............................................................
                (Name of Party)                                        (Name of Party)


By: ........................................................        By: ........................................................
    Name:                                                            Name:
    Title:                                                           Title:
    Date:                                                            Date:

**ISDA® 2002**

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 439 of 637

# Exhibit 2

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 440 of 637

(Bilateral Form)                    (ISDA Agreements Subject to New York Law Only)



International Swaps and Derivatives Association, Inc.

# CREDIT SUPPORT ANNEX

to the Schedule to the

………………………………………………………………………….

dated as of ……………………….

between

…………………………………………………..  and  …………………………………………………

("Party A")                                          ("Party B")

This Annex supplements, forms part of, and is subject to, the above-referenced Agreement, is part of its Schedule and is a Credit Support Document under this Agreement with respect to each party.

Accordingly, the parties agree as follows:—

**Paragraph 1.  Interpretation**

(a)    ***Definitions and Inconsistency.***    Capitalized terms not otherwise defined herein or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 12, and all references in this Annex to Paragraphs are to Paragraphs of this Annex. In the event of any inconsistency between this Annex and the other provisions of this Schedule, this Annex will prevail, and in the event of any inconsistency between Paragraph 13 and the other provisions of this Annex, Paragraph 13 will prevail.

(b)    ***Secured Party and Pledgor.***  All references in this Annex to the "Secured Party" will be to either party when acting in that capacity and all corresponding references to the "Pledgor" will be to the other party when acting in that capacity; *provided, however*, that if Other Posted Support is held by a party to this Annex, all references herein to that party as the Secured Party with respect to that Other Posted Support will be to that party as the beneficiary thereof and will not subject that support or that party as the beneficiary thereof to provisions of law generally relating to security interests and secured parties.

**Paragraph 2.  Security Interest**

Each party, as the Pledgor, hereby pledges to the other party, as the Secured Party, as security for its Obligations, and grants to the Secured Party a first priority continuing security interest in, lien on and right of Set-off against all Posted Collateral Transferred to or received by the Secured Party hereunder. Upon the Transfer by the Secured Party to the Pledgor of Posted Collateral, the security interest and lien granted hereunder on that Posted Collateral will be released immediately and, to the extent possible, without any further action by either party.

Copyright © 1994 by International Swaps and Derivatives Association, Inc.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 441 of 637

## Paragraph 3.  Credit Support Obligations

(a)    *Delivery Amount.*  Subject to Paragraphs 4 and 5, upon a demand made by the Secured Party on or promptly following a Valuation Date, if the Delivery Amount for that Valuation Date equals or exceeds the Pledgor's Minimum Transfer Amount, then the Pledgor will Transfer to the Secured Party Eligible Credit Support having a Value as of the date of Transfer at least equal to the applicable Delivery Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the **"Delivery Amount"** applicable to the Pledgor for any Valuation Date will equal the amount by which:

    (i) the Credit Support Amount

    exceeds

    (ii) the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party.

(b)    *Return Amount.*  Subject to Paragraphs 4 and 5, upon a demand made by the Pledgor on or promptly following a Valuation Date, if the Return Amount for that Valuation Date equals or exceeds the Secured Party's Minimum Transfer Amount, then the Secured Party will Transfer to the Pledgor Posted Credit Support specified by the Pledgor in that demand having a Value as of the date of Transfer as close as practicable to the applicable Return Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the **"Return Amount"** applicable to the Secured Party for any Valuation Date will equal the amount by which:

    (i) the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party

    exceeds

    (ii) the Credit Support Amount.

**"Credit Support Amount"**  means, unless otherwise specified in Paragraph 13, for any Valuation Date (i) the Secured Party's Exposure for that Valuation Date plus (ii) the aggregate of all Independent Amounts applicable to the Pledgor, if any, minus (iii) all Independent Amounts applicable to the Secured Party, if any, minus (iv) the Pledgor's Threshold; *provided, however*, that the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields a number less than zero.

## Paragraph 4.  Conditions Precedent, Transfer Timing, Calculations and Substitutions

(a)    *Conditions Precedent*.  Each Transfer obligation of the Pledgor under Paragraphs 3 and 5 and of the Secured Party under Paragraphs 3, 4(d)(ii), 5 and 6(d) is subject to the conditions precedent that:

    (i) no Event of Default, Potential Event of Default or Specified Condition has occurred and is continuing with respect to the other party; and

    (ii) no Early Termination Date for which any unsatisfied payment obligations exist has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the other party.

(b)    *Transfer Timing.*  Subject to Paragraphs 4(a) and 5 and unless otherwise specified, if a demand for the Transfer of Eligible Credit Support or Posted Credit Support is made by the Notification Time, then the relevant Transfer will be made not later than the close of business on the next Local Business Day; if a demand is made after the Notification Time, then the relevant Transfer will be made not later than the close of business on the second Local Business Day thereafter.

(c)    *Calculations.* All calculations of Value and Exposure for purposes of Paragraphs 3 and 6(d) will be made by the Valuation Agent as of the Valuation Time. The Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) of its calculations not later than the Notification Time on the Local Business Day following the applicable Valuation Date (or in the case of Paragraph  6(d),  following the date of calculation).

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 442 of 637

**(d)**   *Substitutions.*

(i) Unless otherwise specified in Paragraph 13, upon notice to the Secured Party specifying the items of Posted Credit Support to be exchanged, the Pledgor may, on any Local Business Day, Transfer to the Secured Party substitute Eligible Credit Support (the "Substitute Credit Support"); and

(ii) subject to Paragraph 4(a), the Secured Party will Transfer to the Pledgor the items of Posted Credit Support specified by the Pledgor in its notice not later than the Local Business Day following the date on which the Secured Party receives the Substitute Credit Support, unless otherwise specified in Paragraph 13 (the "Substitution Date"); *provided* that the Secured Party will only be obligated to Transfer Posted Credit Support with a Value as of the date of Transfer of that Posted Credit Support equal to the Value as of that date of the Substitute Credit Support.

**Paragraph 5. Dispute Resolution**

If a party (a "Disputing Party") disputes (I) the Valuation Agent's calculation of a Delivery Amount or a Return Amount or (II) the Value of any Transfer of Eligible Credit Support or Posted Credit Support, then (1) the Disputing Party will notify the other party and the Valuation Agent (if the Valuation Agent is not the other party) not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (2) subject to Paragraph 4(a), the appropriate party will Transfer the undisputed amount to the other party not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (3) the parties will consult with each other in an attempt to resolve the dispute and (4) if they fail to resolve the dispute by the Resolution Time, then:

(i) In the case of a dispute involving a Delivery Amount or Return Amount, unless otherwise specified in Paragraph 13, the Valuation Agent will recalculate the Exposure and the Value as of the Recalculation Date by:

(A) utilizing any calculations of Exposure for the Transactions (or Swap Transactions) that the parties have agreed are not in dispute;

(B) calculating the Exposure for the Transactions (or Swap Transactions) in dispute by seeking four actual quotations at mid-market from Reference Market-makers for purposes of calculating Market Quotation, and taking the arithmetic average of those obtained; *provided* that if four quotations are not available for a particular Transaction (or Swap Transaction), then fewer than four quotations may be used for that Transaction (or Swap Transaction); and if no quotations are available for a particular Transaction (or Swap Transaction), then the Valuation Agent's original calculations will be used for that Transaction (or Swap Transaction); and

(C) utilizing the procedures specified in Paragraph 13 for calculating the Value, if disputed, of Posted Credit Support.

(ii) In the case of a dispute involving the Value of any Transfer of Eligible Credit Support or Posted Credit Support, the Valuation Agent will recalculate the Value as of the date of Transfer pursuant to Paragraph 13.

Following a recalculation pursuant to this Paragraph, the Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) not later than the Notification Time on the Local Business Day following the Resolution Time. The appropriate party will, upon demand following that notice by the Valuation Agent or a resolution pursuant to (3) above and subject to Paragraphs 4(a) and 4(b), make the appropriate Transfer.

ISDA®1994

**Paragraph 6.  Holding and Using Posted Collateral**

(a)   *Care of Posted Collateral.* Without limiting the Secured Party's rights under Paragraph 6(c), the  Secured Party will exercise reasonable care to assure the safe custody of all Posted Collateral to the extent required by applicable law, and in any event the Secured Party will be deemed to have exercised reasonable care if it exercises at least the same degree of care as it would exercise with respect to its own property. Except as specified in the preceding sentence, the Secured Party will have no duty with respect to Posted Collateral, including, without limitation, any duty to collect any Distributions, or enforce or preserve any rights pertaining thereto.

(b)   *Eligibility to Hold Posted Collateral; Custodians.*

(i) *General.* Subject to the satisfaction of any conditions specified in Paragraph 13 for holding Posted Collateral, the Secured Party will be entitled to hold Posted Collateral or to appoint an agent (a "Custodian") to hold Posted Collateral for the Secured Party. Upon notice by the Secured Party to the Pledgor of the appointment of a Custodian, the Pledgor's obligations to make any Transfer will be discharged by making the Transfer to that Custodian. The holding of Posted Collateral by a  Custodian will be deemed to be the holding of that Posted Collateral by the Secured Party for which the Custodian is acting.

(ii) *Failure to Satisfy Conditions.* If the Secured Party or its Custodian fails to satisfy any conditions for holding Posted Collateral, then upon a demand made by the Pledgor, the Secured Party will, not later than five Local Business Days after the demand, Transfer or cause its Custodian to Transfer all Posted Collateral held by it to a Custodian that satisfies those conditions or to the Secured Party if it satisfies those conditions.

(iii) *Liability.* The Secured Party will be liable for the acts or omissions of its Custodian to the  same extent that the Secured Party would be liable hereunder for its own acts or omissions.

(c)   *Use of Posted Collateral.* Unless otherwise specified in Paragraph 13 and without limiting the rights and obligations of the parties under Paragraphs 3, 4(d)(ii), 5, 6(d) and 8, if the Secured Party is not a Defaulting Party or an Affected Party with respect to a Specified Condition and no Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then the Secured Party will, notwithstanding Section 9-207 of the New York Uniform Commercial Code, have the right to:

(i) sell, pledge, rehypothecate, assign, invest, use, commingle or otherwise dispose of, or otherwise use in its business any Posted Collateral it holds, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor; and

(ii) register any Posted Collateral in the name of the Secured Party, its Custodian or a nominee for either.

For purposes of the obligation to Transfer Eligible Credit Support or Posted Credit Support pursuant  to Paragraphs 3 and 5 and any rights or remedies authorized under this Agreement, the Secured Party will be deemed to continue to hold all Posted Collateral and to receive Distributions made thereon, regardless of whether the Secured Party has exercised any rights with respect to any Posted Collateral pursuant to (i) or (ii) above.

(d)   *Distributions and Interest Amount.*

(i) *Distributions.*   Subject to Paragraph 4(a), if the Secured Party receives or is deemed to  receive Distributions on a Local Business Day, it will Transfer to the Pledgor not later than the following Local Business Day any Distributions it receives or is deemed to receive to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose).

**ISDA®1994**

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 444 of 637

(ii) *Interest Amount.* Unless otherwise specified in Paragraph 13 and subject to Paragraph 4(a), in lieu of any interest, dividends or other amounts paid or deemed to have been paid with respect to Posted Collateral in the form of Cash (all of which may be retained by the Secured Party), the Secured Party will Transfer to the Pledgor at the times specified in Paragraph 13 the Interest Amount to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose). The Interest Amount or portion thereof not Transferred pursuant to this Paragraph will constitute Posted Collateral in the form of Cash and will be subject to the security interest granted under Paragraph 2.

**Paragraph 7. Events of Default**

For purposes of Section 5(a)(iii)(1) of this Agreement, an Event of Default will exist with respect to a party if:

(i) that party fails (or fails to cause its Custodian) to make, when due, any Transfer of Eligible Collateral, Posted Collateral or the Interest Amount, as applicable, required to be made by it and that failure continues for two Local Business Days after notice of that failure is given to that party;

(ii) that party fails to comply with any restriction or prohibition specified in this Annex with respect to any of the rights specified in Paragraph 6(c) and that failure continues for five Local Business Days after notice of that failure is given to that party; or

(iii) that party fails to comply with or perform any agreement or obligation other than those specified in Paragraphs 7(i) and 7(ii) and that failure continues for 30 days after notice of that failure is given to that party.

**Paragraph 8. Certain Rights and Remedies**

(a)   *Secured Party's Rights and Remedies.* If at any time (1) an Event of Default or Specified Condition with respect to the Pledgor has occurred and is continuing or (2) an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Pledgor, then,  unless the Pledgor has paid in full all of its Obligations that are then due, the Secured Party may exercise one or more of the following rights and remedies:

(i) all rights and remedies available to a secured party under applicable law with respect to Posted Collateral held by the Secured Party;

(ii) any other rights and remedies available to the Secured Party under the terms of Other Posted Support, if any;

(iii) the right to Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(iv) the right to liquidate any Posted Collateral held by the Secured Party through one or more public or private sales or other dispositions with such notice, if any, as may be required under applicable law, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor (with the Secured Party having the right to purchase any or all of the Posted Collateral to be sold) and to apply the proceeds (or the Cash equivalent thereof) from the liquidation of the Posted Collateral to any amounts payable by the Pledgor with respect to any Obligations in that order as the Secured Party may elect.

Each party acknowledges and agrees that Posted Collateral in the form of securities may decline speedily in value and is of a type customarily sold on a recognized market, and, accordingly, the Pledgor is not entitled to prior notice of any sale of that Posted Collateral by the Secured Party, except any notice that is required under applicable law and cannot be waived.

ISDA®1994

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 445 of 637

(b)    **Pledgor's Rights and Remedies.** If at any time an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then (except in the case of an Early Termination Date relating to less than all Transactions (or Swap Transactions) where the Secured Party has paid in full all of its obligations that are then due under Section 6(e) of this Agreement):

(i) the Pledgor may exercise all rights and remedies available to a pledgor under applicable law with respect to Posted Collateral held by the Secured Party;

(ii) the Pledgor may exercise any other rights and remedies available to the Pledgor under the terms of Other Posted Support, if any;

(iii) the Secured Party will be obligated immediately to Transfer all Posted Collateral and the Interest Amount to the Pledgor; and

(iv) to the extent that Posted Collateral or the Interest Amount is not so Transferred pursuant to (iii) above, the Pledgor may:

(A) Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(B) to the extent that the Pledgor does not Set-off under (iv)(A) above, withhold payment of any remaining amounts payable by the Pledgor with respect to any Obligations, up to the Value of any remaining Posted Collateral held by the Secured Party, until that Posted Collateral is Transferred to the Pledgor.

(c)    **Deficiencies and Excess Proceeds.** The Secured Party will Transfer to the Pledgor any proceeds and Posted Credit Support remaining after liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b) after satisfaction in full of all amounts payable by the Pledgor with respect to any Obligations; the Pledgor in all events will remain liable for any amounts remaining unpaid after any liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b).

(d)    **Final Returns.** When no amounts are or thereafter may become payable by the Pledgor with respect to any Obligations (except for any potential liability under Section 2(d) of this Agreement), the Secured Party will Transfer to the Pledgor all Posted Credit Support and the Interest Amount, if any.

**Paragraph 9. Representations**

Each party represents to the other party (which representations will be deemed to be repeated as of each date on which it, as the Pledgor, Transfers Eligible Collateral) that:

(i) it has the power to grant a security interest in and lien on any Eligible Collateral it Transfers as the Pledgor and has taken all necessary actions to authorize the granting of that security interest and lien;

(ii) it is the sole owner of or otherwise has the right to Transfer all Eligible Collateral it Transfers to the Secured Party hereunder, free and clear of any security interest, lien, encumbrance or other restrictions other than the security interest and lien granted under Paragraph 2;

(iii) upon the Transfer of any Eligible Collateral to the Secured Party under the terms of this Annex, the Secured Party will have a valid and perfected first priority security interest therein (assuming that any central clearing corporation or any third-party financial intermediary or other entity not within the control of the Pledgor involved in the Transfer of that Eligible Collateral gives the notices and takes the action required of it under applicable law for perfection of that interest); and

(iv) the performance by it of its obligations under this Annex will not result in the creation of any security interest, lien or other encumbrance on any Posted Collateral other than the security interest and lien granted under Paragraph 2.

6                                                                      ISDA®1994

**Paragraph 10. Expenses**

(a)     *General.* Except as otherwise provided in Paragraphs 10(b) and 10(c), each party will pay its own costs and expenses in connection with performing its obligations under this Annex and neither party will be liable for any costs and expenses incurred by the other party in connection herewith.

(b)     *Posted Credit Support.* The Pledgor will promptly pay when due all taxes, assessments or charges of any nature that are imposed with respect to Posted Credit Support held by the Secured Party upon becoming aware of the same, regardless of whether any portion of that Posted Credit Support is subsequently disposed of under Paragraph 6(c), except for those taxes, assessments and charges that result from the exercise of the Secured Party's rights under Paragraph 6(c).

(c)     *Liquidation/Application of Posted Credit Support.* All reasonable costs and expenses incurred by or on behalf of the Secured Party or the Pledgor in connection with the liquidation and/or application of any Posted Credit Support under Paragraph 8 will be payable, on demand and pursuant to the Expenses Section of this Agreement, by the Defaulting Party or, if there is no Defaulting Party, equally by the parties.

**Paragraph 11. Miscellaneous**

(a)     *Default Interest.* A Secured Party that fails to make, when due, any Transfer of Posted Collateral or the Interest Amount will be obligated to pay the Pledgor (to the extent permitted under applicable law) an amount equal to interest at the Default Rate multiplied by the Value of the items of property that were required to be Transferred, from (and including) the date that Posted Collateral or Interest Amount was required to be Transferred to (but excluding) the date of Transfer of that Posted Collateral or Interest Amount. This interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(b)     *Further Assurances.* Promptly following a demand made by a party, the other party will execute, deliver, file and record any financing statement, specific assignment or other document and take any other action that may be necessary or desirable and reasonably requested by that party to create, preserve, perfect or validate any security interest or lien granted under Paragraph 2, to enable that party to exercise or enforce its rights under this Annex with respect to Posted Credit Support or an Interest Amount or to effect or document a release of a security interest on Posted Collateral or an Interest Amount.

(c)     *Further Protection.* The Pledgor will promptly give notice to the Secured Party of, and defend against, any suit, action, proceeding or lien that involves Posted Credit Support Transferred by the Pledgor or that could adversely affect the security interest and lien granted by it under Paragraph 2, unless that suit, action, proceeding or lien results from the exercise of the Secured Party's rights under Paragraph 6(c).

(d)     *Good Faith and Commercially Reasonable Manner.* Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner.

(e)     *Demands and Notices.* All demands and notices made by a party under this Annex will be made as specified in the Notices Section of this Agreement, except as otherwise provided in Paragraph 13.

(f)     *Specifications of Certain Matters.* Anything referred to in this Annex as being specified in Paragraph 13 also may be specified in one or more Confirmations or other documents and this Annex will be construed accordingly.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 447 of 637

**Paragraph 12. Definitions**

As used in this Annex:—

*"Cash"* means the lawful currency of the United States of America.

"*Credit Support Amount"* has the meaning specified in Paragraph 3.

*"Custodian"* has the meaning specified in Paragraphs 6(b)(i) and 13.

*"Delivery Amount"* has the meaning specified in Paragraph 3(a).

*"Disputing Party"* has the meaning specified in Paragraph 5.

*"Distributions"* means with respect to Posted Collateral other than Cash, all principal, interest and other payments and distributions of cash or other property with respect thereto, regardless of whether the Secured Party has disposed of that Posted Collateral under Paragraph 6(c). Distributions will not include any item of property acquired by the Secured Party upon any disposition or liquidation of Posted Collateral or, with respect to any Posted Collateral in the form of Cash, any distributions on that collateral, unless otherwise specified herein.

*"Eligible Collateral"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"Eligible Credit Support"* means Eligible Collateral and Other Eligible Support.

*"Exposure"* means for any Valuation Date or other date for which Exposure is calculated and subject to Paragraph 5 in the case of a dispute, the amount, if any, that would be payable to a party that is the Secured Party by the other party (expressed as a positive number) or by a party that is the Secured Party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(2)(A) of this Agreement as if all Transactions (or Swap Transactions) were being terminated as of the relevant Valuation Time; *provided* that Market Quotation will be determined by the Valuation Agent using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation").

*"Independent Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Interest Amount"* means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Posted Collateral in the form of Cash held by the Secured Party on that day, determined by the Secured Party for each such day as follows:

> (x) the amount of that Cash on that day; multiplied by

> (y) the Interest Rate in effect for that day; divided by

> (z) 360.

*"Interest Period"* means the period from (and including) the last Local Business Day on which an Interest Amount was Transferred (or, if no Interest Amount has yet been Transferred, the Local Business Day on which Posted Collateral in the form of Cash was Transferred to or received by the Secured Party) to (but excluding) the Local Business Day on which the current Interest Amount is to be Transferred.

*"Interest Rate"* means the rate specified in Paragraph 13.

*"Local Business Day",* unless otherwise specified in Paragraph 13, has the meaning specified in the Definitions Section of this Agreement, except that references to a payment in clause (b) thereof will be deemed to include a Transfer under this Annex.

ISDA®1994

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 448 of 637

*"Minimum Transfer Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Notification Time"* has the meaning specified in Paragraph 13.

*"Obligations"* means, with respect to a party, all present and future obligations of that party under this Agreement and any additional obligations specified for that party in Paragraph 13.

*"Other Eligible Support"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"Other Posted Support"* means all Other Eligible Support Transferred to the Secured Party that remains in effect for the benefit of that Secured Party.

*"Pledgor"* means either party, when that party (i) receives a demand for or is required to Transfer Eligible Credit Support under Paragraph 3(a) or (ii) has Transferred Eligible Credit Support under Paragraph 3(a).

*"Posted Collateral"* means all Eligible Collateral, other property, Distributions, and all proceeds thereof that have been Transferred to or received by the Secured Party under this Annex and not Transferred to the Pledgor pursuant to Paragraph 3(b), 4(d)(ii) or 6(d)(i) or released by the Secured Party under Paragraph 8. Any Interest Amount or portion thereof not Transferred pursuant to Paragraph 6(d)(ii) will constitute Posted Collateral in the form of Cash.

*"Posted Credit Support"* means Posted Collateral and Other Posted Support.

*"Recalculation Date"* means the Valuation Date that gives rise to the dispute under Paragraph 5; *provided*, *however*, that if a subsequent Valuation Date occurs under Paragraph 3 prior to the resolution of the dispute, then the "Recalculation Date" means the most recent Valuation Date under Paragraph 3.

*"Resolution Time"* has the meaning specified in Paragraph 13.

*"Return Amount"* has the meaning specified in Paragraph 3(b).

*"Secured Party"* means either party, when that party (i) makes a demand for or is entitled to receive Eligible Credit Support under Paragraph 3(a) or (ii) holds or is deemed to hold Posted Credit Support.

*"Specified Condition"* means, with respect to a party, any event specified as such for that party in Paragraph 13.

*"Substitute Credit Support"* has the meaning specified in Paragraph 4(d)(i).

*"Substitution Date"* has the meaning specified in Paragraph 4(d)(ii).

*"Threshold"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Transfer"* means, with respect to any Eligible Credit Support, Posted Credit Support or Interest Amount, and in accordance with the instructions of the Secured Party, Pledgor or Custodian, as applicable:

(i) in the case of Cash, payment or delivery by wire transfer into one or more bank accounts specified by the recipient;

(ii) in the case of certificated securities that cannot be paid or delivered by book-entry, payment or delivery in appropriate physical form to the recipient or its account accompanied by any duly executed instruments of transfer, assignments in blank, transfer tax stamps and any other documents necessary to constitute a legally valid transfer to the recipient;

(iii) in the case of securities that can be paid or delivered by book-entry, the giving of written instructions to the relevant depository institution or other entity specified by the recipient, together with a written copy thereof to the recipient, sufficient if complied with to result in a legally effective transfer of the relevant interest to the recipient; and

(iv) in the case of Other Eligible Support or Other Posted Support, as specified in Paragraph 13.

ISDA®1994

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 449 of 637

***"Valuation Agent"*** has the meaning specified in Paragraph 13.

***"Valuation Date"*** means each date specified in or otherwise determined pursuant to Paragraph 13.

***"Valuation Percentage"*** means, for any item of Eligible Collateral, the percentage specified in Paragraph 13.

***"Valuation Time"*** has the meaning specified in Paragraph 13.

***"Value"*** means for any Valuation Date or other date for which Value is calculated and subject to Paragraph 5 in the case of a dispute, with respect to:

    (i) Eligible Collateral or Posted Collateral that is:

        (A) Cash, the amount thereof; and

        (B) a security, the bid price obtained by the Valuation Agent multiplied by the applicable Valuation Percentage, if any;

    (ii) Posted Collateral that consists of items that are not specified as Eligible Collateral, zero; and

    (iii) Other Eligible Support and Other Posted Support, as specified in Paragraph 13.

ISDA®1994

**Paragraph 13. Elections and Variables**

(a)     *Security Interest for "Obligations"*. The term ***"Obligations"*** as used in this Annex includes the following additional obligations:

With respect to Party A:   ..........................................................................................................................

With respect to Party B:   ..........................................................................................................................

(b)     *Credit Support Obligations*.

(i) ***Delivery Amount, Return Amount and Credit Support Amount.***

(A) ***"Delivery Amount"***   has the meaning specified in Paragraph 3(a), unless otherwise specified here: ...........................................................................................................................................

(B) ***"Return Amount"***   has the meaning specified in Paragraph 3(b), unless otherwise specified here: ...........................................................................................................................................

(C) ***"Credit Support Amount"***   has the meaning specified in Paragraph 3, unless otherwise specified here: ...........................................................................................................................................

(ii) *Eligible Collateral.* The following items will qualify as ***"Eligible Collateral"*** for the party specified:

|  |  | Party A | Party B | Valuation Percentage |
|---|---|---|---|---|
| (A) | Cash | [  ] | [  ] | [  ] % |
| (B) | negotiable debt obligations issued by the U.S. Treasury Department having an original maturity at issuance of not more than one year ("Treasury Bills") | [  ] | [  ] | [  ] % |
| (c) | negotiable debt obligations issued by the U.S. Treasury Department having an original maturity at issuance of more than one year but not more than 10 years ("Treasury Notes") | [  ] | [  ] | [  ] % |
| (D) | negotiable debt obligations issued by the U.S. Treasury Department having an original maturity at issuance of more than 10 years ("Treasury Bonds") | [  ] | [  ] | [  ] % |
| (E) | other:   .............................................................. | [  ] | [  ] | [  ] % |

(iii) *Other Eligible Support.* The following items will qualify as ***"Other Eligible Support"*** for the party specified:

|  |  | Party A | Party B |
|---|---|---|---|
| (A) | .............................................................. | [  ] | [  ] |
| (B) | .............................................................. | [  ] | [  ] |

11                                                              ISDA®1994

(iv) *Thresholds.*

(A)   *"Independent Amount"* means with respect to Party A: $ .................................................................

     *"Independent Amount"* means with respect to Party B: $ .................................................................

(B)   *"Threshold"* means with respect to Party A: $ .................................................................

     *"Threshold"* means with respect to Party B: $ .................................................................

(C)   *"Minimum Transfer Amount"* means with respect to Party A: $ ...........................................

     *"Minimum Transfer Amount"* means with respect to Party B: $ ...........................................

(D)   **Rounding.** The Delivery Amount and the Return Amount will be rounded [down to the nearest integral multiple of $. . . . /up and down to the nearest integral multiple of $. . . ., respectively*].

(c)   *Valuation and Timing.*

(i) *"Valuation Agent"* means, for purposes of Paragraphs 3 and 5, the party making the demand under Paragraph 3, and, for purposes of Paragraph 6(d), the Secured Party receiving or deemed to receive the Distributions or the Interest Amount, as applicable, unless otherwise specified here: .........................................

(ii)   *"Valuation Date"* means: ..................................................................................................................

(iii)   *"Valuation Time"* means:

[ ]   the close of business in the city of the Valuation Agent on the Valuation Date or date of calculation, as applicable;

[ ]   the close of business on the Local Business Day before the Valuation Date or date of calculation, as applicable;

*provided* that the calculations of Value and Exposure will be made as of approximately the same time on the same date.

(iv) *"Notification Time"* means 1:00 p.m., New York time, on a Local Business Day, unless otherwise specified here: .................................................................................................................................................

(d)   *Conditions Precedent and Secured Party's Rights and Remedies.* The following Termination Event(s) will be a *"Specified Condition"* for the party specified (that party being the Affected Party if the Termination Event occurs with respect to that party):

|                                          | Party A | Party B |
|------------------------------------------|:-------:|:-------:|
| Illegality                               | [ ]     | [ ]     |
| Tax Event                                | [ ]     | [ ]     |
| Tax Event Upon Merger                    | [ ]     | [ ]     |
| Credit Event Upon Merger                 | [ ]     | [ ]     |
| Additional Termination Event(s):[1]      |         |         |
| ...................................................... | [ ] | [ ] |
| ...................................................... | [ ] | [ ] |

---

\*   Delete as applicable.

[1]   If the parties elect to designate an Additional Termination Event as a "Specified Condition", then they should only designate one or more Additional Termination Events that are designated as such in their Schedule.

ISDA®1994

(e)   *Substitution.*

(i) *"Substitution Date"* has the meaning specified in Paragraph 4(d)(ii), unless otherwise specified here: ..........................................................................................................................................

(ii) *Consent.* If specified here as applicable, then the Pledgor must obtain the Secured Party's consent for any substitution pursuant to Paragraph 4(d): [applicable/inapplicable *][2]

(f)   *Dispute Resolution.*

(i) *"Resolution Time"* means 1:00 p.m., New York time, on the Local Business Day following the  date on which the notice is given that gives rise to a dispute under Paragraph 5, unless otherwise specified here: ..........................................................................................................................................

(ii) *Value.* For the purpose of Paragraphs 5(i)(C) and 5(ii), the Value of Posted Credit Support will be calculated as follows: ......................................................................................................

(iii) *Alternative.* The provisions of Paragraph 5 will apply, unless an alternative dispute resolution procedure is specified here: ..........................................................................................

(g)   *Holding and Using Posted Collateral.*

(i) *Eligibility to Hold Posted Collateral; Custodians.* Party A and its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b); *provided* that the following conditions applicable to it are satisfied:

(1) Party A is not a Defaulting Party.

(2) Posted Collateral may be held only in the following jurisdictions: ..................................................

(3) ...................................................................................................................................................

Initially, the **Custodian** for Party A is  ...................................................................................................

Party B and its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b); *provided* that the following conditions applicable to it are satisfied:

(1) Party B is not a Defaulting Party.

(2) Posted Collateral may be held only in the following jurisdictions: ..................................................

(3) ...................................................................................................................................................

Initially, the **Custodian** for Party B is ....................................................................................................

(ii) *Use of Posted Collateral.* The provisions of Paragraph 6(c) will not apply to the [party/parties * ] specified here:

[ ] Party A

[ ] Party B

and [that party/those parties * ] will not be permitted to:  ..........................................................................

_____

*   Delete as applicable.

[2]  Parties should consider selecting "applicable" where substitution without consent could give rise to a registration requirement to perfect properly the security interest in Posted Collateral (*e.g.,* where a party to the Annex is the New York branch of an English bank).

ISDA®1994

(h)    *Distributions and Interest Amount.*

      (i) *Interest Rate.* The *"Interest Rate"* will be:   .....................................................................

      (ii) *Transfer of Interest Amount.* The Transfer of the Interest Amount will be made on the last Local Business Day of each calendar month and on any Local Business Day that Posted Collateral in the form of Cash is Transferred to the Pledgor pursuant to Paragraph 3 (b), unless otherwise specified here: ...
.........................................................................................................................................................

      (iii) *Alternative to Interest Amount.* The provisions of Paragraph 6(d)(ii) will apply, unless otherwise specified here: .........................................................................................................................

(i)     *Additional Representation(s).*

[Party A/Party B*] represents to the other party (which representation(s) will be deemed to be repeated as of each date on which it, as the Pledgor, Transfers Eligible Collateral) that:

      (i) .............................................................................................................................................

      (ii) ............................................................................................................................................

(j)     *Other Eligible Support and Other Posted Support.*

      (i) *"Value"* with respect to Other Eligible Support and Other Posted Support means:.......................................

      (ii) *"Transfer"* with respect to Other Eligible Support and Other Posted Support means:..................................

(k)     *Demands and Notices.*

All demands, specifications and notices under this Annex will be made pursuant to the Notices Section of this Agreement, unless otherwise specified here:

      Party A: .....................................................................................................................................

                 .....................................................................................................................................

      Party B: .....................................................................................................................................

                 .....................................................................................................................................

(l)     *Addresses for Transfers.*

      Party A: .....................................................................................................................................

                 .....................................................................................................................................

      Party B: .....................................................................................................................................

                 .....................................................................................................................................

(m)    *Other Provisions.*

---

\*   Delete as applicable.

                                          **ISDA®1994**

# Exhibit 3

DocuSign Envelope ID: 3F0BFBFE-FA2F-4B0E-9439-DCC84AFB0E5B
Case 1:24-cv-01533-JPC Document 1-18 Filed 02/28/24 Page 455 of 637

# Genesis

**Amended and Restated Master Confirmation Agreement for
Virtual Currency Put and Call Option Transactions
Dated as of 2020/06/22 (the "Effective Date")
between
GGC International Limited ("Party A") and
Roger Ver ("Party B")**

The parties wish to facilitate the process of entering into and confirming:

put and call option transactions in respect of Bitcoin ("**BTC**"), Ether ("**ETH**") and other Virtual Currency (defined below) having similar characteristics (each, a "**Virtual Currency Transaction**" and collectively, "**Virtual Currency**")

and accordingly agree as follows:

**1.      Application; Contractual Framework.**

(a)      This Master Confirmation Agreement for Virtual Currency Transactions ("**Master Confirmation**") shall apply to each Virtual Currency Transaction (each, a "**Transaction**") entered into between Party A and Party B on or after the Effective Date, unless the Addendum or a confirmation of a Virtual Currency Transaction specifies that this Master Confirmation does not apply.

(b)      As of the date hereof, Party A and Party B will be deemed to enter into (i) an ISDA master agreement in the form of the 2002 ISDA Master Agreement (Multicurrency – Cross Border) published by ISDA (the "**Form ISDA Master Agreement**") without any Schedule, except for the elections and modifications that are provided in Paragraph 7 of this Master Confirmation and (ii) an ISDA credit support agreement in the form of the 1994 ISDA Credit Support Annex (the "**Form ISDA CSA**") without any paragraph 13 thereof, except for the elections and modifications that are provided in Paragraph 8 of this Master Confirmation. In the event of any inconsistency between the provisions of the Form ISDA Master Agreement or the Form ISDA CSA and this Master Confirmation, this Master Confirmation will prevail for the purpose of any Transaction.

**2.      Definitions**.

(a)      The definitions and provisions contained in (i) the 2006 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. ("**ISDA**") (the "**2006 Definitions**") and (ii) the 1998 FX and Currency Option Definitions as published by ISDA, the Emerging Markets Trading Association and the Foreign Exchange Committee (the "**FX Definitions**" and, together with the 2006 Definitions, the "**Definitions**")) are incorporated by reference into this Master Confirmation except as expressly provided herein. In the event of any inconsistency between the Definitions and this Master Confirmation, this Master Confirmation will govern for the purposes of each Transaction. In the event of any inconsistency between the 2006 Definitions and the FX Definitions, the FX Definitions will govern for the purposes of each Transaction.

(b)      For the purpose of the FX Definitions, each Transaction constitutes either a Deliverable Transaction or Non-deliverable Transaction. For the purpose of the 2006 Definitions, each Transaction constitutes a Swap Transaction.

DocuSign Envelope ID: 98A7E-8B6B-4BB-813A-4CEFB07DCBBB
Case 1:24-CV-01533-JPC   Document 1-18   Filed 02/28/24   Page 456 of 637

# Genesis

(c)     Notwithstanding anything to the contrary in this Master Confirmation Agreement or any Transaction, Annex A of the FX Definitions, and any references to Annex A in Section 4.2 of the FX Definitions shall not be applicable to the Transaction, and the FX Definitions shall be read as if any reference to Annex A was removed from the FX Definitions.

**3.     Transaction Confirmation**: The parties shall confirm the Economic Terms (as defined in paragraph 4 below) of each **Virtual Currency Transaction** in a Confirmation (each such Confirmation, a "**Transaction Confirmation**"). Each Transaction Confirmation may be executed and delivered in counterparts (including by facsimile transmission), or an exchange of e-mails. Each Transaction Confirmation shall be deemed to incorporate and be subject to all of the terms of this Master Confirmation. This Master Confirmation, together with each Transaction Confirmation, constitutes a "Confirmation" for purposes of the Form ISDA Master Agreement. Each Transaction Confirmation shall be deemed to incorporate the general terms for all Transactions specified in paragraph 5 and the disruption fallbacks and adjustment conventions specified in paragraph 6.

**4.     Virtual Currency Transaction Economic Terms:**

| | |
|---|---|
| Trade Date: | As specified in the Transaction Confirmation. |
| Reference Currency: | For any transaction, BTC, ETH or another applicable Virtual Currency as specified in the Transaction Confirmation, each of which shall be deemed to be a "currency" for the purpose of the Definitions. |
| Currency Option Type: | Put or Call, as specified in the Transaction Confirmation. |
| Call Currency | Reference Currency specified in the Transaction Confirmation. |
| Call Currency Amount: | The amount of the Reference Currency (which may be a fractional amount) as specified in the Transaction Confirmation. |
| Strike Price: | The amount of USD per 1.00 whole unit of the Reference Currency as specified in the Transaction Confirmation. |
| Expiration Date: | As specified in the Transaction Confirmation. |
| Expiration Time: | As specified in the Transaction Confirmation. |
| Settlement Date: | As specified in the Transaction Confirmation. |
| Premium: | USD Amount as specified in the Transaction Confirmation. |
| Premium Payment Date: | Trade Date |
| Account Details: | As specified in the Transaction Confirmation. |

**5.     General Terms**:

| | |
|---|---|
| Transaction Type: | Currency Option, Call or Put as specified in the Transaction Confirmation |
| Settlement: | As specified in the Transaction Confirmation |

# Genesis

| | |
|---|---|
| Currency Option Style: | As specified in the Transaction Confirmation |
| Seller: | As specified in the Transaction Confirmation. |
| Buyer: | As specified in the Transaction Confirmation. |
| Settlement Currency: | USD |
| Settlement Rate: | Means the exchange rate stated on the Fixing Reference expressed as the USD amount per 1.00 of the Reference Currency on any Valuation Date. |
| Fixing Reference: | As specified in the Transaction Confirmation. |
| Calculation Agent Determination of Settlement Rate: | Applicable |
| Business Day: | Any day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in New York. |
| Business Day Convention: | Following |
| Calculation Agent: | Party A |

**6.    Disruption Events and Fallbacks:**

| | |
|---|---|
| Event Currency: | The Virtual Currency specified in the Transaction Confirmation |
| Non-Event Currency: | USD |
| Disruption Event(s): | |
| (a) General Inconvertibility: | Applicable. |
|     Disruption Fallback: | No-Fault Termination |
| (b) General Non-Transferability: | Applicable. |
|     Disruption Fallback: | No-Fault Termination |
| (c) Calculation Agent Determination of Disruption Event: | Applicable |
| Disruption Fallback(s): | |
| | Where settlement is Deliverable (as specified in the Transaction Confirmation, the following provision regarding Fallback Reference Price shall apply: |
| (a) Fallback Reference Price: | The Calculation Agent will determine the |

Reference: **Error! Reference source not found.** Roger Ver
GGC INTERNATIONAL LIMITED

3 / 15

DocuSign Envelope ID: 6B97F-8B0D-4E4E-3A01-BB9D1CBBD

# Genesis

Settlement Rate for the Transaction on the relevant Exercise Date (or, if different, the day on which rates for that Exercise Date would, in the ordinary course, be published or announced) pursuant to the first of the alternate pricing sources or methodologies specified below that is not subject to Price Source Disruption:

First,

(a) In the case of BTC, the Bloomberg Crypto Fixings (CFIX) available under Bloomberg Ticker: XBT CFIX Currency.
(b) In the case of ETH, the Bloomberg Crypto Fixings (CFIX) available under Bloomberg Ticker: XET CFIX Currency.
(c) In the case of another Virtual Currency, if not available on Bloomberg CFIX, a commonly utilized alternate pricing source, as specified in the Transaction Confirmation.

Second,

(a) In the case of BTC, Tradeblock XBX Index rate;
(b) In the case of ETH, Tradeblock ETX Index rate;
(c) In the case of another Virtual Currency, a commonly utilized alternate pricing source that is not subject to Price Source Disruption.

Third, the Calculation Agent Adjustment of the Settlement Rate if no Adjustment Event has occurred or is continuing, or the Modified Calculation Adjustment of the Settlement Rate if an Adjustment Event has occurred and is continuing and Party A has elected to apply Modified Calculation Agent Adjustment as described below under "Adjustment Events."

Calculation Agent Adjustment Means that the Calculation Agent shall determine the Settlement Rate by taking into consideration all available information that in good faith it deems relevant.

Modified Calculation Agent Adjustment

Means that the Calculation Agent shall in its sole discretion either:

(1)    make such adjustment to the exercise, settlement, payment or any other terms of the Transaction as the Calculation Agent determines

Reference: **Error! Reference source not found.** Roger Ver
GGC INTERNATIONAL LIMITED

4 / 15

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 459 of 637

# Genesis

appropriate to account for the economic effect on the Transaction of any Adjustment Event (including adjustments to account for changes in volatility, expected dividends or other distributions, or liquidity relevant to the Reference Currency or to the Transaction), and determine the effective date of that adjustment; or

(2)       if the Calculation Agent determines that no adjustment that it could make under the previous clause (1) will produce a commercially reasonable result, the relevant Transaction shall terminate, in which case "Cancellation and Payment" will be deemed to apply.

| | |
|---|---|
| Cancellation and Payment | Means the Transaction will be cancelled as of the effective date of the Adjustment Event (as determined by the Calculation Agent) and any payment to be made by one party to the other shall be the Calculation Agent Adjustment Amount. |
| Adjustment Events: | Upon the occurrence of a Potential Adjustment Event that has a 5% or greater effect on the theoretical value of (a) one unit of the Reference Currency or (b) the Transaction any time during the 14 calendar day period immediately following the occurrence of such Potential Adjustment Event (an "**Adjustment Event**"), Party A may in its sole discretion elect Modified Calculation Agent Adjustment. For purposes of determining whether an Adjustment Event has occurred, the theoretical value of one whole unit of the Reference Currency, as applicable, at any time during the 14 calendar day period immediately following the occurrence of a Potential Adjustment Event shall be compared to the value of one whole unit of the Reference Currency, as applicable, as of the point in time immediately prior to the occurrence of such Potential Adjustment Event, with reference to the Settlement Rate at such time. |
| Potential Adjustment Event: | "Potential Adjustment Event" means any of the following:<br><br>(1)       a subdivision, consolidation or reclassification of the Reference Currency, or any similar action in respect of the underlying protocol of the Reference Currency.<br><br>(2)       a free distribution (including but not limited to an "airdrop") or dividend of the Reference |

Reference: **Error! Reference source not found.** Roger Ver
GGC INTERNATIONAL LIMITED

5 / 15

DocuSign Envelope ID: 9E4FFF4B-07A3-4AE1-8E03-26CF33ACCB46
Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 460 of 637

# Genesis

Currency, any other Virtual Currency, cash, or any other asset to existing holders of such Virtual Currency by way of bonus;

(3)     a change in the operating rules of the underlying protocol of the Reference Currency (i.e., a "fork"), capitalization or otherwise;

(4)     a swap, migration, conversion or exchange of the Reference Currency into or for another asset (which, for the avoidance of doubt, does not include the Reference Currency);

(5)     the imposition of, change in or removal of an excise, sales, use, value-added, transfer, stamp, documentary, recording or similar tax on, or measured by reference to, the Reference Currency or any Virtual Currency into which or for which it may be exchanged (other than a tax on, or measured by reference to overall gross or net income) by any government or taxation authority after the Trade Date, if the direct effect of such imposition, change or removal is to raise or lower the Settlement Rate on the Settlement Date from what it would have been without that imposition, change or removal;

(6)     A generalized regulatory enforcement initiative by one or more government authorities on Virtual Currency exchanges, miners or others focused on price manipulation, criminal activity and like activity or effects; or

(7)     Any other event that has a diluting or concentrative effect on the theoretical value of (a) one unit of the Reference Currency or (b) the Transaction.

Virtual Currency

Any type of digital unit (including the Reference Currency) that is used as a medium of exchange or a form of digitally stored value, including but not limited to digital units of exchange that (A) have a centralized repository or administrator, (B) are decentralized and have no centralized repository or administrator, and/or (C) may be created or obtained by computing or manufacturing effort.

[Section 7 appears on next page]

# Genesis

### 7. Form ISDA Master Agreement:

(a) This Master Confirmation shall supplement, form part of, and be subject to the Form ISDA Master Agreement, as deemed entered into as of the date hereof in accordance with Paragraph 1 (b). All provisions contained in or incorporated by reference in that Form ISDA Master Agreement will govern this Master Confirmation except as expressly modified below. Unless the parties subsequently choose to execute and deliver a Form ISDA Master Agreement with specific modifications, this Master Confirmation, together with all other documents referring to the Form ISDA Master Agreement confirming the Reference Currency Transactions entered into between the parties (notwithstanding anything to the contrary in a Transaction Confirmation), shall supplement, form a part of, and be subject to, an agreement in the form of the Form ISDA Master Agreement in accordance with Paragraph 1 (b), except for the following elections.

    i.     <u>Governing Law</u>: New York.

    ii.     <u>Termination Currency</u>: U.S. Dollars.

    iii.     <u>Multiple Transaction Payment Netting</u>: Applicable.

    iv.     <u>Specified Entities of Party B</u>: All Affiliates.

    v.     <u>Process Agent</u>. For the purposes of Section 13(c) of the Form ISDA Master Agreement, Party A appoints as its Process Agent: Genesis Global Trading, Inc. and Party B appoints as its Process Agent itself.

    vi.     <u>Offices</u>: Party A is not a multibranch party and acts from its office in New York. Party B is not a multibranch party and acts from its office in Saint Kitts and Nevis.

    vii.     <u>Credit Support Document</u>: The deemed credit support annex as described in paragraph 8 Margin.

    viii.     <u>Payee Tax representations of Party B</u>: Party B represents that it is a foreign person (as that term is used in section 1.604-4(a) of the U.S. Treasury Regulations) for U.S. federal income tax purposes and "exempt" within the meaning of sections 1.6041-3(p) and 1.6049-4(c) of the U.S. Treasury Regulations from information reporting on U.S. Internal Revenue Service Form 1099 and backup withholding.

    ix.     <u>Documents to be Delivered by Party B prior to the first Transaction</u>:

        1. Identification as per onboarding process.

        2. IRS Form W-8ECI (or any successor thereto) in duplicate, including appropriate attachments, that eliminates U.S. federal withholding tax and backup withholding tax on payments under this Agreement.

(b) For purposes of "Withholding Tax imposed on payments to non-US counterparties under the United States Foreign Account Tax Compliance Act, or FATCA:

    (i)     "Indemnifiable Tax" as defined in Section 14 of the Form ISDA Master Agreement shall not include any U.S. federal withholding tax imposed or collected pursuant to Sections 1471 through 1474 of the U.S. Internal Revenue Code of 1986, as amended (the "Code"), any current

# Genesis

or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b) of the Code, or any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of such Sections of the Code (a "**FATCA Withholding Tax**"),

(ii)    for the avoidance of doubt, a FATCA Withholding Tax is a Tax the deduction or withholding of which is required by applicable law for the purposes of Section 2(d) of the Form ISDA Master Agreement, and

(iii)   if the parties each independently decide to adhere to any ISDA Protocol on FATCA Withholding Tax, upon effective adherence by both parties, the provisions of such Protocol shall supersede the foregoing provision) on the Trade Date of the first such Transaction between us. Additionally, the parties agree that the definitions and provisions contained in the Attachment to the 2010 Short Form HIRE Act Protocol published by ISDA on November 30, 2010 are incorporated into and apply to this Agreement as if set forth in full herein. The definition of "Indemnifiable Tax" shall not include any Dividend Equivalent Tax.

(c)    For the avoidance of doubt, any Transaction entered into prior to the execution of the Form ISDA Master Agreement and this Master Confirmation shall be subject to the terms of such ISDA Form and Master Confirmation as though such Transaction had been entered into after the parties had executed such ISDA Form and Master Confirmation between them.

## 8.  Margin; Form ISDA CSA

(a)    This Master Confirmation shall supplement, form part of, and be subject to the Form ISDA CSA, as deemed entered into as of the date hereof in accordance with Paragraph 1 (b).  All provisions contained in or incorporated by reference in that Form ISDA CSA will govern this Master Confirmation except as expressly modified below.  Unless the parties subsequently choose to execute and deliver a Form ISDA CSA with specific modifications, this Master Confirmation shall constitute a credit support agreement, and together with all other documents referring to the Form ISDA Master Agreement and the Form ISDA CSA confirming Transactions entered into between the parties (notwithstanding anything to the contrary in a Transaction Confirmation), shall supplement, form a part of, and be subject to, an agreement in the form of the Form ISDA CSA in accordance with Paragraph 1 (b), with the following Paragraph 13 elections:

(1)    <u>Eligible Collateral</u>:

a.    Party A: Not applicable

b.    Party B:

i.   USD Cash; valuation percentage 100%;

ii.  Reference Currency; valuation percentage 100% at Spot Rate.

iii. Additional categories of Eligible Collateral as set forth in the related Transaction Confirmation.

(2)    <u>Independent Amount</u>:

a.    Party A: None;

Reference: **Error! Reference source not found.** Roger Ver
GGC INTERNATIONAL LIMITED

8 / 15

# Genesis

   b.   Party B: As set forth in the related Transaction Confirmation

(3)   <u>Threshold</u>:

   a.   Party A: Infinity

   b.   Party B: As set forth in the related Transaction Confirmation

(4)   <u>Minimum Transfer Amount</u>

   a.   As set forth in the related Transaction Confirmation

(5)   <u>Rounding</u>:   The Delivery Amount and the Return Amount shall be rounded down to the nearest integral multiple of USD100.

(6)   <u>Conditions Precedent and Secured Party's Rights and Remedies</u>:   The Termination Event for Illegality will be a «Specified Condition» for Party B, which will be the Affected Party.

(7)   <u>Holding and Using Posted Collateral</u>.  Party A and its Custodian shall be entitled to hold Posted Collateral pursuant to Paragraph 6 of the Form ISDA CSA.

**9.   Relationship Between the Parties**

   a.   <u>No Reliance, etc</u>. Each party represents that (i) it is entering into the Transaction evidenced hereby as principal (and not as agent or in any other capacity); (ii) neither the other party nor any of its agents are acting as a fiduciary for it; (iii) it is not relying upon any representations except those expressly set forth in the Agreement or this Confirmation; (iv) it has not relied on the other party for any legal, regulatory, tax, business, investment, financial, and accounting advice, and it has made its own investment, hedging, and trading decisions based upon its own judgment and upon any view expressed by the other party or any of its agents; and (v) it is entering into each Transaction with a full understanding of the terms, conditions and risks thereof and it is capable of and willing to assume those risks.

   b.   <u>No Regulated Swaps Entity</u>. Each party represents that (i) it is not provisionally registered with the United States Commodity Futures Trading Commission (the "**CFTC**") as a swap dealer or major swap participant (each as defined in the United States Commodity Exchange Act ("**CEA**") and rules promulgated thereunder) and is not a U.S. Person pursuant to applicable CFTC guidance (each, a "**DF Swap Entity**"), (ii) it is not guaranteed by a DF Swap Entity, (iii) it is not a financial counterparty for purposes of Regulation (EU) No 648/2012 on OTC derivatives, central counterparties and trade repositories ("EMIR") and (iv) it has negotiated the Transaction exclusively from the offices described in paragraph 7 above.

   c.   <u>Eligible Contract Participant</u>.  Each party represents that it is an "eligible contract participant" as defined in the CEA and rules and other guidance of the CFTC promulgated thereunder.

   d.   <u>No Retail Commodity Transaction</u>.  Party B represents that no Transaction is a "retail commodity transaction" as defined in Section 2(c)(2)(D) of the CEA.

   e.   <u>Dodd-Frank Reporting</u>. Party A will act as the "reporting counterparty" as required by Parts 43, 45 and 46 of Title 17, Chapter 1 of the CFTC's regulations for all Transactions under this Agreement. Party B appoints Party A to perform the reporting obligations on its behalf and Party A accepts that appointment.

   f.   <u>Securities Law Matters</u>: To the extent the Virtual Currency applicable to a Virtual Currency Transaction is considered to be a security as defined in the Securities Act of

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 464 of 637

# Genesis

1933, Party B represents that the amount of Virtual Currency that is subject to a Transaction is not subject to any restrictions on transfer under the Securities Act and SEC regulations and interpretations thereunder.

     g.    <u>USA PATRIOT Act Notice</u>. Party A hereby notifies Party B that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Act**"), it is required to obtain, verify and record information that identifies Party B, which information includes the name and address of Party B and other information that will allow Party A to identify Party B in accordance with the Act.

     h.    <u>Selected Risks of Virtual Currency Options</u>. PARTY B ACKNOWLEDGED THAT THE RISK OF LOSS IN TRADING VIRTUAL CURRENCIES SUCH AS BTC OR ETH CAN BE SUBSTANTIAL AND, THEREFORE, PARTY B HAS CAREFULLY CONSIDERED WHETHER SUCH TRADING IS APPROPRIATE FOR IT IN LIGHT OF ITS CIRCUMSTANCES AND FINANCIAL RESOURCES. IT IS AWARE OF THE FOLLOWING RISKS OF VIRTUAL CURRENCY TRADING:

     i.    The volatility and unpredictability of the price of Virtual Currency relative to fiat currency may result in significant loss over a short period of time. Certain virtual currencies have experienced daily price volatility of more than 20%. This could result in an Adjustment Event under a Transaction.

     ii.    The risk of losing one's entire investment increases as a Call Option goes out of the money and as expiration nears.

     iii.    The Reference Currency is not legal tender, is not backed by the government, and accounts and value balances are not subject to Federal Deposit Insurance Corporation or Securities Investor Protection Corporation protections.

     iv.    Legislative and regulatory changes or actions at the state, federal, or international level may adversely affect the use, transfer, exchange, and value of Virtual Currency including the Reference Currency.

     v.    Transactions in the Reference Currency or other Virtual Currency may be irreversible, and, accordingly, losses due to fraudulent or accidental transactions may not be recoverable.

     vi.    Some Virtual Currency transactions shall be deemed to be made when recorded on a public ledger, which is not necessarily the date or time that the customer initiates the transaction.

     vii.    The value of the Reference Currency or other Virtual Currency may be derived from the continued willingness of market participants to exchange fiat currency or other Virtual Currency for it, which may result in the potential for permanent and total loss of value of a particular Virtual Currency (such as the Reference Currency) should the market for that Virtual Currency disappear.

     viii.    There is no assurance that a person who accepts a Virtual Currency as payment on any Trade Date or Exercise Date will continue to do so in the future.

     ix.    The nature of Virtual Currency may lead to an increased risk of fraud or cyber-attack. A cybersecurity event could result in a substantial, immediate and irreversible loss for market participants that trade virtual currencies. Even a minor cybersecurity event in a Virtual

DocuSign Envelope ID: 4F4D64BE-4BB1-4E9D-BEF9-30830AD4CABA
Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 465 of 637

# Genesis

Currency is likely to result in downward price pressure on that product and potentially other Virtual Currencies.

x.     The ability to participate in forks could also have implications. For example, one could experience losses if one hold Virtual Currency position through an exchange that does not participate in a fork that creates a new product.

xi.    PARTY A AND ITS CUSTODIAN MAY BE SUBJECT TO ALL OF THESE RISKS WITH RESPECT TO VIRTUAL CURRENCY HELD AS COLLATERAL FOR ANY TRANSACTION.

xii.   VIRTUAL CURRENCY SPOT MARKETS ARE NOT REGULATED BY THE COMMODITY FUTURES TRADING COMMISSION.  One should consult an attorney, accountant and/or financial advisor and sufficiently understand the Virtual Currency markets and risks and carefully consider whether Virtual Currency is appropriate for one in light of their own financial circumstances.

i.     <u>Entire Agreement</u>. This Agreement, including all annexes and appendices hereto, embodies the entire agreement and understanding of the parties hereto in respect of the transactions contem¬plated by this Agreement and supersedes all prior master confirmation agreements, contracts, representations, warranties, promises, covenants, arrangements, communications, and understandings, oral or written, express or implied, between or among the parties with respect to the subject matter hereof, including, without limitation, the two master confirmation agreements dated as of June 15, 2020 between the parties for Bitcoin Cash Put Transactions and Bitcoin Cash Call Transactions, respectively, each of which agreements shall be deemed null and void, and of no further force or effect whatsoever following the date hereof.

[Signatures appear on next page]

Reference: **Error! Reference source not found.** Roger Ver
GGC INTERNATIONAL LIMITED

11 / 15

DocuSign Envelope ID: 87E4F889-6F4F-4A4A-AC5D-7BCE99CB...

# Genesis

In witness whereof, Party A and Party B have executed this Master Confirmation as of the date first written above.

**Party A**

**GGC International Limited**

By:_____

    Name:  Michael Moro
    Title:    CEO

**Party B**

By:_____

    Roger Ver

Reference: **Error! Reference source not found.** Roger Ver
GGC INTERNATIONAL LIMITED

12 / 15

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 467 of 637
DocuSign Envelope ID: ...........

# Genesis

**Annex 1**
**Form of Transaction Confirmation**

**Transaction Confirmation for Virtual Currency**
**Option Transactions**
**Dated as of YYYY/MM/DD (the "Trade Date")**
**between**
**GGC International Limited ("Party A") and**
**Roger Ver ("Party B")**
**under the Amended & Restated Master Confirmation between the parties**
**dated as of 2020/06/22 (the "Effective Date")**

**Transaction Terms:**

| | |
|---|---|
| Buyer: | [Party A/Party B] |
| Seller: | [Party A/Party B] |
| Currency Option Style: | [European/American/Bermuda] |
| Currency Option Type: | [Put/Call] |
| Settlement: | [Deliverable/Non-deliverable] |
| Reference Currency | [BTC] [ETH] [other] |
| [Put/Call] Currency | Reference Currency |
| [Put/Call] Currency Amount: | [■] Units of the Reference Currency |
| Strike Price: | USD [___] per 1.00 Unit of the Reference Currency |
| Expiration Date: | [__ ___ 202_] |
| Expiration Time: | [4:00 AM/PM (local time in New York, New York)] |
| Settlement Date: | Expiration Date |
| Premium: | USD [_____] |
| Premium Payment Date: | Trade Date |
| Fixing Reference: | [_____] |
| **Disruption Fallbacks** | |
| [Fallback Reference Price | |
| Settlement Rate[1]: | The Bloomberg Crypto Fixings (CFIX) applicable to the Event Currency.] |

---

[1] Include only for non-BTC/ETH trades

# Genesis

| | |
|---|---|
| Event Currency: | [Reference Currency] |

### A.  Margin

| | |
|---|---|
| Party B Independent Amount | [USD 0] |
| Party B Threshold | [USD 0] |
| [Notes on posting of margin, if any] | [      ] |
| Minimum Transfer Amount | USD [100,000] |
| [Eligible Collateral Add'l Cat. | Reference Currency] |

### B.  Account Details:

| | |
|---|---|
| Party A: | As per trade execution |
| Party B: | As per onboarding information |

[Signatures appear on next page]

# Genesis

In witness whereof, Party A and Party B have executed this Transaction Confirmation as of the Trade Date first written above.

**Party A**

**Genesis Global Capital International Ltd.**

By: _Michael Moro_

Name: Michael Moro

Title: CEO

**Party B**

By: _Roger Ver_

Name: Roger Ver

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 470 of 637

# Exhibit 4

DocuSign Envelope ID: B49A8CB8-AFC4-4BEE-97D3-BDE24DF40AA9

# Genesis

**Virtual Currency Option Transaction Confirmation**
**dated as of March 22, 2022 ("Trade Date")**
**between GGC International Limited ("Party A")**
**and Roger Ver ("Party B")**
**under the Amended & Restated Master Confirmation Agreement dated June 22, 2020**

**Transaction Terms**

| | |
|---|---|
| Buyer: | Party A |
| Seller: | Party B |
| Currency Option Style: | European |
| Currency Option Type: | Put |
| Settlement: | Deliverable |
| Reference Currency: | Bitcoin Cash (BCH) |
| Put Currency: | Reference Currency |
| Put Currency Amount: | 70,000 Units of the Reference Currency |
| Strike Price: | USD 545 per 1.00 Unit of the Reference Currency |
| Expiration Date: | December 30, 2022 |
| Expiration Time: | 21:00:00 UTC |
| Settlement Date: | Expiration Date |
| Premium: | USD 13,463,100 |
| Premium Payment Date: | Trade Date |
| Fixing Reference: | Tradeblock BCX Index Rate |

**Disruption Fallbacks**

| | |
|---|---|
| Fallback Reference Price | |
| Settlement Rate: | XBN CFIX Currency |
| Event Currency: | Reference Currency |

**Margin**

| | |
|---|---|
| Party B Independent Amount: | 11,445,000 USDC |
| Party B Variation Margin: | USD 0 |
| Minimum Transfer Amount: | USD 100,000 |

**Account Details**

| | |
|---|---|
| Party A: | As per trade execution |
| Party B: | As per onboarding information |

# Genesis

In witness whereof, Party A and Party B have executed this Transaction Confirmation as of the Trade Date first written above.

**Party A**

**GGC International Limited**

By: _Andrew Sullivan_
F42F6115E20F498...
   Name: Andrew Sullivan
   Title: Authorized Signatory

**Party B**

_Roger Ver_
46A442E39A55427...
Roger Ver

INDEX NO. 650439/2023

RECEIVED NYSCEF: 08/05/2024
Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 473 of 637

# Exhibit 5

DocuSign Envelope ID: A4182BD1-7E21-4FB9-8888-8CEB8A2FDC0D

# Genesis

**Virtual Currency Option Transaction Confirmation**
**dated as of June 10, 2022 ("Trade Date")**
**between GGC International Limited ("Party A")**
**and Roger Ver ("Party B")**
**under the Amended & Restated Master Confirmation Agreement dated June 22, 2020**

### Transaction Terms

| | |
|---|---|
| Buyer: | Party A |
| Seller: | Party B |
| Currency Option Style: | European |
| Currency Option Type: | Put |
| Settlement: | Deliverable |
| Reference Currency: | Ether (ETH) |
| Put Currency: | Reference Currency |
| Put Currency Amount: | 10,000 Units of the Reference Currency |
| Strike Price: | USD 5,000 per 1.00 Unit of the Reference Currency |
| Expiration Date: | December 30, 2022 |
| Expiration Time: | 08:00:00 UTC |
| Settlement Date: | Expiration Date |
| Premium: | USD 32,570,000.0 |
| Premium Payment Date: | Trade Date |
| Fixing Reference: | Coinbase: ETH/USD |

**Disruption Fallbacks**

| | |
|---|---|
| Event Currency: | Reference Currency |

**Margin**

| | |
|---|---|
| Party B Independent Amount: | USD 15,000,000.00 |
| Party B Variation Margin: | USD 0 |

**Account Details**

| | |
|---|---|
| Party A: | As per trade execution |
| Party B: | As per onboarding information |

# Genesis

In witness whereof, Party A and Party B have executed this Transaction Confirmation as of the Trade Date first written above.

**Party A**

**GGC International Limited**

By: _Andrew Sullivan_

Name: Andrew Sullivan

Title: Authorized Signatory

**Party B**

_Roger Ver_

Roger Ver

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 476 of 637

# Exhibit 6

FILED: NEW YORK COUNTY CLERK 08/25/2023 06:45 PM
NYSCEF DOC. NO. 44
INDEX NO. 650439/2023
RECEIVED NYSCEF: 08/25/2023

# Genesis

**Virtual Currency Option Transaction Confirmation**
**dated as of June 11, 2022 ("Trade Date")**
**between GGC International Limited ("Party A")**
**and Roger Ver ("Party B")**
**under the Amended & Restated Master Confirmation Agreement dated June 22, 2020**

## Transaction Terms

| | |
|---|---|
| Buyer: | Party A |
| Seller: | Party B |
| Currency Option Style: | European |
| Currency Option Type: | Put |
| Settlement: | Deliverable |
| Reference Currency: | Bitcoin ("BTC") |
| Put Currency: | Reference Currency |
| Put Currency Amount: | 500 Units of the Reference Currency |
| Strike Price: | USD 26,000 per 1.00 Unit of the Reference Currency |
| Expiration Date: | December 30, 2022 |
| Expiration Time: | 08:00:00 UTC |
| Settlement Date: | Expiration Date |
| Premium: | USD 1,987,500.00 |
| Premium Payment Date: | Trade Date |
| Fixing Reference: | Coinbase: ETH/USD |

**Disruption Fallbacks**

| | |
|---|---|
| Event Currency: | Reference Currency |

**Margin**

| | |
|---|---|
| Party B Independent Amount: | USD 3,900,000.00 |
| Party B Threshold: | USD 0 |
| Minimum Transfer Amount: | USD 100,000 |

**Account Details**

| | |
|---|---|
| Party A: | As per trade execution |
| Party B: | As per onboarding information |

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 478 of 637
DocuSign Envelope ID: A7D4B315-5BFD-4F5E-B4B1-0A7D1F77D4CB

# **Genesis**

In witness whereof, Party A and Party B have executed this Transaction Confirmation as of the Trade Date first written above.

**Party A**

**GGC International Limited**

By: _____
    Name: Andrew Sullivan
    Title: Authorized Signatory

**Party B**

_____
Roger Ver

# Exhibit L

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 480 of 637

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

GENESIS GLOBAL CAPITAL
INTERNATIONAL LIMITED,

                              Plaintiff,

                v.

ROGER VER,

                            Defendant.

Index No. 650439/2023

**Motion Seq. No. 002**

---

### MEMORANDUM OF LAW IN OPPOSITION TO COUNTER-DEFENDANT'S MOTION TO DISMISS AMENDED COUNTERCLAIMS OF COUNTER-PLAINTIFF

Daniel J. Kelman
Michael D. Handelsman
1441 Broadway,
6th Floor, #6079
New York, NY 10018
daniel@kelman.law
mike@kelman.law

*Attorneys for Roger Ver*

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT.................................................................................... 1

FACTUAL BACKGROUND..................................................................................... 3

LEGAL STANDARD................................................................................................. 5

ARGUMENT.............................................................................................................. 6

    I. VER'S AMENDED ALLEGATIONS ARE APPROPRIATE.............................. 6

    II. BREACH OF CONTRACT CLAIMS................................................................. 7

        A. GGCI Terminated the Contract.................................................................. 7

        B. Ver's Allegations Meet the Contract Pleading Standard............................. 13

    III. THE FRAUD CLAIM...................................................................................... 16

        A. Fraud Claim Is Plead In The Alternative.................................................... 16

        B. Ver Plead Fraud With Particularity............................................................. 17

        C. Ver Is Not Stating a Counterclaim for Fraudulent Omission...................... 19

        D. Ver's Reliance Is Not on Extracontractual Representations Made Prior to
Entering the Agreement................................................................................... 20

    CONCLUSION........................................................................................................22

# TABLE OF AUTHORITIES

**Cases**                                                        **Page(s)**

*150 Broadway Ny Assocs., L.P. v. Bodner,*
    14 A.D.3d 1 (1st Dep't 2004)...................................................    5

*219 Broadway Corp. v. Alexander's, Inc.,*
    46 N.Y.2d 506 (N.Y. Ct. App. 1979).....................................    5

*511 W 232nd Owners Corp. v. Jennifer Realty Co.,*
    98 N.Y.2d 144 (N.Y. Ct. App. 2002).....................................    5

*Alden Global Value Recovery Master Fund, L.P. v. KeyBank N.A.,*
    159 A.D.3d 618 (1st Dep't 2018)...........................................    5

*Bogoni v. Friedlander,*
    197 A.D.2d 281 (1st Dep't 1994)..........................................   6, 7

*Burlington Loan Mgt. Ltd. v. SMBC Nikko Capital Mkts. Ltd.,*
    2015 N.Y. Misc. LEXIS 1986 (Sup. Ct., N.Y. Cnty. 2015)……………………   5, 13

*Cohn v. Lionel Corp.,*
    21 N.Y.2d 559 (1968)...........................................................   16

*Cortlandt St. Recovery Corp. v. TPG Capital Mgt., L.P.,*
    2022 N.Y. Misc. LEXIS 6181(N.Y. Ct. App. 2022)……..……………….....   13

*Cronos Grp. Ltd. v. XComIP, LLC,*
    156 A.D.3d 54 (1st Dep't 2017)...........................................   17

*Eagle Eye Collection Corp. v. Shariff,*
    190 A.D.3d 600 (1st Dep't 2021)..........................................  14, 15

*Eurycleia Partners, LP v. Seward & Kissel, LLP,*
    12 N.Y.3d 553 (2009)...........................................................   19

*EVEMeta, LLC v. Siemens Convergence Creators Corp.*,
  2018 N.Y. Misc. LEXIS 4445 (Sup. Ct., N.Y. Cnty. 2018)............…..…………...  17, 18

*Gelita, LLC v. 133 Second Ave., LLC*,
  2014 N.Y. Misc. LEXIS 239, 14 (Sup. Ct., N.Y. Cnty. 2018)....…….…………  13

*Goldberg v. EEI Holdco, Inc.*,
  2021 N.Y. Misc. LEXIS 6244………………………………………..…………  14

*Goldin v. TAG Virgin islands, Inc.*,
  149 A.D.3d 467 (1st Dep't 2017)............................................................  17, 18

*Gowen v. Helly Nahmad Gallery, Inc.*,
  60 Misc. 3d 963 (Sup. Ct., NY Cnty. 2018)..........................................................  6

*HSH Nordbank AG v. UBS AG*,
  941 N.Y.S.2d 59 (N.Y. App. Div. 2012)..................................................  22

*Karabu v. Pension Benefit Guaranty Corp.*,
  1997 U.S. Dist. LEXIS 19582 (S.D.N.Y. 1997)....................................  7

*Leon v. Martinez*,
  84 N.Y.2d 83 (1994)..........................................................................  5, 13

*Matter of Northwest 5th & 45th Realty Corp. v. Mitchell, Maxwell & Jackson*,
  164 A.D.3d 1158 (1st Dep't 2018)..........................................................  14

*MMCT, LLC v. JTR Coll. Point, LLC*,
  122 A.D.3d 497(1st Dep't 2014)..........................................................  17

*Nimkoff Rosenfeld & Schecther, LLP v. O'Flaherty*,
  71 A.D.3d 533 (1st Dep't 2010)..........................................................  6

*Pappas v. Tzolis*,
  20 N.Y.3d 231 (N.Y. 2012)……………………………………………...  22

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 484 of 637

*Point Prods. A.G. v. Sony Music Entm't, Inc.*,
    2000 U.S. Dist. LEXIS 10066……………………………………….……..    7, 8


*Riback v. Margulis*,
    43 A.D.3d 1023 (2d Dep't 2007)……………………………….……………...…    14, 15


*Roam Capital v. Asia Alternatives Mgt. LLC*,
    194 A.D.3d 585 (1st Dep't 2021).........................................................................    6


*SSC NY Corp. v. Inveshare, Inc.*,
    No. 655048/2016, 2018 N.Y. Misc. LEXIS 3202 (Sup. Ct. N.Y. Cnty. 2018)......    9, 10


*Vandashield Ltd. v. Isaacson*,
    146 A.D.3d 552 (1st Dep't 2017).........................................................................    13


*Volt Systems Development Corp. v. Raytheon Co.*
    155 A.D.2d 309 (1st Dep't 1989).........................................................................    16


*Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*,
    946 F.2d 1003 (2d Cir. 1991)...............................................................................    7, 8


**Other Authorities**

CPLR 3014…………………………………………………………………….…    16


CPLR 3016(b).....................................................................................................    17, 18


CPLR 3017…………………………………………………………………….…    16


CPLR 3025(a) …………………………………………………………………….…    6, 7


CPLR 3025(b) …………………………………………………………………….…    6, 7


CPLR 3211(a)(1)................................................................................................    5, 13

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 485 of 637

CPLR 3211(a)(7)..................................................................................................   5, 13

CPLR 3211(f)......................................................................................................   6

NY CLS Dr & Cr § 273………………………………………………………..   14

Siegel, NY Prac § 237 (2d ed.)...........................................................................   6, 7

Defendant / Counter-Plaintiff Roger Ver ("Ver"), by and through his attorneys, Kelman PLLC, submits this memorandum of law in opposition to Plaintiff / Counter-Defendant GGC International Limited's ("GGCI") motion to dismiss Ver's Amended Counterclaims.  For the reasons stated herein, Ver respectfully requests that this court deny GGCI's Motion to Dismiss.

## PRELIMINARY STATEMENT

Contracts mean what they say, which is why Ver has counterclaimed against GGCI for its failure to remain solvent and its misrepresentations regarding the same.  GGCI's own derivatives contracts mandated continuous solvency.  Yet when Ver inquired into GGCI's solvency, GGCI deceived him with misleading financial information that induced him to provide tens of millions of dollars in additional collateral.  Months later, after newly discovered evidence caused Ver to suspect GGCI's deceit, Ver raised his concerns to GGCI that it had been and was still insolvent. But rather than answering Ver's questions, GGCI terminated the agreement and filed this action.

GGCI now seeks to dismiss Ver's counterclaim by arguing that it terminated the agreement before Ver was able to uncover its insolvency and issue a notice to cure.  However, there was no need for Ver to do so because GGCI had already terminated the agreement.  Nor would a cure period have mattered, since GGCI would have been unable to cure both its insolvency and its prior misrepresentations.  GGCI now claims it has never been insolvent, an admission that serving a notice to cure would be a futile and useless act.

This is not a case, as GGCI alleges, of Ver declining to terminate the agreement in June 2022, waiting until his options expired, and seeking to escape losses.  Ver promptly inquired into GGCI's solvency in June 2022, relied on GGCI's representations of solvency, then proceeded to pay GGCI tens of millions of dollars in additional collateral to maintain his open positions, including $37,000,000 in collateral just one month prior to his options expiring.  A party seeking

1

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 487 of 637

to welch on a debt would never have made these payments.  Ver's good faith is demonstrated by
his having paid GGCI tens of millions of dollars in collateral right up until December 2022,
when SBF's public statements in the wake of the FTX bankruptcy called GGCI's solvency into
question.

It is GGCI — not Ver — playing a game of "heads I win; tails you lose."  GGCI lied to
Ver about its insolvency in June 2022 and papered over it with accounting tricks, hoping that the
market would move in its direction.  If it did, GGCI would collect; if it didn't, GGCI would file
for bankruptcy.  Either way, Ver would lose, which is precisely why ISDA agreements mandate
continued solvency.

There is nothing conclusory or speculative about Ver's allegations.  GGCI's evidence of
solvency is a pair of _unaudited_ statements of financial condition ("SOFC") from late June 2022,
which reveal a precarious financial situation and raise more questions than they answer.  Those
SOFCs value GGCI's digital assets mark-to-market and apply no discount to them.  Meanwhile,
on June 24, GGCI demanded Ver apply steep discounts — up to 66%[1] — to his own digital
assets if used as collateral.  GGCI would be insolvent were it to apply this same standard to
itself.  A mere 6.3% discount to its digital assets on June 20th, or 1% on June 30th, would leave
GGCI insolvent.  And the 1% is _before_ applying a discount to GGCI's June 30th sham injection
of $151,000,000, which stemmed from a promissory note with a ten-year maturity that was —
implausibly — valued at par.  GGCI was insolvent well before June 30 and their sham capital
injection did nothing to fix it.

---

[1] GGCI demanded Ver to over-collateralize his digital asset collateral by 300%, which is effectively a
discount of 66%.

2

In seeking to dismiss Ver's counterclaim, GGCI is in essence asking this Court to reward it for lying about and concealing its insolvency long enough for options to expire. Their motion should be denied.

### FACTUAL BACKGROUND

In June 2022, GGCI faced insolvency as Three Arrows Capital ("3AC") started to collapse. *See* Ver Amended Counterclaim ("Amended Counterclaim") at ¶¶ 146–156 (Dkt. #32). Desperate for assets, GGCI targeted Ver, a significant customer with multiple expiring options that month. *Id*. at ¶ 157. To collect from him, GGCI let Ver's out-of-the-money options expire; to avoid paying him, GGCI persuaded Ver to roll in-the-money options to a later date. *Id*. at 1. Meanwhile, Genesis secretly planned to margin call and liquidate 3AC immediately after the roll, which would drive Ver's expiring positions to new lows. *Id*. at ¶ 163.

On June 24, when Ver sought to post collateral to support his open options, GGCI informed him that he would need to overcollateralize his positions by 300% were he to use digital assets. *See* Amended Counterclaim at ¶ 169 (Dkt. #32). GGCI's demand made Ver suspicious, and he demanded proof of GGCI's solvency before he would provide any further collateral. *Id*. at ¶ 172. GGCI then provided Ver with a Statement of Financial Condition dated June 20, 2022, ("June 20 SOFC") which misleadingly portrayed narrow positive equity. *Id*. at ¶ 176. In truth, GGCI was already insolvent. *Id*. at ¶¶ 179, 180. The SOFC hid GGCI's insolvency by overvaluing illiquid digital assets by using undiscounted mark-to-market prices. *Id*. Had GGCI applied appropriate discounts to its digital assets, as it demanded from Ver, its SOFC would have revealed its insolvency and Ver would have terminated the contracts because of GGCI's default. *Id*.

By June 30, even using the inflated mark-to-market valuations to artificially increase the value of the digital assets on its books, GGCI was insolvent and facing a shortfall of $136,000,000. Amended Counterclaim at ¶¶ 182–192 (Dkt. #32). GGCI entered into a sham transaction to hide this shortfall. That same day, June 30, GGCI's parent, Genesis Global Capital ("GGC"), purportedly received an injection of $1.1 billion from its parent, Digital Currency Group ("DCG"), and in turn injected $151,000,000 into GGCI to correct the shortfall. *Id.* at ¶¶ 182–184. However, this was just another accounting farce. Instead of injecting capital, DCG provided GGC with a $1.1 billion promissory note, and then recorded the transaction as an injection of $1.1 billion onto its books. *Id.* at ¶¶ 184–186. The actual value of the promissory note was far lower than $1.1 billion, owing to the fact that it had a *ten-year* maturity, and bore interest at a below-market one percent. *Id.* at ¶ 186. GGC — which filed for bankruptcy just months later — never actually injected $151,000,000 into GGCI on June 30, 2022. *Id.* at ¶ 190 . Accordingly, GGCI remained insolvent.

In December 2022, the collapse of the FTX exchange and Alameda Research revealed that GGCI had been insolvent all along. Amended Counterclaim at ¶¶ 198–203 (Dkt. #32). Ver was alerted to GGCI's insolvency by an interview wherein FTX and Alameda co-founder Sam Bankman-Fried stated that Alameda had repaid a $2.5 billion dollar loan to "Genesis" in August 2022. *Id.* at ¶¶ 198–201. This appeared to be an obvious preference transfer that would be subject to clawback. *Id.* at ¶ 201.

As stated in GGCI's own complaint, the "[t]hree options with expiration dates of December 30, 2022 gave rise to this action." *See* Plaintiff's Complaint ("Comp.") at ¶ 7 (Dkt. #9). On January 12, 2023, GGCI sent notice to Ver that an event of default had occurred. *Id.* at ¶ 9. On January 17, 2023, GGCI sent an additional notice to Ver setting January 19, 2023, as the

4

"Early Termination Date." *Id*. at ¶ 10.  As a result, as of January 19, 2023, the contract between the parties was terminated.  Just 4 days later, on January 23, 2023, GGCI filed a Summons with Notice with this court initiating this action.  *See* Summons with Notice (<u>Dkt. #1</u>).  GGCI had terminated the contract before Ver could send a notice of default.

## LEGAL STANDARD

"On a <u>CPLR 3211 (a) (7)</u> motion to dismiss for failure to state a cause of action, the complaint must be construed in the light most favorable to the plaintiff and all factual allegations must be accepted as true." *Alden Global Value Recovery Master Fund, L.P. v. KeyBank N.A.*, <u>159 A.D.3d 618, 621–622</u> (1st Dep't 2018) (quoting *219 Broadway Corp. v. Alexander's, Inc.*, <u>46 N.Y.2d 506, 509</u> (N.Y. Ct. App. 1979)).  "Further, on such a motion, the complaint is to be construed liberally and all reasonable inferences must be drawn in favor of the plaintiff." *Id.* (citations omitted).

A motion to dismiss under <u>CPLR § 3211(a)(7)</u>, for "failure to state a cause of action, must be denied if the factual allegations contained within 'the pleadings' four corners . . . manifest any cause of action cognizable at law.'" *Burlington Loan Mgt. Ltd. v. SMBC Nikko Capital Mkts. Ltd.*, <u>2015 N.Y. Misc. LEXIS 1986, 5</u> (Sup. Ct., N.Y. Cnty. 2015) (considering claim of breach of contract under ISDA agreement) (quoting *511 W 232nd Owners Corp. v. Jennifer Realty Co.*, <u>98 N.Y.2d 144, 151–52</u> (2002)).

Where the motion to dismiss is based on documentary evidence under <u>CPLR § 3211(a)(1)</u>, the claim will be dismissed "if the documentary evidence submitted ***conclusively*** establishes a defense to the asserted claims as a matter of law." *Id.* (quoting *Leon v. Martinez*, <u>84 N.Y.2d 83, 88</u> (1994) (emphasis added); *see also 150 Broadway NY Assocs., L.P. v. Bodner*, <u>14 A.D.3d 1</u>, 5 (1st Dep't 2004).

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 491 of 637

For the reasons set forth herein, GGCI has failed to meet its burden and Ver respectfully requests that GGCI's motion to dismiss be denied.

## ARGUMENT

**I.   VER'S AMENDED ALLEGATIONS ARE APPROPRIATE**

CPLR 3025 (a) plainly allows Ver to amend his pleadings once as of right without leave of court at any time prior to the service of GGCI's answer.  In *Roam Capital v. Asia Alternatives Mgt. LLC,* 194 A.D.3d 585, 585–86 (1st Dep't 2021), the First Department upheld a plaintiff's right to amend without leave under near identical circumstances:

> "A party may amend his pleading once without leave of court . . . at any time before the period for responding to it expires" (CPLR 3025[a]). Since a motion to dismiss extends the defendant's time to answer the complaint "until ten days after service of notice of entry of the order" deciding the motion (CPLR 3211[f]), and since the court had not yet even decided defendant's CPLR 3211 motion at the time plaintiff moved to amend its complaint, plaintiff did not need to move pursuant to CPLR 3025(b); instead, it could have amended as of right pursuant to CPLR 3025(a). (*see Nimkoff Rosenfeld & Schechter, LLP v O'Flaherty,* 71 AD3d533 [1st Dept 2010]; *Gowen v Helly Nahmad Gallery, Inc.,* 60 Misc 3d 963, 979 [Sup Ct, NY County 2018], *affd* 169 AD3d 580 [1st Dept 2019]).

Here, the Amended Answer and Counterclaim is Ver's first Amendment of the Pleadings. Because GGCI had yet to answer, and because the court had yet to rule on GGCI's motion to dismiss, Ver was permitted to amend his complaint without leave of court pursuant to CPLR 3025 (a).

GGCI's reliance on *Bogoni v. Friedlander,* 197 A.D.2d 281, 292 (1st Dep't 1994) is both misplaced and misleading.  It is misplaced because *Bogoni* concerns CPLR 3025 *(b)*, which governs amendments requiring leave of court.  It is misleading because GGCI cherry-picked language from *Bogoni* to conceal its clear reference to CPLR 3025 (b).  Below is the full passage, with the emboldened portion representing the language GGCI chose to omit:

> A word is in order regarding the function and scope of an amendment of pleadings pursuant to CPLR 3025. The purpose of this procedural device is to

6

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 492 of 637

permit the plaintiff to amend his theory of recovery to comply with the facts as they unfold, not to permit the plaintiff to alter his representation of material facts to best suit his theory of recovery and thereby overcome defenses raised in opposition. **As stated by one leading commentator, "**CPLR 3025 (b) **rejects the old practice, applicable in law cases, restricting the action to facts in existence when it was first brought, and instead adopts for all actions the equity practice of allowing the case to take cognizance of facts arising right up to the trial."**

*Bogoni*, 197 A.D.2d at 292 (quoting Siegel, NY Prac § 237, at 353 (2d ed.)).

GGCI argues that Ver is amending his complaint in response to GGCI's arguments in its motion to dismiss. Although the reasoning does not matter, as described above, the truth is that Ver amended his complaint because of new evidence.  On July 7, 2023, a complaint alleging fraud was filed against GGCI's ultimate parent and its controlling shareholder, Digital Currency Group ("DCG") and Barry Silbert.  *See generally* Complaint, *Gemini Trust Company, LLC v. Digital Currency Group, Inc. et al.*, (S.D.N.Y. 2023) (1:23-cv-06864).  The allegations of fraud pertained to the $1.1 billion dollar promissory note that was provided to Genesis Group on June 30, 2022, which lies at the heart of this dispute.  Twenty-four days later, having taken the time to look into those allegations, Ver filed his amended complaint under CPLR 3025 (a).

## II.     BREACH OF CONTRACT CLAIMS

### A.  GGCI Terminated the Contract

*First,* GGCI terminated the agreement in January 2023, which made compliance with the notice and cure period a futile and useless act.

According to GGCI, Ver's contract claims should be dismissed because he failed to follow the ISDA Master Agreement's conditions precedent to recovery. However, GGCI only tells half the story when it asserts that "a party asserting nonperformance must afford a defaulting party any contractually-secured opportunity to cure prior to terminating a contract." *Karabu v. Pension Benefit Guaranty Corp.*, 1997 U.S. Dist. LEXIS 19582, *23 (S.D.N.Y. 1997).  This is

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 493 of 637

because "[p]roviding notice and cure is *not required* where it would be futile." *Point Prods. A.G. v. Sony Music Entm't, Inc.*, 2000 U.S. Dist. LEXIS 10066, *12 (emphasis added) (citing *Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*, 946 F.2d 1003, 1009 (2d Cir. 1991)) (strict adherence to cure provision would have been a "useless act" given plaintiff's abandonment of contract and unjustified ultimatums).

Here, because GGCI had already terminated the contract before Ver could send a notice of default, strict adherence to the notice and cure provisions of the agreements would have been a "useless act."

**Second,** assuming *arguendo* that GGCI had not terminated the contract, providing notice to GGCI of its default due to its insolvency still would have been a futile or useless act.

As alleged in Ver's amended counterclaim, GGCI became insolvent by June 2022, if not earlier. *See* Amended Counterclaim at ¶¶ 36, 123, 145, 157–158, 190, and others (Dkt. #32). Ver raised concerns that GGCI was insolvent in June 2022, and GGCI responded by misrepresenting that it was solvent and providing Ver with misleading documents to support that position. *Id.* at ¶¶ 170–181. GGCI's misrepresentations thus denied Ver the opportunity to terminate the agreement at such time. It was not until late December 2022, just as the options were about to expire, that Ver learned of newly discovered evidence that caused him to inquire further into GGCI's insolvency. *Id.* at ¶¶ 198–208.

However, providing GGCI with a notice of default in late December 2022 would have been a "useless act." GGCI's insolvency and its misrepresentations concerning it had taken place some six to seven months prior, and GGCI could not go back and cure them.

Moreover, GGCI's memorandum of law asserts that it was "never insolvent," which confirms the futility of issuing a notice of default. *See* Memo of Law ISO Motion to Dismiss at

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 494 of 637

4 (Dkt. #35).  Were Ver to issue a notice of default, GGCI would simply decline to cure and

claim to have never been insolvent.

In fact, in an effort to dispose of this meritless issue and to avoid costs associated with

briefing it, Ver did just that.  Out of an "overabundance of caution," on July 25, 2023, Ver issued

GGCI a notice of default and provided them an opportunity to cure. See, Exhibit A to Affidavit

of Michael D. Handelsman, dated Sep. 6, 2023.  Predictably, GGCI did not cure its default, and

instead claimed that it had never been insolvent. *Id.* at Ex. B.  GGCI has again confirmed that

issuing a Notice of Default is a futile and useless act.

*Third,* GGCI's breaches of the agreement were material and have caused Ver damages.

Accordingly, GGCI's reliance on *SSC NY Corp. v. Inveshare, Inc.*, 2018 N.Y. Misc. LEXIS 3202,

*10–11 (Sup. Ct., N.Y. Cnty. 2018) is misplaced.

GGCI points to *Inveshare* to argue that "an *immaterial breach* did not excuse the

non-defaulting party's payment obligations."  *See* Memo of Law ISO Motion to Dismiss at 17

(Dkt. #35) (emphasis added).  As the Court in *Inveshare* explained, "Inveshare has not pleaded

that the confidentiality breach caused it to sustain any damage nor has it alleged (because it

cannot plausibly do so) that the confidentiality breach, which occurred *after* Inveshare's alleged

breach, excused its performance under the Agreement."  *Inveshare*, 2018 N.Y. Misc. LEXIS

3202 at *10–11.

Ver is easily distinguished from Inveshare.  Unlike Inveshare, who did not plead any

damages, Ver has pleaded that GGCI's breaches have caused him damages in excess of

$20,000,000.  *See* Amended Counterclaim at ¶ 248 (Dkt. #32).  Plainly, GGCI's insolvency and

intentional misrepresentations regarding it are material.  GGCI's description of its own

9

insolvency as "immaterial" when the contract makes it a fundamental obligation and when it caused Ver significant damages is simply beyond the pale.

*Fourth,* Ver is not trying to "excuse [his] payment obligations," as was the case in *Inveshare, Inc. See* Memo of Law ISO Motion to Dismiss at 17 (Dkt. #35). Nor has he tried to avoid paying any sums due and owing. Ver's good faith and his willingness to pay any and all sums owed is clearly evidenced by his history of collateral payments to GGCI. Beginning in June 2022, in reliance on GGCI's representations of solvency, Ver has paid GGCI in excess of $60,000,000. Amended Counterclaim at ¶¶ 197–198 (Dkt. #32). This includes a $37,000,000 payment made just a few weeks before the options expired.

GGCI's allegations of Ver's bad faith are a made-for-litigation fantasy. Were Ver simply seeking to avoid paying GGCI, why would he pay them $37,000,000 just one month prior to expiration? This dispute only arose after specific information from the FTX bankruptcy that revealed GGCI to be insolvent reached Ver in late December 2022. Amended Counterclaim ¶¶ 198–210 (Dkt. #32).

As Ver has made clear, "[d]espite GGCI's repeated misrepresentations and false assurances of solvency, [he] maintains his willingness to pay any outstanding sums owed, provided GGCI can finally demonstrate they were solvent at the relevant times." *See* Amended Counterclaim at 4 (Dkt. #32). But instead of taking Ver up on his offer, GGCI wants to dismiss Ver's counterclaim to avoid ever having to do so.

*Fifth,* GGCI's reliance on *In re Lehman Brothers Holdings, Inc., et al.* is also misplaced.[2] *See* Ex. D to Gottlieb Aff. (Dkt. # 36). GGCI cites to *In re Lehman Brothers* to provide an

---

[2] GGCI has only included a partial copy of this transcript. A full 94 pages were provided to the Court. It is unknown how many additional pages follow page 113 of the Transcript, which is clearly not the last page.

example of a party to an ISDA agreement not being excused from their payment obligations despite a bankruptcy filing. However, this case is easily distinguished.

Whereas Ver relied on GGCI's representations of solvency, Lehman Brothers had filed for bankruptcy and was clearly insolvent. The crux of *Lehman* was that Metavante took no steps to terminate the ISDA agreement despite being aware of Lehman Brothers' insolvency. The *Lehman* Court took umbrage with Metavante "riding the market for the period of one year [following the Lehman bankruptcy filing], while taking no action whatsoever." *Id*. at 110:22–23; *see also id*. at 106:11–14 ("Metavante has not, however, attempted to terminate the Agreement").

Ver's actions are easily distinguished from Metavante's. Unlike Ver, Metavante was aware of its counterparty's insolvency. Ver did not sit on his hands for a year like Metavante, Ver was instead deprived of an opportunity to terminate the agreement by GGCI's misrepresentations of solvency. When Ver finally learned he had been deceived, the options were about to expire. GGCI's reliance on *In re Lehman Brothers* is completely misplaced.

Next, whereas the dispute between Ver and GGCI concerns an agreement that has already been terminated, *In re Lehman Brothers* does not. According to the *In re Lehman* Court: "[a]lthough complicated at its core the Agreement is, in fact, a garden variety *executory contract*, one for which there remains something still to be done on both sides." *Id*. at 109:19–21 (emphasis added). Lehman Brothers was fighting to keep the contract in force, unlike GGCI who terminated the agreement.

Finally, *In re Lehman Brothers* was a bankruptcy case that discussed the interplay between bankruptcy law and contract law. *Id*. The matter here does not involve claims under bankruptcy law. *In re Lehman Brothers* is inapposite and should be disregarded.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 497 of 637

*Sixth,* Ver did not delay in seeking to terminate the agreement, GGCI terminated before

he was able to do so and while the parties were still negotiating.   Pursuant to Section 6b of the

ISDA Master Agreement, "[i]f a Termination Event . . . occurs, an Affected Party will, promptly

*upon becoming aware of it,* notify the other party, specifying the nature of that Termination

Event . . ." (Emphasis added).  Ver did not "become aware" of GGCI's insolvency until late

December 2022. GGCI then terminated the contracts and filed the instant lawsuit before Ver had

received answers to his questions from GGCI.  Ver was accordingly unable to serve notice.

*Seventh,* GGCI claims that Ver's allegations of its continuing insolvency post-June 2022

are "nonsensical" because they fail to explain why GGCI's inadequate accounting methods

rendered GGCI insolvent on a continuing basis.  (*See* Memo of Law ISO Motion to Dismiss at

17 (Dkt. #35)).  However, Ver's position is clear.  GGCI's claims of solvency hinge on *unaudited*

SOFCs, and those SOFCs do not reflect its true financial status since GGCI's accounting

methods improperly overvalued assets in an effort to mislead counterparties like Ver into

believing it was solvent.

GGCI's unaudited SOFCs failed to apply a discount to its large sums of illiquid and

volatile tokens during a time of suppressed market activity.  Meanwhile — within days of those

unaudited SOFCs being issued — GGCI was demanding Ver to apply steep discounts (of 66%)

to his own digital assets he wished to use as collateral.  Amended Counterclaim ¶ 169 (Dkt. #32).

This "nonsensical" double standard is a frank admission by GGCI that its own unaudited SOFCs

overvalued digital assets to paint a misleading picture of solvency.  There is absolutely no

justification for GGCI to demand Ver discount his digital assets on June 24th by 66% and not

demand the same of themselves on June 20th and/or 30th.

12

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 498 of 637

Nearly any discount to the value of GGCI's digital asset investments would devour shareholders' equity and cause liabilities to exceed assets.  To illustrate, anything greater than a 1% discount to its digital asset investment would have rendered GGCI insolvent according to its June 30 SOFC.  *See* Amended Counterclaim ¶¶ 184, 214 (Dkt. #32).

For these reasons, Ver respectfully requests that this court deny GGCI's motion to dismiss his amended counterclaim pursuant to CPLR § 3211(a)(7).  The documentary evidence submitted by Claimant, i.e., the contract at issue, does not "conclusively establish[] a defense to the asserted claims as a matter of law" and Ver's amended counterclaim should not be dismissed pursuant to CPLR § 3211(a)(1).  *Burlington Loan Mgt. Ltd.*, 2015 N.Y. Misc. LEXIS 1986, *5 (quoting *Leon v. Martinez*, 84 N.Y.2d 83 at 88).

### B. Ver's Allegations Meet the Contract Pleading Standard

Ver's specific allegations that GGCI's liabilities exceeded its assets at material times in breach of the ISDA meet the standard required to plead a breach of contract claim.  GGCI is wrong that Ver's breach of contract claim is required to meet a heightened pleading standard.  No such pleading standard exists in the realm of contract law since there is "no requirement of heightened particularity in a contract claim." *Cortlandt St. Recovery Corp. v. TPG Capital Mgt., L.P.*, 2022 N.Y. Misc. LEXIS 6181, *47 (N.Y. Ct. App. 2022) (quoting *Vandashield Ltd. v. Isaacson*, 146 A.D.3d 552, 554 (1st Dep't 2017)).

***First,*** a breach of contract claim is "merely subject to notice pleading standards" and at the motion to dismiss stage "it is premature and indeed unnecessary to precisely circumscribe the viable scope of plaintiffs' breach of contract claim.  Discovery will flesh out the facts, and the court can revisit which itemized breaches are viable at the summary judgment stage." *Gelita, LLC v. 133 Second Ave., LLC*, 2014 N.Y. Misc. LEXIS 239, 14 (Sup. Ct., N.Y. Cnty. 2018).

13

Unable to cite a single case involving an ISDA Master Agreement and/or a contract where insolvency was the basis for the breach, GGCI attempts to invent a heightened pleading standard by analogizing to various cases brought under the Debtor and Creditor Law ("DCL"). However, none of those cases invoke such a standard and instead rely on the same standard applied to a breach of contract claim.

In *Matter of Northwest 5th & 45th Realty Corp. v. Mitchell, Maxwell & Jackson*, 164 A.D.3d 1158, 1158 (1st Dep't 2018), "[t]he petition invoked Debtor and Creditor Law § 273, which required insolvency . . . Despite this, the petition *made no allegations* about the fair salable value of MMJ's assets; thus, it *failed to make a prima facie case*." (Emphasis added). The petition was dismissed due to the failure to merely allege a prima facie case.

In *Goldberg v. EEI Holdco, Inc.*, 2021 N.Y. Misc. LEXIS 6244, *4 (Sup. Ct., N.Y. Cnty. 2021) the Court dismissed the DCL petition because "plaintiff's *conclusory allegation* of insolvency d[id] not suffice" (citing *Eagle Eye Collection Corp. v. Shariff*, 190 A.D.3d 600 (1st Dep't 2021)). And in a passage GGCI chose to omit, *Goldberg* applied the same standard as it would to any other motion to dismiss:

> "When determining a motion to dismiss, the Court must accept all factual allegations as true, afford the pleadings a liberal construction, and accord plaintiff the benefit of every possible favorable inference. However, allegations that are "*bare legal conclusions*" or that are "inherently incredible or *flatly contradicted by documentary evidence,*" are not sufficient to withstand a motion to dismiss."

*See Goldberg,* 2021 N.Y. Misc. LEXIS 6244 at *2–3. (emphasis added and internal citations omitted).

Nor did *Eagle Eye Collection Corp. v. Shariff* apply a heightened pleading standard. There, the claims at issue were also based on DCL § 273, and were dismissed as being "*conclusory allegations*" based on the holding in *Riback v. Margulis*, 43 A.D.3d 1023, 1023 (2d

14

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 500 of 637

Dep't 2007). *See Eagle Eye*, 190 A.D.3d at 601 (emphasis added). According to *Riback*, "the facts pleaded are *presumed to be true* and are accorded every favorable inference, bare legal conclusions as well as factual claims *flatly contradicted by the record* are not entitled to any such consideration." *See Riback*, 43 A.D.3d at 1023 (emphasis added).

    The common thread in all of these cases is that there is no special pleading standard. But even if there were, this Court should decline to create new precedent here by applying it to contract actions, owing to the obvious disparity in consequences that flow from a breach of contract versus a petition for insolvency.

    ***Second,*** Ver's allegations clearly meet the applicable notice pleading standards. They are not "flatly contradicted by the record." They are not "speculative and conclusory." Ver's allegations contain numerous specific examples alleging GGCI's insolvency.[3]

    To provide just a single example, GGCI's sole evidence that it was solvent in June 2022 consists of a pair of *unaudited* SOFCs. *See* Amended Counterclaim at ¶¶ 176, 184, 211 (Dkt. #32) Those SOFCs showed an extremely thin positive equity, which largely consisted of illiquid digital assets valued by GGCI at mark-to-market valuations. *See id.* at ¶¶ 111–122. GGCI reported these valuations at a time when digital asset markets were freezing up and these assets were far less liquid than usual. *See id.* at ¶ 152 (citing to an arbitration filing by GGCI's affiliate which stated that "[d]ue to recent extreme volatility in the cryptocurrency markets, the value of the collateral already posted by Three Arrows decreased significantly in comparison to the

---

[3] Examples include:
(1) GGCI's failure to enforce collateral requirements, *see* Amended Counterclaim at ¶ 95 et seq. (Dkt. #32);
(2) GGCI's collateral exposed to a daisy chain of debts, *see id.* at ¶ 105;
(3) GGCI's deviation from ASC 820, *see id.* at ¶ 111 et seq.;
(4) GGCI's over exposure to FTX and Alameda, *see id.* at ¶ 123 et seq.;
(5) GGCI's over exposure to 3AC, *see id.* at ¶ 138 et seq.;
(6) GGCI's misrepresentations of solvency, *see id.* at ¶ 157 et seq.;
(7) DCG's $1.1 billion promissory note and further misrepresentations of solvency, *see id.* at ¶ 182 et seq.

loaned assets under the MLAs."). GGCI knew these assets needed to be discounted, since on June 24, 2022 it demanded Ver apply steep discounts to his own digital assets were he to provide them as collateral. *See id.* at ¶¶ 166–169 .

GGCI never applied any discounts to its digital assets listed in its unaudited SOFCs because doing so would leave them insolvent. In the June 20 SOFC, for example, applying a discount of just over 6% to GGCI's "Investments in Digital Currencies" would be sufficient to cause liabilities to exceed assets. *See* Amended Counterclaim at ¶ 177 (Dkt. #32). And in the June 30 SOFC a mere discount of 1% would suffice to render GGCI insolvent. *See id.* at ¶¶ 184, 214.

For these reasons, Ver respectfully requests that GGCI's motion to dismiss his breach of contract claim be denied.

## III. THE FRAUD CLAIM

### A. Fraud Claim Is Plead In The Alternative

As declared by the Court of Appeals decades ago, "[u]ndeniably, a plaintiff is entitled to advance inconsistent theories in alleging a right to recovery." *Cohn v. Lionel Corp.*, 21 N.Y.2d 559, 563 (1968). Indeed, it is the "clear mandate of CPLR §§ 3014 and 3017 which permit and encourage pleading of claims and remedies in the alternative; as well as New York practice, which provides that the election of remedies, if any, 'need not be made until all the proof has been presented.'" *Volt Systems Development Corp. v. Raytheon Co.*, 155 A.D.2d 309, 309 (1st Dep't 1989) (quoting 3 *Weinstein-Korn-Miller, N.Y. Civ. Prac.*, ¶ 3002.04 at 30-122 (1988)).

Under CPLR § 3014, "[c]auses of action or defenses may be stated alternatively or hypothetically." CPLR § 3014. And under CPLR § 3017(a), "[r]elief in the alternative or of several different types may be demanded." CPLR § 3017.

16

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 502 of 637

Ver's fraud claims are not duplicative.  In the case cited by GGCI, *Cronos Grp. Ltd. v. XComIP, LLC,* 156 A.D.3d 54 (1st Dep't 2017)*,* the court explained that a fraud claim is duplicative when defendants "'misrepresent[]…their intentions with respect to the manner' in which they would perform their contractual duties." *Cronos G* at 63.  In other words, "[a] fraud-based claim is duplicative of a breach of contract claim when the only fraud alleged is that the defendant was not sincere when it promised to perform under the contract." *MMCT, LLC v. JTR Coll. Point, LLC,* 122 A.D.3d 497, 499 (1st Dep't 2014).

Ver is not claiming that GGCI had no intention to perform under the contract *before* it entered into the agreement thereby committing fraud.  Ver is claiming that GGCI was insincere *in its performance* of the contract — specifically, its misrepresentations of solvency intended to induce Ver into sending them tens of millions of dollars to maintain his positions.  This is not the case where, as GGCI claims, the fraud claim arises from the same facts of the contract claim.  The contract claim is that GGCI was insolvent after the contract was entered — whether Ver knew or not.  The fraud claim is that GGCI *misrepresented* its solvency to induce Ver into sending additional collateral.

For these reasons, Ver's fraud claims should not be dismissed, and Ver respectfully requests that GGCI's motion is denied.

### B.  Ver Plead Fraud With Particularity

Under CPLR § 3016(b), "[w]here a cause of action or defense is based upon misrepresentation, fraud, mistake, wilful default, breach of trust or undue influence, the circumstances constituting the wrong shall be stated in detail." CPLR § 3016.

To meet the heightened pleading standard for fraud, the "Plaintiff must merely allege facts sufficient to permit a reasonable inference of the alleged misconduct to each Defendant."

*EVEMeta, LLC v. Siemens Convergence Creators Corp.*, 2018 N.Y. Misc. LEXIS 4445, *17 (Sup. Ct., N.Y. Cnty. 2018) (citing *Goldin v. TAG Virgin Islands, Inc.*, 149 A.D.3d 467, 467 (1st Dep't 2017) (holding that under CPLR 3016's heightened pleading requirement, the Defendants must be able to reasonably infer what the misconduct was from the pleadings)).

According to *Goldin*, "even absent details of time and place" a complaint that "allege[s] facts sufficient to permit a reasonable inference of the alleged misconduct" is deemed to have met "the heightened pleading requirement of CPLR 3016(b)." *Goldin*, 149 A.D.3d at 467.

Ver has met this burden. The 285 paragraphs making up Ver's amended counterclaim provide substantial factual allegations regarding the specific misrepresentations made, the dates that they were made, the motive or intent of GGCI in making those intentional misrepresentations, and the resulting damages suffered as a result of GGCI's actions. *See, e.g.*, Amended Counterclaim ¶¶ 273–285 (Dkt. #32) (explaining that GGCI intentionally sent Ver an inaccurate portrayal of its financial position on June 28, 2022, which induced Ver to make over $60,000,000 in payments to GGCI to maintain his option positions). The counterclaim goes above and beyond the requirement that it merely "allege facts sufficient to permit a reasonable inference of the alleged misconduct." *Goldin*, 149 A.D.3d at 467.

GGCI's position is that even if it had to "write down hundreds of millions of dollars in assets" as a result of the 3AC fallout, "the June 2020 SOFC does not contain any misrepresentations" in and of itself. Memo of Law ISO Motion to Dismiss at 22 (Dkt. #35). Assuming *arguendo* that the June 20 SOFC is in fact accurate on its face (it isn't), and the value of its digital currency investments were not overvalued (they were), the intentional misrepresentation lies in GGCI's carefully concocted decision to send Ver an old balance sheet that was conveniently timed the day before GGCI had to "write down hundreds of millions of

18

dollars in assets."  GGCI knew the June 20 SOFC no longer accurately reflected its financial position by June 28th, yet gave it to Ver anyway.

Before sending tens of millions of dollars to maintain his options positions, and concerned with the recent fallout of 3AC, Ver asked for proof that GGCI was solvent, as GGCI was contractually obligated to be.  But rather than sending a current balance sheet, which would have revealed their insolvency, GGCI sent an old balance sheet that it knew no longer fairly represented its financial situation because it showed a positive — albeit fragile — shareholders' equity.  Amended Counterclaim at ¶¶ 180, 213–214 (Dkt. #32).  In reliance, Ver sent $60M to maintain his positions.  *Id.* at ¶ 178.  Two days later, on June 30, GGCI purportedly added $151,000,000 to their balance sheet, disguised as "Other assets", and claimed to have never been insolvent.  Thus, we have "a material misrepresentation of fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages" sufficient to sustain Ver's fraud claim. *Eurycleia Partners, LP v. Seward & Kissel, LLP,* 12 N.Y.3d 553, 559 (N.Y. Ct. App. 2009).

Therefore, GGCI's motion to dismiss should be denied.

### C.  Ver Is Not Stating a Counterclaim for Fraudulent Omission

GGCI's argument that the lack of a fiduciary relationship prevents a claim for fraudulent omission is misdirected — the basis of Ver's fraud claim is not that there was fraud by omission, but rather that there was fraud by GGCI's affirmative misrepresentation of its financial condition at the time.  Ver is not claiming that GGCI's failure to disclose the events with 3AC is fraud in the omission.   Rather, Ver is claiming GGCI affirmatively misrepresented its solvency by sending Ver a balance sheet that inaccurately portrayed its financial condition at the time.

19

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 505 of 637

Firstly, GGCI intentionally overvalued its assets by valuing its digital assets mark-to-market. Amended Counterclaim at 2 (Dkt. #32). When sending Ver the June 20 SOFC, GGCI knew the value of its digital currency investment was nowhere near the roughly $1.6 billion it claimed, as it consisted largely of illiquid coins in time of market turmoil. *Id.* at ¶ 122. This was an intentionally false representation of its financial condition intended to mislead Ver and induce him to send GGCI collateral.

Nor is the timing of the balance sheet a coincidence. On June 28, 2022, GGCI finally sent Ver an unaudited balance sheet dated June 20, 2022. *Id.* Conveniently, the date of the balance sheet was just one day before GGCI was required to write down hundreds of millions of dollars of intercompany loans with GAP. *Id.* at ¶ 180. Hence, instead of showing a current balance sheet, which would have shown hundreds of millions of dollars less in assets and revealed their insolvency, GGCI decided to send an old balance sheet to convince Ver it was solvent.

Even were the June 20 SOFC accurate (and its assets not overvalued), Ver asked for proof that GGCI was then solvent, and GGCI sent an inaccurate representation of its then financial situation to mislead Ver and induce him to maintain his positions and send additional collateral. This is sufficient to support Ver's claim for fraud. Furthermore, this is fraud in the affirmative and, therefore, no fiduciary relationship is necessary to sustain Ver's claim.

### D. Ver's Reliance Is Not on Extracontractual Representations Made Prior to Entering the Agreement

GGCI seeks to deflect Ver's fraud claim by contending that Ver "disclaimed reliance on any extracontractual representations." *See* Memo of Law ISO Motion to Dismiss at 23 (Dkt. #35). Specifically, GGCI claims that "Ver agreed he was not relying on statements made by GGC International, would perform his own investigation, and acknowledged that cryptocurrency

20

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 506 of 637

assets were volatile and unpredictable." *Id.* at 24 (citing Master Confirmation Agreement ¶¶ 9.a, 9.h, 9.h.i).

Again, GGCI misses the point. GGCI's representation of solvency via the June 20 SOFC is not an *extra*contractual representation — it is one expressly contemplated by the contract. Even if it were extracontractual, Ver only disclaimed extracontractual representations made *prior* to entering into the contract, not *post*contractual representations made to confirm the accuracy of explicit representations made within the contract itself.

Section 9(a)(iii) of the Master Confirmation Agreement sets forth that neither party is "relying upon any representations *except those expressly set forth in the Agreement or this Confirmation*." *van Voorhees Aff.*, Ex. 3 (Dkt. # 41) (emphasis added). Under the ISDA Master Agreement, incorporated by reference into the Master Confirmation Agreement, each party represents that it is solvent and will remain so throughout the contract. *van Voorhees Aff.*, Ex. 1, Sections 3(b), 5(a)(vii)(2) (Dkt. # 41). Thus, when GGCI sent an inaccurate representation of its financial condition to prove its solvency, Ver was concerned with the representations "expressly set forth in the [ISDA Master] Agreement and th[e Master] Confirmation," not any extracontractual representations as GGCI claims. *van Voorhees Aff.*, Ex. 3 (Dkt. # 41).

Furthermore, even if this court finds the representations to be extracontractual, the disclaimers GGCI references are inapplicable to post-contractual representations. Ver did not disclaim any future misrepresentations — only those representations by GGCI prior to entering the agreement. Thus, Ver is entitled to rely upon the representations made by GGCI after entering the agreement as true and accurate, particularly when they relate to representations "expressly set forth" in the agreement, and GGCI's affirmative misrepresentations of its solvency are sufficient to support Ver's claim for fraud.

21

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 507 of 637

None of the cases cited by GGCI are applicable because none concern representations made *after* entering an agreement containing an extra-contractual representations disclaimer.

In *Pappas v. Tzolis*, 20 N.Y.3d 231, 231–232 (N.Y. 2012) the court's decision to dismiss fraud claims was based on statements made *prior* to an agreement being entered into. Nowhere did the Court consider representations made *after*. The court was quick to dismiss the cause of action for fraud as, prior to the sale of the company, the plaintiffs had disclaimed reliance on any representations made by the defendant. *Id.*

Likewise, *HSH Nordbank AG v. UBS AG*, 941 N.Y.S.2d 59, 70 (N.Y. App. Div. 2012) dismissed a fraud claim because of statements made *prior* to entering an agreement, not *after*. Again, the court's decision did not consider representations made *after* entering the agreement and was instead concerned with a party's inability to independently measure risk properly *prior* to entering an agreement. *Id.*

For these reasons, Ver respectfully requests that GGCI's motion to dismiss his fraud claim be denied.

## CONCLUSION

For the foregoing reasons, Ver respectfully requests that the Court deny GGCI's motion to dismiss his contract and fraud claims.

**KELMAN PLLC**

Dated: September 6, 2023

By: /s/ Daniel J. Kelman
Daniel J. Kelman
Michael D. Handelsman
1441 Broadway,
6th Floor, #26079
New York, NY 10018
daniel@kelman.law
mike@kelman.law

22

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 508 of 637

## **WORD COUNT CERTIFICATION**

Pursuant to Rule 17 of subdivision (g) of section 202.70 of the Uniform Rules for the Supreme Court and County Court (Rules of Practice for the Commercial Division of the Supreme Court), I hereby certify that the total number of words in this memorandum of law, excluding the caption, signature block, and word count certification is 6,957.

Dated: New York, New York
      September 6, 2023

                                       */s/ Michael D. Handelsman*
                                       Michael D. Handelsman

# Exhibit M

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 510 of 637

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

GGC INTERNATIONAL LIMITED,

|  |  |
|---|---|
|  | Index No. |
| Plaintiff | |
|  | 650439/2023 Motion |
| v. | |
|  | Seq. No. 002 |
| ROGER VER, | |
|  |  |
| Defendant. | |

---

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFF / COUNTERCLAIM-DEFENDANT GGC INTERNATIONAL LIMITED'S MOTION TO DISMISS DEFENDANT / COUNTERCLAIM-PLAINTIFF <u>ROGER VER'S AMENDED COUNTERCLAIMS</u>

MORRISON COHEN LLP
Jason Gottlieb
Michael Mix
Vani Upadhyaya
909 Third Avenue
New York, New York 10022
(212) 735-8600

*Counsel for Plaintiff / Counterclaim-Defendant GGC International Limited*

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 511 of 637

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ........................................................................... 1

ARGUMENT ..................................................................................................... 3

    I.    THE BREACH OF CONTRACT COUNTERCLAIMS SHOULD BE
    DISMISSED ............................................................................................. 3

        A.    Ver Failed to Comply with the ISDA Master Agreement's Conditions
        Precedent to Suit ......................................................................... 3

        B.    The Counterclaims Do Not Contain Sufficient Allegations of Insolvency 6

    II.    THE FRAUD COUNTERCLAIM SHOULD BE DISMISSED ........................... 8

        A.    The Fraud Counterclaim Is Duplicative of the Breach of Contract
        Counterclaims ............................................................................. 8

        B.    Ver Has Failed to Allege Fraud With Particularity .................................... 9

        C.    Ver Disclaimed Reliance on Extracontractual Representations ............... 10

CONCLUSION ................................................................................................. 11

WORD COUNT CERTIFICATION ...................................................................... 12

i

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 512 of 637

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ashwood Capital, Inc. v. OTG Mgmt., Inc.*,
    99 A.D.3d 1 (1st Dep't 2012) ...................................................................4

*Carlyle, LLC v. Quik Park 1633 Garage LLC*,
    160 A.D.3d 476 (1st Dep't 2018) ..............................................................7

*Cohn v. Lionel Corp.*,
    21 N.Y.2d 559 (1968) ................................................................................8

*Eagle Eye Collection Corp. v. Shariff*,
    190 A.D.3d 600 (1st Dep't 2021) ..............................................................7

*EVEMeta, LLC v. Siemens Convergence Creators Corp.*,
    No. 651484/2016, 2018 N.Y. Misc. LEXIS 4445
    (Sup. Ct. N.Y. Cnty. Oct. 4, 2018)......................................................8, 10

*In re: Genesis Global Holdco, LLC, et al.*,
    No. 23-10063 (SHL) (Bankr. S.D.N.Y.) ...................................................6

*Genger v. Genger*,
    No. 651089/2010, 2015 N.Y. Misc. LEXIS 29
    (Sup. Ct. N.Y. Cnty. Jan. 7, 2015) ...........................................................9

*Goldin v. TAG Virgin Is., Inc.*,
    149 A.D.3d 467 (1st Dep't 2017) ..............................................................9

*Goldin v. Tag Virgin Is. Inc.*,
    No. 651021/2013, 2014 N.Y. Misc. LEXIS 2300
    (Sup. Ct. N.Y. Cnty. May 20, 2014) ......................................................10

*Heth v. Van Riet*,
    No. 651437/2011, 2011 N.Y. Misc. LEXIS 6973
    (Sup. Ct., N.Y. Cnty. Nov. 29, 2011) .......................................................9

*Karabu Corp. v. Pension Benefit Guar. Corp.*,
    No. 96 Civ. 4960 (BSJ), 1997 U.S. Dist. LEXIS 19582
    (S.D.N.Y. Dec. 9, 1997) ............................................................................5

ii

*Point Prods. A.G. v. Sony Music Entm't, Inc.*,
   No. 93 Civ. 4001 (NRB), 2000 U.S. Dist. LEXIS 10066
   (S.D.N.Y. July 19, 2000) ...........................................................................5

*RGH Liquidating Trust v. Deloitte & Touche LLP*,
   47 A.D.3d 516 (1st Dep't 2008) ................................................................9

*Riback v. Margulis*,
   43 A.D.3d 1023 (2d Dep't 2007) ...............................................................7

*Steadman v. Zappin*,
   No. 150591/2017, 2018 N.Y. Misc. LEXIS 854
   (Sup. Ct. N.Y. Cnty. Mar. 13, 2018) ........................................................6

*Volt Sys Dev. Corp. v. Raytheon Co.*,
   155 A.D.2d 309 (1st Dep't 1989) ..............................................................8

*Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*,
   946 F.2d 1003 (2d Cir. 1991).....................................................................5

*XL Diamonds LLC v. Rosen*,
   No. 656102/2019, 2020 N.Y. Misc. LEXIS 3368
   (Sup. Ct. N.Y. Cnty. July 15, 2020).........................................................6

**Statutes**

New York Debtor and Creditor Law § 273 ............................................................2, 7

CPLR 3016.................................................................................................................9

CPLR 3211...............................................................................................................11

iii

Plaintiff / Counterclaim-Defendant GGC International Limited ("GGC International")
respectfully submits this reply memorandum of law in further support of its motion to dismiss (the
"Motion") the Amended Counterclaims, dated July 31, 2023 (the "Counterclaims" or the "CC")
filed by Defendant / Counterclaim-Plaintiff Roger Ver.

**PRELIMINARY STATEMENT**

As described in GGC International's Complaint against Ver for breach of contract, Ver
failed to settle certain cryptocurrency options with GGC International that expired on December
30, 2022. As a result of Ver's breach of contract, Ver owes GGC International at least
$20,689,788, plus interest that continues to accrue.

Ver attempted to circumvent his payment obligations to GGC International by filing
Counterclaims, alleging that at some point in 2022, GGC International became insolvent for some
unspecified amount of time (notwithstanding that GGCI International has never filed for any
insolvency), and such insolvency was a breach of the ISDA Master Agreement[1] to which the
Parties entered through the Master Confirmation Agreement. Even if GGC International had been
insolvent, which it was not, Ver would still be obligated to pay GGC International these amounts.
Further, at no point during 2022 was there a time when Ver would not have owed GGC
International.

GGC International moved to dismiss those Counterclaims. As demonstrated in the Moving
Brief, Ver's claim that he should not have to pay GGC International because it was purportedly
insolvent is both nonsensical and not supported by the relevant contracts. The ISDA Master
Agreement provides a detailed contractual process for what happens if an "Event of Default"

---

[1]     Defined terms are used as in GGC International's initial Memorandum of Law (NYSCEF No. 35, the
"Moving Brief" or the "Moving Br.")

occurs.  Following that process is a condition precedent to suit.  The Opposition effectively

concedes that Ver did not follow those procedures.  Despite Ver's implications that he suspected

GGCI International was insolvent in 2022, the first time that Ver ever notified GGC International

that he believed that an "Event of Default" occurred was in this litigation.

     The Opposition argues that Ver should be excused from following the contracts because

he allegedly did not learn about a supposed insolvency until late 2022 or early 2023.  But the

unambiguous language of the contracts – including the industry-standard ISDA Master Agreement

– does not allow Ver, after his own breach of contract, to retroactively declare an Event of Default

for something that allegedly happened many months earlier.

     Ver's breach of contract claims fail for the additional reason that he has not sufficiently

pleaded that GGC International was ever insolvent.  It is uncontested that GGC International has

never been the debtor in any bankruptcy or insolvency proceeding, either in mid-2022 or now.  It

is uncontested that GGC International has never failed to pay any debts.  The Counterclaims

affirmatively plead that GGC International provided information to Ver showing significant

positive equity, which Ver concedes in his Opposition.  Simply put, Ver's own pleadings confirm

that GGC International had never been insolvent.

     Nevertheless, Ver speculates that, in light of volatile market conditions and the illiquid

nature of some of the assets, a hypothetical auditor might mark down the value of those assets, so

if he squints hard enough, he can make out insolvency.  That is insufficient.  Ver provides no

information as to what he thinks the value of those assets actually are.  Under analogous cases

under New York Debtor and Creditor Law § 273, one cannot state a claim for insolvency without

sufficient allegations of the value of the assets and liabilities.  Even under a notice pleading

standard, Ver's allegations do not suffice.  If Ver's view of the law on this point were correct, any

defendant who owes money under the ISDA Master Agreement could allege that the counterparty

was insolvent at some earlier point, thus excusing payment.  Neither the ISDA Master Agreement,

nor New York law, work that way.

Finally, Ver's fraud Counterclaim should be dismissed.  It is duplicative of his breach of

contract Counterclaims, and because it seeks the exact same quantum of damages.  Ver also fails

to allege fraud with particularity, relying solely on rampant speculation.  And the disclaimers he

agreed to in the Master Confirmation Agreement negate his fraud claims.

## ARGUMENT

## I.  THE BREACH OF CONTRACT COUNTERCLAIMS SHOULD BE DISMISSED

### A.  Ver Failed to Comply with the ISDA Master Agreement's Conditions Precedent to Suit

The Moving Brief explains in detail how Ver failed to follow the ISDA Master

Agreement's conditions precedent to suit.  Moving Br. at 15-18.  Ver alleges that at some

undetermined point in time around June 2022, GGC International became insolvent, an "Event of

Default" under the ISDA Master Agreement.[2]  Section 6(a) of the ISDA Master Agreement

provides that "[i]f at any time an Event of Default . . . has occurred and is then continuing, the

other party may, by not more than 20 days notice to the Defaulting Party specifying the relevant

Event of Default, designate" an "Early Termination Date in respect to all outstanding

Transactions," which will "occur on the date so designated."  ISDA Master Agreement §§ 6(a),

(c).  The ISDA Master Agreement then contains a detailed process for the Parties to calculate the

amount owed, which would vary with market conditions, and provide a "statement" showing how

much is owed.  ISDA Master Agreement §§ 6(d)-(f).

---

[2]      Ver also alleges that it was an "Event of Default" for GGC International to make a misrepresentation to Ver
about its solvency, and all of GGC International's arguments apply equally to this contention.

Even if Ver did suspect insolvency in 2022, Ver failed to follow the proper procedure prior to his own breach of contract leading to this suit. Ver does not allege that he ever provided notice to GGC International "specifying the relevant Event of Default" until July 25, 2023, *after* he breached the contract, GGC International commenced this suit, and moved to dismiss Ver's original counterclaims. Opp. at 9. Ver argues that it would have been "futile" to do so, because he only found out about GGC International's alleged insolvency in late 2022 or early 2023, after GGC International designated an Early Termination Date due to Ver's failure to settle the trades at issue. Opp. at 7-9. But, if Ver really did learn about the alleged insolvency in late 2022 or early 2023, and such insolvency was continuing, Ver could have followed the requirements of the contracts, declared an Early Termination Date, and paid what he owed GGC International "in respect of the outstanding Transactions." Ver, upon his own allegations, did not do so. It is easy to understand why: if he had, he would have owed as much, or more, as is stated in the Complaint.

Instead, Ver is attempting to circumvent his payment obligations altogether by asserting that an Event of Default occurred at some point in the past. The ISDA Master Agreement does not allow such gamesmanship. As noted in the Moving Brief, "courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include." *Ashwood Capital, Inc. v. OTG Mgmt., Inc.*, 99 A.D.3d 1, 7 (1st Dep't 2012) (citation omitted). *See also* Moving Br. at 13-14 (citing cases). Ver is effectively asking the court to ignore the plain language of the parties' agreements to create a new remedy for him, which is not permitted under New York law. *See Ashwood Capital Inc.*, 99 A.D.3d at 7 (courts "may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing").

4

The timing set forth in the ISDA Master Agreement – entered before the alleged insolvency – is critical. Because the assets being traded have a constantly changing market price, it is not possible to pick a historical date several months in the past to which to unwind the relationship. Moreover, as explained in the Moving Brief, because the market price of cryptocurrency assets is constantly changing, the non-defaulting party cannot designate an Early Termination Date more than twenty days into the future under Section 6(a) of the ISDA Master Agreement. Moving Br. at 16. Simply put, Ver is advancing an interpretation of the ISDA Master Agreement that is contradicted by the plain, unambiguous language of the contract.

Ver argues that a non-defaulting party does not need to provide notice and a cure period where "it would be futile." Opp. at 7-8. But GGC International is not arguing that Ver did not provide sufficient time to cure; GGC International is arguing that Ver failed to follow the contract's conditions precedent to suit. Even the cases cited by Ver make clear that only in "limited circumstances" can the "terminating party . . . terminate immediately, without affording the non-performing party notice and an opportunity to cure." *Point Prods. A.G. v. Sony Music Entm't, Inc.*, No. 93 Civ. 4001 (NRB), 2000 U.S. Dist. LEXIS 10066, at *12 (S.D.N.Y. July 19, 2000). Those "limited circumstances" include where the non-performing party "(1) expressly repudiates the parties' contract, or (2) abandons performance thereunder." *Id.* at *15 (internal citations omitted). There are no allegations that GGC International repudiated the contract or abandoned it. Indeed, in *Point Prods.* and *Karabu Corp. v. Pension Benefit Guar. Corp.*, No. 96 Civ. 4960 (BSJ), 1997 U.S. Dist. LEXIS 19582, at *33 (S.D.N.Y. Dec. 9, 1997), both cited in the Opposition, the court found that the non-terminating party did not abandon or repudiate the contract, and thus did not excuse the terminating party's failure to give notice or a cure period. Ver also cites *Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*, 946 F.2d 1003, 1009 (2d Cir. 1991), but there,

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 519 of 637

providing a cure period would have been a "useless act" because the non-terminating party abandoned performance.  There are no similar allegations here.

Even if Ver's unsupported theory is true that the Parties can be put back to June 2022, Ver owed GGC International significant sums of money – even more than GGC International is seeking in the litigation – at all times from the date of the alleged insolvency to the date of Ver's default.  Thus, Ver's statement contradicts his Counterclaims allegations that his damages are over $20,000,000, CC ¶¶ 248, 256, 264, 272, and illustrates his failure to plead damages, a separate basis to dismiss his contract claims.  *See XL Diamonds LLC v. Rosen*, No. 656102/2019, 2020 N.Y. Misc. LEXIS 3368, at *8 (Sup. Ct. N.Y. Cnty. July 15, 2020) ("where a plaintiff fails to allege any 'damages flowing from the breach allege[s] and relies, instead, on wholly speculative theories of damages, dismissal of the breach of contract claim is in order'"); *Steadman v. Zappin*, No. 150591/2017, 2018 N.Y. Misc. LEXIS 854, at *7 (Sup. Ct. N.Y. Cnty. Mar. 13, 2018) ("Without a clear demonstration of damages, there can be no claim for breach of contract").

**B.    The Counterclaims Do Not Contain Sufficient Allegations of Insolvency**

Ver's Opposition underscores that he has not pleaded sufficient allegations that GGC International was ever insolvent.[3]  Ver does not contest that GGC International has never filed for bankruptcy,[4] has never been involuntarily put into an insolvency proceeding, has never been unable to pay its debts, and has never admitted such inability in writing.  Moving Br. at 18-20.

---

[3]    The Opposition incorrectly states that GGC International argued that there is a heightened pleading standard in breach of contract cases.  Opp. at 13-15.  GGC International has made no such claim.

[4]    Some other Genesis entities (Genesis Global Holdco, LLC, Genesis Global Capital, LLC, and Genesis Asia Pacific Pte. Ltd.) are debtors in a bankruptcy proceeding.  *See* CC ¶ 67; *In re: Genesis Global Holdco, LLC, et al.*, No. 23-10063 (SHL) (Bankr. S.D.N.Y.).  But several other Genesis entities, including GGC International, are not now and have never been debtors in any proceeding.

6

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 520 of 637

In support of his theory that GGC International was insolvent, the Opposition points to two unaudited statements of financial condition (each, an "SOFC") that GGC International voluntarily provided to Ver. Yet, the Opposition admits that both SOFCs showed "<u>positive</u> equity" (emphasis added). Opp. at 15. Indeed, while the Opposition dismisses that positive equity as "thin," the Counterclaims allege that one SOFC showed positive equity of over $100 million and the other showed positive equity of $14 million. CC ¶¶ 177, 214. In other words, the Counterclaims affirmatively allege that GGC International was solvent; its assets were greater than its liabilities. The Opposition's abject speculation that due to the illiquid nature of the assets and the lack of liquidity in the market in general, some hypothetical auditor might have applied a discount to GGC International's assets, marking their value down to some undetermined value, cannot be countenanced, even on a notice pleading standard.

The Moving Brief cites several cases dismissing causes of action under DCL § 273 for failure to sufficiently plead insolvency. Moving Br. at 20 (citing cases). Contrary to Ver's argument that these cases are inapplicable, Opp. at 14-15, these cases are analogous because like here, in order to state a claim, the plaintiff must sufficiently plead that the defendant was insolvent. Indeed, neither Ver's breach of contract Counterclaims nor claims under DCL § 273 contain a heightened pleading requirement, underscoring the appropriateness of the analogy. *See Carlyle, LLC v. Quik Park 1633 Garage LLC*, <u>160 A.D.3d 476</u>, 477 (1st Dep't 2018) (no heightened pleading standard for DCL § 273 claims). These cases uniformly show that conclusory allegations of insolvency do not suffice, particularly where the plaintiff does not make adequate allegations regarding the actual value of the assets in question. *See* Moving Br. at 20 (citing cases). *See Eagle Eye Collection Corp. v. Shariff*, <u>190 A.D.3d 600</u>, 602 (1st Dep't 2021); *Riback v. Margulis*, <u>43</u>

7

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 521 of 637

A.D.3d 1023 (2d Dep't 2007).  Ver's conclusory and speculative allegations of insolvency should be similarly dismissed.

## II.    THE FRAUD COUNTERCLAIM SHOULD BE DISMISSED

### A.    The Fraud Counterclaim Is Duplicative of the Breach of Contract Counterclaims

Longstanding New York law provides that a fraud claim will be dismissed if it duplicates a claim for breach of contract with respect to facts alleged and damages sought.  The Moving Brief cites numerous cases, including very recent cases from the First Department, dismissing fraud claims as duplicative of contract claims.  Moving Br. at 20-21.  Indeed, even a case relied upon by Ver in the Opposition – cited for a different proposition – dismissed fraud claims as duplicative of breach of contract claims.  *See EVEMeta, LLC v. Siemens Convergence Creators Corp.*, No. 651484/2016, 2018 N.Y. Misc. LEXIS 4445, at *19-20 (Sup. Ct. N.Y. Cnty. Oct. 4, 2018).

Ver does not contest this long line of case law.  Instead, Ver makes the uncontroversial statement that a plaintiff is allowed to allege "inconsistent theories" and to plead in the alternative.  Opp. at 17.  But Ver's Counterclaims fail for the exact opposite reason – Ver pleads the exact same legal theories, set of facts, and quantum of damages as in his four breach of contract claims.  Moving Br. at 21.  Thus, Ver's argument that his fraud claims are plead in the alternative to his breach of contract claims should be rejected.[5]

Ver attempts to distinguish his breach of contract claims, which concern GGC International's alleged insolvency, from his fraud claim, which concerns GGCI International's alleged misrepresentation of its insolvency.  Opp. at 17.  This supposed distinction does not save

---

[5]    Neither case cited by Ver involves a situation where the plaintiff pleaded a duplicative fraud and breach of contract claim, as Ver did here.  *Cohn v. Lionel Corp.,* 21 N.Y.2d 559, 563 (1968); *Volt Sys. Dev. Corp. v. Raytheon Co.*, 155 A.D.2d 309, 309 (1st Dep't 1989).

8

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 522 of 637

Ver's fraud counterclaim. *See RGH Liquidating Trust v. Deloitte & Touche LLP*, <u>47 A.D.3d 516</u>, 517 (1st Dep't 2008) ("plaintiff's fraud claims were properly dismissed as duplicative of its breach of contract claim, since they are based on alleged fraudulent misrepresentations related to defendants' obligation under their agreements").

Ver fails to address GGC International's independent argument that the fraud counterclaim must be dismissed as duplicative because it seeks the exact same damages as his breach of contract counterclaims. Moving Brief at 21-22. He is thus deemed to have conceded it, and accordingly, the Court should dismiss the fraud counterclaim. *See Genger v. Genger*, No. 651089/2010, <u>2015 N.Y. Misc. LEXIS 29</u>, at *29 (Sup. Ct. N.Y. Cnty. Jan. 7, 2015) ("In their opposition brief, [cross-claim plaintiffs] do not address or contest the argument, and thus are deemed to have conceded it"); *Heth v. Van Riet*, No. 651437/2011, <u>2011 N.Y. Misc. LEXIS 6973</u>, at *7 (Sup. Ct., N.Y. Cnty. Nov. 29, 2011) ("Van Riet has not responded to this argument. The claim shall be deemed abandoned.").

### B.    <u>Ver Has Failed to Allege Fraud With Particularity</u>

Ver does not dispute that claims for fraud must be pleaded with particularity under <u>CPLR 3016(b)</u>. Moving Br. at 22. The Moving Brief explains how the Counterclaims do not contain any affirmative misrepresentations, let alone any affirmative misrepresentations pleaded with particularity. Despite the SOFCs depicting GGC International's positive equity, the Counterclaims allege that a hypothetical auditor might have come to a different conclusion as to GGC International's solvency.

*Goldin v. TAG Virgin Is., Inc.*, <u>149 A.D.3d 467</u> (1st Dep't 2017), cited by Ver, Opp. at 18, is inapposite. Although the First Department decision does not list the allegations of fraud that it found sufficient under <u>CPLR 3016(b)</u>, the Supreme Court decision states that the complaint

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 523 of 637

alleged, *inter alia*, that the defendants, "while acting as investment advisors . . . supplied fraudulent and inadequate information to the Plaintiffs with respect to the holds in their accounts." *Goldin v. Tag Virgin Is. Inc.*, No. 651021/2013, 2014 N.Y. Misc. LEXIS 2300, at *31 (Sup. Ct. N.Y. Cnty. May 20, 2014) (ellipses in original). There are no non-conclusory allegations in the Counterclaims that GGC International provided incorrect information to Ver.

Ver fares no better with his citation to *EVEMeta* (where, as noted above, the court ultimately dismissed the fraud claims as duplicative). There, unlike here, during negotiations with the plaintiff, the defendants allegedly made misrepresentations of fact that they were working towards a particular agreement, when in fact the defendants were allegedly working to cut the defendant out of the deal. *EVEMeta, LLC*, 2018 N.Y. Misc. LEXIS 4445, at *16-18.

### C.    <u>Ver Disclaimed Reliance on Extracontractual Representations</u>

In the Master Confirmation Agreement, Ver specifically agreed, among other things, that he was "not relying upon any representations except those expressly set forth in the Agreement or this Confirmation"; "entering into each Transaction with a full understanding of the terms, conditions and risks thereof and it is capable of and willing to assume those risks," and acknowledging that cryptocurrency assets were volatile and unpredictable. Master Confirmation Agreement ¶¶ 9.a, 9.h, 9.h.i. The Master Confirmation Agreement applied "to each Virtual Currency Transaction (each, a "Transaction") entered into" between the parties on or after the effective date. *Id.* ¶ 1(a).

Ver's fraud claim, in his own words, "is that GGCI misrepresented its solvency to induce Ver into sending additional collateral." Opp. at 17. But, the disclaimers to which Ver agreed expressly apply to <u>each</u> transaction between the parties. Thus, the disclaimers negate Ver's claims for fraud. *See* Moving Br. at 23-24 (citing cases).

10

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 524 of 637

## **CONCLUSION**

For the reasons cited herein, and the reasons set forth in the Moving Brief, the Court should

issue an Order pursuant to CPLR 3211(a)(1) and 3211(a)(7) the Counterclaims in their entirety.

Dated: New York, New York
September 12, 2023

MORRISON COHEN LLP


By: _/s/ Jason Gottlieb_
Jason Gottlieb
Michael Mix
Vani Upadhyaya
909 Third Avenue
New York, New York 10022
(212) 735-8600

*Counsel for Plaintiff / Counterclaim-Defendant GGC International Limited*

11

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 525 of 637

## **WORD COUNT CERTIFICATION**

Pursuant to Rule 17 of subdivision (g) of section 202.70 of the Uniform Rules for the

Supreme Court and County Court (Rules of Practice for the Commercial Division of the Supreme

Court), I hereby certify that the total number of words in this memorandum of law, excluding the

caption, signature block, and word count certification is 3,212.


Dated: New York, New York
September 12, 2023


                                        _____/s/ Jason Gottlieb_____
                                                Jason Gottlieb

12

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 526 of 637

# Exhibit N

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 527 of 637

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

GGC INTERNATIONAL LIMITED,

                        Plaintiff,

           v.

ROGER VER,

                        Defendant.

_____

ROGER VER

               Third-Party Plaintiff,

           v.

BARRY SILBERT, MICHAEL MORO, and
DIGITAL CURRENCY GROUP,

               Third-Party Defendants.

_____

Index No. 650439/2023

**DEFENDANT'S**
**THIRD-PARTY SUMMONS**

TO THE ABOVE-NAMED THIRD-PARTY DEFENDANTS:

**PLEASE TAKE NOTICE you are hereby summoned** to answer the Third-Party Complaint in this action and to serve a copy of your answer, or, if the Third-Party Complaint is not served with this summons, to serve a notice of appearance, on the Third-Party Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Trial is desired in the County of New York.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 528 of 637

TO:

Digital Currency Group
290 Harbor Drive
Stamford, CT 06902

Michael Moro
15-10 Jordan Road
Fairlawn, New Jersey 07410

Barry Silbert
135 Highland Road
Rye, New York 10580

**KELMAN PLLC**

Dated: December 27, 2023

Michael D. Handelsman
Daniel J. Kelman
1441 Broadway
6th Floor, #6079
New York, NY 10018
(212) 380-3818
mike@kelman.law
daniel@kelman.law

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 529 of 637

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| GGC INTERNATIONAL LIMITED, | Index No. 650439/2023 |
| Plaintiff, | |
| v. | |
| ROGER VER, | **THIRD-PARTY COMPLAINT** |
| Defendant. | |
| | |
| ROGER VER | |
| Third-Party Plaintiff, | |
| v. | |
| BARRY SILBERT, MICHAEL MORO, and DIGITAL CURRENCY GROUP, | |
| Third-Party Defendants. | |

Defendant, Roger Ver ("Ver"), by and through his attorneys, Kelman PLLC, herein, alleges as follows:

## INTRODUCTION

1.    This case exposes the deceptive tactics of an insolvent derivatives trading desk desperate to remain afloat.  GGCI's own derivatives contracts mandated continuous solvency. Yet when Ver sought confirmation of their financial status, GGCI deceived him with misleading financial information and induced him to provide tens of millions of dollars in additional collateral.

2.    In June 2022, GGCI faced insolvency as Three Arrows Capital ("3AC") started to collapse.  Desperate for assets, they targeted Ver, a significant customer with multiple expiring

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 530 of 637

options that month.  To collect from him, GGCI let Ver's out-of-the-money options expire; to avoid paying him, GGCI persuaded Ver to roll in-the-money options to a later date.  Meanwhile, Genesis secretly planned to margin call and liquidate 3AC immediately after the roll, which would drive Ver's expiring positions to new lows.

3.     The moment Ver's out-of-the-money June options expired, GGCI abruptly demanded that Ver over-collateralize the positions he had just rolled by a staggering 300%.  This sudden and unprecedented low valuation raised Ver's suspicions about GGCI's solvency, because GGCI had always accepted digital assets as collateral at mark-to-market prices.

4.     In fact, GGCI, as well as its parent companies, was attempting to cover up its insolvency by squeezing Ver for exorbitant sums of collateral.  Although GGCI outwardly applied a low valuation to Ver's digital assets, once they had them in hand, GGCI would add them to their balance sheet as assets valued mark-to-market.  This accounting trick promised to boost GGCI's assets by several hundred million dollars and return them to solvency.

5.     GGCI employed this tactic with the guidance and direction of Barry Silbert, Michael Moro, Digital Currency Group ("DCG"), Genesis Global Holdco ("Genesis Holdco"), and Genesis Global Capital ("Genesis Global") (collectively with GGCI, referred to as the "Genesis Entities").

6.     Ver demanded proof of GGCI's solvency before he would provide any further collateral. GGCI then provided Ver with a Statement of Financial Condition ("SOFC") dated June 20, 2022, which misleadingly portrayed a narrow positive equity. In truth, however, GGCI was already insolvent.  The SOFC hid GGCI's insolvency by using the same accounting trick — overvaluing illiquid digital assets by using undiscounted mark-to-market prices. Had GGCI applied appropriate discounts to its digital assets as it demanded from Ver, their SOFC would

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 531 of 637

have revealed their insolvency and Ver would have terminated the contracts as a result of GGCI's

default.

7.        In July 2022, GGCI continued to conceal its insolvency by misrepresenting that

its parent company, Digital Currency Group ("DCG"), had assumed more than $1.1 billion in

losses that Genesis had suffered. However, unbeknownst to Ver and the public at large, DCG

never injected $1.1 billion into Genesis. Instead, DCG had merely provided Genesis with a

promissory note that promised to pay it $1.1 billion over a *ten year* period.  The fair market value

of that promissory note — its *real* value — was far below its face value; it did not return Genesis

or GGCI to solvency, nor did it help their liquidity issues. GGCI thereby deceived Ver into

believing that it was solvent, which induced Ver to provide more than $60 million in collateral

over the months that followed.

8.        During this time period, employees of DCG, Genesis Holdco, Genesis Global,

and GGCI made a number of knowing misrepresentations to the public in an effort to keep its

customers, including Ver, calm, comfortable, and invested in their products. Unbeknownst to

these customers was the falsity of these statements and the true precarious nature of the finances

of the Genesis Entities. Had the Genesis Entities been honest and forthright from the beginning,

investors such as Ver would have closed their positions immediately, negating significant losses

suffered after this date.

9.        Specifically, Mr. Barry Silbert, the CEO and founder of DCG and Mr. Michael

Moro, the CEO of both Genesis Global and GGCI (and the signatory on many of the agreements

at issue in this case) made a number of public statements with the knowledge, direction, and

approval of the Genesis Entities. With knowledge of the falsity of their statements, Messrs.

Silbert and Moro published a number of tweets designed to placate the public, keep them

invested, and conceal the financial perils that the Genesis Entities were truly facing. Unfortunately for Ver and countless other investors, they were successful in doing so, for a time.

10.     In December 2022, just as Ver's options were expiring, the collapse of the FTX exchange and Alameda Research revealed that Genesis and GGCI were insolvent all along. Ver was alerted to GGCI's insolvency by an interview wherein FTX and Alameda co-founder Sam Bankman-Fried stated that Alameda had repaid a $2.5 billion dollar loan to "Genesis" in August 2022. This appeared to be an obvious preference transfer that would be subject to clawback.

11.     Citing the $2.5 billion repayment from Alameda, Ver requested that GGCI provide further assurances that it had been solvent in June 2022. Ver reminded GGCI that he had faithfully provided additional collateral for months, including a substantial $37 million in payments just weeks earlier. GGCI acknowledged that the timing and size of Ver's recent collateral contributions underscored his genuine concern since he could have simply raised these arguments instead of paying GGCI $37 million dollars.

12.     Consequently, GGCI reluctantly shared its 2021 audited financials with Ver, and denied that it had ever had any involvement with FTX or Alameda. However, analysis of GGCI's 2021 financials directly contradicted these claims. GGCI's 2021 financials revealed that it had allowed a single counterparty to open a $2.5 billion position, collateralized exclusively by FTX's own FTT tokens, which were valued at inflated mark-to-market prices. It was evident that these FTT tokens had come from Alameda.

13.     Thereafter, as GGCI's parent filed for bankruptcy and began negotiating with creditors, Ver learned that Genesis and GGCI had never actually received funds from DCG and had indeed been insolvent the entire time.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 533 of 637

14.     Despite the repeated misrepresentations and false assurances of solvency by Barry
Silbert, Michael Moro, DCG, and GGCI, Ver maintains his willingness to pay any outstanding
sums owed, provided GGCI can finally demonstrate they were solvent at the relevant times.  To
date, they have yet to do so.

### The Parties

15.     Roger Ver ("Ver") is the Defendant/Counter-Plaintiff/Third-Party Plaintiff in this
action.  Ver is a natural person and a resident and citizen of St. Kitts and Nevis.

16.     Genesis Global Capital International Limited ("GGCI") is a Counter-Defendant
in this action.  GGCI is a British Virgin Islands company limited by shares with a principal place
of business at 250 Park Avenue South, in New York County, New York.

17.     Third-Party Defendant Barry Silbert was the CEO, founder, and beneficial owner
of DCG at all times during the Relevant Period.  Silbert was one of three members of DCG's
board of directors during the Relevant Period.  Officers at DCG reported directly to Silbert.
Silbert is also the single-largest shareholder of DCG.  During the Relevant Period, Silbert
worked from DCG's offices in Connecticut, as well as from Genesis's offices at 250 Park Avenue
South, in New York County, New York.  Silbert founded the Genesis Entities and served on
Genesis Trading's board of directors from its founding until June 22, 2022.

18.     Third-Party Defendant Michael Moro served as the CEO or its functional
equivalent of the Genesis Entities, as well as their non-party affiliates, from at least February 2,
2021, through August 17, 2022.  For the same period, Moro also served on Genesis Trading's
board of directors, which served as the de facto board of directors for Genesis Holdco through at
least June 30, 2022.  Throughout the Relevant Period, Moro worked from and resided in the
State of New York.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 534 of 637

19.     Third-Party Defendant DCG is a Delaware corporation doing business in the State of New York.  DCG maintains an office at 262 Harbor Drive, Stamford, CT 06902. DCG wholly owns the Genesis Entities.  During the Relevant Period, DCG's officers also worked from the Genesis Entities' office at 250 Park Avenue South, in New York County, New York.

### Related Non-Parties

20.     Genesis Global Holdco, LLC ("Genesis Holdco") is a Delaware LLC with a principal place of business at 250 Park Avenue South, in New York County, New York. Genesis Holdco has filed for Chapter 11 bankruptcy protection in the Southern District of New York.

21.     Genesis Global Capital, LLC ("Genesis Global") is the direct parent of GGCI. Genesis Global is a Delaware LLC with a principal place of business at 250 Park Avenue South, in New York County, New York. Genesis Global has filed for Chapter 11 bankruptcy protection in the Southern District of New York.

22.     Genesis Holdco and Genesis Global had no independent board of directors until after June 30, 2022.  Instead, non-party Genesis Global Trading, Inc.'s ("Genesis Trading") board of directors heard matters pertaining to Genesis Holdco and Genesis Global through at least June 30, 2022.

23.     The Genesis Entities operated as a single entity during the Relevant Period.  They shared officers, capital, offices, IT infrastructure, and back-office functions.

24.     Genesis Asia Pacific Limited Pte ("GAP") is a Singapore private limited company that has filed for Chapter 11 bankruptcy protection in the Southern District of New York.

25.     Collectively, DCG, GGCI, Genesis Holdco, Genesis Global, GAP and their affiliates comprise the Genesis Group, and are referred to herein as "Genesis".

26.     Three Arrows Capital Limited ("3AC") was a Singapore-based investment firm incorporated in the BVI that specialized in trading and investing in cryptocurrencies and other digital assets before its stunning collapse in mid-2022.  They are now being liquidated in the BVI.

27.     Alameda Research LLC ("Alameda") was a quantitative cryptocurrency trading firm that was founded in 2017 by Sam Bankman-Fried. Alameda, along with FTX and more than 130 affiliated entities, filed for Chapter 11 bankruptcy protection in November 2022.

28.     FTX International Limited (aka FTX Trading Limited) ("FTX") is a cryptocurrency derivatives exchange that was launched in 2019 by Sam Bankman-Fried and others. As discussed above, FTX, and more than 130 affiliated entities, filed for Chapter 11 bankruptcy protection in November 2022.

29.     Sam Bankman-Fried ("SBF") is the now disgraced co-founder and CEO of both FTX and Alameda Research, and was at the heart of one of, if not the, largest cryptocurrency thefts in history, stealing billions of dollars from his customers and using those funds to pay down debts owed by companies he owned or controlled, including Alameda and FTX.



## Jurisdiction and Venue

30.     Jurisdiction and venue are based upon the residence of third-party defendants all of whom resided in, or maintained and operated from offices located within the State, County, and City of New York, and upon commission of tortious acts in the State, County, and City of New York, which caused Ver injury.

### DCG Owns and Operates the Genesis Entities

31.     Defendant DCG owns and operates various cryptocurrency businesses.

32.     DCG marketed the Genesis Entities and non-party Genesis Trading collectively as a premier institutional cryptocurrency and financial services company.  DCG marketed Genesis Global, the direct parent of GGCI, as its leading lending desk with billions of dollars in cryptocurrency loan originations.

33.     During the Relevant Period, DCG controlled the Genesis Entities' key hiring decisions, business strategy, and budget.   DCG and the Genesis Entities also shared IT

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 537 of 637

infrastructure and DCG had direct access to the Genesis Entities' books and records.  Members of DCG's management team served as directors of Genesis Trading and Genesis Holdco, and sat on the Genesis Entities' Organizational Risk Committee, which managed risks arising from the Genesis Entities' lending business.

34.     Upon information and belief, GGCI was formed simply to conduct the same operations as Genesis Global, focusing instead on international clients. Though GGCI claims to be an offshore entity, that is simply a farce.

35.     The CEO of both GGCI and Genesis Global are the same individual, Mr. Michael Moro. Mr. Moro was the signatory for GGCI on a number of documents at issue herein. As an example, Mr. Moro, as CEO of GGCI, signed the Master Confirmation Agreement and Amended Master Confirmation Agreement discussed in further detail below.

36.     Further, both the Master Confirmation Agreement and Amended Confirmation Agreement entered into between Mr. Ver and GGCI stated that GGCI operated out of a single office, which was located in New York. Upon information and belief, that New York office is located at 250 Park Ave, the same address as DCG, Genesis Holdco, and Genesis Global.

37.     In addition, many, if not all, of the employees "working for GGCI" are also employed by Genesis Global and work out of the same NY office space, 250 Park Ave.  Upon information and belief, GGCI has no real offshore presence and is operated from NY with little or no separation between itself, Genesis Global, Genesis Holdco, and DCG.

### GGCI Solicits Ver's Business

38.     On June 10, 2020, GGCI approached Ver, a well-known Bitcoin Cash ("BCH") proponent, to trade BCH-based over-the-counter derivatives.  GGCI sought to start a BCH options book with Ver's help.

39.     Though experienced in digital asset investment, Ver was new to options trading.

40.     Ver was initially hesitant to entrust GGCI with significant assets.  Seeking to win Ver's business, GGCI proposed a mechanism to earn interest on his collateral while his positions were open.

41.     On June 15, 2020, GGCI suggested that Ver could lend his BCH to GGCI at interest while simultaneously using the same assets as collateral for derivative contracts with GGCI.

42.     This arrangement, where Ver's interest-bearing loans served as collateral for GGCI trades, induced Ver to trade derivatives with GGCI.

### The Master Confirmation Agreement and Key Terms

43.     On June 15, 2020, Ver and GGCI executed a Master Loan Agreement ("MLA") which promised to pay Ver interest at agreed upon rates to be determined by the parties during the course of the agreement's term. GGCI and Genesis Global CEO Michael Moro signed on behalf of GGCI.

44.     On June 22, 2020, Ver and GGCI executed a Master Confirmation Agreement to govern their derivative contracts, which was then amended on July 13, 2020 (collectively, the "MCA").  This document was also signed by GGCI and Genesis Global CEO Michael Moro.

45.     The MCA referenced International Swaps and Derivatives Association (ISDA) form agreements, such as the 1994 Credit Support Annex and the 2002 ISDA Master Agreement. These agreements aimed to protect parties in over-the-counter derivatives transactions against potential issues, such as insolvency or misrepresentation.

46.     Although the parties agreed in various transaction confirmations that the 2002 ISDA Master Agreement and the 1994 Credit Annex formed part of the MCA, neither party ever

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 539 of 637

executed and/or signed either of these documents.  Consequently, none of the schedules to either of them formed part of its terms.

47.     In the 2002 ISDA Master Agreement, section 5(a)(vii)(2) required parties to remain solvent at all times, stating that it was an Event of Default if either party "becomes insolvent or is unable to pay its debts."

48.     Additionally, section 5(a)(iv) prohibited misrepresentation, declaring an Event of Default if a party made "[a] representation... [which] proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated."

49.     Each time Ver and GGCI transacted, they executed an individual transaction confirmation based on the MCA terms.  These terms specified collateral requirements, eligible collateral types, and valuation methods.  The MCA listed both US dollars and a "Reference Currency" as eligible collateral, with a valuation percentage of "100% at Spot Rate."

50.     The MCA's use of "Reference Currency" valued at "100% Spot Rate" meant that the underlying digital asset being traded in the derivative contract could serve as collateral, and it would be valued based on its mark-to-market value in the spot markets.

51.     Despite earlier Telegram communications stating otherwise, the confirmations did not mention Ver's loans as acceptable collateral.  However, GGCI disregarded ISDA's standards and the MCA's written terms and eased collateral requirements throughout their course of dealing.

52.     In fact, it was a common practice for GGCI to ease collateral requirements, not only for Ver, but also for its other counterparties.

Case 1:24-cv-01533-JPC     Document 1-18     Filed 02/28/24     Page 540 of 637

## The Importance of Solvency in Derivative Transactions

53.     Derivative transactions involve bets on the future price of an underlying asset. If a counterparty becomes insolvent during the contract, the winning party may not be able to collect, undermining the transaction's sole purpose.

54.     To mitigate this counterparty risk, the 2002 Master ISDA required parties to maintain solvency at all times (the "Solvency Requirement").

55.     The Solvency Requirement was crucial for Ver's decision to enter the MCA, since it ensured that he could collect from GGCI if his derivative positions were successful. The Solvency Requirement also benefited GGCI, as it could collect from Ver and potentially foreclose on collateral if needed.

56.     The Solvency Requirement was designed to apply to any bankruptcy or insolvency laws relevant to a party. For GGCI, a BVI company operating in New York, insolvency under BVI or New York law would breach the requirement. GGCI would be insolvent if it couldn't meet obligations when due, or if its liabilities exceeded its assets.

57.     GGCI's collateral policy was essential for compliance with the Solvency Requirement. If a counterparty failed to pay, GGCI would incur losses, potentially leading to insolvency as assets were either removed from its balance sheet or had their value greatly reduced.

58.     To mitigate this risk, GGCI required counterparties to provide collateral before opening positions, and it was GGCI's responsibility to maintain adequate collateral and ensure its assets exceeded liabilities at all times. Again, any failure to do so would undermine the entire purpose of the transactions.

**GGCI Failed to Enforce Collateral Requirements**

59.     The MCA and its Transaction Confirmations contained strict collateral requirements for Ver, but GGCI did not enforce them.  Instead, GGCI allowed Ver and other customers to maintain undercollateralized positions and provide exotic, illiquid digital assets as collateral.

60.     Firstly, GGCI never required Ver to post US dollars or Reference Currency as collateral.  They allowed Ver to use unrelated digital assets, such as Monero (XMR) and Binance Coin (BNB), even though these assets were unrelated to the underlying derivative transaction.

61.     GGCI permitted other customers to provide even more illiquid and exotic assets as collateral, such as FTT tokens.

62.     On information and belief, GGCI also allowed SOL, OXY, MPS and SRM as collateral to support billions in loans.

63.     Secondly, GGCI valued this exotic collateral at mark-to-market prices without applying appropriate discounts for illiquidity or potential losses during liquidation.

64.     Thirdly, GGCI allowed Ver to maintain collateral amounts below the required sum in the MCA.

65.     Fourthly, GGCI didn't request additional collateral from Ver when the US dollar value of his digital assets fell below key thresholds.

66.     Fifthly, GGCI permitted Ver to use digital assets he had loaned at interest as collateral, which meant that GGCI was taking on additional counterparty risk by redeploying Ver's collateral to profit from an interest rate spread.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 542 of 637

67.   GGCI's relaxed collateral requirements were not exclusive to Ver.  It extended the same or similar benefits to other counterparties, resulting in an increased risk of loss and insolvency if the market turned against them.

68.   Nor were GGCI's relaxed collateral requirements embodied in any agreement or official special status afforded to Ver or other particular customers.   Rather, GGCI simply neglected to enforce the written terms of its agreements.

### GGCI's Collateral Exposed to "Daisy Chain" of Debts

69.   GGCI did not directly possess all of the digital asset collateral deposited by counterparties like Ver.   Instead, GGCI sought to generate profits by loaning out this collateral and profiting from the interest rate spread.   This practice, however, exposed GGCI's collateral value to increased counterparty risk, as it needed to recover the loaned collateral before liquidating it to cover a default.

70.   GGCI's collateral practices created a precarious chain of debt obligations. Essentially, a house of cards. Under normal market conditions, they could manage this debt chain by obtaining US dollars.  However, during times of market stress and illiquidity, a single default could render GGCI unable to access the collateral deposited by Ver or others, exposing them to immense loss.

71.   Without US dollar cash reserves, GGCI would be forced to liquidate investments at fire sale prices, or call in loans from borrowers who may default.  During periods of market illiquidity and stress, GGCI's relaxed collateral practices increased the risk of GGCI becoming undercollateralized and insolvent.

72.   On information and belief, GGCI would routinely loan out its digital assets to other Genesis entities, including GAP, who would loan it to counterparties such as 3AC.

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 543 of 637

73.    These related party loans would eventually become impaired by 3AC's insolvency.  In June 2022, 3AC defaulted on more than $2.3 billion to GAP, causing losses to GGCI as related party loans became impaired.

74.    Barry Silbert, who controlled GGCI and the Genesis Entities through his position as Chairman of DCG, was aware of this risk.  In a June 2021 tweet, he acknowledged the "daisy chain" of debts and emphasized the importance of understanding counterparty risk and identifying weak links in the chain.  Regrettably, Silbert failed to recognize that these weak links existed within his own organization, ultimately jeopardizing the safety of GGCI's collateral.



**GGCI Overstates its Financial Health: Deviating from ASC 820**

75.    GGCI's mark-to-market valuation of digital assets, including those not physically possessed, resulted in an overstatement of its financial health.

76.    Note 2 to GGCI's December 31, 2021 audited financial statement detailed the significant accounting policies and the methods used to derive valuations for its assets and liabilities.  The statement claimed compliance with accounting principles generally accepted in the United States of America (U.S. GAAP).

77.     U.S. GAAP utilizes ASC 820 for determining "fair value," which is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.

78.     ASC 820 establishes a hierarchy of inputs for determining fair value, prioritizing observable inputs and requiring additional disclosures when unobservable inputs are relied on.

79.     GGCI concluded all digital assets and liabilities were recorded and valued based on Level 2 inputs – which are defined as "significant observable inputs".

80.     ASC 820's hierarchy includes three levels:

    a.  Level 1 (unadjusted spot price in an active market, such as the quoted price of Apple shares on the New York Stock Exchange);

    b.  Level 2 (spot prices from less active markets and may or may not be discounted); and

    c.  Level 3 (providing the most discretion, since the quoted price is unreliable and the evaluator is thus forced to rely on other inputs that are unobservable and significant to the overall fair value measurement).

81.     GGCI determined the fair market value of assets in "digital currency investments" and liabilities under "digital currency collateral payable" using Level 2.

82.     Digital assets are a famously volatile asset class, characterized by extreme price fluctuations and inherent unpredictability.  Market movements are driven by factors such as technological advancements, regulatory changes, market sentiment, global economic conditions, illiquidity, and, at times, price manipulation.

83.     At all times relevant, GGCI valued all of its digital assets at mark-to-market prices and never applied a discount to them.

84.     Upon information and belief, GGCI has employed the same inadequate accounting methods at all times during the life of the agreements at issue. As a result, GGCI has

been insolvent for as long as those methods have been employed. To the extent GGCI still employs the same valuation method, it remains insolvent to this day.

85.     Despite liquidity concerns and worsening market conditions beginning in May 2022, GGCI never applied a discount to their Level 2 assets.  All such assets continued to be valued at mark-to-market prices.

86.     GGCI's refusal to apply appropriate discounts to its Level 2 assets allowed GGCI to overstate its financial health and created a misleading picture of a solvent entity where one did not exist.

### Over Exposure to Alameda & FTX

87.     During the course of 2021, Genesis Entities engaged in a broad relaxation of their lending standards, and began to accept increasingly illiquid and exotic digital assets as collateral for loan and obligations and derivative contracts, creating a precarious financial situation.

88.     On information and belief, GGCI went insolvent at some point during 2021 when it made a loan of $2.5 billion and accepted FTT tokens as collateral.  GGCI valued these FTT tokens mark-to-market, which overstated the real value of FTT and resulted in a severe under collateralization, as Alameda had manipulated FTT's price higher to borrow against it.

89.     Consequently, GGCI was grossly overexposed to a single counterparty.  GGCI's 2021 audited financials reported that on December 31, 2021 the company held $2.370 billion in "digital collateral payable", 99% of which were FTT tokens owed to a single counterparty. These FTT tokens represented *nearly 70%* of GGCI's then total assets.

90.     However, the actual fair market value of these FTT tokens was far lower than the mark-to-market prices used by GGCI, which resulted in significantly fewer assets than reported.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 546 of 637

91.     Were GGCI to foreclose on the FTT tokens and sell them for US dollars, *they would have been unable to recover anywhere near the full amount owed.*

92.     GGCI's overexposure to FTT resulted from a quid pro quo relationship between Alameda and Genesis executives.

93.     FTX and Alameda granted Genesis executives early access to purchase FTT tokens at discounted rates before public issuance.

94.     This conflict of interest compromised GGCI's risk management policies and practices, as executives were incentivized to authorize GGCI to take excessive risks for their personal benefit.

95.     If not for these conflicts of interest, Genesis executives might have conducted adequate due diligence on their $2.5 billion loan and learned of Alameda's scheme to manipulate FTT prices and increase its borrowing ability.

96.     In a complaint against Alameda's former CEO, Caroline Ellison, the SEC details this manipulation.  Ellison engaged in automated FTT token purchases to inflate the value of Alameda's collateral, increasing risks for lenders accepting FTT as collateral.

97.     The market crash of May 2022 only worsened GGCI's finances, as Alameda suffered substantial losses, which exacerbated its inability to repay its loan to GGCI.

98.     After May 2022's market crash, Alameda focused its efforts on propping up the price of FTT token, continuing to engage in market operations and offering lines of credit to insolvent entities with large FTT positions to prevent FTT from being liquidated, which would have publicly revealed Alameda's insolvency.

99.     In August 2022, after realizing that Genesis and GGCI would liquidate FTT tokens and reveal their insolvency, Alameda misappropriated customer funds to repay Genesis

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 547 of 637

and GGCI, which was a preferential transfer at the expense of FTX creditors subject to clawback.

100.   Afterwards, Alameda replaced the missing $2.5 billion in FTX customer deposits with the FTT tokens it had just received from Genesis and GGCI, and by valuing FTT at its inflated mark-to-market price created the illusion that FTX remained solvent.

101.   In November 2022, the digital asset exchange Binance called Alameda's bluff and threatened to sell their FTT tokens on the open market, which revealed its lack of liquidity. FTX and Alameda were finally revealed to be insolvent and filed for bankruptcy less than three months after having repaid $2.5 billion to Genesis and GGCI.

### Over Exposure to 3AC & the Crash of May 2022

102.   In May 2022, digital asset markets experienced a steep decline due to the collapse of digital assets LUNA and TerraUSD, causing significant losses, liquidations, and a snowball effect of defaults and insolvencies.

103.   3AC was central to the crash, resulting in substantial losses for GGCI and its counterparties. 3AC owed over $3 billion to creditors, including $2.3 billion to GAP, its largest creditor.

104.   Genesis and GAP were overexposed to 3AC, driven by conflicts of interest related to generating demand for the various digital asset trusts operated by Grayscale (the "Grayscale Trusts"). DCG, Genesis' parent company, owned the investment manager for the Grayscale Trusts and profited from the fees it generated.

105.   Since 2020, GAP had been loaning funds to 3AC to fund its Grayscale Trust purchases. However, GBTC's[1] value declined, resulting in substantial unrealized losses for 3AC.

---

[1] GBTC is the Grayscale Bitcoin Trust, just one of a number of digital asset trusts operated by Grayscale and DCG.

While shares in GBTC traded at a premium to its net asset value when 3AC began conducting the trade in 2020, by June 2022 they were trading at a 30% discount.

106.    Genesis' concerns over its exposure to 3AC had reached a boiling point by January 2022.  That month, Genesis executives had 3AC pledge its GBTC shares to GAP as security.  But as the net asset value of GBTC continued to fall, so did the value of GAP's pledged assets.

107.    Upon information and belief, Genesis' 3AC exposure did not end with the Bitcoin trust, as 3AC was an investor in the other Grayscale Trusts.

108.    In May 2022, after LUNA's collapse, Genesis executives spoke with 3AC and, on information and belief, determined that 3AC was insolvent.

109.    However, GAP's significant exposure to 3AC posed a risk to the solvency of the entire Genesis enterprise, including GGCI, due to various related party loans and intercompany debts.  Consequently, Genesis opted not to issue margin calls to 3AC, despite the terms of their agreement permitting such action, in order to prevent further destabilizing its own financial situation.

110.    On information and belief, if not insolvent as a result of the $2.5 billion loan backed by FTT discussed herein, GGCI was insolvent as a result of 3AC's inability to repay GAP before the end of May 2022.

111.    On June 10, GGCI's need to obtain more capital became urgent.  That day, 3AC's accounts on the Deribit derivatives platform were liquidated.  Genesis executives, alarmed by the Deribit liquidations and cognizant of 3AC's insolvency, understood that 3AC's demise was near and formulated a strategy to avoid immediate recognition of a $2.3 billion loss.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 549 of 637

112.    The plan centered on GAP seizing Grayscale BTC trust shares and other digital assets pledged by 3AC as security for their undercollateralized loans. However, since issuing an unpayable margin call to 3AC would expose their insolvency, Genesis needed to act quickly before the market caught on. By securing 3AC assets ahead of other creditors, GAP aimed to offset the substantial loss and safeguard both its own balance sheet and those of its affiliates.

113.    On June 12, Genesis executives set the plan in motion. GAP issued a margin call to 3AC, demanding an additional $334 million in collateral payments, fully aware that 3AC would be unable to meet the requirement.

114.    On June 13, GAP served a notice of default on 3AC, enabling GAP to liquidate the limited collateral they held and pursue emergency relief to seize further 3AC assets ahead of other creditors.

115.    On June 15, GAP initiated arbitration against 3AC, seeking more than $2.3 billion in loan recovery and emergency relief. This included seeking a preliminary injunction directing 3AC to freeze more than $2.3 billion, and to deposit the pledged assets with GAP, which were allegedly valued at $462 million at the time.

116.    In GAP's arbitration filing, it noted that "[d]ue to recent extreme volatility in the cryptocurrency markets, the value of the collateral already posted by Three Arrows decreased significantly in comparison to the loaned assets under the MLAs."

117.    On June 16, news of the notice of default GAP had issued to 3AC was publicized in the media, and numerous other 3AC lenders began making margin calls and issuing default notices.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 550 of 637

118.    On June 21, GAP's request for a preliminary injunction to freeze or seize certain 3AC pledged assets was denied.  A further hearing was scheduled for July 5, making it evident GAP wouldn't secure these assets by month's end.

119.    Due to the monthly reporting schedule followed by all Genesis entities, it became apparent that GAP and its affiliates, including GGCI, would have to recognize losses related to 3AC in their month-end financial reports for June 2022, which also coincided with their quarterly reporting obligations.

120.    Consequently, GGCI was insolvent in June 2022 due to various factors, including inaccurate loss recording, failure to apply appropriate discounts to Level 2 digital assets in the midst of a liquidity event, untimely recognition of substantial losses linked to 3AC and related parties, and untimely recognition of losses tied to the FTT-collateralized loan.

### Genesis' GGCI's Misrepresentations of Solvency

121.    In or about early June 2022, GGCI devised a plan to strengthen its balance sheet. It aimed to persuade its biggest clients, including Ver, to roll currently profitable options expiring that June to later dates, thereby allowing GGCI to avoid making payments.  Meanwhile, GGCI would allow Ver's currently unprofitable June options to expire, thereby bringing funds into GGCI from Ver and others.

122.    On information and belief, Genesis knew GGCI was insolvent by such time.

123.    On June 7, GGCI asked Ver to roll his deep in-the-money Ethereum options to a later date. Those options expired on June 24.  Ver declined.

124.    On June 9, GGCI sent Ver an article about Ethereum's progress to pique his interest about rolling the options. Ver did not respond.

125.    On June 10, Deribit's liquidation of 3AC signaled 3AC's imminent collapse.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 551 of 637

126.    On June 11, GGCI again requested Ver to roll only his in-the-money Ethereum options to a later date, and offered him attractive terms.  Unaware that Genesis planned to margin call and liquidate 3AC immediately afterwards, Ver agreed to let GGCI roll his in-the-money options.

127.    On June 12 and 13, digital asset prices fell as 3AC was margin called, defaulted, and liquidations commenced, as had been planned by Genesis

128.    Meanwhile, on June 13, and again on the 14th, GGCI requested further collateral from Ver. On June 15, to keep Genesis executives happy, Ver reduced his exposure to GGCI by $22.5 million by buying certain BTC call options.

129.    On June 14, 2022, Silbert, on behalf of DCG's board, instructed Moro and Genesis "to continue aggressively shrinking the loan book and, until such time as we have the right controls, risk monitoring, etc. in place—and we're through the winter—… to limit the extension of any new loans to counterparties."

130.    Also on June 14, 2022, Silbert reported to DCG's board of directors regarding Genesis Global's strategy after Three Arrows' default.  In doing so, Silbert presented the option to "[j]ettison[] the Genesis Capital business" by not supplying Genesis Global with additional capital to strengthen its balance sheet.

131.    Nevertheless, on June 15, 2022, two days after Three Arrows' default, the Genesis Entities tweeted via their shared Twitter account:



132.    Silbert and DCG both re-tweeted this statement on June 15, 2022.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 552 of 637

133.    Indeed, that same day, Silbert wrote to Moro and other Genesis Global personnel in a Microsoft Teams chat that "the word on the street is that genesis is the 'blue chip' in this mess….  we need to continue to perpetuate that of course."  In other words, Silbert directed Genesis Global personnel to perpetuate the idea that, within the cryptocurrency industry, Genesis Global was akin to highly stable "blue chip" companies.

134.    Then, on June 17, 2022, the Genesis Entities' CEO Moro tweeted the following:



135.    DCG's COO reviewed and edited these tweets before Moro posted them.  In strategizing the release of the tweets, DCG's COO directed Moro to send these tweets "from Moro['s] [personal Twitter account]" despite directions from Genesis Global's compliance department that these tweets should come from Genesis Global's corporate account.  The Genesis Entities reposted Moro's tweets that same day.

136.    The tweets and statements set forth above were false and misleading in a number of ways:

a.  First, client funds had been impacted—the Three Arrows losses severely impaired Genesis Global's ability to repay its counterparties, including Earn investors.

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 553 of 637

b. Second, due to Three Arrows' default on June 13, 2022, the Genesis Entities' balance sheets were not strong, solvent, or capable of absorbing the losses; the Genesis Entities suffered a loss that exceeded their equity. Indeed, in a June 21, 2022 email, Silbert informed colleagues at DCG that "the hole in Genesis equity due to the Three Arrows exposure is something they we [sic] will need to fill by 6/30," and asked his colleagues to "keep [that] between us."

c. Three days later, Silbert further explained to DCG personnel "[w]e just can't allow people inside or outside [to] question Genesis' solvency" due to Silbert's concern that this could spark a bank run.

d. Third, the tweets discussed the sale or hedging of all "liquid" collateral while concealing that hundreds of millions of dollars' worth of the loans were secured by illiquid collateral that could not be sold and was not hedged.

e. Fourth, Genesis Global had not "shed the risk and moved on"—as of June 17, 2022, it still held a more than $1 billion receivable relating to Three Arrows as an uncollectible asset on its balance sheet.

137. From June 16 to June 24, GGCI continued discussions with Ver about the additional types of collateral he could offer, and learned it was Ver's strong preference to post a combination of digital assets and certain shares in private companies. GGCI indicated it was prepared to accept these assets as collateral, as it had done previously.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 554 of 637

138.    Throughout the life of GGCI and Ver's two year business relationship, GGCI had always accepted different forms of collateral from Ver, and allowed him to maintain undercollateralized positions.  In fact, it had been GGCI's offer to pay Ver interest on his digital asset collateral, in direct violation of the MCA's collateral requirements, that had induced Ver to trade with GGCI and to continue trading up until that time.

139.    However, upon the expiration of Ver's out-of-the-money options on June 24, Genesis executives abruptly changed their policy.  They demanded that Ver immediately provide 100% of the required collateral in either US dollars or Reference Currency as stated in the MCA, or face a notice of default.

140.    Based on the course of the parties' dealings, GGCI knew Ver was not expecting to be required to pay the full sum of collateral in US dollars or Reference Currency on that day, which GGCI had never required him to do during their two year relationship.

141.    GGCI's plan was to extract an excessive sum of collateral from Ver.  GGCI offered to accept Ver's digital assets and shares as collateral, but only if he _over_-collateralized his position by 300% to 600%.  Were Ver to pay in digital assets, GGCI wanted him to supply 300% as much collateral as the value of his entire position.  If in private shares, 600%.

142.    As a result of the abrupt change in policy and attempt to extract an excessive sum of collateral, Ver began to suspect GGCI's insolvency.  He nonetheless agreed to discuss details with GGCI on a call the following day, June 25.

143.    On the June 25th call, Defendants threatened to issue a notice of default if Ver did not immediately pay the full amount in US dollars or Reference Currency or meet its excessive collateral demands.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 555 of 637

144.     Considering the state of the markets, Ver responded to Defendants on the call by requesting proof of GGCI's solvency.

145.     That same day, June 25, Silbert sent a message to DCG personnel and explained that "[w]e just can't allow people inside or outside [to] question Genesis' solvency."  On information and belief, this was in direct response to Ver having just questioned GGCI's solvency.

146.      Thereafter, GGCI backed off its demands for excessive sums of collateral, began engaging in more constructive discussions to immediately accept certain digital assets, and continued discussions with Ver as to other assets to pledge as collateral.

147.     On information and belief, even using inflated mark-to-market prices for digital assets, GGCI was insolvent on June 25 and was therefore unable to provide Ver with proof of its solvency.

148.     GAP had just lost its bid to freeze 3AC assets in the emergency arbitration hearing on June 21.  At the very latest, GAP should have written down their impaired 3AC loans by such date, which would have resulted in GGCI also writing down any related party loans with GAP.

149.     On June 27, 2022, Genesis Global's then CEO, Moro, emailed DCG and Genesis Global executives, explaining the need to show a "well-capitalized" balance sheet to counterparties like Gemini on June 30, 2022:

> Once the equity problem is solved, the liquidity problem is much easier to solve.  I think we'll find people to lend us additional [cryptocurrency] with a well-capitalized 6/30 balance sheet.
>
> And yes, at some point, our losses in [Three Arrows] and potentially Babel will become public.  But if we're able to show our balance sheet after all of that happened and it still looks strong, I think that 1) people will care

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 556 of 637

less about the losses and 2) we'll be better able to operate from a place of strength going forward.

But as I told Barry this evening, we have a lot of work to do before we can get back to full-steam-ahead on lending. Better to think of it in wind-down mode for the time being, and just manage liquidity as loans roll off. Then we can look to rebuild.

150.     The next day, in a June 28, 2022 email, Moro wrote to Silbert that he had discussed with other Genesis Global representatives how to "best fill the equity hole", euphemistically referring to the Genesis Entities' negative equity value caused by the more than $1 billion in losses. Moro wrote that "[w]hile liquidity [was] still [Genesis Global's] number one focus, [they] only ha[d] a couple of days until quarter-end." Thus, he proposed an "overall plan" of injecting certain assets to "plug the equity hole" and then "work on consistent messaging to speak to the loss to counterparties when we put out [a] new balance sheet" in an effort to "[r]estore confidence in the market and keep looking to borrow with term." Moro continued:

> We wouldn't necessarily need to touch the [proposed] assets [that DCG would inject] … for liquidity purposes, it could just be for balance sheet support. And then with a strengthened balance sheet, we would be able to source additional unsecured funding to be able to continue to manage our liquidity and withdrawal obligations.

151.     Initially, GGCI declined to provide up-to-date solvency proof to Ver, stating it did not produce point-in-time financial statements.

152.     However, on June 28, after Ver had informed GGCI that he was not comfortable sending any further collateral without proof of GGCI's solvency and Moro had discussed the need to "restore confidence in the market," GGCI provided an unaudited point in time financial statement. This statement of financial condition (the "June 20 SOFC") revealed GGCI's various assets and liabilities as of June 20.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 557 of 637

**Genesis Global Capital International Limited**
**Statement of Financial Condition (Unaudited)**
**June 20, 2022**
*(in thousands)*

| Assets | | |
|---|---|---|
| Cash | $ | 12,929 |
| Investments in digital currencies | | 1,594,209 |
| Derivative assets | | 442,733 |
| Collateral receivable | | 454,449 |
| Receivable from customers | | 159,182 |
| Loans receivable | | 399,560 |
| **Total assets** | $ | 3,063,062 |
| | | |
| **Liabilities and stockholder's equity** | | |
| **Liabilities** | | |
| Collateral payable | $ | 2,094,617 |
| Payable to customers | | 94,569 |
| Loans payable | | 606,477 |
| Derivative liabilities | | 167,132 |
| **Total liabilities** | $ | 2,962,795 |
| | | |
| **Stockholder's equity:** | | |
| Total stockholder's equity | | 100,267 |
| **Total liabilities and stockholder's equity** | $ | 3,063,062 |

153.    The June 20 SOFC claimed total assets of $3.063 billion and liabilities of $2.962 billion, which gave GGCI positive equity of just over $100 million. Given that $1.594 billion of GGCI's assets were digital assets ("Investments in digital currencies"), even a small fluctuation in the market would render it insolvent.

154.    Representatives for Ver also sent a number of questions to GGCI and Genesis Global employees regarding the firm's finances.

155.    Ver received a response to these inquiries on June 30th. At the direction of Moro, Silbert and the Genesis Entities, an employee of both GGCI and Genesis Global, and, upon information and belief, other Genesis Entities, made a number of representationss

   a.    First, the employee alleged that they had no concern with GGCI counterparties. However, at the time they had over $1.6 billion in digital assets that they would be stuck with should the market experience a down turn and counterparties be unable to meet their obligations.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 558 of 637

b.  Second, the employee stated that GGCI has "no directional risk to any asset." This would imply that GGCI had hedged its $1.6 billion exposure to digital assets. As discussed above, this was not an accurate representation of GGCI and the Genesis Entities' "directional risk" as their digital assets were not hedged.

c.  Third, the employee represented that it was business as usual despite the chaos and severe financial pressures being felt by all of the Genesis Entities as a result of the default of 3AC. Further, the employee failed to disclose that GGCI's working capital had been reduced from $100 million to $14 million in the 10 days between the date that the SOFC was provided to Ver and sending this email. As Moro had just explained that Genesis was in "wind-down mode," this statement was either intentionally misleading or willfully ignorant.

d.  Finally, when asked if there would be a significant change between the information provided in the June 20th SOFC and the end of month statement, the employee responded that the "overall picture should remain the same." However, as stated above, what the employee failed to disclose the $86 million, or 86%, reduction in working capital in the 10 days since the June 20 SOFC had been prepared.

156.   Faced with an apparently solvent GGCI, who had by now backed off its demands for excessive collateral, Ver saw no choice but to keep his remaining positions open at GGCI and

cooperate with it to ensure collateral levels were mutually acceptable until his remaining options expired, unless and until he was presented with evidence of its insolvency.

157.    However, what Ver did not know at the time was that the June 20 SOFC was an accounting farce.  The $1.596 billion in digital assets was in fact worth far less, and consisted of a large sum of illiquid FTT tokens, which if sold would have left a large shortfall remaining to GGCI from an insolvent counterparty.

158.    This was recognized by Alex Van Vorhees, legal counsel to both Genesis Trading and  GGCI.  While  discussing  collateral  and  the  Genesis  Entities'  demand  that  he overcollateralize, Van Vorhees stated "over collateralization is a function of the assets not being liquid." However, as would later become clear, GGCI and the Genesis Entities did not write down the value of any of its non-liquid cryptocurrency on its balance sheet.

159.    The SOFC's chosen date of June 20 was no accident and was a central part of that farce.  The SOFC did not reflect the full write down of 3AC's impaired loans.  On information and belief, the 3AC loans were deemed impaired by Genesis on June 21 when GAP's request for emergency relief was denied and GAP had no further collateral to support such debts.

160.    When GGCI's plan to seize exorbitant amounts of collateral from Ver failed, GGCI entered into discussions with its parent companies for an injection of capital to return it to solvency in time for its quarterly reporting obligations at the end of June.

**DCG's $1.1 Billion Promissory Note and Further Misrepresentations of Solvency**

161.    DCG and Genesis Global engaged in a communications campaign designed to conceal Genesis Global's financial condition and mislead counterparties into believing Genesis Global was operating "business as usual."  Those counterparties included Ver, who was invested with GGCI.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 560 of 637

162.    From June 13, 2022, through July 2022, DCG employees and executives (including Silbert and DCG's Chief Operating Officer ("COO")) met with Genesis Global and GGCI's leadership daily, often multiple times a day.

163.    During these meetings, Silbert, Moro, DCG, and Genesis Global employees discussed how to communicate with counterparties about Three Arrows, and how to bolster the Genesis Entities' financial condition in the wake of these losses. During the same 30-day period, DCG's COO and DCG's Head of Communications helped draft talking points documents for use by DCG and Genesis Global personnel in conversations with counterparties. It is important to note that GGCI and Genesis Global have the same employees, working out of the same office as the other Genesis Entities.

164.    On June 30, 2022 DCG and Genesis Global entered into a sham transaction designed to cover the insolvency of the Genesis Entities, including GGCI. DCG executed an unsecured promissory note payable to Genesis Global in the amount of $1.1 billion (the "DCG Promissory Note").

165.    Silbert signed the Promissory Note as CEO of DCG.

166.    Moro signed the Promissory Note as the CEO of Genesis Global and Genesis Holdco, and as director of Genesis Asia Pacific.

167.    DCG dictated the terms of the Promissory Note, including the ten-year duration and 1% interest rate. DCG provided no collateral to secure its obligations under the Promissory Note. To the contrary, DCG's repayment of the Promissory Note was subordinate to DCG's repayment of an over $350 million credit facility to unrelated third parties. DCG's pre-existing $350 million obligation reduced the likelihood that DCG could repay the Promissory Note.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 561 of 637

168.   Genesis Global then added the DCG Promissory Note to its balance sheet as a current asset worth $1.1 billion, purportedly to "offset" the $1.2 billion loss it incurred from 3AC's collapse.  With a fresh $1.1 billion added to its balance sheet as a current asset, Genesis Global was then able to use that $1.1 billion to make an injection of capital into its subsidiary, GGCI.

169.   On information and belief, Genesis Global used the DCG Promissory Note to inject $151 million into its subsidiary, GGCI.  GGCI then recorded $151 million as a current asset on its balance sheet worth $151 million.  This was reflected in an unaudited June 30 SOFC, which Ver would later receive from GGCI.

**GGC International Limited**
**Statement of Financial Condition**
**June 30, 2022**
*(in thousands)*

| Assets | | |
|---|---|---|
| Cash | $ | 3,232 |
| Investments in digital currencies and trusts | | 1,439,363 |
| Digital currency loans receivable, net of allowance for loan losses | | 1,250 |
| USD loans receivable, net of allowance for loan losses | | 1,000 |
| Digital currency collateral receivable | | 340,389 |
| Derivative assets | | 369,045 |
| Interest receivable, net of allowance | | 2,758 |
| Receivables from related parties | | 47,334 |
| Other assets | | 151,977 |
| **Total assets** | $ | **2,357,248** |
| | | |
| **Liabilities and member's equity** | | |
| **Liabilities** | | |
| Digital currency loans payable | $ | 370,737 |
| Digital currency collateral payable | | 891,080 |
| USD loans payable | | 18,073 |
| Option collateral payable | | 344,169 |
| Derivative liabilities | | 191,864 |
| Interest payable | | 5,645 |
| Accounts payable and accrued expenses | | 295,894 |
| Payables to related parties | | 225,364 |
| **Total liabilities** | | **2,342,826** |
| | | |
| **Member's equity** | | 14,422 |
| Total member's equity | | 14,422 |
| **Total liabilities and member's equity** | $ | **2,357,248** |

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 562 of 637

170.    The June 30 SOFC contained a brand new line item, "Other assets", which did not appear on the June 20 SOFC.  "Other assets" reported $151 million in assets.   On information and belief, "Other assets" represented funds that had been received by GGCI on June 30 as the result of the DCG Promissory Note.

171.    In reality, however, the fair market value of the DCG Promissory Note was just a small fraction of the $1.1 billion face amount.  The note would not mature for 10 years — not until June 30, 2032 — and bears interest at a rate of just 1%, far below the market interest rate that DCG would be required to pay for unsecured borrowing.  Accordingly, Genesis Global remained insolvent even upon receipt of the DCG Promissory Note.

172.    Likewise, the fair market value of the $151 million GGCI had received was also worth just a fraction of its reported face value, since on information and belief its value was derived from the DCG Promissory Note and did not represent an actual injection of cash. Accordingly, GGCI remained insolvent afterwards, as the actual fair market value of what it had received was insufficient to cover the $136 million in negative equity reported on GGCI's June 30, 2022 SOFC.

173.    On information and belief, both Genesis and DCG had hoped that the DCG Promissory Note would simply serve as a short term bridge loan until the arbitration panel GAP had convened seeking emergency relief from 3AC could make its ruling on July 5, 2022, where GAP hoped to seize certain of 3AC's assets.  However, the arbitration panel denied GAP the relief it sought.

174.    The following day, July 6, Genesis set about to reassure the market that it remained solvent and was continuing business as usual.  That day, Genesis CEO Michael Moro released a public statement on Twitter and explained that "[w]e previously stated in June that we

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 563 of 637

mitigated our losses with respect to a large counterparty who failed to meet a margin call.  Now that the BVI bankruptcy process has commenced, we can confirm that the counterparty was Three Arrows Capital."  Moro asserted that "[t]he loans to this counterparty had a weighted average margin requirement of over 80%.  Once they were unable to meet the margin call requirements, we immediately sold collateral and hedged our downside."  He then claimed that, "[s]ince then, we worked with [DCG] to find the optimal strategy to further isolate the risk.  **DCG has assumed certain liabilities of Genesis related to this counterparty to ensure we have the capital to operate and scale our business for the long term."**  In sum, Moro asserted that "[w]e deploy a number of risk management strategies to ring-fence our portfolio and utilize all capabilities to mitigate losses quickly and effectively."

175.    DCG's COO and Head of Communications edited and helped draft these tweets.  Silbert reviewed these tweets before Moro posted them.

176.    GGCI's insolvency was never cured by an injection of capital from DCG.  DCG never "assumed" or "absorbed" Genesis Global's losses.  Instead, DCG and Genesis engaged in yet another accounting farce.  The DCG Promissory Note was an accounting trick designed to make Genesis Global — and by extension, its subsidiary, GGCI — appear as if they had positive equity *without* ever requiring DCG to commit the financial support needed to actually make Genesis Global and GGCI solvent.

177.    The tweets were false, misleading, and omitted material facts.  DCG did not simply "assume" the $1.1 billion, open-term liability related to Three Arrows, which could be called at any time; it replaced that liability with an illiquid ten-year Promissory Note.

178.    The Promissory Note failed to ensure that Genesis Global had sufficient capital to operate its business.  The Promissory Note required DCG to provide cash payments in no sooner

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 564 of 637

than 10 years, whereas the Three Arrows-related liabilities DCG purportedly "assumed" were callable on demand; this created a mismatch between the Promissory Note and Genesis Global's billions of dollars' worth of on-demand obligations. Genesis Global's and DCG's internal documents reveal that the Promissory Note's ten-year duration and 1% interest rate failed to address the "structural hole" caused by the Three Arrows losses.

179.     In an internal document, Genesis Global's Chief Risk Officer acknowledged that the Promissory Note "wreaks havoc on our balance sheet impacting everything we do."

180.     On July 6, 2022, Genesis Global's Head of Communications and Public Relations sent a document titled "Talking Points to [Three Arrows] Questions" to Moro, as well as DCG's COO, DCG's Head of Communications, and various other senior employees at Genesis Global and DCG with instructions to "review and approve."  DCG's Head of Communications helped draft these talking points.  DCG's COO also reviewed these talking points on July 6, 2022. These talking points were to be used by Genesis Global personnel in conversations with counterparties, including Mr. Ver.

181.     Genesis Global's CFO and other personnel directed employees not to disclose the Promissory Note to counterpartie.  Indeed, many Genesis Global employees were not informed of the Promissory Note until months after its signature.

182.     When counterparties requested additional information concerning Genesis Global's financial statements, Genesis Global continued to conceal and suppress information that would have revealed the Promissory Note or losses on counterparty defaults.  In July 2022, Genesis Global's CFO directed other personnel to tell counterparties that the notes to Genesis Global's balance sheet—which would have explained the Promissory Note and its impact on Genesis Global's balance sheet—were not prepared more frequently than the end of the year.

This was false. Genesis Global prepared notes for its quarterly balance sheets in prior quarters, including its unaudited balance sheets for the second and third quarters of 2021 and the first quarter of 2022.

183. In a July 2022 Microsoft Teams chat, Genesis Global's CFO confessed to her coworkers that the "real reason" why Genesis Global would not provide these footnotes to counterparties was because "[i]n the notes, we are required to disclose a lot of things [w]hich will highlight what happened" including the "assignment of liab[ilities]"—i.e., the Promissory Note.

184. In another Microsoft Teams chat, in September 2022, Genesis Global's CFO explained to coworkers that without the footnotes, counterparties would not know about the Promissory Note from the balance sheet alone.

185. After June 30, 2022, Genesis Global's CFO, in consultation with DCG, directed Genesis Global personnel not to share cash flow and income statements and to withhold Genesis Asia Pacific's financial statements from counterparties. These financial statements would have revealed hundreds of millions of dollars in losses during the second quarter of 2022 and would have revealed that DCG did not "absorb the loss."

186. Genesis Global personnel soon grew concerned that Genesis Global had provided false information to counterparties. On September 1, 2022, Genesis Global's Director of Lending reported to its interim CEO: "I'm hearing concerns from front office folks…. They're concerned about the accuracy of information we have shared with clients re liquidity and variability in our equity…. There still is no liquidity infusion from DCG to fill the gap and instead we have a 'note'." Nevertheless, neither DCG nor Genesis Global corrected the misstatements that Genesis Global employees made to counterparties, including Ver

187.    Ver was misled into believing that GGCI was solvent by the June 20 SOFC and
Genesis CEO Moro's public statements.  Ver was thus unable to timely exercise his contractual
right to terminate the ISDA due to GGCI's violation of the Solvency Requirement.

188.    From June 21, 2022 up until he discovered GGCI's insolvency in December 2022,
Ver made payments to GGCI in excess of $60 million and GGCI liquidated a further
$50,000,000 in collateral.

## Ver Discovers GGCI's Insolvency

189.    On November 11, 2022, FTX and Alameda filed for bankruptcy.  Their
bankruptcy came after a rapid decline when Binance, another exchange, announced they would
sell their FTT tokens on the open market.  Since FTT tokens were highly illiquid and their prices
artificially inflated by Alameda, their value plunged by over 90% following Binance's
announcement.

190.    The FTX and Alameda bankruptcies sent shockwaves through the digital asset
markets.  Surprisingly, Sam Bankman-Fried ("SBF"), the controlling principal behind FTX and
Alameda, started giving public interviews, asserting that FTX wasn't truly insolvent since its
balance sheet held digital assets — primarily FTT tokens — with a mark-to-market value
exceeding customer liabilities.  SBF was eventually indicted on numerous felony charges.

191.    Later that November, rumors circulated that Genesis and its subsidiaries were
insolvent when its lending arm stopped withdrawals, trapping investor funds.  It was later
revealed that GGCI was FTX's largest creditor.

192.    Genesis initiated a restructuring plan to save its business, which focused on
transferring bad assets from GGCI to other Genesis entities destined for bankruptcy.  The plan
aimed to raise capital to pay creditors by selling shares in a financially stable GGCI.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 567 of 637

193.    Meanwhile, Ver continued to pay collateral to GGCI.  Since June 21, 2022, Ver made total payments to GGCI in excess of $60 million and GGCI liquidated collateral valued in excess of $50,000,000.

194.    On or about December 23, just weeks after Ver made $37 million in collateral payments to GGCI, and just one week before his options would expire, Ver became aware of information that made him question GGCI's earlier claim of solvency that had been supported by the June 20 SOFC.

195.    The news was a New York Times interview of SBF, who stated that Alameda had repaid a $2.5 billion loan to "Genesis" that August, about three months before filing for bankruptcy.  SBF added that the loan was repaid because Genesis had called in specific loans made to Alameda.

196.    Ver became concerned that GGCI might have been the entity that lent money to Alameda, potentially affecting GGCI's present solvency and their solvency in June 2022.

197.    As Alameda repaid the loan to Genesis in August, about three months before FTX's bankruptcy, it seemed like this repayment would potentially be subject to an automatic clawback as a preferential transfer.

198.    Ver investigated and learned that there was speculation that SBF had directed Alameda to misappropriate FTX customer funds to repay Genesis.  Alameda then used the FTT tokens it had received back from Genesis to pay FTX, who then used the FTT tokens to replace the missing customer deposits as an asset on its balance sheet.

199.    This caused Ver to grow more concerned, since if true, it would mean that GGCI had been doing what FTX had been doing: propping up its insolvent balance sheet with inflated FTT tokens.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 568 of 637

200.    Since Ver was considering rolling his expiring December 30 options with GGCI to a later date, he wanted to be sure GGCI remained solvent before doing so, and wanted to further confirm they had in fact been solvent that past June when he initially inquired.

201.    In late December 2022, Ver inquired with GGCI as to whether they remained solvent in the wake of the FTX and Alameda bankruptcies, and whether GGCI had any exposure to them, specifically whether it had been GGCI who had reportedly made a $2.5 billion loan to Alameda and was repaid in August 2022.

202.    GGCI responded that all of Ver's trades had been through GGCI.  Despite having lost some funds on FTX, GGCI claimed that it remained solvent and had no further involvement or exposure to Alameda or FTX.

203.    Ver persisted in questioning specifically whether it had been GGCI who received the Alameda loan repayment referred to by SBF in the New York Times interview.  GGCI informed Ver that those funds had been repaid to a different Genesis entity, not GGCI.

204.    At this point, Ver demanded proof of GGCI's present solvency, and demanded GGCI provide proof as to how they valued the assets on its June SOFC, which Ver now suspected had deployed the same misleading mark-to-market accounting that FTX had deployed to deceive its depositors.

205.    Ver reminded GGCI that he had faithfully paid in excess of $60 million in additional collateral since June, believing it his legal obligation to do so since GGCI remained solvent, including $37 million dollars in payments just weeks prior.

206.    Were Ver simply trying to avoid paying a debt to GGCI, as Counter-Defendant alleges in its complaint, he obviously would not have made payments totalling $37 million just weeks earlier, and would have raised concerns instead of paying.

207.    Satisfied Ver's concerns were being raised in good faith, but while still denying the validity of his claims, GGCI produced to Ver its 2021 audited financials, as well as an unaudited SOFC dated June 30, 2022.

208.    However, both of those documents raised even further issues which revealed GGCI to have been insolvent in June 2022 at the latest.

### The June 30 SOFC

209.    The June 30 SOFC revealed to Ver the dramatic and concerning changes which had occurred since the June 20 SOFC.

**Genesis Global Capital International Limited**
**Statement of Financial Condition (Unaudited)**
**June 20, 2022**
*(in thousands)*

|  |  |
|---|---:|
| **Assets** | |
| Cash | $        12,929 |
| Investments in digital currencies | 1,594,209 |
| Derivative assets | 442,733 |
| Collateral receivable | 454,449 |
| Receivable from customers | 159,182 |
| Loans receivable | 399,560 |
| **Total assets** | $   3,063,062 |
| | |
| **Liabilities and stockholder's equity** | |
| **Liabilities** | |
| Collateral payable | $   2,094,617 |
| Payable to customers | 94,569 |
| Loans payable | 606,477 |
| Derivative liabilities | 167,132 |
| **Total liabilities** | $   2,962,795 |
| | |
| **Stockholder's equity:** | |
| Total stockholder's equity | 100,267 |
| **Total liabilities and stockholder's equity** | $   3,063,062 |

**GGC International Limited**
**Statement of Financial Condition**
**June 30, 2022**
*(in thousands)*

|  |  |
|---|---:|
| **Assets** | |
| Cash | $        3,252 |
| Investments in digital currencies and trusts | 1,439,361 |
| Digital currency loans receivable, net of allowance for loan losses | 1,750 |
| USD loans receivable, net of allowance for loan losses | 11,600 |
| Digital currency collateral receivable | 840,389 |
| Derivative assets | 863,045 |
| Interest receivable, net of allowance | 2,758 |
| Receivables from related parties | 47,334 |
| Other assets | 151,977 |
| **Total assets** | $   2,357,248 |
| | |
| **Liabilities and member's equity** | |
| **Liabilities** | |
| Digital currency loans payable | $   370,737 |
| Digital currency collateral payable | 891,080 |
| USD loans payable | 18,073 |
| Option collateral payable | 344,169 |
| Derivative liabilities | 191,864 |
| Interest payable | 5,645 |
| Accounts payable and accrued expenses | 295,894 |
| Payables to related parties | 225,364 |
| **Total liabilities** | 2,342,826 |
| | |
| **Member's equity** | |
| Total member's equity | 14,422 |
| **Total liabilities and member's equity** | $   2,357,248 |

210.    First, there had been a significant reported drop in both positive equity and assets. On June 20, there was positive equity of just $100 million on $3 billion in assets, which indicated GGCI faced significant liquidity and volatility concerns. However, by June 30, positive equity had shrunk to $14 million, with assets dropping by more than $400 million, exacerbating these already significant concerns.

Case 1:24-cv-01533-JPC    Document 1-18    Filed 02/28/24    Page 570 of 637

211.     Second, much of the fall in asset values was attributed to loans that had been written down.  On June 20, GGCI reported "loans receivable" of $399 million.  However, by June 30, loans receivable had been reduced to $2.25 million.[2]  This represented a loss of more than 99% of GGCI's loans receivable in just a ten day period.

212.     On information and belief, these loan write-downs represented losses related to 3AC, which had not been written down in the June 20 SOFC, but were known to Counter-Defendant when the June 20 SOFC was sent to Ver as proof of GGCI's solvency.

213.     Lastly, the June 30 SOFC contained a brand new line item, "Other", which had $151 million in assets.  There was no new corresponding line item in liabilities.

214.     On information and belief, this line item "Other" represented sums that were placed onto GGCI's balance sheet as a result of the DCG Promissory Note.

### GGCI's 2021 Audited Financials

215.     GGCI's 2021 audited financials revealed to Ver both that GGCI had been valuing digital assets at 100% mark-to-market, and that it had in fact been the entity that originated a $2.5 billion loan collateralized by FTT tokens.  Those FTT tokens had ultimately come from Alameda.

216.     The 2021 audited financials explained that GGCI accounted for collateral paid by counterparties as an asset with a corresponding liability.  Alameda's FTT tokens would have been counted on its balance sheet as an asset under "*Investments into digital assets*" and as a liability under "*digital currency collateral payable.*"

---

[2] The June 20 SOFC and June 30 SOFC differed in how they recorded loans receivable.  The June 20 SOFC contains a single line item for "loans receivable"; the June 30 SOFC contains two, one for USD and one for Digital assets. The line item "*USD Loans Receivable net of allowance for loan losses*" is recorded as $1 million, and "*Digital Currency Loans Receivable net of allowance for loan losses*" is recorded as $1.25 million.  Together, they represent "loans receivable" equal to $2.25 million as of June 30, 2022.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 571 of 637

217.    GGCI's balance sheet showed "*Investments in digital currencies*" equal to $2.825 billion, and "*Digital currency collateral payable*" equal to $2.370 billion.

218.    Notably, the "*Digital currency collateral payable*" roughly equaled the $2.5 billion SBF had referred to during his New York Times interview.  And while "*Investments in digital currencies*" was larger, it contained additional digital assets owned by GGCI.

219.    GGCI's cash flow statement in the 2021 audited financials also contained a line item for "*Digital currency collateral payable*" under liabilities, which was equal to the same line item on the balance sheet, indicating these sums made their way onto GGCI's balance sheet in 2021.

220.    GGCI's 2021 audited financials contained a section detailing significant exposures to various counterparties.  The significant counterparties were not identified by name, only certain information about them was provided.  The financials identified a "Counterparty I" who represented 99% of the digital currency collateral payable liability, which was further identified to consist of 99% FTT tokens.

221.    Therefore, GGCI's 2021 financials showed that at some time in 2021 it had originated a loan to a single counterparty backed by FTT tokens, which were valued at $2.3 billion as of December 31, 2021.   It was evident to Ver that "Counterparty I" was Alameda Research.

222.    Lastly, GGCI's 2021 audited financials contained other figures that revealed yet other sources of GGCI's undercapitalization.  The statement of cash flows identified a $105 million dollar operating loss for 2021.  And the statement of changes in stockholder equity identified almost $41 million in distributions in 2021.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 572 of 637

**GGCI's Shifting Explanations**

223.   When Ver pointed out that GGCI's 2021 audited financials identified a $2.5 billion loan obligation to Alameda, contrary to GGCI's prior representations, GGCI provided misleading information to Ver in an attempt to distance itself from Alameda.

224.   Incredibly, GGCI initially claimed that the financials Ver possessed were actually a consolidated report for multiple Genesis entities, and that the FTT tokens belonged to a different Genesis entity.

225.   However, the financials were clearly labeled as having been prepared exclusively for GGCI, which quickly disproved GGCI's claims.

226.   Once disproven, GGCI shifted its narrative and asserted that an affiliate had dealt with Alameda, who then borrowed from GGCI using the FTT tokens as collateral.  GGCI then refused to provide any evidence to support this claim.

227.   Nonetheless, GGCI's claim that the FTT tokens belonged to an affiliate was a difference without distinction, since the tokens had ultimately come from Alameda and would be subject to a clawback in bankruptcy.

228.   In fact, on May 3, 2023, FTX filed a motion in the Southern District of New York, on behalf of itself and affiliated debtors, seeking $3.9 billion back from Genesis, including sums from GGCI.

229.   Ultimately, discussions with GGCI made clear that GGCI hadn't applied any discount to the digital assets on its SOFC.

230.   At one point, GGCI personnel even admitted that they "may have been underwater for a few days."

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 573 of 637

231.    Had GGCI applied appropriate discounts to its digital assets, as it demanded from Ver, its SOFC would have revealed its insolvency.

232.    As a result, Ver would have closed his positions to avoid trading with an insolvent counterparty and saved tens of millions of dollars.

## CAUSES OF ACTION

## COUNT ONE

### (Fraud)

233.    Defendant realleges and incorporates all preceding paragraphs as though fully set forth herein, and further alleges:

234.    As described herein, Defendants Silbert, Moro, and DCG crafted and issued a number of misrepresentations through a series of tweets. Those statements were inaccurate in the following ways and were made with full knowledge of their inaccuracies:

a.  First, client funds had been impacted—the Three Arrows losses severely impaired Genesis Global's ability to repay its counterparties, including Earn investors.

b.  Second, due to Three Arrows' default on June 13, 2022, the Genesis Entities' balance sheets were not strong, solvent, or capable of absorbing the losses; the Genesis Entities suffered a loss that exceeded their equity. Indeed, in a June 21, 2022 email, Silbert informed colleagues at DCG that "the hole in Genesis equity due to the Three Arrows exposure is something they we [sic] will need to fill by 6/30," and asked his colleagues to "keep [that] between us." Three days later, Silbert further explained to

Case 1:24-cv-01533-JPC Document 1-18 Filed 02/28/24 Page 574 of 637

DCG personnel "[w]e just can't allow people inside or outside [to]
question Genesis' solvency" due to Silbert's concern that this
could spark a bank run.

c. Third, the tweets discussed the sale or hedging of all "liquid"
collateral while concealing that hundreds of millions of dollars'
worth of the loans were secured by illiquid collateral that could not
be sold and was not hedged.

d. Fourth, Genesis Global had not "shed the risk and moved on"—as
of June 17, 2022, it still held a more than $1 billion receivable
relating to Three Arrows as an uncollectible asset on its balance
sheet.

235. Third-Party Defendants' conduct was willful, wanton, malicious, and oppressive.

236. Ver relied, in part, on the public statements of Moro and Silbert when deciding to
continue to maintain his option positions at GGCI.

237. In the months following the misleading statements referenced above, Ver made
payments in excess of $60,000,000 to GGCI to maintain his positions and GGCI liquidated over
$50,000,000 of Ver's collateral.

238. Had Silbert and Moro accurately represented the financial condition of the
Genesis Entities in their various statements, Ver never would have continued to make payments
to maintain his option positions and would have avoided the loss of additional collateral by
closing out his positions.

239. Third-Party Defendants' fraud has directly, legally, and proximately caused and
continues to cause injuries to Ver. Ver seeks an award of damages for, among other things,

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 575 of 637

compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000, punitive or exemplary damages for Third-Party Defendants' malicious conduct, all costs and Court fees, reasonable attorneys' fees, as well as any other relief this Court deems just and proper.

## COUNT TWO

### (Civil Conspiracy (Fraud))

240.    Defendant realleges and incorporates all preceding paragraphs as though fully set forth herein, and further alleges:

241.    As described herein, and in Ver's Counterclaim, GGCI and the Genesis Entities made a series of misrepresentations both directly to Ver and in the public with the intent to lull Ver and others into a false sense of security and remain invested in his open option positions, despite the fact that they were aware that GGCI and the Genesis Entities were insolvent.

242.    The Third-Party Defendants and Counter-Defendants combined and agreed with each other and/or others to defraud Ver by intentionally misrepresenting the solvency of the Genesis Entities.

243.    Pursuant to their agreements, explicit or otherwise, Third-Party Defendant and Counter-Defendants acted in concert to support their common purpose of defrauding Ver so that he would maintain his positions with GGCI, despite their insolvency at the time.

244.    Each Third-Party Defendant committed at least one over act in furtherance of such conspiracy including misleading Ver through a series of public statements designed to mislead Ver, and others, into believing that GGCI and the Genesis Entities remained solvent.

245.    Each Third-Party Defendant and Counter-Defendant acted with the common intent to defraud Ver and understood that each shared in that common purpose.

246.    Third-Party Defendants' conduct was willful, wanton, malicious, and oppressive.

247.    Third-Party Defendants' unlawful conspiracy has directly, legally, and proximately caused and continues to cause injuries to Ver. Ver seeks an award of damages for, among other things, compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000, punitive or exemplary damages for Third-Party Defendants' malicious conduct, all costs and Court fees, reasonable attorneys' fees, as well as any other relief this Court deems just and proper.

## COUNT THREE

### (Aiding and Abetting (Fraud))

248.    Defendant realleges and incorporates all preceding paragraphs as though fully set forth herein, and further alleges:

249.    During all relevant times to this matter, Counter-Defendants have committed fraud by making intentional misrepresentations with knowledge of their falsity in an effort to induce Ver to maintain his option positions with GGCI, which he did to his detriment.

250.    During all relevant times to this matter, Third-Party Defendants coordinated with and were aware of the intentional misrepresentations made to Ver.

251.    During all relevant times to this matter, Third-Party Defendants provided substantial assistance and encouragement, materially contributed to, and otherwise aided and abetted this fraud by making intentionally misleading and inaccurate representations to Ver, and the public, regarding the solvency of the Genesis Entities.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 577 of 637

252.     Third-Party Defendants' aiding and abetting this fraud was an actual and proximate cause of Ver's harm, including but not limited to, the additional funds he paid to GGCI to keep his option positions active as a result of the various misrepresentations of Third-Party and Counter-Defendants.

253.     Third-Party Defendants' conduct was willful, wanton, malicious, and oppressive.

254.     Third-Party Defendants' aiding and abetting has directly, legally, and proximately caused and continues to cause injuries to Ver. Ver seeks an award of damages for, among other things, compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000, punitive or exemplary damages for Third-Party Defendants' malicious conduct, all costs and Court fees, reasonable attorneys' fees, as well as any other relief this Court deems just and proper.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Counter-Plaintiff Roger Ver respectfully requests that this Court:

1.  Award compensatory damages from Third-Party Defendants in an amount to be proven at trial, but believed to be in excess of $20,000,000.00 in favor of Ver, as well as punitive or exemplary damages, incidental damages, and consequential damages;

2.  Award Ver pre-judgment and post-judgment interest;

3.  Award Ver reasonable attorney fees, expenses, and the costs of this action; and

4.  Award Ver such other and further relief as this Court may deem just, proper, and equitable under the circumstances.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 578 of 637

## DEMAND FOR JURY TRIAL

Third-Party Plaintiff Roger Ver hereby demands a trial by jury of all claims so triable.

**KELMAN PLLC**

Dated: December 27, 2023

Michael D. Handelsman
Daniel J. Kelman
1441 Broadway
6th Floor, #6079
New York, NY 10018
(212) 380-3818
mike@kelman.law
daniel@kelman.law

# Exhibit O

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 580 of 637

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
THE PEOPLE OF THE STATE OF NEW YORK, by       :
LETITIA JAMES, Attorney General of the State of
New York,                                                          :

                  Plaintiff,       :

     -against-                                      :

GEMINI TRUST COMPANY, LLC; GENESIS
GLOBAL CAPITAL, LLC; GENESIS ASIA PACIFIC :
PTE. LTD.; GENESIS GLOBAL HOLDCO, LLC;
DIGITAL CURRENCY GROUP, INC.; SOICHIRO    :
MORO (a.k.a. MICHAEL MORO); and BARRY E.
SILBERT.                                                           :

              Defendants.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Index No.:

**COMPLAINT**

       Plaintiff, the People of the State of New York, by Letitia James, Attorney General of the

State of New York ("OAG" or "Plaintiff"), alleges the following against Gemini Trust Company,

LLC ("Gemini"); Genesis Global Capital, LLC ("Genesis Capital"); Genesis Asia Pacific Pte.

Ltd. ("Genesis Asia Pacific"); Genesis Global Holdco, LLC ("Genesis Holdco," collectively with

Genesis Capital and Genesis Asia Pacific, the "Genesis Entities"); Digital Currency Group, Inc.

("DCG"); Soichiro "Michael" Moro ("Moro"); and Barry E. Silbert ("Silbert") (together the

"Defendants"):

**NATURE OF THE ACTION**

      1.     In February 2021, Gemini, a New York cryptocurrency[1] platform, and Genesis

Capital, a New York cryptocurrency lender, launched an investment program called Gemini Earn

(or "Earn").  Gemini and Genesis Capital promoted Earn using their social media accounts, a

---

[1] Cryptocurrency—also referred to as a digital asset—refers to an asset issued or transferred
using a blockchain, or a distributed ledger that maintains a system of payments and receipts for
transactions.  Cryptocurrency acts as a digital representation of value that functions as a medium
of exchange, a unit of account, and a store of value.

mass email campaign, media outlets, and their own websites.  Gemini and Genesis Capital marketed Earn to the public as a high-yield investment program where Gemini customers could profit by passively investing their cryptocurrencies with Genesis Capital.  Within months of its launch, Genesis Capital held several billion dollars in Earn investor assets.

2.      On November 16, 2022, Genesis Capital announced that it was suspending all withdrawals from Earn, leaving at least 232,000 Earn investors with more than $1 billion in losses.  These losses were the result of two distinct fraudulent schemes: one perpetrated by Gemini (the "Gemini Scheme"), and one perpetrated by Genesis Capital and its Chief Executive Officer ("CEO") Moro, in coordination with Genesis Capital's parent company DCG, DCG's CEO Silbert, and the other Genesis Entities (the "DCG Scheme").  Under the Gemini Scheme, Gemini solicited money from the public with false assurances that Earn was a highly liquid investment and that Genesis Capital was creditworthy based on Gemini's ongoing risk monitoring.  In reality, however, Gemini's confidential risk reports found that Genesis Capital posed a high risk of default.  Under the DCG Scheme, the Genesis Entities, Moro, DCG, and Silbert disguised $1.1 billion in losses through a months-long campaign of misstatements, omissions, and concealment.

3.      Under the Gemini Scheme, from February 2021, through November 16, 2022, Gemini advertised Earn on its website as a low-risk, highly liquid "investment" that could be "redeem[ed] at any time."  Throughout this same period, Gemini promised that Gemini vetted Genesis Capital "through a risk management framework that reviews [Genesis Capital's] collateralization management process," and that "on a periodic basis [Gemini] conducts analysis of [Genesis Capital's] cash flow, balance sheet, and financial statements."  Gemini further

advertised that Genesis Capital was a "trusted" and "accredited" partner and that Gemini would ensure Genesis Capital had "appropriate risk ratios" and a "healthy financial condition."

4.      During the same period, Gemini encouraged the public and Earn investors to place a heightened degree of "trust and confidence" in Gemini.  On its website and social media accounts, Gemini pledged to its customers "the highest level of fiduciary obligations."  In September 2022, Gemini's President Cameron Winklevoss told investors with concerns about the safety of investing in Genesis Capital and Earn that Gemini "ha[s] always and will continue to prioritize risk management and disclosure as key pillars of our business."

5.      Gemini's internal risk analyses, however, contradicted its assurances about Genesis Capital.  From the start of the program in February 2021, through November 16, 2022, Gemini's internal risk analyses showed that Genesis Capital's loan book was undercollateralized. Only a year into the program, in February 2022, Gemini revised its estimate of Genesis Capital's credit rating from BBB (*i.e.*, investment grade) to CCC (*i.e.*, non-investment, or junk grade). Indeed, from May 2022 through November 2022, Genesis Capital routinely reported to Gemini that it had failed its own internal loan book risk assessments. When advised of Genesis Capital's financial condition in July 2022, one Gemini board member compared Genesis Capital to Lehman Brothers prior to its collapse.

6.      On September 2, 2022, Gemini decided to terminate Earn.  A month later, on October 13, 2022, Gemini formally notified Genesis Capital of its decision and sent a confidential written notice to Genesis Capital terminating all Earn agreements and demanding the return of all investors' assets under Earn.  Yet even after Gemini decided to terminate Earn and provided formal notification to Genesis Capital, Gemini continued to take tens of millions of

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 583 of 637

dollars' worth of additional cryptocurrencies from Earn investors and hand those assets over to Genesis Capital.

7.      Gemini failed to disclose to Earn investors the risks of investing in Earn and Gemini's termination of the Earn program.  Gemini did so even while certain Gemini employees, including an officer of Gemini, closed out their own personal positions in Gemini Earn.

8.      Earn investors were not only defrauded by Gemini, but they were also victims of the DCG Scheme to conceal more than $1 billion in losses at the Genesis Entities.  On June 13, 2022, one of the Genesis Entities' largest borrowers, Three Arrows Capital, Ltd. ("Three Arrows"), defaulted on billions of dollars in loans. The resulting losses created, in Genesis Capital's words, a "structural hole" at Genesis Capital that impaired its ability to repay its open-term liabilities—including to Earn investors.

9.      Starting in June 2022, the Genesis Entities, DCG, Moro, and Silbert conspired to and did in fact falsely represent Genesis Capital's financial condition to conceal this structural hole.  As part of that scheme, the Genesis Entities, DCG, Silbert, and Moro engaged in concerted communications with the public and with counterparties to instill false confidence in Genesis Capital's financial health.  For example, on June 15 and June 17, Genesis Capital, Silbert, Moro, and/or DCG published tweets claiming the Genesis Entities' balance sheet was "strong," that Genesis Capital was functioning "normally," and that it had "shed the risk and moved on."  In reality, Three Arrows' default on June 13, 2022, created an equity deficiency at the Genesis Entities, and Silbert had ordered Genesis Capital to limit its extension of new loans.

10.     On June 30, 2022—the last day of the financial reporting quarter—Moro and Silbert executed an illiquid promissory note under which DCG agreed to pay Genesis Capital $1.1 billion *in a decade* at only a 1% per annum interest rate (the "Promissory Note") to

4

purportedly backstop losses from the Three Arrows loans. DCG never made principal or interest payments under the Promissory Note and the structural hole remained unchanged. Nevertheless, Genesis Capital reported this Promissory Note as an asset on its balance sheet without disclosing to Gemini or the Earn investors its true terms.

11.      Instead of disclosing the terms of the Promissory Note to the Earn investors, the Genesis Entities, DCG, Moro, and Silbert falsely assured counterparties and the public that Genesis Capital was "well-capitalized" and that DCG "absorbed the losses" from the Genesis Entities. Genesis Capital's CEO, Moro, also tweeted that DCG had "assumed certain liabilities of Genesis" associated with Three Arrows, leaving Genesis Capital with "adequate capital" to continue "business as usual." Through these statements, Genesis Capital solicited additional assets through Earn under false pretenses.

12.      These statements were misleading descriptions of the Promissory Note and omitted material information. DCG did not "absorb" the Genesis Entities' losses arising from Three Arrows' default. Rather, those losses were reflected on financial statements that the Genesis Entities concealed from counterparties. Nor did the Promissory Note address the structural hole created by those losses, which elevated the risk of Genesis Capital being unable to repay the Earn investors. Indeed, an officer at Genesis Capital objected to informing counterparties that DCG "absorbed the loss" because they would be unable to defend this statement in calls with counterparties.

13.      Further, DCG did not simply assume liabilities of Genesis relating to Three Arrows. Instead, DCG *replaced* those short-term liabilities with an illiquid obligation that was payable in 10 years at 1% interest. On its face, the Promissory Note failed to plug the structural hole created by the Three Arrows default.

14.     In furtherance of the DCG Scheme, from July 2022 through November 2022, Genesis Capital sent Gemini, as the agent of Earn investors, reports falsely describing Genesis Capital's financial condition.  For example, these reports falsely included the Promissory Note as an asset that could be reduced to cash within a year.  To further deceive Earn investors, Genesis Capital concealed and suppressed disclosure of quarterly income and cash flow statements from Gemini from June 30, 2022, through November 16, 2022.  Genesis Capital also omitted explanatory footnotes to its balance sheet because those footnotes would have revealed the Promissory Note's true nature.  Genesis Capital's CFO and its finance team avoided joining phone calls with counterparties to conceal Genesis Capital's financial condition.  Instead, members of Genesis Capital's sales and lending teams answered financial questions using only approved talking points that contained no explanation of the Promissory Note or its terms.

15.     Meanwhile, from July 2022 to November 2022, DCG further widened Genesis Capital's structural hole when it forced Genesis Capital to extend the maturity date for hundreds of millions of dollars' worth of loans to DCG.  To date, DCG has failed to repay these loans.

16.     Finally, from February 2021, through November 16, 2022, Gemini and Genesis Capital falsely claimed they had all "necessary governmental and other consents, approvals and licenses" to perform their obligations under Earn.  This was false because the Earn accounts were securities and Genesis Capital failed to register in New York as a securities dealer, broker, or salesperson as defined in GBL § 359-(e).

17.     On November 16, 2022, Genesis Capital announced that it faced a liquidity crunch and would not return cryptocurrencies invested under Earn, leaving Earn investors unable to redeem more than $1 billion of their investments.  Some of these unsuspecting investors lost their life savings.  On November 29, 2022, one New Yorker pleaded with Gemini for the return

of her $199,000 investment, writing: "Are you going to be able to give us our money any time

soon? I am crying all day. I am 73 years old and without that money I am doomed."  No

Defendant has returned the Earn investors' assets since the close of the program on November

16, 2022.  Instead, on January 19, 2023, the Genesis Entities declared bankruptcy.

18.     Defendants' fraudulent acts violated New York General Business Law ("GBL")

§§ 352 *et seq.* (the "Martin Act"), and New York Executive Law § 63(12).  Additionally, the

Genesis Entities, DCG, Silbert, and Moro violated state criminal laws, constituting repeated and

persistent illegality in violation of Executive Law § 63(12), including: New York Penal Law §

190.65 (Scheme to Defraud); and New York Penal Law § 105.05 (Conspiracy).

19.     This action seeks to permanently enjoin Defendants from engaging in fraudulent,

deceptive, and illegal acts in violation of the Martin Act and Executive Law; to permanently

enjoin Defendants from engaging in any business related to the issuance, distribution, exchange,

promotion, advertisement, negotiation, purchase, investment advice, or sale of securities or

commodities within or from this state; and to direct Defendants to pay damages, restitution, and

disgorgement of all funds and cryptocurrencies Defendants obtained in connection with its

unlawful, fraudulent, or illegal conduct, and for such other equitable relief as may be necessary.

## **PARTIES**

20.     Plaintiff, the Attorney General of the State of New York, is authorized to bring

this action and to assert the causes of action set forth below in the name and on behalf of the

People of the State of New York pursuant to the Martin Act and Executive Law § 63(12).

21.     Defendant Gemini is a New York trust company chartered by the New York State

Department of Financial Services with a principal place of business at 315 Park Avenue South,

in New York County, New York.  Cameron Winklevoss and his brother Tyler Winklevoss co-

founded Gemini.  From February 2, 2021, through November 16, 2022 (the "Relevant Period"),

Cameron Winklevoss served as Gemini's President and Tyler Winklevoss served as its CEO.

22.     Defendant Genesis Capital is a Delaware limited liability company with a

principal place of business at 250 Park Avenue South, in New York County, New York.

23.     Defendant Genesis Asia Pacific is a Singapore corporation with a business

address at 30 Raffles Place, # 23-01 Oxley @ Raffles, Singapore 048583.  During the Relevant

Period, directors, officers, and employees of Genesis Asia Pacific worked from 250 Park Avenue

South, in New York County, New York.

24.     Defendant Genesis Holdco is a Delaware limited liability company with a

principal place of business at 250 Park Avenue South, in New York County, New York.

Throughout the Relevant Period, Genesis Holdco wholly owned Genesis Capital and Genesis

Asia Pacific.

25.     The Genesis Entities operated as a single entity during the Relevant Period.  They

shared officers, capital, offices, IT infrastructure, and back-office functions.

26.     Genesis Holdco and Genesis Capital had no independent board of directors until

after June 30, 2022.  Instead, non-party Genesis Global Trading, Inc.'s ("Genesis Trading")

board of directors heard matters pertaining to Genesis Holdco and Genesis Capital through at

least June 30, 2022.

27.     On January 19, 2023, the Genesis Entities filed for bankruptcy in the United

States District Court for the Southern District of New York.

28.     Defendant Moro served as the CEO or its functional equivalent of the Genesis

Entities, as well as their non-party affiliates, from at least February 2, 2021, through August 17,

2022.  For the same period, Moro also served on Genesis Trading's board of directors, which

8

served as the *de facto* board of directors for Genesis Holdco through at least June 30, 2022. Throughout the Relevant Period, Moro worked from and resided in the State of New York.

29.     Defendant DCG is a Delaware corporation doing business in the State of New York.  DCG maintains an office at 262 Harbor Drive, Stamford, CT 06902.  DCG wholly owns the Genesis Entities.  During the Relevant Period, DCG's officers also worked from the Genesis Entities' office at 250 Park Avenue South, in New York County, New York.

30.     Silbert was the CEO, founder, and a beneficial owner of DCG at all times during the Relevant Period.  Silbert was one of three members of DCG's board of directors during the Relevant Period.  Officers at DCG reported directly to Silbert.  Silbert is also the single-largest shareholder of DCG.  During the Relevant Period, Silbert worked from DCG's offices in Connecticut, as well as from Genesis's offices at 250 Park Avenue South, in New York County, New York.  Silbert founded the Genesis Entities and served on Genesis Trading's board of directors from its founding until June 22, 2022.

## JURISDICTION AND VENUE

31.     This Court has jurisdiction over the subject matter of this action, personal jurisdiction over the Defendants, and authority to grant the relief requested pursuant to the Martin Act and Executive Law § 63(12).

32.     Pursuant to CPLR § 503, venue is proper in New York County because Plaintiff is located in New York County, with its address at 28 Liberty Street, in the County and State of New York, and because a substantial part of the conduct, events, or omissions giving rise to the claims occurred in New York County.  Additionally, Gemini, DCG, and the Genesis Entities are either domestic or foreign entities that transacted or were authorized to transact business in the

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 589 of 637

state or maintained a principal office in New York County.  Similarly, Defendants Moro and

Silbert transacted business at 250 Park Avenue South, in New York County, New York.

## FACTUAL ALLEGATIONS

**I.   Background Information**

**A.  Gemini Held Itself Out as a Cryptocurrency Exchange Throughout the Relevant Period**

33.     Throughout the Relevant Period, Gemini held itself out to the public as a New

York cryptocurrency exchange that facilitated the buying, selling, exchange, and storage of

cryptocurrencies.

34.     Gemini offered securities to the public, in the form of the Earn investment

product.

**B.  DCG Owns and Operates the Genesis Entities**

35.     Defendant DCG owns and operates cryptocurrency businesses.

36.     DCG marketed the Genesis Entities and non-party Genesis Trading collectively as

a premier institutional cryptocurrency and financial services company.  DCG marketed Genesis

Capital as its leading lending desk with billions of dollars in cryptocurrency loan originations.

37.     During the Relevant Period, DCG controlled the Genesis Entities' key hiring

decisions, business strategy, and budget.  DCG and the Genesis Entities also shared IT

infrastructure and DCG had direct access to the Genesis Entities' books and records.  Members

of DCG's management team served as directors of Genesis Trading and Genesis Holdco, and sat

on the Genesis Entities' Organizational Risk Committee, which managed risks arising from the

Genesis Entities' lending business.

10

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 590 of 637

## C. The Genesis Entities Maintained a Consolidated Lending Book

38.     Genesis Capital lent cryptocurrency and fiat currency to institutions and high-net-worth clients.  Genesis Capital funded these loans by receiving financing from third parties, including the Earn investors.

39.     Genesis Capital profited by making money on the difference between the interest it paid to borrow fiat currency and cryptocurrency and the interest it received from lending the same assets to institutional and high-net-worth clients.

40.     Genesis Asia Pacific lent assets to Singapore-based clients, such as cryptocurrency hedge fund Three Arrows, on behalf of Genesis Capital.  Genesis Capital provided virtually all of Genesis Asia Pacific's lending capital.  Genesis Asia Pacific, in turn, repaid Genesis Capital when Genesis Asia Pacific's own borrowers repaid Genesis Asia Pacific.  Genesis Capital and Genesis Asia Pacific shared a single loan book managed by the Genesis Entities' Co-Head of Trading and Lending ("Managing Director No. 1") from New York.

41.     Genesis Capital and Genesis Asia Pacific maintained separate financial statements, including separate balance sheets.

## II.    Gemini and Genesis Capital Operated Earn as an Investment Contract

42.     On February 2, 2021, DCG subsidiary CoinDesk published a news story announcing that Gemini and Genesis Capital had partnered to launch Earn.  The news article stated: "Gemini, the crypto exchange and custodian, is allowing its customers to earn up to 7.4% annual percentage yield (APY) on their holdings through a partnership with crypto lender Genesis [Capital]."

43.     To invest in Earn, investors first had to buy or hold cryptocurrency on Gemini's cryptocurrency platform.  Gemini induced investors to purchase assets on its cryptocurrency platform to invest in Earn.  For example, beginning in March 2021, Gemini emailed its

customers to advertise a new feature allowing users "to buy and transfer [cryptocurrency] directly into [Earn]" with a single mouse click. Gemini earned commissions on those purchases.

44.     Gemini published a list of the cryptocurrencies eligible for Earn on its webpage. The list included bitcoin, ether, and Gemini dollar.

45.     Gemini selected Genesis Capital as the sole "approved borrower" to receive investors' assets under Earn.

46.     Gemini and Genesis Capital required Earn investors to enter into a "Master Digital Asset Loan Agreement" with Gemini (as "custodian" and the "agent" of the investor) and Genesis Capital (herein the "Earn Master Agreement").

47.     The Earn Master Agreement set forth terms concerning the transfer and return of cryptocurrencies and the payment of fees.  The Earn Master Agreement also contained representations and warranties, including a warranty that the parties were not insolvent.

48.     When investors elected to invest in Earn, Gemini pooled their assets in a wallet with other investors' assets and transferred them to Genesis Capital's wallets on Gemini's platform.  Genesis Capital, in turn transferred these assets from Gemini's platform into its external accounts and wallets, where the assets were pooled and commingled with Genesis Capital's other assets.  Genesis Capital then used these pooled assets in its lending business. Genesis Capital accounted for these cryptocurrencies in combined categories on its balance sheets and financial statements, including in the balance sheet category "[i]nvestments in digital currencies and trusts."

49.     When Earn investors withdrew their assets, Genesis Capital had five days from the date of the withdrawal request to return the investor's assets, along with the yield promised to

the investor.  For its services in Earn, Gemini received an agent fee, which was deducted from the Earn investors' assets and yield.

50.     As a large institutional lender in the cryptocurrency industry, Genesis Capital negotiated more favorable loan terms and interest rates with borrowers than Earn investors could negotiate on their own.  Genesis Capital paid yield to the Earn investors from the interest it earned on its loans to third parties. Thus, the Earn investors' fortunes were tied to the effort and expertise of Genesis Capital, and the investors shared in the profits made by Genesis Capital.

51.     During the Relevant Period, Gemini devoted a page on its website to Earn (the "Earn Page").  On the Earn Page, Gemini advised investors to "[m]ake your crypto work for you," advertised that Earn investors would "receive up to 8.05% [previously 7.4%] on the cryptocurrency you custody with Gemini," and claimed that "[u]nlike other opportunities to earn interest on your cryptocurrency, [with Earn] you can redeem your cryptocurrency at any time, with no penalties, and receive it at its current market value—plus the interest you've earned!" The Earn Page referred to Earn as a "yield-generating cryptocurrency investment."

52.     The yield paid to Earn investors fluctuated.  On a monthly basis, Genesis Capital determined the types of cryptocurrencies it was willing to borrow and the yield it was willing to pay for each type of asset. After determining its agent fees, Gemini published the yield rates for different assets on the Earn Page.  On February 1, 2021, the Earn Page set forth yield rates that Earn investors would receive on their invested cryptocurrencies as follows:

13

## Interest Rates

| Asset | APY | Asset | APY | Asset | APY |
|---|---|---|---|---|---|
| Aave AAVE | 5.83% | Amp AMP | 1.98% | Balancer BAL | 1.54% |
| Basic Attention Token BAT | 3.49% | Bitcoin Cash BCH | 4.55% | Bitcoin BTC | 3.05% |
| Compound COMP | 2.47% | Curve CRV | 1.98% | Dai DAI | 4.16% |
| Ether ETH | 3.05% | Filecoin FIL | 7.40% | Kyber Network KNC | 2.58% |
| Chainlink LINK | 4.46% | Litecoin LTC | 5.10% | Decentraland MANA | 1.80% |
| Maker MKR | 1.98% | Orchid OXT | 2.47% | PAX Gold PAXG | 3.92% |
| Ren REN | 2.71% | Synthetix SNX | 2.69% | Storj STORJ | 1.98% |
| Uma UMA | 2.69% | Uniswap UNI | 3.59% | Yearn.finance YFI | 3.29% |
| Zcash ZEC | 2.25% | 0x ZRX | 3.68% | | |

53.     These rates frequently changed.  For example, an Earn investor who invested one bitcoin at the start of Earn could have earned 3.05% APY on that investment in February 2021, 2.05% in May 2021, 1.65% APY in August 2021, 1.49% APY in September 2021, and 1.01% in February 2022.  On the Earn page, Gemini claimed the rates it offered were "more than 100x the average national interest rate, among the highest rates on the market."

54.     Gemini and Genesis Capital controlled the interest rates and cautioned their investors: "rates may increase or decrease in the future."

55.     From February 2, 2021, through November 16, 2022, Earn investors invested billions of dollars in cryptocurrencies in Genesis Capital.  By reason of these investments, Gemini earned more than $22 million in agent fees, plus more than $10 million in commissions when investors purchased cryptocurrency to invest in Earn.

III.    **Gemini Scheme: Gemini Falsely Assured the Public That Earn Was a Low Risk, Highly Liquid Investment That Could Be Redeemed "At Any Time" and That Genesis Capital Was Creditworthy Based on Gemini's Ongoing Risk Monitoring**

A.  **Gemini Built Its Brand and That of Earn on Trust, Confidence, and Fiduciary Obligations**

56.     During the Relevant Period, Gemini marketed itself as a trust company "that is held to the highest level of fiduciary obligations."  Gemini published this claim on its LinkedIn, Facebook, and other social media pages throughout 2021 and 2022.

57.     Gemini has long sought to differentiate itself from other cryptocurrency companies by claiming to embrace legal regulation and encouraging its customers to place a heightened degree of trust and confidence in Gemini and its products.  In January 2019, Gemini's head of marketing told the Wall Street Journal: "[w]e [at Gemini] believe that investors coming into cryptocurrency deserve the exact same protections as investors in more traditional markets, adhering to the same standards, practices, regulations and compliance protocols."

58.      In a September 2019 statement, Gemini co-founder Tyler Winklevoss stated, "Gemini's philosophy of asking for permission, not forgiveness, is a first in the crypto industry." That year, Gemini published advertisements in the New York Times, at New York subway stops, and on New York City taxis, declaring: "The Revolution Needs Rules" and "Crypto Without Chaos."

59.     Also in September 2019, Tyler Winklevoss informed customers in a blog post that Gemini "strive[d] to always … put the interests of our customers ahead of our own and provide proper disclosures and transparency."

60.     Throughout 2021 and 2022, the concepts of "trust" and adherence to its "fiduciary obligations" were central to Gemini's marketing.  Gemini's website advertised that it was a "fiduciary," "[t]he most trusted crypto-native finance platform," and that it "worked hard to

15

provide [customers] with a high-integrity choice and … look[ed] forward to earning and maintaining your trust."

61.    Gemini also owed its customers fiduciary obligations under the New York Banking Law.  During the Relevant Period, Gemini stated in its user agreement that it is "a fiduciary under § 100 of the New York Banking Law… and a custodian that is licensed to custody [its customers'] Digital Assets in trust on [its customers'] behalf."

62.    Gemini deployed this trust-based branding in its promotion of Earn.  In August 2021, Gemini published a blog post announcing that "more than $3 billion in loans [have been] originated through [Earn]" and that "[i]nstilling trust in our products is central to Gemini's ethos, and crossing this milestone is indicative of the confidence our customers have in our business."

63.    On September 22, 2022, Gemini's President Cameron Winklevoss conducted an "Ask Me Anything" (or "AMA") on Reddit, a social media platform, where he encouraged the public to ask questions and get real-time answers about Gemini's products.  During that AMA, one Reddit user asked Winklevoss: "Can you please talk more about partnering with Genesis? There is still so much fear to get back to [Earn]."  Winklevoss responded:

> We selected Genesis as a partner due to their experience in managing a large loan portfolio and reputation for compliance. Since we launched Earn in Jan 2021, Genesis has never failed to return assets when Gemini customers called back their loans. This was the case even when the broader market was experiencing liquidity issues earlier this year. That said, loaning your assets always carries some risk, and we encourage you to review the Master Loan Agreement to understand your rights as a lender. ***We have always and will continue to prioritize risk management and disclosure as key pillars of our business.***

(emphasis added).

64.    On November 11, 2022—just five days before Genesis Capital suspended redemptions leaving Earn investors unable to withdraw their cryptocurrencies—Cameron and Tyler Winklevoss shared a blog post on Gemini's website that repeated "Gemini Is Built on

16

Trust, Safety, and Compliance: Ask For Permission, Not For Forgiveness." That blog post

assured investors:

> [s]ince its inception eight years ago, Gemini has worked with regulatory
> stakeholders and lawmakers to help shape thoughtful regulation that fosters both
> consumer protection and innovation. We will continue to do this work. We have
> spent considerable time applying for and becoming licensed and regulated in
> various jurisdictions across the world. This is not the easier path (it is expensive
> and time consuming) but we believe it is the right one.

65.     As a fiduciary, Gemini had an affirmative duty to disclose material information to

its customers concerning Earn and Genesis Capital.

**B.     Gemini Falsely Assured Its Customers That Investing in Earn Was Liquid and That
Genesis Capital Was a Trusted and Accredited Counterparty**

66.     From February 9, 2021, through at least November 14, 2022, Gemini referred to

Genesis Capital on the Earn Page as a "trusted partner[]" and "accredited third party borrower[]"

that Gemini "vetted through a risk management framework which reviews [Genesis Capital's]

collateralization management process." Throughout the same period, Gemini assured investors

on the Earn Page that "on a periodic basis [Gemini] will conduct analysis of [Genesis Capital's]

cash flow, balance sheet, and financial statements to ensure the appropriate risk ratios and

healthy financial condition of [Genesis Capital]" and that Genesis Capital was required to "return

[Earn investors'] funds [to Earn investors] within five business days" of an investor's withdrawal

request.

67.     In mass marketing emails sent to Gemini customers in and after February 2021,

Gemini repeated the quote set forth in the preceding paragraph.

68.     Because Gemini promised Earn investors the ability to redeem their investments

and profit "at any time," Genesis Capital needed to carefully manage its liquidity, loan book

asset durations, and financial condition. Thus, Genesis Capital agreed to share quarterly its

financial statements and information about its collateral management process with Gemini.

17

Gemini used this information to conduct ongoing due diligence and to monitor Genesis Capital's financial condition on behalf, and as an agent, of the Earn investors.

69. Gemini had authority to terminate Earn or demand the withdrawal of all assets on behalf of the investors at any time.

70. Gemini's public assurances to Earn investors concerning Genesis Capital and Earn were contradicted by Gemini's internal risk assessments. These assurances were, therefore, false, misleading, and contained material omissions.

### C. Gemini Falsely Assured the Public that Genesis Capital's Loan Book Was Overcollateralized

71. On February 2, 2021, Gemini's Head of Risk stated in a press release that, "Gemini reviewed Genesis [Capital's] financial statements and verified that the lender's loans are overcollateralized." Overcollateralization means the collateral supporting outstanding loans is worth more than 100% of those loans. This press release, and Gemini's statement, remained accessible on the internet throughout the Relevant Period.

72. Gemini made similar claims directly to investors. For example, on March 5, 2021, a business development employee at Gemini responded to an investor inquiry about Earn by stating: "based on our due diligence, Genesis is only lending assets deposited into [Earn] to institutional borrowers in an overcollateralized way."

73. Contrary to Gemini's claim, Genesis Capital's loan book was not overcollateralized, either when Gemini claimed it was or at any time thereafter. The below chart shows the approximate collateral coverage ratio for each financial quarter:

| December 2020 | March 2021 | June 2021 | September 2021 | December 2021 | March 2022 | June 2022 | September 2022 |
|---|---|---|---|---|---|---|---|
| 60% | 87% | 71% | 85% | 90% | 61% | 76% | 66% |

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 598 of 637

74.     Gemini internally acknowledged this misrepresentation.  On March 9, 2021, a risk

management employee reporting directly to Gemini's Head of Risk corrected a similar

misstatement by stating: "[l]ending is 'collateralized' but not necessarily 'overcollateralized'."

However, the false statement was never corrected, and the February 2, 2021 article by CoinDesk,

a DCG subsidiary, containing the misstatement remained accessible to Earn investors and the

public throughout the Relevant Period.

### D.  Gemini's Risk Analyses Revealed Genesis Capital Had Inappropriate Risk Ratios, Was a "Junk" Grade Investment, and Was Neither Trusted Nor Accredited

75.     Contrary to Gemini's claims, Earn investors faced a high risk that Genesis Capital

would default.

76.     Shortly after the launch of Earn, Gemini's internal risk analysis of Genesis

Capital revealed concerns regarding Genesis Capital's liquidity and financial ratios.  In a

confidential internal document dated May 14, 2021, Gemini's risk management team determined

that Genesis Capital was "highly leveraged, with over 95% debt to asset ratio" and the "majority

of [Genesis Capital's] assets are from debts."  The risk management team also determined

"Genesis [Capital]… has low liquidity.  The business is just able to cover its short-term

obligations."  Further, Gemini's risk management team stated that while "Genesis [Capital] ha[d]

cash inflows in 2020," those inflows were "mainly from financing activities [*i.e.*, borrowing]"

and its 2020 "[c]ash flow from operating activities [was] negative."  Gemini further concluded

that Genesis posed a higher risk than other potential partners that Gemini considered for Earn.

77.     By May 2021, Earn investors had already placed more than $2 billion in assets

into the program.  By August 2021, that number increased to $3 billion.

19

1.   **Gemini Secretly Rated Genesis Capital as "Junk"**

78.     Around February 2022, Gemini's risk management team analyzed Genesis
Capital's financial statements for the third quarter of 2021.  They stated that "[c]ompared with
peers and the overall market, Genesis[] [Capital's] financials are generally weaker with a high
leverage ratio and low liquidity ratio, similar to companies with CCC/C rating" (also known as a
"junk" rating).  Based on this credit rating, the risk management team projected that in a market
downturn, "a 50-60% default rate for Genesis [Capital] [wa]s an appropriate assumption, given
additional risks in Crypto industry vs traditional industry."

79.     Gemini's risk management team repeated this same language in several
documents presented to the head of Gemini's market risk team between February 2022 and July
2022.

80.     Gemini's CCC rating estimate reflected a marked decline in Genesis Capital's
financial condition; before the launch of Earn, Gemini had analyzed Genesis Capital's 2019
financial statements and estimated that Genesis Capital was a "moderate risk" and comparable to
companies with a "BBB" (*i.e.*, investment grade) credit rating.

81.     According to Fitch Ratings, any credit rating below "BBB" is "speculative grade"
and not "investment grade."  A "CCC" issuer rating indicates a "[s]ubstantial credit risk" with
"[v]ery low margin for safety" and for whom "[d]efault is a real possibility."

82.     Because of the risks posed by Genesis Capital's default, beginning in May 2022,
Gemini's management team, including its President, Cameron Winklevoss, began privately
discussing whether to terminate Earn.  In May 2022, Winklevoss requested "a 1-pager on the risk
profile of [Earn] and Genesis [Capital]" to understand whether Earn "adequately compensates
[Gemini] for the risk."  That one-pager, dated June 6, 2022, reiterated the projected 50-60%

default rate for CCC companies in the event of a market downturn and predicted a potential loss

in the hundreds of millions of dollars based on that default rate.

83.    Gemini continued discussing whether to terminate Earn through the summer of

2022.  On or around July 18, 2022, Gemini's risk management and product teams compiled a

slide titled "Gemini Earn: Risk vs. Reward."  Gemini's Associate Director of Risk and its

Command Pilot (or head) of NeoBanking (the business unit at Gemini managing Earn) reviewed

this document.

84.    In this document, Gemini acknowledged:

> [the market risk team] believes Genesis [Capital] financial [sic] is similar to a
> CCC company, which would be required to pay a 14%+ yield in the public debt
> market.  Therefore, lenders would require a *~**14% yield*** to compensate for
> Genesis [Capital]'s default risk.

(emphasis in original).

85.    The same document also indicated that Genesis Capital could lose up to $1.4

billion from a single borrower's default.

86.    Rather than disclose the risk to Earn investors so that they could take steps to

protect themselves, Gemini instead proposed using this information to protect itself.  In the same

document, Gemini's risk management team concluded Gemini was "not compensated enough" to

assume Genesis Capital's risk of default, and that Gemini should accordingly "[w]eaken the

connection between Earn and Gemini" by changing Earn's branding, or "[e]ducate clients on the

potential losses" to "properly set clients' expectations."  Gemini's risk management team

proposed these solutions to "[r]educe [the] reputational risk [to Gemini] arising from a Genesis

default."

87.    On or around July 28, 2022, Gemini's Board of Managers met to discuss how to

close "the disconnect between the risk profile the program has been designed for—as an agent,

Gemini is not liable for losses in case of Genesis default—and the expectation of having to make a hard choice in case of Genesis becoming insolvent." According to a document prepared for this meeting, "[o]ne option [to close that disconnect] [wa]s to judge the disconnect inherently unfixable and proceed with an orderly shutdown of Gemini Earn."

88.     During this meeting, Gemini's Board of Managers, Cameron Winklevoss, and Tyler Winklevoss discussed the credit and liquidity risks associated with Genesis Capital and Earn. Gemini's Associate Director of Risk and its Command Pilot of NeoBanking presented to the Board during that meeting regarding Genesis Capital's credit and liquidity risks.

89.     During that meeting, several board members expressed doubts about Genesis Capital's creditworthiness. Cameron Winklevoss began the meeting by noting that Genesis Capital's "[b]orrowers [were] lying about their financials" and asked, "can we trust that 'A players' are running Genesis and are going to make good decisions/avoid getting duped?" One board member compared Genesis Capital's debt-to-equity ratio to that of Lehman Brothers prior to its collapse and said, "[i]f the market sneezes, you're in the same situation again." A board member also questioned whether Genesis Capital had misrepresented information to Gemini about its largest borrower at the time, Alameda.

90.     Immediately after this discussion, the Board of Managers and the Winklevosses discussed whether to wind down Earn to avoid reputational damage from Genesis Capital's default. Between this meeting and when the Earn program was terminated, Gemini gave Genesis Capital an additional hundreds of millions of dollars' worth of investor assets.

## 2.     Gemini Received Risk Reports From Genesis Capital That Showed Continued Deterioration

91.     In addition to Genesis Capital's financial statements, Genesis Capital also gave Gemini risk reports indicating that Genesis Capital's credit risk grew from May 1, 2022. In May

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 602 of 637

2022, Genesis Capital provided Gemini with weekly Credit Portfolio Metrics reports regarding

its key risk metrics, such as the percentage of Genesis Capital's loans secured by collateral.

Each metric had a threshold that indicated Genesis Capital's ordinary risk tolerance.

92.     From May 1, 2022, through November 16, 2022, Gemini observed that Genesis

Capital routinely exceeded these thresholds for several key risk metrics.

93.     Genesis Capital's excesses of key risk metric thresholds grew more frequent and

consistent as this period continued.  From August 16, 2022, through November 16, 2022,

Genesis Capital exceeded at least two—and as many as five—key risk metric thresholds out of

nine threshold-bearing metrics in every report it provided to Gemini.

94.     Genesis Capital's consistent failures to manage its key risk metrics

demonstrated—or should have demonstrated—to Gemini that Genesis Capital's collateralization

management process was failing and that Genesis Capital took inadequate steps to reduce risk.

### 3.  Gemini Failed to Disclose to Earn Investors Overconcentration in Genesis Capital's Loan Book

### i.  Overconcentration in Alameda

95.     On July 6, 2022, Genesis Capital began to provide reports to Gemini regarding

additional risk metrics.  From July 6, 2022, through August 16, 2022, these reports showed that

Genesis Capital's loans were heavily concentrated in a single counterparty, cryptocurrency

trading firm Alameda, which was the borrower for nearly 60% of all outstanding loans from

Genesis Capital to unaffiliated counterparties (*i.e.*, excluding loans to DCG and its affiliates).

Further, Genesis Capital's loans to Alameda were mostly secured with FTT tokens issued by

23

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 603 of 637

Alameda's affiliate, cryptocurrency platform FTX Trading, Ltd.  This counterparty concentration and poor-quality collateral created a risk of massive losses if Alameda defaulted.

96.    On August 8, 2022, Cameron Winklevoss spoke to Genesis Capital's Managing Director No. 1 regarding Gemini's concerns about Genesis Capital's risk management practices. During that conversation, Winklevoss said that unless DCG itself guaranteed repayment of the Earn investments, Gemini would wind down Earn.  Gemini never informed Earn investors of these actions.  Nor did Gemini ever receive a guarantee from DCG.

97.    On August 16, 2022, Genesis Capital recalled nearly $2 billion in loans to Alameda.  However, Gemini's risk assessments showed that Genesis Capital's risk ratios remained above Genesis Capital's own tolerance levels even after recalling these loans.

### ii.   Overconcentration in Related Parties

98.    Without Alameda, Genesis Capital's loan book was overconcentrated in loans to related parties like DCG.

99.    From August 16, 2022, through November 16, 2022, nearly 50% of Genesis Capital's outstanding loans consisted of loans to its own affiliates, including hundreds of millions of dollars in unsecured loans to its own parent company, DCG.

100.   Gemini failed to disclose any of these material facts to Earn investors.

### E.  Gemini Misled Investors Who Expressed Concern About Earn

101.   From February 2021 through at least November 14, 2022, Gemini never adjusted, amended, or corrected its representations about the Earn investment program, the quality of its "trusted" and "accredited" partner or the fulsomeness of its own risk management processes.  In

fact, Gemini repeated these misrepresentations directly to Earn investors when they were at their

most vulnerable.

102.    June 2022 marked a period of rapid deterioration and instability in the crypto

markets, with the collapse of TerraUSD and Luna causing losses at Three Arrows and other

cryptocurrency companies.

103.    On June 16, 2022, one retail Earn investor asked Gemini via email whether "any

of [the Earn investor's] funds have been placed with [Three Arrows].  If so, are [the investor's]

funds in jeopardy?"  Gemini responded:

> Your funds in Earn are not insured by Gemini but are held with our trusted
> partners. Our partners are vetted through our risk management framework and
> always disclosed to you, so you know which institution has borrowed your funds.
> Currently, Gemini is partnering with accredited third party borrower Genesis.
>
> …. All loans are open-term and callable, and the customer's experience is
> seamless with Gemini's platform, allowing quick access to earn interest and
> redeem funds.

104.    Likewise, on June 27, 2022, one retail Earn investor wrote to Gemini: "[w]ith the

layoffs and what is happening with other exchanges like Celsius and Blockfi I am concerned

about Gemini.  Does Gemini have any similar vulnerabilities?"  Gemini responded in part: "We

founded Gemini with a security-first mentality and ethos of asking for permission, not

forgiveness. We have worked hard to provide you with a high-integrity choice and we look

forward to earning and maintaining your trust."

105.    When this Earn investor asked about "liquidity vulnerabilities" and "risky

investments/loans that would risk my assets or cause Gemini to halt withdrawals" for Earn,

Gemini responded:

> Gemini is partnering with accredited third party borrowers including Genesis,
> who are vetted through a risk management framework which reviews our
> partners' collateralization management process. On a periodic basis we will

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 605 of 637

> conduct an analysis of our partners' cash flow, balance sheet, and financial
> statements to ensure the appropriate risk ratios and healthy financial condition of
> our partners. We will notify you when interest payments hit your account, and
> you can then check balances in real time. Gemini will continue to add high-
> quality partners in order to ensure competitive rates and allow you to diversify
> your borrowers.

Two days later, this investor made an additional $1,000 ACH transfer into his Gemini account.

106.    Similarly, on July 24, 2022, another retail Earn investor asked Gemini in an email whether it was "involved with any of the drama surrounding [Three Arrows]," and more specifically, how events surrounding Three Arrows impacted Genesis Capital and Earn investors. A Gemini customer service representative responded, "we are not involved in anything regarding [Three Arrows]" and followed up with:

> Genesis [is] vetted through a risk management framework which reviews our
> partners' collateralization management process. On a periodic basis we will
> conduct an analysis of our partner's cash flow, balance sheet, and financial
> statements to ensure the appropriate risk ratios and healthy financial condition of
> our partners.

107.    After the same investor requested additional details, Gemini's customer service representative responded: "all of Gemini's business operations continue to function normally, including Earn.  Unfortunately, I do not have any more information at this time."

108.    Through these statements, Gemini assured investors that it was safe to invest their cryptocurrencies in Genesis Capital through Earn.

109.    During this same period, Gemini risk management personnel withdrew their own investments from Earn.  A Gemini Senior Risk Associate working on Earn withdrew his entire remaining Earn investment—totaling over $4,000—between June 26, 2022, and September 5, 2022.

110.     Likewise, Gemini's Chief Operations Officer, who also sat on Gemini's Enterprise Risk Management Committee, withdrew his entire remaining Earn investment— totaling more than $100,000—on June 16 and June 17, 2022.

**F. Gemini Secretly Sought to Terminate Earn in October 2023 While Continuing to Induce Investments in Earn from the Public and Continuing to Turn Over Investor Assets to Genesis Capital**

111.     On September 2, 2022, Gemini's leadership, including Cameron and Tyler Winklevoss, decided to terminate Earn due to the reputational risk that Gemini would suffer if Genesis Capital defaulted.  On October 13, 2022, Gemini sent a confidential formal written notice to Genesis Capital terminating all Earn Agreements on behalf of Earn investors and demanding the return of all Earn investors' assets.  Gemini did not announce this decision to the Earn investors and instead kept soliciting investor assets.

112.     On October 20, 2022, DCG's CEO, Silbert, met with Gemini's president Cameron Winklevoss.  During that meeting, according to internal DCG documents, Silbert informed Winklevoss that Gemini was Genesis Capital's largest and most important source of capital and that Genesis Capital could not redeem Earn investors' funds without Genesis Capital declaring bankruptcy.

113.     Gemini secretly granted Genesis Capital multiple extensions to return investor funds.

114.     Even after Gemini privately demanded the return of investor funds on October 13, 2022, it transferred tens of millions of dollars' worth of Earn investors' assets to Genesis Capital.

115.     Neither Gemini nor Genesis Capital disclosed to Earn investors the termination notice, the extensions of the redemption date, or the risk that Genesis Capital would go into bankruptcy.  These were material facts for investors.

IV.   **DCG Scheme: The Genesis Entities, DCG, Moro and Silbert Concealed a $1 Billion Loss From Earn Investors**

116.    The Earn investors were also the victims of a separate scheme perpetrated by the Genesis Entities, DCG, and their respective CEOs Moro and Silbert to conceal more than $1 billion in losses at Genesis Capital.

A.   **The Genesis Entities Suffer Around $1.1 Billion in Losses**

117.    In the days leading up to June 13, 2022, Three Arrows was the Genesis Entities' second-largest borrower.  Although Three Arrows nominally borrowed from Genesis Asia Pacific, Genesis Capital used Genesis Asia Pacific as a pass-through entity to lend its own assets to Three Arrows.  Genesis Asia Pacific's loans to Three Arrows were open-term and callable by Genesis Asia Pacific.  Three Arrows paid between 8-15% interest on these loans.

118.    When Genesis Capital funded these loans, it categorized them as "receivables from related parties" on its balance sheet, which reflected the amount that Genesis Capital gave to Genesis Asia Pacific to lend to Three Arrows.  Genesis Asia Pacific repaid Genesis Capital around the same time that Three Arrows repaid its loans to Genesis Asia Pacific.  For its part, Genesis Asia Pacific recorded the amounts it owed to Genesis Capital in connection with these loans as "current liabilities" on its balance sheet—*i.e.*, liabilities payable within one year.

119.    Neither Gemini nor Genesis Capital informed Earn investors that their assets were being passed to Genesis Asia Pacific.  Indeed, Gemini did not conduct ongoing diligence into Genesis Asia Pacific, and did not receive Genesis Asia Pacific's financial statements on a quarterly basis.

120.    Genesis Capital and Genesis Asia Pacific failed to conduct adequate due diligence on Three Arrows.  Contrary to assurances to Gemini on February 18, 2022, that Genesis Capital reviewed its borrowers' "[m]ost recent financial statements with quarterly update cadence,"

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 608 of 637

neither Genesis Capital nor Genesis Asia Pacific had received audited financial statements from

Three Arrows since July 2020.  Genesis Capital and Genesis Asia Pacific also accepted from

Three Arrows illiquid collateral to secure more than $500 million in loans.

121.    On June 13, 2022, Three Arrows defaulted on billions in loans from Genesis Asia

Pacific.  As a result of this default, Genesis Asia Pacific (and thus, the Genesis lending business

generally) incurred a loss of approximately $1 billion in open-term, on-demand assets.  Around

the same time as Three Arrows' default, Genesis Capital also incurred more than $100 million in

losses arising from the default of another borrower, Babel Finance.

122.    The losses from Three Arrows and Babel created negative equity value at the

Genesis Entities and created a deficit in the open-term assets available to repay Earn investors.

Genesis Capital's internal documents stated that these losses opened a $1.1 billion structural hole

in Genesis Capital's loan book.

**B. The Genesis Entities, DCG, Moro and Silbert Plug the Structural Hole With Deceit
and Misrepresent Genesis Capitals' Financial Condition to Counterparties**

123.    DCG and Genesis Capital engaged in a communications campaign designed to

conceal Genesis Capital's financial condition and mislead counterparties into believing Genesis

Capital was operating "business as usual."  Those counterparties included Gemini, which

conducted ongoing due diligence on behalf of the Earn investors.

124.    From June 13, 2022, through July 2022, DCG employees and executives

(including Silbert and DCG's Chief Operating Officer ("COO")) met with Genesis Capital's

leadership daily, often multiple times a day.  During these meetings, DCG and Genesis Capital

employees discussed how to communicate with counterparties about Three Arrows, and how to

bolster the Genesis Entities' financial condition in the wake of these losses.  During the same

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 609 of 637

period, DCG's COO and DCG's Head of Communications helped draft talking points documents for use by DCG and Genesis Capital personnel in conversations with counterparties.

125.    On June 13, 2022, Silbert directed Moro and Genesis Capital's COO to lead the company's response to the Three Arrows' situation "with support and guidance from DCG."

126.    On June 13, 2022, Silbert reported to DCG's board that Three Arrows defaulted and that Genesis Capital's "unsecured exposure," or expected loss at the time, was "uncomfortably big (well over $500 mm now)." Silbert went on to explain that some of the collateral provided by Three Arrows was illiquid as it consisted of shares of the Grayscale Bitcoin Trust ("GBTC") issued by DCG-subsidiary Grayscale Investments, LLC, which Genesis Capital could not liquidate due to restrictions on sales of stock by the issuing company's affiliates. Accordingly, Silbert reported to DCG's board that Genesis Capital was preparing for a bank run, and that DCG would seek additional financing both for itself and Genesis. In Silbert's words: "Everything needs to be on the table" regarding financing.

127.    Then, on June 14, 2022, Silbert, on behalf of DCG's board, instructed Moro and Genesis "to continue aggressively shrinking the loan book and, until such time as we have the right controls, risk monitoring, etc. in place—and we're through the winter—… to limit the extension of any new loans to counterparties."

128.    Also on June 14, 2022, Silbert reported to DCG's board of directors regarding Genesis Capital's strategy after Three Arrows' default. In doing so, Silbert presented the option to "[j]ettison[] the Genesis Capital business" by not supplying Genesis Capital with additional capital to strengthen its balance sheet.

129.    Nevertheless, on June 15, 2022, two days after Three Arrows' default, the Genesis Entities tweeted via their shared Twitter account:

30



130.    Silbert and DCG both re-tweeted this statement on June 15, 2022.

131.    Indeed, that same day, Silbert wrote to Moro and other Genesis Capital personnel in a Microsoft Teams chat that "the word on the street is that genesis is the 'blue chip' in this mess….  we need to continue to perpetuate that of course."  In other words, Silbert directed Genesis Capital personnel to perpetuate the idea that, within the cryptocurrency industry, Genesis Capital was akin to highly stable "blue chip" companies.

132.    Then, on June 17, 2022, the Genesis Entities' CEO Moro tweeted the following:



133.    DCG's COO reviewed and edited these tweets before Moro posted them.  In strategizing the release of the tweets, DCG's COO directed Moro to send these tweets "from Moro['s] [personal Twitter account]" despite directions from Genesis Capital's compliance department that these tweets should come from Genesis Capital's corporate account.  The Genesis Entities reposted Moro's tweets that same day.

134.     Similarly, in a June 17, 2022 phone call with Gemini's risk management personnel, Managing Director No. 1 stated, "Genesis remains solvent and operates [business as usual] at the moment.  With the strong [loan book] and capital support from DCG, Genesis has no concerns on business operations."  In the same call, Managing Director No. 1 further stated, "Genesis experienced a certain amount of losses from the liquidation, but will absorb the losses using its own balance sheet."

135.     After the call with Gemini, Silbert and DCG's COO were updated that same day that Gemini "asked hard [questions] about [Three Arrows]," but that Managing Director No. 1 "fended it off."

136.     Gemini continued to send Genesis Capital additional investor funds after June 17, 2022.

137.     The tweets and statements to Gemini set forth above were false and misleading in at least five ways.

138.     First, client funds had been impacted—the Three Arrows losses severely impaired Genesis Capital's ability to repay its counterparties, including Earn investors.

139.     Second, due to Three Arrows' default on June 13, 2022, the Genesis Entities' balance sheets were not strong, solvent, or capable of absorbing the losses; the Genesis Entities suffered a loss that exceeded their equity.  Indeed, in a June 21, 2022 email, Silbert informed colleagues at DCG that "the hole in Genesis equity due to the Three Arrows exposure is something they we [sic] will need to fill by 6/30," and asked his colleagues to "keep [that] between us."  Three days later, Silbert further explained to DCG personnel "[w]e just can't allow people inside or outside [to] question Genesis' solvency" due to Silbert's concern that this could spark a bank run.

32

140.    Third, the tweets discussed the sale or hedging of all "liquid" collateral while concealing that hundreds of millions of dollars' worth of the loans were secured by illiquid collateral that could not be sold and was not hedged.

141.    Fourth, Genesis Capital had not "shed the risk and moved on"—as of June 17, 2022, it still held a more than $1 billion receivable relating to Three Arrows as an uncollectible asset on its balance sheet.

142.    Fifth, Genesis Capital was not operating "business as usual"; the business was seeking to fill an equity deficiency and at Silbert's direction on June 14, 2022, limited the origination of new loans and started shrinking its loan book.

143.    On June 27, 2022, Genesis Capital's then CEO, Moro, emailed DCG and Genesis Capital executives, explaining the need to show a "well-capitalized" balance sheet to counterparties like Gemini on June 30, 2022:

> Once the equity problem is solved, the liquidity problem is much easier to solve. I think we'll find people to lend us additional [cryptocurrency] with a well-capitalized 6/30 balance sheet.
>
> And yes, at some point, our losses in [Three Arrows] and potentially Babel will become public.  But if we're able to show our balance sheet after all of that happened and it still looks strong, I think that 1) people will care less about the losses and 2) we'll be better able to operate from a place of strength going forward.
>
> But as I told Barry this evening, we have a lot of work to do before we can get back to full-steam-ahead on lending.  Better to think of it in wind-down mode for the time being, and just manage liquidity as loans roll off. Then we can look to rebuild.

144.    The next day, in a June 28, 2022 email, Moro wrote to Silbert that he had discussed with other Genesis Capital representatives how to "best fill the equity hole", euphemistically referring to the Genesis Entities' negative equity value caused by the more than $1 billion in losses.  Moro wrote that "[w]hile liquidity [was] still [Genesis Capital's] number

33

one focus, [they] only ha[d] a couple of days until quarter-end." Thus, he proposed an "overall plan" of injecting certain assets to "plug the equity hole" and then "work on consistent messaging to speak to the loss to counterparties when we put out [a] new balance sheet" in an effort to "[r]estore confidence in the market and keep looking to borrow with term." Moro continued:

> We wouldn't necessarily need to touch the [proposed] assets [that DCG would inject] … for liquidity purposes, it could just be for balance sheet support. And then with a strengthened balance sheet, we would be able to source additional unsecured funding to be able to continue to manage our liquidity and withdrawal obligations.

145.    At this time, the Earn investors were one of Genesis Capital's largest sources of unsecured funding.

146.    Silbert responded: "It is certainly our hope and intention to help Genesis address the equity-hole—hopefully by 6/30. To that end, the Genesis team should be working 24/7 with DCG and [DCG's subsidiary, DCG International Investments, Ltd.] teams to figure out all possible ways to do so along the lines" outlined in Moro's email.

147.    On June 30, 2022, Moro and Silbert entered into the $1.1 billion Promissory Note. Under the Promissory Note, DCG agreed to pay Genesis Capital a decade later at only 1% interest per annum to "replace" the receivables Genesis Capital would have otherwise received from Genesis Asia Pacific for the Three Arrows loans. Genesis Capital categorized this $1.1 billion as an asset on its balance sheet.

148.    Silbert signed the Promissory Note as CEO of DCG.

149.    Moro signed the Promissory Note as the CEO of Genesis Capital and Genesis Holdco, and as director of Genesis Asia Pacific.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 614 of 637

150.    DCG dictated the terms of the Promissory Note, including the ten-year duration

and 1% interest rate.  DCG provided no collateral to secure its obligations under the Promissory

Note.  To the contrary, DCG's repayment of the Promissory Note was subordinate to DCG's

repayment of an over $350 million credit facility to unrelated third parties.  DCG's pre-existing

$350 million obligation reduced the likelihood that DCG could repay the Promissory Note.

151.    On July 6, 2022, in reference to Three Arrows, Moro tweeted:



152.    DCG's COO and Head of Communications edited and helped draft these tweets.

Silbert reviewed these tweets before Moro posted them.

153.    The tweets were false, misleading, and omitted material facts.  DCG did not

simply "assume" the $1.1 billion, open-term liability related to Three Arrows, which could be

called at any time; it *replaced* that liability with an illiquid ten-year Promissory Note.

154.    The Promissory Note failed to ensure that Genesis Capital had sufficient capital to

operate its business.  The Promissory Note required DCG to provide cash payments in no sooner

than 10 years, whereas the Three Arrows-related liabilities DCG purportedly "assumed" were

callable on demand; this created a mismatch between the Promissory Note and Genesis Capital's

billions of dollars' worth of on-demand obligations to Earn users. Genesis Capital's and DCG's

35

internal documents reveal that the Promissory Note's ten-year duration and 1% interest rate failed to address the "structural hole" caused by the Three Arrows losses. In an internal document, Genesis Capital's Chief Risk Officer acknowledged that the Promissory Note "wreaks havoc on our balance sheet impacting everything we do."

155. Earn investors reviewed Moro's July 6, 2022 tweets and determined them to be material. Indeed, some Earn investors emailed Gemini customer service representatives asking about Genesis Capital's financial condition in the wake of Three Arrows; in response, Gemini "encourage[d] [these investors] to take a look at Genesis's public statements [from July 2022] for more detailed information on its exposure to" Three Arrows—*i.e.*, Moro's July 6, 2022 tweets. Thereafter, these retail investors provided additional assets to Genesis Capital. For example, one of these retail investors invested more than $1,000 in Gemini Earn on July 20, 2022, shortly after Gemini directed this investor to Moro's tweets. This investor lost more than $10,000 in Gemini Earn when Genesis Capital suspended withdrawals on November 16, 2022.

156. Likewise, on July 13, 2022, Gemini observed in internal documents that "several customers [using the social media website Reddit] were reassured by statements from Genesis re [Three Arrows]."

157. On July 6, 2022, Genesis Capital's Head of Communications and Public Relations sent a document titled "Talking Points to [Three Arrows] Questions" to Moro, as well as DCG's COO, DCG's Head of Communications, and various other senior employees at Genesis Capital and DCG with instructions to "review and approve." DCG's Head of Communications helped draft these talking points. DCG's COO also reviewed these talking points on July 6, 2022. These talking points were to be used by Genesis Capital personnel in conversations with counterparties, including Gemini.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 616 of 637

158.    These talking points did not provide any information regarding the Promissory

Note, its ten-year duration or 1% interest rate, or the $1.1 billion value of Genesis Capital's

losses.  Instead, the talking points included the misrepresentations that DCG "absorbed" the

losses, that Genesis Capital was "well capitalized," and that "DCG has assumed certain liabilities

of Genesis related to [Three Arrows] to ensure [Genesis Capital] ha[d] more than adequate

capital to operate and scale our business for the long-term."

159.    Relying on these talking points, on July 6, 2022, Genesis Entities' Co-Head of

Trading and Lending, Managing Director No.1, informed Gemini, both over the phone and in

writing, that the Three Arrows "[l]osses [were] predominantly absorbed by and netted against

DCG balance sheet" and that Genesis Capital remained "well-capitalized."  Genesis Capital

misled investors and omitted material facts regarding its financial condition during these

communications, including that Genesis Capital's balance sheet contained an illiquid $1.1 billion

Promissory Note.

160.    On July 18, 2022, DCG filed a bankruptcy claim against Three Arrows for more

than $1 billion.  The same day, DCG's COO instructed Managing Director No. 1 in writing to

"manage [G]emini and the other largest counterparties" because DCG was concerned that Earn

investors would withdraw their assets.  Thus, on July 18, 2022, Managing Director No.1 told

Gemini's risk personnel conducting due diligence for Earn investors: "There might be some

information relating to DCG's claim against [Three Arrows] that gets published today or

tomorrow. None of this is new information and all of our loses [sic] have already been absorbed

by DCG/realized on our balance sheet.…  All of the losses have already been reflected and are

with DCG."

161.     Even after July 18, 2022, Gemini transferred hundreds of millions of dollars'
worth of investor assets to Genesis Capital under Earn.

162.     These statements on July 6 and 18, 2022, were false, misleading, and omitted
material information.  DCG did not "absorb" the Genesis Entities' losses.  The Promissory Note
concealed those losses on Genesis Capital's balance sheet but did not replace the lost open-term
assets.  On July 7, 2022, Managing Director No. 1 described the issue to DCG's COO as follows:

> the issue is more structural … even though DCG took on liability from [Genesis
> Asia Pacific], it still leaves a liquidity hole if we were to conceptually wind the
> book down to nothing, the liquidity hole long-term = the $900 m2m loss on
> [Three Arrows] + the lack of liquidity on the GBTC collateral which is another
> $450mm, so structurally, we have about 1.345B we'd need to get in the form of
> long-term debt or equity to ultimately have enough liquid capital to wind
> everything down.

163.     In another communication dated July 22, 2022, Managing Director No. 1
explained to a high-level DCG employee that the Three Arrows losses created a "[d]uration
mismatch [at Genesis Capital] because we had [one billion] of open term assets with [Three
Arrows] which no longer exist and thus cannot be used to offset all of our open term liabilities"
including liabilities to the Earn investors.  Managing Director No. 1 continued to explain that
there was an additional "asset quality mismatch because $500 [million] of the collateral we
absorbed to offset the [Three Arrows] losses was GBTC which isn't liquid. So both of these
things on net contribute to the overall net liquidity gap [Genesis Capital] [has] as an
organization."

164.     Further, the losses were not reflected on Genesis Capital's balance sheet—they
were reflected on Genesis Asia Pacific's Q2 2022 income statement, which Genesis Capital
never provided to Gemini.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 618 of 637

165.    On July 21, 2022, Genesis Capital's CFO corrected some of these misstatements, writing in an email to a member of Genesis Capital's sales team: "[w]e should avoid using the word 'well-capitalized'" and "DCG didn't absorb the loss."  The same day, Genesis Capital's CFO also messaged Managing Director No. 1 and several members of the lending team: "[w]e have to stop making reference that we are well capitalized."

166.    On July 21, 2022, Genesis Capital's CFO informed DCG and the Genesis Entities' Heads of Communications of similar false statements contained in Genesis Capital's and DCG's talking points.  Neither DCG nor Genesis Capital corrected any prior misstatements made to Gemini or the Earn investors.

167.    Genesis Capital's CFO objected to these false statements to further conceal Genesis Capital's financial condition.  As Genesis Capital's CFO explained to Genesis Capital's Chief Marketing Officer on July 21, 2022: "I don't want sales to tell people we have no losses and then ask me to be on a call to justify that."

168.    Genesis Capital's CFO and its finance team avoided joining phone calls with counterparties to conceal Genesis Capital's financial condition.  Instead, members of Genesis Capital's sales and lending teams answered financial questions using only approved talking points that contained no explanation of the Promissory Note or its terms.  In a private message dated August 30, 2022, Genesis Capital's CFO confided to a colleague:

> We are only comfortable to share what will yield the best outcome for the firm. [Having the finance team] on the call without anticipated questions is not putting finance on the spot.  It's putting the firm on the spot.  That's what we have to convey [to Genesis Capital personnel] [and] why [having the finance team join counterparty calls] will be putting c suites and [the] firm "at risk."

169.    Starting in July 2022, and continuing multiple times per week until November 16, 2022, Genesis Capital provided reports to Gemini that listed the value of Genesis Capital's

"current assets." A "current asset" is one that can be reduced to cash or cash equivalents within the course of one year. These reports fraudulently categorized the Promissory Note as a current asset, even though it was payable ten years later. In response to inquiries from Gemini, on July 28, 2022, Genesis Capital's CFO helped Genesis Capital's lending team draft an email to Gemini which explained that the "current assets" column in this report contained "$1.1bn in receivables from related parties"—*i.e.*, the Promissory Note. This email to Gemini omitted any reference to the Promissory Note's duration or other terms.

### C. DCG and Genesis Capital Concealed Information That Would Have Revealed Their Deceit

170.     Genesis Capital's CFO and other personnel directed employees not to disclose the Promissory Note to counterparties such as Gemini. Indeed, many Genesis Capital employees were not informed of the Promissory Note until months after its signature.

171.     When counterparties requested additional information concerning Genesis Capital's financial statements, Genesis Capital continued to conceal and suppress information that would have revealed the Promissory Note or losses on counterparty defaults. In July 2022, Genesis Capital's CFO directed other personnel to tell counterparties that the notes to Genesis Capital's balance sheet—which would have explained the Promissory Note and its impact on Genesis Capital's balance sheet—were not prepared more frequently than the end of the year. This was false. Genesis Capital prepared notes for its quarterly balance sheets in prior quarters, including its unaudited balance sheets for the second and third quarters of 2021 and the first quarter of 2022.

172.     In a July 2022 Microsoft Teams chat, Genesis Capital's CFO confessed to her co-workers that the "real reason" why Genesis Capital would not provide these footnotes to counterparties was because "[i]n the notes, we are required to disclose a lot of things [w]hich

will highlight what happened" including the "assignment of liab[ilities]"—*i.e.*, the Promissory Note.

173.    In another Microsoft Teams chat, in September 2022, Genesis Capital's CFO explained to coworkers that without the footnotes, counterparties would not know about the Promissory Note from the balance sheet alone.

174.    After June 30, 2022, Genesis Capital's CFO, in consultation with DCG, directed Genesis Capital personnel not to share cash flow and income statements and to withhold Genesis Asia Pacific's financial statements from counterparties.  These financial statements would have revealed hundreds of millions of dollars in losses during the second quarter of 2022 and would have revealed that DCG did not "absorb the loss."

175.    Cash flow and income statements were important to Gemini's ability to assess Genesis Capital's ability to pay back Earn investors.  Thus, Gemini requested Genesis Capital's cash flow and income statements for the second quarter of 2022 on multiple occasions after June 30, 2022.

176.    Genesis Capital ignored these requests and Gemini allowed them to do so.

177.    Before executing the Promissory Note, Genesis Capital executives, including Moro, Genesis Capital's CFO, and Managing Director No 1, informed DCG officers and employees what financial statements had previously been shared with counterparties, including Gemini.  Thus, both DCG and Genesis Capital knew that they were deviating from past practices in providing only a balance sheet to Gemini.

178.    Genesis Capital personnel soon grew concerned that Genesis Capital had provided false information to counterparties.  On September 1, 2022, Genesis Capital's Director of Lending reported to its interim CEO: "I'm hearing concerns from front office folks.... They're

concerned about the accuracy of information we have shared with clients re liquidity and variability in our equity…. There still is no liquidity infusion from DCG to fill the gap and instead we have a 'note'." Nevertheless, neither DCG nor Genesis Capital corrected the misstatements that Genesis Capital employees made to counterparties, including the Earn investors.

179.    On October 28, 2022, Silbert authorized Genesis Capital's Director of Lending to disclose the Promissory Note to Gemini—a mere two weeks before Genesis Capital suspended withdrawals and weeks after Gemini notified Genesis Capital that it was terminating Earn.

**D.    DCG Created a Liquidity Crunch at Genesis Capital While Misleading Investors into Believing the Opposite**

180.    From January 2022 through July 2022, DCG and its subsidiary, DCG International Investments, Ltd. ("DCGI"), collectively borrowed more than $800 million from Genesis Capital.

181.    On January 24, 2022, Genesis Capital lent DCG $100 million in cash on an unsecured basis, with a stated maturity date of July 24, 2022. DCG failed to repay that loan on or before its maturity date. Instead, on July 25, 2022, a DCG executive informed Managing Director No. 1 that DCG "literally [did not] have the money right now" to repay the loan.

182.    Also on July 25, 2022, the same day, DCG's treasurer emailed Genesis Capital's COO and Managing Director No. 1:

> We received guidance from [Silbert] to re-paper the $100mm loan (with July 24th maturity) from Genesis to DCG by 10 months (until May 2023). Please let us know what documentation is needed to execute on the new loan. Also, we need to include language that the loan could be repaid early without any penalty.

183.    Managing Director No. 1 objected, stating: "given the continued pressure from major lenders such as … Gemini … this duration mismatch will certainly put Genesis in a much worse spot." The same day, on July 25, 2022, DCG's Treasurer responded that DCG "need[ed]

to preserve liquidity to meet our operating cash needs over the next few months." After

additional objections, the next day, Managing Director No.1 relented stating: "it sounds like we

don't have much room to push back, so we will do what DCG needs us to do." DCG also

dictated the interest rate for this loan.

184.    Similarly, on February 23, 2022, Genesis Capital lent DCG another $100 million

in U.S. dollars on an unsecured basis, with a stated maturity date of August 23, 2022. After the

payment became due, at DCG's insistence, Genesis Capital extended the maturity date of this

loan to May 2023.

185.    On or about June 18, 2022, Genesis Capital lent approximately 18,697 bitcoin

(valued at over $355 million as of June 18, 2022) to affiliate, DCGI, on an open-term basis.

Rather than repaying this loan in bitcoin—the denomination of the loan—DCGI partially repaid

that loan on November 10, 2022, with 25,999,457 shares of GBTC which were worth

approximately $250 million as of November 10, 2022.

186.    This repayment deprived Genesis Capital of liquidity because unlike bitcoin,

Genesis Capital neither borrowed nor lent GBTC, and could not liquidate the GBTC shares due

to affiliate sales restrictions as referenced in paragraph 126 above.

187.    After this repayment, 4,550.45 bitcoin (approximately $80 million as of

November 10, 2022) remained outstanding on Genesis Capital's loan to DCGI. On November

10, 2022, DCG made Genesis Capital extend the maturity date for the remaining amount to May

11, 2023. These loans all remain unpaid.

## V.    Gemini and Genesis Capital Misrepresented the Licensed Status of Genesis Capital

188.    Gemini and Genesis Capital also systematically deceived Earn investors regarding

the regulatory oversight of Genesis Capital. Both parties led Earn investors to believe Genesis

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 623 of 637

Capital had met its regulatory burdens to receive investments through Earn lawfully.  However,
this was not the case.

189.    To invest in Earn, all Earn investors had to agree to the Earn Master Agreement
between the Earn investor, Genesis Capital, and Gemini as "custodian" and "agent" for the Earn
investors.  Earn investors accessed this agreement through Gemini's platform.

190.    The Earn Master Agreement contained several "Representations and Warranties,"
including that "[e]ach Party represent[ed] and warrant[ed] that to its knowledge the transaction
contemplated in th[e] [Earn Master Agreement] [we]re not prohibited by law or other authority
in the jurisdiction of its place of incorporation, place of principal office, or residence and that it
has necessary licenses and registrations to operate in the manner contemplated in this
Agreement."  Further, "[e]ach Party represent[ed] and warrant[ed] that it ha[d] all necessary
governmental and other consents, approvals and licenses to perform its obligations" under Earn.

191.    Genesis Capital's Chief Legal Officer acknowledged several months before the
launch of Earn that the program "may be viewed as an investment contract under the securities
laws."

192.    By promoting Earn on its website and social media accounts and entering into
Earn Master Agreements with Earn customers, Genesis Capital offered for sale and sold
securities without registering with the OAG as a securities dealer or a securities salesperson.

193.    Earn is a security under the Martin Act because Earn investors provided their
cryptocurrency assets to Genesis Capital with the expectation of receiving promised yields from
Genesis Capital's efforts in deploying investors' pooled assets.

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 624 of 637

194.     Despite its failure to register with the OAG, Genesis Capital continued to represent that it was authorized to enter into transactions with Earn investors in New York and entered into tens of thousands of Earn Master Agreements with New Yorkers.

195.     Months before the launch of the Gemini Earn program, Gemini knew that Genesis Capital was regulated only by FinCEN and, in fact, categorized Genesis Capital's lack of regulation as a "high" risk factor in internal documents.

196.     Neither Genesis Capital nor Gemini corrected the misstatement made in the Earn Master Agreement.

## VI.     Genesis Capital Announces It Cannot Repay More Than 232,000 Earn Investors

197.     On or about November 12, 2022, Genesis Capital privately sought an emergency loan of between $750 million and $1 billion from a third party, and informed the proposed lender that it was facing a "liquidity crunch primar[ily] due to certain illiquid assets on its balance sheet following the events of [Three Arrows]" including (1) the Promissory Note; (2) GBTC; and (3) unsecured loans to DCG.  Genesis Capital did not—or could not—obtain this emergency loan.

198.     On November 16, 2022, Genesis Capital, using the Twitter handle (@GenesisTrading), announced:



Genesis @GenesisTrading · Nov 16
Our #1 priority is to serve our clients and preserve their assets. Therefore, in consultation with our professional financial advisors and counsel, we have taken the difficult decision to temporarily suspend redemptions and new loan originations in the lending business.

86          170          240

Show this thread

**VII.    Earn Investors Lost Over One Billion Dollars Due to Defendants' Fraud**

199.    When Genesis Capital suspended withdrawals on November 16, 2022, it owed more than $1 billion to more than 232,000 Earn investors, including at least 29,000 New Yorkers.  Many of these investors unsuccessfully attempted to withdraw their investments in the days around November 16, 2022.

200.    One of the Earn investors was Complainant No. 1, a 73-year-old mother, grandmother, and resident of the State of New York.  She and her husband, who are both retired, invested their life savings of over $199,000 in Earn because they believed Gemini's marketing statements that Gemini was a safe and secure choice.  Complainant No. 1 had hoped to use this money to pay for her grandchild's education.  Outside of her Earn investment, she and her husband have little savings.  Defendants have failed to return any of her assets or the profits she expected to receive.

201.    Another Earn investor, Complainant No. 2, is a 56-year-old resident of the State of New York.  Complainant No. 2 invested approximately $20,500 in Earn, virtually all his savings.  Complainant No. 2 chose Earn because he researched the product and came to believe, based on Gemini's statements, that Earn was more secure than other interest-bearing cryptocurrency investments.

202.    These complainants are just two of the 232,000 investors who placed their trust in Earn and are now desperate for relief.  To date, Genesis Capital has not lifted this "temporar[y] suspen[sion]" and neither Genesis Capital nor Gemini have returned the Earn investors' assets.  Instead, Genesis Capital filed for bankruptcy.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

*Martin Act Securities Fraud—Article 23-A of the General Business Law*

(Against Defendant Gemini**)**

203.    The Attorney General repeats and re-alleges the paragraphs above as if fully stated herein.

204.    The cryptocurrencies bought, sold, and stored on Gemini's exchange and used as part of Earn, including Gemini dollar, bitcoin, and ether, among other cryptocurrencies, constituted securities or commodities under the Martin Act, and the pooled investment program that Gemini and Genesis Capital referred to as "Gemini Earn" constituted securities under the Martin Act.

205.    The acts and practices alleged herein violated Article 23-A of the GBL in that Gemini employed, or employs, or is about to employ a device, scheme or artifice to defraud or for obtaining money or property by means of any false pretense, representation or promise in the issuance, exchange, purchase, sale, promotion, negotiation, advertisement, investment advice or distribution within or from this state of securities or commodities, and constituted fraudulent practices as defined in GBL § 352 *et seq.*

206.    The acts and practices alleged herein violated Article 23-A of the GBL in that Gemini employed, or employs, or is about to employ deception, concealment, suppression, fraud, false pretense, false promise, or materially false and misleading representations, statements, and omissions in the issuance, exchange, purchase, sale, promotion, negotiation, advertisement, investment advice or distribution within or from this state of securities or commodities, and constituted fraudulent practices as defined in GBL § 352 *et seq.*

207.    The acts and practices alleged herein violated GBL § 352-c(1)(a) in that Gemini used or employed fraud, deception, concealment, suppression, or false pretense, where engaged

in to induce or promote the issuance, distribution, exchange, sale, negotiation, or purchase within
or from this state of securities or commodities, as defined in GBL § 352, regardless of whether
issuance, distribution, exchange, sale, negotiation or purchase resulted, and constituted
fraudulent practices as defined in GBL § 352 *et seq*.

208.    The acts and practices alleged herein violated GBL§ 352-c(1)(b), in that Gemini
made promises or representations as to the future which were beyond reasonable expectation or
unwarranted by existing circumstances where engaged in to induce or promote the issuance,
distribution, exchange, sale, negotiation, or purchase within or from this state of securities or
commodities, as defined in GBL § 352, regardless of whether issuance, distribution, exchange,
sale, negotiation or purchase resulted, and constituted fraudulent practices as defined in GBL
§ 352 *et seq*.

209.    The acts and practices alleged herein violated GBL§ 352-c(1)(c) in that Gemini
made representations or statements which were false, and with regard to which Gemini (i) knew
the truth; (ii) with reasonable effort could have known the truth; (iii) made no reasonable effort
to ascertain the truth; or (iv) did not have knowledge concerning the representation or statement
made, where engaged in to induce or promote the issuance, distribution, exchange, sale,
negotiation, or purchase within or from this state of securities or commodities, as defined in GBL
§ 352, regardless of whether issuance, distribution, exchange, sale, negotiation or purchase
resulted, and constituted fraudulent practices as defined in GBL § 352 *et seq*.

210.    The acts and practices alleged herein violated GBL§ 352-c(6) in that Gemini
intentionally engaged in fraud, deception, concealment, suppression, false pretense or fictitious
or pretended purchase or sale, or made a material false representation or statement with intent to
deceive or defraud, while engaged in inducing or promoting the issuance, distribution, exchange,

sale, negotiation or purchase within or from this state of securities or commodities, as defined in

GBL § 352, and thereby wrongfully obtained property of a value in excess of two hundred fifty

dollars, and constituted fraudulent practices as defined in GBL § 352 *et seq.*

### SECOND CAUSE OF ACTION

*Martin Act Securities Fraud—Article 23-A of the General Business Law*

(Against Genesis Global Holdco, LLC, Genesis Global Capital, LLC, Genesis Asia Pacific Pte.
Ltd., Digital Currency Group, Inc., Barry Silbert and Soichiro Moro (a.k.a. Michael Moro) (the
"Genesis/DCG Defendants"))

211.    The Attorney General repeats and re-alleges the paragraphs above as if fully

stated herein.

212.    The acts and practices alleged herein violated Article 23-A of the GBL in that the

Genesis/DCG Defendants employed, or employs, or are about to employ a device, scheme or

artifice to defraud or for obtaining money or property by means of any false pretense,

representation or promise in the issuance, exchange, purchase, sale, promotion, negotiation,

advertisement, investment advice or distribution within or from this state of securities or

commodities, and constituted fraudulent practices as defined in GBL § 352 *et seq.*

213.    The acts and practices alleged herein violated Article 23-A of the GBL in that the

Genesis/DCG Defendants employed, or employs, or are about to employ deception,

concealment, suppression, fraud, false pretense, false promise, or materially false and misleading

representations, statements, and omissions in the issuance, exchange, purchase, sale, promotion,

negotiation, advertisement, investment advice or distribution within or from this state of

securities or commodities, and constituted fraudulent acts and fraudulent practices as defined in

GBL § 352 *et seq.*

214.    The acts and practices alleged herein violated GBL § 352-c(1)(a) in that the

Genesis/DCG Defendants used or employed fraud, deception, concealment, suppression, or false

49

pretense, where engaged in to induce or promote the issuance, distribution, exchange, sale,

negotiation, or purchase within or from this state of securities or commodities, as defined in GBL

§ 352, regardless of whether issuance, distribution, exchange, sale, negotiation or purchase

resulted, and constituted fraudulent practices as defined in GBL § 352 *et seq*.

215.    The acts and practices alleged herein violated GBL § 352-c(1)(b) in that the

Genesis/DCG Defendants made promises or representations as to the future which were beyond

reasonable expectation or unwarranted by existing circumstances where engaged in to induce or

promote the issuance, distribution, exchange, sale, negotiation, or purchase within or from this

state of securities or commodities, as defined in GBL § 352, regardless of whether issuance,

distribution, exchange, sale, negotiation or purchase resulted, and constituted fraudulent practices

as defined in GBL § 352 *et seq*.

216.    The acts and practices alleged herein violated GBL § 352-c(1)(c) in that the

Genesis/DCG Defendants made representations or statements which were false, and with regard

to which the Genesis/DCG Defendants: (i) knew the truth; (ii) with reasonable effort could have

known the truth; (iii) made no reasonable effort to ascertain the truth; or (iv) did not have

knowledge concerning the representation or statement made, where engaged in to induce or

promote the issuance, distribution, exchange, sale, negotiation, or purchase within or from this

state of securities or commodities, as defined in GBL § 352, regardless of whether issuance,

distribution, exchange, sale, negotiation or purchase resulted, and constituted fraudulent practices

as defined in GBL § 352 *et seq*.

217.    The acts and practices alleged herein violated GBL § 352-c(6) in that the

Genesis/DCG Defendants intentionally engaged in fraud, deception, concealment, suppression,

false pretense or fictitious or pretended purchase or sale, or made a material false representation

or statement with intent to deceive or defraud, while engaged in inducing or promoting the

issuance, distribution, exchange, sale, negotiation or purchase within or from this state of

securities or commodities, as defined in GBL § 352, and thereby wrongfully obtains property of

a value in excess of two hundred fifty dollars, and constituted fraudulent practices as defined in

GBL § 352 *et seq.*

## THIRD CAUSE OF ACTION
*Martin Act Failure to Register—General Business Law § 359-e and Regulations Promulgated thereunder, 13 NYCRR § 10*
(Against Defendant Genesis Capital)

218.    The Attorney General repeats and re-alleges the paragraphs above as if fully

stated herein.

219.    The acts and practices alleged herein violated GBL § 359-e and regulations

promulgated thereunder, including provision of Official Compilation of Codes, Rules, and

Regulations of the State of New York Title 13, Chapter II, Subchapter A, Part 10, insofar as

Genesis Capital's acts and practices constituted the sale or offer for sale to or purchase or offer to

purchase from the public within or from New York, any securities issued or to be issued without

filing a registration statement.

220.    Genesis Capital has not registered with OAG as a securities broker or dealer and

is not exempt from such registration requirement.

221.    Each security transaction offered or effected by the referenced Defendant within

New York constituted fraudulent practices as defined in GBL § 352 *et seq*.

222.    The referenced Defendant have repeatedly and persistently violated GBL § 359-

e(3) and the Official Compilation of Codes, Rules, and Regulations of the State of New York

Title 13, Chapter II, Subchapter A, Part 10.

## FOURTH CAUSE OF ACTION
*Repeated and Persistent Fraud—Executive Law § 63(12)*
(Against Defendant Gemini)

223.    The Attorney General repeats and re-alleges the paragraphs above as if fully

stated herein.

224.    The acts and practices alleged herein constitute conduct proscribed by Executive

Law § 63(12), in that Gemini engaged in repeated fraudulent acts or otherwise demonstrated

persistent fraud in the carrying on, conducting or transaction of business.

## FIFTH CAUSE OF ACTION
*Repeated and Persistent Fraud—Executive Law § 63(12)*
(Against the Genesis/DCG Defendants)

225.    The Attorney General repeats and re-alleges the paragraphs above as if fully

stated herein.

226.    The acts and practices alleged herein constitute conduct proscribed by Executive

Law § 63(12), in that the Genesis/DCG Defendants engaged in repeated fraudulent acts or

otherwise demonstrated persistent fraud in the carrying on, conducting or transaction of business.

## SIXTH CAUSE OF ACTION
*Repeated and Persistent Illegality—Executive Law § 63(12)*
*Illegality: Martin Act*
(Against Defendant Gemini)

227.    The Attorney General repeats and re-alleges the paragraphs above as if fully

stated herein.

228.    The acts and practices alleged herein constitute conduct proscribed by Executive

Law § 63(12), in that Gemini engaged in repeated fraudulent or illegal acts in violation of GBL

§§ 352, 352-c, and 353.

52

229.     Accordingly, Gemini engaged in repeated fraudulent or illegal acts or otherwise demonstrated persistent fraud or illegality in the carrying on, conducting or transaction of business.

## SEVENTH CAUSE OF ACTION
*Repeated and Persistent Illegality—Executive Law § 63(12)*
*Illegality: Martin Act*

(Against the Genesis/DCG Defendants)

230.     The Attorney General repeats and re-alleges the paragraphs above as if fully stated herein.

231.     The acts and practices alleged herein constitute conduct proscribed by Executive Law § 63(12), in that the Genesis/DCG Defendants engaged in repeated fraudulent or illegal acts in violation of GBL §§ 352, 352-c, and 353.

232.     Accordingly, the Genesis/DCG Defendants engaged in repeated fraudulent or illegal acts or otherwise demonstrated persistent fraud or illegality in the carrying on, conducting or transaction of business.

## EIGHTH CAUSE OF ACTION
*Repeated and Persistent Illegality—Executive Law § 63(12)*
*Illegality: Scheme to Defraud under New York Penal Law*

(Against Genesis/DCG Defendants)

233.     The Attorney General repeats and re-alleges the paragraphs above as if fully stated herein.

234.     The acts and practices alleged herein constitute conduct proscribed by Executive Law § 63(12), in that the Genesis/DCG Defendants engaged in repeated fraudulent or illegal acts by violating New York Penal Law § 190.65(1)(b), Scheme to Defraud in the First Degree.

235.     Pursuant to NY Penal Law § 190.65(1)(b), a person commits a scheme to defraud in the first degree when he or she engages in a scheme constituting a systematic ongoing course

Case 1:24-cv-01533-JPC   Document 1-18   Filed 02/28/24   Page 633 of 637

of conduct with intent to defraud more than one person or to obtain property from more than one

person by false or fraudulent pretenses, representations or promises, and so obtains property with

a value in excess of one thousand dollars from one or more such persons.

236.    The Genesis/DCG Defendants, through their conduct described above, have

engaged in a scheme constituting a systematic ongoing course of conduct with intent to defraud

more than one person or to obtain property from more than one person by false or fraudulent

pretenses, representations or promises, and so obtained property with a value in excess of one

thousand dollars from one or more such persons.

237.    With respect to the Genesis/DCG Defendants that are not natural persons, they are

liable for the additional reasons that the conduct constituting the offense is engaged in,

authorized, solicited, requested, commanded, or recklessly tolerated by the board of directors or

by a high managerial agent acting within the scope of his employment and in behalf of the

corporation.

238.    Accordingly, the Genesis/DCG Defendants engaged in repeated fraudulent or

illegal acts or otherwise demonstrated persistent fraud or illegality in the carrying on, conducting

or transaction of business.

### NINTH CAUSE OF ACTION
*Repeated and Persistent Illegality—Executive Law § 63(12)*
*Illegality: Conspiracy in the Fifth Degree under New York Penal Law*
(Against the Genesis/DCG Defendants)

239.    The Attorney General repeats and re-alleges the paragraphs above as if fully

stated herein.

240.    The acts and practices alleged herein constitute conduct proscribed by Executive

Law § 63(12), in that the Genesis/DCG Defendants engaged in repeated fraudulent or illegal acts

by violating New York Penal Law § 105.05(1), Conspiracy in the Fifth Degree.

54

241.     Pursuant to NY Penal Law § 105.05(1), a person commits conspiracy in the fifth degree when, with intent that conduct constituting a felony be performed, he agrees with one or more persons to engage in or cause the performance of such conduct.

242.     At least one of the Genesis/DCG Defendant co-conspirators engaged in an overt act, such as preparing the Promissory Note, financial statements, and risk reports, drafting talking points and communication related messaging, and/or corresponding with Gemini and the public concerning Genesis Capital's financial condition, in furtherance of the agreement.

243.     Overt acts in furtherance of the conspiracy occurred as late as 2022.

244.     With respect to the Genesis/DCG Defendants that are not natural persons, they are liable for the additional reasons that the conduct constituting the offense is: i) engaged in, authorized, solicited, requested, commanded, or recklessly tolerated by the board of directors or by a high managerial agent acting within the scope of his employment and in behalf of the corporation, or ii) is engaged in by an agent of the corporation while acting within the scope of his employment and on behalf of the corporation, and the offense is a misdemeanor or a violation.

245.     Thus, the Genesis/DCG Defendant engaged in a conspiracy to engage in a scheme to defraud, and violated the Martin Act, as referenced above.

246.     Accordingly, the Genesis/DCG Defendants engaged in repeated fraudulent or illegal acts or otherwise demonstrated persistent fraud or illegality in the carrying on, conducting or transaction of business.

### TENTH CAUSE OF ACTION
*Repeated and Persistent Illegality—Executive Law § 63(12)*
*Martin Act – Failure to Register*

(Against Defendant Genesis Capital)

247.    The Attorney General repeats and re-alleges the paragraphs above as if fully stated herein.

248.    The acts and practices alleged herein constitute conduct proscribed by Executive Law § 63(12), in that the Genesis Capital violated GBL§ 359-e and regulations promulgated thereunder, including provision of Official Compilation of Codes, Rules, and Regulations of the State of New York Title 13, Chapter II, Subchapter A, Part 10, insofar as Genesis Capital's acts and practices constituted the sale or offer for sale to or purchase or offer to purchase from the public within or from New York, any securities issued or to be issued without filing a registration statement.

249.    Genesis Capital has not registered with OAG as a securities broker or dealer and is not exempt from such registration requirement.

250.    Each security transaction offered or effected by the referenced Defendant within New York constituted fraudulent practices as defined in GBL § 352 *et seq*.

251.    Accordingly, Genesis Capital engaged in repeated fraudulent or illegal acts or otherwise demonstrated persistent fraud or illegality in the carrying on, conducting or transaction of business.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Permanently enjoining Defendants from violating the Martin Act, Article 23-A of the General Business Law, and Executive Law § 63(12) and from engaging in the fraudulent, deceptive and illegal acts alleged herein;

B.    Permanently enjoining Defendants from engaging in any business related to the issuance, offer, distribution, exchange, promotion, advertisement, negotiation, purchase, investment advice, or sale of securities or commodities within or from this state;

56

C.     Directing Defendants to pay damages caused, directly or indirectly, by the fraudulent and deceptive acts and repeated fraudulent acts and persistent illegality complained of herein plus applicable pre-judgment interest;

D.     Directing Defendants to disgorge all amounts obtained in connection with or as a result of fraudulent and deceptive acts and repeated fraudulent acts and persistent illegality complained of herein;

E.     Directing Defendants to make restitution of all funds obtained by Defendants from investors in connection with the fraudulent and deceptive acts fraudulent and deceptive acts and repeated fraudulent acts and persistent illegality complained of herein;

F.     Directing Defendants to each pay the sum of $2,000 to Plaintiff pursuant to GBL § 353(1);

G.     Directing such other equitable relief as may be necessary to redress Defendants' violations of New York Law; and

*[Continued on next page]*

57

H.   Granting such other and further relief as may be just and proper.

Dated: New York, New York          LETITIA JAMES
       October 19, 2023            Attorney General of the State of New York

                                   By: _____
                                       Geoffrey Andreu
                                       John Ruth
                                       Assistant Attorneys General

                                       Gabriel Tapalaga
                                       Senior Enforcement Counsel

                                       Kenneth Haim
                                       Deputy Chief, Investor Protection Burau

                                       Shamiso Maswoswe
                                       Chief, Investor Protection Bureau
                                       28 Liberty Street
                                       New York, New York 10005
                                       Tel.: (212) 416-8769

                                   *Counsel for the People of the State of New York*