# Exhibit **1**

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 2 of 248

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

GGC INTERNATIONAL LIMITED,

                              Plaintiff,

          v.

ROGER VER,

                              Defendant.

Index No. 650439/2023

Motion Seq. No. 002

**NOTICE OF MOTION**

      **PLEASE TAKE NOTICE**, that upon the accompanying memorandum of law; the Affirmation of Jason Gottlieb dated August 21, 2023 and the exhibits annexed thereto; the Affirmation of Alex van Voorhees dated August 21, 2023 and the exhibits annexed thereto; and upon all prior proceedings heretofore had herein, Plaintiff / Counterclaim-Defendant GGC International Limited will move this Court in the Motion Submission Part Courtroom, Room 130, at the Courthouse located at 60 Centre Street, New York, New York, on the 13th day of September, 2023 at 9:30 am, or as soon thereafter as counsel may be heard, for an order pursuant to CPLR 3211(a)(1) and 3211(a)(7) dismissing the Counterclaims, dated July 31, 2023, filed by Defendant / Counterclaim-Plaintiff Roger Ver, and for such other, further, and different relief that the Court deems just and proper.

      **PLEASE TAKE FURTHER NOTICE**, that pursuant to CPLR 2214(b), answering papers, if any, are required to be served upon the undersigned so as to be received at least seven (7) days before the return date of this motion.

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 3 of 248

Dated: New York, New York
      August 21, 2023

MORRISON COHEN LLP

By: /s/ Jason Gottlieb
      Jason Gottlieb
      Michael Mix
      Vani Upadhyaya
      909 Third Avenue
      New York, New York 10022
      (212) 735-8600

      *Counsel for Plaintiff and*
      *Counterclaim Defendant GGC*
      *International Limited*

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 4 of 248

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

GGC INTERNATIONAL LIMITED,

                                    Plaintiff

                v.

ROGER VER,

                                    Defendant.

Index No. 650439/2023

Motion Seq. No. 002

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF / COUNTERCLAIM-DEFENDANT GGC INTERNATIONAL LIMITED'S MOTION TO DISMISS DEFENDANT / COUNTERCLAIM-PLAINTIFF ROGER VER'S AMENDED COUNTERCLAIMS

MORRISON COHEN LLP
Jason Gottlieb
Michael Mix
Vani Upadhyaya
909 Third Avenue
New York, New York 10022
(212) 735-8600

*Counsel for Plaintiff / Counterclaim-Defendant GGC International Limited*

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 5 of 248

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ................................................................... 1

STATEMENT OF FACTS .......................................................................... 4

LEGAL STANDARD.................................................................................. 10

ARGUMENT ............................................................................................... 11

    I.      VER'S AMENDED ALLEGATIONS ARE INAPPROPRIATE ...................... 11

    II.     THE BREACH OF CONTRACT COUNTERCLAIMS SHOULD BE
           DISMISSED .................................................................................... 13

           A.    Ver Failed to Comply with the ISDA Master Agreement's Conditions
                 Precedent to Suit ..................................................................... 13

           B.    The Counterclaims Do Not Contain Sufficient Allegations of Insolvency
                 ................................................................................................ 18

    III.    THE FRAUD COUNTERCLAIM SHOULD BE DISMISSED.......................... 20

           A.    The Fraud Counterclaim Is Duplicative of the Breach of Contract
                 Counterclaims ........................................................................... 20

           B.    Ver Has Failed to Allege Fraud With Particularity ................................. 22

           C.    Ver Cannot State a Counterclaim for Fraudulent Omission .................... 23

           D.    Ver Disclaimed Reliance on Extracontractual Representations .............. 23

CONCLUSION.............................................................................................. 24

WORD COUNT CERTIFICATION ............................................................ 26

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*ACE Sec. Corp., Home Equity Loan Tr., Series 2006-SL2 v. DB Structured Prods., Inc.,*
    25 N.Y.3d 581 (2015) .................................................................15

*Aetna Cas. & Sur. Co. v. Merchants Mut. Ins. Co.,*
    84 A.D.2d 736 (1st Dep't 1981) ..................................................11

*Ashwood Capital, Inc. v. OTG Mgmt., Inc.,*
    99 A.D.3d 1 (1st Dep't 2012) .................................................13, 14

*Bogoni v. Friedlander,*
    197 A.D.2d 281 (1st Dep't 1994) ................................................12

*Chase Manhattan Bank v. N.H. Ins. Co.,*
    304 A.D.2d 423 (1st Dep't 2003) ................................................24

*Cronos Grp. Ltd. v. XComIP, LLC,*
    156 A.D.3d 54 (1st Dep't 2017) ..................................................21

*Dinerman v. Jewish Bd. of Family & Children's Servs., Inc.,*
    55 A.D.3d 530 (2d Dep't 2008) ...................................................10

*Eagle Eye Collection Corp. v. Shariff,*
    190 A.D.3d 600 (1st Dep't 2021) ................................................20

*Erickson Air-Crane, Inc. v. EAC Holdings, L.L.C.,*
    84 A.D.3d 464 (1st Dep't 2011) ..................................................15

*Eurycleia Partners, LP v. Seward & Kissel, LLP,*
    12 N.Y.3d 553 (2009) ...........................................................22, 23

*Fawer v. Shipkevich PLLC,*
    213 A.D.3d 408 (1st Dep't 2023) ................................................11

*Ferro Fabricators, Inc. v. 1807-1811 Park Ave. Dev. Corp.,*
    127 A.D.3d 479 (1st Dep't 2015) ................................................22

ii

*Goldberg v. EEI Holdco, Inc.*,
   Index No. 654617/2020, 2021 N.Y. Misc. LEXIS 6244
   (Sup. Ct. N.Y. Cnty. Dec. 7, 2021) .......................................................................20

*Golub v. Tanenbaum-Harber Co., Inc.*,
   88 A.D.3d 622 (1st Dep't 2011) ...........................................................................23

*Greenfield v. Philles Records*,
   98 N.Y.2d 562 (2002) ...........................................................................................14

*Harris v. Seward Park Hous. Corp.*,
   79 A.D.3d 425 (1st Dep't 2010) ...........................................................................14

*Hinnant v. Carrington Mtge. Servs., LLC*,
   56 Misc. 3d 1205(A) (Sup. Ct. Kings Cnty. 2017) ...............................................11

*HSH Nordbank AG v. UBS AG*,
   95 A.D.3d 185 (1st Dep't 2012) ...........................................................................24

*Jackson v. YAM Holding Corp.*,
   97 A.D.3d 637 (2d Dep't 2012) ............................................................................14

*In re Lehman Brothers Holdings, Inc., et al.*,
   No. 08-13555 (JMP), 2011 Bankr. LEXIS 1899
   (S.D.N.Y. Bankr. May 23, 2011) ..........................................................................17

*Manipal Educ. Ams., LLC v. Taufiq*,
   203 A.D.3d 662 (1st Dep't 2022) .........................................................................21

*MHR Capital Partners LP v. Presstek, Inc.*,
   12 N.Y.3d 640 (2009) ...........................................................................................15

*Mid-Hudson Val. Fed. Credit Union v. Quartararo & Lois, PLLC*,
   31 N.Y.3d 1090 (2018) .........................................................................................11

*Morgenthow & Latham v. Bank of N.Y. Co.*,
   305 A.D.2d 74 (1st Dep't 2003) ...........................................................................11

*Matter of Northwest 5th & 45th Realty Corp. v. Mitchell, Maxwell & Jackson*,
   164 A.D.3d 1158 (1st Dep't 2018) ........................................................................20

*Pappas v. Tzolis*,
   20 N.Y.3d 233 (2012) ...........................................................................................24

*Reiss v. Fin. Performance Corp.*,
   97 N.Y.2d 195 (2001) ...........................................................................................13

iii

*Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*,
  60 A.D.3d 61 (1st Dep't 2008) ................................................................13, 14

*Sea v. Thread Counsel, Inc.*,
  Index No. 653551/2020, 2021 N.Y. Misc. LEXIS 12791
  (Sup. Ct. N.Y. Cnty. Oct. 29, 2021).................................................................21

*Sebastian Holdings, Inc. v. Deutsche Bank AG*,
  78 A.D.3d 446 (1st Dep't 2010) ........................................................................23

*Sheila C. v. Povich*,
  11 A.D.3d 120 (1st Dep't 2004) ........................................................................10

*SSC NY Corp. v. Inveshare, Inc.*,
  No. 655048/2016, 2018 N.Y. Misc. LEXIS 3202
  (Sup. Ct. N.Y. Cnty. July 24, 2018).................................................................17

*Vt. Teddy Bear Co. v. 538 Madison Realty Co.*,
  1 N.Y.3d 470 (2004) ...........................................................................................13

*W.W.W. Assocs. v. Giancontieri*,
  77 N.Y.2d 157 (1990) .........................................................................................13

*XL Diamonds LLC v. Rosen*,
  No. 656102/2019, 2020 N.Y. Misc. LEXIS 3368
  (Sup. Ct. N.Y. Cnty. July 15, 2020).................................................................17

## Other Authorities

CPLR 3013................................................................................................................11

CPLR 3016.........................................................................................................22, 23

CPLR 3025................................................................................................................12

CPLR 3211............................................................................................................1, 25

iv

Case 1:24-cv-01533-JPC    Document 20-1    Filed 03/20/24    Page 9 of 248

Plaintiff / Counterclaim-Defendant GGC International Limited ("GGC International") originally moved to dismiss the Counterclaims, dated May 9, 2023 filed by Defendant / Counterclaim-Plaintiff Roger Ver ("Ver") (ECF No. 11, the "May 9 Counterclaims").[1] After GGC International's motion to dismiss was fully briefed, Ver filed an Amended Answer and Counterclaims on July 31, 2023 (ECF No. 32). Now, GGC International respectfully submits this memorandum of law in support of its motion (the "Motion"), pursuant to CPLR 3211(a)(1) and 3211(a)(7) to dismiss the Amended Counterclaims, dated July 31, 2023 (the "Counterclaims") filed by Ver (together with GGC International, the "Parties").[2]

## PRELIMINARY STATEMENT

Contracts mean what they say, and Ver's Counterclaims plainly reveal that Ver did not follow the contractual prerequisites to file suit.

Ver, who describes himself as "experienced in digital asset investment," entered an agreement with GGC International to trade cryptocurrency options, the Amended and Restated Master Confirmation Agreement for Virtual Currency Put and Call Options Transactions dated as of June 22, 2020 (the "Master Confirmation Agreement").[3] Through the Master Confirmation Agreement, the Parties also entered the 2002 ISDA Master Agreement (the "ISDA Master

---

[1]    The May 9 Counterclaims are attached as Exhibit A to the August 21, 2023 Affirmation of Jason Gottlieb (the "Gottlieb Aff.").

[2]    The Counterclaims are attached as Exhibit B to the August 21, 2023 Affirmation of Jason Gottlieb (the "Gottlieb Aff.").

[3]    A true and correct copy of the Master Confirmation Agreement is attached as Exhibit 3 to the August 21, 2023 Affirmation of Alex van Voorhees (the "van Voorhees Aff.").

Agreement")[4] and the 1994 ISDA Credit Support Annex (the "ISDA Credit Support Annex")[5], including certain negotiated elections. The ISDA Master Agreement and the ISDA Credit Support Annex are industry-standard documents that provide market participants with relationship terms that govern the trading of over-the-counter derivative transactions. Although Ver asserts several times that the Parties never signed the ISDA Master Agreement or the ISDA Credit Support Annex, the Master Confirmation Agreement explicitly states that the parties are deemed to enter into these documents, and indeed most of Ver's claims rely on the ISDA Master Agreement.

Pursuant to those relationship terms, the Parties entered numerous cryptocurrency options transactions with each other. Ver failed to settle certain options with expiration dates of December 30, 2022, which was an "Event of Default" under the ISDA Master Agreement. Thereafter, GGC International followed the contractual requirements of the ISDA Master Agreement; it provided notice of the default, designated an "Early Termination Date" and then sent Ver a "Calculation Statement" evidencing the amounts owed by Ver in light of his failure to settle the trades. After Ver failed to pay this amount owed, GGC International filed this action (ECF No. 9, the "Complaint").[6]

Ver answered the Complaint and asserted six Counterclaims: four for breach of contract, one for fraud, and one for fraudulent inducement. Ver dropped the fraudulent inducement counterclaim in his Amended Answer and Counterclaims, but still asserts the breach of contract

---

[4]     A true and correct copy of the ISDA Master Agreement is attached as Exhibit 1 to the van Voorhees Aff.

[5]     A true and correct copy of the Credit Support Annex is attached as Exhibit 2 to the van Voorhees Aff.

[6]     The Complaint is attached as Exhibit C to the Gottlieb Aff.

2

and fraud Counterclaims. All of Ver's Counterclaims are legally insufficient and should be dismissed.

Ver's Counterclaims are each premised on the same set of allegations – that GGC International was insolvent, misrepresented its insolvency and omitted facts pertaining to its insolvency to Ver. Regardless of the veracity of such allegations – which GGC International vehemently denies – they are insufficient, even at the pleading stage.

Ver asserts that GGC International's alleged insolvency and misrepresentations – which allegedly occurred in mid-June 2022 – constituted an "Event of Default" under the ISDA Master Agreement. But assuming an Event of Default had occurred, Ver had a choice. He could have followed the conditions precedent to suit contained in the ISDA Master Agreement, including providing notice to the defaulting party of the alleged Event of Default, designating an "Early Termination Date," and providing a "statement" showing how much is owed. Ver, by his own allegations, chose not to do so, likely because if Ver had actually thought that GGC International was insolvent, and followed the proper procedures, he still would have been required to pay GGC International a substantial sum under the relevant trades. Because GGC International paid a premium to purchase the options from Ver, there was no possibility that GGC International would be required to make a net payment; if the options became valueless, GGC International would have just declined to exercise them. Ver instead allowed the contract to remain outstanding, presumably hoping that he would owe less, and then refused to make the required payment when the options matured. He is now attempting to circumvent his payment obligations to GGC International by alleging that an Event of Default occurred at some point nearly a year earlier. But that is not how

3

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 12 of 248

the ISDA Master Agreement works.  Ver's failure to follow the ISDA Master Agreement is fatal to his breach of contract Counterclaims.

The breach of contract Counterclaims also fail to state a claim because GGC International was never insolvent.  Ver alleges that GGC International provided information about its solvency to Ver, but that information uniformly showed that GGC International's assets were greater than its liabilities.  There are no allegations that GGC International has ever been unable to pay any debts, or has ever had any bankruptcy proceeding filed against it.  By Ver's own allegations, GGC International is not insolvent, and never was.

Ver's fraud Counterclaim is also insufficient, for several reasons.  It concerns the same facts and seeks the same quantum of damages as the breach of contract Counterclaims, and thus should be dismissed as duplicative.  Ver fails to plead any misrepresentation with particularity, and to the extent his claim relies on fraudulent omissions, such claim fails for lack of a fiduciary relationship.  And, Ver disclaimed reliance in the relevant contracts, destroying his ability to bring a fraud Counterclaim now.

In sum, Ver's Counterclaims are a thinly disguised attempt to circumvent his own breach of contract.  The Counterclaims should be dismissed.

## STATEMENT OF FACTS

This statement of facts is based on the allegations in the Counterclaims, taken as true for purposes of this Motion, as well as documentary evidence cited herein.[7]

## GGC International and Ver Enter Into the Master Confirmation Agreement

---

[7]      While not relevant for this Motion, Ver's Counterclaims contain numerous factual inaccuracies, even outside of the infirmities enumerated in this Motion.

4

Ver describes himself as a "well-known Bitcoin Cash ('BCH') proponent" who is "experienced in digital asset investment." CC ¶¶ 74-75. On or about June 22, 2020, the Parties entered into the Master Confirmation Agreement. Although Ver states that the Master Confirmation merely "referenced" the ISDA Master Agreement and the ISDA Credit Support Annex and that "neither party ever executed and/or signed either of these documents," CC ¶¶ 81-82, the Master Confirmation Agreement – which Ver alleges he did execute, CC ¶ 80 – explicitly states that GGC International and Ver are "deemed" to have entered into the ISDA Master Agreement and the ISDA Credit Support Annex. Master Confirmation Agreement § 1(b). And Section 7(a) of the Master Confirmation Agreement states that the Master Confirmation Agreement "shall supplement, form part of, and be subject to the Form ISDA Master Agreement."[8]

The ISDA Master Agreement, which Ver was deemed to have entered by virtue of the Master Confirmation Agreement, provides the general conditions for payment and delivery. Section 2(a)(i) of the ISDA Master Agreement states that "[e]ach party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement." Section 2(a)(ii) of the ISDA Master Agreement provides that "[p]ayments under this Agreement will be made on the due date for value on the date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency."

Section 5(a) of the ISDA Master Agreement lists several potential "Events of Default." As relevant to Ver's Counterclaims, Section 5(a)(iv) states that it is an Event of a Default if a party

---

[8] Ver's Counterclaims also are premised on the allegation that GGC International violated the ISDA Master Agreement. As such, even Ver does not believe that the fact that the Parties did not formally sign the ISDA Master Agreement has any legal significance.

5

makes a representation that "proves to have been incorrect or misleading in any material respect." And Section 5(a)(vii) states that it is an Event of Default where a party "becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due."

The ISDA Master Agreement contains a very specific process as to what the non-defaulting party may elect to do after an Event of Default has occurred. Section 6(a) states that if an Event of Default "has occurred and is then continuing," the non-defaulting party may "designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions." Section 6(e)(i) of the ISDA Master Agreement provides that "[i]f notice designating an Early Termination Date is given under Section 6(a) . . . the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default . . . is then continuing."

Upon an Early Termination Date, an "Early Termination Amount" is due. Section 6(e)(i) of the ISDA Master Agreement sets forth the detailed formula to determine the "Early Termination Amount."

Section (6)(d)(i) of the ISDA Master Agreement also states that upon the "occurrence of an Early Termination Date, each party will make the calculations . . . contemplated by Section 6(e)" and will provide such statement to the other party. Any "Early Termination Amount will be payable "on the day on which notice of the amount payable is effective in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default." ISDA Master Agreement § 6(d)(2). An "Early Termination Amount" payable by one party can be "set-off" by amounts due to that party. ISDA Master Agreement § 6(f).

6

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 15 of 248

Section (9)(a) of the ISDA Master Agreement states that "[t]his Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter. Each of the parties acknowledges that in entering into this Agreement it has not relied on any oral or written representation, warranty or other assurance (except as provided for or referred to in this Agreement) and waives all rights and remedies which might otherwise be available to it in respect thereof, except that nothing in this Agreement will limit or exclude any liability of a party for fraud." And Section 9.a of the Master Confirmation Agreement states that each party is "not relying on any representations except those expressly set forth in the Agreement or this Confirmation."

The Master Confirmation Agreement contains numerous disclaimers. In particular, each Party represented that "it is not relying upon any representations except those expressly set forth in the Agreement or this Confirmation," that "it has made its own investment, hedging, and trading decisions based upon its own judgment and upon any view expressed by the other party or any of its agents," and "it is entering into each Transaction with a full understanding of the terms, conditions and risks thereof and it is capable of and willing to assume those risks." Master Confirmation Agreement § 9.a(iii)-(v).

Section 9.h of the Master Confirmation Agreement contains an additional disclaimer, in capitalized lettering: Ver "ACKNOWLEDGED THAT THE RISK OF LOSS IN TRADING VIRTUAL CURRENCIES SUCH AS BTC OR ETH CAN BE SUBSTANTIAL AND, THEREFORE [VER] HAS CAREFULLY CONSIDERED WHETHER SUCH TRADING IS APPROPRIATE FOR IT IN LIGHT OF ITS CIRCUMSTANCES AND FINANCIAL RESOURCES." Ver further acknowledged that the "volatility and unpredictability of the price of

7

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 16 of 248

Virtual Currency relative to fiat currency may result in significant loss over a short period of time."

Master Confirmation Agreement § 9.h.i.  Ver also acknowledged that the "value of the Reference

Currency or other Virtual Currency may be derived from the continued willingness of market

participants to exchange fiat currency or other Virtual Currency for it, which may result in the

potential for permanent and total loss of value of a particular Virtual Currency (such as the

Reference Currency) should the market for that Virtual Currency disappear."  Master Confirmation

Agreement § 9.h.vii.

**GGC International and Ver Enter Into Options Transactions That Ver Fails to Settle**

GGC International and Ver entered into numerous cryptocurrency options transactions

governed by the Master Confirmation and the ISDA Master Agreement.  Ver references three

specific transactions in his Counterclaims, each of which was deep in the money to GGC

International.  Pursuant to a trade confirmation dated March 22, 2022, Ver agreed to sell a put

option to GGC International for 70,000 units of BCH, with a strike price of $545 per BCH.  CC ¶

251; van Voorhees Aff. Ex. 4.  Pursuant to a trade confirmation dated June 10, 2022, Ver agreed

to sell a put option to GGC International for 10,000 Ether ("ETH"), with a strike price of $5,000

per ETH.  CC ¶ 259; van Voorhees Aff. Ex. 5.  Pursuant to a trade confirmation dated June 11,

2022, Ver agreed to sell a put option to GGC International for 500 Bitcoin ("BTC"), with a strike

price of $26,000 per BTC.  CC ¶ 267; van Voorhees Aff. Ex. 6.  In each of the three options, GGC

International agreed to pay a premium to Ver.  van Voorhees Aff. Exs. 4-6. Those three options

trades are also the subject of GGC International's affirmative claims for Ver's nonpayment.

Compl. ¶ 36.

8

Case 1:24-cv-01533-JPC    Document 20-1    Filed 03/20/24    Page 17 of 248

GGC International's Complaint describes how Ver failed to settle those three options transactions, which all expired in the money to GGC International on December 30, 2022. After GGC International followed the enumerated contractual procedure, GGC International designated an "Early Termination Date," and provided Ver with a statement showing that he owed $20,869,788. Compl. ¶¶ 38-49. Ver failed to pay that amount to GGC International, leading to GGC International initiating this lawsuit against Ver.

**Ver Baldly Alleges that He Is Excused From His Breach Due to Alleged Insolvency**

Ver alleges in his Counterclaims that at some point during the contractual relationship between the Parties, GGC International became insolvent. Ver claims that on June 28, 2022, GGC International voluntarily provided Ver with an unaudited statement of financial condition showing its assets and liabilities as of June 20, 2022 (the "June 20 SOFC"). CC ¶ 176. The June 20 SOFC "claimed total assets of $3.063 billion and liabilities of $2.962 billion, which gave GGCI positive equity of just over $100 million." CC ¶ 177.

Ver alleges that GGCI's affiliate Genesis Asia Pacific Limited Pte ("GAP") made loans to third party Three Arrows Capital Limited ("3AC"), a Singapore-based cryptocurrency hedge fund, and when 3AC was on the verge of collapse, GAP made margin calls to 3AC, liquidated 3AC's collateral, and initiated an arbitration against 3AC, including a request for emergency relief. CC ¶¶ 149-51.[9] Ver alleges that after GAP failed to obtain that emergency relief, Genesis Global then injected $151 million into GGCI. CC ¶ 184.

---

[9]    While Ver uses inflammatory rhetoric to describe GAP's actions with respect to its arbitration against 3AC, *see, e.g.* CC ¶ 149 ("On June 12, Genesis executives set the plan in motion"), Ver does not allege that GAP did anything unlawful or inappropriate in that arbitration.

9

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 18 of 248

Ver claims that when he subsequently received an unaudited statement of financial condition showing GGC International's assets and liabilities as of June 30, 2022 (the "June 30 SOFC"), "positive equity had shrunk to $14 million." CC ¶ 214.

Ver further alleges that GGC International held a significant amount of FTT tokens, the token issued by cryptocurrency exchange FTX, which subsequently went bankrupt in November 2022. CC ¶¶ 71, 124. Ver believes that such tokens were overvalued. Ver also alleges that he did not discover GGC International's significant FTT exposure until he subsequently received GGC International's 2021 audited financial statement (the "2021 Audited Financial Statement"). CC ¶¶ 219-26.

Ver thus asserts that "GGCI was insolvent in June 2022 due to various factors, including inaccurate loss recording, failure to apply appropriate discounts to Level 2 digital assets in the midst of a liquidity event, untimely recognition of substantial losses linked to 3AC and related parties, and untimely recognition of losses tied to the FTT-collateralized loan." CC ¶ 156.

## <u>LEGAL STANDARD</u>

The sole criterion in considering a motion to dismiss for failure to state a cause of action is whether "from the complaint's four corners factual allegations are discerned which taken together manifest any cause of action cognizable at law." *Dinerman v. Jewish Bd. of Family & Children's Servs., Inc.*, 55 A.D.3d 530, 531 (2d Dep't 2008); *see also Sheila C. v. Povich*, 11 A.D.3d 120, 122 (1st Dep't 2004). A "defendant is entitled to notice of the material elements of each cause of action." *Aetna Cas. & Sur. Co. v. Merchants Mut. Ins. Co.*, 84 A.D.2d 736, 736 (1st Dep't 1981). Even "[l]iberally construing plaintiffs' allegations," a complaint must contain "specificity needed to apprise defendant of the occurrences at issue." *Fawer v. Shipkevich PLLC*, 213 A.D.3d 408,

10

408 (1st Dep't 2023). *See also Mid-Hudson Val. Fed. Credit Union v. Quartararo & Lois, PLLC*, 31 N.Y.3d 1090, 1091 (2018) (a complaint will be dismissed when it "failed to allege facts 'sufficiently particular to give the court and defendants notice of the transactions, occurrences, or series of transactions or occurrences, intended to be proved.'") (citing CPLR 3013). And "the court cannot strain to give meaning to a pleading which generally fails to state any cognizable claim against the defendants." *Hinnant v. Carrington Mtge. Servs., LLC*, 56 Misc. 3d 1205(A), 1205A (Sup. Ct. Kings Cnty. 2017).

"In those circumstances where the legal conclusions and factual allegations are flatly contradicted by documentary evidence, they are not presumed to be true or accorded every favorable inference." *Morgenthow & Latham v. Bank of N.Y. Co.*, 305 A.D.2d 74, 78 (1st Dep't 2003) (citations and quotation marks omitted).

## ARGUMENT

## I. VER'S AMENDED ALLEGATIONS ARE INAPPROPRIATE

In his Amended Answer and Counterclaims, Ver inappropriately amends allegations regarding GGC International's alleged insolvency in a transparent attempt to circumvent GGC International's arguments in its Motion to Dismiss and Reply Brief. In particular, in his original Answer and Counterclaims, Ver alleged that GGC International was insolvent in June 2022, but did not include allegations of any insolvency after that point. *See* May 9 Counterclaims ¶¶ 158, 174, 202. Indeed, in Ver's Opposition to GGC International's Motion to Dismiss, Ver continued to argue that GGC International was insolvent in mid-2022, but not after that. In both its Motion to Dismiss and Reply Brief, GGC International argued that Ver failed to allege that any Event of

11

Default was "continuing," which triggers the contractual provisions for "Event of Default" under the ISDA Master Agreement. *See* ISDA Master Agreement §§ 6(a), (c).

Then, one business day after GGC International filed its Reply Brief, Ver amended his allegations to speculate not only that GGC International was insolvent at some point in 2022, but that "GGCI's insolvency was never cured by an injection of capital from DCG," and that "GGCI remained insolvent..." CC ¶¶ 187, 190. Ver's new allegations are manufactured solely to get around GGC International's arguments that Ver never alleged that any Event of Default was "continuing." Ver twice filed papers alleging GGC International's insolvency in mid-2022 only, and now impermissibly attempts to alter material facts to pretend that an alleged insolvency was "continuing" in a desperate attempt to preserve his claims.

The First Department admonished similar attempts to inappropriately amend pleadings: "A word is in order regarding the function and scope of an amendment of pleadings pursuant to CPLR 3025. The purpose of this procedural device is to permit the plaintiff to amend his theory of recovery to comply with the facts as they unfold, not to permit the plaintiff to alter his representation of material facts to best suit his theory of recovery and thereby overcome defenses raised in opposition." *See Bogoni v. Friedlander*, 197 A.D.2d 281, 292 (1st Dep't 1994). Ver's new allegations are an inappropriate attempt to amend material facts involving the timing of GGC International's alleged insolvency to comply with his theory of recovery, and overcome the meritorious defenses that GGC International fully briefed in its Motion to Dismiss and Reply Brief.

In light of clear First Department precedent, this Court should disregard Ver's inappropriately manufactured allegations that GGC International's insolvency was "continuing."

12

Additionally, for the reasons discussed below, including the unambiguous language of the ISDA
Master Agreement, Ver's futile attempts at amending these allegations still fail.

## II.   THE BREACH OF CONTRACT COUNTERCLAIMS SHOULD BE DISMISSED

### A.   Ver Failed to Comply with the ISDA Master Agreement's Conditions Precedent to Suit

"According to well-established rules of contract interpretation, 'when parties set down their
agreement in a clear, complete document, their writing should as a rule be enforced according to
its terms.'" *Ashwood Capital, Inc. v. OTG Mgmt., Inc.*, 99 A.D.3d 1, 7 (1st Dep't 2012) (quoting
*W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990)). In "commercial contracts negotiated
at arm's length by sophisticated counseled businesspeople . . . 'courts should be extremely
reluctant to interpret an agreement as impliedly stating something which the parties have neglected
to specifically include.'" *Ashwood Capital*, *Inc.* 99 A.D.3d at 7 (quoting *Vt. Teddy Bear Co. v.
538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004)). Courts "may not by construction add or
excise terms, nor distort the meaning of those used and thereby 'make a new contract for the parties
under the guise of interpreting the writing.'" *Ashwood Capital, Inc.*, 99 A.D.3d at 7 (quoting *Reiss
v. Fin. Performance Corp.*, 97 N.Y.2d 195, 199 (2001)).

A "contract is unambiguous if 'on its face it is reasonably susceptible of only one meaning.'
Parol evidence cannot be used to create an ambiguity where the words of the parties' agreement
are otherwise clear and unambiguous." *Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*,
60 A.D.3d 61, 66 (1st Dep't 2008) (quoting *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569
(2002)). "[C]lear contractual language does not become ambiguous simply because the parties to
the litigation argue different interpretations." *Riverside S. Planning Corp.*, 60 A.D.3d at 67

13

(citations omitted). "Whether a contract is ambiguous must be determined by the court as a matter of law, looking solely to the plain language used by the parties within the four corners of the contract to discern its meaning and not to extrinsic sources." *Ashwood Capital, Inc.*, 99 A.D.3d at 7-8.

The elements of breach of contract are "the existence of a contract, the plaintiff's performance thereunder, the defendant's breach thereof, and resulting damages." *Harris v. Seward Park Hous. Corp.*, 79 A.D.3d 425, 426 (1st Dep't 2010) (citation omitted). Courts will dismiss claims for breach of contract if the contract unambiguously contradicts the plaintiff's allegations. *See* 99 A.D.3d at 8-9; 60 A.D.3d at 67; *Jackson v. YAM Holding Corp.*, 97 A.D.3d 637, 638-39 (2d Dep't 2012) (dismissing claim for breach of contract and declining to consider extrinsic evidence of parties' intent).

Ver asserts four Counterclaims for breach of contract. Each is premised on Ver's allegation that GGC International was insolvent. The first Counterclaim alleges that GGC International breached the ISDA Master Agreement because it is an "Event of Default" under that agreement for a party to be insolvent. CC ¶¶ 237-48. While this Counterclaim fails to reference a specific clause in the ISDA Master Agreement, it is apparent that Ver is alleging a breach of Section 5(a)(vii) of the ISDA Master Agreement. The second to fourth Counterclaims assert that GGC International made a "misrepresentation" about its solvency to Ver. CC ¶¶ 249-72. While these Counterclaims fail to reference a specific clause in the ISDA Master Agreement, it is evident that Ver is alleging a breach of Section 5(a)(iv) of the ISDA Master Agreement, stating that it is an "Event of Default" for one party to make a misrepresentation to the other party.

14

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 23 of 248

Regardless of the truth of Ver's allegations (which are absolutely false), the four Counterclaims for breach of contract each suffer from the identical key legal flaw requiring dismissal – Ver failed to follow the ISDA Master Agreement's contractual pre-requisites to sue for breach of that agreement, which served as conditions precedent.

The Court of Appeals has explained that a condition precedent to recovery is an "act or event, other than a lapse in time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises." *MHR Capital Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 645 (2009) (affirming dismissal of complaint) (citation and quotation marks omitted). The Court of Appeals "recognized that the use of terms such as 'if,' 'unless' and 'until' constitutes 'unmistakable language of condition.'" *Id.* (quotation marks omitted). "Express conditions must be literally performed; substantial performance will not suffice." *Id. See also ACE Sec. Corp., Home Equity Loan Tr., Series 2006-SL2 v. DB Structured Prods., Inc.*, 25 N.Y.3d 581, 589 (2015) ("the two certificateholders did not validly commence this action because they failed to comply with the contractual condition precedent to suit"); *Erickson Air-Crane, Inc. v. EAC Holdings, L.L.C.*, 84 A.D.3d 464, 465 (1st Dep't 2011) (affirming dismissal for plaintiff's failure to comply with a condition precedent).

As explained above, the ISDA Master Agreement contains a very specific procedure that is available to a non-defaulting party in the event of insolvency or misrepresentation. The ISDA Master Agreement plainly states that "[i]f at any time an Event of Default with respect to a party . . . has occurred and is then continuing, the other party may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate" an "Early Termination Date in respect to all outstanding Transactions," which will "occur on the date so designated." ISDA

15

Master Agreement §§ 6(a), (c). Then, the ISDA Master Agreement contains a detailed process by which the parties make calculations as to how much is owed (factoring in set-offs for other transactions), and provide a "statement" showing those calculations. ISDA Master Agreement §§ 6(d)-(f). Ver concedes this contractual procedure; he alleges that "in the event of default, all transactions were to be terminated, and the parties were expected to settle any financial obligations at that point." CC ¶ 244. Notably, Section 6(a) uses conditional language; it only permits the non-defaulting party to declare an Early Termination Date – in turn requiring the parties to engage in the process set forth in Sections (6)(c)-(f) of the ISDA Master Agreement – "[i]f at any time an Event of Default . . . has occurred and is then occurring" (emphasis added). The ISDA Master Agreement thus utilizes the conditional language indicative of a condition precedent as explained by the Court of Appeals in *MHR Capital Partners*.

Thus, after the non-defaulting party follows the procedures in Section 6 of the ISDA Master Agreement, if the defaulting party does not pay the amount owed, that failure to pay would be a breach. Indeed, Ver's failure to pay after GGC International followed these procedures is precisely what GGC International is asserting in its claims against Ver.

Section 6's requirements make logical sense. When a non-defaulting party takes no action after its counterparty defaults, it does not need to change its market position or re-hedge its risk. This is also why a non-defaulting party cannot designate an Early Termination Date more than twenty days into the future under Section 6(a) of the ISDA Master Agreement: timing of the valuation matters. A party should not be permanently excused from making payments on its obligations or allowed to circumvent its contractual obligations by arguing that its counterparty was in breach at some point in the distant past. *See, e.g.*, *SSC NY Corp. v. Inveshare, Inc.*, No.

16

655048/2016, 2018 N.Y. Misc. LEXIS 3202, at *10-11 (Sup. Ct. N.Y. Cnty. July 24, 2018)

(denying motion for leave to assert counterclaim and explaining that an immaterial breach did not

excuse the non-defaulting party's payment obligations).  *See also* Gottlieb Aff. Ex. D (relevant

portions of transcript of oral decision in *In re Lehman Brothers Holdings, Inc., et al.*, No. 08-13555

(JMP), 2011 Bankr. LEXIS 1899 (S.D.N.Y. Bankr. May 23, 2011) finding that counterparty to

ISDA agreement governing derivatives transactions was not excused from its payment obligations

despite Lehman Brothers' bankruptcy).

Ver does not allege that he followed these pre-requisites to suit or that he provided any

notice whatsoever of GGC International's alleged default.  He does not allege that he provided

notice to GGC International "specifying the relevant Event of Default."  He does not allege that

he ever designated an "Early Termination Date."  And, he ignores the significant sums of money

that he owes GGC International, and does not sufficiently allege damages stemming from the

purported breach of contract.  *See XL Diamonds LLC v. Rosen*, No. 656102/2019, 2020 N.Y. Misc.

LEXIS 3368, at *8 (Sup. Ct. N.Y. Cnty. July 15, 2020) ("where a plaintiff fails to allege any

'damages flowing from the breach allege[s] and relies, instead, on wholly speculative theories of

damages, dismissal of the breach of contract claim is in order'").

For the first time in his Amended Answer and Counterclaims, Ver implies that GGC

International's purported insolvency is "continuing."  CC ¶¶ 187, 190.  Even if this Court chooses

not to disregard these allegations as discussed above, these allegations are nonsensical.  Ver alleges

that GGC International employed "inadequate accounting methods" and "[a]s a result, GGCI has

been insolvent for as long as those methods have been employed."  CC ¶ 120.  Even assuming

*arguendo* that GGC International's accounting methods are "inadequate," Ver fails to explain why

17

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 26 of 248

that would mean that GGC International is insolvent. Ver offers no facts about GGC International's purported insolvency following mid-2022, or any facts indicating that an alleged insolvency is "continuing" to this day. Even with these amended allegations, Ver fails to meet the contractual prerequisites to bring suit.

After his own breach, Ver allowed the contracts to be terminated by GGC International and is now trying to circumvent his contractual obligations by alleging that GGC International was insolvent. That is not permitted by the relevant contracts. Ver's entire Counterclaims are thus premised on a made-for-litigation allegation that should be rejected even at the pleading stage.

Accordingly, having failed to follow the ISDA Master Agreement's conditions precedent to recovery, Ver's four breach of contract Counterclaims fail to state a claim and should be dismissed.

### B.     The Counterclaims Do Not Contain Sufficient Allegations of Insolvency

Ver's four Counterclaims for breach of contract fail for the additional reason that there are insufficient allegations of GGC International's insolvency. To the contrary, Ver's allegations support the allegation that GGC International was <u>not</u> insolvent.

Section 5(a)(vii) states that it is an "Event of Default" if a party, *inter alia*, "becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due." Ver fails to allege any filed insolvency proceeding for GGC International, because GGC International has never filed for insolvency (or been involuntarily put into an insolvency proceeding).[10] Ver does not allege that GGC International has ever been unable

---

[10]     To the contrary, as Ver admits, <u>other</u> Genesis entities have filed for bankruptcy protection in the Southern District of New York, CC ¶ 68; GGC International notably is not part of the bankruptcy.

18

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 27 of 248

to pay its debts or has admitted such inability in writing. Ver pleads that he received multiple financial documents from GGC International but, upon his own allegations, all of them show that GGC International's assets were greater than its liabilities. *See* CC ¶¶ 176-177, 214.

In an attempt to circumvent that basic math, Ver points to a number of facts (including facts extrinsic to GGC International) and makes the conclusory allegation that GGC International's financial statements must be wrong. For example, he complains that GGC International's balance sheet utilized the mark-to-market value of certain cryptocurrency tokens within GGC International's possession without discounting the assets' value given the potential for volatility or illiquidity in the market, CC ¶¶ 111-22, even though Ver admits that the mark-to-market valuation was set forth in its <u>audited</u> financial statement, i.e., was determined by GGC International's auditor as of the date set forth therein. CC ¶ 219. He also does not allege what the value of those tokens should have been.

Next, Ver alleges that GGC International suffered losses because an affiliate, Genesis Asia Pacific Limited Pte (not GGC International) lost a motion in an arbitration to temporarily freeze certain assets, causing GGC International to write down its assets, CC ¶ 154, but again alleges that GGC International had positive equity by the June 30 SOFC. CC ¶ 214. Ver speculates that GGC International must have been insolvent on June 25, 2022, between the June 20 SOFC and the June 30 SOFC, CC ¶ 173, but does not explain why he chose that date or what GGC International's assets and liabilities were on that exact date. Ver makes the post-hoc allegation that certain FTT tokens possessed by GGC International were overvalued because months later, FTX collapsed and filed for bankruptcy protection (in <u>November</u> 2022), CC ¶¶ 123-37, but FTX's November 2022 failure does not *ipso facto* mean that GGC International was insolvent three months earlier.

19

Then, Ver alleges that DCG executed a promissory note payable to Genesis Global, and Genesis Global injected $151 million of capital into GGC International. CC ¶¶ 182, 184. Despite this, Ver alleges that DCG and Genesis Global engaged in an "accounting farce," CC ¶ 190, and that "GGCI remained insolvent afterwards." CC ¶ 187. These abstract allegations echo Ver's speculations that GGC International's financial statements must be wrong, and are belied by the documents themselves. CC ¶ 214.

In total, Ver's allegations are completely speculative and conclusory and do not suffice. His Counterclaims for breach of contract should be dismissed. *See Matter of Northwest 5th & 45th Realty Corp. v. Mitchell, Maxwell & Jackson*, 164 A.D.3d 1158, 1158 (1st Dep't 2018) (denying petition and finding that petitioner failed to make a prima facie case of respondent's insolvency where "petition made no allegations about the fair salable value of [respondent's] assets"); *Eagle Eye Collection Corp. v. Shariff*, 190 A.D.3d 600, 602 (1st Dep't 2021) (affirming dismissal of cause of action because "plaintiff's conclusory allegations of insolvency does not suffice to support its claim"); *Goldberg v. EEI Holdco, Inc.*, Index No. 654617/2020, 2021 N.Y. Misc. LEXIS 6244, at *4-5 (Sup. Ct. N.Y. Cnty. Dec. 7, 2021) ("plaintiff's conclusory allegation of insolvency does not suffice," noting that "it is not Defendants' burden to show that Holdco/EEI was *not* insolvent") (emphasis in original).

## III.    THE FRAUD COUNTERCLAIM SHOULD BE DISMISSED

### A.    The Fraud Counterclaim Is Duplicative of the Breach of Contract Counterclaims

Ver's fraud Counterclaim should be dismissed as duplicative of Ver's four breach of contract Counterclaims. Under longstanding New York law, "a fraud claim is not stated by allegations that simply duplicate, in the facts alleged and damages sought, a claim for breach of

20

contract." *Cronos Grp. Ltd. v. XComIP, LLC*, 156 A.D.3d 54, 62 (1st Dep't 2017).  The First Department "has held numerous times that a fraud claim that arises from the same facts as an accompanying contract claim, seeks identical damages and does not allege a breach of any duty collateral to or independent of the parties' agreements is subject to dismissal as redundant of the contract claim." *Id.* at 62-63 (citations and internal quotation marks).

Applying this principle, courts routinely dismiss as duplicative fraud claims based on the same facts underlying a contract claim.  *See, e.g.*, *Manipal Educ. Ams., LLC v. Taufiq*, 203 A.D.3d 662, 663 (1st Dep't 2022) ("The fraud claim against these defendants should also be dismissed . . . as duplicative of the breach of contract claim"); *Land 'n Sea v. Thread Counsel, Inc.*, Index No. 653551/2020, 2021 N.Y. Misc. LEXIS 12791 (Sup. Ct. N.Y. Cnty. Oct. 29, 2021) (dismissing fraud claims that "are based on the same facts as its breach of contract cause of action and plaintiff[s] seeks the same damages on its fraud and breach of contract claims").

Ver's fraud Counterclaim duplicates his four breach of contract Counterclaims.  Each of his four breach of contract Counterclaims are premised on Ver's allegation that GGC International was insolvent and made misrepresentations about such insolvency (including about a dispute with an unrelated third party 3AC), in violation of the ISDA Master Agreement.  Ver's fraud Counterclaim is based on the exact same set of facts.  Ver's fraud Counterclaim alleges that GGC International "knowingly made a material misrepresentation to Mr. Ver regarding its current financial condition" and that he was prevented "from discovering GGCI's insolvency and exercising his right to terminate the contract as a result."  CC ¶¶ 279-80.  Each of the five causes of action seeks the exact same quantum of damages:  $20,000,000, plus punitive damages, and attorneys' fees and costs.  *Compare* CC ¶¶ 248, 256, 264, 272 *with* CC ¶¶ 285.

21

New York law thus requires dismissal of the fraud Counterclaim as duplicative of the breach of contract Counterclaims.

### B.    Ver Has Failed to Allege Fraud With Particularity

"The elements of a cause of action for fraud require a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages." *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559 (2009). Critically, "claim[s] rooted in fraud must be pleaded with the requisite particularity under CPLR 3016(b)."[11] *Id. See also Ferro Fabricators, Inc. v. 1807-1811 Park Ave. Dev. Corp.*, 127 A.D.3d 479, 480 (1st Dep't 2015) ("[T]he third-party complaint only contains general allegations as to the alleged misrepresentations and virtually no information as to when and by whom these representations were made.").

Ver's Counterclaim for fraud fails to satisfy CPLR 3016(b).

The fraud Counterclaim fails to plead any misrepresentation with particularity.  At most, Ver pleads that GGC International provided Ver with the June 20 SOFC but did not provide Ver with information about an arbitrator's denial of emergency relief sought by a different Genesis entity, GAP, against a third party 3AC, which Ver believes caused GGCI to "write down hundreds of millions of dollars in assets."  CC ¶ 278.  But, as explained above, the June 20 SOFC does not contain any misrepresentations, nor does Ver allege any such misrepresentations with particularity. Because the fraud Counterclaim fails to meet CPLR 3016(b), it should be dismissed.

---

[11]    CPLR 3016(b) states that "[w]here a cause of action or defense is based upon misrepresentation, fraud, mistake, willful default, breach of trust or undue influence, the circumstances constituting the wrong shall be stated in detail."

22

### C.    Ver Cannot State a Counterclaim for Fraudulent Omission

To the extent that Ver is alleging fraudulent omissions to support his fraud Counterclaim, such claims would fail because "an omission does not constitute fraud unless there is a fiduciary relationship between the parties." *Eurycleia Partners, LP*, 46 A.D.3d at 402. *See also Golub v. Tanenbaum-Harber Co., Inc.*, 88 A.D.3d 622, 622 (1st Dep't 2011) (same); *Sebastian Holdings, Inc. v. Deutsche Bank AG*, 78 A.D.3d 446, 447 (1st Dep't 2010) ("[T]he lack of a fiduciary relationship between the parties is fatal to plaintiff's claims for . . . fraudulent concealment.").

Ver's allegation that when GGC International provided Ver with the June 20 SOFC on June 28, 2022, it omitted to inform Ver of an order in the 3AC arbitration that had occurred on June 21, 2022, CC ¶¶ 278-79, is plainly an alleged omission, not an affirmative misrepresentation. Ver's allegation that GGC International did not disclose to Ver that its affiliate GAP was issuing margin calls to 3AC and liquidating 3AC's collateral is also an omission. Yet, Ver does not allege that it had any fiduciary relationship with GGC International. To the contrary, each Party represented in the Master Confirmation Agreement that "neither the other party nor any of its agents are acting as a fiduciary for it." Master Confirmation Agreement § 9.a(ii). And the Counterclaims plainly allege that GGC International and Ver had an arms' length business relationship. Because there is no fiduciary relationship between GGC International and Ver, Ver cannot assert a claim against GGC International based on an allegedly fraudulent omission.

### D.    Ver Disclaimed Reliance on Extracontractual Representations

Ver's fraud Counterclaim fails for the additional reason that he disclaimed reliance on any extracontractual representations. Under New York law, disclaimers that parties are "not relying on any representations as to the very matter as to which they now claim they were defrauded," will

23

render a fraud claim deficient. *Pappas v. Tzolis*, 20 N.Y.3d 233 (2012) (disclaimers in a pre-litigation agreement governing the sale of LLC membership interests precluded fraud claims). *See also HSH Nordbank AG v. UBS AG*, 95 A.D.3d 185, 201 (1st Dep't 2012) ("[t]o permit [plaintiff] to sue [defendant] for fraud based on extracontractual representations concerning the risk level of the notes would 'in effect condone [plaintiff's] own fraud in deliberately misrepresenting its true intention' when it disclaimed reliance on any such representations at the time of contracting."); *Chase Manhattan Bank v. N.H. Ins. Co.*, 304 A.D.2d 423, 424 (1st Dep't 2003).

Here, the documentary evidence unambiguously shows that Ver agreed he was not relying on statements made by GGC International, would perform his own investigation, and acknowledged that cryptocurrency assets were volatile and unpredictable. Master Confirmation Agreement ¶¶ 9.a, 9.h, 9.h.i. Based on these provisions, Ver disclaimed reliance on any alleged extracontractual representations purportedly made by GGC International. Without a basis to plead reliance, Ver cannot state a claim for fraud.

## **CONCLUSION**

For the reasons cited herein, the Court should issue an Order pursuant to CPLR 3211(a)(1) and 3211(a)(7) the Counterclaims in their entirety.

24

Dated: New York, New York
       August 21, 2023

                           MORRISON COHEN LLP


                           By:     /s/ *Jason Gottlieb*       
                                Jason Gottlieb
                                Michael Mix
                                Vani Upadhyaya
                                909 Third Avenue
                                New York, New York 10022
                                (212) 735-8600

                                *Counsel for Plaintiff / Counterclaim-*
                                *Defendant GGC International*
                                *Limited*

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 34 of 248

## **WORD COUNT CERTIFICATION**

Pursuant to Rule 17 of subdivision (g) of section 202.70 of the Uniform Rules for the

Supreme Court and County Court (Rules of Practice for the Commercial Division of the

Supreme Court), I hereby certify that the total number of words in this memorandum of law,

excluding the caption, signature block, and word count certification is 6,984.

Dated: New York, New York
      August 21, 2023

                                      */s/ Jason Gottlieb*
                                       Jason Gottlieb

26

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 35 of 248

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

GGC INTERNATIONAL LIMITED,

                                Plaintiff,

           v.

ROGER VER,

                              Defendant.

Index No. 650439/2023

Motion Seq. No. 002

**AFFIRMATION OF JASON
GOTTLIEB**

        JASON GOTTLIEB, an attorney duly admitted to practice before the Courts of the State of New York, affirms the following to be true under penalties of perjury and pursuant to CPLR 2106:

        1.      I am a member of Morrison Cohen LLP, attorneys for Plaintiff / Counterclaim-Defendant GGC International Limited ("GGC International").  I am fully familiar with the facts and circumstances contained in this affirmation.

        2.      I submit this affirmation in support of GGC International's motion to dismiss the counterclaims of Defendant / Counterclaim-Plaintiff Roger Ver ("Ver").

        3.      Attached hereto as **Exhibit A** is a true and correct copy of Ver's Answer and Counterclaims dated May 9, 2023 (NYSCEF 11).

        4.      Attached hereto as **Exhibit B** is a true and correct copy of Ver's Amended Answer and Counterclaims dated July 31, 2023 (NYSCEF 32).

        5.      Attached hereto as **Exhibit C** is a true and correct copy of GGC International's Complaint against Ver, dated March 28, 2023 (NYSCEF No. 9).

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 36 of 248

6.      Attached hereto as **Exhibit D** is a true and correct copy of relevant portions of a transcript of an oral decision, obtained from PACER, in *In re Lehman Brothers Holdings, Inc., et al.*, No. 08-13555 (JMP), 2011 Bankr. LEXIS 1899 (S.D.N.Y. Bankr. May 23, 2011).

Dated:  New York, New York
        August 21, 2023


                                                    */s/ Jason Gottlieb* _____
                                                    Jason Gottlieb

## **WORD COUNT CERTIFICATION**

Pursuant to Rule 17 of subdivision (g) of section 202.70 of the Uniform Rules for the

Supreme Court and County Court (Rules of Practice for the Commercial Division of the

Supreme Court), I hereby certify that the total number of words in this memorandum of law,

excluding the caption, signature block, and word count certification is 204.


Dated: New York, New York
        August 21, 2023

                                    _/s/ Jason Gottlieb _____
                                         Jason Gottlieb

# Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

|  |  |
|---|---|
| GENESIS GLOBAL CAPITAL INTERNATIONAL LIMITED,<br><br>Plaintiff,<br><br>v.<br><br>ROGER VER,<br><br>Defendant. | Index No. 650439/2023<br><br>ANSWER AND COUNTERCLAIM OF ROGER VER |

Defendant, Roger Ver ("Ver"), by and through his attorneys, Kelman PLLC, in response to the allegations contained in the complaint of Genesis Global Capital International Limited ("GGCI") filed herein, alleges as follows:

## INTRODUCTION

This case exposes the deceptive tactics of an insolvent derivatives trading desk desperate to remain afloat. GGCI's own derivatives contracts mandated continuous solvency. Yet when Ver sought confirmation of their financial status, GGCI deceived him with misleading financial information and induced him to provide tens of millions of dollars in additional collateral.

In June 2022, GGCI faced insolvency as Three Arrows Capital ("3AC") started to collapse. Desperate for assets, they targeted Ver, a significant customer with multiple expiring options that month. To collect from him, GGCI let Ver's out-of-the-money options expire; to avoid paying him, GGCI persuaded Ver to roll in-the-money options to a later date. Meanwhile, Genesis secretly planned to margin call and liquidate 3AC immediately after the roll, which would drive Ver's expiring positions to new lows.

The moment Ver's out-of-the-money June options expired, GGCI abruptly demanded that Ver over-collateralize the positions he had just rolled by a staggering 300%. Since GGCI had

1

always accepted digital assets as collateral at mark-to-market prices, this sudden and unprecedented low valuation raised Ver's suspicions about GGCI's solvency.

In fact, GGCI was attempting to cover up their insolvency by squeezing Ver for exorbitant sums of collateral. Although GGCI outwardly applied a low valuation to Ver's digital assets, once they had them in hand, GGCI would add them to their balance sheet as assets valued mark-to-market. This accounting trick promised to boost GGCI's assets by several hundred million dollars and return them to solvency.

Ver demanded proof of GGCI's solvency before he would provide any further collateral. GGCI then provided Ver with a Statement of Financial Condition ("SOFC") dated June 20, 2022, which misleadingly portrayed a narrow positive equity. In truth, however, GGCI was already insolvent. The SOFC hid GGCI's insolvency by using the same accounting trick — overvaluing illiquid digital assets by using undiscounted mark-to-market prices. Had GGCI applied appropriate discounts to their digital assets, as they demanded from Ver, their SOFC would have revealed their insolvency and Ver would have terminated the contracts as a result of GGCI's default.

In December 2022, the collapse of the FTX exchange and Alameda Research revealed that GGCI had been insolvent all along. Ver was alerted to GGCI's insolvency by an interview wherein FTX and Alameda co-founder Sam Bankman-Fried stated that Alameda had repaid a $2.5 billion dollar loan to "Genesis" in August 2022. This appeared to be an obvious preference transfer that would be subject to clawback.

Citing the $2.5 billion repayment from Alameda, Ver requested that GGCI provide further assurances that it had been solvent in June 2022. Ver reminded GGCI that he had faithfully provided additional collateral for months, including a substantial $37 million in

payments just weeks earlier. GGCI acknowledged that the timing and size of Ver's recent collateral contributions underscored his genuine concern, since he could have simply raised these arguments instead of paying GGCI $37 million dollars.

Consequently, GGCI reluctantly shared its 2021 audited financials with Ver, and denied that it had ever had any involvement with FTX or Alameda. However, analysis of GGCI's 2021 financials directly contradicted these claims. GGCI's 2021 financials revealed that it had allowed a single counterparty to open a $2.5 billion position, collateralized exclusively by FTX's own FTT tokens, which were valued at inflated mark-to-market prices. It was evident that these FTT tokens had come from Alameda.

Despite GGCI's repeated misrepresentations and false assurances of solvency, Ver maintains his willingness to pay any outstanding sums owed, provided GGCI can finally demonstrate they were solvent at the relevant times. To date, they have yet to do so.

<u>ANSWER TO THE COMPLAINT</u>

Preliminary Statement

1.      Defendant denies the allegations of paragraph 1.

2.      Defendant denies the allegations of paragraph 2.

3.      Defendant denies the allegations of paragraph 3 and alleges the documents referenced therein speak for themselves. Further, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms. Further, the parties also did not execute the ISDA Credit Support Annex, and no elections were made as to Section 13 of that agreement, entitled "Elections and Variables."

3

Case 1:24-cv-01533-JPC    Document 20-1    Filed 03/20/24    Page 42 of 248

4.      Defendant lacks sufficient information and knowledge to form a belief as to the allegations contained in paragraph 4.

5.      Defendant admits that the Master Confirmation Agreement makes certain elections and modifications to the 2002 ISDA Master Agreement and the ISDA Credit Support Annex as alleged in paragraph 5.  However, the parties never executed a 2002 ISDA Master Agreement or the ISDA Credit Support Annex, and no elections were made as to the schedule to the 2002 ISDA Master Agreement or Section 13 of the ISDA Support Annex, each of which contain material terms.

6.      Defendant lacks sufficient information and knowledge to form a belief as to the allegations contained in paragraph 6, but believes same to be true.

7.      Defendant denies the allegations contained in paragraph 7.  As discussed in Mr. Ver's counterclaim below GGCI was likely insolvent well in advance of December 2022.  The precise date of GGCI's insolvency is not currently known, but this dispute may implicate option contracts with different expiration dates.

8.      Defendant denies the allegations contained in paragraph 8.  As will be evident from Mr. Ver's counterclaim, Plaintiff was in default of the option agreements well in advance of December 2022 and, in fact, owes Mr. Ver damages estimated to be well in excess of $20 million.

9.      Defendant admits receiving the notices referenced in paragraph 9 but denies that he owed GGCI anything as a result of its default and breach of the contracts between the parties.

10.     Defendant admits receiving the "Calculation Statement" referenced in paragraph 10 but denies that he owed GGCI anything as a result of its default and breach of the contracts between the parties.

4

11.     Defendant admits the allegations contained in paragraph 11 that he has failed to pay the sums identified in paragraph 10 as the funds requested are not duly owed as a result of GGCI's default and breach of the contracts between the parties.

12.     Defendant denies the allegations contained in paragraph 12.

13.     Defendant denies the allegations contained in paragraph 13 and states that the parties did not execute a 2002 ISDA Master Agreement or the schedules attached thereto which contain material terms.

The Parties

14.     Defendant lacks sufficient knowledge and information to form a belief as to the allegations contained in paragraph 14.

15.     Defendant admits the allegations contained in paragraph 15.  Mr. Ver is a citizen of St. Kitts, but does not reside at 858 Zenway Blvd. Unit 15-203, Frigate Bay, St. Kitts and Nevis.

Jurisdiction and Venue

16.     Defendant admits the allegations contained in paragraph 16.  While the Master Confirmation makes reference to the 2002 ISDA Master Agreement and ISDA Support Annex, no such agreements were executed by the parties, and no elections were made as to the schedule to the 2002 ISDA Master Agreement or Section 13 of the ISDA Support Annex, which contain material terms.

17.     Defendant admits the allegations contained in paragraph 17.

18.     Defendant admits the allegations contained in paragraph 18.

Statement of Facts

19.     Defendant admits the allegations contained in paragraph 19.

5

20.     Defendant denies the allegations contained in paragraph 20.  While the Master Confirmation makes reference to the 2002 ISDA Master Agreement and ISDA Support Annex, no such agreements were executed by the parties, and no elections were made as to the schedule to the 2002 ISDA Master Agreement or Section 13 of the ISDA Support Annex, which contain material terms.

21.     Defendant admits the allegations contained in paragraph 21.

22.     Defendant admits that the 2002 ISDA Master Agreement "provides general conditions for payment and delivery" as alleged in paragraph 22.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

23.     Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 23.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

24.     Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 24.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

25.     Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 25.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

6

26.    Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 26.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

27.    Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 27.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

28.    Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 28.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

29.    Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 29.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

30.    Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 30.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.   Further, the document speaks for itself.

31.    Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 31.  However, the parties never executed a 2002 ISDA Master Agreement,

Case 1:24-cv-01533-JPC    Document 20-1    Filed 03/20/24    Page 46 of 248

and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement. Further, the document speaks for itself.

32.     Defendant admits the allegations contained in paragraph 32. Further, the document speaks for itself.

33.     Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 33. However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement. Further, the document speaks for itself.

34.     Defendant admits that the parties executed various option transactions as alleged in paragraph 34 but currently lacks sufficient knowledge and information to form a belief as to whether a transaction confirmation was sent for each and every transaction.

35.     Defendant denies the allegations contained in paragraph 35. However, Mr. Ver admits that he did not terminate the contracts as a direct result of GGCI's multiple intentional misrepresentations regarding its solvency and other related issues.

36.     Defendant denies the allegations contained in paragraph 36 to the extent that GGCI is attempting to limit this dispute to three transactions. Upon information and belief, GGCI was insolvent by June 2022 and, in fact, owed Mr. Ver substantial sums. Defendant admits that the terms of the three option contracts reflected in paragraph 36 are accurate.

37.     Defendant admits the allegations contained in paragraph 37. Further, the documents speak for themselves.

38.     Defendant admits that three option contracts expired in December 2022 as alleged in paragraph 38, but denies that these are the only option contracts at issue in this dispute.

8

Case 1:24-cv-01533-JPC    Document 20-1    Filed 03/20/24    Page 47 of 248

39.     Defendant admits the allegations contained in paragraph 39, but denies that any sums were owed to GGCI as a result of its breach of the agreements between the parties and is owed substantial sums from GGCI.

40.     Defendant admits to receiving the notice referenced in paragraph 40.  Further, the document speaks for itself.

41.     Defendant admits the allegations contained in paragraph 41, but denies that any sums were duly owed to GGCI as a result of its default and various breaches of the agreements.

42.     Defendant admits to receiving the notice referenced in paragraph 42.  Further, the document speaks for itself.

43.     Defendant admits to receiving the notice referenced in paragraph 43.  Further, the document speaks for itself.

44.     Defendant admits the allegations contained in paragraph 41, but denies that any sums were duly owed to GGCI as a result of its own default and various breaches of the agreements.

45.     Defendant admits to receiving the notice referenced in paragraph 45.  Further, the document speaks for itself.

46.     Defendant lacks sufficient knowledge and information to form a belief as to the allegations contained in paragraph 46.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

47.     Defendant admits to receiving the notice referenced in paragraph 47 but denies the accuracy of the alleged sums owed contained therein.  Further, the document speaks for itself.

9

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 48 of 248

48.     Defendant admits the allegations contained in paragraph 41, but denies that any sums were duly owed to GGCI as a result of its own default and various breaches of the agreements.

49.     Defendant admits the allegations contained in paragraph 49.

Claims for Relief
Claim One

50.     Defendant repeats and incorporates in full his responses each allegation set forth in paragraphs 1–49.

51.     The allegations in paragraph 51 state legal conclusions to which no response is required.  To the extent a response is required, the parties did not execute a 2002 ISDA Master Agreement or ISDA Support Annex, and no elections were made as to the schedule to the 2002 ISDA Master Agreement or Section 13 of the ISDA Support Annex, which contain material terms.

52.     The allegations in paragraph 52 state legal conclusions to which no response is required.  To the extent a response is required, Defendant denies the allegations contained therein as GGCI failed to meet its contractual obligations to Mr. Ver.

53.     The allegations in paragraph 53 state legal conclusions to which no response is required.  To the extent a response is required, Defendant denies the allegations of paragraph 53.

54.     Defendant denies the allegations contained in paragraph 54.

55.     The allegations in paragraph 55 state legal conclusions to which no response is required.  To the extent a response is required, Defendant denies the allegations of paragraph 55.

56.     The allegations in paragraph 56 state legal conclusions to which no response is required.  To the extent a response is required, Defendant denies the allegations of paragraph 56.

10

### Request for Relief

Defendant denies the allegations in the Request for Relief, including the "Wherefore" clause, that Plaintiff is entitled to any form or any amount of relief.

### Affirmative Defenses

57. Plaintiff has failed to state a claim upon which relief can be granted.

58. Plaintiff has failed to produce all of the relevant agreements between the parties, including agreements related to the ISDA Master Agreement, including but not limited to the confirmations, definition booklets and credit support documentation.

59. The Plaintiff's requests for relief are barred by the doctrine of unclean hands.

60. Plaintiff lacks standing to avail itself of the Courts of the State of New York in that it is a foreign corporation, doing business in New York, without payment of the required taxes and fees in connection with its business operations.

61. Plaintiff failed to act in a commercially reasonable manner.

62. Plaintiff has breached the agreement between the parties, barring Plaintiff's request for relief.

### COUNTERCLAIM

### The Parties

63. Roger Ver ("Ver") is the Counter-Plaintiff in this action. Ver is a natural person and a resident and citizen of St. Kitts and Nevis.

64. Genesis Global Capital International Limited ("GGCI") is the Counter-Defendant in this action. GGCI is a British Virgin Islands company limited by shares with a principal place of business in New York.

11

Related Non-Parties

65.     Genesis Global Limited ("Genesis Global") is the ultimate parent of GGCI.

66.     Genesis Global Trading, Inc. ("Genesis Trading") is a subsidiary of Digital Currency Group, and it is a leading cryptocurrency trading and lending firm that primarily serves institutional clients.

67.     Genesis Asia Pacific Limited Pte ("GAP") is a Singapore private limited company that has filed for Chapter 11 bankruptcy protection in the Southern District of New York.

68.     Collectively, GGCI, Genesis Global, Genesis Trading, GAP and their affiliates are referred to as "Genesis".

69.     Digital Currency Group, Inc ("DCG") is a global venture capital company that invests in blockchain and digital currency-related companies.  DCG is the ultimate parent of Genesis.

70.     Three Arrows Capital Limited ("3AC") was a Singapore-based investment firm that specialized in trading and investing in cryptocurrencies and other digital assets before its stunning collapse in mid-2022.  They are now being liquidated in the BVI.

71.     Alameda Research LLC ("Alameda") was a quantitative cryptocurrency trading firm that was founded in 2017 by Sam Bankman-Fried. Alameda, along with FTX and more than 130 affiliated entities, filed for Chapter 11 bankruptcy protection in November 2022.

72.     FTX International Limited (aka FTX Trading Limited) ("FTX") is a cryptocurrency derivatives exchange that was launched in 2019 by Sam Bankman-Fried and others. As discussed above, FTX, and more than 130 affiliated entities, filed for Chapter 11 bankruptcy protection in November 2022.

12

73.     Sam Bankman-Fried ("SBF") is the now disgraced co-founder and CEO of both FTX and Alameda Research, and was at the heart of one of, if not the, largest cryptocurrency thefts in history, stealing billions of dollars from his customers and using those funds to pay down debts owed by companies he owned or controlled, including Alameda and FTX.

### GGCI Solicits Ver's Business

74.     On June 10, 2020, GGCI approached Ver, a well-known Bitcoin Cash ("BCH") proponent, to trade BCH-based over-the-counter derivatives.  GGCI sought to start a BCH options book with Ver's help.

75.     Though experienced in digital asset investment, Ver was new to options trading.

76.     Ver was initially hesitant to entrust GGCI with significant assets.  Seeking to win Ver's business, GGCI proposed a mechanism to earn interest on his collateral while his positions were open.

77.     On June 15, 2020, GGCI suggested that Ver could lend his BCH to GGCI at interest while simultaneously using the same assets as collateral for derivative contracts with GGCI.

78.     This arrangement, where Ver's interest-bearing loans served as collateral for GGCI trades, induced Ver to trade derivatives with GGCI.

### The Master Confirmation Agreement and Key Terms

79.     On June 15, 2020, Ver and GGCI executed a Master Loan Agreement ("MLA") which promised to pay Ver interest at agreed upon rates to be determined by the parties during the course of the agreement's term.

13

80.     On June 22, 2020, Ver and GGCI executed a Master Confirmation Agreement to govern their derivative contracts, which was then amended on July 13, 2020 (collectively, the "MCA").

81.     The MCA referenced International Swaps and Derivatives Association (ISDA) form agreements, such as the 1994 Credit Support Annex and the 2002 ISDA Master Agreement. These agreements aimed to protect parties in over-the-counter derivatives transactions against potential issues, such as insolvency or misrepresentation.

82.     Although the parties agreed in various transaction confirmations that the 2002 ISDA Master Agreement and the 1994 Credit Annex formed part of the MCA, neither party ever executed and/or signed either of these documents.  Consequently, none of the schedules to either of them formed part of its terms.

83.     In the 2002 ISDA Master Agreement, section 5(a)(vii)(2) required parties to remain solvent at all times, stating that it was an Event of Default if either party "becomes insolvent or is unable to pay its debts."

84.     Additionally, section 5(a)(iv) prohibited misrepresentation, declaring an Event of Default if a party made "[a] representation... [which] proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated."

85.     Each time Ver and GGCI transacted, they executed an individual transaction confirmation based on the MCA terms.  These terms specified collateral requirements, eligible collateral types, and valuation methods.  The MCA listed both US dollars and a "Reference Currency" as eligible collateral, with a valuation percentage of "100% at Spot Rate."

14

86.     The MCA's use of "Reference Currency" valued at "100% Spot Rate" meant that the underlying digital asset being traded in the derivative contract could serve as collateral, and it would be valued based on its mark-to-market value in the spot markets.

87.     Despite earlier Telegram communications stating otherwise, the confirmations did not mention Ver's loans as acceptable collateral.  However, GGCI disregarded ISDA's standards and the MCA's written terms and eased collateral requirements throughout their course of dealing.

88.     In fact, it was a common practice for GGCI to ease collateral requirements, not only for Ver, but also for its other counterparties.

### The Importance of Solvency in Derivative Transactions

89.     Derivative transactions involve bets on the future price of an underlying asset.  If a counterparty becomes insolvent during the contract, the winning party may not be able to collect, undermining the transaction's sole purpose.

90.     To mitigate this counterparty risk, the 2002 Master ISDA required parties to maintain solvency at all times (the "Solvency Requirement").

91.     The Solvency Requirement was crucial for Ver's decision to enter the MCA, since it ensured that he could collect from GGCI if his derivative positions were successful.  The Solvency Requirement also benefited GGCI, as they could collect from Ver and potentially foreclose on collateral if needed.

92.     The Solvency Requirement was designed to apply to any bankruptcy or insolvency laws relevant to a party.  For GGCI, a BVI company operating in New York, insolvency under BVI or New York law would breach the requirement.  GGCI would be insolvent if it couldn't meet obligations when due, or if its liabilities exceeded its assets.

15

Case 1:24-cv-01533-JPC    Document 20-1    Filed 03/20/24    Page 54 of 248

93.     GGCI's collateral policy was essential for compliance with the Solvency Requirement.  If a counterparty failed to pay, GGCI would incur losses, potentially leading to insolvency as assets were either removed from their balance sheet or had their value greatly reduced.

94.     To mitigate this risk, GGCI required counterparties to provide collateral before opening positions, and it was GGCI's responsibility to maintain adequate collateral and ensure their assets exceeded liabilities at all times.  Again, any failure to do so would undermine the entire purpose of the transactions.

### GGCI Failed to Enforce Collateral Requirements

95.     The MCA and its Transaction Confirmations contained strict collateral requirements for Ver, but GGCI did not enforce them.  Instead, GGCI allowed Ver and other customers to maintain undercollateralized positions and provide exotic, illiquid digital assets as collateral.

96.     Firstly, GGCI never required Ver to post US dollars or Reference Currency as collateral.  They allowed Ver to use unrelated digital assets, such as Monero (XMR) and Binance Coin (BNB), even though these assets were unrelated to the underlying derivative transaction.

97.     GGCI permitted other customers to provide even more illiquid and exotic assets as collateral, such as FTT tokens.

98.     On information and belief, GGCI also allowed SOL, OXY, MPS and SRM as collateral to support billions in loans.

99.     Secondly, GGCI valued this exotic collateral at mark-to-market prices without applying appropriate discounts for illiquidity or potential losses during liquidation.

16

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 55 of 248

100.    Thirdly, GGCI allowed Ver to maintain collateral amounts below the required sum in the MCA.

101.    Fourthly, GGCI didn't request additional collateral from Ver when the US dollar value of his digital assets fell below key thresholds.

102.    Fifthly, GGCI permitted Ver to use digital assets he had loaned at interest as collateral, which meant that GGCI was taking on additional counterparty risk by redeploying Ver's collateral to profit from an interest rate spread.

103.    GGCI's relaxed collateral requirements were not exclusive to Ver.  They extended the same or similar benefits to other counterparties, resulting in an increased risk of loss and insolvency if the market turned against them.

104.    Nor were GGCI's relaxed collateral requirements embodied in any agreement or official special status afforded to Ver or other particular customers.  Rather, GGCI simply neglected to enforce the written terms of their agreements.

### GGCI's Collateral Exposed to "Daisy Chain" of Debts

105.    GGCI did not directly possess all of the digital asset collateral deposited by counterparties like Ver.  Instead, GGCI sought to generate profits by loaning out this collateral and profiting from the interest rate spread.  This practice, however, exposed GGCI's collateral value to increased counterparty risk, as they needed to recover the loaned collateral before liquidating it to cover a default.

106.    GGCI's collateral practices created a precarious chain of debt obligations. Essentially, a house of cards. Under normal market conditions, they could manage this debt chain by obtaining US dollars.  However, during times of market stress and illiquidity, a single default

17

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 56 of 248

could render GGCI unable to access the collateral deposited by Ver or others, exposing them to immense loss.

107.    Without US dollar cash reserves, GGCI would be forced to liquidate investments at fire sale prices, or call in loans from borrowers who may default.  During periods of market illiquidity and stress, GGCI's relaxed collateral practices increased the risk of GGCI becoming undercollateralized and insolvent.

108.    On information and belief, GGCI would routinely loan out their digital assets to other Genesis entities, including GAP, who would loan it to counterparties such as 3AC.

109.    These related party loans would eventually become impaired by 3AC's insolvency.  In June 2022, 3AC defaulted on more than $2.3 billion to GAP, causing losses to GGCI as related party loans became impaired.

110.    Barry Silbert, who controlled GGCI and the Genesis Entities through his position as Chairman of DCG, was aware of this risk.  In a June 2021 tweet, he acknowledged the "daisy chain" of debts and emphasized the importance of understanding counterparty risk and identifying weak links in the chain.  Regrettably, Silbert failed to recognize that these weak links existed within his own organization, ultimately jeopardizing the safety of GGCI's collateral.



GGCI Overstates its Financial Health: Deviating from ASC 820

111.    GGCI's mark-to-market valuation of digital assets, including those not physically possessed, resulted in an overstatement of its financial health.

112.    Note 2 to GGCI's December 31, 2021 audited financial statement detailed the significant accounting policies and the methods used to derive valuations for its assets and liabilities.  The statement claimed compliance with accounting principles generally accepted in the United States of America (U.S. GAAP).

113.    U.S. GAAP utilizes ASC 820 for determining "fair value," which is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.

114.    ASC 820 establishes a hierarchy of inputs for determining fair value, prioritizing observable inputs and requiring additional disclosures when unobservable inputs are relied on.

115.    GGCI concluded all digital assets and liabilities were recorded and valued based on Level 2 inputs – which are defined as "significant observable inputs".

116.    ASC 820's hierarchy includes three levels:

a. Level 1 (unadjusted spot price in an active market, such as the quoted price of Apple shares on the New York Stock Exchange);

b. Level 2 (spot prices from less active markets and may or may not be discounted); and

c. Level 3 (providing the most discretion, since the quoted price is unreliable and the evaluator is thus forced to rely on other inputs that are unobservable and significant to the overall fair value measurement).

117.    GGCI determined the fair market value of assets in "digital currency investments" and liabilities under "digital currency collateral payable" using Level 2.

19

118.    Digital assets are a famously volatile asset class, characterized by extreme price fluctuations and inherent unpredictability.  Market movements are driven by factors such as technological advancements, regulatory changes, market sentiment, global economic conditions, illiquidity, and, at times, price manipulation.

119.    At all times relevant, GGCI valued all of their digital assets at mark-to-market prices and never applied a discount to them.

120.    Despite liquidity concerns and worsening market conditions beginning in May 2022, GGCI never applied a discount to their Level 2 assets.  All such assets continued to be valued at mark-to-market prices.

121.    GGCI's refusal to apply appropriate discounts to its Level 2 assets allowed GGCI to overstate its financial health and created a misleading picture of a solvent entity where one did not exist.

Over Exposure to Alameda & FTX

122.    During the course of 2021, Genesis entities engaged in a broad relaxation of their lending standards, and began to accept increasingly illiquid and exotic digital assets as collateral for loan and obligations and derivative contracts, creating a precarious financial situation.

123.    On information and belief, GGCI went insolvent at some point during 2021 when it made a loan of $2.5 billion and accepted FTT tokens as collateral.  GGCI valued these FTT tokens mark-to-market, which overstated the real value of FTT and resulted in a severe under collateralization, as Alameda had manipulated FTT's price higher to borrow against it.

124.    Consequently, GGCI was grossly overexposed to a single counterparty.  GGCI's 2021 audited financials reported that on December 31, 2021 the company held $2.370 billion in

20

"digital collateral payable", 99% of which were FTT tokens owed to a single counterparty. These FTT tokens represented *nearly 70%* of GGCI's then total assets.

125.    However, the actual fair market value of these FTT tokens was far lower than the mark-to-market prices used by GGCI, which resulted in significantly fewer assets than reported.

126.    Were GGCI to foreclose on the FTT tokens and sell them for US dollars, *they would have been unable to recover anywhere near the full amount owed.*

127.    GGCI's overexposure to FTT resulted from a quid pro quo relationship between Alameda and Genesis executives.

128.    FTX and Alameda granted Genesis executives early access to purchase FTT tokens at discounted rates before public issuance.

129.    This conflict of interest compromised GGCI's risk management policies and practices, as executives were incentivized to authorize GGCI to take excessive risks for their personal benefit.

130.    If not for these conflicts of interest, Genesis executives might have conducted adequate due diligence on their $2.5 billion loan and learned of Alameda's scheme to manipulate FTT prices and increase its borrowing ability.

131.    In a complaint against Alameda's former CEO, Caroline Ellison, the SEC details this manipulation.  Ellison engaged in automated FTT token purchases to inflate the value of Alameda's collateral, increasing risks for lenders accepting FTT as collateral.

132.    The market crash of May 2022 only worsened GGCI's finances, as Alameda suffered substantial losses, which exacerbated its inability to repay its loan to GGCI.

133.    After May 2022's market crash, Alameda focused its efforts on propping up the price of FTT token, continuing to engage in market operations and offering lines of credit to

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 60 of 248

insolvent entities with large FTT positions to prevent FTT from being liquidated, which would have publicly revealed Alameda's insolvency.

134.    In August 2022, after realizing that Genesis and GGCI would liquidate FTT tokens and reveal their insolvency, Alameda misappropriated customer funds to repay Genesis and GGCI, which was a preferential transfer at the expense of FTX creditors subject to clawback.

135.    Afterwards, Alameda replaced the missing $2.5 billion in FTX customer deposits with the FTT tokens they had just received from Genesis and GGCI, and by valuing FTT at its inflated mark-to-market price created the illusion that FTX remained solvent.

136.    In November 2022, the digital asset exchange Binance called Alameda's bluff and threatened to sell their FTT tokens on the open market, which revealed their lack of liquidity. FTX and Alameda were finally revealed to be insolvent and filed for bankruptcy less than three months after having repaid $2.5 billion to Genesis and GGCI.

Over Exposure to 3AC & the Crash of May 2022

137.    In May 2022, digital asset markets experienced a steep decline due to the collapse of digital assets LUNA and TerraUSD, causing significant losses, liquidations, and a snowball effect of defaults and insolvencies.

138.    3AC was central to the crash, resulting in substantial losses for GGCI and its counterparties.  3AC owed over $3 billion to creditors, including $2.3 billion to GAP, its largest creditor.

139.    Genesis and GAP were overexposed to 3AC, driven by conflicts of interest related to generating demand for the various digital asset trusts operated by Grayscale (the

22

"Grayscale Trusts"). DCG, Genesis' parent company, owned the investment manager for the Grayscale Trusts and profited from the fees it generated.

140.    Since 2020, GAP had been loaning funds to 3AC to fund its Grayscale Trust purchases. However, GBTC's[1] value declined, resulting in substantial unrealized losses for 3AC. While shares in GBTC traded at a premium to its net asset value when 3AC began conducting the trade in 2020, by June 2022 they were trading at a 30% discount.

141.    Genesis' concerns over their exposure to 3AC had reached a boiling point by January 2022. That month, Genesis executives had 3AC pledge their GBTC shares to GAP as security. But as the net asset value of GBTC continued to fall, so did the value of GAP's pledged assets.

142.    Upon information and belief, Genesis' 3AC exposure did not end with the Bitcoin trust, as 3AC was an investor in the other Grayscale Trusts.

143.    In May 2022, after LUNA's collapse, Genesis executives spoke with 3AC and, on information and belief, determined that 3AC was insolvent.

144.    However, GAP's significant exposure to 3AC posed a risk to the solvency of the entire Genesis enterprise, including GGCI, due to various related party loans and intercompany debts. Consequently, Genesis opted not to issue margin calls to 3AC, despite the terms of their agreement permitting such action, in order to prevent further destabilizing their own financial situation.

145.    On information and belief, if not insolvent as a result of the $2.5 billion loan backed by FTT discussed herein, GGCI was insolvent as a result of 3AC's inability to repay GAP by the end of May 2022.

---

[1] GBTC is the Grayscale Bitcoin Trust, just one of a number of digital asset trusts operated by Grayscale and DCG.

146.    On June 10, GGCI's need to obtain more capital became urgent.  That day, 3AC's accounts on the Deribit derivatives platform were liquidated.  Genesis executives, alarmed by the Deribit liquidations and cognizant of 3AC's insolvency, understood that 3AC's demise was near and formulated a strategy to avoid immediate recognition of a $2.3 billion loss.

147.    The plan centered on GAP seizing Grayscale BTC trust shares and other digital assets pledged by 3AC as security for their undercollateralized loans.  However, since issuing an unpayable margin call to 3AC would expose their insolvency, Genesis needed to act quickly before the market caught on.  By securing 3AC assets ahead of other creditors, GAP aimed to offset the substantial loss and safeguard both its own balance sheet and those of its affiliates.

148.    On June 12, Genesis executives set the plan in motion.  GAP issued a margin call to 3AC, demanding an additional $334 million in collateral payments, fully aware that 3AC would be unable to meet the requirement.

149.    On June 13, GAP served a notice of default on 3AC, enabling GAP to liquidate the limited collateral they held and pursue emergency relief to seize further 3AC assets ahead of other creditors.

150.    On June 15, GAP initiated arbitration against 3AC, seeking more than $2.3 billion in loan recovery and emergency relief.  This included seeking a preliminary injunction directing 3AC to freeze more than $2.3 billion, and to deposit the pledged assets with GAP, which were allegedly valued at $462 million at the time.

151.    In their arbitration filing, GAP noted that "[d]ue to recent extreme volatility in the cryptocurrency markets, the value of the collateral already posted by Three Arrows decreased significantly in comparison to the loaned assets under the MLAs."

152.     On June 16, news of the notice of default GAP had issued to 3AC was publicized in the media, and numerous other 3AC lenders began making margin calls and issuing default notices.

153.     On June 21, GAP's request for a preliminary injunction to freeze or seize certain 3AC pledged assets was denied.  A further hearing scheduled for July 5, making it evident GAP wouldn't secure these assets by month's end.

154.     Due to the monthly reporting schedule followed by all Genesis entities, it became apparent that GAP and its affiliates, including GGCI, would have to recognize losses related to 3AC in their month-end financial reports for June 2022, which also coincided with their quarterly reporting obligations.

155.     On June 30, DCG had accepted that GAP, GGCI, and other entities were insolvent and needed capital injections.  Accordingly, DCG loaned $1.1 billion to Genesis Global.

156.     On information and belief, Genesis Global then injected $150 million into GGCI. This amount was recorded as an asset in a newly added line item, "Other", to GGCI's June 30, 2022, SOFC.  Without this, GGCI's negative equity would have exceeded $136 million on June 30.

157.     Consequently, at the latest, GGCI was insolvent in June due to various factors, including inaccurate loss recording, failure to apply appropriate discounts to Level 2 digital assets in the midst of a liquidity event, untimely recognition of substantial losses linked to 3AC and related parties, and untimely recognition of losses tied to the FTT-collateralized loan.

GGCI's Misrepresentations of Solvency

158.     In or about early June, GGCI devised a plan to strengthen its balance sheet.  They aimed to persuade their biggest clients, including Ver, to roll currently profitable options expiring

25

in June to later dates, thereby allowing GGCI to avoid making payments.  Meanwhile, GGCI would allow Ver's currently unprofitable June options to expire, thereby bringing funds into GGCI from Ver and others.

159.    On information and belief, Genesis knew GGCI was insolvent by such time.

160.    On June 7, GGCI asked Ver to roll his deep in-the-money Ethereum options to a later date. Those options expired on June 24.  Ver declined.

161.    On June 9, GGCI sent Ver an article about Ethereum's progress to pique his interest about rolling the options  Ver did not respond.

162.    On June 10, Deribit's liquidation of 3AC signaled 3AC's imminent collapse.

163.    On June 11, GGCI again requested Ver to roll only his in-the-money Ethereum options to a later date, and offered him attractive terms.  Unaware that Genesis planned to margin call and liquidate 3AC immediately afterwards, Ver agreed to let GGCI roll his in-the-money options.

164.    On June 12 and 13, digital asset prices fell as 3AC was margin called, defaulted, and liquidations commenced, as had been planned by Genesis

165.    Meanwhile, on June 13, and again on the 14th, GGCI requested further collateral from Ver.  On June 15, to keep Genesis executives happy, Ver reduced his exposure to GGCI by $22.5 million by buying certain BTC call options.

166.    From June 16 to June 24, GGCI continued discussions with Ver about the additional types of collateral he could offer, and learned it was Ver's strong preference to post a combination of digital assets and certain shares in private companies.  GGCI indicated they were prepared to accept these assets as collateral, as they had done previously.

26

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 65 of 248

167. Throughout the life of their two year business relationship, GGCI had always accepted different forms of collateral from Ver, and allowed him to maintain undercollateralized positions. In fact, it had been GGCI's offer to pay Ver interest on his digital asset collateral, in direct violation of the MCA's collateral requirements, that had induced Ver to trade with GGCI and to continue trading up until that time.

168. However, upon the expiration of Ver's out-of-the-money options on June 24, Genesis executives abruptly changed their policy. They demanded that Ver immediately provide 100% of the required collateral in either US dollars or Reference Currency as stated in the MCA, or face a notice of default.

169. Based on the course of the parties' dealings, GGCI knew Ver was not expecting to be required to pay the full sum of collateral in US dollars or Reference Currency on that day, which GGCI had never required him to do during their two year relationship.

170. GGCI's plan was to extract an excessive sum of collateral from Ver. GGCI offered to accept his digital assets and shares as collateral, but only if he *over*-collateralized his position by 300% to 600%. Were Ver to pay in digital assets, GGCI wanted him to supply 300% as much collateral as the value of his entire position. If in private shares, 600%.

171. As a result of the abrupt change in policy and attempt to extract an excessive sum of collateral, Ver began to suspect GGCI's insolvency. He nonetheless agreed to discuss details with GGCI on a call the following day, June 25.

172. On the June 25th call, Defendants threatened to issue a notice of default if Ver did not immediately pay the full amount in US dollars or Reference Currency or meet their excessive collateral demands.

27

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 66 of 248

173.    Considering the state of the markets, Ver requested proof of GGCI's solvency. Thereafter, GGCI backed off their demands for excessive sums of collateral, began engaging in more constructive discussions to immediately accept certain digital assets, and continued discussions with Ver as to other assets to pledge as collateral.

174.    On information and belief, even using inflated mark-to-market prices for digital assets, GGCI was insolvent on June 25 and were therefore unable to provide Ver with proof of their solvency.

175.    GAP had just lost its bid to freeze 3AC assets in the emergency arbitration hearing on June 21.  At the very latest, GAP should have written down their impaired 3AC loans by such date, which would have resulted in GGCI also writing down any related party loans with GAP.

176.    Initially, GGCI declined to provide up-to-date solvency proof to Ver, stating they did not produce point-in-time financial statements.

177.    However, on June 28, after Ver had informed GGCI that he was not comfortable sending any further collateral without proof of GGCI's solvency, GGCI provided a point in time financial statement.   This statement of financial condition (the "June 20 SOFC") revealed GGCI's various assets and liabilities as of June 20.

178.    The June 20 SOFC claimed total assets of $3.063 billion and liabilities of $2.962 billion, which gave GGCI positive equity of just over $100 million.  Given that $1.594 billion of GGCI's assets were digital assets ("Investments in digital currencies"), even a small fluctuation in the market would render them insolvent.

28

**Genesis Global Capital International Limited**
**Statement of Financial Condition (Unaudited)**
**June 20, 2022**
*(in thousands)*

| | | |
|---|---|---|
| **Assets** | | |
| Cash | $ | 12,929 |
| Investments in digital currencies | | 1,594,209 |
| Derivative assets | | 442,733 |
| Collateral receivable | | 454,449 |
| Receivable from customers | | 159,182 |
| Loans receivable | | 399,560 |
| **Total assets** | $ | 3,063,062 |
| | | |
| **Liabilities and stockholder's equity** | | |
| **Liabilities** | | |
| Collateral payable | $ | 2,094,617 |
| Payable to customers | | 94,569 |
| Loans payable | | 606,477 |
| Derivative liabilities | | 167,132 |
| **Total liabilities** | $ | 2,962,795 |
| | | |
| **Stockholder's equity:** | | |
| Total stockholder's equity | | 100,267 |
| **Total liabilities and stockholder's equity** | $ | 3,063,062 |

179.    Faced with an apparently solvent GGCI, who had by now backed off their demands for excessive collateral, Ver saw no choice but to keep his remaining positions open at GGCI and cooperate with them to ensure collateral levels were mutually acceptable until his remaining options expired.

180.    However, what Ver did not know at the time was that the June 20 SOFC was an accounting farce. The $1.596 billion in digital assets was in fact worth far less, and consisted of a large sum of illiquid FTT tokens, which if sold would have left a large shortfall remaining to GGCI from an insolvent counterparty.

181.    The SOFC's chosen date of June 20 was no accident and was a central part of that farce. The SOFC did not reflect the full write down of 3AC's impaired loans. On information

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 68 of 248

and belief, the 3AC loans were deemed impaired by Genesis on June 21 when GAP's request for emergency relief was denied and GAP had no further collateral to support such debts.

182. When GGCI's plan to seize exorbitant amounts of collateral from Ver failed, GGCI entered discussions with their parent company to receive an injection of capital, which occurred on June 30 when DCG injected $1.1 billion into Genesis.

## Ver Discovers GGCI's Insolvency

183. On November 11, 2022, FTX and Alameda filed for bankruptcy. Their bankruptcy came after a rapid decline when Binance, another exchange, announced they would sell their FTT tokens on the open market. Since FTT tokens were highly illiquid and their prices artificially inflated by Alameda, their value plunged by over 90% following Binance's announcement.

184. The FTX and Alameda bankruptcies sent shockwaves through the digital asset markets. Surprisingly, Sam Bankman-Fried ("SBF"), the controlling principal behind FTX and Alameda, started giving public interviews, asserting that FTX wasn't truly insolvent since its balance sheet held digital assets—primarily FTT tokens—with a mark-to-market value exceeding customer liabilities. SBF was eventually indicted on numerous felony charges.

185. Later that November, rumors circulated that Genesis and its subsidiaries were insolvent when its lending arm stopped withdrawals, trapping investor funds. It was later revealed that GGCI was FTX's largest creditor.

186. Genesis initiated a restructuring plan to save its business, which focused on transferring bad assets from GGCI to other Genesis entities destined for bankruptcy. The plan aimed to raise capital to pay creditors by selling shares in a financially stable GGCI.

30

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 69 of 248

187.    Meanwhile, Ver continued to pay collateral to GGCI.  Since June 21, 2022, Ver has made total payments to GGCI in excess of $60 million and GGCI has liquidated collateral valued in excess of $50,000,000.

188.    On or about December 23, just weeks after Ver made $37 million in collateral payments to GGCI, he became aware of information that made him question GGCI's earlier claim of solvency that had been supported by the June 20 SOFC.

189.    The news was a New York Times interview of SBF, who stated that Alameda had repaid a $2.5 billion loan to "Genesis" that August, about three months before filing for bankruptcy.  SBF added that the loan was repaid because Genesis had called in specific loans made to Alameda.

190.    Ver became concerned that GGCI might have been the entity that lent money to Alameda, potentially affecting GGCI's present solvency and their solvency in June 2022.

191.    As Alameda repaid the loan to Genesis in August, about three months before FTX's bankruptcy, it seemed like this repayment would potentially be subject to an automatic clawback as a preferential transfer.

192.    Ver investigated and learned that there was speculation that SBF had directed Alameda to misappropriate FTX customer funds to repay Genesis.  Alameda then used the FTT tokens it had received back from Genesis to pay FTX, who then used the FTT tokens to replace the missing customer deposits as an asset on their balance sheet.

193.    This caused Ver to grow more concerned, since if true, it would mean that GGCI had been doing what FTX had been doing: propping up their insolvent balance sheet with inflated FTT tokens.

31

194.    Since Ver was considering rolling his expiring December 30 options with GGCI to a later date, he wanted to be sure GGCI remained solvent before doing so, and wanted to further confirm they had in fact been solvent that past June when he initially inquired.

195.    In late December 2022, Ver inquired with GGCI as to whether they remained solvent in the wake of the FTX and Alameda bankruptcies, and whether GGCI had any exposure to them, specifically whether it had been GGCI who had reportedly made a $2.5 billion loan to Alameda and was repaid in August 2022.

196.    GGCI responded that all of Ver's trades had been through GGCI. Despite having lost some funds on FTX, GGCI claimed that it remained solvent and had no further involvement or exposure to Alameda or FTX.

197.    Ver persisted in questioning specifically whether it had been GGCI who received the Alameda loan repayment referred to by SBF in the New York Times interview. GGCI informed Ver that those funds had been repaid to a different Genesis entity, not GGCI.

198.    At this point, Ver demanded proof of GGCI's present solvency, and demanded GGCI provide proof as to how they valued the assets on their June SOFC, which Ver now suspected had deployed the same misleading mark-to-market accounting that FTX had deployed to deceive their depositors.

199.    Ver reminded GGCI that he had faithfully paid in excess of $60 million in additional collateral since June, believing it his legal obligation to do so since GGCI remained solvent, including $37 million dollars in payments just weeks prior.

200.    Were Ver simply trying to avoid paying a debt to GGCI, as Counter-Defendant alleges in its complaint, he obviously would not have made payments totalling $37 million just weeks earlier, and would have raised concerns instead of paying.

201.    Satisfied Ver's concerns were being raised in good faith, but while still denying the validity of his claims, GGCI produced to Ver their audited 2021 financials, as well as an SOFC dated June 30, 2022.

202.    However, both of those documents raised even further issues which revealed GGCI to have been insolvent in June 2022 at the latest.

GGCI's June 30 SOFC and 2021 Audited Financials

203.    The June 30 SOFC revealed dramatic and concerning changes which had occurred since the June 20 SOFC.

204.    First, there had been a significant reported drop in both positive equity and assets. On June 20, there was positive equity of just $100 million on $3 billion in assets, which indicated GGCI faced significant liquidity and volatility concerns. However, by June 30, positive equity had shrunk to $14 million, with assets dropping by more than $400 million, exacerbating the already troubling liquidity and volatility concerns.

205.    Second, much of the fall in asset values was attributed to loans that had been written down.  On June 20, GGCI reported "loans receivable" of $399 million.  However, by June 30 (which had broken "loans receivable" to two line items), loans receivable had been reduced to $1 million and related party loans $47 million.  This represented a combined loss of over $350 million in loan write downs in just ten days.

206.    On information and belief, these loan write-downs represented losses related to 3AC, which had not been written down in the June 20 SOFC, but were known to Counter-Defendant when the June 20 SOFC was sent to Mr. Ver as proof of GGCI's solvency.

207.    Lastly, the June 30 SOFC contained a brand new line item, "Other", which had $151 million in assets.  There was no new corresponding line item in liabilities.

33

208.   On information and belief, this line item "Other" represented funds that had recently been injected as the result of DCG's $1.1 billion capital injection on June 30.

**GGC International Limited**
**Statement of Financial Condition**
**June 30, 2022**
*(in thousands)*

| Assets | | |
|---|---|---|
| Cash | $ | 3,232 |
| Investments in digital currencies and trusts | | 1,439,363 |
| Digital currency loans receivable, net of allowance for loan losses | | 1,250 |
| USD loans receivable, net of allowance for loan losses | | 1,000 |
| Digital currency collateral receivable | | 340,389 |
| Derivative assets | | 869,045 |
| Interest receivable, net of allowance | | 2,758 |
| Receivables from related parties | | 47,334 |
| Other assets | | 151,977 |
| **Total assets** | $ | 2,357,248 |
| | | |
| **Liabilities and member's equity** | | |
| **Liabilities** | | |
| Digital currency loans payable | $ | 370,737 |
| Digital currency collateral payable | | 891,080 |
| USD loans payable | | 18,073 |
| Option collateral payable | | 344,169 |
| Derivative liabilities | | 191,864 |
| Interest payable | | 5,645 |
| Accounts payable and accrued expenses | | 295,894 |
| Payables to related parties | | 225,364 |
| **Total liabilities** | | 2,342,826 |
| | | |
| **Member's equity** | | 14,422 |
| Total member's equity | | 14,422 |
| **Total liabilities and member's equity** | $ | 2,357,248 |

209.   GGCI's 2021 audited financials revealed both that GGCI had been valuing digital assets at 100% mark-to-market, and that it had in fact been the entity that originated a $2.5 billion loan collateralized by FTT tokens.   Those FTT tokens had ultimately come from Alameda.

34

Case 1:24-cv-01533-JPC    Document 20-1    Filed 03/20/24    Page 73 of 248

210. The 2021 audited financials explained that GGCI accounted for collateral paid by counterparties as an asset with a corresponding liability. Alameda's FTT tokens would have been counted on their balance sheet as an asset under "*Investments into digital assets*" and as a liability under "*digital currency collateral payable.*"

211. GGCI's balance sheet showed "*Investments in digital currencies*" equal to $2.825 billion, and "*Digital currency collateral payable*" equal to $2.370 billion.

212. Notably, the "*Digital currency collateral payable*" roughly equaled the $2.5 billion SBF had referred to during his New York Times interview. And while "*Investments in digital currencies*" was larger, it contained additional digital assets owned by GGCI.

213. GGCI's cash flow statement in the 2021 audited financials also contained a line item for "*Digital currency collateral payable*" under liabilities, which was equal to the same line item on the balance sheet, indicating these sums made their way onto GGCI's balance sheet in 2021.

214. GGCI's 2021 audited financials contained a section detailing significant exposures to various counterparties. The significant counterparties were not identified by name, only certain information about them was provided. The financials identified a "Counterparty I" who represented 99% of the digital currency collateral payable liability, which was further identified to consist of 99% FTT tokens.

215. Therefore, GGCI's 2021 financials showed that at some time in 2021 it had originated a loan to a single counterparty backed by FTT tokens, which were valued at $2.3 billion as of December 31, 2021. Accordingly, it became evident to Ver that "Counterparty I" was Alameda Research.

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 74 of 248

216.     Lastly, GGCI's 2021 audited financials contained other figures that revealed yet other sources of GGCI's undercapitalization.  The statement of cash flows identified a $105 million dollar operating loss for 2021.  And the statement of changes in stockholder equity identified almost $41 million in distributions in 2021.

GGCI's Shifting Explanations

217.     When Ver pointed out that GGCI's 2021 audited financials identified a $2.5 billion loan obligation to Alameda, contrary to GGCI's prior representations, GGCI provided misleading information to Ver in an attempt to distance itself from Alameda.

218.     Incredibly, GGCI initially claimed that the financials Ver possessed were actually a consolidated report for multiple Genesis entities, and that the FTT tokens belonged to a different Genesis entity.

219.     However, the financials were clearly labeled as having been prepared exclusively for GGCI, which quickly disproved GGCI's claims.

220.     Once disproven, GGCI shifted its narrative and asserted that an affiliate had dealt with Alameda, who then borrowed from GGCI using the FTT tokens as collateral.  GGCI then refused to provide any evidence to support this claim.

221.     Nonetheless, GGCI's claim that the FTT tokens belonged to an affiliate was a difference without distinction, since the tokens had ultimately come from Alameda and would be subject to a clawback in bankruptcy.

222.     In fact, on May 3, 2023, FTX filed a motion in the Southern District of New York, on behalf of itself and affiliated debtors, seeking $3.9 billion back from Genesis, including sums from GGCI.

36

223. Ultimately, discussions with GGCI made clear that GGCI hadn't applied any discount to the digital assets on their SOFC.

224. At one point, GGCI personnel even admitted that they "may have been underwater for a few days."

225. Had GGCI applied appropriate discounts to their digital assets, as they demanded from Ver, their SOFC would have revealed their insolvency.

226. As a result, Ver would have closed his positions to avoid trading with an insolvent counterparty and saved tens of millions of dollars.

<u>CAUSES OF ACTION</u>

COUNT ONE

(Breach of Contract (Insolvency))

227. Defendant realleges and incorporates all preceding paragraphs as though fully set forth herein, and further alleges:

228. As discussed herein, GGCI and Ver were parties to the Master Confirmation which incorporated the ISDA Master Agreement and ISDA Credit Support Annex by reference.

229. During the life of the parties' relationship, there were well over 100 transactions conducted by GGCI on behalf of Ver.

230. The Master Confirmation executed in connection with each transaction incorporated the 2002 ISDA Master Agreement by reference.

231. The 2002 ISDA Master Agreement defines a number of Events of Default. One such event of default is the insolvency of either party.

232. As described herein, GGCI became insolvent at some point prior to July 1, 2022.

37

233.    At the point of insolvency, GGCI was in breach of all option contracts then open between the parties and subject to the 2002 ISDA Master Agreement.

234.    As per the agreements between the parties, in the event of default, all transactions were to be terminated, and the parties were expected to settle any financial obligations at that point.

235.    However, as a result of GGCI's failure to notify Ver of their insolvency, and their campaign of obfuscation, Ver did not become aware of the insolvency for quite some time.

236.    Following the insolvency, but prior to Ver becoming aware of same, Ver contributed substantial additional funds to maintain his then open options positions, which never should have been paid to GGCI as a result of its insolvency.

237.    Ver has suffered significant damages as a direct result of GGCI's breach of the agreements between the parties.

238.    Accordingly, Ver respectfully requests that this Court award all relevant damages caused by Counter-Defendant's breach of contract, including, but not limited to, compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000.00, punitive or exemplary damages for their malicious conduct, all costs and Court fees, reasonable attorneys' fees, as well as any other relief this Court deems just and proper.

COUNT TWO

(Breach of Contract (Misrepresentation) - BCH Options)

239.    Defendant realleges and incorporates all preceding paragraphs as though fully set forth herein, and further alleges:

240.    As discussed herein, GGCI and Ver were parties to the Master Confirmation which incorporated the ISDA Master Agreement and ISDA Credit Support Annex by reference.

38

241. Pursuant to a trade confirmation dated March 22, 2022, GGCI agreed to purchase from Ver a put option for 70,000 units of Bitcoin Cash ("BCH"), with a strike price of $545 per BCH.

242. The Master Confirmation executed in connection with this transaction incorporated the 2002 ISDA Master Agreement by reference.

243. The 2002 ISDA Master Agreement defines a Misrepresentation by either party as an Event of Default as well. Pursuant to the 2002 ISDA Master Agreement, any representation that "proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated" would be considered an Event of Default.

244. As discussed herein, GGCI made, and repeated, a number of material misrepresentations and omissions regarding its solvency. These repeated misrepresentations and omissions constitute a material breach of the agreement.

245. Ver has suffered, and continues to suffer, irreparable harm as a direct and proximate result of Counter-Defendant's breach of the agreement.

246. Accordingly, Ver respectfully requests that this Court award all relevant damages caused by Counter-Defendant's breach of contract, including, but not limited to, compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000.00, punitive or exemplary damages for their malicious conduct, all costs and Court fees, reasonable attorneys' fees, as well as any other relief this Court deems just and proper.

COUNT THREE

(Breach of Contract (Misrepresentation) - ETH Options)

247. Defendant realleges and incorporates all preceding paragraphs as though fully set forth herein, and further alleges:

39

248.     As discussed herein, GGCI and Ver were parties to the Master Confirmation which incorporated the ISDA Master Agreement and ISDA Credit Support Annex by reference.

249.     Pursuant to a trade confirmation dated June 10, 2022, GGCI agreed to purchase from Ver a put option for 10,000 Ether ("ETH"), with a strike price of $5,000 per ETH.

250.     The Master Confirmation executed in connection with this transaction incorporated the 2002 ISDA Master Agreement by reference.

251.     The 2002 ISDA Master Agreement defines a Misrepresentation by either party as an Event of Default as well.  Pursuant to the 2002 ISDA Master Agreement, any representation that "proves to have been incorrect or misleading in any material respect when made or deemed to have been made or repeated" would be considered an Event of Default.

252.     As discussed herein, GGCI made, and repeated, a number of material misrepresentations and omissions regarding its solvency.  These repeated misrepresentations and omissions constitute a material breach of the agreement.

253.     Ver has suffered, and continues to suffer, irreparably harm as a direct and proximate result of Counter-Defendant's breach of the agreement.

254.     Accordingly, Ver respectfully requests that this Court award all relevant damages caused by Counter-Defendant's breach of contract, including, but not limited to, compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000.00, punitive or exemplary damages for their malicious conduct, all costs and Court fees, reasonable attorneys' fees, as well as any other relief this Court deems just and proper.

40

## COUNT FOUR

### (Breach of Contract (Misrepresentation) - BTC Options)

255.    Defendant realleges and incorporates all preceding paragraphs as though fully set forth herein, and further alleges:

256.    As discussed herein, GGCI and Ver were parties to the Master Confirmation which incorporated the ISDA Master Agreement and ISDA Credit Support Annex by reference.

257.    Pursuant to a trade confirmation dated June 11, 2022, GGCI agreed to purchase from Ver a put option for 500 Bitcoin ("BTC"), with a strike price of $26,000 per BTC.

258.    The Master Confirmation executed in connection with this transaction incorporated the 2002 ISDA Master Agreement by reference.

259.    The 2002 ISDA Master Agreement defines a Misrepresentation by either party as an Event of Default as well.  Pursuant to the 2002 ISDA Master Agreement, any representation that "proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated" would be considered an Event of Default.

260.    As discussed herein, GGCI made, and repeated, a number of material misrepresentations and omissions regarding its solvency.  These repeated misrepresentations and omissions constitute a material breach of the agreement.

261.    Ver has suffered, and continues to suffer, irreparably harm as a direct and proximate result of Counter-Defendant's breach of the agreement.

262.    Accordingly, Ver respectfully requests that this Court award all relevant damages caused by Counter-Defendant's breach of contract, including, but not limited to, compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000.00,

punitive or exemplary damages for their malicious conduct, all costs and Court fees, reasonable attorneys' fees, as well as any other relief this Court deems just and proper.

## COUNT FIVE

### (Fraud)

263.   Defendant realleges and incorporates all preceding paragraphs as though fully set forth herein, and alleges as follows:

264.   On June 7, 2022, GGCI began contacting Mr. Ver regarding rolling over his in-the-money Ethereum option.  However, Mr. Ver was not interested.

265.   Over the next few days, GGCI continued to try and convince Mr. Ver that rolling over his options was the right thing to do, sending articles about the performance of ETH and proposing more favorable terms.  Mr. Ver eventually agreed to roll his options.

266.   Shortly after electing to roll over his in-the-money options, GGCI began making collateral demands that were 1) above and beyond any level of collateral required by the parties' agreements and 2) not in line with the parties' previous course of dealing.

267.   Considering the state of the market, namely the Luna and 3AC collapses, Mr. Ver was concerned about the solvency of GGCI and began to ask questions.  On June 25, 2022, Mr. Ver requested that GGCI provide proof of its solvency.

268.   On June 28, 2022, GGCI delivered a statement of financial condition dated June 20, 2022 (the previously discussed June 20 SOFC).  However, on June 21, 2022, GAP's request for emergency relief in its arbitration against 3AC was denied, requiring GAP and, in turn, GGCI to write down hundreds of millions of dollars in assets.

269.   By sending an incomplete, or otherwise misleading SOFC, GGCI knowingly made a material misrepresentation to Mr. Ver regarding its current financial condition.

42

270.    This material misrepresentation or omission was made by GGCI with the express intent to induce Mr. Ver to maintain his Ethereum option position with GGCI and prevent him from discovering GGCI's insolvency and exercising his right to terminate the contract as a result.

271.    Mr. Ver relied on the June 20 SOFC statement, accepting the representations of GGCI as accurate, and did in fact continue to maintain his option positions at GGCI.

272.    In the months following the delivery of the intentionally misleading June 20 SOFC, Mr. Ver made payments in excess of $60,000,000 to GGCI to maintain his positions and GGCI liquidated over $50,000,000 of Ver's collateral.

273.    Had GGCI disclosed accurate financial information as of June 28, 2022, or otherwise disclosed the 3AC write downs resulting from its failure in the 3AC arbitration, Mr. Ver never would have continued to make payments to maintain the option and would have terminated the option contracts as a result of GGCI's insolvency.

274.    However, as a direct result of GGCI's intentional misrepresentations Mr. Ver has suffered significant damages.

275.    Accordingly, Ver respectfully requests that this Court award all relevant damages caused by Counter-Defendant's fraud, including, but not limited to, compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000.00, punitive or exemplary damages for their malicious conduct, all costs and Court fees, reasonable attorneys' fees, as well as any other relief this Court deems just and proper.

COUNT SIX

(Fraudulent Inducement)

276.    Defendant realleges and incorporates all preceding paragraphs as though fully set forth herein, and further alleges:

43

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 82 of 248

277.    As described herein, during June 2022, GGCI personnel launched a campaign to convince Ver to allow his out-of-the-money options expire, while rolling over his in-the-money options to a later date.

278.    At first, Ver was not interested in such a plan.   However, after a series of discussions and representations by GGCI, Ver elected to follow their suggestion and roll over his in-the-money options to a later expiration date.

279.    Unbeknownst to Ver, at the same time that GGCI was convincing him to rollover his options, GAP, a closely related entity, was engaging in a plan to liquidate one of its biggest customers, 3AC.

280.    What was known to GGCI, but unknown to Ver as a result of GGCI's material omission, was that this liquidation was going to have a large negative impact on Ver's expiring options.

281.    The liquidation of 3AC's collateral, as well as the ensuing fall out from one of the space's largest players teetering on bankruptcy, could have no other effect than to drive down market prices, thereby hurting Ver's position.

282.    GGCI knew that had they disclosed GAP's plan to margin call and/or liquidate 3AC, Ver would have rejected any rollovers and instead, let his in-the-money options expire, and collect his profits from those trades, further increasing the financial strain being felt by Counter-Defendant and its related entities.

283.    Ver justifiably relied on this omission when making his decision to roll over his open options contracts.

284.    Not surprisingly, least of all to GGCI, the downfall of 3AC, and the ensuing panic, had a drastic effect on the markets, greatly hurting Ver's open positions.

44

285.    But for the actions of GGCI, the options Ver had rolled would have expired in profit on June 24.

286.    Further, following the fraudulently induced rollover, Ver was required to meet various margin calls.  From the date of his rollover, until those newly rolled over contracts expired, Ver made in payments in excess of $60,000,000 to GGCI to maintain his positions, and had over $50,000,000 in collateral liquidated, that never would have been paid to Counter-Defendant had they not omitted the material information regarding the 3AC margin call and liquidation.

287.    Accordingly, Ver respectfully requests that this Court award all relevant damages caused by Counter-Defendant's fraudulent inducement, including, but not limited to, compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000.00, punitive or exemplary damages for their malicious conduct, all costs and Court fees, reasonable attorneys' fees, as well as any other relief this Court deems just and proper.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Counter-Plaintiff Roger Ver respectfully requests that this Court:

1.   Deny Counter-Defendant's claims for relief in their entirety;

2.   Award compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000.00 in favor of Mr. Ver on his Counterclaims, as well as punitive or exemplary damages, incidental damages, and consequential damages;

3.   Award Counter-Plaintiff pre-judgment and post-judgment interest;

4.   Award Counter-Plaintiff's reasonable attorney fees, expenses, and the costs of this action; and

45

INDEX NO. 650439/2023

RECEIVED NYSCEF: 08/09/2023

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 84 of 248

5. Award Counter-Plaintiff such other and further relief as this Court may deem just, proper, and equitable under the circumstances.

<u>DEMAND FOR JURY TRIAL</u>

Counter-Plaintiff hereby demands a trial by jury of all claims so triable.

KELMAN PLLC

Dated: May 9, 2023

By:   <u>s/: Daniel J. Kelman</u>
Daniel J. Kelman
Michael D. Handelsman
1501 Broadway,
12th Floor, #2972
New York, NY 10036
daniel@kelman.law
mike@kelman.law

46

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 85 of 248

# Exhibit B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| GENESIS GLOBAL CAPITAL INTERNATIONAL LIMITED,<br><br>Plaintiff,<br><br>v.<br><br>ROGER VER,<br><br>Defendant. | Index No. 650439/2023<br><br>**AMENDED ANSWER AND COUNTERCLAIM OF ROGER VER** |

Defendant, Roger Ver ("Ver"), by and through his attorneys, Kelman PLLC, in response to the allegations contained in the complaint of Genesis Global Capital International Limited ("GGCI") filed herein, alleges as follows:

## INTRODUCTION

This case exposes the deceptive tactics of an insolvent derivatives trading desk desperate to remain afloat. GGCI's own derivatives contracts mandated continuous solvency. Yet when Ver sought confirmation of their financial status, GGCI deceived him with misleading financial information and induced him to provide tens of millions of dollars in additional collateral.

In June 2022, GGCI faced insolvency as Three Arrows Capital ("3AC") started to collapse. Desperate for assets, they targeted Ver, a significant customer with multiple expiring options that month. To collect from him, GGCI let Ver's out-of-the-money options expire; to avoid paying him, GGCI persuaded Ver to roll in-the-money options to a later date. Meanwhile, Genesis secretly planned to margin call and liquidate 3AC immediately after the roll, which would drive Ver's expiring positions to new lows.

The moment Ver's out-of-the-money June options expired, GGCI abruptly demanded that Ver over-collateralize the positions he had just rolled by a staggering 300%. This sudden and

unprecedented low valuation raised Ver's suspicions about GGCI's solvency, because GGCI had always accepted digital assets as collateral at mark-to-market prices.

In fact, GGCI was attempting to cover up its insolvency by squeezing Ver for exorbitant sums of collateral.  Although GGCI outwardly applied a low valuation to Ver's digital assets, once they had them in hand, GGCI would add them to their balance sheet as assets valued mark-to-market.  This accounting trick promised to boost GGCI's assets by several hundred million dollars and return them to solvency.

Ver demanded proof of GGCI's solvency before he would provide any further collateral. GGCI then provided Ver with a Statement of Financial Condition ("SOFC") dated June 20, 2022, which misleadingly portrayed a narrow positive equity. In truth, however, GGCI was already insolvent.  The SOFC hid GGCI's insolvency by using the same accounting trick — overvaluing illiquid digital assets by using undiscounted mark-to-market prices.  Had GGCI applied appropriate discounts to its digital assets as it demanded from Ver, their SOFC would have revealed their insolvency and Ver would have terminated the contracts as a result of GGCI's default.

In July 2022, GGCI continued to conceal its insolvency by misrepresenting that its parent company, Digital Currency Group ("DCG"), had assumed more than $1.1 billion in losses that Genesis had suffered. However, unbeknownst to Ver and the public at large, DCG never injected $1.1 billion into Genesis. Instead, DCG had merely provided Genesis with a promissory note that promised to pay it $1.1 billion over a *ten year* period.  The fair market value of that promissory note — its *real* value — was far below its face value; it did not return Genesis or GGCI to solvency, nor did it help their liquidity issues. GGCI thereby deceived Ver into believing that it

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 88 of 248

was solvent, which induced Ver to provide more than $60 million in collateral over the months that followed.

In December 2022, just as Ver's options were expiring, the collapse of the FTX exchange and Alameda Research revealed that Genesis and GGCI were insolvent all along. Ver was alerted to GGCI's insolvency by an interview wherein FTX and Alameda co-founder Sam Bankman-Fried stated that Alameda had repaid a $2.5 billion dollar loan to "Genesis" in August 2022. This appeared to be an obvious preference transfer that would be subject to clawback.

Citing the $2.5 billion repayment from Alameda, Ver requested that GGCI provide further assurances that it had been solvent in June 2022. Ver reminded GGCI that he had faithfully provided additional collateral for months, including a substantial $37 million in payments just weeks earlier. GGCI acknowledged that the timing and size of Ver's recent collateral contributions underscored his genuine concern, since he could have simply raised these arguments instead of paying GGCI $37 million dollars.

Consequently, GGCI reluctantly shared its 2021 audited financials with Ver, and denied that it had ever had any involvement with FTX or Alameda. However, analysis of GGCI's 2021 financials directly contradicted these claims. GGCI's 2021 financials revealed that it had allowed a single counterparty to open a $2.5 billion position, collateralized exclusively by FTX's own FTT tokens, which were valued at inflated mark-to-market prices. It was evident that these FTT tokens had come from Alameda.

Thereafter, as GGCI's parent filed for bankruptcy and began negotiating with creditors, Ver learned that Genesis and GGCI had never actually received funds from DCG and had indeed been insolvent the entire time.

3

Despite GGCI's repeated misrepresentations and false assurances of solvency, Ver maintains his willingness to pay any outstanding sums owed, provided GGCI can finally demonstrate they were solvent at the relevant times.  To date, they have yet to do so.

## ANSWER TO THE COMPLAINT

### Preliminary Statement

1.      Defendant denies the allegations of paragraph 1.

2.      Defendant denies the allegations of paragraph 2.

3.      Defendant denies the allegations of paragraph 3 and alleges the documents referenced therein speak for themselves.  Further, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms.  Further, the parties also did not execute the ISDA Credit Support Annex, and no elections were made as to Section 13 of that agreement, entitled "Elections and Variables."

4.      Defendant lacks sufficient information and knowledge to form a belief as to the allegations contained in paragraph 4.

5.      Defendant admits that the Master Confirmation Agreement makes certain elections and modifications to the 2002 ISDA Master Agreement and the ISDA Credit Support Annex as alleged in paragraph 5.  However, the parties never executed a 2002 ISDA Master Agreement or the ISDA Credit Support Annex, and no elections were made as to the schedule to the 2002 ISDA Master Agreement or Section 13 of the ISDA Support Annex, each of which contain material terms.

6.      Defendant lacks sufficient information and knowledge to form a belief as to the allegations contained in paragraph 6, but believes same to be true.

4

7.      Defendant denies the allegations contained in paragraph 7.  As discussed in Ver's counterclaim below GGCI was likely insolvent well in advance of December 2022.  The precise date of GGCI's insolvency is not currently known, but this dispute may implicate option contracts with different expiration dates.

8.      Defendant denies the allegations contained in paragraph 8.  As will be evident from Ver's counterclaim, Plaintiff was in default of the option agreements well in advance of December 2022 and, in fact, owes Ver damages estimated to be well in excess of $20 million.

9.      Defendant admits receiving the notices referenced in paragraph 9 but denies that he owed GGCI anything as a result of its default and breach of the contracts between the parties.

10.     Defendant admits receiving the "Calculation Statement" referenced in paragraph 10 but denies that he owed GGCI anything as a result of its default and breach of the contracts between the parties.

11.     Defendant admits the allegations contained in paragraph 11 that he has failed to pay the sums identified in paragraph 10 as the funds requested are not duly owed as a result of GGCI's default and breach of the contracts between the parties.

12.     Defendant denies the allegations contained in paragraph 12.

13.     Defendant denies the allegations contained in paragraph 13 and states that the parties did not execute a 2002 ISDA Master Agreement or the schedules attached thereto which contain material terms.

**The Parties**

14.     Defendant lacks sufficient knowledge and information to form a belief as to the allegations contained in paragraph 14.

5

Case 1:24-cv-01533-JPC    Document 20-1    Filed 03/20/24    Page 91 of 248

15.     Defendant admits the allegations contained in paragraph 15.  Mr. Ver is a citizen of St. Kitts, but does not reside at 858 Zenway Blvd. Unit 15-203, Frigate Bay, St. Kitts and Nevis.

### Jurisdiction and Venue

16.     Defendant admits the allegations contained in paragraph 16.  While the Master Confirmation makes reference to the 2002 ISDA Master Agreement and ISDA Support Annex, no such agreements were executed by the parties, and no elections were made as to the schedule to the 2002 ISDA Master Agreement or Section 13 of the ISDA Support Annex, which contain material terms.

17.     Defendant admits the allegations contained in paragraph 17.

18.     Defendant admits the allegations contained in paragraph 18.

### Statement of Facts

19.     Defendant admits the allegations contained in paragraph 19.

20.     Defendant denies the allegations contained in paragraph 20.  While the Master Confirmation makes reference to the 2002 ISDA Master Agreement and ISDA Support Annex, no such agreements were executed by the parties, and no elections were made as to the schedule to the 2002 ISDA Master Agreement or Section 13 of the ISDA Support Annex, which contain material terms.

21.     Defendant admits the allegations contained in paragraph 21.

22.     Defendant admits that the 2002 ISDA Master Agreement "provides general conditions for payment and delivery" as alleged in paragraph 22.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the

Case 1:24-cv-01533-JPC    Document 20-1    Filed 03/20/24    Page 92 of 248

2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

23.  Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 23.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

24.  Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 24.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

25.  Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 25.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

26.  Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 26.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

27.  Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 27.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

7

28.     Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 28.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

29.     Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 29.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

30.     Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 30.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.   Further, the document speaks for itself.

31.     Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 31.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

32.     Defendant admits the allegations contained in paragraph 32.   Further, the document speaks for itself.

33.     Defendant admits that the form 2002 ISDA Master Agreement is accurately quoted in paragraph 33.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

8

34.     Defendant admits that the parties executed various option transactions as alleged in paragraph 34 but currently lacks sufficient knowledge and information to form a belief as to whether a transaction confirmation was sent for each and every transaction.

35.     Defendant denies the allegations contained in paragraph 35.  However, Ver admits that he did not terminate the contracts as a direct result of GGCI's multiple intentional misrepresentations regarding its solvency and other related issues.

36.     Defendant denies the allegations contained in paragraph 36 to the extent that GGCI is attempting to limit this dispute to three transactions.  Upon information and belief, GGCI was insolvent by June 2022 and, in fact, owed Ver substantial sums.  Defendant admits that the terms of the three option contracts reflected in paragraph 36 are accurate.

37.     Defendant admits the allegations contained in paragraph 37.  Further, the documents speak for themselves.

38.     Defendant admits that three option contracts expired in December 2022 as alleged in paragraph 38, but denies that these are the only option contracts at issue in this dispute.

39.     Defendant admits the allegations contained in paragraph 39, but denies that any sums were owed to GGCI as a result of its breach of the agreements between the parties and is owed substantial sums from GGCI.

40.     Defendant admits to receiving the notice referenced in paragraph 40.  Further, the document speaks for itself.

41.     Defendant admits the allegations contained in paragraph 41, but denies that any sums were duly owed to GGCI as a result of its default and various breaches of the agreements.

42.     Defendant admits to receiving the notice referenced in paragraph 42.  Further, the document speaks for itself.

9

43.     Defendant admits to receiving the notice referenced in paragraph 43.  Further, the document speaks for itself.

44.     Defendant admits the allegations contained in paragraph 41, but denies that any sums were duly owed to GGCI as a result of its own default and various breaches of the agreements.

45.     Defendant admits to receiving the notice referenced in paragraph 45.  Further, the document speaks for itself.

46.     Defendant lacks sufficient knowledge and information to form a belief as to the allegations contained in paragraph 46.  However, the parties never executed a 2002 ISDA Master Agreement, and no elections were made as to the schedule to the 2002 ISDA Master Agreement, which contains material terms of the agreement.  Further, the document speaks for itself.

47.     Defendant admits to receiving the notice referenced in paragraph 47 but denies the accuracy of the alleged sums owed contained therein.   Further, the document speaks for itself.

48.     Defendant admits the allegations contained in paragraph 41, but denies that any sums were duly owed to GGCI as a result of its own default and various breaches of the agreements.

49.     Defendant admits the allegations contained in paragraph 49.

**Claims for Relief**
**Claim One**

50.     Defendant repeats and incorporates in full his responses to each allegation set forth in paragraphs 1–49.

51.     The allegations in paragraph 51 state legal conclusions to which no response is required.   To the extent a response is required, the parties did not execute a 2002 ISDA Master

10

Agreement or ISDA Support Annex, and no elections were made as to the schedule to the 2002 ISDA Master Agreement or Section 13 of the ISDA Support Annex, which contain material terms.

52.      The allegations in paragraph 52 state legal conclusions to which no response is required.  To the extent a response is required, Defendant denies the allegations contained therein as GGCI failed to meet its contractual obligations to Ver.

53.      The allegations in paragraph 53 state legal conclusions to which no response is required.  To the extent a response is required, Defendant denies the allegations of paragraph 53.

54.      Defendant denies the allegations contained in paragraph 54.

55.      The allegations in paragraph 55 state legal conclusions to which no response is required.  To the extent a response is required, Defendant denies the allegations of paragraph 55.

56.      The allegations in paragraph 56 state legal conclusions to which no response is required.  To the extent a response is required, Defendant denies the allegations of paragraph 56.

**Request for Relief**

Defendant denies the allegations in the Request for Relief, including the "Wherefore" clause, that Plaintiff is entitled to any form or any amount of relief.

**Affirmative Defenses**

57.      Plaintiff has failed to state a claim upon which relief can be granted.

58.      Plaintiff has failed to produce all of the relevant agreements between the parties, including agreements related to the ISDA Master Agreement, including but not limited to the confirmations, definition booklets and credit support documentation.

59.      The Plaintiff's requests for relief are barred by the doctrine of unclean hands.

11

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 97 of 248

60.     Plaintiff lacks standing to avail itself of the Courts of the State of New York in that it is a foreign corporation, doing business in New York, without payment of the required taxes and fees in connection with its business operations.

61.     Plaintiff failed to act in a commercially reasonable manner.

62.     Plaintiff has breached the agreement between the parties, barring Plaintiff's request for relief.

## COUNTERCLAIM

### The Parties

63.     Roger Ver ("Ver") is the Counter-Plaintiff in this action.  Ver is a natural person and a resident and citizen of St. Kitts and Nevis.

64.     Genesis Global Capital International Limited ("GGCI") is the Counter-Defendant in this action.  GGCI is a British Virgin Islands company limited by shares with a principal place of business in New York.

### Related Non-Parties



65. Digital Currency Group, Inc ("DCG") is a global venture capital company that invests in blockchain and digital currency-related companies. DCG is the ultimate parent of the entities that comprise the Genesis Group (pictured above), which includes GGCI.

66. Genesis Global Holdco, LLC ("Genesis Holdco") is a subsidiary of Digital Currency Group. Genesis Holdco is a Delaware LLC that has filed for Chapter 11 bankruptcy protection in the Southern District of New York.

67. Genesis Global Capital, LLC ("Genesis Global") is a subsidiary of Genesis Holdco. Genesis Global is also the ultimate parent of GGCI. Genesis Global is a Delaware LLC that has filed for Chapter 11 bankruptcy protection in the Southern District of New York.

68. Genesis Asia Pacific Limited Pte ("GAP") is a Singapore private limited company that has filed for Chapter 11 bankruptcy protection in the Southern District of New York.

69. Collectively, GGCI, Genesis Holdco, Genesis Global, GAP and their affiliates comprise the Genesis Group, and are referred to herein as "Genesis".

70. Three Arrows Capital Limited ("3AC") was a Singapore-based investment firm incorporated in the BVI that specialized in trading and investing in cryptocurrencies and other digital assets before its stunning collapse in mid-2022. They are now being liquidated in the BVI.

71. Alameda Research LLC ("Alameda") was a quantitative cryptocurrency trading firm that was founded in 2017 by Sam Bankman-Fried. Alameda, along with FTX and more than 130 affiliated entities, filed for Chapter 11 bankruptcy protection in November 2022.

72. FTX International Limited (aka FTX Trading Limited) ("FTX") is a cryptocurrency derivatives exchange that was launched in 2019 by Sam Bankman-Fried and

others. As discussed above, FTX, and more than 130 affiliated entities, filed for Chapter 11 bankruptcy protection in November 2022.

73.     Sam Bankman-Fried ("SBF") is the now disgraced co-founder and CEO of both FTX and Alameda Research, and was at the heart of one of, if not the, largest cryptocurrency thefts in history, stealing billions of dollars from his customers and using those funds to pay down debts owed by companies he owned or controlled, including Alameda and FTX.

### GGCI Solicits Ver's Business

74.     On June 10, 2020, GGCI approached Ver, a well-known Bitcoin Cash ("BCH") proponent, to trade BCH-based over-the-counter derivatives.  GGCI sought to start a BCH options book with Ver's help.

75.     Though experienced in digital asset investment, Ver was new to options trading.

76.     Ver was initially hesitant to entrust GGCI with significant assets.  Seeking to win Ver's business, GGCI proposed a mechanism to earn interest on his collateral while his positions were open.

77.     On June 15, 2020, GGCI suggested that Ver could lend his BCH to GGCI at interest while simultaneously using the same assets as collateral for derivative contracts with GGCI.

78.     This arrangement, where Ver's interest-bearing loans served as collateral for GGCI trades, induced Ver to trade derivatives with GGCI.

### The Master Confirmation Agreement and Key Terms

79.     On June 15, 2020, Ver and GGCI executed a Master Loan Agreement ("MLA") which promised to pay Ver interest at agreed upon rates to be determined by the parties during the course of the agreement's term.

80.     On June 22, 2020, Ver and GGCI executed a Master Confirmation Agreement to govern their derivative contracts, which was then amended on July 13, 2020 (collectively, the "MCA").

81.     The MCA referenced International Swaps and Derivatives Association (ISDA) form agreements, such as the 1994 Credit Support Annex and the 2002 ISDA Master Agreement. These agreements aimed to protect parties in over-the-counter derivatives transactions against potential issues, such as insolvency or misrepresentation.

82.     Although the parties agreed in various transaction confirmations that the 2002 ISDA Master Agreement and the 1994 Credit Annex formed part of the MCA, neither party ever executed and/or signed either of these documents.  Consequently, none of the schedules to either of them formed part of its terms.

83.     In the 2002 ISDA Master Agreement, section 5(a)(vii)(2) required parties to remain solvent at all times, stating that it was an Event of Default if either party "becomes insolvent or is unable to pay its debts."

84.     Additionally, section 5(a)(iv) prohibited misrepresentation, declaring an Event of Default if a party made "[a] representation... [which] proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated."

85.     Each time Ver and GGCI transacted, they executed an individual transaction confirmation based on the MCA terms.  These terms specified collateral requirements, eligible collateral types, and valuation methods.  The MCA listed both US dollars and a "Reference Currency" as eligible collateral, with a valuation percentage of "100% at Spot Rate."

86.     The MCA's use of "Reference Currency" valued at "100% Spot Rate" meant that the underlying digital asset being traded in the derivative contract could serve as collateral, and it would be valued based on its mark-to-market value in the spot markets.

87.     Despite earlier Telegram communications stating otherwise, the confirmations did not mention Ver's loans as acceptable collateral.  However, GGCI disregarded ISDA's standards and the MCA's written terms and eased collateral requirements throughout their course of dealing.

88.     In fact, it was a common practice for GGCI to ease collateral requirements, not only for Ver, but also for its other counterparties.

### The Importance of Solvency in Derivative Transactions

89.     Derivative transactions involve bets on the future price of an underlying asset.  If a counterparty becomes insolvent during the contract, the winning party may not be able to collect, undermining the transaction's sole purpose.

90.     To mitigate this counterparty risk, the 2002 Master ISDA required parties to maintain solvency at all times (the "Solvency Requirement").

91.     The Solvency Requirement was crucial for Ver's decision to enter the MCA, since it ensured that he could collect from GGCI if his derivative positions were successful.  The Solvency Requirement also benefited GGCI, as it could collect from Ver and potentially foreclose on collateral if needed.

92.     The Solvency Requirement was designed to apply to any bankruptcy or insolvency laws relevant to a party.  For GGCI, a BVI company operating in New York, insolvency under BVI or New York law would breach the requirement.  GGCI would be insolvent if it couldn't meet obligations when due, or if its liabilities exceeded its assets.

16

93.     GGCI's collateral policy was essential for compliance with the Solvency Requirement.  If a counterparty failed to pay, GGCI would incur losses, potentially leading to insolvency as assets were either removed from its balance sheet or had their value greatly reduced.

94.     To mitigate this risk, GGCI required counterparties to provide collateral before opening positions, and it was GGCI's responsibility to maintain adequate collateral and ensure its assets exceeded liabilities at all times.  Again, any failure to do so would undermine the entire purpose of the transactions.

### GGCI Failed to Enforce Collateral Requirements

95.     The MCA and its Transaction Confirmations contained strict collateral requirements for Ver, but GGCI did not enforce them.  Instead, GGCI allowed Ver and other customers to maintain undercollateralized positions and provide exotic, illiquid digital assets as collateral.

96.     Firstly, GGCI never required Ver to post US dollars or Reference Currency as collateral.  They allowed Ver to use unrelated digital assets, such as Monero (XMR) and Binance Coin (BNB), even though these assets were unrelated to the underlying derivative transaction.

97.     GGCI permitted other customers to provide even more illiquid and exotic assets as collateral, such as FTT tokens.

98.     On information and belief, GGCI also allowed SOL, OXY, MPS and SRM as collateral to support billions in loans.

99.     Secondly, GGCI valued this exotic collateral at mark-to-market prices without applying appropriate discounts for illiquidity or potential losses during liquidation.

17

100.     Thirdly, GGCI allowed Ver to maintain collateral amounts below the required sum in the MCA.

101.     Fourthly, GGCI didn't request additional collateral from Ver when the US dollar value of his digital assets fell below key thresholds.

102.     Fifthly, GGCI permitted Ver to use digital assets he had loaned at interest as collateral, which meant that GGCI was taking on additional counterparty risk by redeploying Ver's collateral to profit from an interest rate spread.

103.     GGCI's relaxed collateral requirements were not exclusive to Ver.  It extended the same or similar benefits to other counterparties, resulting in an increased risk of loss and insolvency if the market turned against them.

104.     Nor were GGCI's relaxed collateral requirements embodied in any agreement or official special status afforded to Ver or other particular customers.  Rather, GGCI simply neglected to enforce the written terms of its agreements.

### GGCI's Collateral Exposed to "Daisy Chain" of Debts

105.     GGCI did not directly possess all of the digital asset collateral deposited by counterparties like Ver.  Instead, GGCI sought to generate profits by loaning out this collateral and profiting from the interest rate spread.  This practice, however, exposed GGCI's collateral value to increased counterparty risk, as it needed to recover the loaned collateral before liquidating it to cover a default.

106.     GGCI's collateral practices created a precarious chain of debt obligations. Essentially, a house of cards. Under normal market conditions, they could manage this debt chain by obtaining US dollars.  However, during times of market stress and illiquidity, a single default

18

could render GGCI unable to access the collateral deposited by Ver or others, exposing them to immense loss.

107.    Without US dollar cash reserves, GGCI would be forced to liquidate investments at fire sale prices, or call in loans from borrowers who may default.  During periods of market illiquidity and stress, GGCI's relaxed collateral practices increased the risk of GGCI becoming undercollateralized and insolvent.

108.    On information and belief, GGCI would routinely loan out its digital assets to other Genesis entities, including GAP, who would loan it to counterparties such as 3AC.

109.    These related party loans would eventually become impaired by 3AC's insolvency.  In June 2022, 3AC defaulted on more than $2.3 billion to GAP, causing losses to GGCI as related party loans became impaired.

110.    Barry Silbert, who controlled GGCI and the Genesis Entities through his position as Chairman of DCG, was aware of this risk.  In a June 2021 tweet, he acknowledged the "daisy chain" of debts and emphasized the importance of understanding counterparty risk and identifying weak links in the chain.  Regrettably, Silbert failed to recognize that these weak links existed within his own organization, ultimately jeopardizing the safety of GGCI's collateral.



## GGCI Overstates its Financial Health: Deviating from ASC 820

111.   GGCI's mark-to-market valuation of digital assets, including those not physically possessed, resulted in an overstatement of its financial health.

112.   Note 2 to GGCI's December 31, 2021 audited financial statement detailed the significant accounting policies and the methods used to derive valuations for its assets and liabilities.   The statement claimed compliance with accounting principles generally accepted in the United States of America (U.S. GAAP).

113.   U.S. GAAP utilizes ASC 820 for determining "fair value," which is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.

114.   ASC 820 establishes a hierarchy of inputs for determining fair value, prioritizing observable inputs and requiring additional disclosures when unobservable inputs are relied on.

115.   GGCI concluded all digital assets and liabilities were recorded and valued based on Level 2 inputs – which are defined as "significant observable inputs".

116.   ASC 820's hierarchy includes three levels:

   a.   Level 1 (unadjusted spot price in an active market, such as the quoted price of Apple shares on the New York Stock Exchange);

   b.   Level 2 (spot prices from less active markets and may or may not be discounted); and

   c.   Level 3 (providing the most discretion, since the quoted price is unreliable and the evaluator is thus forced to rely on other inputs that are unobservable and significant to the overall fair value measurement).

117.   GGCI determined the fair market value of assets in "digital currency investments" and liabilities under "digital currency collateral payable" using Level 2.

20

118.    Digital assets are a famously volatile asset class, characterized by extreme price fluctuations and inherent unpredictability. Market movements are driven by factors such as technological advancements, regulatory changes, market sentiment, global economic conditions, illiquidity, and, at times, price manipulation.

119.    At all times relevant, GGCI valued all of its digital assets at mark-to-market prices and never applied a discount to them.

120.    Upon information and belief, GGCI has employed the same inadequate accounting methods at all times during the life of the agreements at issue. As a result, GGCI has been insolvent for as long as those methods have been employed. To the extent GGCI still employs the same valuation method, it remains insolvent to this day.

121.    Despite liquidity concerns and worsening market conditions beginning in May 2022, GGCI never applied a discount to their Level 2 assets. All such assets continued to be valued at mark-to-market prices.

122.    GGCI's refusal to apply appropriate discounts to its Level 2 assets allowed GGCI to overstate its financial health and created a misleading picture of a solvent entity where one did not exist.

**Over Exposure to Alameda & FTX**

123.    During the course of 2021, Genesis entities engaged in a broad relaxation of their lending standards, and began to accept increasingly illiquid and exotic digital assets as collateral for loan and obligations and derivative contracts, creating a precarious financial situation.

124.    On information and belief, GGCI went insolvent at some point during 2021 when it made a loan of $2.5 billion and accepted FTT tokens as collateral. GGCI valued these FTT

tokens mark-to-market, which overstated the real value of FTT and resulted in a severe under collateralization, as Alameda had manipulated FTT's price higher to borrow against it.

125.   Consequently, GGCI was grossly overexposed to a single counterparty. GGCI's 2021 audited financials reported that on December 31, 2021 the company held $2.370 billion in "digital collateral payable", 99% of which were FTT tokens owed to a single counterparty. These FTT tokens represented *nearly 70%* of GGCI's then total assets.

126.   However, the actual fair market value of these FTT tokens was far lower than the mark-to-market prices used by GGCI, which resulted in significantly fewer assets than reported.

127.   Were GGCI to foreclose on the FTT tokens and sell them for US dollars, *they would have been unable to recover anywhere near the full amount owed*.

128.   GGCI's overexposure to FTT resulted from a quid pro quo relationship between Alameda and Genesis executives.

129.   FTX and Alameda granted Genesis executives early access to purchase FTT tokens at discounted rates before public issuance.

130.   This conflict of interest compromised GGCI's risk management policies and practices, as executives were incentivized to authorize GGCI to take excessive risks for their personal benefit.

131.   If not for these conflicts of interest, Genesis executives might have conducted adequate due diligence on their $2.5 billion loan and learned of Alameda's scheme to manipulate FTT prices and increase its borrowing ability.

132.   In a complaint against Alameda's former CEO, Caroline Ellison, the SEC details this manipulation. Ellison engaged in automated FTT token purchases to inflate the value of Alameda's collateral, increasing risks for lenders accepting FTT as collateral.

22

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 108 of 248

133.    The market crash of May 2022 only worsened GGCI's finances, as Alameda suffered substantial losses, which exacerbated its inability to repay its loan to GGCI.

134.    After May 2022's market crash, Alameda focused its efforts on propping up the price of FTT token, continuing to engage in market operations and offering lines of credit to insolvent entities with large FTT positions to prevent FTT from being liquidated, which would have publicly revealed Alameda's insolvency.

135.    In August 2022, after realizing that Genesis and GGCI would liquidate FTT tokens and reveal their insolvency, Alameda misappropriated customer funds to repay Genesis and GGCI, which was a preferential transfer at the expense of FTX creditors subject to clawback.

136.    Afterwards, Alameda replaced the missing $2.5 billion in FTX customer deposits with the FTT tokens it had just received from Genesis and GGCI, and by valuing FTT at its inflated mark-to-market price created the illusion that FTX remained solvent.

137.    In November 2022, the digital asset exchange Binance called Alameda's bluff and threatened to sell their FTT tokens on the open market, which revealed its lack of liquidity.  FTX and Alameda were finally revealed to be insolvent and filed for bankruptcy less than three months after having repaid $2.5 billion to Genesis and GGCI.

**Over Exposure to 3AC & the Crash of May 2022**

138.    In May 2022, digital asset markets experienced a steep decline due to the collapse of digital assets LUNA and TerraUSD, causing significant losses, liquidations, and a snowball effect of defaults and insolvencies.

139.    3AC was central to the crash, resulting in substantial losses for GGCI and its counterparties.  3AC owed over $3 billion to creditors, including $2.3 billion to GAP, its largest creditor.

140.    Genesis and GAP were overexposed to 3AC, driven by conflicts of interest related to generating demand for the various digital asset trusts operated by Grayscale (the "Grayscale Trusts").  DCG, Genesis' parent company, owned the investment manager for the Grayscale Trusts and profited from the fees it generated.

141.    Since 2020, GAP had been loaning funds to 3AC to fund its Grayscale Trust purchases.  However, GBTC's[1] value declined, resulting in substantial unrealized losses for 3AC.  While shares in GBTC traded at a premium to its net asset value when 3AC began conducting the trade in 2020, by June 2022 they were trading at a 30% discount.

142.    Genesis' concerns over its exposure to 3AC had reached a boiling point by January 2022.  That month, Genesis executives had 3AC pledge its GBTC shares to GAP as security.  But as the net asset value of GBTC continued to fall, so did the value of GAP's pledged assets.

143.    Upon information and belief, Genesis' 3AC exposure did not end with the Bitcoin trust, as 3AC was an investor in the other Grayscale Trusts.

144.    In May 2022, after LUNA's collapse, Genesis executives spoke with 3AC and, on information and belief, determined that 3AC was insolvent.

145.    However, GAP's significant exposure to 3AC posed a risk to the solvency of the entire Genesis enterprise, including GGCI, due to various related party loans and intercompany debts.  Consequently, Genesis opted not to issue margin calls to 3AC, despite the terms of their

---

[1] GBTC is the Grayscale Bitcoin Trust, just one of a number of digital asset trusts operated by Grayscale and DCG.

agreement permitting such action, in order to prevent further destabilizing its own financial situation.

146.    On information and belief, if not insolvent as a result of the $2.5 billion loan backed by FTT discussed herein, GGCI was insolvent as a result of 3AC's inability to repay GAP before the end of May 2022.

147.    On June 10, GGCI's need to obtain more capital became urgent.  That day, 3AC's accounts on the Deribit derivatives platform were liquidated.  Genesis executives, alarmed by the Deribit liquidations and cognizant of 3AC's insolvency, understood that 3AC's demise was near and formulated a strategy to avoid immediate recognition of a $2.3 billion loss.

148.    The plan centered on GAP seizing Grayscale BTC trust shares and other digital assets pledged by 3AC as security for their undercollateralized loans.  However, since issuing an unpayable margin call to 3AC would expose their insolvency, Genesis needed to act quickly before the market caught on.  By securing 3AC assets ahead of other creditors, GAP aimed to offset the substantial loss and safeguard both its own balance sheet and those of its affiliates.

149.    On June 12, Genesis executives set the plan in motion.  GAP issued a margin call to 3AC, demanding an additional $334 million in collateral payments, fully aware that 3AC would be unable to meet the requirement.

150.    On June 13, GAP served a notice of default on 3AC, enabling GAP to liquidate the limited collateral they held and pursue emergency relief to seize further 3AC assets ahead of other creditors.

151.    On June 15, GAP initiated arbitration against 3AC, seeking more than $2.3 billion in loan recovery and emergency relief.  This included seeking a preliminary injunction directing

25

3AC to freeze more than $2.3 billion, and to deposit the pledged assets with GAP, which were allegedly valued at $462 million at the time.

152.    In GAP's arbitration filing, it noted that "[d]ue to recent extreme volatility in the cryptocurrency markets, the value of the collateral already posted by Three Arrows decreased significantly in comparison to the loaned assets under the MLAs."

153.    On June 16, news of the notice of default GAP had issued to 3AC was publicized in the media, and numerous other 3AC lenders began making margin calls and issuing default notices.

154.    On June 21, GAP's request for a preliminary injunction to freeze or seize certain 3AC pledged assets was denied. A further hearing was scheduled for July 5, making it evident GAP wouldn't secure these assets by month's end.

155.    Due to the monthly reporting schedule followed by all Genesis entities, it became apparent that GAP and its affiliates, including GGCI, would have to recognize losses related to 3AC in their month-end financial reports for June 2022, which also coincided with their quarterly reporting obligations.

156.    Consequently, GGCI was insolvent in June 2022 due to various factors, including inaccurate loss recording, failure to apply appropriate discounts to Level 2 digital assets in the midst of a liquidity event, untimely recognition of substantial losses linked to 3AC and related parties, and untimely recognition of losses tied to the FTT-collateralized loan.

**GGCI's Misrepresentations of Solvency**

157.    In or about early June 2022, GGCI devised a plan to strengthen its balance sheet. It aimed to persuade its biggest clients, including Ver, to roll currently profitable options expiring that June to later dates, thereby allowing GGCI to avoid making payments. Meanwhile, GGCI

26

would allow Ver's currently unprofitable June options to expire, thereby bringing funds into GGCI from Ver and others.

158.    On information and belief, Genesis knew GGCI was insolvent by such time.

159.    On June 7, GGCI asked Ver to roll his deep in-the-money Ethereum options to a later date. Those options expired on June 24.  Ver declined.

160.    On June 9, GGCI sent Ver an article about Ethereum's progress to pique his interest about rolling the options Ver did not respond.

161.    On June 10, Deribit's liquidation of 3AC signaled 3AC's imminent collapse.

162.    On June 11, GGCI again requested Ver to roll only his in-the-money Ethereum options to a later date, and offered him attractive terms.  Unaware that Genesis planned to margin call and liquidate 3AC immediately afterwards, Ver agreed to let GGCI roll his in-the-money options.

163.    On June 12 and 13, digital asset prices fell as 3AC was margin called, defaulted, and liquidations commenced, as had been planned by Genesis

164.    Meanwhile, on June 13, and again on the 14th, GGCI requested further collateral from Ver. On June 15, to keep Genesis executives happy, Ver reduced his exposure to GGCI by $22.5 million by buying certain BTC call options.

165.    From June 16 to June 24, GGCI continued discussions with Ver about the additional types of collateral he could offer, and learned it was Ver's strong preference to post a combination of digital assets and certain shares in private companies.  GGCI indicated it was prepared to accept these assets as collateral, as it had done previously.

166.    Throughout the life of GGCI and Ver's two year business relationship, GGCI had always accepted different forms of collateral from Ver, and allowed him to maintain

undercollateralized positions.  In fact, it had been GGCI's offer to pay Ver interest on his digital asset collateral, in direct violation of the MCA's collateral requirements, that had induced Ver to trade with GGCI and to continue trading up until that time.

167.    However, upon the expiration of Ver's out-of-the-money options on June 24, Genesis executives abruptly changed their policy.  They demanded that Ver immediately provide 100% of the required collateral in either US dollars or Reference Currency as stated in the MCA, or face a notice of default.

168.    Based on the course of the parties' dealings, GGCI knew Ver was not expecting to be required to pay the full sum of collateral in US dollars or Reference Currency on that day, which GGCI had never required him to do during their two year relationship.

169.    GGCI's plan was to extract an excessive sum of collateral from Ver.  GGCI offered to accept Ver's digital assets and shares as collateral, but only if he _over_-collateralized his position by 300% to 600%.  Were Ver to pay in digital assets, GGCI wanted him to supply 300% as much collateral as the value of his entire position.  If in private shares, 600%.

170.    As a result of the abrupt change in policy and attempt to extract an excessive sum of collateral, Ver began to suspect GGCI's insolvency.  He nonetheless agreed to discuss details with GGCI on a call the following day, June 25.

171.    On the June 25th call, Defendants threatened to issue a notice of default if Ver did not immediately pay the full amount in US dollars or Reference Currency or meet its excessive collateral demands.

172.    Considering the state of the markets, Ver requested proof of GGCI's solvency.  Thereafter, GGCI backed off its demands for excessive sums of collateral, began engaging in

more constructive discussions to immediately accept certain digital assets, and continued discussions with Ver as to other assets to pledge as collateral.

173.     On information and belief, even using inflated mark-to-market prices for digital assets, GGCI was insolvent on June 25 and was therefore unable to provide Ver with proof of its solvency.

174.     GAP had just lost its bid to freeze 3AC assets in the emergency arbitration hearing on June 21.  At the very latest, GAP should have written down their impaired 3AC loans by such date, which would have resulted in GGCI also writing down any related party loans with GAP.

175.     Initially, GGCI declined to provide up-to-date solvency proof to Ver, stating it did not produce point-in-time financial statements.

176.     However, on June 28, after Ver had informed GGCI that he was not comfortable sending any further collateral without proof of GGCI's solvency, GGCI provided an unaudited point in time financial statement.   This statement of financial condition (the "June 20 SOFC") revealed GGCI's various assets and liabilities as of June 20.

**Genesis Global Capital International Limited**
**Statement of Financial Condition (Unaudited)**
**June 20, 2022**
*(in thousands)*

| Assets | | |
|---|---|---:|
| Cash | $ | 12,929 |
| Investments in digital currencies | | 1,594,209 |
| Derivative assets | | 442,733 |
| Collateral receivable | | 454,449 |
| Receivable from customers | | 159,182 |
| Loans receivable | | 399,560 |
| **Total assets** | $ | 3,063,062 |
| | | |
| **Liabilities and stockholder's equity** | | |
| **Liabilities** | | |
| Collateral payable | $ | 2,094,617 |
| Payable to customers | | 94,569 |
| Loans payable | | 606,477 |
| Derivative liabilities | | 167,132 |
| **Total liabilities** | $ | 2,962,795 |
| | | |
| **Stockholder's equity:** | | |
| Total stockholder's equity | | 100,267 |
| **Total liabilities and stockholder's equity** | $ | 3,063,062 |

177. The June 20 SOFC claimed total assets of $3.063 billion and liabilities of $2.962 billion, which gave GGCI positive equity of just over $100 million. Given that $1.594 billion of GGCI's assets were digital assets ("Investments in digital currencies"), even a small fluctuation in the market would render it insolvent.

178. Faced with an apparently solvent GGCI, who had by now backed off its demands for excessive collateral, Ver saw no choice but to keep his remaining positions open at GGCI and cooperate with it to ensure collateral levels were mutually acceptable until his remaining options expired, unless and until he was presented with evidence of its insolvency.

179. However, what Ver did not know at the time was that the June 20 SOFC was an accounting farce. The $1.596 billion in digital assets was in fact worth far less, and consisted of

a large sum of illiquid FTT tokens, which if sold would have left a large shortfall remaining to GGCI from an insolvent counterparty.

180.     The SOFC's chosen date of June 20 was no accident and was a central part of that farce.  The SOFC did not reflect the full write down of 3AC's impaired loans.  On information and belief, the 3AC loans were deemed impaired by Genesis on June 21 when GAP's request for emergency relief was denied and GAP had no further collateral to support such debts.

181.     When GGCI's plan to seize exorbitant amounts of collateral from Ver failed, GGCI entered into discussions with its parent companies for an injection of capital to return it to solvency in time for its quarterly reporting obligations at the end of June.

**DCG's $1.1 Billion Promissory Note and Further Misrepresentations of Solvency**

182.     On June 30, 2022 DCG and Genesis Global entered into a sham transaction designed to cover the insolvency of Genesis, including GGCI.  DCG executed an unsecured promissory note payable to Genesis Global in the amount of $1.1 billion (the "DCG Promissory Note").

183.     Genesis Global then added the DCG Promissory Note to its balance sheet as a current asset worth $1.1 billion, purportedly to "offset" the $1.2 billion loss it incurred from 3AC's collapse.  With a fresh $1.1 billion added to its balance sheet as a current asset, Genesis Global was then able to use that $1.1 billion to make an injection of capital into its subsidiary, GGCI.

184.     On information and belief, Genesis Global used the DCG Promissory Note to inject $151 million into its subsidiary, GGCI.  GGCI then recorded $151 million as a current asset on its balance sheet worth $151 million.  This was reflected in an unaudited June 30 SOFC, which Ver would later receive from GGCI.

31

Case 1:24-cv-01533-JPC Document 20-1 Filed 03/20/24 Page 117 of 248

**GGC International Limited**
**Statement of Financial Condition**
**June 30, 2022**
*(in thousands)*

| Assets | | |
|---|---|---|
| Cash | $ | 3,232 |
| Investments in digital currencies and trusts | | 1,439,461 |
| Digital currency loans receivable, net of allowance for loan losses | | 1,250 |
| USD loans receivable, net of allowance for loan losses | | 1,800 |
| Digital currency collateral receivable | | 340,389 |
| Derivative assets | | 369,045 |
| Interest receivable, net of allowance | | 2,758 |
| Receivables from related parties | | 47,334 |
| Other assets | | 151,977 |
| **Total assets** | $ | 2,357,248 |
| | | |
| Liabilities and member's equity | | |
| **Liabilities** | | |
| Digital currency loans payable | $ | 370,737 |
| Digital currency collateral payable | | 891,080 |
| USD loans payable | | 18,073 |
| Option collateral payable | | 344,169 |
| Derivative liabilities | | 191,864 |
| Interest payable | | 5,645 |
| Accounts payable and accrued expenses | | 295,894 |
| Payables to related parties | | 225,364 |
| **Total liabilities** | | 2,342,826 |
| | | |
| Member's equity | | 14,422 |
| Total member's equity | | 14,422 |
| **Total liabilities and member's equity** | $ | 2,357,248 |

185.    The June 30 SOFC contained a brand new line item, "Other assets", which did not appear on the June 20 SOFC.  "Other assets" reported $151 million in assets.   On information and belief, "Other assets" represented funds that had been received by GGCI on June 30 as the result of the DCG Promissory Note.

186.    In reality, however, the fair market value of the DCG Promissory Note was just a small fraction of the $1.1 billion face amount.  The note would not mature for 10 years — not until June 30, 2032 — and bears interest at a rate of just 1%, far below the market interest rate that DCG would be required to pay for unsecured borrowing.  Accordingly, Genesis Global remained insolvent even upon receipt of the DCG Promissory Note.

32

187.    Likewise, the fair market value of the $151 million GGCI had received was also worth just a fraction of its reported face value, since on information and belief its value was derived from the DCG Promissory Note and did not represent an actual injection of cash. Accordingly, GGCI remained insolvent afterwards, as the actual fair market value of what it had received was insufficient to cover the $136 million in negative equity reported on GGCI's June 30, 2022 SOFC.

188.    On information and belief, both Genesis and DCG had hoped that the DCG Promissory Note would simply serve as a short term bridge loan until the arbitration panel GAP had convened seeking emergency relief from 3AC could make its ruling on July 5, 2022, where GAP hoped to seize certain of 3AC's assets.   However, the arbitration panel denied GAP the relief it sought.

189.    The following day, July 6, Genesis set about to reassure the market that it remained solvent and was continuing business as usual.   That day, Genesis CEO Michael Moro released a public statement on Twitter and explained that "[w]e previously stated in June that we mitigated our losses with respect to a large counterparty who failed to meet a margin call.  Now that the BVI bankruptcy process has commenced, we can confirm that the counterparty was Three Arrows Capital."   Moro asserted that "[t]he loans to this counterparty had a weighted average margin requirement of over 80%.  Once they were unable to meet the margin call requirements, we immediately sold collateral and hedged our downside."   He then claimed that, "[s]ince then, we worked with [DCG] to find the optimal strategy to further isolate the risk. **DCG has assumed certain liabilities of Genesis related to this counterparty to ensure we have the capital to operate and scale our business for the long term."**   In sum, Moro asserted

that "[w]e deploy a number of risk management strategies to ring-fence our portfolio and utilize all capabilities to mitigate losses quickly and effectively."

190.    GGCI's insolvency was never cured by an injection of capital from DCG.  DCG never "assumed" or "absorbed" Genesis Global's losses.  Instead, DCG and Genesis engaged in yet another accounting farce.  The DCG Promissory Note was an accounting trick designed to make Genesis Global — and by extension, its subsidiary, GGCI — appear as if they had positive equity *without* ever requiring DCG to commit the financial support needed to actually make Genesis Global and GGCI solvent.

191.    Ver was misled into believing that GGCI was solvent by the June 20 SOFC and Genesis CEO Moro's July 6 public statements.  Ver was thus unable to timely exercise his contractual right to terminate the ISDA due to GGCI's violation of the Solvency Requirement.

192.    From June 21, 2022 up until he discovered GGCI's insolvency in December 2022, Ver made payments to GGCI in excess of $60 million and GGCI liquidated a further $50,000,000 in collateral.

**Ver Discovers GGCI's Insolvency**

193.    On November 11, 2022, FTX and Alameda filed for bankruptcy.  Their bankruptcy came after a rapid decline when Binance, another exchange, announced they would sell their FTT tokens on the open market.  Since FTT tokens were highly illiquid and their prices artificially inflated by Alameda, their value plunged by over 90% following Binance's announcement.

194.    The FTX and Alameda bankruptcies sent shockwaves through the digital asset markets.  Surprisingly, Sam Bankman-Fried ("SBF"), the controlling principal behind FTX and Alameda, started giving public interviews, asserting that FTX wasn't truly insolvent since its

balance sheet held digital assets — primarily FTT tokens — with a mark-to-market value exceeding customer liabilities. SBF was eventually indicted on numerous felony charges.

195.    Later that November, rumors circulated that Genesis and its subsidiaries were insolvent when its lending arm stopped withdrawals, trapping investor funds. It was later revealed that GGCI was FTX's largest creditor.

196.    Genesis initiated a restructuring plan to save its business, which focused on transferring bad assets from GGCI to other Genesis entities destined for bankruptcy. The plan aimed to raise capital to pay creditors by selling shares in a financially stable GGCI.

197.    Meanwhile, Ver continued to pay collateral to GGCI. Since June 21, 2022, Ver made total payments to GGCI in excess of $60 million and GGCI liquidated collateral valued in excess of $50,000,000.

198.    On or about December 23, just weeks after Ver made $37 million in collateral payments to GGCI, and just one week before his options would expire, Ver became aware of information that made him question GGCI's earlier claim of solvency that had been supported by the June 20 SOFC.

199.    The news was a New York Times interview of SBF, who stated that Alameda had repaid a $2.5 billion loan to "Genesis" that August, about three months before filing for bankruptcy. SBF added that the loan was repaid because Genesis had called in specific loans made to Alameda.

200.    Ver became concerned that GGCI might have been the entity that lent money to Alameda, potentially affecting GGCI's present solvency and their solvency in June 2022.

201.    As Alameda repaid the loan to Genesis in August, about three months before FTX's bankruptcy, it seemed like this repayment would potentially be subject to an automatic clawback as a preferential transfer.

202.    Ver investigated and learned that there was speculation that SBF had directed Alameda to misappropriate FTX customer funds to repay Genesis. Alameda then used the FTT tokens it had received back from Genesis to pay FTX, who then used the FTT tokens to replace the missing customer deposits as an asset on its balance sheet.

203.    This caused Ver to grow more concerned, since if true, it would mean that GGCI had been doing what FTX had been doing: propping up its insolvent balance sheet with inflated FTT tokens.

204.    Since Ver was considering rolling his expiring December 30 options with GGCI to a later date, he wanted to be sure GGCI remained solvent before doing so, and wanted to further confirm they had in fact been solvent that past June when he initially inquired.

205.    In late December 2022, Ver inquired with GGCI as to whether they remained solvent in the wake of the FTX and Alameda bankruptcies, and whether GGCI had any exposure to them, specifically whether it had been GGCI who had reportedly made a $2.5 billion loan to Alameda and was repaid in August 2022.

206.    GGCI responded that all of Ver's trades had been through GGCI. Despite having lost some funds on FTX, GGCI claimed that it remained solvent and had no further involvement or exposure to Alameda or FTX.

207.    Ver persisted in questioning specifically whether it had been GGCI who received the Alameda loan repayment referred to by SBF in the New York Times interview. GGCI informed Ver that those funds had been repaid to a different Genesis entity, not GGCI.

208.    At this point, Ver demanded proof of GGCI's present solvency, and demanded GGCI provide proof as to how they valued the assets on its June SOFC, which Ver now suspected had deployed the same misleading mark-to-market accounting that FTX had deployed to deceive its depositors.

209.    Ver reminded GGCI that he had faithfully paid in excess of $60 million in additional collateral since June, believing it his legal obligation to do so since GGCI remained solvent, including $37 million dollars in payments just weeks prior.

210.    Were Ver simply trying to avoid paying a debt to GGCI, as Counter-Defendant alleges in its complaint, he obviously would not have made payments totalling $37 million just weeks earlier, and would have raised concerns instead of paying.

211.    Satisfied Ver's concerns were being raised in good faith, but while still denying the validity of his claims, GGCI produced to Ver its 2021 audited financials, as well as an unaudited SOFC dated June 30, 2022.

212.    However, both of those documents raised even further issues which revealed GGCI to have been insolvent in June 2022 at the latest.

### The June 30 SOFC

213.    The June 30 SOFC revealed to Ver the dramatic and concerning changes which had occurred since the June 20 SOFC.

37

**Genesis Global Capital International Limited**
**Statement of Financial Condition (Unaudited)**
**June 20, 2022**
*(in thousands)*

| Assets | | |
|---|---|---:|
| Cash | $ | 12,929 |
| Investments in digital currencies | | 1,594,209 |
| Derivative assets | | 442,733 |
| Collateral receivable | | 454,449 |
| Receivable from customers | | 159,182 |
| Loans receivable | | 399,560 |
| **Total assets** | $ | 3,063,062 |
| **Liabilities and stockholder's equity** | | |
| **Liabilities** | | |
| Collateral payable | $ | 2,094,617 |
| Payable to customers | | 94,569 |
| Loans payable | | 606,477 |
| Derivative liabilities | | 167,132 |
| **Total liabilities** | | 2,962,795 |
| **Stockholder's equity:** | | |
| Total stockholder's equity | | 100,267 |
| **Total liabilities and stockholder's equity** | $ | 3,063,062 |

**GGC International Limited**
**Statement of Financial Condition**
**June 30, 2022**
*(in thousands)*

| Assets | | |
|---|---|---:|
| Cash | $ | 3,250 |
| Investments in digital currencies and trusts | | 1,439,540 |
| Digital currency loans receivable, net of allowance for loan losses | | 1,250 |
| USD loans receivable, net of allowance for loan losses | | 1,000 |
| Digital currency collateral receivable | | 340,389 |
| Derivative assets | | 669,645 |
| Interest receivable, net of allowance | | 2,758 |
| Receivables from related parties | | 47,334 |
| Other assets | | 151,977 |
| **Total assets** | $ | 2,357,248 |
| **Liabilities and member's equity** | | |
| **Liabilities** | | |
| Digital currency loans payable | $ | 370,737 |
| Digital currency collateral payable | | 891,080 |
| USD loans payable | | 18,073 |
| Option collateral payable | | 344,169 |
| Derivative liabilities | | 191,864 |
| Interest payable | | 5,645 |
| Accounts payable and accrued expenses | | 295,894 |
| Payables to related parties | | 225,364 |
| **Total liabilities** | | 2,342,826 |
| **Member's equity** | | 14,422 |
| Total member's equity | | 14,422 |
| **Total liabilities and member's equity** | $ | 2,357,248 |

214.     First, there had been a significant reported drop in both positive equity and assets. On June 20, there was positive equity of just $100 million on $3 billion in assets, which indicated GGCI faced significant liquidity and volatility concerns. However, by June 30, positive equity had shrunk to $14 million, with assets dropping by more than $400 million, exacerbating the already troubling liquidity and volatility concerns.

215.     Second, much of the fall in asset values was attributed to loans that had been written down.  On June 20, GGCI reported "loans receivable" of $399 million.  However, by June 30, loans receivable had been reduced to $2.25 million.[2]  This represented a loss of more than 99% of GGCI's loans receivable in just a ten day period.

---

[2] The June 20 SOFC and June 30 SOFC differed in how they recorded loans receivable.  The June 20 SOFC contains a single line item for "loans receivable"; the June 30 SOFC contains two, one for USD and one for Digital assets. The line item "*USD Loans Receivable net of allowance for loan losses*" is recorded as $1 million, and "*Digital Currency Loans Receivable net of allowance for loan losses*" is recorded as $1.25 million.  Together, they represent "loans receivable" equal to $2.25 million as of June 30, 2022.

38

216.    On information and belief, these loan write-downs represented losses related to 3AC, which had not been written down in the June 20 SOFC, but were known to Counter-Defendant when the June 20 SOFC was sent to Ver as proof of GGCI's solvency.

217.    Lastly, the June 30 SOFC contained a brand new line item, "Other", which had $151 million in assets.  There was no new corresponding line item in liabilities.

218.    On information and belief, this line item "Other" represented sums that were placed onto GGCI's balance sheet as a result of the DCG Promissory Note.

**GGCI's 2021 Audited Financials**

219.    GGCI's 2021 audited financials revealed to Ver both that GGCI had been valuing digital assets at 100% mark-to-market, and that it had in fact been the entity that originated a $2.5 billion loan collateralized by FTT tokens.  Those FTT tokens had ultimately come from Alameda.

220.    The 2021 audited financials explained that GGCI accounted for collateral paid by counterparties as an asset with a corresponding liability.  Alameda's FTT tokens would have been counted on its balance sheet as an asset under "*Investments into digital assets*" and as a liability under "*digital currency collateral payable.*"

221.    GGCI's balance sheet showed "*Investments in digital currencies*" equal to $2.825 billion, and "*Digital currency collateral payable*" equal to $2.370 billion.

222.    Notably, the "*Digital currency collateral payable*" roughly equaled the $2.5 billion SBF had referred to during his New York Times interview.  And while "*Investments in digital currencies*" was larger, it contained additional digital assets owned by GGCI.

223.    GGCI's cash flow statement in the 2021 audited financials also contained a line item for "*Digital currency collateral payable*" under liabilities, which was equal to the same line

Case 1:24-cv-01533-JPC    Document 20-1    Filed 03/20/24    Page 125 of 248

item on the balance sheet, indicating these sums made their way onto GGCI's balance sheet in 2021.

224.    GGCI's 2021 audited financials contained a section detailing significant exposures to various counterparties.  The significant counterparties were not identified by name, only certain information about them was provided.  The financials identified a "Counterparty I" who represented 99% of the digital currency collateral payable liability, which was further identified to consist of 99% FTT tokens.

225.    Therefore, GGCI's 2021 financials showed that at some time in 2021 it had originated a loan to a single counterparty backed by FTT tokens, which were valued at $2.3 billion as of December 31, 2021.  Accordingly, it became evident to Ver that "Counterparty I" was Alameda Research.

226.    Lastly, GGCI's 2021 audited financials contained other figures that revealed yet other sources of GGCI's undercapitalization.  The statement of cash flows identified a $105 million dollar operating loss for 2021.  And the statement of changes in stockholder equity identified almost $41 million in distributions in 2021.

**GGCI's Shifting Explanations**

227.    When Ver pointed out that GGCI's 2021 audited financials identified a $2.5 billion loan obligation to Alameda, contrary to GGCI's prior representations, GGCI provided misleading information to Ver in an attempt to distance itself from Alameda.

228.    Incredibly, GGCI initially claimed that the financials Ver possessed were actually a consolidated report for multiple Genesis entities, and that the FTT tokens belonged to a different Genesis entity.

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 126 of 248

229.     However, the financials were clearly labeled as having been prepared exclusively for GGCI, which quickly disproved GGCI's claims.

230.     Once disproven, GGCI shifted its narrative and asserted that an affiliate had dealt with Alameda, who then borrowed from GGCI using the FTT tokens as collateral.  GGCI then refused to provide any evidence to support this claim.

231.     Nonetheless, GGCI's claim that the FTT tokens belonged to an affiliate was a difference without distinction, since the tokens had ultimately come from Alameda and would be subject to a clawback in bankruptcy.

232.     In fact, on May 3, 2023, FTX filed a motion in the Southern District of New York, on behalf of itself and affiliated debtors, seeking $3.9 billion back from Genesis, including sums from GGCI.

233.     Ultimately, discussions with GGCI made clear that GGCI hadn't applied any discount to the digital assets on its SOFC.

234.     At one point, GGCI personnel even admitted that they "may have been underwater for a few days."

235.     Had GGCI applied appropriate discounts to its digital assets, as it demanded from Ver, its SOFC would have revealed its insolvency.

236.     As a result, Ver would have closed his positions to avoid trading with an insolvent counterparty and saved tens of millions of dollars.

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 127 of 248

## CAUSES OF ACTION

## COUNT ONE

### (Breach of Contract (Insolvency))

237.    Defendant realleges and incorporates all preceding paragraphs as though fully set forth herein, and further alleges:

238.    As discussed herein, GGCI and Ver were parties to the Master Confirmation which incorporated the ISDA Master Agreement and ISDA Credit Support Annex by reference.

239.    During the life of the parties' relationship, there were well over 100 transactions conducted by GGCI on behalf of Ver.

240.    The Master Confirmation executed in connection with each transaction incorporated the 2002 ISDA Master Agreement by reference.

241.    The 2002 ISDA Master Agreement defines a number of Events of Default.  One such event of default is the insolvency of either party.

242.    As described herein, GGCI became insolvent at some point prior to July 1, 2022.

243.    At the point of insolvency, GGCI was in breach of all option contracts then open between the parties and subject to the 2002 ISDA Master Agreement.

244.    As per the agreements between the parties, in the event of default, all transactions were to be terminated, and the parties were expected to settle any financial obligations at that point.

245.    However, as a result of GGCI's failure to notify Ver of its insolvency, and its campaign of obfuscation, Ver did not become aware of the insolvency for quite some time.

42

246.    Following the insolvency, but prior to Ver becoming aware of same, Ver contributed substantial additional funds to maintain his then open options positions, which never should have been paid to GGCI as a result of its insolvency.

247.    Ver has suffered significant damages as a direct result of GGCI's breach of the agreements between the parties.

248.    Accordingly, Ver respectfully requests that this Court award all relevant damages caused by Counter-Defendant's breach of contract, including, but not limited to, compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000.00, punitive or exemplary damages for their malicious conduct, all costs and Court fees, reasonable attorneys' fees, as well as any other relief this Court deems just and proper.

## COUNT TWO

### (Breach of Contract (Misrepresentation) - BCH Options)

249.    Defendant realleges and incorporates all preceding paragraphs as though fully set forth herein, and further alleges:

250.    As discussed herein, GGCI and Ver were parties to the Master Confirmation which incorporated the ISDA Master Agreement and ISDA Credit Support Annex by reference.

251.    Pursuant to a trade confirmation dated March 22, 2022, GGCI agreed to purchase from Ver a put option for 70,000 units of Bitcoin Cash ("BCH"), with a strike price of $545 per BCH.

252.    The Master Confirmation executed in connection with this transaction incorporated the 2002 ISDA Master Agreement by reference.

253.    The 2002 ISDA Master Agreement defines a Misrepresentation by either party as an Event of Default as well.  Pursuant to the 2002 ISDA Master Agreement, any representation

43

that "proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated" would be considered an Event of Default.

254.    As discussed herein, GGCI made, and repeated, a number of material misrepresentations and omissions regarding its solvency.  These repeated misrepresentations and omissions constitute a material breach of the agreement.

255.    Ver has suffered, and continues to suffer, irreparable harm as a direct and proximate result of Counter-Defendant's breach of the agreement.

256.    Accordingly, Ver respectfully requests that this Court award all relevant damages caused by Counter-Defendant's breach of contract, including, but not limited to, compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000.00, punitive or exemplary damages for its malicious conduct, all costs and Court fees, reasonable attorneys' fees, as well as any other relief this Court deems just and proper.

## COUNT THREE

### (Breach of Contract (Misrepresentation) - ETH Options)

257.    Defendant realleges and incorporates all preceding paragraphs as though fully set forth herein, and further alleges:

258.    As discussed herein, GGCI and Ver were parties to the Master Confirmation which incorporated the ISDA Master Agreement and ISDA Credit Support Annex by reference.

259.    Pursuant to a trade confirmation dated June 10, 2022, GGCI agreed to purchase from Ver a put option for 10,000 Ether ("ETH"), with a strike price of $5,000 per ETH.

260.    The Master Confirmation executed in connection with this transaction incorporated the 2002 ISDA Master Agreement by reference.

261.    The 2002 ISDA Master Agreement defines a Misrepresentation by either party as an Event of Default as well.  Pursuant to the 2002 ISDA Master Agreement, any representation that "proves to have been incorrect or misleading in any material respect when made or deemed to have been made or repeated" would be considered an Event of Default.

262.    As discussed herein, GGCI made, and repeated, a number of material misrepresentations and omissions regarding its solvency.  These repeated misrepresentations and omissions constitute a material breach of the agreement.

263.    Ver has suffered, and continues to suffer, irreparable harm as a direct and proximate result of Counter-Defendant's breach of the agreement.

264.    Accordingly, Ver respectfully requests that this Court award all relevant damages caused by Counter-Defendant's breach of contract, including, but not limited to, compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000.00, punitive or exemplary damages for their malicious conduct, all costs and Court fees, reasonable attorneys' fees, as well as any other relief this Court deems just and proper.

## COUNT FOUR

### (Breach of Contract (Misrepresentation) - BTC Options)

265.    Defendant realleges and incorporates all preceding paragraphs as though fully set forth herein, and further alleges:

266.    As discussed herein, GGCI and Ver were parties to the Master Confirmation which incorporated the ISDA Master Agreement and ISDA Credit Support Annex by reference.

267.    Pursuant to a trade confirmation dated June 11, 2022, GGCI agreed to purchase from Ver a put option for 500 Bitcoin ("BTC"), with a strike price of $26,000 per BTC.

45

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 131 of 248

268.     The Master Confirmation executed in connection with this transaction incorporated the 2002 ISDA Master Agreement by reference.

269.     The 2002 ISDA Master Agreement defines a Misrepresentation by either party as an Event of Default as well.  Pursuant to the 2002 ISDA Master Agreement, any representation that "proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated" would be considered an Event of Default.

270.     As discussed herein, GGCI made, and repeated, a number of material misrepresentations and omissions regarding its solvency.  These repeated misrepresentations and omissions constitute a material breach of the agreement.

271.     Ver has suffered, and continues to suffer, irreparable harm as a direct and proximate result of Counter-Defendant's breach of the agreement.

272.     Accordingly, Ver respectfully requests that this Court award all relevant damages caused by Counter-Defendant's breach of contract, including, but not limited to, compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000.00, punitive or exemplary damages for its malicious conduct, all costs and Court fees, reasonable attorneys' fees, as well as any other relief this Court deems just and proper.

## COUNT FIVE

### (Fraud)

273.     Defendant realleges and incorporates all preceding paragraphs as though fully set forth herein, and alleges as follows:

274.     On June 7, 2022, GGCI began contacting Ver regarding rolling over his in-the-money Ethereum option.  However, Ver was not interested.

Case 1:24-cv-01533-JPC    Document 20-1    Filed 03/20/24    Page 132 of 248

275.    Over the next few days, GGCI continued to try and convince Ver that rolling over his options was the right thing to do, sending articles about the performance of ETH and proposing more favorable terms.  Ver eventually agreed to roll his options.

276.    Shortly after electing to roll over his in-the-money options, GGCI began making collateral demands that were 1) above and beyond any level of collateral required by the parties' agreements and 2) not in line with the parties' previous course of dealing.

277.    Considering the state of the market, namely the Luna and 3AC collapses, Ver was concerned about the solvency of GGCI and began to ask questions.  On June 25, 2022, Ver requested that GGCI provide proof of its solvency.

278.    On June 28, 2022, GGCI delivered a statement of financial condition dated June 20, 2022 (the previously discussed June 20 SOFC).  However, on June 21, 2022, GAP's request for emergency relief in its arbitration against 3AC was denied, requiring GAP and, in turn, GGCI to write down hundreds of millions of dollars in assets.

279.    By sending an incomplete, or otherwise misleading SOFC, GGCI knowingly made a material misrepresentation to Ver regarding its current financial condition.

280.    This material misrepresentation or omission was made by GGCI with the express intent to cause Ver to maintain his Ethereum option position with GGCI and prevent him from discovering GGCI's insolvency and exercising his right to terminate the contract as a result.

281.    Ver relied on the June 20 SOFC statement, accepting the representations of GGCI as accurate, and did in fact continue to maintain his option positions at GGCI.

282.    In the months following the delivery of the intentionally misleading June 20 SOFC, Ver made payments in excess of $60,000,000 to GGCI to maintain his positions and GGCI liquidated over $50,000,000 of Ver's collateral.

47

283.     Had GGCI not knowingly provided inaccurate financial information via the June 20 SOFC, or otherwise disclosed the 3AC write downs resulting from its failure in the 3AC arbitration, Ver never would have continued to make payments to maintain the option and would have terminated the option contracts as a result of GGCI's insolvency.

284.     However, as a direct result of GGCI's intentional misrepresentations Ver did make additional payments and has suffered significant damages.

285.     Accordingly, Ver respectfully requests that this Court award all relevant damages caused by Counter-Defendant's fraud, including, but not limited to, compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000.00, punitive or exemplary damages for their malicious conduct, all costs and Court fees, reasonable attorneys' fees, as well as any other relief this Court deems just and proper.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Counter-Plaintiff Roger Ver respectfully requests that this Court:

1. Deny Counter-Defendant's claims for relief in their entirety;

2. Award compensatory damages in an amount to be proven at trial, but believed to be in excess of $20,000,000.00 in favor of Ver on his Counterclaims, as well as punitive or exemplary damages, incidental damages, and consequential damages;

3. Award Counter-Plaintiff pre-judgment and post-judgment interest;

4. Award Counter-Plaintiff's reasonable attorney fees, expenses, and the costs of this action; and

5. Award Counter-Plaintiff such other and further relief as this Court may deem just, proper, and equitable under the circumstances.

48

## DEMAND FOR JURY TRIAL

Counter-Plaintiff hereby demands a trial by jury of all claims so triable.

**KELMAN PLLC**

Dated: July 31, 2023                    By:   s/: Daniel J. Kelman
                                              Daniel J. Kelman
                                              Michael D. Handelsman
                                              1501 Broadway,
                                              12th Floor, #2972
                                              New York, NY 10036
                                              daniel@kelman.law
                                              mike@kelman.law

49

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 135 of 248

# Exhibit C

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 136 of 248

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

GGC INTERNATIONAL LIMITED,

                              Plaintiff,

     - against –

ROGER VER,

                              Defendant.

Index No. 650439/2023

**COMPLAINT**

---

Plaintiff GGC International Limited ("GGC International"), as for its Complaint against Defendant Roger Ver ("Ver," and together with GGC International, the "Parties"), alleges as follows:

## PRELIMINARY STATEMENT

1.     This action seeks to redress Ver's straightforward failure to settle three cryptocurrency options agreements that expired on December 30, 2022.

2.     Ver failed to make payments on those transactions even though Ver had agreed to and recognized them.  This action does not result from any collateral that Ver had transferred to GGC International to partially collateralize his obligations.

3.     GGC International and Ver entered into the Amended and Restated Master Confirmation Agreement for Virtual Currency Put and Call Options Transactions dated as of June 22, 2020 (the "Master Confirmation Agreement").  Pursuant to the Master Confirmation Agreement, the Parties are deemed to enter into the 2002 ISDA Master Agreement (the "ISDA Master Agreement") and the 1994 ISDA Credit Support Annex (the "ISDA Credit Support Annex"), with certain supplements.  Accordingly, unless stated otherwise, when this Complaint

references the Master Confirmation Agreement, it also is incorporating by reference the ISDA Master Agreement and the ISDA Credit Support Annex.

4.     The ISDA Master Agreement and the ISDA Credit Support Annex are industry-standard documents that provide market participants with relationship-level terms that govern the trading of over-the-counter derivative transactions.

5.     The Master Confirmation Agreement makes certain elections and modifications to the ISDA Master Agreement and ISDA Credit Support Annex.  The Master Confirmation Agreement – as includes the terms of the ISDA Master Agreement and the ISDA Credit Support Annex – sets forth the terms under which GGC International and Ver may enter into transactions for the purchase and sale of cryptocurrency put and call options.

6.     In 2022 alone, the Parties entered into thirty-one cryptocurrency options transactions.  The terms of each transaction were memorialized in a written "Transaction Confirmation," which refers back to the Master Confirmation Agreement.

7.     Three options with expiration dates of December 30, 2022 gave rise to this action.

8.     Upon the settlement date for the three options, Ver owed GGC International roughly $110 million in exchange for the underlying tokens, minus amounts owing by GGC International to Ver.  However, Ver did not make that payment.

9.     GGC International thereafter sent several notices to Ver.  On January 12, 2023, GGC International sent a notice to Ver notifying him that as a result of his nonpayment, an "Event of Default" would occur if Ver failed to pay the amount owed within one business day.  Ver once again failed to pay the amount owed.

10.     On January 17, 2023, GGC International sent another notice to Ver that due to the Event of Default that had occurred and was continuing, GGC International designated January 19,

2023 as the "Early Termination Date" under the ISDA Master Agreement. Then, on January 20, 2023, GGC International sent Ver a "Calculation Statement," in which GGC International set off certain collateral previously delivered by Ver against the amounts owed by Ver, resulting in an amount of $20,869,788 owing from Ver to GGC International.

11.     Ver failed to pay this amount to GGC International, despite the multiple written notices and multiple oral conversations with Ver.

12.     Ver's failure to pay constitutes a breach of contract.

13.     As a result of Ver's breach of contract, GGC International has been damaged. GGC International is entitled to at least $20,869,788, plus interest. The ISDA Master Agreement also entitles GGC International to indemnity for GGC International's out-of-pocket expenses, including attorneys' fees.

## THE PARTIES

14.     Plaintiff GGC International Limited is a corporation organized and existing under the laws of the British Virgin Islands.

15.     Defendant Roger Ver is an individual residing at 858 Zenway Blvd. Unit 15-203, Frigate Bay, St. Kitts and Nevis.

## JURISDICTION AND VENUE

16.     This court has personal jurisdiction over Ver because he contractually consented to jurisdiction in the courts of the State of New York. In particular, Section 13(b)(i)(2) of the ISDA Master Agreement states that "[w]ith respect to any suit, action or proceedings related to any dispute arising out of or in connection with this Agreement . . . each party irrevocably . . . submits . . . if this Agreement is expressed to be governed by the laws of the State of New York, to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City."

3

17.     Section 7(a)(i) of the Master Confirmation Agreement sets the governing law as

New York, and as such, pursuant to Section 13(b)(i)(2) of the ISDA Master Agreement, Ver has

agreed to jurisdiction in the courts of New York.

18.     Venue is also proper because the Parties contractually consented to have disputes

heard by the courts in the State of New York.

## STATEMENT OF FACTS

### GGC International and Ver Enter into the Master Confirmation Agreement

19.     The Master Confirmation Agreement between GGC International[1] and Ver sets

forth the terms under which the Parties may enter into cryptocurrency put and call option

transactions.

20.     The Master Confirmation Agreement states that GGC International and Ver are

deemed to have entered into the ISDA Master Agreement and the ISDA Credit Support Annex.

21.     Section 3 of the Master Confirmation Agreement provides that when the parties

enter into an option transaction, they are to confirm the economic terms of such transaction in a

"Transaction Confirmation."  Sections 4 and 5 of the Master Confirmation Agreement provide the

terms to be included in each Transaction Confirmation.

### The ISDA Master Agreement Sets Forth the General Payment Terms

22.     The ISDA Master Agreement, which Ver was deemed to have entered by virtue of

the Master Confirmation Agreement, provides the general conditions for payment and delivery.

---

[1]     The signature page of the Master Confirmation Agreement erroneously lists the relevant party as "Genesis
Global Capital International Ltd" instead of GGC International.  However, the heading of the Master Confirmation
Agreement correctly refers to GGC International, as does every relevant Transaction Confirmation.

23.     In particular, Section 2(a)(i) of the ISDA Master Agreement states that "[e]ach party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement."

24.     Section 2(a)(ii) of the ISDA Master Agreement provides that "[p]ayments under this Agreement will be made on the due date for value on the date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency."

25.     Section 2(c) of the ISDA Master Agreement states that the

> parties may elect in respect of two or more Transactions that a net amount and payment obligation will be determined in respect of all amounts payable on the same date in the same currency in respect of those Transactions, regardless of whether such amounts are payable in respect of the same Transaction.  The election may be made in the Schedule or any Confirmation by specifying that "Multiple Transaction Payment Netting" applies to the Transactions identified as being subject to the election . . . . If Multiple Transaction Payment Netting is applicable to Transactions, it will apply to those Transactions with effect from the starting date specified in the Schedule or such Confirmation, or, if a starting date is not specified in the Schedule or such Confirmation, the starting date otherwise agreed by the parties in writing.  This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

26.     Section 7(a)(iii) of the Master Confirmation Agreement states that "Multiple Transaction Payment Netting," as described above, is applicable.

**Failure to Pay Amounts Due Will Result in an Event of Default**

27.     Section 5(a) of the ISDA Master Agreement lists several potential "Events of Default."

28.     As relevant to this dispute, Section 5(a)(i) of the ISDA Master Agreement states that it is an "Event of Default" if a party fails to:

5

> make, when due, any payment under this Agreement or delivery
> under Section 2(a)(i) or 9(h)(i)(2) or (4) required to be made by it if
> such failure is not remedied on or before the first Local Business
> Day in the case of any such payment or the first Local Delivery Day
> in the case of any such delivery after, in each case, notice of such
> failure is given to the party.

29.     Section 6(a) of the ISDA Master Agreement permits a non-defaulting party to declare an "Early Termination Date" upon not more than twenty days' notice where an Event of Default has occurred.

30.     Section 6(e)(i) of the ISDA Master Agreement provides that "[i]f notice designating an Early Termination Date is given under Section 6(a) . . . the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default . . . is then continuing."

31.     Upon an Early Termination Date, an "Early Termination Amount" is due.  Section 6(e)(i) of the ISDA Master Agreement sets forth the formula to determine the "Early Termination Amount."

32.     Section 7(a)(i) of the Master Confirmation Agreement states that New York law shall govern any transactions between GGC International and Ver.

33.     Section 11 of the ISDA Master Agreement provides that a "Defaulting Party will on demand indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees . . . incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection."

6

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 142 of 248

**GGC International and Ver Enter Into Options Transactions**

34.     After entering into the Master Confirmation Agreement, GGC International and Ver entered into various options transactions.  For each transaction, the Parties entered into a Transaction Confirmation memorializing the terms.

35.     Throughout 2022, as a result of the transactions entered into by the Parties, Ver owed money to GGC International, including as much as $135 million in June 2022.  GGC International repeatedly accommodated Ver when he suffered from liquidity problems and was unable to post required collateral.  During this period, GGC International performed all of its contractual obligations to Ver.  Regardless, Ver's contractual remedy for any type of default, insolvency or otherwise, would have been to terminate the agreement; Ver never did so, and any such termination would have resulted in him owing such significant sums to GGC International.

36.     The three options which expired on December 30, 2022 are the subject of this action and detailed below:

(a)     Pursuant to a trade confirmation dated March 22, 2022, GGC International agreed to purchase from Ver a put option for 70,000 units of Bitcoin Cash ("BCH"), with a strike price of $545 per BCH.

(b)     Pursuant to a trade confirmation dated June 10, 2022, GGC International agreed to purchase from Ver a put option for 10,000 Ether ("ETH"), with a strike price of $5,000 per ETH.

(c)     Pursuant to a trade confirmation dated June 11, 2022, GGC International agreed to purchase from Ver a put option for 500 Bitcoin ("BTC"), with a strike price of $26,000 per BTC.

7

37.     Each of the three confirmations states that the "Settlement Date" is same as the "Expiration Date" of each option.

**Ver Fails to Settle the Three Options Transactions**

38.     The three options in question expired on December 30, 2022.

39.     As noted above, the "Settlement Date" for each of the three options was the same as the "Expiration Date," i.e., December 30, 2022.  As such, Ver was required to settle the options on December 30, 2022.  He failed to do so.

40.     On January 12, 2023, GGC International sent a letter to Ver with the subject line "NOTICE OF DEFAULT: FAILURE TO PAY" (the "January 12 Notice").  The January 12 Notice informed Ver that he "failed to pay the amount of $71,221,052 due and owing on the Settlement Date (December 30, 2022) under the Transaction Confirmations.  The consequence of [Ver's] failure to make payment is that an Event of Default will occur under Section 5(a)(i) of the Master Agreement, to the extent [Ver's] failure to pay continues for one Local Business Day, after the effective date of this notice."

41.     Ver failed to make payment as required within one Local Business Day after the January 12 Notice.

42.     On January 17, 2023, GGC International sent a letter to Ver with the subject line "NOTICE OF EVENT OF DEFAULT AND DESIGNATION OF EARLY TERMINATION DATE" (the "January 17 Notice").  The January 17 Notice informed Ver that he had "failed to pay $71,221,052, which was the amount due and owing on the Settlement Date (December 30, 2022) under the Transaction Confirmations.  Pursuant to Section 6(a) of the Master Agreement, this letter serves as notice, effective as of the date of this notice, that an Event of Default under Section 5(a)(i) of the Master Agreement has occurred and is continuing with respect to [Ver]."

8

43.     In the January 17 Notice, GGC International further "designates January 19, 2023, as the Early Termination Date," and "will make the calculations required under Section 6(e) of the Master Agreement and, in accordance with the Master Agreement, will notify you of the amount calculated thereunder and the date on which such amount will be payable."

44.     Ver failed to make payment after receipt of the January 17 Notice.

45.     On January 20, 2023, GGC International sent a letter to Ver with the subject line "CALCULATION STATEMENT FOR PAYMENT ON EARLY TERMINATION" (the "January 20 Statement").

46.     The January 20 Statement constituted the statement required by Section 6(d)(i) of the ISDA Master Agreement detailing the calculation of the amount that remains payable by Ver to GGC International.

47.     The January 20 Statement stated that Ver owed GGC International $67,850,000 across the three options.  That amount was calculated by subtracting the amount owed by GGC International to Ver from the amount owed by Ver to GGC International.[2]  In that January 20 Statement, GGC International then set off collateral posted by Ver valued at $46,980,212 against the $67,850,000 owed by Ver, resulting in a "Termination Payment Amount" of $20,869,788.

48.     Ver failed to make payment after receipt of the January 20 Statement.

49.     GGC International is seeking that amount in this action, plus fees, expenses, and interest.

---

[2]     As noted above, the Parties elected to apply "Multiple Transaction Payment Netting" under the ISDA Master Agreement.

## CLAIMS FOR RELIEF

## CLAIM ONE

### *(Breach of Contract)*

50.    GGC International hereby incorporates by reference all allegations set forth previously in this Complaint as though fully set forth herein.

51.    GGC International and Ver are parties to the Master Confirmation Agreement and are deemed to enter into the ISDA Master Agreement and ISDA Credit Support Annex.

52.    GGC International complied with all of its contractual obligations under the Master Confirmation Agreement, the ISDA Master Agreement, and ISDA Credit Support Annex.

53.    As set forth above, Ver breached the Master Confirmation Agreement, and the transactions entered thereunder, by failing to settle three options transactions that expired on December 30, 2022. Such failure constituted an "Event of Default" under the relevant agreements and is a breach of contract.

54.    Under the three options, and subtracting amounts owed by GGC International to Ver, Ver owes a total of $67,850,000. In light of the $46,980,212 in collateral that Ver already delivered, the net amount owed by Ver is $20,689,788.

55.    Accordingly, as a result of Ver's breach of contract, GGC International has been damaged in an amount to be determined at trial, but believed to be in excess of $20,689,788, plus interest.

56.    In addition, GGC International is entitled to the repayment of its attorneys' fees and costs pursuant to Section 11 of the ISDA Master Agreement.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff GGC International respectfully demands the judgment against Defendant Ver as follows:

10

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 146 of 248

1.    On GGC International's First Cause of Action, for an order awarding GGC International damages in an amount to be determined at trial but in no event less than $20,689,788, plus interest at the New York statutory rate, plus repayment of GGC International's attorneys' fees and costs; and

2.    Such other and further relief as the Court deems just and proper.

Dated:  New York, New York
        March 28, 2023

                        MORRISON COHEN LLP


                        By: /s/ Jason P. Gottlieb
                            Jason P. Gottlieb
                            Michael Mix
                        909 Third Avenue
                        New York, NY  10022
                        Telephone: 212-735-8600
                        Facsimile:  212-735-8708

                        *Attorneys for Plaintiff GGC International Limited*

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 147 of 248

# Exhibit D

FILED: NEW YORK COUNTY CLERK 08/21/2023 06:47 PM
INDEX NO. 650439/2023
NYSCEF DOC. NO. 40
RECEIVED NYSCEF: 08/21/2023

08-13555-scc Doc 52533-1 Filed 03/29/24 Entered 03/29/24 Page 148 of 248 Main Document
Pg 1 of 170

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555(JMP)

Case No. 08-01420(JMP)(SIPA)

Adv. Case No. 09-01258

Adv. Case No. 08-01743

Adv. Case No. 09-01242

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS, INC., et al.,

                    Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS INC.,

                    Debtor.

- - - - - - - - - - - - - - - - - - - -x

NEUBERGER BERMAN, LLC,

                    Plaintiff,

          -against-

PNC BANK, NATIONAL ASSOCIATION,

LEHMAN BROTHERS INC., AND LEHMAN

BROTHERS COMMERICAL CORPORATION,

                    Defendants.

- - - - - - - - - - - - - - - - - - - -x

08-13555-scc Doc 52533-1 Filed 03/29/24 Entered 03/29/24 21:40:19 Main Document Pg 2 of 170

2

```
 1    - - - - - - - - - - - - - - - - - - - -x

 2    STATE STREET BANK AND TRUST COMPANY,

 3                    Plaintiff,

 4    LEHMAN COMMERCIAL PAPER INC.,

 5            -against-

 6                    Defendant.

 7    - - - - - - - - - - - - - - - - - - - -x

 8    LEHMAN BROTHERS SPECIAL FINANCING INC.,

 9                    Plaintiff,

10    BNY CORPORATE TRUSTEE SERVICES, LTD.,

11            -against-

12                    Defendant.

13    - - - - - - - - - - - - - - - - - - - -x

14

15              U.S. Bankruptcy Court

16              One Bowling Green

17              New York, New York

18

19              September 15, 2009

20              10:03 a.m.

21

22    B E F O R E:

23    HON. JAMES M. PECK

24    U.S. BANKRUPTCY JUDGE

25
```

3

1

2    RE: CASE NOS. 08-13555(JMP) and 08-01420(JMP)(SIPA)

3    HEARING re Interim Applications for Allowance of Compensation

4    for Professional Services Rendered and for Reimbursement of

5    Actual and Necessary Expenses [Docket No. 4839]

6

7    HEARING re Motion of Wells Fargo, NA for Relief from the

8    Automatic Stay [Docket No. 4640]

9

10   HEARING re Motion of Wells Fargo, NA for Relief from the

11   Automatic Stay [Docket No. 4671]

12

13   HEARING re Motion of Washington Mutual Bank f/k/a Washington

14   Mutual Bank, FA. For Relief from the Automatic Stay [Docket No.

15   4759]

16

17   HEARING re Motion of A/P Hotel, LLC for Relief from the

18   Automatic Stay [Docket No. 4950]

19

20   HEARING re Motion for Authorization to Assume an Interest Rate

21   Swap with MEG Energy Corp. [Docket No. 5012]

22

23

24

25

4

1

2      HEARING re Debtors' Motion for Establishment of Procedures for

3      the Debtors to Transfer Their Interests in Respect of

4      Residential and Commercial Loans Subject to Foreclosure to

5      Wholly-Owned Non-Debtor Subsidiaries [Docket No. 4966]

6

7      HEARING re Debtors' Motion for Establishment of Procedures for

8      the Debtors to Compromise Claims of the Debtors in Respect of

9      Real Estate Loans [Docket No. 4942]

10

11     HEARING re Motion of Landwirtschaftliche Rentenbank for 2004

12     Examination [Docket No. 4800]

13

14     HEARING re Debtors' Motion for Authorization to Implement

15     Alternative Dispute Resolution Procedures for Affirmative

16     Claims of Debtors Under Derivative Contracts [Docket No. 4453]

17

18     HEARING re Debtors' Motion to Compel Performance of Metavante

19     Corporation's Obligations Under an Executory Contract and to

20     Enforce the Automatic Stay [Docket No. 3691]

21

22     HEARING re Motion of DnB Nor Bank ASA for Allowance and Payment

23     of Administrative Expense Claim and Allowing Setoff of Such

24     Claim [Docket No. 4054]

25

5

1

2    HEARING re Motion of William Kuntz, III for Review of Dismissal

3    of Appeal [Docket No. 1261]

4

5    RE: ADV. CASE NO. 09-01258:

6    PRE-TRIAL CONFERENCE

7

8    RE: ADV. CASE NO. 08-01743:

9    PRE-TRIAL CONFERENCE

10

11   RE: ADV. CASE NO. 09-01242:

12   Motion of BNY Corporate Trustee Services Limited to Stay

13   Further Proceedings Pending Disposition of its Motion for Leave

14   to Appeal the August 12, 2009 Order Denying BNY's Motion to

15   Dismiss and any Disposition of the Merits of that Appeal

16

17

18

19

20

21

22

23

24   Transcribed by:  Clara Rubin

25                    Pnina Eilberg

99

1    that it has been presented and will make some judgments as to

2    the identity of the mediators in consultation with counsel for

3    the debtors and for the creditors' committee who have been so

4    active in developing these procedures.

5            I recognize that a lot of people who are in court at

6    this moment are here for the ADR procedures, and I'm going to

7    give people who want to leave an opportunity to leave.  I'm

8    also going to give everybody an opportunity for a break.  But

9    because of the congestion of this docket, I think I'm going to

10   go until 1 o'clock.  So let's take a break for ten minutes, and

11   then resume, and then go until 1 o'clock and then break for

12   lunch.  We're adjourned until then.

13           MR. GRUENBERGER:  Thank you, Your Honor.

14        (Recess from 12:12 p.m. to 12:28 p.m.)

15           THE COURT:  Be seated please.  Number 11, Metavante.

16           MR. SLACK:  Your Honor, Richard Slack from Weil,

17   Gotshal for the debtors.  We're here on the debtors' motion to

18   compel performance of Metavante Corporation.  As Your Honor

19   knows, two months ago we had argument, after fully briefing the

20   issue.  Your Honor is in receipt of letters from both

21   Metavante's counsel and from the debtors, which I think

22   provides the status of where we are in terms of discussions,

23   which is, essentially, that the parties have not had

24   substantial discussions, as the letters which are docketed

25   state.

100

1          The debtors were requested to make a proposal to

2     resolve it, which we did.  We have not received a proposal from

3     Metavante in the two months since the hearing, and Metavante

4     has not responded to our proposal that we've made.

5          Your Honor has mentioned Metavante a couple of times

6     today, and so Your Honor may have a plan for the conference,

7     but it is the debtors' position that this matter should be

8     considered and decided, at the Court's discretion, obviously.

9          THE COURT:  Understood.  I'm ready to rule today.

10         MR. ARNOLD:  May it please the Court, mindful of that

11    comment, I want you to know why we wrote the letter, so that

12    you have in mind that parties do take into account the risks of

13    not settling, and you were quite clear at the hearing on July

14    14th that there was an opportunity for the parties to consider

15    resolving this matter.

16         For the Court's information, neither Lehman nor its

17    counsel have been obdurate, ornery, or in any fashion

18    unprofessional.  Our dealings have been quite, to the contrary,

19    exceptional throughout the history of our relationships.  I

20    reached out to counsel for the debtors to explain how it is

21    that an impending transaction which will close on October 1st

22    would, in my judgment, have a favorable impact on the

23    likelihood of this matter resolving consensually.  That was the

24    singular purpose for us writing the letter to the Court.  We

25    are not here today to reargue the motion.  The Court heard

FILED: NEW YORK COUNTY CLERK 08/21/2023 06:47 PM
INDEX NO. 650439/2023

NYSCEF DOC. NO. 40

08-13555-smg  Doc 52533-3  Filed Document Entered 03/20/14  Page 155 of 248

Pg 101 of 170

RECEIVED NYSCEF: 08/21/2023

101

1    extensive oral argument.  It has been well briefed.  The issues

2    have come up again in, frankly, in other instances and motions

3    and adversary proceedings.  I wanted the Court to know that it

4    was not by design, neglect or deliberately ignoring your

5    comments on July 14th that the settlement has not proceeded

6    further than it has.  About a week ago we received a settlement

7    proposal.  I am authorized to state by both Fidelity and

8    Metavante that post-closing of the merged entity we expect to,

9    and intend to, and will make a settlement proposal, but we're

10   also mindful that it hasn't been settled, and if it is the

11   Court's desire to rule on the matter today, we govern ourselves

12   accordingly.  I just wanted the Court to know what I've done

13   since July 14th to try to move this matter on.

14           THE COURT:  Okay.  Thank you for that update.

15           MR. ARNOLD:  Thank you, Your Honor.

16           THE COURT:  The Metavante matter consumed the better

17   part of an afternoon's oral argument.  My best recollection is

18   that we specially listed it on the afternoon before the July

19   omnibus hearing.  Candidly, I don't recall why it was specially

20   listed all by itself, but it's just as well that it happened,

21   because it took a lot of time.

22           It's correct that I encouraged the parties to attempt

23   to resolve this consensually, and I appreciate the fact that

24   large enterprises, particularly those that are involved in

25   major transactions in which acquisitions are literally weeks

102

1    away from being consummated, may be distracted or may have

2    other priorities.  But I also believe that when I suggested

3    that this be listed for the September 15th omnibus hearing it

4    was with the notion that, in effect, time would be up.

5         I'm also mindful of the fact that on today's calendar

6    a matter very similar to this, item 6, has been consensually

7    resolved, involving the payment of fifty percent more dollars

8    to the debtors than are at issue in this current dispute.

9         I am prepared to rule and will do so now.  Recognize

10   that what I'm about to do will take some time and will probably

11   take us to the lunch hour.  If there is anyone here who doesn't

12   want to hear the ruling in this case I'd like you to be free to

13   both leave, because I won't be offended, or, if at some point

14   during my rendition of this ruling you say to yourself this is

15   something I don't need to hear, you're also free to leave at

16   that point.

17        LBSF requests that the Court compel Metavante to

18   perform its obligations under that certain 1992 ISDA Master

19   Agreement dated as of November 20, 2007, defined as the "Master

20   Agreement".  And that certain trade confirmation dated December

21   4, 2007, defined as the "Confirmation", and together with the

22   Master Agreement, the "Agreement".

23        The Master Agreement provides the basic terms of the

24   parties' contractual relationship and contemplates being

25   supplemented by trade confirmations that provide the economic

103

```
1    terms of the specific transactions agreed to by the parties.

2    Under the Master Agreement, Metavante and LBSF entered into an

3    interest rate swap transaction, the terms of which were

4    documented pursuant to the Confirmation.

5            LBHI is a credit support provider for LBSF's payment

6    obligations under the Agreement.

7            Due to declining interest rates the value of LBSF's

8    position under the Agreement has increased.  As of May 2009,

9    under the payment terms of the Agreement, Metavante owed LBSF

10   in excess of 6 million dollars, representing quarterly payments

11   due November, 2008, February, 2009 and May, 2009, plus default

12   interest in excess of 300,000 dollars.

13           It is possible that due to current market conditions

14   and to the quarterly payment schedule prescribed by the

15   Agreement the amounts that Metavante owes to LBSF as of today

16   are even higher than those stated in the motion.  Metavante has

17   refused to make any payments to LBSF.  In fact, it has refused

18   to perform its obligations under the Agreement, as of November

19   3, 2008.  Instead, Metavante claims that LBSF and LBHI, via the

20   filing of their respective Chapter 11 cases, each caused an

21   event of default under the Agreement.

22           Metavante argues that due to such events of default it

23   has the right, but not the obligation, under the safe harbor

24   provisions of the Bankruptcy Code, to terminate all outstanding

25   derivative transactions under the Agreement.  Metavante also
```

104

1    maintains that it is not otherwise required to perform under

2    the Agreement.

3            The parties presented their arguments to the Court at

4    a hearing held on July 14, 2009.  Notably at the hearing

5    counsel to Metavante stated that, quote, "the opportunity to

6    settle the matter", is a possibility.  The reference in the

7    transcript is page 58, lines 18 to 19.  The Court took the

8    matter under advisement and suggested that it be calendared for

9    the September 15, 2009 omnibus hearing for purposes of either a

10   bench ruling or a status conference on any progress the parties

11   may have made towards a resolution.

12           I want to make clear that I am proceeding with this

13   ruling because I view the letter described by counsel for

14   Metavante, which talked about a possible settlement

15   counterproposal occurring sometime after the closing of a

16   merger on October 1, as being an insufficient commitment to a

17   timely settlement.

18           On September 14, 2009 the Court received letters from

19   counsel to each of the parties.  Counsel to Metavante requests

20   an adjournment to October 14.  Counsel states that an

21   adjournment will facilitate the parties' settlement

22   negotiations but explains that Metavante may not make a

23   counterproposal to LBSF's September 5, 2009 settlement proposal

24   until after the proposed October 1, 2009 closing of a merger.

25   Counsel also suggests that an adjournment will allow the Court

105

1    to put the motion on the same track as two other motions

2    currently pending before the Court.  Which motions, counsel

3    claims, raise similar issues to the motion?  Counsel to LBSF

4    and LBHI maintain that inasmuch as Metavante has done nothing

5    since July 14, 2009 to settle this matter other than asking

6    LBSF and LBHI to make a settlement proposal, the parties are no

7    closer to settlement than they were at the hearing, and,

8    therefore, the status conference should go forward as planned.

9         While each of the matters reference by counsel to

10   Metavante may have overlapping issues with those presented in

11   the current dispute, each matter involves its own distinct set

12   of fats.  Moreover, each of the two referenced matters is in

13   its infancy.  No response has been filed in either one, which

14   may further delay resolution here.

15        This is a dispute that has been fully briefed and

16   argued and is ripe for determination.  Moreover, I note that

17   the settlement that was achieved with MEG Energy that was

18   referenced this morning indicates that parties who are willing

19   to settle can, and do.

20        Under the Agreement LBSF is obligated to pay the

21   floating three month USD LIBOR BBA interest rate on a notional

22   amount of 600 million dollars, which notional amount declines

23   over time, beginning in May, 2010.  Metavante, in turn, is

24   obligated to pay a fixed interest rate, 3.865 percent, on the

25   notional amount.  The Agreement is set to expire on February 1,

106

1    2012.  The Agreement defines event of default to include the

2    bankruptcy of any party or credit support provider.  Under the

3    terms of the Agreement, upon an event of default the non-

4    defaulting party may designate an early termination date.  Upon

5    termination a final payment is calculated and paid in order to

6    put the parties into the same economic position as if the

7    termination had not occurred.

8            In the instant case Metavante has refused to perform

9    under the Agreement on account of the event of default that has

10   occurred, and is continuing, on account of the bankruptcies of

11   LBSF and LBHI.  Metavante has not, however, attempted to

12   terminate the Agreement.  Instead, Metavante entered into a

13   replacement hedge covering the period from November 3, 2008

14   through February 1, 2010.

15           LBSF and LBHI argue that the Agreement is an executory

16   contract because material performance, specifically payment

17   obligations, remain due by both LBSF and Metavante.  Under

18   Bankruptcy Code Section 365(a) a debtor in possession may,

19   "subject to the court's approval, assume or reject any

20   executory contract".  The case law makes clear, however, that

21   while a debtor determines whether to assume or reject an

22   executory contract the counterparty to such contract must

23   continue to perform.

24           LBSF and LBHI further argue that the safe harbor

25   provisions do not excuse Metavante's failure to perform.

107

1    Indeed, the safe harbor provisions permit qualifying non-debtor

2    counterparties to derivative contracts to exercise certain

3    limited contractual rights triggered by, among other things, a

4    Chapter 11 filing.  They're available, however, only to the

5    extent that a counterparty seeks to one, liquidate, terminate

6    or accelerate its contracts or two, net out its positions.  All

7    other uses of ipso facto provisions remain unenforceable under

8    the Bankruptcy Code.

9         Notably, Metavante does not dispute that it has failed

10   to perform under the Agreement.  Instead, Metavante argues that

11   the occurrence of an event of default under the Agreement gives

12   rise to its right, as the non-defaulting party, to terminate

13   under the safe harbor provisions.  According to Metavante the

14   occurrence of an event of default does not, however, create the

15   obligation for it to terminate under the safe harbor

16   provisions.  Metavante emphasizes the term, quote, "condition

17   precedent" set forth in Sections 2(a), 1 and 3 of the

18   Agreement, which subject payment obligations to the condition

19   precedent that no event of default with respect to the party

20   has occurred and is continuing.

21        Metavante argues that under New York State contract

22   law a failure of a condition precedent excuses a party's

23   obligation to perform.  Metavante states that its unequivocal

24   right to suspend payments until the termination of the

25   Agreement is fundamental to the manner in which swap parties

108

1       government themselves.  Metavante takes issue with LBSF and

2       LBHI in asking the Court to treat the Agreement like a garden

3       variety executory contract, arguing that it cannot be compelled

4       to pay because LBSF and LBHI cannot provide the essential item

5       of value Metavante bargained for, namely an effective

6       counterparty.

7               Metavante further argues on information and belief

8       that LBSF and LBHI also are in default under certain

9       unspecified indebtedness that allegedly may have created a

10      cross default under the Agreement, asserting, as a result, an

11      alleged need to engage in the discovery process.

12              It is clear that the filing of bankruptcy petitions by

13      LBHI and LBSF constitute events of default under the Agreement.

14      Specifically, Section 5(a)(vii) of the Agreement provides that

15      it shall constitute an event of default should a party to the

16      Agreement or any credit support provider of such party

17      institute a proceeding seeking a judgment of insolvency or

18      bankruptcy, or any other relief under any bankruptcy insolvency

19      law or similar law affecting creditors' rights.

20              Section 2(a)(i) and 3 of the Agreement, in turn,

21      subject payment obligations to the condition precedent that no

22      event of default with respect to the other party has occurred

23      and is continuing.  It is also clear, however, that the safe

24      harbor provisions, primarily Bankruptcy Code Sections 560 and

25      561, protect a non-defaulting swap counterparty's contractual

109

1    rights solely to liquidate, terminate or accelerate one or more

2    swap agreements because of a condition of the kind specified in

3    Section 365(e)(1), or to "offset or net out any termination

4    values or payment amounts arising under or in connection with

5    the termination, liquidation or acceleration of one or more

6    swap agreements".  That language comes from Section 560.

7            In the instant matter Metavante has attempted neither

8    to liquidate, terminate or accelerate the Agreement, nor to

9    offset or net out its position as a result of the events of

10   default caused by the filing of bankruptcy petitions by LBHI

11   and LBSF.  Metavante simply is withholding performance, relying

12   on the conditions precedent language in Sections 2(a)(i) and

13   (iii) under the Agreement.

14           The question presented in this matter and the issue

15   that was argued by the parties at the hearing is whether

16   Metavante's withholding of performance is permitted, either

17   under the safe harbor provisions or under terms of the

18   Agreement itself.  It is not.

19           Although complicated at its core the Agreement is, in

20   fact, a garden variety executory contract, one for which there

21   remains something still to be done on both sides.  Each party

22   to the Agreement still is obligated to make quarterly payments

23   based on a floating or fixed interest rate of a notional

24   amount, it being understood that the net obligor actually makes

25   a payment after the parties respective positions are calculated

110

1    on a quarterly basis, in February, May, August and November of

2    each calendar year.

3         Under relevant case law it is clear that while an un-

4    assumed executory contract is not enforceable against a debtor,

5    see NLRB v. Bildisco & Bildisco, 465 US 513 at 531, such a

6    contract is enforceable by a debtor against the counterparty.

7    See McLean Industries, Inc. v. Medical Laboratory Automation,

8    Inc., 96 B.R. 440 at 449 (Bankr. S.D.N.Y. 1989).  Metavante

9    relies on In re Lucre, Inc., 339 BR 648 (WD Mich.) for the

10   proposition that a debtor's uncured pre-petition breach of its

11   executory contract, here the event of default caused by the

12   bankruptcy filings of LBHI and LBSF, will, in and of itself,

13   justify continued nonperformance by the non-debtor

14   counterparty, and mere commencement of bankruptcy proceedings

15   and the imposition of the automatic stay does not empower the

16   debtor to compel performance from a non-debtor party.

17        The Court rejects the Lucre decision as nonbinding and

18   non-persuasive.  While Metavante's argument for the events of

19   default caused by the bankruptcy filings of LBHI and LBSF do

20   create an obligation for it to terminate the Agreement under

21   the safe harbor provisions, that's a tenable argument.  Its

22   conduct of riding the market for the period of one year, while

23   taking no action whatsoever, is simply unacceptable and

24   contrary to the spirit of these provisions of the Bankruptcy

25   Code.

111

1          First, inasmuch as the Bankruptcy Code trumps any

2     state law excuse of nonperformance, Metavante's reliance on New

3     York contract law is misplaced.  Moreover, legislative history

4     evidences Congress's intent to allow for the prompt closing out

5     or liquidation of open accounts upon the commencement of a

6     bankruptcy case.  Citation is to the Congressional history of

7     this, H.R. Rep. 97-420 at 1 (1982), as well as its stated

8     rationale that the immediate termination for default and the

9     netting provisions are critical aspects of swap transactions

10    and are necessary for the protection of all parties in light of

11    the potential for rapid changes in the financial markets.

12    Citation to the Senate Report number 101-285 at 1 (1990).

13         The safe harbor provisions specifically permit

14    termination solely, quote, "because of a condition of the kind

15    specified in Section 365(e)(1) that is the insolvency or

16    financial condition of the debtor and the commencement of a

17    bankruptcy case.  See also In re Enron Corp., 2005. WL 3874285,

18    at *4, Judge Gonzalez's case, 2005.  Noting that a

19    counterparty's action under the safe harbor provisions must be

20    made fairly contemporaneously with the bankruptcy filing, less

21    the contract be rendered just another ordinary executory

22    contract.

23         The Court finds that Metavante's window to act

24    promptly under the safe harbor provisions has passed, and while

25    it may not have had the obligation to terminate immediately

FILED: NEW YORK COUNTY CLERK 08/21/2023 06:47 PM          INDEX NO. 650439/2023

NYSCEF DOC. NO. 40          08-13555-scc Doc 52533-1 Filed Document Entered 09/23/09 14:21 Page 166 of 248 Document          RECEIVED NYSCEF: 08/21/2023

Pg 112 of 170

112

1    upon the filing of LBHI or LBSF, its failure to do so, at this

2    juncture, constitutes a waiver of that right at this point.

3           Metavante's references to defaults under certain

4    unspecified indebtedness that allegedly may have created a

5    cross default under the Agreement are of no moment.  First,

6    Metavante failed to set forth the basis, either in its papers

7    or at the hearing, for its information and belief that such a

8    default may have occurred.  Its assertion that such a default

9    may have occurred indicates that Metavante is not aware of any

10   such default, and, therefore, did not rely on that default in

11   its refusal to perform under the Agreement or lacks knowledge

12   of what that default may be.

13          Additionally, the argument that LBSF or LBHI may have

14   defaulted under other specified indebtedness, as that term is

15   defined in the Agreement, relies upon the financial condition

16   of bankruptcy debtors to withhold performance.  That is also

17   unenforceable as an ipso facto clause that may not be enforced

18   under the Bankruptcy Code Section 365(e)(1)(A).

19          LBSF and LBHI are entitled to continued receipt of

20   payments under the Agreement.  Metavante's attempts to control

21   LBSF's right to receive payment under the Agreement constitute,

22   in effect, an attempt to control property of the estate.  See

23   In re Enron Corp., 300 B.R. 201 at 212 (S.D.N.Y. 2003),

24   recognizing that contract rights are property of the estate and

25   that therefore those rights are protected by the automated

113

```
 1    stay.

 2              This is a violation of the automatic stay imposed by

 3    Code Section 362.  Accordingly, for the reasons set forth in

 4    LBSF's and LBHI's papers, for the reasons stated on the record

 5    at the hearing and for the reasons stated on the record today,

 6    pursuant to Bankruptcy Code Sections 105(a), 362 and 365,

 7    Metavante is directed to perform under the Agreement until such

 8    time as LBSF and LBHI determine whether to assume or reject.

 9    That's the ruling of the Court.

10              MR. KRASNOW:  Good afternoon, Your Honor.  Richard

11    Krasnow, Weil, Gotshal & Manges, for the Chapter 11 debtors.

12    We are close to the end of this morning's agenda, but not quite

13    there as yet.  The next item, Your Honor, is number 12.  It is

14    the motion of DnB Nor Bank described in the agenda.  Your

15    Honor, that matter has been fully submitted to the Court, fully

16    briefed, arguments held on November 5th, and today is the

17    scheduled status conference.

18              THE COURT:  Okay.  I'm ready to rule on that, but

19    given the hour I'm not going to take the time to do that now.

20    But we'll issue a short memorandum in due course.  So as to not

21    create any undue suspense for those parties who are here in

22    connection with the DnB Nor matter, I am deciding that in favor

23    of the debtors and against DnB Nor, denying DnB Nor's motion

24    for allowance of an administrative expense claim, substantially

25    for the reasons set forth in the committee's papers.
```

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 168 of 248

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

GGC INTERNATIONAL LIMITED,

                              Plaintiff

          v.

ROGER VER,

                              Defendant.

Index No. 650439/2023

Motion Seq. No. 002

**AFFIRMATION OF ALEX
VAN VOORHEES**

ALEX VAN VOORHEES, an attorney duly admitted to practice before the Courts of the

State of New York, affirms the following to be true under penalties of perjury and pursuant to

CPLR 2106:

1.       I am an attorney and an authorized signatory for Plaintiff / Counterclaim-Defendant

GGC International Limited ("GGC International").   I am fully familiar with the facts and

circumstances contained in this affirmation.

2.       I submit this affirmation in support of GGC International's motion to dismiss the

counterclaims of Defendant / Counterclaim-Plaintiff Roger Ver ("Ver").

3.       Attached hereto as **Exhibit 1** is a true and correct copy of the 2002 ISDA Master

Agreement.

4.       Attached hereto as **Exhibit 2** is a true and correct copy of the 1994 ISDA Credit

Support Annex.

5.       Attached hereto as **Exhibit 3** is a true and correct copy of the Amended and

Restated Master Confirmation Agreement for Virtual Currency Put and Call Options Transactions

dated as of June 22, 2020, between GGC International and Ver.

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 169 of 248

6.     Attached hereto as **Exhibit 4** is a true and correct copy of a trade confirmation dated March 22, 2022 in which Ver agreed to sell a put option to GGC International for 70,000 units of Bitcoin Cash.

7.     Attached hereto as **Exhibit 5** is a true and correct copy of a trade confirmation dated June 10, 2022, in which Ver agreed to sell a put option to GGC International for 10,000 Ether.

8.     Attached hereto as **Exhibit 6** is a true and correct copy of a trade confirmation dated June 11, 2022, in which Ver agreed to sell a put option to GGC International for 500 Bitcoin.

[*SIGNATURE APPEARS ON NEXT PAGE*]

Case 1:24-cv-01533-JPC    Document 20-1    Filed 03/20/24    Page 170 of 248

Dated:  New York, New York
       August 21, 2023

ALEX VAN VOORHEES

## **WORD COUNT CERTIFICATION**

Pursuant to Rule 17 of subdivision (g) of section 202.70 of the Uniform Rules for the

Supreme Court and County Court (Rules of Practice for the Commercial Division of the

Supreme Court), I hereby certify that the total number of words in this affirmation, excluding the

caption, signature block, and word count certification is 270.


Dated: New York, New York
      August 21, 2023

                                   */s/ Jason Gottlieb* _____
                                           Jason Gottlieb

# Exhibit **1**

Case 1:24-cv-01533-JPC    Document 20-1    Filed 03/20/24    Page 173 of 248



**ISDA**®

International Swaps and Derivatives Association, Inc.

# 2002 MASTER AGREEMENT

dated as of ....................................................................

............................................................. and ..............................................................................

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this 2002 Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties or otherwise effective for the purpose of confirming or evidencing those Transactions. This 2002 Master Agreement and the Schedule are together referred to as this "Master Agreement".

Accordingly, the parties agree as follows:—

**1.    Interpretation**

(a)    *Definitions.* The terms defined in Section 14 and elsewhere in this Master Agreement will have the meanings therein specified for the purpose of this Master Agreement.

(b)    *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement, such Confirmation will prevail for the purpose of the relevant Transaction.

(c)    *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

**2.    Obligations**

(a)    *General Conditions.*

(i)    Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)    Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

Copyright © 2002 by International Swaps and Derivatives Association, Inc.

(iii)    Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other condition specified in this Agreement to be a condition precedent for the purpose of this Section 2(a)(iii).

(b)    *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the Scheduled Settlement Date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting of Payments.* If on any date amounts would otherwise be payable:—

(i)    in the same currency; and

(ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by which the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount and payment obligation will be determined in respect of all amounts payable on the same date in the same currency in respect of those Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or any Confirmation by specifying that "Multiple Transaction Payment Netting" applies to the Transactions identified as being subject to the election (in which case clause (ii) above will not apply to such Transactions). If Multiple Transaction Payment Netting is applicable to Transactions, it will apply to those Transactions with effect from the starting date specified in the Schedule or such Confirmation, or, if a starting date is not specified in the Schedule or such Confirmation, the starting date otherwise agreed by the parties in writing. This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

(i)    *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

(1)    promptly notify the other party ("Y") of such requirement;

(2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

(3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

ISDA® 2002

(4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

(A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

(B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, after a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

(ii)    *Liability.* If:—

(1)    X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)    X does not so deduct or withhold; and

(3)    a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

**3.**    **Representations**

Each party makes the representations contained in Sections 3(a), 3(b), 3(c), 3(d), 3(e) and 3(f) and, if specified in the Schedule as applying, 3(g) to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement). If any "Additional Representation" is specified in the Schedule or any Confirmation as applying, the party or parties specified for such Additional Representation will make and, if applicable, be deemed to repeat such Additional Representation at the time or times specified for such Additional Representation.

(a)    *Basic Representations.*

(i)    *Status.* It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)    *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

    ISDA® 2002

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 176 of 248

(iii)   *No Violation or Conflict.* Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)   *Consents.* All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)   *Obligations Binding.* Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b)   *Absence of Certain Events.* No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)   *Absence of Litigation.* There is not pending or, to its knowledge, threatened against it, any of its Credit Support Providers or any of its applicable Specified Entities any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)   *Accuracy of Specified Information.* All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)   *Payer Tax Representation.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)   *Payee Tax Representations.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

(g)   *No Agency.* It is entering into this Agreement, including each Transaction, as principal and not as agent of any person or entity.

**4.    Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)   *Furnish Specified Information.* It will deliver to the other party or, in certain cases under clause (iii) below, to such government or taxing authority as the other party reasonably directs:—

(i)   any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii)   any other documents specified in the Schedule or any Confirmation; and

(iii)    upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)    **Maintain Authorisations.** It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)    **Comply With Laws.** It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)    **Tax Agreement.** It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)    **Payment of Stamp Tax.** Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated, organised, managed and controlled or considered to have its seat, or where an Office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction"), and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

## 5.    Events of Default and Termination Events

(a)    **Events of Default.** The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes (subject to Sections 5(c) and 6(e)(iv)) an event of default (an "Event of Default") with respect to such party:—

(i)    **Failure to Pay or Deliver.** Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 9(h)(i)(2) or (4) required to be made by it if such failure is not remedied on or before the first Local Business Day in the case of any such payment or the first Local Delivery Day in the case of any such delivery after, in each case, notice of such failure is given to the party;

(ii)    **Breach of Agreement; Repudiation of Agreement.**

(1)    Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 9(h)(i)(2) or (4) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied within 30 days after notice of such failure is given to the party; or

(2)    the party disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, this Master Agreement, any Confirmation executed and delivered by that party or any

**ISDA® 2002**

Transaction evidenced by such a Confirmation (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(iii)     *Credit Support Default.*

(1)     Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)     the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document, or any security interest granted by such party or such Credit Support Provider to the other party pursuant to any such Credit Support Document, to be in full force and effect for the purpose of this Agreement (in each case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)     the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(iv)     *Misrepresentation.* A representation (other than a representation under Section 3(e) or 3(f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)     *Default Under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

(1)     defaults (other than by failing to make a delivery) under a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction;

(2)     defaults, after giving effect to any applicable notice requirement or grace period, in making any payment due on the last payment or exchange date of, or any payment on early termination of, a Specified Transaction (or, if there is no applicable notice requirement or grace period, such default continues for at least one Local Business Day);

(3)     defaults in making any delivery due under (including any delivery due on the last delivery or exchange date of) a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or an early termination of, all transactions outstanding under the documentation applicable to that Specified Transaction; or

(4)     disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, a Specified Transaction or any credit support arrangement relating to a Specified Transaction that is, in either case, confirmed or evidenced by a document or other confirming evidence executed and delivered by that party, Credit Support Provider or Specified Entity (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

ISDA® 2002

(vi)    *Cross-Default.* If "Cross-Default" is specified in the Schedule as applying to the party, the occurrence or existence of:—

    (1)    a default, event of default or other similar condition or event (however described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) where the aggregate principal amount of such agreements or instruments, either alone or together with the amount, if any, referred to in clause (2) below, is not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments before it would otherwise have been due and payable; or

    (2)    a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments under such agreements or instruments on the due date for payment (after giving effect to any applicable notice requirement or grace period) in an aggregate amount, either alone or together with the amount, if any, referred to in clause (1) above, of not less than the applicable Threshold Amount;

(vii)    *Bankruptcy.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

    (1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4)(A) institutes or has instituted against it, by a regulator, supervisor or any similar official with primary insolvency, rehabilitative or regulatory jurisdiction over it in the jurisdiction of its incorporation or organisation or the jurisdiction of its head or home office, a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by it or such regulator, supervisor or similar official, or (B) has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and such proceeding or petition is instituted or presented by a person or entity not described in clause (A) above and either (I) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (II) is not dismissed, discharged, stayed or restrained in each case within 15 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 15 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) above (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

ISDA® 2002

(viii)  *Merger Without Assumption.* The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, or reorganises, reincorporates or reconstitutes into or as, another entity and, at the time of such consolidation, amalgamation, merger, transfer, reorganisation, reincorporation or reconstitution:—

    (1)  the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party; or

    (2)  the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)  *Termination Events.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes (subject to Section 5(c)) an Illegality if the event is specified in clause (i) below, a Force Majeure Event if the event is specified in clause (ii) below, a Tax Event if the event is specified in clause (iii) below, a Tax Event Upon Merger if the event is specified in clause (iv) below, and, if specified to be applicable, a Credit Event Upon Merger if the event is specified pursuant to clause (v) below or an Additional Termination Event if the event is specified pursuant to clause (vi) below:—

(i)  *Illegality.* After giving effect to any applicable provision, disruption fallback or remedy specified in, or pursuant to, the relevant Confirmation or elsewhere in this Agreement, due to an event or circumstance (other than any action taken by a party or, if applicable, any Credit Support Provider of such party) occurring after a Transaction is entered into, it becomes unlawful under any applicable law (including without limitation the laws of any country in which payment, delivery or compliance is required by either party or any Credit Support Provider, as the case may be), on any day, or it would be unlawful if the relevant payment, delivery or compliance were required on that day (in each case, other than as a result of a breach by the party of Section 4(b)):—

    (1)  for the Office through which such party (which will be the Affected Party) makes and receives payments or deliveries with respect to such Transaction to perform any absolute or contingent obligation to make a payment or delivery in respect of such Transaction, to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

    (2)  for such party or any Credit Support Provider of such party (which will be the Affected Party) to perform any absolute or contingent obligation to make a payment or delivery which such party or Credit Support Provider has under any Credit Support Document relating to such Transaction, to receive a payment or delivery under such Credit Support Document or to comply with any other material provision of such Credit Support Document;

(ii)  *Force Majeure Event.* After giving effect to any applicable provision, disruption fallback or remedy specified in, or pursuant to, the relevant Confirmation or elsewhere in this Agreement, by reason of force majeure or act of state occurring after a Transaction is entered into, on any day:—

    (1)  the Office through which such party (which will be the Affected Party) makes and receives payments or deliveries with respect to such Transaction is prevented from performing any absolute or contingent obligation to make a payment or delivery in respect of such Transaction, from receiving a payment or delivery in respect of such Transaction or from complying with any other material provision of this Agreement relating to such Transaction (or would be so prevented if such payment, delivery or compliance were required on that day), or it becomes impossible or

impracticable for such Office so to perform, receive or comply (or it would be impossible or impracticable for such Office so to perform, receive or comply if such payment, delivery or compliance were required on that day); or

(2)    such party or any Credit Support Provider of such party (which will be the Affected Party) is prevented from performing any absolute or contingent obligation to make a payment or delivery which such party or Credit Support Provider has under any Credit Support Document relating to such Transaction, from receiving a payment or delivery under such Credit Support Document or from complying with any other material provision of such Credit Support Document (or would be so prevented if such payment, delivery or compliance were required on that day), or it becomes impossible or impracticable for such party or Credit Support Provider so to perform, receive or comply (or it would be impossible or impracticable for such party or Credit Support Provider so to perform, receive or comply if such payment, delivery or compliance were required on that day),

so long as the force majeure or act of state is beyond the control of such Office, such party or such Credit Support Provider, as appropriate, and such Office, party or Credit Support Provider could not, after using all reasonable efforts (which will not require such party or Credit Support Provider to incur a loss, other than immaterial, incidental expenses), overcome such prevention, impossibility or impracticability;

(iii)    *Tax Event.* Due to (1) any action taken by a taxing authority, or brought in a court of competent jurisdiction, after a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (2) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Settlement Date (A) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 9(h)) or (B) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 9(h)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iv)    *Tax Event Upon Merger.* The party (the "Burdened Party") on the next succeeding Scheduled Settlement Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 9(h)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets (or any substantial part of the assets comprising the business conducted by it as of the date of this Master Agreement) to, or reorganising, reincorporating or reconstituting into or as, another entity (which will be the Affected Party) where such action does not constitute a Merger Without Assumption;

(v)    *Credit Event Upon Merger.* If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, a Designated Event (as defined below) occurs with respect to such party, any Credit Support Provider of such party or any applicable Specified Entity of such party (in each case, "X") and such Designated Event does not constitute a Merger Without Assumption, and the creditworthiness of X or, if applicable, the successor, surviving or transferee entity of X, after taking into account any applicable Credit Support Document, is materially weaker immediately after the occurrence of such Designated Event than that of X immediately prior to the occurrence of such Designated Event (and, in any such event, such party or its successor, surviving or transferee entity, as appropriate, will be the Affected Party). A "Designated Event" with respect to X means that:—

(1)    X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets (or any substantial part of the assets comprising the business conducted by X as of the

**ISDA® 2002**

date of this Master Agreement) to, or reorganises, reincorporates or reconstitutes into or as, another entity;

(2)    any person, related group of persons or entity acquires directly or indirectly the beneficial ownership of (A) equity securities having the power to elect a majority of the board of directors (or its equivalent) of X or (B) any other ownership interest enabling it to exercise control of X; or

(3)    X effects any substantial change in its capital structure by means of the issuance, incurrence or guarantee of debt or the issuance of (A) preferred stock or other securities convertible into or exchangeable for debt or preferred stock or (B) in the case of entities other than corporations, any other form of ownership interest; or

(vi)    *Additional Termination Event.*  If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties will be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    *Hierarchy of Events.*

(i)    An event or circumstance that constitutes or gives rise to an Illegality or a Force Majeure Event will not, for so long as that is the case, also constitute or give rise to an Event of Default under Section 5(a)(i), 5(a)(ii)(1) or 5(a)(iii)(1) insofar as such event or circumstance relates to the failure to make any payment or delivery or a failure to comply with any other material provision of this Agreement or a Credit Support Document, as the case may be.

(ii)    Except in circumstances contemplated by clause (i) above, if an event or circumstance which would otherwise constitute or give rise to an Illegality or a Force Majeure Event also constitutes an Event of Default or any other Termination Event, it will be treated as an Event of Default or such other Termination Event, as the case may be, and will not constitute or give rise to an Illegality or a Force Majeure Event.

(iii)    If an event or circumstance which would otherwise constitute or give rise to a Force Majeure Event also constitutes an Illegality, it will be treated as an Illegality, except as described in clause (ii) above, and not a Force Majeure Event.

(d)    *Deferral of Payments and Deliveries During Waiting Period.*  If an Illegality or a Force Majeure Event has occurred and is continuing with respect to a Transaction, each payment or delivery which would otherwise be required to be made under that Transaction will be deferred to, and will not be due until:—

(i)    the first Local Business Day or, in the case of a delivery, the first Local Delivery Day (or the first day that would have been a Local Business Day or Local Delivery Day, as appropriate, but for the occurrence of the event or circumstance constituting or giving rise to that Illegality or Force Majeure Event) following the end of any applicable Waiting Period in respect of that Illegality or Force Majeure Event, as the case may be; or

(ii)    if earlier, the date on which the event or circumstance constituting or giving rise to that Illegality or Force Majeure Event ceases to exist or, if such date is not a Local Business Day or, in the case of a delivery, a Local Delivery Day, the first following day that is a Local Business Day or Local Delivery Day, as appropriate.

(e)    *Inability of Head or Home Office to Perform Obligations of Branch.*  If (i) an Illegality or a Force Majeure Event occurs under Section 5(b)(i)(1) or 5(b)(ii)(1) and the relevant Office is not the Affected Party's head or home office, (ii) Section 10(a) applies, (iii) the other party seeks performance of the relevant obligation or

compliance with the relevant provision by the Affected Party's head or home office and (iv) the Affected Party's head or home office fails so to perform or comply due to the occurrence of an event or circumstance which would, if that head or home office were the Office through which the Affected Party makes and receives payments and deliveries with respect to the relevant Transaction, constitute or give rise to an Illegality or a Force Majeure Event, and such failure would otherwise constitute an Event of Default under Section 5(a)(i) or 5(a)(iii)(1) with respect to such party, then, for so long as the relevant event or circumstance continues to exist with respect to both the Office referred to in Section 5(b)(i)(1) or 5(b)(ii)(1), as the case may be, and the Affected Party's head or home office, such failure will not constitute an Event of Default under Section 5(a)(i) or 5(a)(iii)(1).

## 6.     Early Termination; Close-Out Netting

(a)     *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)     *Right to Terminate Following Termination Event.*

(i)     *Notice.* If a Termination Event other than a Force Majeure Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction, and will also give the other party such other information about that Termination Event as the other party may reasonably require. If a Force Majeure Event occurs, each party will, promptly upon becoming aware of it, use all reasonable efforts to notify the other party, specifying the nature of that Force Majeure Event, and will also give the other party such other information about that Force Majeure Event as the other party may reasonably require.

(ii)     *Transfer to Avoid Termination Event.* If a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, other than immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)     *Two Affected Parties.* If a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice of such occurrence is given under Section 6(b)(i) to avoid that Termination Event.

(iv)     **Right to Terminate.**

(1)      If:—

(A)      a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(B)      a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there are two Affected Parties, or the Non-affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, if the relevant Termination Event is then continuing, by not more than 20 days notice to the other party, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(2)      If at any time an Illegality or a Force Majeure Event has occurred and is then continuing and any applicable Waiting Period has expired:—

(A)      Subject to clause (B) below, either party may, by not more than 20 days notice to the other party, designate (I) a day not earlier than the day on which such notice becomes effective as an Early Termination Date in respect of all Affected Transactions or (II) by specifying in that notice the Affected Transactions in respect of which it is designating the relevant day as an Early Termination Date, a day not earlier than two Local Business Days following the day on which such notice becomes effective as an Early Termination Date in respect of less than all Affected Transactions. Upon receipt of a notice designating an Early Termination Date in respect of less than all Affected Transactions, the other party may, by notice to the designating party, if such notice is effective on or before the day so designated, designate that same day as an Early Termination Date in respect of any or all other Affected Transactions.

(B)      An Affected Party (if the Illegality or Force Majeure Event relates to performance by such party or any Credit Support Provider of such party of an obligation to make any payment or delivery under, or to compliance with any other material provision of, the relevant Credit Support Document) will only have the right to designate an Early Termination Date under Section 6(b)(iv)(2)(A) as a result of an Illegality under Section 5(b)(i)(2) or a Force Majeure Event under Section 5(b)(ii)(2) following the prior designation by the other party of an Early Termination Date, pursuant to Section 6(b)(iv)(2)(A), in respect of less than all Affected Transactions.

(c)      **Effect of Designation.**

(i)      If notice designating an Early Termination Date is given under Section 6(a) or 6(b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)      Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 9(h)(i) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date will be determined pursuant to Sections 6(e) and 9(h)(ii).

(d)    *Calculations; Payment Date.*

(i)    *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (I) showing, in reasonable detail, such calculations (including any quotations, market data or information from internal sources used in making such calculations), (2) specifying (except where there are two Affected Parties) any Early Termination Amount payable and (3) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation or market data obtained in determining a Close-out Amount, the records of the party obtaining such quotation or market data will be conclusive evidence of the existence and accuracy of such quotation or market data.

(ii)    *Payment Date.* An Early Termination Amount due in respect of any Early Termination Date will, together with any amount of interest payable pursuant to Section 9(h)(ii)(2), be payable (1) on the day on which notice of the amount payable is effective in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default and (2) on the day which is two Local Business Days after the day on which notice of the amount payable is effective (or, if there are two Affected Parties, after the day on which the statement provided pursuant to clause (i) above by the second party to provide such a statement is effective) in the case of an Early Termination Date which is designated as a result of a Termination Event.

(e)    *Payments on Early Termination.* If an Early Termination Date occurs, the amount, if any, payable in respect of that Early Termination Date (the "Early Termination Amount") will be determined pursuant to this Section 6(e) and will be subject to Section 6(f).

(i)    *Events of Default.* If the Early Termination Date results from an Event of Default, the Early Termination Amount will be an amount equal to (1) the sum of (A) the Termination Currency Equivalent of the Close-out Amount or Close-out Amounts (whether positive or negative) determined by the Non-defaulting Party for each Terminated Transaction or group of Terminated Transactions, as the case may be, and (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (2) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If the Early Termination Amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of the Early Termination Amount to the Defaulting Party.

(ii)    *Termination Events.* If the Early Termination Date results from a Termination Event:—

(1)    *One Affected Party.* Subject to clause (3) below, if there is one Affected Party, the Early Termination Amount will be determined in accordance with Section 6(e)(i), except that references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and to the Non-affected Party, respectively.

(2)    *Two Affected Parties.* Subject to clause (3) below, if there are two Affected Parties, each party will determine an amount equal to the Termination Currency Equivalent of the sum of the Close-out Amount or Close-out Amounts (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions, as the case may be, and the Early Termination Amount will be an amount equal to (A) the sum of (I) one-half of the difference between the higher amount so determined (by party "X") and the lower amount so determined (by party "Y") and (II) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to Y. If the Early Termination Amount is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of the Early Termination Amount to Y.

ISDA® 2002

(3)     *Mid-Market Events.* If that Termination Event is an Illegality or a Force Majeure Event, then the Early Termination Amount will be determined in accordance with clause (1) or (2) above, as appropriate, except that, for the purpose of determining a Close-out Amount or Close-out Amounts, the Determining Party will:—

(A)     if obtaining quotations from one or more third parties (or from any of the Determining Party's Affiliates), ask each third party or Affiliate (I) not to take account of the current creditworthiness of the Determining Party or any existing Credit Support Document and (II) to provide mid-market quotations; and

(B)     in any other case, use mid-market values without regard to the creditworthiness of the Determining Party.

(iii)     *Adjustment for Bankruptcy.* In circumstances where an Early Termination Date occurs because Automatic Early Termination applies in respect of a party, the Early Termination Amount will be subject to such adjustments as are appropriate and permitted by applicable law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)     *Adjustment for Illegality or Force Majeure Event.* The failure by a party or any Credit Support Provider of such party to pay, when due, any Early Termination Amount will not constitute an Event of Default under Section 5(a)(i) or 5(a)(iii)(1) if such failure is due to the occurrence of an event or circumstance which would, if it occurred with respect to payment, delivery or compliance related to a Transaction, constitute or give rise to an Illegality or a Force Majeure Event. Such amount will (1) accrue interest and otherwise be treated as an Unpaid Amount owing to the other party if subsequently an Early Termination Date results from an Event of Default, a Credit Event Upon Merger or an Additional Termination Event in respect of which all outstanding Transactions are Affected Transactions and (2) otherwise accrue interest in accordance with Section 9(h)(ii)(2).

(v)     *Pre-Estimate.* The parties agree that an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks, and, except as otherwise provided in this Agreement, neither party will be entitled to recover any additional damages as a consequence of the termination of the Terminated Transactions.

(f)     *Set-Off.* Any Early Termination Amount payable to one party (the "Payee") by the other party (the "Payer"), in circumstances where there is a Defaulting Party or where there is one Affected Party in the case where either a Credit Event Upon Merger has occurred or any other Termination Event in respect of which all outstanding Transactions are Affected Transactions has occurred, will, at the option of the Non-defaulting Party or the Non-affected Party, as the case may be ("X") (and without prior notice to the Defaulting Party or the Affected Party, as the case may be), be reduced by its set-off against any other amounts ("Other Amounts") payable by the Payee to the Payer (whether or not arising under this Agreement, matured or contingent and irrespective of the currency, place of payment or place of booking of the obligation). To the extent that any Other Amounts are so set off, those Other Amounts will be discharged promptly and in all respects. X will give notice to the other party of any set-off effected under this Section 6(f).

For this purpose, either the Early Termination Amount or the Other Amounts (or the relevant portion of such amounts) may be converted by X into the currency in which the other is denominated at the rate of exchange at which such party would be able, in good faith and using commercially reasonable procedures, to purchase the relevant amount of such currency.

14                                        **ISDA® 2002**

If an obligation is unascertained, X may in good faith estimate that obligation and set off in respect of the estimate, subject to the relevant party accounting to the other when the obligation is ascertained.

Nothing in this Section 6(f) will be effective to create a charge or other security interest. This Section 6(f) will be without prejudice and in addition to any right of set-off, offset, combination of accounts, lien, right of retention or withholding or similar right or requirement to which any party is at any time otherwise entitled or subject (whether by operation of law, contract or otherwise).

## 7.    Transfer

Subject to Section 6(b)(ii) and to the extent permitted by applicable law, neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:—

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any Early Termination Amount payable to it by a Defaulting Party, together with any amounts payable on or with respect to that interest and any other rights associated with that interest pursuant to Sections 8, 9(h) and 11.

Any purported transfer that is not in compliance with this Section 7 will be void.

## 8.    Contractual Currency

(a)    *Payment in the Contractual Currency.* Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in good faith and using commercially reasonable procedures in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments.* To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in clause (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purpose of such judgment or order and the rate of exchange at which such party is able, acting in good faith and using

commercially reasonable procedures in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party.

(c)      *Separate Indemnities.* To the extent permitted by applicable law, the indemnities in this Section 8 constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)      *Evidence of Loss.* For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

**9.      Miscellaneous**

(a)      *Entire Agreement.* This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter. Each of the parties acknowledges that in entering into this Agreement it has not relied on any oral or written representation, warranty or other assurance (except as provided for or referred to in this Agreement) and waives all rights and remedies which might otherwise be available to it in respect thereof, except that nothing in this Agreement will limit or exclude any liability of a party for fraud.

(b)      *Amendments.* An amendment, modification or waiver in respect of this Agreement will only be effective if in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system.

(c)      *Survival of Obligations.* Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)      *Remedies Cumulative.* Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)      *Counterparts and Confirmations.*

(i)       This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission and by electronic messaging system), each of which will be deemed an original.

(ii)      The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation will be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes, by an exchange of electronic messages on an electronic messaging system or by an exchange of e-mails, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex, electronic message or e-mail constitutes a Confirmation.

(f)      *No Waiver of Rights.* A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)      *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or or to be taken into consideration in interpreting this Agreement.

ISDA® 2002

(h)  **Interest and Compensation.**

(i)  **Prior to Early Termination.** Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction:—

(1)  **Interest on Defaulted Payments.** If a party defaults in the performance of any payment obligation, it will, to the extent permitted by applicable law and subject to Section 6(c), pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as the overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment (and excluding any period in respect of which interest or compensation in respect of the overdue amount is due pursuant to clause (3)(B) or (C) below), at the Default Rate.

(2)  **Compensation for Defaulted Deliveries.** If a party defaults in the performance of any obligation required to be settled by delivery, it will on demand (A) compensate the other party to the extent provided for in the relevant Confirmation or elsewhere in this Agreement and (B) unless otherwise provided in the relevant Confirmation or elsewhere in this Agreement, to the extent permitted by applicable law and subject to Section 6(c), pay to the other party interest (before as well as after judgment) on an amount equal to the fair market value of that which was required to be delivered in the same currency as that amount, for the period from (and including) the originally scheduled date for delivery to (but excluding) the date of actual delivery (and excluding any period in respect of which interest or compensation in respect of that amount is due pursuant to clause (4) below), at the Default Rate. The fair market value of any obligation referred to above will be determined as of the originally scheduled date for delivery, in good faith and using commercially reasonable procedures, by the party that was entitled to take delivery.

(3)  **Interest on Deferred Payments.** If:—

(A)  a party does not pay any amount that, but for Section 2(a)(iii), would have been payable, it will, to the extent permitted by applicable law and subject to Section 6(c) and clauses (B) and (C) below, pay interest (before as well as after judgment) on that amount to the other party on demand (after such amount becomes payable) in the same currency as that amount, for the period from (and including) the date the amount would, but for Section 2(a)(iii), have been payable to (but excluding) the date the amount actually becomes payable, at the Applicable Deferral Rate;

(B)  a payment is deferred pursuant to Section 5(d), the party which would otherwise have been required to make that payment will, to the extent permitted by applicable law, subject to Section 6(c) and for so long as no Event of Default or Potential Event of Default with respect to that party has occurred and is continuing, pay interest (before as well as after judgment) on the amount of the deferred payment to the other party on demand (after such amount becomes payable) in the same currency as the deferred payment, for the period from (and including) the date the amount would, but for Section 5(d), have been payable to (but excluding) the earlier of the date the payment is no longer deferred pursuant to Section 5(d) and the date during the deferral period upon which an Event of Default or Potential Event of Default with respect to that party occurs, at the Applicable Deferral Rate; or

(C)  a party fails to make any payment due to the occurrence of an Illegality or a Force Majeure Event (after giving effect to any deferral period contemplated by clause (B) above), it will, to the extent permitted by applicable law, subject to Section 6(c) and for so long as the event or circumstance giving rise to that Illegality or Force Majeure Event

Case 1:24-cv-01533-JPC    Document 20-1    Filed 03/20/24    Page 190 of 248

continues and no Event of Default or Potential Event of Default with respect to that party has occurred and is continuing, pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as the overdue amount, for the period from (and including) the date the party fails to make the payment due to the occurrence of the relevant Illegality or Force Majeure Event (or, if later, the date the payment is no longer deferred pursuant to Section 5(d)) to (but excluding) the earlier of the date the event or circumstance giving rise to that Illegality or Force Majeure Event ceases to exist and the date during the period upon which an Event of Default or Potential Event of Default with respect to that party occurs (and excluding any period in respect of which interest or compensation in respect of the overdue amount is due pursuant to clause (B) above), at the Applicable Deferral Rate.

(4)    *Compensation for Deferred Deliveries.* If:—

(A)    a party does not perform any obligation that, but for Section 2(a)(iii), would have been required to be settled by delivery;

(B)    a delivery is deferred pursuant to Section 5(d); or

(C)    a party fails to make a delivery due to the occurrence of an Illegality or a Force Majeure Event at a time when any applicable Waiting Period has expired,

the party required (or that would otherwise have been required) to make the delivery will, to the extent permitted by applicable law and subject to Section 6(c), compensate and pay interest to the other party on demand (after, in the case of clauses (A) and (B) above, such delivery is required) if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

(ii)    **Early Termination.** Upon the occurrence or effective designation of an Early Termination Date in respect of a Transaction:—

(1)    *Unpaid Amounts.* For the purpose of determining an Unpaid Amount in respect of the relevant Transaction, and to the extent permitted by applicable law, interest will accrue on the amount of any payment obligation or the amount equal to the fair market value of any obligation required to be settled by delivery included in such determination in the same currency as that amount, for the period from (and including) the date the relevant obligation was (or would have been but for Section 2(a)(iii) or 5(d)) required to have been performed to (but excluding) the relevant Early Termination Date, at the Applicable Close-out Rate.

(2)    *Interest on Early Termination Amounts.* If an Early Termination Amount is due in respect of such Early Termination Date, that amount will, to the extent permitted by applicable law, be paid together with interest (before as well as after judgment) on that amount in the Termination Currency, for the period from (and including) such Early Termination Date to (but excluding) the date the amount is paid, at the Applicable Close-out Rate.

(iii)    **Interest Calculation.** Any interest pursuant to this Section 9(h) will be calculated on the basis of daily compounding and the actual number of days elapsed.

## 10.   Offices; Multibranch Parties

(a)      If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to and agrees with the other party that, notwithstanding the place of booking or its jurisdiction of incorporation or organisation, its obligations are the same in terms of recourse against it as if it had entered into the Transaction through its head or home office, except that a party will not have recourse to the head or home office of the other party in respect of any payment or delivery deferred pursuant to Section 5(d) for so long as the payment or delivery is so deferred.  This representation and agreement will be deemed to be repeated by each party on each date on which the parties enter into a Transaction.

(b)      If a party is specified as a Multibranch Party in the Schedule, such party may, subject to clause (c) below, enter into a Transaction through, book a Transaction in and make and receive payments and deliveries with respect to a Transaction through any Office listed in respect of that party in the Schedule (but not any other Office unless otherwise agreed by the parties in writing).

(c)      The Office through which a party enters into a Transaction will be the Office specified for that party in the relevant Confirmation or as otherwise agreed by the parties in writing, and, if an Office for that party is not specified in the Confirmation or otherwise agreed by the parties in writing, its head or home office.  Unless the parties otherwise agree in writing, the Office through which a party enters into a Transaction will also be the Office in which it books the Transaction and the Office through which it makes and receives payments and deliveries with respect to the Transaction.  Subject to Section 6(b)(ii), neither party may change the Office in which it books the Transaction or the Office through which it makes and receives payments or deliveries with respect to a Transaction without the prior written consent of the other party.

## 11.   Expenses

A Defaulting Party will on demand indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, execution fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

## 12.   Notices

(a)      *Effectiveness.*  Any notice or other communication in respect of this Agreement may be given in any manner described below (except that a notice or other communication under Section 5 or 6 may not be given by electronic messaging system or e-mail) to the address or number or in accordance with the electronic messaging system or e-mail details provided (see the Schedule) and will be deemed effective as indicated:—

(i)      if in writing and delivered in person or by courier, on the date it is delivered;

(ii)     if sent by telex, on the date the recipient's answerback is received;

(iii)    if sent by facsimile transmission, on the date it is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)     if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date it is delivered or its delivery is attempted;

(v)      if sent by electronic messaging system, on the date it is received; or

ISDA® 2002

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 192 of 248

(vi)    if sent by e-mail, on the date it is delivered,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication will be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Details.* Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system or e-mail details at which notices or other communications are to be given to it.

## 13.    Governing Law and Jurisdiction

(a)    *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction.* With respect to any suit, action or proceedings relating to any dispute arising out of or in connection with this Agreement ("Proceedings"), each party irrevocably:—

(i)    submits:—

(1)    if this Agreement is expressed to be governed by English law, to (A) the non-exclusive jurisdiction of the English courts if the Proceedings do not involve a Convention Court and (B) the exclusive jurisdiction of the English courts if the Proceedings do involve a Convention Court; or

(2)    if this Agreement is expressed to be governed by the laws of the State of New York, to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City;

(ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party; and

(iii)    agrees, to the extent permitted by applicable law, that the bringing of Proceedings in any one or more jurisdictions will not preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Service of Process.* Each party irrevocably appoints the Process Agent, if any, specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12(a)(i), 12(a)(iii) or 12(a)(iv). Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by applicable law.

(d)    *Waiver of Immunities.* Each party irrevocably waives, to the extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction or order for specific performance or recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

14.    **Definitions**

As used in this Agreement:—

*"Additional Representation"* has the meaning specified in Section 3.

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Force Majeure Event, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event (which, in the case of an Illegality under Section 5(b)(i)(2) or a Force Majeure Event under Section 5(b)(ii)(2), means all Transactions unless the relevant Credit Support Document references only certain Transactions, in which case those Transactions and, if the relevant Credit Support Document constitutes a Confirmation for a Transaction, that Transaction) and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Agreement"* has the meaning specified in Section 1(c).

*"Applicable Close-out Rate"* means:—

(a)    in respect of the determination of an Unpaid Amount:—

    (i)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

    (ii)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate;

    (iii)    in respect of obligations deferred pursuant to Section 5(d), if there is no Defaulting Party and for so long as the deferral period continues, the Applicable Deferral Rate; and

    (iv)    in all other cases following the occurrence of a Termination Event (except where interest accrues pursuant to clause (iii) above), the Applicable Deferral Rate; and

(b)    in respect of an Early Termination Amount:—

    (i)    for the period from (and including) the relevant Early Termination Date to (but excluding) the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable:—

        (1)    if the Early Termination Amount is payable by a Defaulting Party, the Default Rate;

        (2)    if the Early Termination Amount is payable by a Non-defaulting Party, the Non-default Rate; and

        (3)    in all other cases, the Applicable Deferral Rate; and

(ii)    for the period from (and including) the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable to (but excluding) the date of actual payment:—

(1)    if a party fails to pay the Early Termination Amount due to the occurrence of an event or circumstance which would, if it occurred with respect to a payment or delivery under a Transaction, constitute or give rise to an Illegality or a Force Majeure Event, and for so long as the Early Termination Amount remains unpaid due to the continuing existence of such event or circumstance, the Applicable Deferral Rate;

(2)    if the Early Termination Amount is payable by a Defaulting Party (but excluding any period in respect of which clause (1) above applies), the Default Rate;

(3)    if the Early Termination Amount is payable by a Non-defaulting Party (but excluding any period in respect of which clause (1) above applies), the Non-default Rate; and

(4)    in all other cases, the Termination Rate.

**"Applicable Deferral Rate"** means:—

(a)    for the purpose of Section 9(h)(i)(3)(A), the rate certified by the relevant payer to be a rate offered to the payer by a major bank in a relevant interbank market for overnight deposits in the applicable currency, such bank to be selected in good faith by the payer for the purpose of obtaining a representative rate that will reasonably reflect conditions prevailing at the time in that relevant market;

(b)    for purposes of Section 9(h)(i)(3)(B) and clause (a)(iii) of the definition of Applicable Close-out Rate, the rate certified by the relevant payer to be a rate offered to prime banks by a major bank in a relevant interbank market for overnight deposits in the applicable currency, such bank to be selected in good faith by the payer after consultation with the other party, if practicable, for the purpose of obtaining a representative rate that will reasonably reflect conditions prevailing at the time in that relevant market; and

(c)    for purposes of Section 9(h)(i)(3)(C) and clauses (a)(iv), (b)(i)(3) and (b)(ii)(1) of the definition of Applicable Close-out Rate, a rate equal to the arithmetic mean of the rate determined pursuant to clause (a) above and a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount.

**"Automatic Early Termination"** has the meaning specified in Section 6(a).

**"Burdened Party"** has the meaning specified in Section 5(b)(iv).

**"Change in Tax Law"** means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs after the parties enter into the relevant Transaction.

**"Close-out Amount"** means, with respect to each Terminated Transaction or each group of Terminated Transactions and a Determining Party, the amount of the losses or costs of the Determining Party that are or would be incurred under then prevailing circumstances (expressed as a positive number) or gains of the Determining Party that are or would be realised under then prevailing circumstances (expressed as a negative number) in replacing, or in providing for the Determining Party the economic equivalent of, (a) the material terms of that Terminated Transaction or group of Terminated Transactions, including the payments and deliveries by the parties under Section 2(a)(i) in respect of that Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date (assuming satisfaction of the conditions precedent in

    **ISDA® 2002**

Section 2(a)(iii)) and (b) the option rights of the parties in respect of that Terminated Transaction or group of Terminated Transactions.

Any Close-out Amount will be determined by the Determining Party (or its agent), which will act in good faith and use commercially reasonable procedures in order to produce a commercially reasonable result. The Determining Party may determine a Close-out Amount for any group of Terminated Transactions or any individual Terminated Transaction but, in the aggregate, for not less than all Terminated Transactions. Each Close-out Amount will be determined as of the Early Termination Date or, if that would not be commercially reasonable, as of the date or dates following the Early Termination Date as would be commercially reasonable.

Unpaid Amounts in respect of a Terminated Transaction or group of Terminated Transactions and legal fees and out-of-pocket expenses referred to in Section 11 are to be excluded in all determinations of Close-out Amounts.

In determining a Close-out Amount, the Determining Party may consider any relevant information, including, without limitation, one or more of the following types of information:—

(i)       quotations (either firm or indicative) for replacement transactions supplied by one or more third parties that may take into account the creditworthiness of the Determining Party at the time the quotation is provided and the terms of any relevant documentation, including credit support documentation, between the Determining Party and the third party providing the quotation;

(ii)      information consisting of relevant market data in the relevant market supplied by one or more third parties including, without limitation, relevant rates, prices, yields, yield curves, volatilities, spreads, correlations or other relevant market data in the relevant market; or

(iii)     information of the types described in clause (i) or (ii) above from internal sources (including any of the Determining Party's Affiliates) if that information is of the same type used by the Determining Party in the regular course of its business for the valuation of similar transactions.

The Determining Party will consider, taking into account the standards and procedures described in this definition, quotations pursuant to clause (i) above or relevant market data pursuant to clause (ii) above unless the Determining Party reasonably believes in good faith that such quotations or relevant market data are not readily available or would produce a result that would not satisfy those standards. When considering information described in clause (i), (ii) or (iii) above, the Determining Party may include costs of funding, to the extent costs of funding are not and would not be a component of the other information being utilised. Third parties supplying quotations pursuant to clause (i) above or market data pursuant to clause (ii) above may include, without limitation, dealers in the relevant markets, end-users of the relevant product, information vendors, brokers and other sources of market information.

Without duplication of amounts calculated based on information described in clause (i), (ii) or (iii) above, or other relevant information, and when it is commercially reasonable to do so, the Determining Party may in addition consider in calculating a Close-out Amount any loss or cost incurred in connection with its terminating, liquidating or re-establishing any hedge related to a Terminated Transaction or group of Terminated Transactions (or any gain resulting from any of them).

Commercially reasonable procedures used in determining a Close-out Amount may include the following:—

(1)       application to relevant market data from third parties pursuant to clause (ii) above or information from internal sources pursuant to clause (iii) above of pricing or other valuation models that are, at the time of the determination of the Close-out Amount, used by the Determining Party in the regular course of its business in pricing or valuing transactions between the Determining Party and unrelated third parties that are similar to the Terminated Transaction or group of Terminated Transactions; and

ISDA® 2002

(2)      application of different valuation methods to Terminated Transactions or groups of Terminated Transactions depending on the type, complexity, size or number of the Terminated Transactions or group of Terminated Transactions.

*"Confirmation"* has the meaning specified in the preamble.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Contractual Currency"* has the meaning specified in Section 8(a).

*"Convention Court"* means any court which is bound to apply to the Proceedings either Article 17 of the 1968 Brussels Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters or Article 17 of the 1988 Lugano Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Cross-Default"* means the event specified in Section 5(a)(vi).

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Designated Event"* has the meaning specified in Section 5(b)(v).

*"Determining Party"* means the party determining a Close-out Amount.

*"Early Termination Amount"* has the meaning specified in Section 6(e).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"electronic messages"* does not include e-mails but does include documents expressed in markup languages, and *"electronic messaging system"* will be construed accordingly.

*"English law"* means the law of England and Wales, and *"English"* will be construed accordingly.

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Force Majeure Event"* has the meaning specified in Section 5(b).

*"General Business Day"* means a day on which commercial banks are open for general business (including dealings in foreign exchange and foreign currency deposits).

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority), and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means (a) in relation to any obligation under Section 2(a)(i), a General Business Day in the place or places specified in the relevant Confirmation and a day on which a relevant settlement system is open or operating as specified in the relevant Confirmation or, if a place or a settlement system is not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) for the purpose of determining when a Waiting Period expires, a General Business Day in the place where the event or circumstance that constitutes or gives rise to the Illegality or Force Majeure Event, as the case may be, occurs, (c) in relation to any other payment, a General Business Day in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment and, if that currency does not have a single recognised principal financial centre, a day on which the settlement system necessary to accomplish such payment is open, (d) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), a General Business Day (or a day that would have been a General Business Day but for the occurrence of an event or circumstance which would, if it occurred with respect to payment, delivery or compliance related to a Transaction, constitute or give rise to an Illegality or a Force Majeure Event) in the place specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (e) in relation to Section 5(a)(v)(2), a General Business Day in the relevant locations for performance with respect to such Specified Transaction.

*"Local Delivery Day"* means, for purposes of Sections 5(a)(i) and 5(d), a day on which settlement systems necessary to accomplish the relevant delivery are generally open for business so that the delivery is capable of being accomplished in accordance with customary market practice, in the place specified in the relevant Confirmation or, if not so specified, in a location as determined in accordance with customary market practice for the relevant delivery.

*"Master Agreement"* has the meaning specified in the preamble.

*"Merger Without Assumption"* means the event specified in Section 5(a)(viii).

*"Multiple Transaction Payment Netting"* has the meaning specified in Section 2(c).

*"Non-affected Party"* means, so long as there is only one Affected Party, the other party.

*"Non-default Rate"* means the rate certified by the Non-defaulting Party to be a rate offered to the Non-defaulting Party by a major bank in a relevant interbank market for overnight deposits in the applicable currency, such bank to be selected in good faith by the Non-defaulting Party for the purpose of obtaining a representative rate that will reasonably reflect conditions prevailing at the time in that relevant market.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Other Amounts"* has the meaning specified in Section 6(f).

ISDA® 2002

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 198 of 248

*"Payee"* has the meaning specified in Section 6(f).

*"Payer"* has the meaning specified in Section 6(f).

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Proceedings"* has the meaning specified in Section 13(b).

*"Process Agent"* has the meaning specified in the Schedule.

*"rate of exchange"* includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Schedule"* has the meaning specified in the preamble.

*"Scheduled Settlement Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Specified Entity"* has the meaning specified in the Schedule.

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect to any such transaction) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is not a Transaction under this Agreement but (i) which is a rate swap transaction, swap option, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option, credit protection transaction, credit swap, credit default swap, credit default option, total return swap, credit spread transaction, repurchase transaction, reverse repurchase transaction, buy/sell-back transaction, securities lending transaction, weather index transaction or forward purchase or sale of a security, commodity or other financial instrument or interest (including any option with respect to any of these transactions) or (ii) which is a type of transaction that is similar to any transaction referred to in clause (i) above that is currently, or in the future becomes, recurrently entered into in the financial markets (including terms and conditions incorporated by reference in such agreement) and which is a forward, swap, future, option or other derivative on one or more rates, currencies, commodities, equity securities or other equity instruments, debt securities or other debt instruments, economic indices or measures of economic risk or value, or other benchmarks against which payments or deliveries are to be made, (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Stamp Tax Jurisdiction"* has the meaning specified in Section 4(e).

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means, with respect to any Early Termination Date, (a) if resulting from an Illegality or a Force Majeure Event, all Affected Transactions specified in the notice given pursuant to Section 6(b)(iv), (b) if resulting from any other Termination Event, all Affected Transactions and (c) if resulting from an Event of Default, all Transactions in effect either immediately before the effectiveness of the notice designating that Early Termination Date or, if Automatic Early Termination applies, immediately before that Early Termination Date.

*"Termination Currency"* means (a) if a Termination Currency is specified in the Schedule and that currency is freely available, that currency, and (b) otherwise, euro if this Agreement is expressed to be governed by English law or United States Dollars if this Agreement is expressed to be governed by the laws of the State of New York.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Close-out Amount is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Force Majeure Event, a Tax Event, a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Threshold Amount"* means the amount, if any, specified as such in the Schedule.

*"Transaction"* has the meaning specified in the preamble.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii) or due but for Section 5(d)) to such party under Section 2(a)(i) or 2(d)(i)(4) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date, (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii) or 5(d)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market value of that which was (or would have been) required to be delivered and (c) if the Early Termination Date results from an Event of Default, a Credit Event Upon Merger or an Additional Termination Event in respect of which all outstanding Transactions are Affected Transactions, any Early Termination Amount due prior to such Early Termination Date and which remains unpaid as of such Early Termination Date, in each case together with any amount of interest accrued or other

**ISDA® 2002**

compensation in respect of that obligation or deferred obligation, as the case may be, pursuant to Section 9(h)(ii)(1) or (2), as appropriate. The fair market value of any obligation referred to in clause (b) above will be determined as of the originally scheduled date for delivery, in good faith and using commercially reasonable procedures, by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it will be the average of the Termination Currency Equivalents of the fair market values so determined by both parties.

*"Waiting Period"* means:—

(a)    in respect of an event or circumstance under Section 5(b)(i), other than in the case of Section 5(b)(i)(2) where the relevant payment, delivery or compliance is actually required on the relevant day (in which case no Waiting Period will apply), a period of three Local Business Days (or days that would have been Local Business Days but for the occurrence of that event or circumstance) following the occurrence of that event or circumstance; and

(b)    in respect of an event or circumstance under Section 5(b)(ii), other than in the case of Section 5(b)(ii)(2) where the relevant payment, delivery or compliance is actually required on the relevant day (in which case no Waiting Period will apply), a period of eight Local Business Days (or days that would have been Local Business Days but for the occurrence of that event or circumstance) following the occurrence of that event or circumstance.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

.......................................................................    .......................................................................
(Name of Party)    (Name of Party)

By: ...............................................................    By: ...............................................................

    Name:        Name:

    Title:        Title:

    Date:        Date:

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 201 of 248



International Swaps and Derivatives Association, Inc.

## SCHEDULE
## to the
## 2002 Master Agreement

dated as of .................................................................

between ...................................................... and ......................................................

("Party A")                                      ("Party B")

[*established as a [COUNTERPARTY TYPE]*]        [*established as a [COUNTERPARTY TYPE]*]

[*with company number [NUMBER]*]                [*with company number [NUMBER]*]

[*under the laws of [JURISDICTION]*]            [*under the laws of [JURISDICTION]*]

[*acting through its [BRANCH]*]*                [*acting through its [BRANCH]*]*

**Part 1.   Termination Provisions.**

(a)     ***"Specified Entity"*** means in relation to Party A for the purpose of:—

Section 5(a)(v), ...........................................................................................................

Section 5(a)(vi), ..........................................................................................................

Section 5(a)(vii), .........................................................................................................

Section 5(b)(v), ...........................................................................................................

and in relation to Party B for the purpose of:—

Section 5(a)(v), ...........................................................................................................

Section 5(a)(vi), ..........................................................................................................

Section 5(a)(vii), .........................................................................................................

Section 5(b)(v), ...........................................................................................................

---

\*      Include if applicable.

(b)  **"Specified Transaction"** [will have the meaning specified in Section 14 of this Agreement.][means .............

............................................................................................................................................................................

..........................................................................................................................................................................]*

(c)  The **"Cross-Default"** provisions of Section 5(a)(vi) [will][will not]* apply to Party A

[will][will not]* apply to Party B

[**"Specified Indebtedness"** [will have the meaning specified in Section 14 of this Agreement.][means ...........

..........................................................................................................................................................................]*

**"Threshold Amount"** means ...........................................................................................................................

....................................................................................................................................................................]**

(d)  The **"Credit Event Upon Merger"** provisions of Section 5(b)(v) [will][will not]* apply to Party A

[will][will not]* apply to Party B

(e)  The **"Automatic Early Termination"** provision of Section 6(a) [will][will not]* apply to Party A

[will][will not]* apply to Party B

(f)  **"Termination Currency"** [will have the meaning specified in Section 14 of this Agreement.][means ............

..........................................................................................................................................................................]*

(g)  **Additional Termination Event** [will][will not]* apply.  [The following will constitute an Additional

Termination Event:— ............................................................................................................................

............................................................................................................................................................................

............................................................................................................................................................................

............................................................................................................................................................................

For the purpose of the foregoing Termination Event, the Affected Party or Affected Parties will be:— ..........

..........................................................................................................................................................................]***

## Part 2.  **Tax Representations.**\*\*\*\*

(a)  **Payer Representations.** For the purpose of Section 3(e) of this Agreement[, Party A and Party B do not make any representations.][:—

[[(i)]  [Party A] [and] [Party B] [each] make[s] the following representation:—

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 9(h) of this Agreement) to

---

\*          Delete as applicable.

\*\*        Include if Cross-Default will apply to either Party A or Party B.

\*\*\*      Include if Additional Termination Event will apply.

\*\*\*\*    N.B : the following representations may need modification if either party is a Multibranch Party.

be made by it to the other party under this Agreement. In making this representation, it may rely on (i) the accuracy of any representations made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction of the agreement contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, except that it will not be a breach of this representation where reliance is placed on clause (ii) above and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.]*

[[(ii)]    [Party A] [and] [Party B] [each] make[s] the following representation[s]:— .....................................

...........................................................................................................................................................

...........................................................................................................................................................

........................................................................................................................................ ]]*

(b)    **Payee Representations.** For the purpose of Section 3(f) of this Agreement[, Party A and Party B do not make any representations.][:—

[[(i)]    [Party A] [and] [Party B] [each] make[s] the following representation:—

It is fully eligible for the benefits of the "Business Profits" or "Industrial and Commercial Profits" provision, as the case may be, the "Interest" provision or the "Other Income" provision, if any, of the Specified Treaty with respect to any payment described in such provisions and received or to be received by it in connection with this Agreement and no such payment is attributable to a trade or business carried on by it through a permanent establishment in the Specified Jurisdiction.

*"Specified Treaty"* means with respect to Party A ................................................................................

*"Specified Jurisdiction"* means with respect to Party A ........................................................................

*"Specified Treaty"* means with respect to Party B ................................................................................

*"Specified Jurisdiction"* means with respect to Party B .....................................................................]*

[[(ii)]    [Party A] [and] [Party B] [each] make[s] the following representation:—

Each payment received or to be received by it in connection with this Agreement will be effectively connected with its conduct of a trade or business in the Specified Jurisdiction.

*"Specified Jurisdiction"* means with respect to Party A ........................................................................

*"Specified Jurisdiction"* means with respect to Party B .....................................................................]*

[[(iii)]    [Party A] [and] [Party B] [each] make[s] the following representation:—

It is a "U.S. person" (as that term is used in section 1.1441-4(a)(3)(ii) of United States Treasury Regulations) for United States federal income tax purposes.]*

---

\*    Delete as applicable.

[[(iv)]    [Party A] [and] [Party B] [each] make[s] the following representation:—

It is a "non-U.S. branch of a foreign person" (as that term is used in section 1.1441-4(a)(3)(ii) of United States Treasury Regulations) for United States federal income tax purposes.]*

[[(v)]    [Party A] [and] [Party B] [each] make[s] the following representation:—

With respect to payments made to an address outside the United States or made by a transfer of funds to an account outside the United States, it is a "non-U.S. branch of a foreign person" (as that term is used in section 1.1441-4(a)(3)(ii) of United States Treasury Regulations) for United States federal income tax purposes.]*

[[(vi)]    [Party A] [and] [Party B] [each] make[s] the following representation:—

It is a "foreign person" (as that term is used in section 1.6041-4(a)(4) of United States Treasury Regulations) for United States federal income tax purposes.]*

[[(vii)]    [Party A] [and] [Party B] [each] make[s] the following representation[s]:—

..................................................................................................................................
..................................................................................................................................
.......................................................................................................................... ]]*

## Part 3.  Agreement to Deliver Documents.

For the purpose of Sections 4(a)(i) and 4(a)(ii) of this Agreement, each party agrees to deliver the following documents, as applicable:—

(a)    Tax forms, documents or certificates to be delivered are[: none][:—

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered |
|---|---|---|
| ............................... | ............................................. | ............................................. |
| ............................... | ............................................. | ............................................. |
| ............................... | ............................................. | ............................................. |
| ............................... | ............................................. | ............................................. |
| ............................... | ............................................. | ...........................................]* |

---

*        Delete as applicable

(b)    Other documents to be delivered are[: none][:—

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| ........................... | ........................................................ | .................................. | [Yes][No] |
| ........................... | ........................................................ | .................................. | [Yes][No] |
| ........................... | ........................................................ | .................................. | [Yes][No] |
| ........................... | ........................................................ | .................................. | [Yes][No] |
| ........................... | ........................................................ | .................................. | [Yes][No]]* |

### Part 4.  Miscellaneous.

(a)    *Addresses for Notices.*  For the purpose of Section 12(a) of this Agreement:—

Address for notices or communications to Party A:—

Address: ................................................................................................................................

Attention: ..............................................................................................................................

Telex No.: ................................................    Answerback: ..................................................

Facsimile No.: .........................................    Telephone No.: ...............................................

E-mail: ..................................................................................................................................

Electronic Messaging System Details: .................................................................................

Specific Instructions: ...........................................................................................................

Address for notices or communications to Party B:—

Address: ................................................................................................................................

Attention: ..............................................................................................................................

Telex No.: ................................................    Answerback: ..................................................

Facsimile No.: .........................................    Telephone No.: ...............................................

E-mail: ..................................................................................................................................

Electronic Messaging System Details: .................................................................................

Specific Instructions: ...........................................................................................................

---

*    Delete as applicable.

ISDA® 2002

(b)    *Process Agent.*  For the purpose of Section 13(c) of this Agreement:—

Party A appoints as its Process Agent: [not applicable][.................................................................]*

Party B appoints as its Process Agent: [not applicable][.................................................................]*

(c)    *Offices.*  The provisions of Section 10(a) [will][will not]* apply to this Agreement.

(d)    *Multibranch Party.*  For the purpose of Section 10(b) of this Agreement:—

Party A [is not a Multibranch Party.][is a Multibranch Party and may enter into a Transaction through any of the following Offices:—

........................................   ........................................   ........................................

........................................   ........................................   ...................................]*

Party B [is not a Multibranch Party.][is a Multibranch Party and may enter into a Transaction through any of the following Offices:—

........................................   ........................................   ........................................

........................................   ........................................   ...................................]*

[(e)    *Calculation Agent.*  The Calculation Agent is ..................................................................... , unless otherwise specified in a Confirmation in relation to the relevant Transaction.]**

[(f)    *Credit Support Document.*  Details of any Credit Support Document:— [none][............................................

..................................................................................................................................................................

..................................................................................................................................................................

................................................................................................................................................................]*

[(g)    *Credit Support Provider.*  Credit Support Provider means in relation to Party A, [none][ ...............................

..................................................................................................................................................................

................................................................................................................................................................]*

Credit Support Provider means in relation to Party B, [none][...........................................................................

..................................................................................................................................................................

................................................................................................................................................................]*

[(h)]    *Governing Law.*  This Agreement will be governed by and construed in accordance with [English law][the laws of the State of New York (without reference to choice of law doctrine)]*.

---

\*    Delete as applicable.

\*\*   Include if applicable.

                                               ISDA® 2002

Case 1:24-cv-01533-JPC  Document 20-1  Filed 03/20/24  Page 207 of 248

[(i)]  **_Netting of Payments._** "Multiple Transaction Payment Netting" [will not apply for the purpose of Section 2(c) of this Agreement.][will apply for the purpose of Section 2(c) of this Agreement to [all Transactions][the following Transactions or groups of Transactions:— ...................................................................

................................................................................................................................................................ ]

(in each case starting from [the date of this Agreement][ ........................................................................])]*

[(j)]  **_"Affiliate"_** [will have the meaning specified in Section 14 of this Agreement.][means ...................................

................................................................................................................................................................]*

[(k)]  **_Absence of Litigation._**  For the purpose of Section 3(c):—

**_"Specified Entity"_** means in relation to Party A. ................................................................................................

**_"Specified Entity"_** means in relation to Party B. ................................................................................................

[(l)]  **_No Agency._**  The provisions of Section 3(g) [will][will not]* apply to this Agreement.

[(m)]  **_Additional Representation_** [will][will not]* apply.  [For the purpose of Section 3 of this Agreement, the following will constitute an Additional Representation:—

[[(i)]  **_Relationship Between Parties._**  Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):—

[(1)]  _Non-Reliance._ It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary.  It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction, it being understood that information and explanations related to the terms and conditions of a Transaction will not be considered investment advice or a recommendation to enter into that Transaction.  No communication (written or oral) received from the other party will be deemed to be an assurance or guarantee as to the expected results of that Transaction.

[(2)]  _Assessment and Understanding._ It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction.  It is also capable of assuming, and assumes, the risks of that Transaction.

[(3)]  _Status of Parties._ The other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction.]]*

[[(n)]  **_Recording of Conversations._** Each party (i) consents to the recording of telephone conversations between the trading, marketing and other relevant personnel of the parties in connection with this Agreement or any potential Transaction, (ii) agrees to obtain any necessary consent of, and give any necessary notice of such recording to, its relevant personnel and (iii) agrees, to the extent permitted by applicable law, that recordings may be submitted in evidence in any Proceedings.]**

* Delete as applicable.
** Include if applicable.

ISDA® 2002

Part 5.  **Other Provisions.**

........................................................   ........................................................
(Name of Party)   (Name of Party)


By: ...............................................   By: ...............................................

    Name:       Name:

    Title:       Title:

    Date:       Date:

**ISDA® 2002**

Case 1:24-cv-01533-JPC    Document 20-1    Filed 03/20/24    Page 209 of 248

# Exhibit 2

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 210 of 248

(Bilateral Form)                    (ISDA Agreements Subject to New York Law Only)



International Swaps and Derivatives Association, Inc.

# CREDIT SUPPORT ANNEX

to the Schedule to the

...............................................................................

dated as of ..........................

between

..................................................... and ..................................................

("Party A")                                          ("Party B")

This Annex supplements, forms part of, and is subject to, the above-referenced Agreement, is part of its Schedule and is a Credit Support Document under this Agreement with respect to each party.

Accordingly, the parties agree as follows:—

**Paragraph 1.  Interpretation**

(a)    ***Definitions and Inconsistency.***    Capitalized terms not otherwise defined herein or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 12, and all references in this Annex to Paragraphs are to Paragraphs of this Annex. In the event of any inconsistency between this Annex and the other provisions of this Schedule, this Annex will prevail, and in the event of any inconsistency between Paragraph 13 and the other provisions of this Annex, Paragraph 13 will prevail.

(b)    ***Secured Party and Pledgor.***  All references in this Annex to the "Secured Party" will be to either party when acting in that capacity and all corresponding references to the "Pledgor" will be to the other party when acting in that capacity; *provided, however*, that if Other Posted Support is held by a party to this Annex, all references herein to that party as the Secured Party with respect to that Other Posted Support will be to that party as the beneficiary thereof and will not subject that support or that party as the beneficiary thereof to provisions of law generally relating to security interests and secured parties.

**Paragraph 2.  Security Interest**

Each party, as the Pledgor, hereby pledges to the other party, as the Secured Party, as security for its Obligations, and grants to the Secured Party a first priority continuing security interest in, lien on and right of Set-off against all Posted Collateral Transferred to or received by the Secured Party hereunder. Upon the Transfer by the Secured Party to the Pledgor of Posted Collateral, the security interest and lien granted hereunder on that Posted Collateral will be released immediately and, to the extent possible, without any further action by either party.

Copyright © 1994 by International Swaps and Derivatives Association, Inc.

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 211 of 248

**Paragraph 3.  Credit Support Obligations**

(a)  ***Delivery Amount.***  Subject to Paragraphs 4 and 5, upon a demand made by the Secured Party on or promptly following a Valuation Date, if the Delivery Amount for that Valuation Date equals or exceeds the Pledgor's Minimum Transfer Amount, then the Pledgor will Transfer to the Secured Party Eligible Credit Support having a Value as of the date of Transfer at least equal to the applicable Delivery Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the ***"Delivery Amount"*** applicable to the Pledgor for any Valuation Date will equal the amount by which:

(i) the Credit Support Amount

exceeds

(ii) the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party.

(b)  ***Return Amount.***  Subject to Paragraphs 4 and 5, upon a demand made by the Pledgor on or promptly following a Valuation Date, if the Return Amount for that Valuation Date equals or exceeds the Secured Party's Minimum Transfer Amount, then the Secured Party will Transfer to the Pledgor Posted Credit Support specified by the Pledgor in that demand having a Value as of the date of Transfer as close as practicable to the applicable Return Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the ***"Return Amount"*** applicable to the Secured Party for any Valuation Date will equal the amount by which:

(i) the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party

exceeds

(ii) the Credit Support Amount.

***"Credit Support Amount"***  means, unless otherwise specified in Paragraph 13, for any Valuation Date (i) the Secured Party's Exposure for that Valuation Date plus (ii) the aggregate of all Independent Amounts applicable to the Pledgor, if any, minus (iii) all Independent Amounts applicable to the Secured Party, if any, minus (iv) the Pledgor's Threshold; *provided, however*, that the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields a number less than zero.

**Paragraph 4.  Conditions Precedent, Transfer Timing, Calculations and Substitutions**

(a)  ***Conditions Precedent***.  Each Transfer obligation of the Pledgor under Paragraphs 3 and 5 and of the Secured Party under Paragraphs 3, 4(d)(ii), 5 and 6(d) is subject to the conditions precedent that:

(i) no Event of Default, Potential Event of Default or Specified Condition has occurred and is continuing with respect to the other party; and

(ii) no Early Termination Date for which any unsatisfied payment obligations exist has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the other party.

(b)  ***Transfer Timing.***  Subject to Paragraphs 4(a) and 5 and unless otherwise specified, if a demand for the Transfer of Eligible Credit Support or Posted Credit Support is made by the Notification Time, then the relevant Transfer will be made not later than the close of business on the next Local Business Day; if a demand is made after the Notification Time, then the relevant Transfer will be made not later than the close of business on the second Local Business Day thereafter.

(c)  ***Calculations.***  All calculations of Value and Exposure for purposes of Paragraphs 3 and 6(d) will be made by the Valuation Agent as of the Valuation Time. The Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) of its calculations not later than the Notification Time on the Local Business Day following the applicable Valuation Date (or in the case of Paragraph  6(d),  following the date of calculation).

ISDA®1994

**(d)** *Substitutions.*

(i) Unless otherwise specified in Paragraph 13, upon notice to the Secured Party specifying the items of Posted Credit Support to be exchanged, the Pledgor may, on any Local Business Day, Transfer to the Secured Party substitute Eligible Credit Support (the "Substitute Credit Support"); and

(ii) subject to Paragraph 4(a), the Secured Party will Transfer to the Pledgor the items of Posted Credit Support specified by the Pledgor in its notice not later than the Local Business Day following the date on which the Secured Party receives the Substitute Credit Support, unless otherwise specified in Paragraph 13 (the "Substitution Date"); *provided* that the Secured Party will only be obligated to Transfer Posted Credit Support with a Value as of the date of Transfer of that Posted Credit Support equal to the Value as of that date of the Substitute Credit Support.

**Paragraph 5. Dispute Resolution**

If a party (a "Disputing Party") disputes (I) the Valuation Agent's calculation of a Delivery Amount or a Return Amount or (II) the Value of any Transfer of Eligible Credit Support or Posted Credit Support, then (1) the Disputing Party will notify the other party and the Valuation Agent (if the Valuation Agent is not the other party) not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (2) subject to Paragraph 4(a), the appropriate party will Transfer the undisputed amount to the other party not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (3) the parties will consult with each other in an attempt to resolve the dispute and (4) if they fail to resolve the dispute by the Resolution Time, then:

(i) In the case of a dispute involving a Delivery Amount or Return Amount, unless otherwise specified in Paragraph 13, the Valuation Agent will recalculate the Exposure and the Value as of the Recalculation Date by:

(A) utilizing any calculations of Exposure for the Transactions (or Swap Transactions) that the parties have agreed are not in dispute;

(B) calculating the Exposure for the Transactions (or Swap Transactions) in dispute by seeking four actual quotations at mid-market from Reference Market-makers for purposes of calculating Market Quotation, and taking the arithmetic average of those obtained; *provided* that if four quotations are not available for a particular Transaction (or Swap Transaction), then fewer than four quotations may be used for that Transaction (or Swap Transaction); and if no quotations are available for a particular Transaction (or Swap Transaction), then the Valuation Agent's original calculations will be used for that Transaction (or Swap Transaction); and

(C) utilizing the procedures specified in Paragraph 13 for calculating the Value, if disputed, of Posted Credit Support.

(ii) In the case of a dispute involving the Value of any Transfer of Eligible Credit Support or Posted Credit Support, the Valuation Agent will recalculate the Value as of the date of Transfer pursuant to Paragraph 13.

Following a recalculation pursuant to this Paragraph, the Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) not later than the Notification Time on the Local Business Day following the Resolution Time. The appropriate party will, upon demand following that notice by the Valuation Agent or a resolution pursuant to (3) above and subject to Paragraphs 4(a) and 4(b), make the appropriate Transfer.

ISDA®1994

**Paragraph 6.  Holding and Using Posted Collateral**

(a)      *Care of Posted Collateral.* Without limiting the Secured Party's rights under Paragraph 6(c), the  Secured Party will exercise reasonable care to assure the safe custody of all Posted Collateral to the extent required by applicable law, and in any event the Secured Party will be deemed to have exercised reasonable care if it exercises at least the same degree of care as it would exercise with respect to its own property. Except as specified in the preceding sentence, the Secured Party will have no duty with respect to Posted Collateral, including, without limitation, any duty to collect any Distributions, or enforce or preserve any rights pertaining thereto.

(b)      *Eligibility to Hold Posted Collateral; Custodians.*

(i) *General.* Subject to the satisfaction of any conditions specified in Paragraph 13 for holding Posted Collateral, the Secured Party will be entitled to hold Posted Collateral or to appoint an agent (a "Custodian") to hold Posted Collateral for the Secured Party. Upon notice by the Secured Party to the Pledgor of the appointment of a Custodian, the Pledgor's obligations to make any Transfer will be discharged by making the Transfer to that Custodian. The holding of Posted Collateral by a  Custodian will be deemed to be the holding of that Posted Collateral by the Secured Party for which the Custodian is acting.

(ii) *Failure to Satisfy Conditions.* If the Secured Party or its Custodian fails to satisfy any conditions for holding Posted Collateral, then upon a demand made by the Pledgor, the Secured Party will, not later than five Local Business Days after the demand, Transfer or cause its Custodian to Transfer all Posted Collateral held by it to a Custodian that satisfies those conditions or to the Secured Party if it satisfies those conditions.

(iii) *Liability.* The Secured Party will be liable for the acts or omissions of its Custodian to the  same extent that the Secured Party would be liable hereunder for its own acts or omissions.

(c)      *Use of Posted Collateral.* Unless otherwise specified in Paragraph 13 and without limiting the rights and obligations of the parties under Paragraphs 3, 4(d)(ii), 5, 6(d) and 8, if the Secured Party is not a Defaulting Party or an Affected Party with respect to a Specified Condition and no Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then the Secured Party will, notwithstanding Section 9-207 of the New York Uniform Commercial Code, have the right to:

(i) sell, pledge, rehypothecate, assign, invest, use, commingle or otherwise dispose of, or otherwise use in its business any Posted Collateral it holds, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor; and

(ii) register any Posted Collateral in the name of the Secured Party, its Custodian or a nominee for either.

For purposes of the obligation to Transfer Eligible Credit Support or Posted Credit Support pursuant  to Paragraphs 3 and 5 and any rights or remedies authorized under this Agreement, the Secured Party will be deemed to continue to hold all Posted Collateral and to receive Distributions made thereon, regardless of whether the Secured Party has exercised any rights with respect to any Posted Collateral pursuant to (i) or (ii) above.

(d)      *Distributions and Interest Amount.*

(i) *Distributions.*   Subject to Paragraph 4(a), if the Secured Party receives or is deemed to  receive Distributions on a Local Business Day, it will Transfer to the Pledgor not later than the following Local Business Day any Distributions it receives or is deemed to receive to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose).

ISDA®1994

(ii) *Interest Amount.* Unless otherwise specified in Paragraph 13 and subject to Paragraph 4(a), in lieu of any interest, dividends or other amounts paid or deemed to have been paid with respect to Posted Collateral in the form of Cash (all of which may be retained by the Secured Party), the Secured Party will Transfer to the Pledgor at the times specified in Paragraph 13 the Interest Amount to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose). The Interest Amount or portion thereof not Transferred pursuant to this Paragraph will constitute Posted Collateral in the form of Cash and will be subject to the security interest granted under Paragraph 2.

**Paragraph 7. Events of Default**

For purposes of Section 5(a)(iii)(1) of this Agreement, an Event of Default will exist with respect to a party if:

(i) that party fails (or fails to cause its Custodian) to make, when due, any Transfer of Eligible Collateral, Posted Collateral or the Interest Amount, as applicable, required to be made by it and that failure continues for two Local Business Days after notice of that failure is given to that party;

(ii) that party fails to comply with any restriction or prohibition specified in this Annex with respect to any of the rights specified in Paragraph 6(c) and that failure continues for five Local Business Days after notice of that failure is given to that party; or

(iii) that party fails to comply with or perform any agreement or obligation other than those specified in Paragraphs 7(i) and 7(ii) and that failure continues for 30 days after notice of that failure is given to that party.

**Paragraph 8. Certain Rights and Remedies**

(a)      *Secured Party's Rights and Remedies.* If at any time (1) an Event of Default or Specified Condition with respect to the Pledgor has occurred and is continuing or (2) an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Pledgor, then, unless the Pledgor has paid in full all of its Obligations that are then due, the Secured Party may exercise one or more of the following rights and remedies:

(i) all rights and remedies available to a secured party under applicable law with respect to Posted Collateral held by the Secured Party;

(ii) any other rights and remedies available to the Secured Party under the terms of Other Posted Support, if any;

(iii) the right to Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(iv) the right to liquidate any Posted Collateral held by the Secured Party through one or more public or private sales or other dispositions with such notice, if any, as may be required under applicable law, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor (with the Secured Party having the right to purchase any or all of the Posted Collateral to be sold) and to apply the proceeds (or the Cash equivalent thereof) from the liquidation of the Posted Collateral to any amounts payable by the Pledgor with respect to any Obligations in that order as the Secured Party may elect.

Each party acknowledges and agrees that Posted Collateral in the form of securities may decline speedily in value and is of a type customarily sold on a recognized market, and, accordingly, the Pledgor is not entitled to prior notice of any sale of that Posted Collateral by the Secured Party, except any notice that is required under applicable law and cannot be waived.

ISDA®1994

(b)    *Pledgor's Rights and Remedies.* If at any time an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then (except in the case of an Early Termination Date relating to less than all Transactions (or Swap Transactions) where the Secured Party has paid in full all of its obligations that are then due under Section 6(e) of this Agreement):

(i) the Pledgor may exercise all rights and remedies available to a pledgor under applicable law with respect to Posted Collateral held by the Secured Party;

(ii) the Pledgor may exercise any other rights and remedies available to the Pledgor under the terms of Other Posted Support, if any;

(iii) the Secured Party will be obligated immediately to Transfer all Posted Collateral and the Interest Amount to the Pledgor; and

(iv) to the extent that Posted Collateral or the Interest Amount is not so Transferred pursuant to (iii) above, the Pledgor may:

(A) Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(B) to the extent that the Pledgor does not Set-off under (iv)(A) above, withhold payment of any remaining amounts payable by the Pledgor with respect to any Obligations, up to the Value of any remaining Posted Collateral held by the Secured Party, until that Posted Collateral is Transferred to the Pledgor.

(c)    *Deficiencies and Excess Proceeds.* The Secured Party will Transfer to the Pledgor any proceeds and Posted Credit Support remaining after liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b) after satisfaction in full of all amounts payable by the Pledgor with respect to any Obligations; the Pledgor in all events will remain liable for any amounts remaining unpaid after any liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b).

(d)    *Final Returns.* When no amounts are or thereafter may become payable by the Pledgor with respect to any Obligations (except for any potential liability under Section 2(d) of this Agreement), the Secured Party will Transfer to the Pledgor all Posted Credit Support and the Interest Amount, if any.

**Paragraph 9. Representations**

Each party represents to the other party (which representations will be deemed to be repeated as of each date on which it, as the Pledgor, Transfers Eligible Collateral) that:

(i) it has the power to grant a security interest in and lien on any Eligible Collateral it Transfers as the Pledgor and has taken all necessary actions to authorize the granting of that security interest and lien;

(ii) it is the sole owner of or otherwise has the right to Transfer all Eligible Collateral it Transfers to the Secured Party hereunder, free and clear of any security interest, lien, encumbrance or other restrictions other than the security interest and lien granted under Paragraph 2;

(iii) upon the Transfer of any Eligible Collateral to the Secured Party under the terms of this Annex, the Secured Party will have a valid and perfected first priority security interest therein (assuming that any central clearing corporation or any third-party financial intermediary or other entity not within the control of the Pledgor involved in the Transfer of that Eligible Collateral gives the notices and takes the action required of it under applicable law for perfection of that interest); and

(iv) the performance by it of its obligations under this Annex will not result in the creation of any security interest, lien or other encumbrance on any Posted Collateral other than the security interest and lien granted under Paragraph 2.

ISDA®1994

## Paragraph 10. Expenses

(a)    *General.* Except as otherwise provided in Paragraphs 10(b) and 10(c), each party will pay its own costs and expenses in connection with performing its obligations under this Annex and neither party will be liable for any costs and expenses incurred by the other party in connection herewith.

(b)    *Posted Credit Support.* The Pledgor will promptly pay when due all taxes, assessments or charges of any nature that are imposed with respect to Posted Credit Support held by the Secured Party upon becoming aware of the same, regardless of whether any portion of that Posted Credit Support is subsequently disposed of under Paragraph 6(c), except for those taxes, assessments and charges that result from the exercise of the Secured Party's rights under Paragraph 6(c).

(c)    *Liquidation/Application of Posted Credit Support.* All reasonable costs and expenses incurred by or on behalf of the Secured Party or the Pledgor in connection with the liquidation and/or application of any Posted Credit Support under Paragraph 8 will be payable, on demand and pursuant to the Expenses Section of this Agreement, by the Defaulting Party or, if there is no Defaulting Party, equally by the parties.

## Paragraph 11. Miscellaneous

(a)    *Default Interest.* A Secured Party that fails to make, when due, any Transfer of Posted Collateral or the Interest Amount will be obligated to pay the Pledgor (to the extent permitted under applicable law) an amount equal to interest at the Default Rate multiplied by the Value of the items of property that were required to be Transferred, from (and including) the date that Posted Collateral or Interest Amount was required to be Transferred to (but excluding) the date of Transfer of that Posted Collateral or Interest Amount. This interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(b)    *Further Assurances.* Promptly following a demand made by a party, the other party will execute, deliver, file and record any financing statement, specific assignment or other document and take any other action that may be necessary or desirable and reasonably requested by that party to create, preserve, perfect or validate any security interest or lien granted under Paragraph 2, to enable that party to exercise or enforce its rights under this Annex with respect to Posted Credit Support or an Interest Amount or to effect or document a release of a security interest in Posted Collateral or an Interest Amount.

(c)    *Further Protection.* The Pledgor will promptly give notice to the Secured Party of, and defend against, any suit, action, proceeding or lien that involves Posted Credit Support Transferred by the Pledgor or that could adversely affect the security interest and lien granted by it under Paragraph 2, unless that suit, action, proceeding or lien results from the exercise of the Secured Party's rights under Paragraph 6(c).

(d)    *Good Faith and Commercially Reasonable Manner.* Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner.

(e)    *Demands and Notices.* All demands and notices made by a party under this Annex will be made as specified in the Notices Section of this Agreement, except as otherwise provided in Paragraph 13.

(f)    *Specifications of Certain Matters.* Anything referred to in this Annex as being specified in Paragraph 13 also may be specified in one or more Confirmations or other documents and this Annex will be construed accordingly.

ISDA®1994

**Paragraph 12. Definitions**

As used in this Annex:—

*"Cash"* means the lawful currency of the United States of America.

"*Credit Support Amount"* has the meaning specified in Paragraph 3.

*"Custodian"* has the meaning specified in Paragraphs 6(b)(i) and 13.

*"Delivery Amount"* has the meaning specified in Paragraph 3(a).

*"Disputing Party"* has the meaning specified in Paragraph 5.

*"Distributions"* means with respect to Posted Collateral other than Cash, all principal, interest and other payments and distributions of cash or other property with respect thereto, regardless of whether the Secured Party has disposed of that Posted Collateral under Paragraph 6(c). Distributions will not include any item of property acquired by the Secured Party upon any disposition or liquidation of Posted Collateral or, with respect to any Posted Collateral in the form of Cash, any distributions on that collateral, unless otherwise specified herein.

*"Eligible Collateral"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"Eligible Credit Support"* means Eligible Collateral and Other Eligible Support.

*"Exposure"* means for any Valuation Date or other date for which Exposure is calculated and subject to Paragraph 5 in the case of a dispute, the amount, if any, that would be payable to a party that is the Secured Party by the other party (expressed as a positive number) or by a party that is the Secured Party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(2)(A) of this Agreement as if all Transactions (or Swap Transactions) were being terminated as of the relevant Valuation Time; *provided* that Market Quotation will be determined by the Valuation Agent using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation").

*"Independent Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Interest Amount"* means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Posted Collateral in the form of Cash held by the Secured Party on that day, determined by the Secured Party for each such day as follows:

> (x) the amount of that Cash on that day; multiplied by

> (y) the Interest Rate in effect for that day; divided by

> (z) 360.

*"Interest Period"* means the period from (and including) the last Local Business Day on which an Interest Amount was Transferred (or, if no Interest Amount has yet been Transferred, the Local Business Day on which Posted Collateral in the form of Cash was Transferred to or received by the Secured Party) to (but excluding) the Local Business Day on which the current Interest Amount is to be Transferred.

*"Interest Rate"* means the rate specified in Paragraph 13.

*"Local Business Day",* unless otherwise specified in Paragraph 13, has the meaning specified in the Definitions Section of this Agreement, except that references to a payment in clause (b) thereof will be deemed to include a Transfer under this Annex.

*"Minimum Transfer Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Notification Time"* has the meaning specified in Paragraph 13.

*"Obligations"* means, with respect to a party, all present and future obligations of that party under this Agreement and any additional obligations specified for that party in Paragraph 13.

*"Other Eligible Support"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"Other Posted Support"* means all Other Eligible Support Transferred to the Secured Party that remains in effect for the benefit of that Secured Party.

*"Pledgor"* means either party, when that party (i) receives a demand for or is required to Transfer Eligible Credit Support under Paragraph 3(a) or (ii) has Transferred Eligible Credit Support under Paragraph 3(a).

*"Posted Collateral"* means all Eligible Collateral, other property, Distributions, and all proceeds thereof that have been Transferred to or received by the Secured Party under this Annex and not Transferred to the Pledgor pursuant to Paragraph 3(b), 4(d)(ii) or 6(d)(i) or released by the Secured Party under Paragraph 8. Any Interest Amount or portion thereof not Transferred pursuant to Paragraph 6(d)(ii) will constitute Posted Collateral in the form of Cash.

*"Posted Credit Support"* means Posted Collateral and Other Posted Support.

*"Recalculation Date"* means the Valuation Date that gives rise to the dispute under Paragraph 5; *provided*, *however*, that if a subsequent Valuation Date occurs under Paragraph 3 prior to the resolution of the dispute, then the "Recalculation Date" means the most recent Valuation Date under Paragraph 3.

*"Resolution Time"* has the meaning specified in Paragraph 13.

*"Return Amount"* has the meaning specified in Paragraph 3(b).

*"Secured Party"* means either party, when that party (i) makes a demand for or is entitled to receive Eligible Credit Support under Paragraph 3(a) or (ii) holds or is deemed to hold Posted Credit Support.

*"Specified Condition"* means, with respect to a party, any event specified as such for that party in Paragraph 13.

*"Substitute Credit Support"* has the meaning specified in Paragraph 4(d)(i).

*"Substitution Date"* has the meaning specified in Paragraph 4(d)(ii).

*"Threshold"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Transfer"* means, with respect to any Eligible Credit Support, Posted Credit Support or Interest Amount, and in accordance with the instructions of the Secured Party, Pledgor or Custodian, as applicable:

(i) in the case of Cash, payment or delivery by wire transfer into one or more bank accounts specified by the recipient;

(ii) in the case of certificated securities that cannot be paid or delivered by book-entry, payment or delivery in appropriate physical form to the recipient or its account accompanied by any duly executed instruments of transfer, assignments in blank, transfer tax stamps and any other documents necessary to constitute a legally valid transfer to the recipient;

(iii) in the case of securities that can be paid or delivered by book-entry, the giving of written instructions to the relevant depository institution or other entity specified by the recipient, together with a written copy thereof to the recipient, sufficient if complied with to result in a legally effective transfer of the relevant interest to the recipient; and

(iv) in the case of Other Eligible Support or Other Posted Support, as specified in Paragraph 13.

ISDA®1994

***"Valuation Agent"*** has the meaning specified in Paragraph 13.

***"Valuation Date"*** means each date specified in or otherwise determined pursuant to Paragraph 13.

***"Valuation Percentage"*** means, for any item of Eligible Collateral, the percentage specified in Paragraph 13.

***"Valuation Time"*** has the meaning specified in Paragraph 13.

***"Value"*** means for any Valuation Date or other date for which Value is calculated and subject to Paragraph 5 in the case of a dispute, with respect to:

    (i) Eligible Collateral or Posted Collateral that is:

        (A) Cash, the amount thereof; and

        (B) a security, the bid price obtained by the Valuation Agent multiplied by the applicable Valuation Percentage, if any;

    (ii) Posted Collateral that consists of items that are not specified as Eligible Collateral, zero; and

    (iii) Other Eligible Support and Other Posted Support, as specified in Paragraph 13.

ISDA®1994

**Paragraph 13. Elections and Variables**

(a)      *Security Interest for "Obligations".* The term ***Obligations*** as used in this Annex includes the following additional obligations:

With respect to Party A:  ...............................................................................................................................

With respect to Party B:  ...............................................................................................................................

(b)      *Credit Support Obligations.*

(i) ***Delivery Amount, Return Amount and Credit Support Amount.***

(A) ***"Delivery Amount"***  has the meaning specified in Paragraph 3(a), unless otherwise specified here: ............................................................................................................................................

(B) ***"Return Amount"***  has the meaning specified in Paragraph 3(b), unless otherwise specified here: ............................................................................................................................................

(C) ***"Credit Support Amount"***  has the meaning specified in Paragraph 3, unless otherwise specified here: ............................................................................................................................................

(ii) *Eligible Collateral.* The following items will qualify as ***"Eligible Collateral"*** for the party specified:

| | | Party A | Party B | Valuation Percentage |
|---|---|---|---|---|
| (A) | Cash | [  ] | [  ] | [  ] % |
| (B) | negotiable debt obligations issued by the U.S. Treasury Department having an original maturity at issuance of not more than one year ("Treasury Bills") | [  ] | [  ] | [  ] % |
| (c) | negotiable debt obligations issued by the U.S. Treasury Department having an original maturity at issuance of more than one year but not more than 10 years ("Treasury Notes") | [  ] | [  ] | [  ] % |
| (D) | negotiable debt obligations issued by the U.S. Treasury Department having an original maturity at issuance of more than 10 years ("Treasury Bonds") | [  ] | [  ] | [  ] % |
| (E) | other:  ........................................................... | [  ] | [  ] | [  ] % |

(iii) *Other Eligible Support.* The following items will qualify as ***"Other Eligible Support"*** for the party specified:

| | | Party A | Party B |
|---|---|---|---|
| (A) | ........................................................................... | [  ] | [  ] |
| (B) | ........................................................................... | [  ] | [  ] |

ISDA®1994

(iv) *Thresholds.*

    (A)   *"Independent Amount"* means with respect to Party A: $ ............................................................

         *"Independent Amount"* means with respect to Party B: $ ............................................................

    (B)   *"Threshold"* means with respect to Party A: $ ......................................................................

         *"Threshold"* means with respect to Party B: $ ......................................................................

    (C)   *"Minimum Transfer Amount"* means with respect to Party A: $ .........................................

         *"Minimum Transfer Amount"* means with respect to Party B: $ .........................................

    (D)   **Rounding.** The Delivery Amount and the Return Amount will be rounded [down to the nearest integral multiple of $. . . . /up and down to the nearest integral multiple of $. . . ., respectively*].

(c)   *Valuation and Timing.*

(i) *"Valuation Agent"* means, for purposes of Paragraphs 3 and 5, the party making the demand under Paragraph 3, and, for purposes of Paragraph 6(d), the Secured Party receiving or deemed to receive the Distributions or the Interest Amount, as applicable, unless otherwise specified here: .........................................

(ii) *"Valuation Date"* means: ...................................................................................................................

(iii) *"Valuation Time"* means:

      [   ]     the close of business in the city of the Valuation Agent on the Valuation Date or date of calculation, as applicable;

      [   ]     the close of business on the Local Business Day before the Valuation Date or date of calculation, as applicable;

*provided* that the calculations of Value and Exposure will be made as of approximately the same time on the same date.

(iv) *"Notification Time"* means 1:00 p.m., New York time, on a Local Business Day, unless otherwise specified here: ...........................................................................................................................................

(d)   *Conditions Precedent and Secured Party's Rights and Remedies.* The following Termination Event(s) will be a *"Specified Condition"* for the party specified (that party being the Affected Party if the Termination Event occurs with respect to that party):

| | Party A | Party B |
|---|---|---|
| Illegality | [   ] | [   ] |
| Tax Event | [   ] | [   ] |
| Tax Event Upon Merger | [   ] | [   ] |
| Credit Event Upon Merger | [   ] | [   ] |
| Additional Termination Event(s):[1] | | |
| ............................................................ | [   ] | [   ] |
| ............................................................ | [   ] | [   ] |

---

\*   Delete as applicable.

[1]   If the parties elect to designate an Additional Termination Event as a "Specified Condition", then they should only designate one or more Additional Termination Events that are designated as such in their Schedule.

ISDA®1994

(e)  *Substitution.*

(i) *"Substitution Date"* has the meaning specified in Paragraph 4(d)(ii), unless otherwise specified here: .............................................................................................................................................................

(ii) *Consent.* If specified here as applicable, then the Pledgor must obtain the Secured Party's consent for any substitution pursuant to Paragraph 4(d): [applicable/inapplicable *][2]

(f)  *Dispute Resolution.*

(i) *"Resolution Time"* means 1:00 p.m., New York time, on the Local Business Day following the date on which the notice is given that gives rise to a dispute under Paragraph 5, unless otherwise specified here: .............................................................................................................................................................

(ii) *Value.* For the purpose of Paragraphs 5(i)(C) and 5(ii), the Value of Posted Credit Support will be calculated as follows: ...................................................................................................................................

(iii) *Alternative.* The provisions of Paragraph 5 will apply, unless an alternative dispute resolution procedure is specified here: ...................................................................................................................................

(g)  *Holding and Using Posted Collateral.*

(i) *Eligibility to Hold Posted Collateral; Custodians.* Party A and its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b); *provided* that the following conditions applicable to it are satisfied:

(1) Party A is not a Defaulting Party.

(2) Posted Collateral may be held only in the following jurisdictions: ................................................................

(3) ................................................................................................................................................................

Initially, the **Custodian** for Party A is  ................................................................................................................

Party B and its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b); *provided* that the following conditions applicable to it are satisfied:

(1) Party B is not a Defaulting Party.

(2) Posted Collateral may be held only in the following jurisdictions: ................................................................

(3) ................................................................................................................................................................

Initially, the **Custodian** for Party B is ................................................................................................................

(ii) *Use of Posted Collateral.* The provisions of Paragraph 6(c) will not apply to the [party/parties *] specified here:

[ ] Party A

[ ] Party B

and [that party/those parties *] will not be permitted to:  ...............................................................................

---

*  Delete as applicable.

[2]  Parties should consider selecting "applicable" where substitution without consent could give rise to a registration requirement to perfect properly the security interest in Posted Collateral (*e.g.,* where a party to the Annex is the New York branch of an English bank).

ISDA®1994

(h)     *Distributions and Interest Amount.*

    (i) *Interest Rate.* The *"Interest Rate"* will be:   .........................................................................

    (ii) *Transfer of Interest Amount.* The Transfer of the Interest Amount will be made on the last Local Business Day of each calendar month and on any Local Business Day that Posted Collateral in the form of Cash is Transferred to the Pledgor pursuant to  Paragraph 3 (b),  unless otherwise specified here: … ............................................................................................................................................................

    (iii) *Alternative to Interest Amount.* The provisions of Paragraph 6(d)(ii) will apply, unless otherwise specified here:  ...................................................................................................................

(i)     *Additional Representation(s).*

[Party A/Party B*] represents to the other party (which representation(s) will be deemed to be repeated as of each date on which it, as the Pledgor, Transfers Eligible Collateral) that:

    (i)  ...........................................................................................................................................

    (ii) ...........................................................................................................................................

(j)     *Other Eligible Support and Other Posted Support.*

    (i) *"Value"* with respect to Other Eligible Support and Other Posted Support means:.......................................

    (ii) *"Transfer"* with respect to Other Eligible Support and Other Posted Support means:................................

(k)     *Demands and Notices.*

All demands, specifications and notices under this Annex will be made pursuant to the Notices Section of this Agreement, unless otherwise specified here:

    Party A: ...................................................................................................................................

        ............................................................................................................................

    Party B: ...................................................................................................................................

        ............................................................................................................................

(l)     *Addresses for Transfers.*

    Party A: ...................................................................................................................................

        ............................................................................................................................

    Party B: ...................................................................................................................................

        ............................................................................................................................

(m)     *Other Provisions.*

---

\*     Delete as applicable.

Exhibit **3**

DocuSign Envelope ID: 8F4D79F7-8B2D-43B5-B13A-9DC823A1AD49



**Amended and Restated Master Confirmation Agreement for**
**Virtual Currency Put and Call Option Transactions**
**Dated as of 2020/06/22 (the "<u>Effective Date</u>")**
between
**GGC International Limited ("<u>Party A</u>") and**
**Roger Ver ("<u>Party B</u>")**

The parties wish to facilitate the process of entering into and confirming:

put and call option transactions in respect of Bitcoin ("**BTC**"), Ether ("**ETH**") and other Virtual Currency (defined below) having similar characteristics (each, a "**Virtual Currency Transaction**" and collectively, "**Virtual Currency**")

and accordingly agree as follows:

**1.    Application; Contractual Framework.**

(a)    This Master Confirmation Agreement for Virtual Currency Transactions ("**Master Confirmation**") shall apply to each Virtual Currency Transaction (each, a "**Transaction**") entered into between Party A and Party B on or after the Effective Date, unless the Addendum or a confirmation of a Virtual Currency Transaction specifies that this Master Confirmation does not apply.

(b)    As of the date hereof, Party A and Party B will be deemed to enter into (i) an ISDA master agreement in the form of the 2002 ISDA Master Agreement (Multicurrency – Cross Border) published by ISDA (the "**Form ISDA Master Agreement**") without any Schedule, except for the elections and modifications that are provided in Paragraph 7 of this Master Confirmation and (ii) an ISDA credit support agreement in the form of the 1994 ISDA Credit Support Annex (the "**Form ISDA CSA**") without any paragraph 13 thereof, except for the elections and modifications that are provided in Paragraph 8 of this Master Confirmation. In the event of any inconsistency between the provisions of the Form ISDA Master Agreement or the Form ISDA CSA and this Master Confirmation, this Master Confirmation will prevail for the purpose of any Transaction.

**2.    Definitions**.

(a)    The definitions and provisions contained in (i) the 2006 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. ("**ISDA**") (the "**2006 Definitions**") and (ii) the 1998 FX and Currency Option Definitions as published by ISDA, the Emerging Markets Trading Association and the Foreign Exchange Committee (the "**FX Definitions**" and, together with the 2006 Definitions, the "**Definitions**")) are incorporated by reference into this Master Confirmation except as expressly provided herein. In the event of any inconsistency between the Definitions and this Master Confirmation, this Master Confirmation will govern for the purposes of each Transaction. In the event of any inconsistency between the 2006 Definitions and the FX Definitions, the FX Definitions will govern for the purposes of each Transaction.

(b)    For the purpose of the FX Definitions, each Transaction constitutes either a Deliverable Transaction or Non-deliverable Transaction. For the purpose of the 2006 Definitions, each Transaction constitutes a Swap Transaction.

DocuSign Envelope ID: 8F4B7DEC-8F0F-4B29-AA3A-1DE8D4766BAA

# Genesis

(c)    Notwithstanding anything to the contrary in this Master Confirmation Agreement or any Transaction, Annex A of the FX Definitions, and any references to Annex A in Section 4.2 of the FX Definitions shall not be applicable to the Transaction, and the FX Definitions shall be read as if any reference to Annex A was removed from the FX Definitions.

**3.    Transaction Confirmation**: The parties shall confirm the Economic Terms (as defined in paragraph 4 below) of each **Virtual Currency Transaction** in a Confirmation (each such Confirmation, a "**Transaction Confirmation**"). Each Transaction Confirmation may be executed and delivered in counterparts (including by facsimile transmission), or an exchange of e-mails. Each Transaction Confirmation shall be deemed to incorporate and be subject to all of the terms of this Master Confirmation. This Master Confirmation, together with each Transaction Confirmation, constitutes a "Confirmation" for purposes of the Form ISDA Master Agreement. Each Transaction Confirmation shall be deemed to incorporate the general terms for all Transactions specified in paragraph 5 and the disruption fallbacks and adjustment conventions specified in paragraph 6.

**4.    Virtual Currency Transaction Economic Terms:**

| | |
|---|---|
| Trade Date: | As specified in the Transaction Confirmation. |
| Reference Currency: | For any transaction, BTC, ETH or another applicable Virtual Currency as specified in the Transaction Confirmation, each of which shall be deemed to be a "currency" for the purpose of the Definitions. |
| Currency Option Type: | Put or Call, as specified in the Transaction Confirmation. |
| Call Currency | Reference Currency specified in the Transaction Confirmation. |
| Call Currency Amount: | The amount of the Reference Currency (which may be a fractional amount) as specified in the Transaction Confirmation. |
| Strike Price: | The amount of USD per 1.00 whole unit of the Reference Currency as specified in the Transaction Confirmation. |
| Expiration Date: | As specified in the Transaction Confirmation. |
| Expiration Time: | As specified in the Transaction Confirmation. |
| Settlement Date: | As specified in the Transaction Confirmation. |
| Premium: | USD Amount as specified in the Transaction Confirmation. |
| Premium Payment Date: | Trade Date |
| Account Details: | As specified in the Transaction Confirmation. |

**5.    General Terms:**

| | |
|---|---|
| Transaction Type: | Currency Option, Call or Put as specified in the Transaction Confirmation |
| Settlement: | As specified in the Transaction Confirmation |

DocuSign Envelope ID: 8F4B55DE-8BB0-4E83-A03A-965E5D4CE76F

# Genesis

| | |
|---|---|
| Currency Option Style: | As specified in the Transaction Confirmation |
| Seller: | As specified in the Transaction Confirmation. |
| Buyer: | As specified in the Transaction Confirmation. |
| Settlement Currency: | USD |
| Settlement Rate: | Means the exchange rate stated on the Fixing Reference expressed as the USD amount per 1.00 of the Reference Currency on any Valuation Date. |
| Fixing Reference: | As specified in the Transaction Confirmation. |
| Calculation Agent Determination of Settlement Rate: | Applicable |
| Business Day: | Any day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in New York. |
| Business Day Convention: | Following |
| Calculation Agent: | Party A |

## 6.    Disruption Events and Fallbacks:

| | |
|---|---|
| Event Currency: | The Virtual Currency specified in the Transaction Confirmation |
| Non-Event Currency: | USD |
| Disruption Event(s): | |
| (a) General Inconvertibility: | Applicable. |
| Disruption Fallback: | No-Fault Termination |
| (b) General Non-Transferability: | Applicable. |
| Disruption Fallback: | No-Fault Termination |
| (c) Calculation Agent Determination of Disruption Event: | Applicable |
| Disruption Fallback(s): | |
| | Where settlement is Deliverable (as specified in the Transaction Confirmation, the following provision regarding Fallback Reference Price shall apply: |
| (a) Fallback Reference Price: | The Calculation Agent will determine the |

Reference: **Error! Reference source not found.** Roger Ver
GGC INTERNATIONAL LIMITED

3 / 15

DocuSign Envelope ID: 87185D4E-8BFD-4B98-83AC-88470CE0A3E6

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 228 of 248

# Genesis

Settlement Rate for the Transaction on the relevant Exercise Date (or, if different, the day on which rates for that Exercise Date would, in the ordinary course, be published or announced) pursuant to the first of the alternate pricing sources or methodologies specified below that is not subject to Price Source Disruption:

First,

   (a) In the case of BTC, the Bloomberg Crypto Fixings (CFIX) available under Bloomberg Ticker: XBT CFIX Currency.
   (b) In the case of ETH, the Bloomberg Crypto Fixings (CFIX) available under Bloomberg Ticker: XET CFIX Currency.
   (c) In the case of another Virtual Currency, if not available on Bloomberg CFIX, a commonly utilized alternate pricing source, as specified in the Transaction Confirmation.

Second,

   (a) In the case of BTC, Tradeblock XBX Index rate;
   (b) In the case of ETH, Tradeblock ETX Index rate;
   (c) In the case of another Virtual Currency, a commonly utilized alternate pricing source that is not subject to Price Source Disruption.

Third, the Calculation Agent Adjustment of the Settlement Rate if no Adjustment Event has occurred or is continuing, or the Modified Calculation Adjustment of the Settlement Rate if an Adjustment Event has occurred and is continuing and Party A has elected to apply Modified Calculation Agent Adjustment as described below under "Adjustment Events."

Calculation Agent Adjustment Means that the Calculation Agent shall determine the Settlement Rate by taking into consideration all available information that in good faith it deems relevant.

Modified Calculation Agent Adjustment

Means that the Calculation Agent shall in its sole discretion either:

(1)     make such adjustment to the exercise, settlement, payment or any other terms of the Transaction as the Calculation Agent determines

DocuSign Envelope ID: 6F3D4EF8-B8DD-4F64-83A6-6951AE6D8A27

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 229 of 248

# Genesis

|  | appropriate to account for the economic effect on the Transaction of any Adjustment Event (including adjustments to account for changes in volatility, expected dividends or other distributions, or liquidity relevant to the Reference Currency or to the Transaction), and determine the effective date of that adjustment; or |
|---|---|
|  | (2)    if the Calculation Agent determines that no adjustment that it could make under the previous clause (1) will produce a commercially reasonable result, the relevant Transaction shall terminate, in which case "Cancellation and Payment" will be deemed to apply. |
| Cancellation and Payment | Means the Transaction will be cancelled as of the effective date of the Adjustment Event (as determined by the Calculation Agent) and any payment to be made by one party to the other shall be the Calculation Agent Adjustment Amount. |
| Adjustment Events: | Upon the occurrence of a Potential Adjustment Event that has a 5% or greater effect on the theoretical value of (a) one unit of the Reference Currency or (b) the Transaction any time during the 14 calendar day period immediately following the occurrence of such Potential Adjustment Event (an "**Adjustment Event**"), Party A may in its sole discretion elect Modified Calculation Agent Adjustment. For purposes of determining whether an Adjustment Event has occurred, the theoretical value of one whole unit of the Reference Currency, as applicable, at any time during the 14 calendar day period immediately following the occurrence of a Potential Adjustment Event shall be compared to the value of one whole unit of the Reference Currency, as applicable, as of the point in time immediately prior to the occurrence of such Potential Adjustment Event, with reference to the Settlement Rate at such time. |
| Potential Adjustment Event: | "Potential Adjustment Event" means any of the following: |
|  | (1)    a subdivision, consolidation or reclassification of the Reference Currency, or any similar action in respect of the underlying protocol of the Reference Currency. |
|  | (2)    a free distribution (including but not limited to an "airdrop") or dividend of the Reference |

Reference: **Error! Reference source not found.** Roger Ver
GGC INTERNATIONAL LIMITED

5 / 15

DocuSign Envelope ID: 6F4B3FF8-86BD-418E-83A4-3E80D6B9C81B

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 230 of 248

# Genesis

Currency, any other Virtual Currency, cash, or any other asset to existing holders of such Virtual Currency by way of bonus;

(3)   a change in the operating rules of the underlying protocol of the Reference Currency (i.e., a "fork"), capitalization or otherwise;

(4)   a swap, migration, conversion or exchange of the Reference Currency into or for another asset (which, for the avoidance of doubt, does not include the Reference Currency);

(5)   the imposition of, change in or removal of an excise, sales, use, value-added, transfer, stamp, documentary, recording or similar tax on, or measured by reference to, the Reference Currency or any Virtual Currency into which or for which it may be exchanged (other than a tax on, or measured by reference to overall gross or net income) by any government or taxation authority after the Trade Date, if the direct effect of such imposition, change or removal is to raise or lower the Settlement Rate on the Settlement Date from what it would have been without that imposition, change or removal;

(6)   A generalized regulatory enforcement initiative by one or more government authorities on Virtual Currency exchanges, miners or others focused on price manipulation, criminal activity and like activity or effects; or

(7)   Any other event that has a diluting or concentrative effect on the theoretical value of (a) one unit of the Reference Currency or (b) the Transaction.

| | |
|---|---|
| Virtual Currency | Any type of digital unit (including the Reference Currency) that is used as a medium of exchange or a form of digitally stored value, including but not limited to digital units of exchange that (A) have a centralized repository or administrator, (B) are decentralized and have no centralized repository or administrator, and/or (C) may be created or obtained by computing or manufacturing effort. |

[Section 7 appears on next page]

FILED: NEW YORK COUNTY CLERK 08/21/2023 06:47 PM
DocuSign Envelope ID: 6F480A74-8BC8-49E8-A7BA-B84EA7CDDDB4
NYSCEF DOC. NO. 44

Case 1:24-cv-01533-JPC    Document 20-1    Filed 03/20/24    Page 231 of 248

INDEX NO. 650439/2023
RECEIVED NYSCEF: 08/21/2023

# Genesis

### 7.  Form ISDA Master Agreement:

(a) This Master Confirmation shall supplement, form part of, and be subject to the Form ISDA Master Agreement, as deemed entered into as of the date hereof in accordance with Paragraph 1 (b). All provisions contained in or incorporated by reference in that Form ISDA Master Agreement will govern this Master Confirmation except as expressly modified below. Unless the parties subsequently choose to execute and deliver a Form ISDA Master Agreement with specific modifications, this Master Confirmation, together with all other documents referring to the Form ISDA Master Agreement confirming the Reference Currency Transactions entered into between the parties (notwithstanding anything to the contrary in a Transaction Confirmation), shall supplement, form a part of, and be subject to, an agreement in the form of the Form ISDA Master Agreement in accordance with Paragraph 1 (b), except for the following elections.

  i.  <u>Governing Law</u>: New York.

  ii.  <u>Termination Currency</u>: U.S. Dollars.

  iii.  <u>Multiple Transaction Payment Netting</u>: Applicable.

  iv.  <u>Specified Entities of Party B</u>: All Affiliates.

  v.  <u>Process Agent</u>. For the purposes of Section 13(c) of the Form ISDA Master Agreement, Party A appoints as its Process Agent: Genesis Global Trading, Inc. and Party B appoints as its Process Agent itself.

  vi.  <u>Offices</u>:  Party A is not a multibranch party and acts from its office in New York.   Party B is not a multibranch party and acts from its office in Saint Kitts and Nevis.

  vii.  <u>Credit Support Document</u>:   The deemed credit support annex as described in paragraph 8 Margin.

  viii.  <u>Payee Tax representations of Party B</u>: Party B represents that it is a foreign person (as that term is used in section 1.604-4(a) of the U.S. Treasury Regulations) for U.S. federal income tax purposes and "exempt" within the meaning of sections 1.6041-3(p) and 1.6049-4(c) of the U.S. Treasury Regulations from information reporting on U.S. Internal Revenue Service Form 1099 and backup withholding.

  ix.  <u>Documents to be Delivered by Party B prior to the first Transaction</u>:

    1.  Identification as per onboarding process.

    2.  IRS Form  W-8ECI (or any successor thereto) in duplicate, including appropriate attachments, that eliminates U.S. federal withholding tax and backup withholding tax on payments under this Agreement.

(b)     For purposes of "Withholding Tax imposed on payments to non-US counterparties under the United States Foreign Account Tax Compliance Act, or FATCA:

    (i)    "Indemnifiable Tax" as defined in Section 14 of the Form ISDA Master Agreement shall not include any U.S. federal withholding tax imposed or collected pursuant to Sections 1471 through 1474 of the U.S. Internal Revenue Code of 1986, as amended (the "Code"), any current

Reference: **Error! Reference source not found.** Roger Ver
GGC INTERNATIONAL LIMITED

7 / 15

# Genesis

or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b) of the Code, or any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of such Sections of the Code (a "**FATCA Withholding Tax**"),

(ii)    for the avoidance of doubt, a FATCA Withholding Tax is a Tax the deduction or withholding of which is required by applicable law for the purposes of Section 2(d) of the Form ISDA Master Agreement, and

(iii)    if the parties each independently decide to adhere to any ISDA Protocol on FATCA Withholding Tax, upon effective adherence by both parties, the provisions of such Protocol shall supersede the foregoing provision) on the Trade Date of the first such Transaction between us. Additionally, the parties agree that the definitions and provisions contained in the Attachment to the 2010 Short Form HIRE Act Protocol published by ISDA on November 30, 2010 are incorporated into and apply to this Agreement as if set forth in full herein. The definition of "Indemnifiable Tax" shall not include any Dividend Equivalent Tax.

(c)    For the avoidance of doubt, any Transaction entered into prior to the execution of the Form ISDA Master Agreement and this Master Confirmation shall be subject to the terms of such ISDA Form and Master Confirmation as though such Transaction had been entered into after the parties had executed such ISDA Form and Master Confirmation between them.

## 8.  Margin; Form ISDA CSA

(a)    This Master Confirmation shall supplement, form part of, and be subject to the Form ISDA CSA, as deemed entered into as of the date hereof in accordance with Paragraph 1 (b).  All provisions contained in or incorporated by reference in that Form ISDA CSA will govern this Master Confirmation except as expressly modified below.  Unless the parties subsequently choose to execute and deliver a Form ISDA CSA with specific modifications, this Master Confirmation shall constitute a credit support agreement, and together with all other documents referring to the Form ISDA Master Agreement and the Form ISDA CSA confirming Transactions entered into between the parties (notwithstanding anything to the contrary in a Transaction Confirmation), shall supplement, form a part of, and be subject to, an agreement in the form of the Form ISDA CSA in accordance with Paragraph 1 (b), with the following Paragraph 13 elections:

(1)    Eligible Collateral:

    a.    Party A: Not applicable

    b.    Party B:

        i.    USD Cash; valuation percentage 100%;

        ii.    Reference Currency; valuation percentage 100% at Spot Rate.

        iii.    Additional categories of Eligible Collateral as set forth in the related Transaction Confirmation.

(2)    Independent Amount:

    a.    Party A: None;

Reference: **Error! Reference source not found.** Roger Ver
GGC INTERNATIONAL LIMITED

8 / 15

DocuSign Envelope ID: ... Case 1:24-cv-01533-JPC    Document 20-1    Filed 03/20/24    Page 233 of 248

# Genesis

        b.    Party B: As set forth in the related Transaction Confirmation

(3)   <u>Threshold</u>:

        a.    Party A: Infinity

        b.    Party B: As set forth in the related Transaction Confirmation

(4)   <u>Minimum Transfer Amount</u>

        a.  As set forth in the related Transaction Confirmation

(5)   <u>Rounding</u>:  The Delivery Amount and the Return Amount shall be rounded down to the nearest integral multiple of USD100.

(6)   <u>Conditions Precedent and Secured Party's Rights and Remedies</u>:  The Termination Event for Illegality will be a «Specified Condition» for Party B, which will be the Affected Party.

(7)   <u>Holding and Using Posted Collateral</u>.  Party A and its Custodian shall be entitled to hold Posted Collateral pursuant to Paragraph 6 of the Form ISDA CSA.

**9.  Relationship Between the Parties**

    a.    <u>No Reliance, etc</u>. Each party represents that (i) it is entering into the Transaction evidenced hereby as principal (and not as agent or in any other capacity); (ii) neither the other party nor any of its agents are acting as a fiduciary for it; (iii) it is not relying upon any representations except those expressly set forth in the Agreement or this Confirmation; (iv) it has not relied on the other party for any legal, regulatory, tax, business, investment, financial, and accounting advice, and it has made its own investment, hedging, and trading decisions based upon its own judgment and upon any view expressed by the other party or any of its agents; and (v) it is entering into each Transaction with a full understanding of the terms, conditions and risks thereof and it is capable of and willing to assume those risks.

    b.    <u>No Regulated Swaps Entity</u>. Each party represents that (i) it is not provisionally registered with the United States Commodity Futures Trading Commission (the "**CFTC**") as a swap dealer or major swap participant (each as defined in the United States Commodity Exchange Act ("**CEA**") and rules promulgated thereunder) and is not a U.S. Person pursuant to applicable CFTC guidance (each, a "**DF Swap Entity**"), (ii) it is not guaranteed by a DF Swap Entity, (iii) it is not a financial counterparty for purposes of Regulation (EU) No 648/2012 on OTC derivatives, central counterparties and trade repositories ("EMIR") and (iv) it has negotiated the Transaction exclusively from the offices described in paragraph 7 above.

    c.    <u>Eligible Contract Participant</u>.  Each party represents that it is an "eligible contract participant" as defined in the CEA and rules and other guidance of the CFTC promulgated thereunder.

    d.    <u>No Retail Commodity Transaction</u>.  Party B represents that no Transaction is a "retail commodity transaction" as defined in Section 2(c)(2)(D) of the CEA.

    e.    <u>Dodd-Frank Reporting</u>. Party A will act as the "reporting counterparty" as required by Parts 43, 45 and 46 of Title 17, Chapter 1 of the CFTC's regulations for all Transactions under this Agreement. Party B appoints Party A to perform the reporting obligations on its behalf and Party A accepts that appointment.

    f.    <u>Securities Law Matters</u>: To the extent the Virtual Currency applicable to a Virtual Currency Transaction is considered to be a security as defined in the Securities Act of

DocuSign Envelope ID: 6F3D73F3-81F0-4813-A4BB-681A19CBFEBD

# Genesis

1933, Party B represents that the amount of Virtual Currency that is subject to a Transaction is not subject to any restrictions on transfer under the Securities Act and SEC regulations and interpretations thereunder.

g.   <u>USA PATRIOT Act Notice</u>. Party A hereby notifies Party B that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Act**"), it is required to obtain, verify and record information that identifies Party B, which information includes the name and address of Party B and other information that will allow Party A to identify Party B in accordance with the Act.

h.   <u>Selected Risks of Virtual Currency Options</u>. PARTY B ACKNOWLEDGED THAT THE RISK OF LOSS IN TRADING VIRTUAL CURRENCIES SUCH AS BTC OR ETH CAN BE SUBSTANTIAL AND, THEREFORE, PARTY B HAS CAREFULLY CONSIDERED WHETHER SUCH TRADING IS APPROPRIATE FOR IT IN LIGHT OF ITS CIRCUMSTANCES AND FINANCIAL RESOURCES. IT IS AWARE OF THE FOLLOWING RISKS OF VIRTUAL CURRENCY TRADING:

i.    The volatility and unpredictability of the price of Virtual Currency relative to fiat currency may result in significant loss over a short period of time. Certain virtual currencies have experienced daily price volatility of more than 20%. This could result in an Adjustment Event under a Transaction.

ii.   The risk of losing one's entire investment increases as a Call Option goes out of the money and as expiration nears.

iii.  The Reference Currency is not legal tender, is not backed by the government, and accounts and value balances are not subject to Federal Deposit Insurance Corporation or Securities Investor Protection Corporation protections.

iv.   Legislative and regulatory changes or actions at the state, federal, or international level may adversely affect the use, transfer, exchange, and value of Virtual Currency including the Reference Currency.

v.    Transactions in the Reference Currency or other Virtual Currency may be irreversible, and, accordingly, losses due to fraudulent or accidental transactions may not be recoverable.

vi.   Some Virtual Currency transactions shall be deemed to be made when recorded on a public ledger, which is not necessarily the date or time that the customer initiates the transaction.

vii.  The value of the Reference Currency or other Virtual Currency may be derived from the continued willingness of market participants to exchange fiat currency or other Virtual Currency for it, which may result in the potential for permanent and total loss of value of a particular Virtual Currency (such as the Reference Currency) should the market for that Virtual Currency disappear.

viii. There is no assurance that a person who accepts a Virtual Currency as payment on any Trade Date or Exercise Date will continue to do so in the future.

ix.   The nature of Virtual Currency may lead to an increased risk of fraud or cyber-attack. A cybersecurity event could result in a substantial, immediate and irreversible loss for market participants that trade virtual currencies. Even a minor cybersecurity event in a Virtual

DocuSign Envelope ID: 8F4EE49-8B1F-4B46-8343-8D31E5C7FEA0

# Genesis

Currency is likely to result in downward price pressure on that product and potentially other Virtual Currencies.

x.   The ability to participate in forks could also have implications. For example, one could experience losses if one hold Virtual Currency position through an exchange that does not participate in a fork that creates a new product.

xi.   PARTY A AND ITS CUSTODIAN MAY BE SUBJECT TO ALL OF THESE RISKS WITH RESPECT TO VIRTUAL CURRENCY HELD AS COLLATERAL FOR ANY TRANSACTION.

xii.   VIRTUAL CURRENCY SPOT MARKETS ARE NOT REGULATED BY THE COMMODITY FUTURES TRADING COMMISSION. One should consult an attorney, accountant and/or financial advisor and sufficiently understand the Virtual Currency markets and risks and carefully consider whether Virtual Currency is appropriate for one in light of their own financial circumstances.

i.   <u>Entire Agreement</u>. This Agreement, including all annexes and appendices hereto, embodies the entire agreement and understanding of the parties hereto in respect of the transactions contem¬plated by this Agreement and supersedes all prior master confirmation agreements, contracts, representations, warranties, promises, covenants, arrangements, communications, and understandings, oral or written, express or implied, between or among the parties with respect to the subject matter hereof, including, without limitation, the two master confirmation agreements dated as of June 15, 2020 between the parties for Bitcoin Cash Put Transactions and Bitcoin Cash Call Transactions, respectively, each of which agreements shall be deemed null and void, and of no further force or effect whatsoever following the date hereof.

[Signatures appear on next page]

Reference: **Error! Reference source not found.** Roger Ver
GGC INTERNATIONAL LIMITED

11 / 15

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 236 of 248

# Genesis

In witness whereof, Party A and Party B have executed this Master Confirmation as of the date first written above.

**Party A**

**GGC International Limited**

By:_____
    Name:  Michael Moro
    Title:   CEO

**Party B**

By:_____
    Roger Ver

DocuSign Envelope ID: 6F4BCF2E-8F1E-4F17-8E03-325C8D1AC6BA
Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 237 of 248

# Genesis

**Annex 1**

**Form of Transaction Confirmation**

**Transaction Confirmation for Virtual Currency
Option Transactions
Dated as of YYYY/MM/DD (the "Trade Date")
between
GGC International Limited ("Party A") and
Roger Ver ("Party B")
under the Amended & Restated Master Confirmation between the parties
dated as of 2020/06/22 (the "Effective Date")**

**Transaction Terms:**

| | |
|---|---|
| Buyer: | [Party A/Party B] |
| Seller: | [Party A/Party B] |
| Currency Option Style: | [European/American/Bermuda] |
| Currency Option Type: | [Put/Call] |
| Settlement: | [Deliverable/Non-deliverable] |
| Reference Currency | [BTC] [ETH] [other] |
| [Put/Call] Currency | Reference Currency |
| [Put/Call] Currency Amount: | [■] Units of the Reference Currency |
| Strike Price: | USD [___] per 1.00 Unit of the Reference Currency |
| Expiration Date: | [__ ___ 202_] |
| Expiration Time: | [4:00 AM/PM (local time in New York, New York)] |
| Settlement Date: | Expiration Date |
| Premium: | USD [_____] |
| Premium Payment Date: | Trade Date |
| Fixing Reference: | [_____] |
| **Disruption Fallbacks** | |
| [Fallback Reference Price | |
| Settlement Rate[1]: | The Bloomberg Crypto Fixings (CFIX) applicable to the Event Currency.] |

---

[1] Include only for non-BTC/ETH trades

Reference: **Error! Reference source not found.** Roger Ver
GGC INTERNATIONAL LIMITED

13 / 15

DocuSign Envelope ID: 87CB27E-E8F6-45B2-A6E6-53A1CBEFB38
Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 238 of 248

# Genesis

| | |
|---|---|
| Event Currency: | [Reference Currency] |

### A.  Margin

| | |
|---|---|
| Party B Independent Amount | [USD 0] |
| Party B Threshold | [USD 0] |
| [Notes on posting of margin, if any] | [      ] |
| Minimum Transfer Amount | USD [100,000] |
| [Eligible Collateral Add'l Cat. | Reference Currency] |

### B.  Account Details:

| | |
|---|---|
| Party A: | As per trade execution |
| Party B: | As per onboarding information |

[Signatures appear on next page]

DocuSign Envelope ID: 83-4EB7E-8B1D-4F50-83AC-EE5D1DC8BEBA
Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 239 of 248

# Genesis

In witness whereof, Party A and Party B have executed this Transaction Confirmation as of the Trade Date first written above.

**Party A**

**Genesis Global Capital International Ltd.**

By: _Michael Moro_____
  705B2FE45937490...

Name: Michael Moro

Title: CEO

**Party B**

By: _Roger Ver_____
  18A112E39A55427...

Name: Roger Ver

# Exhibit 4

DocuSign Envelope ID: 6FB5B28B-AF79-419B-B655-02E73DDE403F

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 241 of 248



**Virtual Currency Option Transaction Confirmation**
**dated as of March 22, 2022 ("Trade Date")**
**between GGC International Limited ("Party A")**
**and Roger Ver ("Party B")**
**under the Amended & Restated Master Confirmation Agreement dated June 22, 2020**

### Transaction Terms

| | |
|---|---|
| Buyer: | Party A |
| Seller: | Party B |
| Currency Option Style: | European |
| Currency Option Type: | Put |
| Settlement: | Deliverable |
| Reference Currency: | Bitcoin Cash (BCH) |
| Put Currency: | Reference Currency |
| Put Currency Amount: | 70,000 Units of the Reference Currency |
| Strike Price: | USD 545 per 1.00 Unit of the Reference Currency |
| Expiration Date: | December 30, 2022 |
| Expiration Time: | 21:00:00 UTC |
| Settlement Date: | Expiration Date |
| Premium: | USD 13,463,100 |
| Premium Payment Date: | Trade Date |
| Fixing Reference: | Tradeblock BCX Index Rate |
| **Disruption Fallbacks** | |
| Fallback Reference Price | |
| Settlement Rate: | XBN CFIX Currency |
| Event Currency: | Reference Currency |
| **Margin** | |
| Party B Independent Amount: | 11,445,000 USDC |
| Party B Variation Margin: | USD 0 |
| Minimum Transfer Amount: | USD 100,000 |
| **Account Details** | |
| Party A: | As per trade execution |
| Party B: | As per onboarding information |

FILED: NEW YORK COUNTY CLERK 08/21/2023 06:47 PM
INDEX NO. 650439/2023
NYSCEF DOC. NO. 44
RECEIVED NYSCEF: 08/21/2023

# Genesis

In witness whereof, Party A and Party B have executed this Transaction Confirmation as of the Trade Date first written above.

**Party A**

**GGC International Limited**

By: _Andrew Sullivan_
    F42F6116E20F498...
    Name: Andrew Sullivan
    Title: Authorized Signatory

**Party B**

_Roger Ver_
18A112E39A55427...
Roger Ver

# Exhibit **5**

FILED: NEW YORK COUNTY CLERK 08/21/2023 06:47 PM
NYSCEF DOC. NO. 44
DocuSign Envelope ID: A46F93A-732F-4F13-88Be-5A64BF2A79CD



## Genesis

**Virtual Currency Option Transaction Confirmation**
**dated as of June 10, 2022 ("Trade Date")**
**between GGC International Limited ("Party A")**
**and Roger Ver ("Party B")**
**under the Amended & Restated Master Confirmation Agreement dated June 22, 2020**

### Transaction Terms

| | |
|---|---|
| Buyer: | Party A |
| Seller: | Party B |
| Currency Option Style: | European |
| Currency Option Type: | Put |
| Settlement: | Deliverable |
| Reference Currency: | Ether (ETH) |
| Put Currency: | Reference Currency |
| Put Currency Amount: | 10,000 Units of the Reference Currency |
| Strike Price: | USD 5,000 per 1.00 Unit of the Reference Currency |
| Expiration Date: | December 30, 2022 |
| Expiration Time: | 08:00:00 UTC |
| Settlement Date: | Expiration Date |
| Premium: | USD 32,570,000.0 |
| Premium Payment Date: | Trade Date |
| Fixing Reference: | Coinbase: ETH/USD |

**Disruption Fallbacks**

| | |
|---|---|
| Event Currency: | Reference Currency |

**Margin**

| | |
|---|---|
| Party B Independent Amount: | USD 15,000,000.00 |
| Party B Variation Margin: | USD 0 |

**Account Details**

| | |
|---|---|
| Party A: | As per trade execution |
| Party B: | As per onboarding information |

Case 1:24-cv-01533-JPC   Document 20-1   Filed 03/20/24   Page 245 of 248

# Genesis

In witness whereof, Party A and Party B have executed this Transaction Confirmation as of the Trade Date first written above.

**Party A**

**GGC International Limited**

By: _Andrew Sullivan_
    F42F6115E20F498...
    Name: Andrew Sullivan
    Title: Authorized Signatory

**Party B**

_Roger Ver_
18A112E39A55427...
Roger Ver

# Exhibit **6**



**Virtual Currency Option Transaction Confirmation**
dated as of June 11, 2022 ("Trade Date")
between GGC International Limited ("Party A")
and Roger Ver ("Party B")
under the Amended & Restated Master Confirmation Agreement dated June 22, 2020

### Transaction Terms

| | |
|---|---|
| Buyer: | Party A |
| Seller: | Party B |
| Currency Option Style: | European |
| Currency Option Type: | Put |
| Settlement: | Deliverable |
| Reference Currency: | Bitcoin ("BTC") |
| Put Currency: | Reference Currency |
| Put Currency Amount: | 500 Units of the Reference Currency |
| Strike Price: | USD 26,000 per 1.00 Unit of the Reference Currency |
| Expiration Date: | December 30, 2022 |
| Expiration Time: | 08:00:00 UTC |
| Settlement Date: | Expiration Date |
| Premium: | USD 1,987,500.00 |
| Premium Payment Date: | Trade Date |
| Fixing Reference: | Coinbase: ETH/USD |

**Disruption Fallbacks**

| | |
|---|---|
| Event Currency: | Reference Currency |

**Margin**

| | |
|---|---|
| Party B Independent Amount: | USD 3,900,000.00 |
| Party B Threshold: | USD 0 |
| Minimum Transfer Amount: | USD 100,000 |

**Account Details**

| | |
|---|---|
| Party A: | As per trade execution |
| Party B: | As per onboarding information |

DocuSign Envelope ID: D7E47E4A-EF9A-4F0F-A5AF-C4F49A6D7D2B
Case 1:24-cv-01533-JPC Document 20-1 Filed 03/20/24 Page 248 of 248

# Genesis

In witness whereof, Party A and Party B have executed this Transaction Confirmation as of the Trade Date first written above.

**Party A**

**GGC International Limited**

By: _____
   Name: Andrew Sullivan
   Title: Authorized Signatory

**Party B**

_____
Roger Ver