UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
                                :

GGC INTERNATIONAL LIMITED,           :

                      Plaintiff,       :

                                  :

         -v-                    :        24 Civ. 1533 (JPC)

                                  :

ROGER VER,                        :

                                  :

                    Defendant.     :

                                  :        <u>OPINION AND ORDER</u>
---------------------------------------------------------------X
                                  :

ROGER VER,                        :

                                  :

                    Counterclaim-Plaintiff,   :

                                  :

         -v-                    :

                                  :

GGC INTERNATIONAL LIMITED,           :

                                  :

                    Counterclaim-Defendant. :

---------------------------------------------------------------X
                                  :

ROGER VER,                        :

                                  :

                    Third-Party Plaintiff,    :

                                  :

         -v-                    :

                                  :

BARRY SILBERT, *et al.*,             :

                                  :

                    Third-Party Defendants.  :

                                  :

---------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

       Third-Party Plaintiff Roger Ver ("Ver") brings claims for fraud against Third-Party

Defendants Barry Silbert ("Silbert"), Digital Currency Group, Inc. ("DCG," and together with

Silbert, the "DCG Defendants"), and Michael Moro ("Moro").  Ver alleges that Silbert, DCG, and Moro intentionally misrepresented the financial condition of several interrelated cryptocurrency trading companies, including Plaintiff and Counterclaim-Defendant GGC International Limited ("GGCI"), leading Ver to remain invested in GGCI's derivatives products.  Moro and the DCG Defendants both move to dismiss Ver's Third-Party Complaint under Federal Rules of Civil Procedure 8, 9(b), and 12(b)(6).  For the following reasons, the motions are granted.

## I. Background[1]

### A.    Facts

#### 1.  DCG and the Genesis Entities

DCG owns and operates various cryptocurrency businesses.  TP Compl. ¶ 31.  As alleged, "[d]uring the Relevant Period,"[2] DCG "controlled the . . . key hiring decisions, business strategy, and budget" of a group of affiliated businesses known as the "Genesis Entities."  *Id.* ¶ 33. Although the Third-Party Complaint does not clearly allege which businesses are the "Genesis Entities," that term appears to refer to Genesis Global Holdco ("Genesis Holdco"), Genesis Global Capital ("Genesis Global"), and GGCI.  *See id.* ¶ 5.  The Third-Party Complaint contains the following organizational chart of the Genesis Entities, as well as other affiliated businesses, *id.* at 8:

---

[1] The following facts, which are assumed true for purposes of this Opinion and Order, are taken from the Third-Party Complaint, Dkt. 1-17 ("TP Compl.").  *See Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 141 (2d Cir. 2011) (explaining that on a motion to dismiss pursuant to Rule 12(b)(6), the court must "assum[e] all facts alleged within the four corners of the complaint to be true, and draw[] all reasonable inferences in plaintiff's favor").

[2] The Third-Party Complaint does not define the term "Relevant Period," but the Court assumes that this term refers to June 2022 and July 2022, which is when the alleged misrepresentations are said to have occurred.  *See* TP Compl. ¶¶ 2, 6-7.



DCG marketed the Genesis Entities collectively as a premier institutional cryptocurrency and financial services company. *Id.* ¶ 32. DCG also marketed Genesis Global, which is the "direct parent of GGCI," as its leading lending desk with billions of dollars in cryptocurrency loan originations. *Id.* GGCI "was formed simply to conduct the same operations as Genesis Global, focusing instead on international clients." *Id.* ¶ 34.

The Genesis Entities "operated as a single entity during the Relevant Period," sharing officers, capital, offices, IT infrastructure, and back-office functions. *Id.* ¶ 23. DCG and the Genesis Entities shared IT infrastructure and DCG had direct access to the Genesis Entities' books and records. *Id.* ¶ 33. Silbert was the CEO, founder, and beneficial owner of DCG during the Relevant Period, *id.* ¶ 17, while Moro "served as the CEO or its functional equivalent of the Genesis Entities, as well as their non-party affiliates, from at least February 2, 2021, through August 17, 2022," *id.* ¶ 18. In particular, Moro was the CEO of both GGCI and Genesis Global,

and was the signatory for GGCI on a number of documents.  *Id.* ¶ 35.  The Third-Party Complaint alleges that although GGCI is a British Virgin Islands company, its principal place of business is in New York City, it has "no real offshore presence," and is operated from New York "with little or no separation between itself, Genesis Global, Genesis Holdco, and DCG."  *Id.* ¶¶ 16, 37.

### 2.  GGCI Begins Trading with Ver

On June 10, 2020, GGCI approached Ver, "a well-known Bitcoin Cash ('BCH') proponent, to trade BCH-based over-the-counter derivatives."  *Id.* ¶ 38.  While Ver was hesitant to entrust GGCI with significant assets, GGCI proposed that Ver lend his BCH at interest while simultaneously using the same assets as collateral for derivative contracts with GGCI.  *Id.* ¶¶ 40-41.  This arrangement induced Ver to trade derivatives with GGCI.  *Id.* ¶ 42.

On June 15, 2020, Ver and GGCI executed a Master Loan Agreement ("MLA"), with Moro signing the agreement on behalf of GGCI.  *Id.* ¶ 43.  On June 22, 2020, Ver and GGCI executed a Master Confirmation Agreement ("MCA") to govern their derivative contracts, which agreement Moro also signed on behalf of GGCI.  *Id.* ¶ 44.  The MCA was later amended on July 13, 2020.  *Id.*  The MCA referenced form agreements from the International Swaps and Derivatives Association ("ISDA"), which aimed to protect parties in over-the-counter derivatives transactions against potential issues, like insolvency or misrepresentation.  *Id.* ¶¶ 45-48.

To mitigate counterparty risk in derivatives transactions, one of the ISDA agreements required the parties to maintain solvency at all times.  *Id.* ¶ 54.  This solvency requirement ensured that Ver could collect from GGCI if his derivative positions were successful, while GGCI could collect from Ver and foreclose on collateral if needed.  *Id.* ¶ 55.  Although the MCA contained strict collateral requirements for Ver, GGCI did not enforce them and instead allowed Ver and other customers to maintain undercollateralized positions.  *Id.* ¶¶ 50-52, 59-68.  This exposed

GGCI to additional risk of becoming insolvent during periods of market illiquidity and stress. *Id.* ¶ 71.

### 3. 2022 Market Instability

GGCI would routinely loan out its digital assets to other Genesis entities, including an affiliated company named Genesis Asia Pacific Limited Pte ("GAP"). *Id.* ¶¶ 24, 72. GAP, in turn, loaned those digital assets out, including to Three Arrows Capital Limited ("3AC"), a Singapore-based investment firm that specialized in trading and investing in cryptocurrencies and other digital assets. *Id.* ¶¶ 26, 72. In May 2022, digital markets suffered "a steep decline due to the collapse of digital assets LUNA and TerraUSD, causing significant losses, liquidations, and a snowball effect of defaults and insolvencies." *Id.* ¶ 102. "3AC was central to the crash," *id.* ¶ 103, and in June 2022 defaulted on more than $2.3 billion to GAP, *id.* ¶¶ 2, 73, 103. This "caus[ed] losses to GGCI as related party loans became impaired." *Id.* ¶¶ 73, 109. As alleged, if GGCI was not already insolvent,[3] it now "was insolvent as a result of 3AC's inability to repay GAP before the end of May 2022." *Id.* ¶ 110.

In early June 2022, GGCI "devised a plan to strengthen its balance sheet." *Id.* ¶ 121. This plan was to "persuade its biggest clients, including Ver, to roll currently profitable options expiring that June to later dates, thereby allowing GGCI to avoid making payments," while simultaneously "allow[ing] Ver's currently unprofitable June options to expire, thereby bringing funds into

---

[3] The Third-Party Complaint contains additional allegations that GGCI became insolvent in 2021 as a result of overexposure to illiquid digital assets called FTT tokens, the value of which was overinflated by FTX International Limited ("FTX") and Alameda Research LLC ("Alameda"). *See* TP Compl. ¶¶ 27-28, 87-101. Because the alleged misrepresentations made by Moro and the DCG Defendants relate only to the 2022 market instability and Ver's derivative claims are based on those same 2022 events, the Court will not further discuss these additional allegations from 2021.

GGCI." *Id.* ¶ 121.  On June 7 and June 11, GGCI asked Ver "to roll his deep in-the-money Ethereum options to a later date," and Ver ultimately agreed. *Id.* ¶¶ 123, 126.

Around this time, unnamed Genesis executives had GAP issue a margin call to 3AC, demanding additional collateral payments, aware that 3AC would not be able to meet the requirement.  *Id.* ¶¶ 111, 113, 126.  GAP then served a notice of default on 3AC on June 13, enabling GAP to liquidate the limited collateral it held and pursue emergency relief through arbitration to "seize further 3AC assets ahead of other creditors." *Id.* ¶ 114.

As digital asset prices continued to fall, GGCI requested Ver post additional collateral on June 13 and June 14.  *Id.* ¶ 128.  Ver bought $22.5 million in Bitcoin call options to reduce his exposure to GGCI.  *Id.*  On June 14, "Silbert, on behalf of DCG's board, instructed Moro and Genesis 'to continue aggressively shrinking the loan book and, until such time as we have the right controls, risk monitoring, etc. in place—and we're through the winter—. . . to limit the extension of any new loans to counterparties.'" *Id.* ¶ 129.  Silbert also reported to DCG's board on the 3AC default, suggesting that DCG not supply Genesis Global with additional capital to strengthen its balance sheet. *Id.* ¶ 130.

On June 15, 2022, the Genesis Entities sent the following tweet (the "Genesis June 15 Tweet") from their shared Twitter account, which Silbert and DCG both re-tweeted, *id.* ¶¶ 131-32:



**Genesis** @GenesisTrading · Jun 15, 2022
Despite continued heightened market volatility, the Genesis balance sheet is strong and our business is operating normally. Our lending business continues to meet client demand. Our trading business remains an essential liquidity provider in the spot and derivatives markets.

    💬 19        🔁 38        ♡ 232        📊        ⬆️

Two days later, on June 17, 2022, Moro tweeted the following two tweets (the "Moro June Tweets"), *id.* ¶ 134:



Ver alleges that "DCG's COO reviewed and edited these tweets before Moro posted them," and "strategiz[ed] the release of the tweets." *Id.* ¶ 135.

From June 16 to June 24, GGCI "continued discussions with Ver about the additional types of collateral he could offer," and indicated it would accept Ver's preferred approach of posting a combination of digital asset and certain shares in private companies. *Id.* ¶ 137. But "upon the expiration of Ver's out-of-the-money options on June 24," Genesis executives demanded Ver immediately provide 100% of the collateral in either US dollars or "Reference Currency," meaning the underlying digital asset being traded in the derivative contract, valued based on its mark-to-market value, or else Ver would face a notice of default. *Id.* ¶¶ 49-50, 139. Ver alleges that GGCI "knew Ver was not expecting to be required to pay the full sum of collateral in US dollars or Reference Currency on that day," as "GGCI had never required him to do [so] during their two year relationship." *Id.* ¶ 140. Ultimately, GGCI "offered to accept Ver's digital assets and shares

as collateral, but only if he *over*-collateralized his position" by 300% if Ver paid in digital assets or 600% if Ver paid in private shares. *Id.* ¶ 141.

Due to this request, "Ver began to suspect GGCI's insolvency," and subsequently requested on a June 25 call that GGCI show proof of solvency. *Id.* ¶¶ 142-144. Also on June 25, Silbert messaged DCG personnel, "[w]e just can't allow people inside or outside [to] question Genesis' solvency," in direct response to Ver having just done so. *Id.* ¶ 145. Ver alleges that "GGCI was insolvent on June 25 and was therefore unable to provide Ver with proof of its solvency." *Id.* ¶ 147; *see id.* ¶ 148 ("GAP had just lost its bid to freeze 3AC assets in the emergency arbitration hearing on June 21. At the very latest, GAP should have written down their impaired 3AC loans by such date, which would have resulted in GGCI also writing down any related party loans with GAP.").

On June 27 and June 28, Moro emailed DCG and Genesis Global executives, including Silbert, discussing balance sheet and liquidity management. *Id.* ¶¶ 149-150. On June 28, "after Ver had informed GGCI that he was not comfortable sending any further collateral without proof of GGCI's solvency," GGCI provided the following "unaudited point in time financial statement" known as a "statement of financial condition" as of June 20 (the "June 20 SOFC"), *id.* ¶ 152:

**Genesis Global Capital International Limited**
**Statement of Financial Condition (Unaudited)**
**June 20, 2022**
*(in thousands)*

| Assets | | |
|---|---|---|
| Cash | $ | 12,929 |
| Investments in digital currencies | | 1,594,209 |
| Derivative assets | | 442,733 |
| Collateral receivable | | 454,449 |
| Receivable from customers | | 159,182 |
| Loans receivable | | 399,560 |
| **Total assets** | $ | 3,063,062 |
| | | |
| **Liabilities and stockholder's equity** | | |
| **Liabilities** | | |
| Collateral payable | $ | 2,094,617 |
| Payable to customers | | 94,569 |
| Loans payable | | 606,477 |
| Derivative liabilities | | 167,132 |
| **Total liabilities** | $ | 2,962,795 |
| | | |
| **Stockholder's equity:** | | |
| Total stockholder's equity | | 100,267 |
| **Total liabilities and stockholder's equity** | $ | 3,063,062 |

After Ver's representatives sent GGCI and Genesis Global employees questions regarding the firms' finances, an unnamed employee of both GGCI and Genesis Global responded on June 30. *Id.* ¶¶ 154-155. The Third-Party Complaint alleges that, "[a]t the direction of Moro, Silbert and the Genesis Entities," this employee "made a number of representations[]," including that GGCI had hedged its exposure to digital assets and that it "was business as usual," despite the market instability. *Id.* ¶ 155.

"Faced with an apparently solvent GGCI . . . Ver saw no choice but to keep his remaining positions open at GGCI and cooperate with it . . . until his remaining options expired, unless and until he was presented with evidence of its insolvency." *Id.* ¶ 156. But according to Ver, "the June 20 SOFC was an accounting farce," as GGCI's digital assets were "worth far less" than the statement represented. *Id.* ¶ 157. To address this reality, "GGCI entered into discussions with its parent companies for an injection of capital to return it to solvency in time for its quarterly reporting obligations at the end of June." *Id.* ¶ 160.

### 4.  The DCG Promissory Note

On June 30, 2022, DCG executed an unsecured promissory note (the "DCG Promissory Note") payable to Genesis Global in the amount of $1.1 billion.  *Id.* ¶ 164.  Silbert signed the Promissory Note on behalf of DCG, and Moro signed it on behalf of Genesis Global.  *Id.* ¶¶ 165-166.  The terms of the note include a ten-year duration and a 1% interest rate.  *Id.* ¶ 167.  Genesis Global added the DCG Promissory Note to its balance sheet as an asset worth $1.1 billion, and injected $151 million into GGCI.  *Id.* ¶¶ 168-169.  In an unaudited Statement of Financial Condition as of June 30 (the "June 30 SOFC"), GGCI recorded this $151 million injection in an entry listed as "Other assets," *id.* ¶ 169:

**GGC International Limited**
**Statement of Financial Condition**
**June 30, 2022**
*(in thousands)*

| Assets | | |
|---|---|---|
| Cash | $ | 3,232 |
| Investments in digital currencies and trusts | | 1,439,363 |
| Digital currency loans receivable, net of allowance for loan losses | | 1,250 |
| USD loans receivable, net of allowance for loan losses | | 1,900 |
| Digital currency collateral receivable | | 340,389 |
| Derivative assets | | 369,045 |
| Interest receivable, net of allowance | | 2,758 |
| Receivables from related parties | | 47,334 |
| Other assets | | 151,977 |
| **Total assets** | $ | 2,357,248 |
| | | |
| **Liabilities and member's equity** | | |
| **Liabilities** | | |
| Digital currency loans payable | $ | 370,737 |
| Digital currency collateral payable | | 891,080 |
| USD loans payable | | 18,073 |
| Option collateral payable | | 344,169 |
| Derivative liabilities | | 191,864 |
| Interest payable | | 5,645 |
| Accounts payable and accrued expenses | | 295,894 |
| Payables to related parties | | 225,364 |
| **Total liabilities** | | 2,342,826 |
| | | |
| Member's equity | | 14,422 |
| Total member's equity | | 14,422 |
| **Total liabilities and member's equity** | $ | 2,357,248 |

Ver alleges that "the fair market value of the DCG Promissory Note was just a small fraction of the $1.1 billion face amount," and therefore "Genesis Global remained insolvent even upon receipt of the DCG Promissory Note." *Id.* ¶ 171. Moreover, as alleged, the fair market value of the $151 million injection was "worth just a fraction of its reported face value" because "its value was derived from the DCG Promissory Note," and thus the injection was insufficient to resolve GGCI's solvency issue. *Id.* ¶ 172.

On July 6, 2022, Moro released a public statement on Twitter (the "Moro July 6 Tweet"; together with the Moro June Tweets, the "Moro Tweets"), which confirmed that 3AC had caused losses to Genesis in June. *Id.* ¶ 174. But Moro said that "[s]ince then, we worked with [DCG] to find the optimal strategy to further isolate the risk. DCG has assumed certain liabilities of Genesis related to this counterparty to ensure we have the capital to operate and scale our business for the long term." *Id.* (emphasis omitted). Ver alleges that "DCG's COO and Head of Communications edited and helped draft these tweets. Silbert reviewed these tweets before Moro posted them." *Id.* ¶ 175. Ver alleges that this statement was "misleading" because DCG had not "assumed" the 3AC losses, but had "replaced that liability with an illiquid ten-year Promissory Note." *Id.* ¶¶ 176-177.

According to Ver, Genesis Global personnel "grew concerned that Genesis Global had provided false information to counterparties," including Ver. *Id.* ¶ 186. Ver alleges that he "was misled into believing that GGCI was solvent by the June 20 SOFC and Genesis CEO Moro's public statements," and that he "was thus unable to timely exercise his contractual right to terminate the ISDA due to GGCI's violation of the Solvency Requirement." *Id.* ¶ 187. Ver also says that "[f]rom June 21, 2022 up until he discovered GGCI's insolvency in December 2022, Ver made payments to GGCI in excess of $60 million and GGCI liquidated a further $50,000,000 in collateral." *Id.* ¶ 188.

### 5. Ver's Concerns with GGCI's Solvency

Ver alleges that the collapse of FTX and Alameda in November 2022 ultimately led him to question whether GGCI's representations of solvency were accurate. On December 23, 2022, "just weeks after Ver made $37 million in collateral payments to GGCI, and just one week before his options would expire," Ver reviewed a *New York Times* interview with Samuel Bankman-Fried, FTX's former CEO, who "stated that Alameda had repaid a $2.5 billion loan to 'Genesis' that August . . . because Genesis had called in specific loans made to Alameda." *Id.* ¶¶ 194-195.

Ver "became concerned that GGCI might have been the entity that lent money to Alameda, potentially affecting GGCI's present solvency and their solvency in June 2022." *Id.* ¶ 196.

As Ver at the time "was considering rolling his expiring December 30 options with GGCI to a later date, he wanted to be sure GGCI remained solvent before doing so, and wanted to further confirm they had in fact been solvent that past June when he initially inquired." *Id.* ¶ 200. Ver inquired with GGCI about its solvency in the wake of the FTX and Alameda bankruptcies, and GGCI responded that it remained solvent and the funds in question had been repaid to another Genesis entity. *Id.* ¶¶ 201-203. Ver then "demanded proof of GGCI's present solvency, and demanded GGCI provide proof as to how they valued the assets on its June SOFC," reminding GGCI that "he had faithfully paid in excess of $60 million in additional collateral since June, believing it his legal obligation to do so since GGCI remained solvent, including $37 million dollars in payments just weeks prior." *Id.* ¶¶ 204-205. In response, GGCI "produced to Ver its 2021 audited financials, as well as an unaudited SOFC dated June 30, 2022." *Id.* ¶ 207. Ver alleges that both documents contain financial discrepancies. *Id.* ¶¶ 209-222.

Ver alleges that "[u]ltimately, discussions with GGCI made clear that GGCI hadn't applied any discount to the digital assets on its SOFC," and that "[a]t one point, GGCI personnel even admitted that they 'may have been underwater for a few days.'" *Id.* ¶¶ 229-230. Ver maintains that "[h]ad GGCI applied appropriate discounts to its digital assets . . . its SOFC would have revealed its insolvency," and that "[a]s a result, Ver would have closed his positions to avoid trading with an insolvent counterparty and saved tens of millions of dollars." *Id.* ¶¶ 231-232.

## B.    Procedural History

Ver filed his Third-Party Complaint against Silbert, DCG, and Moro in the New York Supreme Court, New York County, on December 27, 2023. Dkt. 1-17. The Third-Party Complaint

contains three counts. Count One asserts a claim for fraud, alleging that "Silbert, Moro, and DCG crafted and issued a number of misrepresentations through a series of tweets," identifying four alleged misrepresentations. TP Compl. ¶ 234. Ver asserts that he "relied, in part, on the public statements of Moro and Silbert when deciding to continue to maintain his option positions at GGCI." *Id.* ¶ 236. Ver avers that "[h]ad Silbert and Moro accurately represented the financial condition of the Genesis Entities in their various statements, Ver never would have continued to make payments to maintain his option positions and would have avoided the loss of additional collateral by closing out his positions." *Id.* ¶ 238.

Count Two asserts a claim for civil conspiracy to commit fraud, stating that "GGCI and the Genesis Entities made a series of misrepresentations both directly to Ver and in the public with the intent to lull Ver and others into a false sense of security and remain invested in his open option positions, despite the fact that they were aware that GGCI and the Genesis Entities were insolvent." *Id.* ¶ 241. Ver alleges that "[t]he Third-Party Defendants and Counter-Defendants[4] combined and agreed with each other and/or others to defraud Ver by intentionally misrepresenting the solvency of the Genesis Entities," and that "[p]ursuant to their agreements, explicit or otherwise, Third-Party Defendant and Counter-Defendants acted in concert to support their common purpose of defrauding Ver so that he would maintain his positions with GGCI, despite their insolvency at the time." *Id.* ¶¶ 242-243.

Count Three asserts a claim for aiding and abetting fraud, contending that "Counter-Defendants have committed fraud by making intentional misrepresentations with knowledge of their falsity in an effort to induce Ver to maintain his option positions with GGCI, which he did to

---

[4] The Third-Party Complaint does not define the term "Counter-Defendants," but the Court assumes that this refers to Counterclaim-Defendant GGCI.

his detriment," and that the "Third-Party Defendants coordinated with and were aware of the intentional misrepresentations made to Ver." *Id.* ¶¶ 249-250.  Ver alleges that "Third-Party Defendants provided substantial assistance and encouragement, materially contributed to, and otherwise aided and abetted this fraud by making intentionally misleading and inaccurate representations to Ver, and the public, regarding the solvency of the Genesis Entities." *Id.* ¶ 251.

The Third-Party Defendants were served on January 29, 2024, Dkt. 1 ¶ 9, and on February 28, 2024, Silbert and DCG removed this case to federal court, Dkt. 1.  On April 18, 2024, Moro moved to dismiss the Third-Party Complaint.  Dkts. 29, 30 ("Moro MTD").  On May 2, 2024, the DCG Defendants also moved to dismiss the Third-Party Complaint.  Dkts. 36, 37 ("DCG MTD").  Ver filed his opposition to Moro's motion on May 16, 2024, Dkt. 38 ("Opp. to Moro MTD"), and his opposition to the DCG Defendants' motion on May 30, 2024, Dkt. 39 ("Opp. to DCG MTD").  Moro filed his reply on June 6, 2024, Dkt. 40 ("Moro Reply"), and the DCG Defendants filed their reply on June 20, 2024, Dkt. 41 ("DCG Reply").

## II.  Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires a pleading to contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Rule 8 does not demand "detailed factual allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), but to survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550

U.S. at 555.  In making that determination, the Court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor," *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015), but need not accept "legal conclusions" as true, *Iqbal*, 556 U.S. at 678.

When a claim sounds in fraud, a complaint must meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b).  Rule 9(b) requires that "a party must state with particularity the circumstances constituting fraud or mistake," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  In other words, Rule 9(b) requires pleading the circumstances of the fraud and the defendant's mental state. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 171 (2d Cir. 2015).  To satisfy this heightened burden, the complaint must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent."  *Id.* (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004)).  In terms of a defendant's mental state, the complaint must allege facts "that give rise to a strong inference of fraudulent intent."  *Id.* (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006)).  Courts view the alleged facts "in their totality, not in isolation."  *Id.* (citation omitted).

### III.  Discussion

### A.   Fraud Claim

To state a claim of common law fraud under New York law, a plaintiff must allege "(1) a material misstatement, (2) known by the perpetrator to be false, (3) made with an intent to deceive, (4) upon which the plaintiff reasonably relies, and (5) damages."  *Quiroz v. Beaverton Foods, Inc.*, No. 17 Civ. 7348 (NGG), 2019 WL 1473088, at *10 (E.D.N.Y. Mar. 31, 2019) (internal quotation

marks omitted) (quoting *Rotterdam Ventures v. Ernst & Young LLP*, 752 N.Y.S.2d 746, 747-48 (3d Dep't 2002)).  For purposes of this Opinion and Order, the Court focuses on the fourth of these elements, reasonable reliance.[5]  "[A] fraud claim requires the plaintiff to have relied upon a misrepresentation by a defendant to his or her detriment."  *Pasternack v. Lab. Corp. of Am. Holdings*, 59 N.E.3d 485, 493 (N.Y. 2016).  "[R]eliance does not simply involve a state of mind; it involves specific action or inaction, and therefore must be pleaded with particularity."  *In re Bear Stearns Cos. Sec., Derivative, & ERISA Litig.* ("*In re Bear Stearns*"), 995 F. Supp. 2d 291, 313 (S.D.N.Y. 2014).[6]

Count One advances a fraud claim predicated on "Silbert, Moro, and DCG craft[ing] and issu[ing] a number of misrepresentations through a series of tweets."  TP Compl. ¶ 234.  The Third-Party Complaint does not specify which tweets the fraud claim is predicated on, but it presumably is referring to the Genesis June 15 Tweet, which Silbert and DCG both re-tweeted, *id.* ¶¶ 131-132, and the Moro Tweets, *id.* ¶¶ 134-135, 174.  While the Third-Party Complaint alleges that the statements in those tweets were inaccurate in a number of ways, *id.* ¶ 234 (identifying inaccuracies in the Genesis June 15 Tweet and Moro Tweets), only two allegations support reliance.  First, "Ver relied, in part, on the public statements of Moro and Silbert when deciding to continue to maintain

---

[5] Although Moro and the DCG Defendants also argue alternate grounds for dismissing Ver's fraud claim, *see* Moro MTD at 9-18; DCG MTD at 9-18, the Court will not pass on those grounds herein given its conclusion that any allegations of reliance are plainly lacking.  Likewise, the Court does not reach Moro's alternative argument that Ver disclaimed reliance on extracontractual representations in the MCA.  Moro MTD at 17.

[6] The parties assume that Rule 9(b) applies to all elements of the fraud claim.  "The Second Circuit has not yet determined whether Rule 9(b)'s heightened pleading requirement applies to allegations of reliance in connection with a common law fraud claim."  *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 463 n.16 (S.D.N.Y. 2018).  But "[s]everal district courts in this district and at least one circuit, the Fourth Circuit, have held that a complaint must allege with particularity that [the plaintiff] actually relied upon the defendant's supposed misstatements."  *In re Fyre Festival Litig.*, 399 F. Supp. 3d 203, 216 (S.D.N.Y. 2019) (internal quotation marks omitted) (collecting cases).  The Court agrees with that approach.

his option positions at GGCI." *Id.* ¶ 236.  Second, "[h]ad Silbert and Moro accurately represented the financial condition of the Genesis Entities in their various statements, Ver never would have continued to make payments to maintain his option positions and would have avoided the loss of additional collateral by closing out his positions." *Id.* ¶ 238; *see* Opp. to Moro MTD at 16-17 (citing these two allegations to support reliance).

These allegations are insufficient to plead reliance on the allegedly misleading statements. Most significantly, Ver's allegations are "conclusory and generalized to all alleged misstatements" made by the Third-Party Defendants.  *In re Fyre Festival Litig.*, 399 F. Supp. 3d at 216; *see Int'l Fund Mgmt. S.A. v. Citigroup, Inc.*, 822 F. Supp. 2d 368, 386-87 (S.D.N.Y. 2011) (holding that "conclusory" allegations are insufficient to support a claim for fraud under New York common law and misstatements under Section 18 of the Securities Exchange Act).  The Third-Party Complaint is conspicuously lacking in details of "when and how [Ver] relied upon the [challenged] statement."  *In re Fyre Festival Litig.*, 399 F. Supp. 3d at 217.  In fact, as the DCG Defendants correctly point out, the Third-Party Complaint does not even allege that Ver read or reviewed the Genesis June 15 Tweet and the Moro Tweets.  DCG MTD at 9-10.  While it may be a reasonable inference that Ver read these tweets if he allegedly relied upon them, his failure to advance particular allegations concerning that review is problematic for pleading reliance, for a number of reasons.

Assuming Ver read the tweets, the date *when* he did so is essential to assessing the role that the content of the tweets, as opposed to other representations made to Ver by GGCI about its solvency, played in Ver's ultimate decision to maintain his option positions.  *See In re Fyre Festival Litig.*, 399 F. Supp. 3d at 217 ("Because plaintiffs have not alleged that they knew of [the allegedly misleading] Tweet, the Court cannot infer that any of their actions, including further

expenditure of funds, were made in reliance on [that] Tweet, as opposed to earlier statements that have been determined to be non-actionable or were made by others."). This absence of any allegation concerning Ver's actual review of the tweets is fatal to his pleading of reliance. *See id.* at 216-17 (collecting cases) ("Because there is no assertion that any plaintiff saw, read, or otherwise noticed [the tweet in question], there is no allegation that there was actual reliance at all." (internal quotation marks omitted)); *see also id.* at 217 ("Broad assertions of reliance on multiple misstatements covering at least a four-month period of time are insufficient.").

Ver's reliance-related allegations also "lack supporting factual matter indicating *how* [he] relied on the alleged misrepresentations." *Int'l Fund Mgmt.*, 822 F. Supp. 2d at 386 (emphasis added). The Third-Party Complaint challenges the conduct of multiple parties with few specific factual allegations about any particular party's misrepresentation and how it impacted Ver's decision to maintain his option positions. Underscoring this issue, Ver never ties the allegedly misleading tweets to any particular decision to post additional collateral or roll his options. *See SRM Glob. Master Fund Ltd. P'ship v. Bear Stearns Cos.*, 829 F.3d 173, 177-78 (2d Cir. 2016) (explaining that factual allegations that the plaintiff "relied on the misrepresentations . . . in its analysis of [the defendant] and in deciding whether it should purchase [the defendant's] securities" were not properly pleaded because the plaintiff failed to allege that he "actually purchased or sold stock, or actually entered into or unwound a swap agreement, in reliance on the defendants' misrepresentations"); *In re Bear Stearns*, 995 F. Supp. 2d at 309 (dismissing claims brought under Section 18 of the Securities Exchange Act where the plaintiff "does not link [his] review of any particular statements . . . to any actual [transaction] and does not identify a particular transaction that [he] allegedly made in reliance on the" statement in question). While Ver suggests that all his trading with GGCI from mid-June 2022 to late December 2022 relied in part on the tweets in

question, TP Compl. ¶ 236, he fails to explain why that is the case, especially considering the highly volatile market conditions at the time.  Moreover, by not advancing specific allegations about how the tweets affected his actions or inactions, Ver has "fail[ed] to provide [the Third-Party Defendants] notice of when and how [he] relied upon the statement[s]."  *In re Fyre Festival Litig.*, 399 F. Supp. 3d at 217.  In short, Ver's generic assertion that he would have changed his behavior if events had been different is not sufficient to satisfy the pleading requirements of Rule 9(b).

In his briefs, Ver urges the Court to view these conclusory statements "in light of" Ver's "repeated requests for assurances as to GGCI's solvency and refusal to pay on his contract until such assurances were provided."  Opp. to DCG MTD at 15-16; *see* Opp. to Moro MTD at 17 (same).  But the Third-Party Complaint contains no allegation linking Ver's communications with GGCI to his reliance on Moro's and the DCG Defendants' tweets.  And to the extent that Ver is asking the Court to connect these disparate portions of the pleading to draw an inference of reliance (a request Ver does not explicitly make), these particularized allegations would seem to support the inference that Ver *did not* rely on the tweets re-tweeted or sent by Silbert, DCG, and Moro when deciding to continue trading with GGCI.

Importantly, the Genesis June 15 Tweet and the Moro June Tweets were made on June 15 and June 17.  TP Compl. ¶¶ 131, 134.  But Ver alleges that he only "began to suspect GGCI's insolvency" after GGCI "changed their policy" regarding the collateralization of his options on June 24.  *Id.* ¶¶ 139-142.  The Third-Party Complaint further alleges that Ver's concerns about GGCI's solvency was not assuaged until after GGCI had provided the June 20 SOFC on June 28, and that a GGCI employee "made a number of representations" about GGCI's solvency on June 30.  *Id.* ¶¶ 152-156.  As alleged, Ver's decision to keep his remaining positions open with GGCI and post additional collateral was made at that point, *id.* ¶ 156—several days before the Moro July

6 Tweet concerning the DCG Promissory Note, *see id.* ¶ 174.  Thus, these allegations would all lead the Court to draw a critically different inference than what Ver desires: it was GGCI's alleged misrepresentations, not anything in the Genesis June 15 Tweet or the Moro Tweets, which led Ver to maintain his positions and post additional collateral.  *See Terra Sec. Asa Konkursbo v. Citigroup, Inc.*, 740 F. Supp. 2d 441, 448 (S.D.N.Y. 2010) (explaining that "[t]o determine, on a motion to dismiss, whether a plaintiff has alleged reasonable reliance, a court may 'consider the entire context of the transaction'" (quoting *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir. 2003))).

"Simply put, what the [Third-Party] Complaint lacks are factual allegations that indicate how [Ver] changed h[is] behavior in response to believing Defendants' alleged misrepresentations."  *Bocci v. Nationstar Mortg. LLC*, No. 23 Civ. 1780 (JPC) (KHP), 2024 WL 4326932, at *13 (S.D.N.Y. Sept. 27, 2024).  Thus, dismissal of Count One is appropriate.  *See, e.g.*, *SRM Glob. Master Fund Ltd.*, 829 F.3d at 178 (affirming the dismissal of a fraud claim where the plaintiff failed to identify "any part of its complaint that adequately alleges reliance on any misrepresentations").

## B.  Derivative Claims

Count Two alleges that Moro and the DCG Defendants engaged in a civil conspiracy to commit fraud, while Count Three alleges that these Defendants aided and abetted fraud.  *See* TP Compl. ¶¶ 240-254.  Both claims pertain to Moro and the DCG Defendants allegedly assisting or conspiring in the intentional misrepresentation of the solvency of the Genesis Entities, including GGCI.  *See id.* ¶ 242 ("The Third-Party Defendants and Counter-Defendants combined and agreed with each other and/or others to defraud Ver by intentionally misrepresenting the solvency of the Genesis Entities."); *id.* ¶ 251 ("During all relevant times to this matter, Third-Party Defendants

provided substantial assistance and encouragement, materially contributed to, and otherwise aided and abetted [the Counter-Defendants'] fraud by making intentionally misleading and inaccurate representations to Ver, and the public, regarding the solvency of the Genesis Entities.").

As is evident from these allegations, the aiding and abetting claim overlaps with the conspiracy claim. "In cases in which Plaintiffs' aiding and abetting claims overlap with their conspiracy claims, New York courts have allowed the aiding and abetting claims to proceed, but have dismissed as duplicative the conspiracy claims." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC* ("*Lorely*"), No. 12 Civ. 3723 (RJS), 2016 WL 5719749, at *8 (S.D.N.Y. Sept. 29, 2016). The Court agrees with the DCG Defendants that the claim for conspiracy is duplicative of the aiding and abetting claim. DCG MTD at 24. Both claims stem from the same set of facts: that Moro and the DCG Defendants assisted GGCI in GGCI's fraud against Ver by concealing its insolvency, which is the subject of Ver's counterclaims against GGCI in this case.

In opposing dismissal, Ver argues that "the means by which each was achieved differs significantly," because "[t]he aiding and abetting claim is based on the DCG Defendants' provision of a sham promissory note, while the conspiracy claim is based on the DCG Defendants' orchestration of a misinformation campaign designed to mislead customers and conceal GGCI's insolvency." Opp. to DCG MTD at 25. But Ver's argument does not address how the Third-Party Complaint pleads these two Counts. Both Counts, as pleaded, concern the same intentional misrepresentation, *see* TP Compl. ¶¶ 242, 251, and Ver cannot amend his pleading of those Counts through unsworn representations of his counsel in opposing the motion to dismiss, *see, e.g.*, *Peacock v. Suffolk Bus Corp.*, 100 F. Supp. 3d 225, 231 (E.D.N.Y. 2015). The Court also agrees with the DCG Defendants, *see* DCG Reply at 9-10, that, even were these Counts strategically pleaded so as to cite only to different allegations, the Third-Party Complaint makes clear that the

22

"conspiracy claim[] add[s] no new allegations distinct from those underlying [Ver's] fraud and aiding and abetting fraud claim[]," and therefore dismissal of the civil conspiracy claim is warranted as duplicative of the aiding and abetting claim. *Pentacon BV v. Vanderhaegen*, 725 F. Supp. 3d 350, 388-89 (S.D.N.Y. 2024) (internal quotation marks omitted).

Moro's contention that the aiding and abetting claim also should be dismissed as duplicative of the fraud claim in Count One fails, however. *See* Moro MTD at 18-19. Ver's fraud claim pertains to the alleged direct misrepresentations made in the challenged tweets, *see* Opp. to Moro MTD at 18, while the aiding and abetting claim is premised both on those misrepresentations, TP Compl. ¶ 251, and the Third-Party Defendants' coordination of *GGCI*'s misrepresentations to Ver concerning GGCI's solvency, *id.* ¶¶ 249-250. Moreover, "as many federal and state cases have recognized, Plaintiffs may plead aiding and abetting fraud in the alternative to their underlying fraud claim," and "New York courts have been particularly reluctant to dismiss aiding and abetting claims at the pleading stage, so long as plaintiffs do not merely allege that defendants aided and abetted their own fraud, but rather, premise the aiding and abetting claims on different conduct." *Loreley*, 2016 WL 5719749, at *6 (alterations adopted and internal quotation marks and citations omitted). Since Ver's aiding and abetting claim "also allege[s] acts of substantial assistance that are distinct from the alleged misrepresentations and omissions that are actionable under [Ver's] claim for fraud," it is not impermissibly duplicative with the primary fraud claim. *Id.*

This leaves the issue of whether the aiding and abetting claim in Count Three is properly pleaded. It is not. The elements of an aiding and abetting fraud claim under New York law are "(1) the existence of a fraud; (2) [Defendants'] knowledge of the fraud; and (3) that [Defendants] provided substantial assistance to advance the fraud's commission." *Krys v. Pigott,* 749 F.3d 117,

127 (2d Cir. 2014) (internal quotation marks omitted).  Ver's pleading of this claim must satisfy Rule 9(b)'s particularity requirements.  *See Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292-93 (2d Cir. 2006).

Assuming *arguendo* that Ver has a viable fraud claim against GGCI predicated on its representations to Ver regarding GGCI's solvency (an issue which is still being litigated), the Court agrees with Moro and the DCG Defendants that Ver has still failed to plead with particularity an aiding and abetting claim.  The issues here are twofold and mutually reinforcing.

First, the majority of Ver's allegations regarding Moro's and the DCG Defendants' participation in GGCI's alleged wrongdoing rely on improper group pleading.  *See In re Platinum-Beechwood Litig.*, 427 F. Supp. 3d 395, 449 (S.D.N.Y. 2019) ("Generally, to meet the Rule 9(b) . . . pleading standards, more specificity is required than the broad and group-pled allegations quoted above."); Moro MTD at 20; DCG MTD at 21.  Indeed, as the Court's factual recitation *supra* reflects, the Third-Party Complaint is imprecisely drafted and forces the Court to speculate about what Ver means by a number of terms, underscoring the group pleading issue.  *See In re Platinum-Beechwood Litig.*, 427 F. Supp. 3d at 449 n.9 ("The fact that the Court has to speculate on what 'them' refers to underscore[s] a problem with this type of broad and group-pled allegations.").  Count Three itself advances no specific allegations concerning any of the Third-Party Defendants, simply stating that "[d]uring all relevant times to this matter, Third-Party Defendants coordinated with and were aware of the intentional misrepresentations made to Ver," and "Third-Party Defendants provided substantial assistance and encouragement, materially contributed to, and otherwise aided and abetted this fraud by making intentionally misleading and inaccurate representations to Ver, and the public, regarding the solvency of the Genesis Entities."

TP Compl. ¶¶ 250-251.  "These allegations rely on impermissible group pleading that does not satisfy Rule 9(b)."  *In re Platinum-Beechwood Litig.*, 427 F. Supp. 3d at 453.

Nor are the supporting allegations in the body of Ver's Third-Party Complaint more specific.  While the Third-Party Complaint contains particular allegations regarding the Third-Party Defendants' participation in alleged wrongdoing concerning the equity issues in the Genesis Entities broadly, once the allegations move to their knowledge of and participation in *GGCI*'s alleged fraudulent misrepresentations to Ver—the non-duplicative alleged fraud that the aiding and abetting claim is pleaded to be derivative of—the allegations Ver advances are non-specific and generalized.  *See, e.g.*, TP Compl. ¶ 122 ("On information and belief, Genesis knew GGCI was insolvent by [early June 2022].");  *id.* ¶ 155 ("At the direction of Moro, Silbert and the Genesis Entities, an employee of both GGCI and Genesis Global, and, upon information and belief, other Genesis Entities, made a number of representations[].").  By containing only unspecified and general allegations concerning Moro's and the DCG Defendants' involvement in the particular acts that give rise to Ver's primary fraud claim against GGCI, the Third-Party Complaint fails to satisfy Rule 9(b) as to Count Three.  *See In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 147 (S.D.N.Y. 2021) ("[W]hen fraud is alleged against multiple defendants, a plaintiff must set forth separately the acts complained of by each defendant.  A complaint may not simply clump defendants together in vague allegations to meet the pleading requirements of Rule 9(b)." (internal quotation marks omitted)).  "The failure to isolate the key allegations against each defendant supports dismissal" under Rules 9(b) and 12(b)(6).  *Id.* (internal quotation marks omitted).

This naturally leads to the second issue: the absence of such particularized allegations reflects insufficient pleading of Moro's and the DCG Defendants' "substantial assistance to

advance the fraud's commission." *Krys,* 749 F.3d at 127 (internal quotation marks omitted). Focusing on this element, Ver primarily points to the particularized allegations regarding the $1.1 billion "illusory promissory note" that DCG issued.  Opp. to Moro MTD at 19; Opp. to DCG MTD at 20.   But the Third-Party Complaint and Ver's opposition briefs never adequately tie the allegations surrounding the DCG Promissory Note to the specific alleged fraud perpetrated by GGCI.  While Ver argues that Moro signed and accepted the DCG Promissory Note and therefore "provided substantial assistance to GGCI's efforts to conceal their insolvency," Opp. to Moro MTD at 19, the Third-Party Complaint alleges that Moro "signed the Promissory Note as the CEO of Genesis Global and Genesis Holdco, and as director of Genesis Asia Pacific," not in any capacity at GGCI, TP Compl. ¶ 166.  Ver responds to the Third-Party Defendants' arguments that the DCG Promissory Note does not concern GGCI, by pointing to his allegation that "$151 million of the DCG Promissory Note ended up on GGCI's balance sheet."  Opp. to DCG MTD at 20.  But as the DCG Defendants note, the Third-Party Complaint advances no allegations regarding the Third-Party Defendants' participation in or knowledge of any transfer of that $151 million from Genesis Global to GGCI.  DCG MTD at 21.

Moreover, Ver's allegation regarding the $151 million injection cannot support his aiding and abetting claim, for a simple reason:[7] the injection is not alleged to be a proximate cause of any

---

[7] Both Moro and the DCG Defendants argue that because the only allegation concerning the DCG Promissory Note's relation to the $151 million injection is pleaded "[o]n information and belief," TP Compl. ¶ 169, this allegation cannot meet Rule 9(b)'s particularity requirements.  *See* Moro Reply at 8; DCG MTD at 20-21.  Rule 9(b), however, does not categorically prohibit allegations pleaded "upon information and belief."  *Amalgamated Nat'l Health Fund v. Hickey Freeman Tailored Clothing, Inc.*, No. 23 Civ. 1428 (GHW), 2024 WL 1330049, at *2 (S.D.N.Y. Mar. 28, 2024) ("As the Second Circuit [has] explained . . . 'despite the generally rigid requirement that fraud be pleaded with particularity, allegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge.'" (quoting *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990))).  While "[t]his exception to the general rule must not be

of Ver's harm. "[E]mbedded into the substantial assistance element is a proximate cause analysis, which requires a showing that a defendant's participation was the proximate cause of plaintiff's injury." *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 346 F. Supp. 3d 473, 487 (S.D.N.Y. 2018) (internal quotation marks omitted and alterations adopted); *see also Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 370 (S.D.N.Y. 2007) (explaining that "substantial assistance is intimately related to the concept of proximate cause" because the substantiality of any assistance is measured "by whether the action of the aider and abettor proximately caused the harm on which the primary liability is predicated"). Here, GGCI's primary fraud liability is predicated on GGCI's intentional misrepresentations to Ver concerning its solvency. *See* TP Compl. ¶ 249 (alleging that GGCI "committed fraud by making intentional misrepresentations with knowledge of their falsity in an effort to induce Ver to maintain his option positions with GGCI, which he did to his detriment").

Yet, these misrepresentations allegedly occurred prior to or contemporaneous with (but without any mention of) the injection. *See* TP Compl. ¶¶ 152-156 (identifying misrepresentations which allegedly occurred on June 28 and June 30); *id.* ¶ 164 (alleging that the DCG Promissory Note was executed on June 30). As alleged, Ver did not even receive the June 30 SOFC, which indicated that the $151 million transfer was made, until late December 2022 after the FTX and Alameda bankruptcies led Ver to have additional concerns about GGCI's solvency. *See id.* ¶¶ 201-214. The Third-Party Complaint contains no allegations that Ver rolled any options over or posted

---

mistaken for license to base claims of fraud on speculation and conclusory allegations," a complaint may nonetheless satisfy Rule 9(b) if it "adduce[s] specific facts supporting a strong inference of fraud" and pleads other facts upon information and belief. *Wexner*, 902 F.2d at 172. Ver does not explain why this allegation meets this standard, but given the context of the Third-Party Complaint's specific allegations surrounding the transfer and the disparity between the June 20 SOFC and the June 30 SOFC, *see* TP Compl. ¶¶ 168-172, the Court will assume that this allegation is properly pleaded.

any additional collateral after he was provided the allegedly fraudulent notification of the $151 million injection, nor does the Third-Party Complaint indicate that GGCI's alleged misrepresentations to Ver concerning its solvency were impacted by the capital injection. Indeed, while Ver insists on "[t]he foreseeability of Ver's reliance," Opp. to DCG MTD at 21, that argument is severely undermined by the failure of Ver to allege how the $151 million injection impacted his reliance at all. Thus, the Third-Party Complaint lacks any indication that Ver's harm was proximately caused by the Third-Party Defendant's action, and therefore has failed to particularly allege substantial assistance. *See Fraternity Fund*, 479 F. Supp. 2d at 370.[8]

Because of these pleading deficiencies, dismissal of the aiding and abetting claim is appropriate.[9]

## IV. Conclusion

For these reasons, Moro's and the DCG Defendants' motions are granted. Ver's Third-Party Complaint is dismissed without prejudice. Because the Third-Party Complaint's relation to

---

[8] To the extent that Ver is contending that the harm was caused by the Moro July 6 Tweet about DCG "assum[ing] certain liabilities of Genesis," TP Compl. ¶ 174 (emphasis omitted), such an aiding and abetting claim would be improperly duplicative of the Ver's primary fraud claim against Moro because the derivative claim would "merely allege that [Moro] aided and abetted [his] own fraud," rather than "premis[ing] the aiding and abetting claims on different conduct." *Loreley*, 2016 WL 5719749, at *6 (internal quotation marks omitted and alteration adopted).

[9] Ver has not requested leave to amend his Third-Party Complaint in the event the Court grants the motions to dismiss. "[E]ven when a party does not ask for leave to amend, the Court may grant leave to amend *sua sponte*." *In re Garrett Motion Inc. Sec. Litig.*, No. 20 Civ. 7992 (JPC), 2022 WL 976269, at *18 (S.D.N.Y. Mar. 31, 2022) (internal quotation marks omitted) (collecting cases). But a district court does not abuse its discretion in failing to *sua sponte* grant a party leave to amend. *See Bruno v. Metro. Transp. Auth.*, 344 F. App'x 634, 636 (2d Cir. 2009) (summary order) (collecting cases). Because the Third-Party Complaint was the basis for this case's removal to federal court, providing leave to file an Amended Third-Party Complaint would necessarily have an impact on whether this case should be remanded upon dismissal. As a result, the Court concludes the most prudent course is not to grant leave to amend *sua sponte*, so as to afford Ver the opportunity to determine whether he would prefer to seek leave to amend or to ask this Court to remand the case to state court.

ongoing bankruptcy proceedings provided the basis for this action's removal from state court, *see* Dkt. 1 ¶¶ 10-16, Ver and GGCI are directed to file simultaneous letter briefs within one week of this Opinion and Order, advising the Court as to their views on whether this action should be remanded to state court. *See Bailey v. AHB Mgmt. Corp.*, No. 22 Civ. 7316 (CBA), 2023 WL 4552462, at *3 (E.D.N.Y. 2023) (remanding to state court after the dismissal of a third-party complaint because the remaining parties "are non-diverse parties" and the remaining claims "are state-law claims" and thus "[t]here is no independent basis for federal subject matter jurisdiction"). The Clerk of Court is respectfully directed to close Docket Numbers 29 and 36.

SO ORDERED.

Dated: January 29, 2025
       New York, New York

_____
JOHN P. CRONAN
United States District Judge

29